JUDGE CARTER

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

14 CV 4463

RECEIVED
JUN 20 2014
U.S.D.C. S.D. N.Y.
CASHIERS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MICHAEL PICARELLA,

                    Plaintiff,

       -against-

HSBC (USA) SECURITIES, INC.,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:

**COMPLAINT**

Plaintiff, Michael Picarella, through his attorneys, Liddle & Robinson, L.L.P., for his complaint against Defendant HSBC (USA) Securities, Inc., alleges:

## THE PARTIES

1.    Plaintiff, Michael W. Picarella, is a 47-year-old male who resides in Melville, New York. He obtained his undergraduate degree in Business Administration from Hofstra University in 1989, and his Masters of Business Administration from Fordham University, with a concentration in Finance and Business Economics, in 1995. He is employed by Defendant HSBC (USA) Securities, Inc., at its New York City headquarters as Senior Vice President of Sales Management, Global Markets (Americas).

2.    Defendant HSBC (USA) Securities, Inc. ("HSBC") is a New York corporation with its principal place of business and New York headquarters at 452 Fifth Avenue, New York, New York 10018.

## NATURE OF THE ACTION

3.     This is a civil action for damages and remedies alleging unlawful retaliation, in violation Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Administrative Code of the City of New York, § 8-101 *et seq.* (the "New York City Human Rights Law" or "NYCHRL"); and the New York State Executive Law, § 290 *et seq.* (the "New York State Human Rights Law" or "NYSHRL").

## JURISDICTION AND VENUE

4.     This Court has original subject matter jurisdiction over the Title VII claims asserted pursuant to 28 U.S.C. §§ 1331 and 1343, because they arise under the laws of the United States and are brought to recover damages for the deprivation of equal rights.

5.     This Court has supplemental jurisdiction over the NYSHRL and NYCHRL claims asserted under the provisions of 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims, and are so related to the federal claims as to form a part of the same case or controversy under Article III of the United States Constitution.

6.     Picarella has exhausted his administrative remedies and complied with all statutory prerequisites to his Title VII claim. He filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on June 27, 2013, and was issued a Notice of Right to Sue on March 25, 2014. Any and all other prerequisites to the filing of this complaint have been met.

7.     Venue is proper in this District under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because the Defendant conducts business and can be found in this district, and a substantial part of the events giving rise to Picarella's claims occurred in the Southern District of New York.

## SUMMARY OF THE ACTION

8.     Picarella was the victim of knowing, intentional retaliation by Defendant HSBC and senior executives that it employed. Such workplace retaliation is unlawful under federal, New York State, and New York City laws prohibiting employment discrimination. Workplace retaliation is a form of unlawful discrimination because the victim of retaliation is treated differently from employees who do not suffer retaliation.

9.     According to the EEOC, unlawful retaliation occurs when an employer takes an adverse action against an employee because that employee has opposed an unlawful employment practice by complaining to the employer about it, or by filing a charge of unlawful employment discrimination with the EEOC.

10.     The Supreme Court has noted that the anti-retaliation provision of Title VII seeks to prevent an employer from suppressing or interfering with an employee's efforts to advance enforcement of the law's basic guarantee of equal employment opportunity, and that it seeks to prevent injury to individuals who complain about or report unlawful employment practices.

11.     Beginning in early 2012, and continuing throughout 2013, Picarella complained to HSBC that a young female co-worker had been the victim of unlawful and debilitating sexual harassment by senior HSBC executives. HSBC responded by retaliating against both Picarella and the female victim of the sexual harassment, identified here as "Jane Doe," by taking employment actions against them that were substantially and materially adverse, causing substantial damage and injury to each of them.

12.     Picarella complained repeatedly to HSBC, often in writing, that Jane Doe was being sexually harassed by HSBC executives. He complained first to one of the harassers, Eileen Hedges, at that time HSBC Senior Vice President and Head of Business Development (Americas), who supervised both Picarella and Jane Doe. When Hedges reacted to Picarella's

complaints with hostility for complaining about her conduct, Picarella took his complaint, beginning in April 2012, to Ellen Weiss, Head of Human Resources for HSBC Global Markets. His complaint that Jane Doe was being sexually harassed by HSBC was later made to other HSBC Human Resources and management executives.

13.     All of Picarella's complaints to HSBC Human Resources and HSBC executives regarding the sexual harassment of Jane Doe were based either on personal knowledge that Picarella acquired as an actual witness to the unlawful conduct, or on information communicated to him during 2012 by Jane Doe or other HSBC employees who knew of the unlawful conduct.

14.     Picarella complained to Weiss that Hedges regularly subjected Jane Doe to sexually explicit and intimidating remarks, and encouraged her to dress provocatively. He complained that Hedges pressured Jane Doe to have sex with male HSBC executives and customers, often at HSBC-sponsored conferences outside of New York City.

15.     Picarella complained to Weiss that Hedges had attempted to intimidate Jane Doe by exposing her own breast in the presence of Jane Doe and Picarella in the HSBC offices. Picarella also complained that Hedges was harassing Jane Doe by spreading false and defamatory information about her in the HSBC offices – including falsely stating to co-workers that Jane Doe was having sex with bank clients when Hedges and Jane Doe traveled to bank functions outside of the United States.

16.     Picarella complained to Weiss that Hedges' intimidating remarks to Jane Doe included discussing intimate details of her sexual relationship with her husband, and that Hedges repeatedly disclosed to Jane Doe explicit sexual details of her extramarital relationships with senior male HSBC executives, including HSBC's former Chief Financial Officer of Global Banking and Markets Americas.

17.     Picarella complained to Weiss that Hedges attempted to expose Jane Doe's breasts to male bank employees by pulling her blouse down at an office function, and that Hedges struck Jane Doe on the buttocks severely enough to frighten her.

18.     A few months later, Picarella reported these complaints to Weiss' supervisor, Mary Bilbrey, Head of HSBC USA Human Resources, and to Hedges' supervisor, Pablo Pizzimbono, HSBC Head of Sales, Global Markets Americas. Picarella also complained at that time that Hedges had pressured Jane Doe to have sex with HSBC's Head of Global Markets Sales, HSBC Mexico, at an HSBC conference in Florida, and those sexual advances against Jane Doe by that male senior executive followed that same night.

19.     As a direct result of Picarella's complaints that Jane Doe was being sexually harassed, and in violation of federal and state law and its own Human Resources policies, HSBC retaliated against Picarella in the months that followed his complaints, as described below, by taking a series of materially adverse actions against him in nearly every aspect of his job. These adverse employment actions included significantly diminishing his material job responsibilities, assigning him clerical tasks, and excluding him repeatedly from important departmental meetings.

20.     These retaliatory acts included HSBC executives spreading demeaning, false and defamatory information about Picarella among his fellow employees, which resulted in substantial damage to his reputation and earning capacity.

21.     In gross, the series of retaliatory acts described herein have effectively destroyed Picarella's once-promising career in the financial services industry. Before being recruited to HSBC, Picarella rose from early roles as Analyst then Vice President at Morgan Stanley, to the position of Director at Lehman Brothers before joining HSBC as a Senior Vice President. Since

joining HSBC, his progress has been frozen. He has not been promoted, and has not received any meaningful increase in salary or incentive compensation – despite HSBC's promise when he was recruited from Barclay's that he would be promoted to Managing Director.

22.     Instead, HSBC retaliated against Picarella by effectively demoting him. HSBC required Picarella to report to a supervisor with ten years less experience, which diminished his responsibilities. HSBC selected a younger and less qualified employee over Picarella to replace Hedges when she was reassigned. HSBC executives disparaged Picarella to his peers, did not assign him new work, severely reduced his assignments and responsibilities, and removed him from client-related planning, meetings and communications. The retaliation included HSBC directives that Picarella not attend critical staff and client meetings, removing Picarella from his position as chair of his department's Hedge Fund Governance Committee, and deliberately removing Picarella's name from his own department's organizational chart.

23.     HSBC's unlawful retaliation against Picarella included publicly monitoring his email communications, and falsely reporting to his peers that he was "in trouble," that he was "a problem in the organization," and that he did not add "value to the company." HSBC also retaliated against Picarella by telling his co-workers that "he did not have a future at the bank" after he had complained about and opposed the pervasive sexual harassment of his young female co-worker by senior HSBC executives.

24.     After Picarella exercised his right to file a Charge of Discrimination with the EEOC in June 2013, complaining that HSBC had unlawfully retaliated against him for complaining about the sexual harassment of his female co-worker, HSBC continued its pattern of retaliation against him.

25.     As a result of these unlawful employment practices, Picarella has been stripped of most, if not all, of his significant job responsibilities at HSBC, severely damaging his earning capacity and career. HSBC's campaign of retaliation and disparagement has caused Picarella severe and lasting reputational damage, loss of earnings and earning capacity, and severe mental and emotional distress.

26.     Equally egregious, HSBC used its internal investigation of Jane Doe's and Picarella's sexual harassment complaints to further damage Picarella and Jane Doe rather than to protect them. HSBC's internal investigation became a tool of retaliation rather than protection for Jane Doe and Picarella. HSBC turned the internal investigation of the misconduct of senior HSBC executives into a campaign to falsely impugn Jane Doe's character, and disclosed Picarella's complaints – which were made with the expectation of confidentiality – throughout the company, including to the many employees it and its outside counsel contacted during that investigation.

27.     As a result, the fact that Picarella had complained to HSBC Human Resources about the unlawful sexual harassment of Jane Doe described above was widely known by Picarella's managers, including Hedges, Suzy White (COO, Global Markets Americas), Pizzimbono, Michael Karam (SVP, Business Manager, Metals Sales and Trading), and other HSBC employees who initiated the acts of retaliation described herein.

28.     The unlawful retaliation described herein was undertaken by HSBC in knowing violation of federal, state, and local law, and in knowing disregard of HSBC Corporate Human Resources Policies specifically prohibiting such conduct.

29.     HSBC Human Resources Policies include the following **Fundamental Principle**:

> In all its endeavors, it is the policy of HSBC . . . to act honestly and
> fairly at all times. It is the Corporation's policy to comply with the
> spirit as well as the letter of all applicable laws and regulations in
> all that it does. Each employee of the Corporation is expected to do
> the same . . . All employees are responsible for ensuring that the
> working environment is free from any form of harassment,
> discrimination, or inappropriate behavior.

30.     HSBC Human Resources Policies thus specifically prohibit retaliation in any form

against an employee who "makes a report of alleged harassment . . .," noting that such retaliation

is a "serious violation of this policy and is prohibited by law."

31.     In addition, HSBC Human Resources policies specifically prohibit all forms of

sexual harassment:

> The Company is committed to creating and maintaining a collegial
> work environment in which all individuals are treated with respect
> and dignity. Everyone has the right to work in a professional
> atmosphere that promotes equal opportunities and prohibits
> discriminatory practices, including sexual harassment . . . . Such
> harassment, whether verbal, physical or in the form of a hostile
> work environment . . . is unacceptable and will not be tolerated.

(Section 140, Corporate Human Resources Policies).

32.     HSBC's non-harassment policy provides, in pertinent part, as follows:

**POLICY**

**DESCRIPTION OF HARASSMENT**

> Harassment based upon the foregoing characteristics can be either
> blatant or overt or subtle and covert. Such behavior can demean,
> abuse, intimidate or offend others because of their personal
> attributes or background. . . Regardless of whether the acts in
> question are verbal or non-verbal, typically they are: (1) directed
> toward an individual or group whom they insult, stereotype, or
> threaten; (2) designed to create, or have the effect of creating an
> intimidating or hostile working environment; or (3) disruptive of
> an individual's ability to pursue normal social or business
> activities.

## DEFINITION OF SEXUAL HARASSMENT

Sexual harassment constitutes discrimination and is illegal under federal, state, and local laws. For purposes of this policy, sexual harassment is defined as it is in the Equal Employment Opportunity Commission Guidelines . . . as:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or (3) such conduct has the purpose and effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive working environment.

## EXAMPLES OF POTENTIAL SEXUAL HARASSMENT

Sexual harassment may include a range of subtle and not-so-subtle conduct. Depending upon the circumstances, this conduct may be overt pressure for sexual favors; sexual jokes, flirtations, innuendoes, advances, or propositions; verbal abuse of a sexual nature; graphic commentary about an individual's body, sexual prowess or sexual deficiencies; sex-based leering, whistling, touching or pinching; assault or other coerced sexual acts; suggestive, insulting, or obscene comments or gestures . . . Sexual harassment can include harassment between individuals of the same sex.

(Section 140, Corporate Human Resources Policies).

33.    Given the severe and pervasive nature of the sexual harassment Picarella's female co-worker suffered, and the retaliation against Picarella that followed his complaints, it is apparent that New York and federal laws prohibiting retaliation in the workplace were not enforced by HSBC management, and that HSBC Human Resources Policies prohibiting all forms of retaliation by HSBC employees and supervisors were not promulgated in good faith.

## FACTUAL BACKGROUND

34.     Picarella joined HSBC on May 5, 2011, as Senior Vice President, Business Development (Americas), after being recruited by HSBC from Barclays PLLC (successor to Lehman Brothers), where he had been employed since 2004. During the recruiting process, Picarella's primary interview at HSBC was with Eileen Hedges, who was then Senior Vice President and Head of Business Development (Americas), and later became Picarella's supervisor. Hedges reported to Pizzimbono, who also interviewed Picarella for HSBC.

35.     At the time Picarella was recruited by HSBC, he had 22 years of fixed income and institutional equities experience in the financial services industry, which included 13 years of operational risk and business management experience at Morgan Stanley & Co.

36.     When Picarella was hired by HSBC, both Hedges and Weiss promised Picarella that he would be Hedges' "deputy" (an industry term used to describe a successor), that within two years, Hedges would transfer to a new role in the organization, and that Picarella would then be promoted to Managing Director.

37.     Upon joining HSBC, Picarella's job responsibilities in Business Development (Americas) included annual planning for strategic clients, on-boarding and exiting commercial and banking clients, external industry surveys, serving as business risk officer, global cross-selling initiatives, working with Operation Topaz anti-money laundering initiatives, working with Dodd-Frank compliance initiatives, and global markets reporting to senior management.

38.     HSBC effectively stripped Picarella of these responsibilities following his internal complaints of the sexual harassment of his co-worker, in many cases substituting clerical tasks for professional duties. The retaliation described herein continued after the filing of his EEOC Charge opposing the retaliation he suffered.

39.     In addition, following Picarella's complaints of the unlawful sexual harassment of Jane Doe, HSBC retaliated against Picarella by freezing his compensation at levels far below the average salary and bonus paid to Senior Vice Presidents at large European banks with offices in New York City, and over $1,000,000 less than the average total compensation for the Managing Director position Picarella had been promised.

### HSBC Executives Sexually Harass Picarella's Female Co-Worker

40.     At the time Picarella joined HSBC in May 2011, his female co-worker, Jane Doe, was approximately 26 years of age, and was employed as an administrative assistant in Business Development (Americas). She, like Picarella, was directly supervised by Hedges.  Hedges, Jane Doe, and Picarella sat next to each other on the trading floor of HSBC headquarters at 452 Park Avenue.

41.     Shortly after Picarella joined HSBC, he observed that Hedges was disparaging Jane Doe's character in conversation with other bank employees outside of Jane Doe's presence, in part by accusing her of sleeping with bank customers and bank employees.  Hedges falsely reported to Picarella that every time she and Jane Doe traveled on business, Jane Doe would have sex with employees and customers of the bank, mentioning, among other things, trips to Toronto and Mexico City. Picarella observed that Hedges constantly harassed Jane Doe, insisting that she accompany Hedges in the late afternoon to bars near the HSBC offices, and then later criticizing her for those visits.

42.     Picarella learned that Hedges was constantly harassing Jane Doe with sexually intimidating conduct. She accused Jane Doe of wearing "fuck me" shoes. She would ask Jane Doe "what kind of underwear are you wearing," and "did you get laid."

43.     Picarella learned that on one occasion in 2010, Hedges pulled Jane Doe's blouse down in an attempt to expose Jane Doe's breasts in the presence of male bank employees. In

November 2011, in the presence of both Jane Doe and Picarella in the HSBC offices, Hedges removed one of her own breasts from her clothing and exposed herself.

44.     From the time Picarella began working with Hedges until Jane Doe left HSBC in May 2012, Picarella heard Hedges repeatedly directing sexually explicit remarks at Jane Doe in the office. Hedges repeatedly referred to performing fellatio on her husband, which she called her "three minute rule." Picarella heard Hedges repeatedly disclose to Jane Doe explicit sexual details of her extramarital relationships with senior male HSBC executives, including the former CFO.  Hedges repeatedly discussed explicit physical details of her sexual relationship with her husband in the presence of both Jane Doe and Picarella, statements that were offensive and intimidating to them.

## Picarella Complains to HSBC HR About the Sexual Harassment of Jane Doe

45.     During February and March 2012, Picarella met with Hedges to complain about her sexual harassment of Jane Doe, to request that she cease harassing Jane Doe, and to complain about bullying conduct directed toward him. Despite Picarella's complaint, Hedges continued to sexually harass Jane Doe, and became increasingly hostile to Picarella.

46.     On April 11, 2012, Picarella met with Ellen Weiss of HSBC Human Resources and complained to her about the sexual harassment of Jane Doe described in the preceding paragraphs. He also complained that Hedges was bullying him from her position as his supervisor, insisting that he run personal errands for her, and demeaning him in meetings in front of his professional colleagues.

47.     Picarella reported to Weiss that Hedges regularly demanded that Jane Doe accompany her to bars after work hours, and would often suggest to Jane Doe that she should have sex with bank customers and employees.  Picarella reported to Weiss that Hedges had exposed her breast in his and Jane Doe's presence.  He complained to Weiss that Hedges was

12

disparaging Jane Doe by spreading rumors around the office, which he believed to be false, including that Jane Doe was having sex with bank clients and employees when Hedges and Jane Doe traveled to bank functions outside the United States.  Picarella told Weiss that Hedges' discriminatory behavior was having a negative psychological toll on Jane Doe, and that her health was suffering because of it.

48.     Beginning April 23, 2012, in retaliation for complaining about Hedges' harassment of Jane Doe, Picarella and Jane Doe were excluded from Pizzimbono's weekly Global Markets sales meetings, which were referred to in the department as the "inner circle" meeting.

49.     Picarella's exclusion from the "inner circle" meeting was significant because these meetings involved sensitive and confidential information that was not circulated throughout the department.   Exclusion from the "inner circle" meeting indicated that the excluded member would not receive choice assignments and client meetings.   In this case, it acted as a signal to others in the department that Picarella's career at HSBC was in jeopardy.

50.     On or about June 1, 2012, Jane Doe left HSBC for new employment. Thereafter, in late June, Pizzimbono and Weiss separately questioned Picarella about his knowledge concerning the conduct of Hedges and male HSBC executives at HSBC's LATAM investment conference held in Key Largo, Florida, in late March. Picarella reported that he heard Jane Doe and others on his desk describe Hedges as heavily intoxicated at some functions, and appearing to be intimate with a senior HSBC banker from Latin America. He reported hearing Jane Doe discussing a senior male HSBC executive inappropriately touching her at an evening function, and propositioning her for sex. Weiss and Pizzimbono asked Picarella to provide them with a list

of all HSBC executives who Picarella believed were in attendance at the Key Largo conference, and he did so on June 28th.

51.     On or about June 29, 2012, Weiss contacted Picarella and reported to him that her office had investigated his complaints regarding the sexual harassment of Jane Doe by Hedges and senior male HSBC executives. Weiss stated that her office had spoken with the witnesses Picarella had named less than twenty-four hours before, and had concluded that no sexual harassment of Jane Doe had taken place.  Weiss told Picarella that Hedges denied sexually harassing Jane Doe, and that HSBC had decided not to contact Jane Doe or the senior male executive about Picarella's complaint.

52.     Because Weiss, who was a close personal friend of Hedges, had not conducted an adequate investigation of Picarella's sexual harassment complaints, Picarella summarized his conversation with Weiss in an email to her on July 1, 2012. His email made clear that he did not agree with Weiss' conclusion, and objected to her failure to investigate his bullying complaint. Picarella noted that Human Resources had told Hedges about his complaint, despite having indicated that his complaint would remain confidential. The next day, July 2, Weiss called Picarella and told him that, in light of his July 1 email, the investigation of his complaints would remain open.

53.     Thereafter, Picarella met with Weiss on three separate occasions in July 2012 – July 12, 24, and 26. At the first meeting, he repeated his complaints regarding the sexual harassment of Jane Doe by HSBC executives.

54.     On or about July 24, 2012, Weiss told Picarella that her investigation of his sexual harassment complaints had concluded. On July 26, 2012, Picarella recapped two discussions he had with Weiss on July 24 in an email to Weiss. He indicated that Weiss told him that she had

reached out to the Key Largo witnesses he identified and that "none of the people questioned saw Eileen [act] in any inappropriate manner at Key Largo."

55.     His email confirmed that during these conversations, Weiss indicated that Hedges would be moved to a new role within the bank, and that Picarella would no longer report to her. Despite this reassurance, Picarella expressed concern that Markets COO Suzy White, Hedges, and Pizzimbono "want[ed] Picarella out of the organization" because of his sexual harassment complaints.

56.     On or around July 31, 2012, Picarella met with White. During this meeting, Picarella repeated his expectation that he would be promoted to the position being vacated by Hedges, and reminded White that he had been hired to be Hedges' successor.

57.     In July or August 2012, Jane Doe contacted Picarella regarding a job reference, and during that conversation, provided him with details of the sexual harassment she had experienced from Hedges, and the senior male executive, at the LATAM conference in March.

### HSBC Retaliates Against Picarella

58.     On September 5, 2012, Picarella was asked to meet with Pizzimbono and White. At that time, he was informed that Carol Jenner, an HSBC Vice President with ten years less experience than Picarella, had been selected to replace Hedges as Head of Business Development (Americas). Picarella was never interviewed or consulted regarding the bank's decision to replace Hedges with Jenner, and thus was denied promotion to the position he had been promised when he was recruited to HSBC from Barclays.

59.     The result of Jenner's selection was to effectively demote Picarella by reassigning many of his responsibilities to Jenner.

60.     In June 2012, Picarella had been assigned to supervise his department's customer Suitability compliance program pursuant to FINRA Rule 2111. He immediately discovered

substantial problems with HSBC's compliance, including the names of some 1200 customers from whom Suitability Affirmation was needed. In addition, by early July, it was determined that HSBC was required to initiate an electronic Suitability Assessment for all clients who traded Global Markets products prior to client trading, as part of FINRA and Dodd-Frank compliance.

61.     Picarella met with White and Jenner to discuss the Suitability compliance issues facing HSBC shortly after he was demoted on September 5, 2012.  A few days later, on or around September 12, 2012, COO Suzy White took away Picarella's responsibility for monitoring the bank's FINRA Suitability compliance, and reassigned it to Jenner.

62.     Around the same time, White reassigned Picarella's responsibility for monitoring HSBC compliance with internal Relationship Manager "Know Your Customer" requirements to other bank employees.

63.     Each of these adverse employment actions significantly diminished Picarella's professional responsibilities and substantially diminished his stature in his department.

64.     On September 17, 2012, Picarella complained to Pizzimbono that taking these significant Suitability and relationship compliance responsibilities away from him was retaliation for his opposition to the sexual harassment of Jane Doe by Hedges and male HSBC executives.

65.     The following day, September 18, 2012, Picarella complained about this retaliation in an email to Mary Bilbrey, Head of HSBC USA Human Resources, and in a call to the HSBC Employee Integrity Hotline.  Picarella informed Bilbrey that he had raised serious issues with Weiss that he needed to escalate, including the "[r]egulatory and internal control issues with Sr. Mgmt in Markets" he had raised "over the past few months."  He reported to Bilbrey that as a result of his complaints, he had been "targeted and retaliated against in the Market's [sic.] organization."

66.     Following this email, Picarella was asked by Bilbrey to meet with HSBC HR representatives Maria Malanga and Debra Harmon, and did so on September 25, October 2, and October 3, 2012.  During these meetings, he complained to that Jane Doe had been sexually harassed at the LATAM conference in March by male HSBC executives and by Hedges, including being pressured one evening by Hedges and HSBC's Head of Global Markets Sales (Mexico) to have sex with that male executive.

67.     Picarella reported that the same evening, as Jane Doe was driving the male HSBC executive to an event, the executive reached under Jane Doe's skirt, put his hand on her thigh, and attempted to touch her between her legs. Picarella stated that later the same night, Hedges again pressured Jane Doe to have sex with the male HSBC executive, after which he placed his hands on Jane Doe's buttocks and pinched her.

68.     Picarella reported that at the same conference, another senior male HSBC executive verbally attacked Jane Doe by shouting at her, in the presence of co-workers, that he wanted to bend her over, pull down her pants, and spread her legs.

69.     On October 2, 2012, Picarella summarized his complaints that Jane Doe had been sexually harassed, and his complaint that he was being bullied by Hedges, in an email to Malanga, as follows:

1. Sexual Harassment from Eileen Hedges
2. Bullying from Suzy White, Eileen and Pablo Pizzimbono
3. An Internal Control issue that I raised was trying to be hid by Suzy and Pablo
4. A Regulatory Issue (FINRA Suitability) that I raised was attempted to be hid by Suzy and Pablo
5. Fraud (falsified T & E reports) by Eileen and Pablo
6. Retaliation by Suzy and Pablo
7. In addition I highlighted the sexual harassment of [Jane Doe] by Eileen and [HSBC's] head of Mexico Sales [who] works for Pablo in Key Largo in March 2012.

70.     The email included Picarella's complaints regarding the sexual harassment of Jane Doe, and retaliation against him by "Suzy and Pablo." He also made specific reference to the Relationship Manager "Internal Control issue" that he argued "was trying to be hid by Suzy and Pablo," and to the FINRA Suitability "that was attempted to be hid by Suzy and Pablo."

71.     On or about October 8, 2012, Picarella received an email from Bilbrey and Malanga listing the issues he raised in his October 2 email to Malanga, and purporting to summarize his September 25, October 2, and October 3, 2012 meetings with Human Resources.

72.     Malanga's email confirmed Picarella's complaints about the sexual harassment of Jane Doe by Hedges and senior male HSBC executives, and the retaliation he suffered for reporting this unlawful conduct. However, because Malanga's email did not accurately reflect all the facts Picarella included in his internal complaints or the discussion in the meetings listed, Picarella edited the text of the email, and forwarded his revision to HSBC Human Resources on October 11. Picarella listed his complaints as follows:

> After contacting the HSBC Integrity Tip Line and Mary Bilbrey, Mike Picarella met with Maria Malanga and Debra Harmon from Human Resources for approximately 6+ hours over the following dates; 9-28-12, 10-2-12 and 10-3-12 and the below summarizes the concerns he raised.
>
> 1. Unacceptable behavior in the organization
>    Sexual Harassment
>    Ongoing bullying culture
>    Fraud
> 2. To date the unacceptable behavior has been handled inappropriately
> 3. There is legal, reputation, regulatory and operational risk to the firm
> 4. Escalating to Head of HR Americas is an act of last resort as allegations have not been handled appropriately
> 5. The unacceptable behavior embedded in Markets does not reconcile with the cultural transformation and courageous integrity principals promoted by Patrick Nolan, Irene Dorner and other Sr Executives of the firm

73.    In his October 11 email to Bilbrey, Picarella summarized again the sexual harassment of Jane Doe by Hedges and the HSBC Mexico executive at the Key Largo conference earlier in March:

> Eileen was pushing . . . (Head of Mexico Sales and reports to Pablo Pizzimbono) to sleep with [Jane Doe] at Key Largo and Eileen was verbally and physically pushing [Jane Doe] sleep with [him]. [Jane Doe] said that [he] ended up groping her rear-end at the bar in Key Largo in front of people and that no one stopped [him] ([Jane Doe] actually cried when she told Mike this part)

### The Unlawful Retaliation Against Picarella Continues

74.    During the same period of time, Picarella learned that on October 3, 2012, while in Toronto on HSBC business, Suzy White had falsely reported to other senior HSBC executives that Picarella was suing the company, and told them to be careful talking about him in any Human Resources inquiry. These remarks openly disparaged his loyalty and trustworthiness among his co-workers.

75.    At about the same time, White approached Mattias Feau, who was then HSBC Acting Manager of Operational Risk and Internal Control, and told him not to include Picarella in current meetings regarding the FINRA inquiry because he "had an axe to grind with the firm" and was otherwise involved in "legal issues" with the bank.  The result was that Picarella was excluded from the FINRA-related meetings and kept in the dark about the content of these meetings. Picarella later learned from Feau that HSBC replaced Picarella at these important meetings with Jenner.

76.    On December 13, 2012, Picarella discovered that he had been excluded from client planning sessions with HSBC bankers for 2013, a function he had coordinated the year before. He reported this exclusion to Pizzimbono, who did not respond to his complaint.

77.     In December 2012, Hedges ordered a temporary employee to remove Picarella's name from his department's Organizational Chart.  On December 18, 2012, Picarella complained about this retaliation in an email to White:

> It came to my attention this morning that Eileen Hedges . . . removed my name from the Sales Org Chart. She has also confirmed the promotion of Carol Jenner to SVP. Apparently I have been subjected to the adverse action of demotion or worse, with no indication of that from you or anyone else.  I did not understand that Eileen had the authority to remove me from the chart. I would like an immediate explanation.

78.     On at least two separate occasions, Hedges and Mary Jo Rodgers, a Vice President who worked closely with Pablo Pizzimbono, told the temporary employee that they had directed that Picarella's name be removed from the firm's organizational chart because Picarella "doesn't have much more time here yet," and to "get him off the chart—he won't be working here much longer."

79.     On January 16, 2013, Picarella emailed Bilbrey that HSBC's dissemination throughout his department of his internal complaints about the sexual harassment of Jane Doe had resulted in Picarella's exclusion from company business activities and harassment by co-workers. From that date forward, most of Picarella's co-workers avoided speaking or interacting with him, even those with whom he formerly had a good personal relationship.

80.     On February 12, 2013, Pizzimbono and Patrick Brady took away Picarella's role as Hedge Fund Governance Committee Chair.

81.     Until Hedges' employment was involuntarily terminated by HSBC in June 2013, Hedges continued to disparage Picarella to his peers and supervisors.  White and Weiss, among others, also continued to disparage Picarella within the bank. Jim Levelis, a Senior Vice President in another department of the bank, told his colleagues that Picarella did "not add value to the organization," and that "the bank is suing Picarella." Levelis and White are close friends.

82.     Picarella filed a Charge of Discrimination with the EEOC on June 27, 2013, naming HSBC as the Respondent. In the twelve months that have passed since that filing, HSBC has continued to retaliate against Picarella because he opposed the unlawful sexual harassment of Jane Doe described above.

83.     During this period, Alexis Zafridis, an assistant to Tom O'Leary, HSBC Head of Equity Sales and Trading, told a senior HSBC trader that "Picarella is trouble," and that the trader needed to "choose his friends more wisely because [Picarella] is a problem in the organization." O'Leary and White are close friends and report to the same person.

84.     A consultant who reported to White referred to Picarella as a "support person" in an email to colleagues. This employee had interacted with Picarella in the past, knew that he was a Senior Vice President, and that he had been assigned significant senior responsibility before the retaliation described herein took place.

85.     Michael Karam, Picarella's current supervisor, refused to communicate or interact with Picarella for long periods of time during 2013 and 2014, periods of silence that sometimes extended for over three months.

86.     Picarella has been excluded by White from the HSBC US Business Manager email group, and was downgraded in his performance review for 2013 from a grade of 3 (Strong) to a grade of 3 Minus, a significant downgrade in the HSBC rating system.

## FIRST CLAIM FOR RELIEF
### Retaliation
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*)**

87.     Plaintiff repeats and realleges the allegations of Paragraphs 1-86 above as if separately set forth herein.

88.     At all relevant times, Plaintiff was an "employee" of the Defendant under the provisions of Title VII, 42 U.S.C. § 2000e(f), and Defendant was an "employer" under the provisions of Title VII, 42 U.S.C. § 2000e(b).

89.     From in or around January 2012, through the present, Plaintiff opposed Defendant's unlawful and discriminatory employment practices described above, including the sexual harassment suffered by his female co-worker, Jane Doe, and HSBC's retaliation against Plaintiff.

90.     This opposition includes written and oral internal complaints of discrimination to the Defendant, its Human Resources department, and Plaintiff's supervisors, including Hedges, White, Pizzimbono, and Karam, and the filing by Plaintiff of a Charge of Discrimination against HSBC (asserting unlawful retaliation) with the Equal Employment Opportunity Commission on June 27, 2013.

91.     This opposition by Plaintiff to Defendant's unlawful employment practices constitutes protected activity under Title VII, 42 U.S.C. § 2000e-3(a), and was well known to the Defendant and each executive identified herein at or about the time such opposition was made.

92.     Defendant responded to Plaintiff's complaints regarding the sexual harassment of his female co-worker by retaliating against him for having engaged in such protected activity, in violation of Title VII, 42 U.S.C. § 2000e-3(a).

93.     Such retaliation consisted of the materially adverse employment actions taken against Picarella by HSBC and its executives that are described herein, including:

    a.   HSBC failed to promote Picarella to Managing Director and to Hedges' position as Head of Business Development when Hedges was reassigned, or to consider him for such promotion, after promising to do so before he complained;

    b.   HSBC demoted Picarella by requiring him to report to a supervisor with ten years less experience in sales management and operational risk, which diminished his responsibilities;

    c.   HSBC deliberately excluded Picarella from important meetings, materially diminishing his standing in the company, his earning capacity, and his career prospects at HSBC;

    d.   HSBC severely reduced Picarella's job responsibilities and assignments, assigned him duties normally assigned to clerical workers, and refused to assign him new work normally assigned to his job title;

    e.   HSBC deliberately excluded Picarella from client-related planning meetings and communications;

    f.   Picarella's supervisors, Hedges and White, as well as other HSBC senior executives, disparaged Picarella internally at HSBC by criticizing his experience and qualifications;

    g.   HSBC falsely reported to Picarella's peers that he was "in trouble" and was "being sued by the bank";

    h.   HSBC disparaged Picarella by stating that he was "a problem in the organization" and that he did not "add value to the company";

i.  HSBC, and Hedges, disparaged Picarella by telling Picarella's co-workers that he did not have a future at HSBC because he had complained about the sexual harassment of Jane Doe;

j.  HSBC, Hedges, and Mary Jo Rogers intentionally removed Picarella's name from his department's Organizational Chart;

k.  HSBC removed Picarella as Chair of the Hedge Fund Governance Committee;

l.  Suzy White and Ellen Weiss disclosed internally at HSBC that they were monitoring Picarella's office computer and email communications; and

m.  HSBC relieved Picarella of his responsibility for monitoring HSBC's compliance with federal Suitability standards when he complained of irregularities and deficiencies in that compliance function.

94.    As a result of Defendant's retaliatory conduct, Plaintiff has suffered substantial damages, including the loss of back pay and front pay, and is entitled compensatory damages, including emotional pain and mental anguish, and reputational damage, including loss of earning capacity, in an amount to be determined at trial.

95.    Defendant's unlawful retaliatory conduct, as described herein, was undertaken with malice or reckless indifference to Plaintiff's rights, entitling him to punitive damages under Title VII.

## SECOND CLAIM FOR RELIEF
### Retaliation
### (NYCHRL, § § 8-107(7) & (19))

96.     Plaintiff repeats and incorporates by reference the allegations of Paragraphs 1-86 and 93 above as if separately set forth herein.

97.     From in or around January 2012 through the present, Plaintiff opposed the Defendant's sexual harassment of his female co-worker by engaging in the protected activity identified in the preceding paragraphs.

98.     Defendant responded to Plaintiff's complaints of the sexual harassment of his female co-worker, and to his complaints of unlawful retaliation, by retaliating against him for having engaged in such protected activity, in violation of § 8-107(7) and § 8-107(19) of the New York City Human Rights Law.

99.     Such retaliation consisted of the adverse employment actions taken against Picarella by HSBC and its executives that are described throughout the preceding paragraphs.

100.    As a result of Defendant's retaliatory conduct, Plaintiff has suffered substantial damages, including the loss of back pay and front pay, and is entitled to compensatory damages, including emotional pain and mental anguish, and reputational damage, including loss of earning capacity, in an amount to be determined at trial.

101.    Defendant's unlawful retaliatory conduct, as described herein, was undertaken with malice or reckless indifference to Plaintiff's rights, entitling him to punitive damages.

## THIRD CLAIM FOR RELIEF
### Retaliation
### (NYSHRL, New York Executive Law § 296 *et seq.*)

102.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1-86 and 93 above as if separately set forth herein.

103.    From in or around January 2012 through the present, Plaintiff opposed the Defendant's sexual harassment of his female co-worker by engaging in the protected activity identified in the preceding paragraphs.

104.    Defendant responded to Plaintiff's complaints of gender discrimination and sexual harassment of his female co-worker, and to his complaints of unlawful retaliation, by retaliating against him for having engaged in such protected activity, in violation of § 296 of the New York State Human Rights Law.

105.    Such retaliation consisted of the materially adverse employment actions taken against Picarella by HSBC and its executives that are described throughout the preceding paragraphs.

106.    As a result of Defendant's retaliatory conduct, Plaintiff has suffered substantial damages, including the loss of back pay and front pay, and is entitled to compensatory damages, including emotional pain and mental anguish, and reputational damage, including loss of earning capacity, in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendant for all damages permitted by law, including back pay, front pay, and compensatory and punitive damages, and for prejudgment interest, attorneys' fees and costs, and for such other and further relief as determined to be just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action.

Dated:      New York, New York
            June 20, 2014

                                   Respectfully submitted,

                                   LIDDLE & ROBINSON, L.L.P.
                                       James R. Hubbard
                                       Marc A. Susswein

                                   800 Third Avenue
                                   New York, New York  10022
                                   (212) 687-8500

                                   By: _____

                                   Attorneys for Plaintiff Michael Picarella