IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

MICHAEL PICARELLA,                :

                     Plaintiff,      :      14-cv-4463 (ALC) (AJP)

                        :

         -against-          :

                        :

HSBC SECURITIES (USA) INC.,    :

                        :

                Defendant.     :

                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

James R. Hubbard
Marc A. Susswein
LIDDLE & ROBINSON, LLP
800 Third Avenue
New York, New York 10022
Phone: (212) 687-8500
Facsimile: (212) 687-1500
jhubbard@liddlerobinson.com
msusswein@liddlerobinson.com

*Attorneys for Plaintiff Michael Picarella*

Dated: July 17, 2015

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... ii

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF FACTS ....................................................................2

    A.    Picarella Complains About Sexual Harassment of 27 Year Old Female Co-Worker.................................................................3

    B.    Picarella Is the Victim of Persistent Retaliation and Antagonism from HSBC Management Through His Termination in Early 2015..................................................................................7

    C.    Michael Karam Becomes Picarella's Supervisor and Demonstrates Animus.................................................................................9

    D.    Picarella Is Locked Out of His Offices on December 1, 2014 and Placed on Administrative Leave on January 15, 2015.................12

    E.    Picarella's Employment is Terminated by HSBC on the False Ground That He Was the Source of a Leak of Internal HSBC Information to the New York Post..............................................13

STANDARD OF REVIEW .................................................................15

ARGUMENT ...................................................................................16

    I.    Picarella's Prima Facie Case of Retaliation....................................16

    II.    A Genuine Factual Dispute Exists With Respect To Causal Connection...................................................................20

    III.    A Genuine Dispute of Facts Exists Whether HSBC's Asserted Reasons for Terminating Picarella Were Pretext for Retaliation ...................................................................23

        A.    HSBC's Assertion that Picarella was Terminated for Poor Performance .........................................................24

        B.    HSBC's Assertion that Picarella was Terminated for Leaking Information ...........................................................25

    IV.    Picarella's Retaliation Claim Under the NYCHRL....................................27

CONCLUSION....................................................................................28

-i-

## TABLE OF AUTHORITIES

**Page No.**

**Cases**

*Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762 (S.D.N.Y. 2002) ........................................................ 15

*Awad v. City of New York*, No. 13 Civ. 5753 BMC, 2014 WL 1814114 (E.D.N.Y.
    May 7, 2014) ............................................................................................................................ 19

*Bermudez v. City of New York*, No. 1:10-CV-1162 (ALC), 2015 WL 1500235
    (S.D.N.Y. March 15, 2015) (Carter, J.) ................................................................................. 15

*Binder v. Long Island Lighting Co.*, 57 F.3d 193 (2d Cir. 1995) .................................................. 23

*Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53 (2006) ............................. 18

*Byrnie v. Town of Cromwell Bd. Educ.*, 243 F.3d 93 (2d Cir. 2001) ............................................ 24

*Caban v. Richline Grp., Inc.*, No. 10 CIV. 559 ALC, 2012 WL 2861377
    (S.D.N.Y. July 10, 2012) (Carter, J) ................................................................................ 15, 17

*Celotex Corp. v. Catrett, 477* U.S. 317 (1986) ............................................................................ 15

*Chan v. NYU Downtown Hosp.*, No. 03 Civ. 3003, 2004 WL 213024 (S.D.N.Y.
    Feb. 3, 2004) ........................................................................................................................... 22

*Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-5612 (SJF)(AKT), 2012
    WL 3646935 (E.D.N.Y. Aug. 22, 2012) ................................................................................ 22

*De la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16 (2d Cir.
    1996) ........................................................................................................................................ 19

*Douglas v. City of Waterbury*, 494 F. Supp. 2d 112 (D. Conn. 2007) ........................................ 19

*Evans v. Port Authority of New York and New Jersey*, 192 F. Supp. 2d 247
    (S.D.N.Y. 2002) ....................................................................................................................... 24

*Gordon v. New York City Bd. Educ.,* 232 F.3d 111 (2d Cir. 2000) ............................ 17, 20, 22, 24

*Hicks v. Baines,* 593 F.3d 159 (2d Cir. 2010) .............................................................................. 19

*Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166 (2d Cir. 2005) ............................................... 17

*Kachmar v. SunGard Data Sys.,* 109 F.3d 173 (3d Cir. 1997) .................................................... 22

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537 (2d Cir. 2010) ....................................................... 15

*Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006) .................. 17, 19

*Kirkland v. Cablevision Sys.*, 760 F.3d 223 (2d Cir. 2014) ........................................................ 23

*Kwan v. Andalex Group LLC*, 737 F.3d 834 (2d Cir. 2013).............................................. 15, 23, 26

*Madera v. Metropolitan Life Ins. Co.*, No. 99 CIV.4005 (MBM), 2002 WL
1453827 (S.D.N.Y. July 3, 2002) (Mukasey, J.) ...................................................... 22

*Martin v. State Univ. of New York*, 704 F. Supp. 2d 202 (E.D.N.Y. 2010)................................. 21

*Martinez v. New York City Dept. Educ.*, No. 04 Civ. 2728 (LTS) (DFE), 2008 WL
2220638 (S.D.N.Y. 2008)............................................................................ 20

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ...................................................... 16, 20

*Mihalik v. Credit Agricole Cheuvreusx North America, Inc.*, 715 F.3d 102 (2d Cir.
2013) .................................................................................................. 27, 28

*Millea v. Metro-North R.R.*, 658 F.3d 154 (2d Cir. 2011) ........................................................ 18

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)........................................... 20, 23

*Rist v. HSBC Securities (USA) Inc.*, No. 14 Civ. 6503 (ALC) (AJP) (S.D.N.Y.) ....................... 22

*Riviera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11 (2d Cir. 2014)......................... 18

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ................................................................ 23

*Stratton v. Department for the Aging for N.Y.,* 132 F.3d 869 (2d Cir. 1997) ............................. 23

*Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248 (1981)................................................... 23

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) .................................................. 26

*Weiss v. JPMorgan Chase & Co.*, 332 Fed. Appx. 659 (2d Cir. 2009).................................... 20, 25

*White v. Dept. Corr. Services*, 814 F. Supp. 2d 374 (S.D.N.Y. 2011)..................................... 19, 21

*Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123 (2d Cir.2004)............................................... 19

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005) ........................................................ 18

*Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217 (2d Cir. 2006)................................................... 19

## **Other Authorities**

42 U.S.C. §§ 2000e–3(a).............................................................................................. 16

Fed. R. Civ. P. Rule 56(a)............................................................................................ 15

## PRELIMINARY STATEMENT

This case is not, as HSBC urges, about poor performance by Picarella. It is about "strong" performance that was obstructed by HSBC's hostility and retaliation. It is about an executive who stood up for a young female co-worker who had been sexually harassed by three senior executives in his division. It is about a global bank whose response to that courage was a pattern of retaliation and antagonism against the messenger that lasted over two years, and ended with Picarella's termination for the knowingly false reason that he had leaked internal HSBC information to a reporter. It is about lasting damage inflicted upon the performance and career of a talented and experienced financial services executive by unlawful retaliation.

The summary judgment record reflects that HSBC retaliated against Picarella by progressively stripping him of his material responsibilities, and thus interfered with his performance. At the same time, HSBC retaliated by turning the oppositional provisions of state and federal law and its own rules upside down, by demonizing Picarella after he complained, as a "human resources problem," and threatening to "marginalize him" – instead of conducting an independent investigation and reprimanding the offending executives.[1]

There is abundant evidence at the *prima facie* proof stage to establish the inference of unlawful retaliation, including causal connection between Picarella's sexual harassment and retaliation complaints, and the adverse actions that regularly followed. There is substantial direct evidence of retaliatory animus by managers who had knowledge of Picarella's complaints. After his supervisor ███ called Picarella an "hr related problem," and threatened to "marginalize

---

[1] HSBC's Human Resources policies specifically prohibit retaliation for reporting sexual harassment. *HSBC Anti-Harassment Policy,* PROTECTION AGAINST RETALIATION, provides as follows: "The Company strictly prohibits retaliation against an employee who reports alleged unlawful harassment or who participates in a harassment investigation. . . . Employees will not be penalized for making good-faith, truthful reports of violations of the harassment policy." (HDecl. Ex. 14).

him," ███ displayed anger and animus when he verbally and physically threatened Picarella at his performance review in November 2014. There is substantial circumstantial evidence of causal connection as well, including an unbroken pattern of antagonism in the adverse actions and retaliation that followed Picarella's complaints of sexual harassment and retaliation. Finally, there is substantial evidence that the two reasons HSBC gave for terminating Picarella – poor performance, and leaking internal information – were pretext.

Because the facts related to each of these issues are highly disputed, and because all reasonable inferences from them must be drawn in Picarella's favor, HSBC has not met its burden of demonstrating the absence of genuine issues of material fact on Picarella's retaliation claims, and is not entitled to summary disposition of his claims in this case.

## STATEMENT OF FACTS

Plaintiff Picarella is 48 years of age, obtained a B.A. degree from Hofstra University in 1989, and his MBA (Finance and Business Economics) from Fordham University in 1995. He joined Defendant HSBC's Global Markets Sales (Americas) on May 5, 2011, as Senior Vice President, Business Development, in HSBC's New York City offices. Prior to joining HSBC, Picarella had over 22 years of fixed income and international equities experience in the financial services industry, including 13 years of operational risk/business management experience as a Vice President at Morgan Stanley & Co. from 1989 to 2003. He was employed by Lehman Bros. through its bankruptcy in 2008, and then its successor Barclays PLC, through April 14, 2011, as Head of U.S. Fixed Income Product Management. His employment was terminated in a redundancy reduction in force caused by the merger of the Lehman and Barclays work forces. (PDecl. ¶¶ 2-3); (H Decl. Ex. 78).[2]

---

[2] References to "PDecl." are to the Declaration of Michael Picarella, included as Exhibit 1 to the Declaration of James R. Hubbard dated July 15, 2015 ("HDecl.")

Picarella was recruited by HSBC while on garden leave from Barclays in spring 2011. He was interviewed by Ian Mullen, Chief Operating Officer of HSBC Global Markets; Pablo Pizzimbono, Head of Sales for HSBC Global Markets; and Eileen Hedges, Senior Vice President and Head of Business Development. Both Mullen and Hedges promised Picarella that he was being hired as Hedges' deputy, and successor, as she was expected to transfer to a new role in the organization in the near future. (PDecl. ¶¶ 4-5); (HDecl. Ex. 9) (Mullen 15:12-22; 16:17-25). Hedges became Picarella's direct supervisor. She in turn reported to Pizzimbono. In November 2011, Mullen was succeeded as COO of Global Markets by Suzy White. Both White and Pizzimbono reported to Didier Descamps, Co-Head of Global Markets (Americas). (PDecl. ¶ 6).[3]

Picarella's principal job responsibilities in Business Development when he joined HSBC were annual strategic planning for firm clients, on-boarding and exiting commercial and banking clients, monitoring external industry surveys, serving as business risk officer (BIRO), global cross-selling initiatives, coordinating Operation Topaz anti-money laundering initiatives, working with Dodd-Frank compliance initiatives, and global markets reporting to senior management. (PDecl. ¶ 7). By the end of 2013, virtually all of these material responsibilities had been taken away by White, Pizzimbono, or Hedges' successor, Carol Semetulskis. (PDecl. ¶¶ 8-9, 52).

## A.     Picarella Complains About Sexual Harassment of 27 Year Old Female Co-Worker

Beginning in spring 2012, and through late that year, Picarella repeatedly complained to HSBC senior management and Human Resources ("HR") that a young female co-worker, referred to here as Jane Doe ("Doe"), had been sexually harassed by senior HSBC executives in Global Market Sales, all of whom reported to either White or Pizzimbono. Doe was approximately 27 years of age, employed as an analyst in Business Development, and directly supervised by Hedges.

---

[3] Margaret Murray was Pizzimbono's Administrative Assistant, and Vice President Mary-Jo Rogers was his Sales Marketing Coordinator.

Hedges, Doe, and Picarella sat next to each other on the ninth floor of HSBC headquarters at 452 Park Avenue. (PDecl. ¶ 10).

Shortly after he joined HSBC in 2011, Picarella observed that Hedges was disparaging Doe, in part by accusing her of sleeping with bank customers and employees. During the summer and fall of 2011, Picarella observed that Hedges harassed Doe by insisting that she accompany Hedges in the late afternoon to bars near the HSBC offices, and regularly addressed Doe with sexually intimidating language; wearing "fuck me" shoes; "what kind of underwear are you wearing; "did you get laid." In November 2011, Picarella reported to Mullen that Hedges removed one of her breasts from her clothing and exposed herself to both Doe and Picarella while at work. (PDecl. ¶¶ 12-14). In fall 2011, and into spring 2012, Picarella heard Hedges repeatedly directing other sexually explicit and intimidating remarks at Doe in the office, and disclosing to Doe explicit sexual details of extramarital relationships with senior male HSBC executives. Hedges repeatedly discussed explicit physical details of her sexual relationship with her husband in Picarella and Doe's presence. (PDecl. ¶ 18).

In February and March 2012, Picarella complained directly to Hedges that her treatment of Doe was sexual harassment, and asked that she stop it. When her misconduct continued, Picarella met with Pizzimbono, and complained about the sexual harassment of Doe. (PDecl. ¶¶ 19-20). Picarella then met on April 11, 2012 with Ellen Weiss, HR Head for HSBC Global Markets, and complained to her that Hedges was sexually harassing Doe, and bullying him. Weiss immediately told Hedges that Picarella had complained to HR that she had sexually harassed Doe. (PDecl. ¶ 29). By May 7, 2012, Pizzimbono had informed HSBC HR that he wanted Hedges "out of a managerial role, and is on border line of saying out all together." He indicated that he thought

"she's too big of a liability for his business and says he needs the drama just to end." (HDecl. Ex. 25). On May 31, 2012, HSBC terminated Doe's employment. (PDecl. ¶ 22).

In late June 2012, Pizzimbono and Weiss questioned Picarella about his knowledge of misconduct by HSBC executives at HSBC's LATAM investment conference in Key Largo, Florida in late March. By this time, Picarella had learned that Doe was the victim of sexual harassment at the Key Largo conference by Hedges and two senior male HSBC executives who reported to Pizzimbono. Picarella told Weiss and Pizzimbono that he had learned that one senior male HSBC sales executive in Latin America who reported to Pizzimbono sexually touched Doe twice during an evening event at the Key Largo conference, and had been encouraged by Hedges, in Doe's presence, to have sex with Doe. Another senior male HSBC sales executive, who reported directly to Pizzimbono in New York, was identified by Picarella as having participated in the sexual harassment by directing sexually intimidating remarks at Doe at the evening event. Pizzimbono told Picarella to report these events to Weiss, and he did so. (PDecl. ¶ 24).

On May 15, 2015, Defendant HSBC took Doe's deposition, and at that time questioned her specifically about the sexual harassment she suffered at the HSBC Key Largo conference. She confirmed the sexually harassing conduct she experienced there from the three senior HSBC Global Market Sales executives consistent with Picarella's complaints. (HDecl. Ex. 10) (Doe 159: 13 – 160:14, 166:2-169:18).

On or about July 24, 2012, Hedges was informed by Sue Jang of HSBC HR, who participated in the investigation of Picarella's complaints, that she was being put on final warning, and that her managerial responsibilities were being taken away. (PDecl. ¶ 30). On September 5, 2012, Picarella was informed by Pizzimbono and White that they had selected Semetulskis, an HSBC Vice President with ten years less experience than Picarella, to replace Hedges as Head of

Business Development. Picarella thus was denied promotion to the Head position he had been promised when he was recruited to HSBC — without being interviewed or consulted regarding the open position. (PDecl. ¶ 31). Shortly after this meeting, on September 12, 2012, COO White took away Picarella's major responsibility for monitoring HSBC's FINRA Suitability compliance and reassigned it to Semetulskis, and reassigned Picarella's responsibility for monitoring HSBC compliance with internal Relationship Manager "Know Your Customer" requirements to other bank employees. (PDecl. ¶ 32).

Picarella then complained to Pizzimbono that taking these significant Suitability and compliance responsibilities from him was retaliation for his complaints that Doe had been sexually harassed by Hedges and senior male HSBC executives. (PDecl. ¶ 33). On September 18, 2012, Picarella complained about this retaliation in an email to Mary Bilbrey, Head of HSBC USA HR, and in a call to the HSBC Employee Integrity Hotline. (PDecl. ¶ 34); (HDecl. Ex. 29).[4] On October 11, 2012, Picarella sent a "Summary of Meetings" to Bilbrey in which he summarized over several pages his complaint that Doe had been sexually harassed, including at the HSBC Key Largo conference in March:

> [E]ileen was pushing . . . (███████████████ and reports to Pablo Pizzimbono) to sleep with [Doe] at Key Largo and Eileen was verbally and physically pushing [Doe] to sleep with [him]. [Doe] said that [he] ended up groping her rear-end right at the bar in Key Largo in front of people and that no one stopped [him] ([Doe] actually cried when she told Mike this part). (HDecl. Ex. 34) (HSBCPIC 00000007).

---

[4] On September 26, 2012, Maria Malanga and Laura Kane of HSBC HR discussed Picarella's sexual harassment complaint in a Sametime Chat, and made fun of it despite its seriousness. Kane indicated that she was "trying my best not to be biased, but I am thinking we have a boy who cries wolf." Malanga responded that she "was thinking the same." (HDecl. Ex. 32).

**B.**   **Picarella Is the Victim of Persistent Retaliation and Antagonism By HSBC Management Through His Termination in Early 2015**

The summary judgment record demonstrates that beginning in spring 2012, HSBC repeatedly retaliated against Picarella in a sustained pattern of adverse actions and antagonism that did not end until his employment was terminated. The retaliation began in late April 2012, following Picarella's sexual harassment complaint to Weiss, when he was excluded from Pizzimbono's weekly Global Markets sales meeting, referred to as the "inner circle" meeting – which continued on without Picarella. Exclusion from the "inner circle" meetings was damaging. (PDecl. ¶ 22); (HDecl. Ex. 33). In early September 2012, Picarella had been rejected for the position of Head of Business Management in favor Semetulskis, despite HSBC's promise that he would be Hedges' successor. Also in September 2012, White had reassigned Picarella's responsibility for monitoring the bank's Suitability compliance to Semetulskis, and reassigned his responsibility for monitoring compliance with Relationship Manager performance to other employees. (PDecl. ¶¶ 31-32).

In October 2012, COO White directed the HSBC Acting Manager of Operational Risk and Internal Control not to include Picarella in important meetings regarding a FINRA inquiry, and replaced him at those meetings with Semetulskis. (PDecl. ¶ 43). On December 13, 2012, Picarella discovered that he had been excluded from client strategic planning sessions with HSBC bankers for 2013, a function he had coordinated the year before. (PDecl. ¶ 44). Also in December 2012, Hedges and Pizzimbono assistant Rogers directed an HSBC employee to leave Picarella's name off the departmental Organizational Chart for Global Market Sales because "he won't be working here much longer." (PDecl. ¶ 45); (HDecl. Ex.  3, Goldwasser ¶ 8). On December 18, 2012, Picarella complained to White that this retaliatory action was a demotion or worse. (HDecl. Ex. 35). By the end of 2012, HSBC had frozen Picarella's compensation, including his annual bonus,

and his compensation remained frozen until he was terminated by HSBC on March 27, 2015. (PDecl. ¶ 47).

Picarella complained repeatedly in 2013 and 2014 that HSBC continued to retaliate against him because of his complaints of sexual harassment by senior executives under White and Pizzimbono. On January 16, 2013, Picarella complained to Bilbrey that HSBC's widespread dissemination of his internal complaints regarding the sexual harassment of Jane Doe had resulted in retaliation, including Pizzimbono taking over his responsibility for client planning meetings with Senior Relationship Managers, harassment by co-workers, and being "excluded by Pablo, Suzy, and others." (PDecl. ¶ 48); (HDecl. Ex. 36). On February 12, 2013, Picarella complained that Pizzimbono and Patrick Brady had taken away his role as Chair of the important Hedge Fund Governance Committee. (HDecl. 93). On March 13, 2013, Picarella complained to Bilbrey that he continued to experience a pattern of hostility and antagonism at work, and gave examples. (PDecl. ¶ 51); (HDecl. Ex. 47).

On April 23, 2013, Picarella complained to Pizzimbono that he, Semetulskis, and White had taken away most of his significant job responsibilities and redistributed them to the "COO team, RMs and [Semetulskis] including: Suitability, Sales Authority, Client Planning, and Hedge Fund Committees, and Client on-boarding."  He complained that Semetulskis had taken over New Client on-boarding which had previously been his responsibility. He objected to Pizzimbono's suggestion that he should do weekend work on a weekly commentary when he had little work to do during the week. (PDecl. ¶ 52); (HDecl. Ex. 48). On April 24, 2013, Picarella complained to Bilbrey that the March 2013 Sales Org. Chart for Markets still did not include his name. (PDecl. ¶ 53); (HDecl. Exs. 46 & 49).

**C.      Michael Karam Becomes Picarella's Supervisor and Demonstrates Animus**

In May 2013, Michael Karam replaced Semetulskis as Picarella's supervisor. From the outset, Karam was hostile to Picarella, largely because he and his management – Pizzimbono, White and Descamps – viewed Picarella as "**the hr related prob.**," particularly after Picarella's EEOC Charge was filed in late June. (HDecl. Exs. 50, 55 & 57) (emphasis added). On June 7, 2013, referring to Picarella, Karam wrote to Semetulskis that "**we'll marginalize his behavior,**" to which she responds "great." (PDecl. ¶ 54); (HDecl. Ex. 52) (emphasis added). Subsequently, Karam accused Picarella of insubordination – for which Karam was criticized by HSBC Human Resources. (HDecl. Ex. 60). Ultimately, ███ verbally and physically threatened Picarella during a review meeting in late 2014, openly displaying anger at Picarella. (PDecl. ¶ 75) (HDecl. Exs. 69, 70).

In June 2013, Picarella was removed by White from the W8/W9 Tax deficiency initiative which he managed, and from Sales BCC (Operational Risk) activities.  (PDecl. ¶ 56). On July 25, 2013, Karam informed Picarella that Pizzimbono had taken over responsibility for all new client business cases, and that Karam would approve all client exits.  Both activities had been a central responsibility of Picarella's.  (PDecl. ¶ 57). Karam observed at that time that Picarella "must have tremendous capacity" – recognizing that he had been stripped of much of his material work assignments.  (HDecl. Ex. 53).

In August 2013, Picarella was excluded from meetings with Greenwich Associates to review their survey results, which he previously was assigned to coordinate. Karam did not communicate or interact with Picarella for long periods of time during the summer of 2013.  He did not give Picarella any assignments for client on-boarding in this period, and assumed his previous client on-boarding approval and RM support duties. Karam employed James Long, a

direct report of COO White, to log and track business cases; that responsibility had been Picarella's. (PDecl. ¶¶ 58-59).

On September 23, 2013, Karam sent an email that Picarella considered belittling and condescending. (PDecl. ¶ 59); (HDecl. Ex. 54). Shortly after receiving it, Picarella emailed Bilbrey to complain that Karam had not met with or spoken to him in person in three months, since "the time of my filing with the EEOC," and continued to retaliate against him by taking over his role "coordinating business case approvals ["on boarding"] and prioritization with Pablo Pizzimbono and Relationship Managers." Picarella emphasized that he was "being publically (sic) belittled and humiliated by [Karam] in front of several Sr staff" by an email [Karam] wrote and noted that he continued "to be retaliated against and mistreated." (PDecl. ¶ 59); (HDecl. Ex. 55). On October 17, 2013, in an email exchange with David Rose in London regarding discussion issues for Decamps and White, Karam reported that he had been asked by White to help out "**with Picarella, the hr related prob.**" (HDecl. Ex. 57) (emphasis added). By this time HSBC had turned its prohibition against retaliation upside down. The protected employee – and not the harassers – was now identified as the problem, and thus highly disparaged.

After the September 27 meeting, Karam did not meet with Picarella again until December 10, 2013, when he presented Picarella's 2013 Mid-Year performance review. The rating was "3 – Strong." It noted that Picarella had demonstrated positive momentum with the objectives discussed at the September responsibilities meeting. Karam added that those "responsibilities fall short of those that are typically expected of a SVP in the COO/Business Manager's role." (PDecl. ¶ 63); (HDecl. Ex. 59). In late November, 2013, Alexis Zafridis, an assistant to Tom O'Leary, HSBC Head of Equity Sales and Trading (a Pizzimbono direct report), told to his co-worker James Rist that Relationship Manager Jim Levelis was disparaging Picarella by telling co-workers that

"Picarella is trouble," and that "[Picarella] is a problem in the organization." (PDecl. ¶ 64); (HDecl. Ex. 58).

By email on January 8, 2014, Karam accused Picarella of insubordination when he asked for more clarity on his role and responsibilities. (HDecl. Ex. 60). Picarella complained to Renee Montgomery a senior HSBC HR officer, who apologized and indicated that Karam had not chosen his words wisely in accusing Picarella of insubordination. (PDecl. ¶ 65). On January 29, 2014, Karam wrote to a colleague that he was likely to take over Semetulskis' role working for Pizzimbono, and that he had been working with Pizzimbono and others "**on this whole Mike [P]icarella situation**." Karam added that Suzy [White] and Didier [Descamps] "are extremely supportive of the move." (HDecl. Ex. 61) (emphasis added).

On February 12, 2014, Picarella informed Karam that the Greenwich Associates survey work he had assigned to him had previously been completed by Semetulskis and others, and that no work was needed at that time. (PDecl. ¶ 66). On May 14, 2014, Karam provided Picarella with his 2013 Year End Performance Review. The rating remained "3 - Strong." Despite this rating, Karam commented that Picarella's overall handling of his responsibilities had "fallen short of those typically expected of an SVP in the COO/Business Manager's role." (HDecl. Exs. 63). On the same date, Sue Jang, the HSBC HR officer who participated in the investigation of Picarella's sexual harassment complaint, asked Weiss if she could "**add**" Picarella to the list of employees "**the business wants to let go**." (HDecl. Ex. 62) (emphasis added). On May 5, 2014, Karam called Picarella's 2013 Self-Assessment inaccurate and inflammatory. (PDecl. ¶ 68).

On September 22, 2014 Karam informed Picarella that he had uploaded the GM Sales COO Scorecard on which he had recorded draft objectives for Picarella for 2014. (HDecl. Ex. 64-65). Picarella responded that the objectives Karam uploaded did not match the objectives discussed in

May, and that a mid-year review based on them would not be fruitful. (HDecl. Ex. 66). On October

20, 2014, Picarella complained to Bilbrey that he was being subjected to "continued retaliation. . .

[and his] responsibilities stripped . . . ." He noted that he "had continued to complain in desperation

to HR and still I sit with no more than 1 hour of work a week on average."

> At times, months have gone by with no work at all. My reviews are given many
> months after the firm mandated deadline if they are given at all, and they last only
> a few minutes. A year and a half has passed with hardly any purpose or work.
> (PDecl. ¶ 73); (HDecl Ex. 67).

**D.    Picarella Is Locked Out of His Offices on December 1, 2014 and Placed on Administrative Leave on January 15, 2015.**

On November 21, 2014, Picarella met with ▮▮▮▮ for his 2014 Mid-Year review. (PDecl.

¶ 74). The review listed a grade of "3," but at the end lists Picarella as "Off Track," with the

notation that "[t]here remains a commitment to work with Mike to function within those

expectations of an SVP, but this is becoming increasingly challenging given his lack of initiative."

(HDecl. Ex. 68) (Picarella 005546). ▮▮▮▮ was physically and verbally threatening at the meeting.

He tossed a page of the review across the table where Picarella was seated, and while Picarella

was reading it, leaned over the small conference table, and demanded in a loud and threatening

voice that Picarella look at him. When Picarella lifted his gaze from the document, ▮▮▮▮ was

pointing his finger at close range at his face and chest such that Picarella was concerned for his

personal safety. (PDecl. ¶ 75). On November 24, 2014, Picarella emailed Bilbrey complaining

about ▮▮▮▮ threatening conduct at the November 21 meeting (HDecl. Ex. 69), and on

November 26, 2014, submitted a detailed written response to Karam's 2014 Mid-Year review,

complaining that Karam's negative rating was "a continual act of retaliation." (HDecl. Ex. 72)

(Picarella005548). Karam entirely omitted any reference in the review to the "successful role out

of Dealogic that [Picarella] led through early 2014, and the successful re-establishment of the client

On-boarding (for all clients, HF included) /Exit/Rationalization Meeting that [Picarella] coordinated." (HDecl. Ex. 72) (Picarella 005548).

On December 1, 2014, as Picarella was arriving at HSBC's midtown offices after the Thanksgiving holiday, he discovered that HSBC had disabled his security pass. (PDecl. ¶ 77); HDecl. Ex. 73). He learned from Malanga that HSBC was requiring him to work remotely from home until an investigation of his complaint about Karam's conduct was completed. He was not provided with remote access to HSBC systems for three weeks. (PDecl. ¶ 77); (HDecl. Ex. 71).

**E.** **Picarella's Employment Is Terminated by HSBC on the False Ground That He Was the Source of the Leak of Internal HSBC Information to the New York Post**

On January 13, 2015, there was a bi-weekly sales meeting at HSBC offices in New York City, chaired by Daniel Silber, at that time HSBC's Head of Markets Institutional Sales, and attended by approximately 20 members of his sales team. Picarella was a member, and attended by telephone. (PDecl. ¶ 79). The next day, January 14, Silber received a call from reporter Kevin Dugan of the New York Post, who referred to several internal issues discussed the day before at Silber's meeting, which Dugan obviously did not attend.  Silber was concerned that internal information had gotten out, and called his supervisor Descamps, and White, who began an investigation of the source of the leak to Dugan. (HDecl. Ex. 13) (Silber 42:10-16). Silber testified that Picarella's name came up as a possible source of the leak for the reason that he was "a disgruntled employee who was suing the bank."  (HDecl. Ex. 13) (Silber 43:22-45:23).

Picarella did not discuss the January 13, 2015 Silber sales meeting or any matters discussed during the call with any person, including his attorneys, at any time in January 2015, or at any time until he saw a reference to it in a New York Post article by Dugan on February 11, 2015, long after Dugan's call to Silber about the leak. (PDecl. ¶ 80); (HDecl. Ex. 76).

On January 15, 2015, Picarella was accused by HSBC of being the source of the leak, and placed on paid administrative leave, and cut off from any access to HSBC systems or premises. (PDecl. ¶ 81). By letter dated January 15, 2015, HSBC advised Picarella that he had been placed on administrative leave effective immediately because it "has reason to believe that [he] had conveyed confidential – and potentially privileged – HSBC information to one or more third parties not entitled to hold such information, in violation of HSBC policies and the terms of employment. His access to HSBC's systems and premises has been suspended." (HDecl. Ex. 75).

██████████████████████████

████████████████████████████ Picarella's employment at HSBC was terminated on March 27, 2015, in part on that ground. Karam recommended that Picarella be terminated, and Descamps made the decision to terminate him. (HDecl. Ex. 4) (Descamps 48:12-15; 49:11-17); (HDecl. Ex. 6) (Karam 79:10-80:19). The March 26 termination letter, signed by Susan Roskell, Head of HR, informed Picarella that his employment with Defendant HSBC Securities was terminated "effective immediately . . . due to significant performance issues . . . ." It stated that that "[i]n addition . . .  the investigation into the disclosure of internal confidential discussions from the January 13, 2015 sales group meeting resulted in a finding that you were highly likely the source of that information, either directly or indirectly" (HDecl. Ex. 77). Roskell testified that this finding "*was part of the decision*" to terminate Picarella. (HDecl. Ex. 12) (Roskell 38:16-24).

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

███████████████████████████████████

███████████████████████████████████

████

## STANDARD OF REVIEW

On a motion for summary judgment under Fed. R. Civ. P. Rule 56(a), "[t]he moving party has the burden of demonstrating 'the absence of a genuine issue of material fact.'" *Bermudez v. City of New York*, No. 1:10-CV-1162 (ALC), 2015 WL 1500235, at *7 (S.D.N.Y. March 15, 2015) (Carter, J.) (citing *Celotex Corp. v. Catrett, 477* U.S. 317, 323 (1986)).[5] "Moreover, 'the court must draw all reasonable inferences in favor of the non-moving party  . . . and may not make credibility determinations or weigh the evidence.'" *Caban v. Richline Grp., Inc.*, No. 10 CIV. 559 ALC, 2012 WL 2861377, at *6 (S.D.N.Y. July 10, 2012) (Carter, J.) (citing *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)). Accordingly, "summary judgment will be granted only if there is 'one reasonable conclusion as to the verdict, i.e., it is quite clear what the truth is.'" *Caban*, 2012 WL 2861377, at *6 (quoting *Kaytor*, 609 F.3d at 546). The Second Circuit has recognized that special considerations come into play where a summary judgment motion involves the motivation and intent of the moving party. *See Kwan v. Andalex Group LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (need for caution on summary judgment where dispute as to employer's intent). In a discrimination case, when "[e]vidence has been marshaled which supports both parties' assertions. . . [d]eciding which story to believe is the unique province of a jury." *Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762, 773 (S.D.N.Y. 2002).

---

[5] Unless noted, all internal citations and quotation marks are omitted, and all emphasis is added.

## ARGUMENT

HSBC has not met its burden of demonstrating the absence of genuine factual disputes on the central issues raised by its motion – causal connection, and pretext. It does not contest the abundant evidence that Picarella engaged in protected activity throughout 2012 as he complained about the sexual harassment of his female co-worker, and throughout 2013 and 2014 as he complained about the retaliation that followed. The clear evidence of retaliatory animus revealed in the Statement of Facts, and the pattern of antagonism that surrounded it until Picarella was fired, creates a genuine dispute of fact on causal connection that is more than adequate to meet Picarella's *de minimis* burden at this stage. There is strong evidence in the summary judgment record that both reasons HSBC gave for terminating Picarella – poor performance and leaking internal information – were not credible, and thus were pretext for retaliation.

### I.    **Picarella's Prima Facie Case of Retaliation**

Plaintiff's Second Amended Complaint asserts retaliation claims under Title VII and the New York State (NYSHRL) and New York City (NYCHRL) Human Rights Laws. Under the "Opposition Clause" of Title VII, a covered employer is prohibited from discriminating [retaliating] against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . ." 42 U.S.C. §§ 2000e–3(a).  The NYSHRL and the NYCHRL likewise make such retaliation unlawful. Retaliation claims under each statutory scheme are reviewed at the summary judgment stage under the burden-shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of retaliation, which requires the existence of genuine issues of fact on the following elements:

> (1) [T]hat [he] participated in a protected activity; (2) that [his] participation was known to [his] employer; (3) that [his] employer thereafter subjected [him] to a

materially adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Caban*, 2012 WL 2861377, at *11. "The burden of proof at the prima facie stage is 'minimal' or 'de minimis.'" *Id.* at *12; *accord Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

> If this initial burden is met, a presumption of retaliation arises, and the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the employer produces such evidence, then the employee must, in order to avoid summary judgment, show that retaliation was a substantial reason for the adverse employment action or that the proffered legitimate, non-retaliatory reason was pretextual.

*Caban*, 2012 WL 2861377,  at *12.

HSBC does not contest the evidence that Picarella engaged in protected activity, and does not seriously contest its knowledge of Picarella's protected activity, from his numerous oral and written complaints, HSBC's investigation of them, and his EEOC Charge. "[T]o satisfy the knowledge requirement" nothing "more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. New York City Bd. Educ.*, 232 F.3d 111, 116 (2d Cir. 2000); *accord Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006).  Knowledge on the part of individual actors may be shown by circumstantial evidence:

> The lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment . . . A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge . . . This is so, moreover, regardless of whether the issue of causation arises in the context of plaintiff's satisfaction of her prima facie case or as part of her ultimate burden of proving that retaliation played a motivating role in, or contributed to, the employer's decision . . . Accordingly then, to the extent that the district court charged the jury that the very *agents* of the Board who engaged in retaliatory actions against Gordon had to know of her protected activity, it erred.

*Gordon*, 232 F.3d at 117 (emphasis added); *see also Woodman v. WWOR-TV, Inc*., 411 F.3d 69, 83 (2d Cir. 2005) (direct or circumstantial evidence of knowledge).

In this case, there is both direct and circumstantial evidence that the managers who participated in the adverse actions and the retaliation Picarella suffered had knowledge of his complaints. Despite their denials, the record reflects that Hedges (PDecl. ¶ 29), Pizzimbono (PDecl. ¶¶ 20, 24, 30) (HSBCPIC 00001285 ) (HDecl. Ex. 61) (HSBCPIC00006019) ("working with them on this whole Mike Picarella situation"), White (HDecl. Ex.  57) ("Suzy/didier"), Semetulskis (Jenner) (PDecl. ¶¶ 52, 54) (HDecl. Ex. 52), Karam (HDecl. Ex. 55, 57, 61 65, 72 (Picarella005548), and Descamps (HDecl. Ex. 4) (Descamps 7:22-8:4) – all were aware of Picarella's complaints that Doe had been sexually harassed, as well as his complaints that he suffered retaliation for reporting it.

The summary judgment record also contains substantial evidence that Picarella was subjected to a series of adverse employment actions, including the removal of his material job responsibilities, and finally his termination, as the Statement of Facts (SOF) reflects. The test for demonstrating an "adverse" employment action is settled.  A plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Millea v. Metro-North R.R.*, 658 F.3d 154, 164 (2d Cir. 2011) (quoting *Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53, 68 (2006)). Material adversity is determined objectively, based on the reactions of a reasonable employee, and is not dependent, as HSBC contends, on whether the plaintiff was in fact deterred from protected activity.  *See Riviera v. Rochester Genesee Reg'l Transp. Auth*., 743 F.3d 11, 25 (2d Cir. 2014). Viewing the evidence in the light most favorable to Picarella, and drawing all reasonable inferences in his favor, a

reasonable jury could determine that beyond his termination, the retaliatory acts about which he complained, separately and in combination, were sufficient to "dissuade a reasonable worker from making or supporting a charge of discrimination," and thus rose to the level of adverse employment actions. *White v. Dept. Corr. Services*, 814 F. Supp. 2d 374, 389 (S.D.N.Y. 2011) (citing *Burlington*, 548 U.S. at 68).

The termination of Picarella's employment was concededly an adverse action. Other adverse employment actions include subjecting an employee to "significantly diminished material responsibilities." *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir. 2004); *see also Kessler,* 461 F.3d at 209-10 (stripping responsibilities); *De la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996) (altering the terms and conditions of plaintiff's employment in a negative way); *Awad v. City of New York*, No. 13 Civ. 5753 BMC, 2014 WL 1814114, at *3 (E.D.N.Y. May 7, 2014) (stripping of plaintiff's responsibilities supports inference that plaintiff suffered material adverse action). In considering whether a plaintiff has suffered an adverse employment action, "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010); *accord Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006) (ridicule "part of larger campaign of harassment which though trivial in detail may have been substantial in gross"); *see also Douglas v. City of Waterbury*, 494 F. Supp. 2d 112, 124-25 (D. Conn. 2007) (allegation of insubordination by supervisor might affect work record and is an adverse employment action). Karam accused Picarella of insubordination. (PDecl. ¶ 65) On October 20, 2014, Picarella complained that his responsibilities had been "stripped" as part of "continued retaliation" and he had "no more than 1 hour of work a week on average." (PDecl. ¶ 73); (HDecl Ex. 67).

## II.   **A Genuine Factual Dispute Exists With Respect To Causal Connection**

The last element of the *prima facie* case is evidence of causal connection between Plaintiff's protected activity and the adverse employment actions he suffered. Here, as the SOF reveals, Picarella engaged in protected activity repeatedly during 2012 and 2013, first in reporting the sexual harassment of Jane Doe, then as he complained repeatedly of HSBC's retaliation actions.[6] The summary judgment record, as the SOF reveals, likewise establishes a continuous pattern of adverse actions and antagonism following these numerous internal complaints. This evidence, together with the retaliatory animus reflected by the summary judgment record, creates a clear dispute of fact on the existence of causal connection.

A plaintiff may establish a causal connection "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon,* 232 F.3d at 117. Picarella has presented both direct and circumstantial evidence of causal connection in opposition to the motion.[7]

First, there is startling evidence of retaliatory animus by HSBC managers who had knowledge of Picarella's complaints, permitting a reasonable jury to conclude they harbored a retaliatory animus against Picarella. Hedges told a co-worker in 2012 to leave Picarella off his group's organization chart because he "would not be around much longer." (HDecl. Ex. 3)

---

[6] Complaints of retaliation for protected activity constitute protected activity themselves for purposes of a plaintiff's prima facie case in the *McDonnell Douglas* analysis. *Martinez v. New York City Dept. Educ.*, No. 04 Civ. 2728 (LTS) (DFE), 2008 WL 2220638, at *11 (S.D.N.Y. 2008).

[7] A plaintiff in a discrimination case is not "required to demonstrate bad faith in the form of direct evidence of discriminatory animus; a plaintiff may prove discriminatory animus through circumstantial evidence." *Weiss v. JPMorgan Chase & Co.*, 332 Fed. Appx. 659, 663 (2d Cir. 2009) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)).

(Goldwasser ¶ 8). On June 7, 2013, referring to Picarella, Karam wrote to Semetulskis that "**we'll marginalize his behavior,**" to which she responds "great." (HDecl. Ex. 52) (emphasis added). On October 17, 2013, in an email exchange with David Rose in London regarding discussion issues for Decamps and White, Karam reported that he had been asked by White to help out "**with Picarella, the hr related prob.**" (HDecl. Ex. 57) (emphasis added). Nothing could demonstrate retaliatory animus more than a supervisor's reference to a complaining employee as an "hr problem."

Subsequently, in January 2014, Karam accused Picarella of insubordination. (HDecl. Ex. 60). By May 2014, Sue Jang of HSBC HR, who had initially investigated Picarella's sexual harassment complaint, asked Weiss, who headed HR in Picarella's group, if she could "add" Picarella to the list of employees "the business wants to let go." (HDecl. Ex. 62). Karam was belligerent and threatening when delivering Picarella's performance review in November 2014. (PDecl. ¶ 75). "Negative reactions by an employer to a plaintiff's complaints of discrimination have been deemed indicative of retaliatory animus." *White,* 814 F. Supp. 2d at 390 (supervisor yelled at plaintiff after learning she had filed EEOC charge). A supervisor's anger toward an employee upon learning the employee had complained about him is a display of retaliatory animus "by the very individual who made the decision not to renew the plaintiff," and is adequate to "satisfy the causation requirement at the prima facie stage." *Martin v. State Univ. of New York*, 704 F. Supp. 2d 202, 231 (E.D.N.Y. 2010). ████ threatening display of anger at Picarella at the November 21 performance review is substantial evidence of animus, followed by Karam's recommendation barely three months later that Picarella be fired. *None* of the foregoing evidence of retaliatory animus is mentioned in HSBC's motion.

This evidence of retaliatory animus by Picarella's direct supervisors and his HR department is part of an unbroken pattern of hostility and antagonism that followed his complaints of sexual harassment and retaliation. Such a pattern of antagonism between protected activity and adverse employment actions that follow is recognized as circumstantial evidence of causal connection. *See Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-5612 (SJF)(AKT), 2012 WL 3646935, at *14 (E.D.N.Y. Aug. 22, 2012) (pattern of antagonism in intervening period) (citing *Chan v. NYU Downtown Hosp.*, No. 03 Civ. 3003, 2004 WL 213024, at *3 (S.D.N.Y. Feb. 3, 2004), and *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997) (causation may be inferred from pattern of antagonism followed protected activity)); *see also Madera v. Metro. Life Ins. Co.*, No. 99 CIV.4005 (MBM), 2002 WL 1453827, a *7 (S.D.N.Y. July 3, 2002) (Mukasey, J.) (denying summary judgment in light of corporate hostility towards plaintiff between his 1992 EEOC complaint and his 1997 termination, where rational jury could conclude ". . . that the circumstances give rise to an inference of retaliatory motive.").

Finally, the record reflects that Picarella's co-worker James Rist, who like Picarella was employed in the group where the alleged harassers were employed, reported the sexual harassment of Jane Doe in the same time frame as Picarella, and suffered similarly severe retaliation by HSBC senior management. This proof is substantial circumstantial evidence of causal connection between Picarella's sexual harassment complaints and the series of adverse actions he suffered. *Gordon,* 232 F.3d at 117; (HDecl. Ex. 11) (Rist 26:2-3, 14:19-16:24, 18:11-20:7, 131:15-132:4, 156:4-10).[8] The direct and circumstantial evidence of causal connection in the summary judgment record is more than sufficient to meet Picarella's *de minimis* burden at this stage of the case, and permit a reasonable juror to infer retaliatory motive.

---

[8] *Rist v. HSBC Securities (USA) Inc.*, No. 14 Civ. 6503 (ALC) (AJP) (S.D.N.Y.).

**III.    A Genuine Dispute of Facts Exists Whether HSBC's Asserted
         <u>Reasons for Terminating Picarella Were Pretext for Retaliation</u>**

HSBC's motion asserts two reasons for terminating Picarella's employment – poor

performance, and leaking internal HSBC information to a New York Post reporter. There is

substantial evidence in the summary judgment record that both asserted reasons were pretext for

retaliation. A plaintiff may prove pretext by evidence of "weaknesses, implausibilities,

inconsistencies, or contradictions in the employer's proffered legitimate, non-retaliatory reasons

for its action." *Kwan,* 737 F.3d at 846. Pretext may be shown "either directly by persuading the court

that a discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*,

450 U.S. 248, 256 (1981).  Pretext can constitute "powerful evidence of discrimination."  *Stratton*

*v. Department for the Aging for N.Y.,* 132 F.3d 869, 879 (2d Cir. 1997); *Binder v. Long Island*

*Lighting Co*., 57 F.3d 193, 200 (2d Cir. 1995) ("Resort to a pretextual explanation is, like flight from

the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of

illegal conduct.").

> The factfinder's disbelief of the reasons put forward by the defendant (particularly
> if disbelief is accompanied by a suspicion of mendacity) may, together with the
> elements of the prima facie case, suffice to show intentional discrimination. Thus,
> rejection of the defendant's proffered reasons will *permit* the trier of fact to infer
> the ultimate fact of intentional discrimination,

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) (citing *St. Mary's Honor Ctr.*

*v. Hicks*, 509 U.S. 502, 511 (1993)).

When a plaintiff proffers evidence that could, if believed, support a finding of pretext, "[a]

jury might credit all of [the] proffered evidence, some of it, or none at all. But that is 'left for the

jury to decide at trial.'" *Kirkland v. Cablevision Sys*., 760 F.3d 223, 227 (2d Cir. 2014). "It is . . .

now settled that a plaintiff in a Title VII action need not disprove a defendant's proffered rationale

for its adverse actions in order to prevail." *Gordon*, 232 F.3d at 117. Even in cases where the plaintiff cannot offer direct evidence of discriminatory animus, the plaintiff can "defeat summary judgment on the strength of [a] *prima facie* case combined with circumstantial evidence that [the] stated reason for [the adverse employment action] is pretext." *Evans v. Port Auth. of New York and New Jersey*, 192 F. Supp. 2d 247, 266 (S.D.N.Y. 2002); *accord Byrnie v. Town of Cromwell Bd. Educ.*, 243 F.3d 93, 102 (2d Cir. 2001).

### A. HSBC's Assertion that Picarella Was Terminated for Poor Performance

HSBC's first asserted reason for terminating Picarella is poor performance. Yet resolving all reasonable inferences in Picarella's favor, a trier of fact could reasonably find that HSBC had not decided to terminate Picarella for poor performance until it learned in late March that its other excuse – leaking internal information – had no basis in fact, and thus that HSBC's performance reason was not credible.

Despite the subjective recollection of its declarants, HSBC had consistently given Picarella *"3-Strong"* annual and mid-year performance reviews since he joined the bank in May 2011. (HDecl. Exs. 16, 20, 31, 51, 59, 63). His 360 reviews in early 2013, which were requested by Semetulskis, were highly complimentary – though HSBC's Memorandum entirely ignores them. (HDecl. Exs. 39-45).

> "I enjoyed working with Mike. I found him to be professional and realistic." (HDecl. Ex. 39); "He tends to be very responsive . . . and most importantly flexible." (HDecl. Ex. 40). "Mike is viewed as a valuable business partner to CMB . . . [h]e was valued with GM as a person who can cut through the issue and resolve problems." (HDecl. 41). "Mike is a pleasure to work with and always carries himself in [a] professional manner. Mike always has the best interest of the firm foremost in his actions and is an asset to the Firm." (HDecl. Ex. 43). "Very approachable and personable. . . Coordinates well across desks/businesses with respect to prioritization and resolution of . . . onboarding issues." (HDecl. Ex. 44).

When Karam changed Picarella's rating in November 2014 to "Off-Track," he gave Picarella a forward-looking review that "[t]here remains a commitment to work with Mike to

function within those expectations of an SVP . . . ." (HDecl. Ex. 68) (HSBCPIC00000084).  HSBC never put Picarella on a performance plan, entitling him to the inference that no performance-based termination decision had been made in late November. Realistically, that was the last month HSBC permitted Picarella to perform in any reasonable way. HSBC had no measure of Picarella's performance from that point forward because he was not permitted to come to his HSBC office after December 1, 2014, after he complained that ████ had threatened him on November 21; was not provided remote access to HSBC systems until three weeks later; and by January 15, 2015 had been placed on administrative leave when he was accused of leaking sales information.

████ Off-Track evaluation on November 21, 2014 (HDecl. Ex. 68) also is highly suspect. ████ had demonstrated open hostility and retaliatory animus as outlined in preceding sections, verbally and physically threatening Picarella on November 21, disparaging him as "the hr related problem," and "marginalizing" him by removing most of his job responsibilities. In "employment discrimination cases, courts must give particular scrutiny to 'subjective evaluation[s],' because (1) 'any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative, and, if such assertions are accepted, prevail in virtually every case. . . .'" *Weiss v. JPMorgan Chase & Co.*, 332 Fed. Appx. 659, 661.  HSBC's criticism of Picarella's performance as a Vice President at Barclays PLC is equally suspect. Picarella's Barclays' employment was terminated in a redundancy reduction in force, ████████

████████████████

████████████

### B.    HSBC'S Assertion that Picarella Was Terminated for Leaking Information

HSBC's March 26, 2015 termination letter to Picarella stated that its investigation "resulted in a finding that you were highly likely the source [of the] leak, either directly or indirectly." (HDecl. Ex. 77). The HR Head who signed the letter testified that this finding "*was part of the*

*decision*" to terminate Picarella. (HDecl. Ex. 12) (Roskell 38:16-24). Yet Didier Descamps, HSBC's Co-Head of Global Markets Americas, the senior executive in New York who made the decision to terminate Picarella, testified that he "*was told before making the decision . . . that no proof was available about where the leak was [from]*," and made the decision only on the basis of Picarella's performance. (HDecl. Ex. 4) (Descamps 47:11-22). Roskell's false explanation for Picarella's termination, and the conflicting reasons given for that action, plainly raises an issue of fact whether the reasons asserted were a cover-up for retaliation. *See Kwan,* 737 F.3d at 847. The knowingly false charge that Picarella had violated HSBC rules by leaking internal information also is plain evidence of retaliatory animus. "If the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [termination]." *Hicks,* 93 F.3d at 165.

HSBC also challenges, at the pretext stage, Picarella's ability to demonstrate that material issues of fact exist with respect to "but-for" causation under *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). There is no requirement that he do so in the face of the substantial evidence of pretext in the summary judgment record. As the Second Circuit recently observed, "the determination whether retaliation for protected activity was a 'but-for' cause [of the adverse actions asserted] is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Kwan,* 737 F.3d at 846 n.5. A plaintiff may prove "that retaliation was a but-for cause of an adverse action" at the summary judgment stage by creating an issue of fact on pretext by demonstrating "weaknesses . . . or contradictions in the employer's proffered legitimate, non-retaliatory reasons for its action." *Id.* In this case, a reasonable jury could conclude, in light of HSBC's shifting and false reasons for Picarella's termination, coupled with his prima facie proof

of retaliation, that his termination was actually retaliatory – and it was because of his protected activity.

Finally, it is important to note that HSBC fills its Memorandum with factual allegations that are based upon inferences impermissibly drawn in its own favor, rather than Picarella's, and in most cases are not supported by the summary judgment record. One is its reference to "the well-documented seriousness with which HSBC treated each of Picarella's complaints," which HSBC argues weighs against a finding of pretext. (Def. Memorandum at 19). That factual assertion is highly disputed. (PDecl. ¶¶  25, 26, 41) (HDecl. Ex. 32) ("trying my best not to be biased"). Another is that Picarella's poor performance began before his protected activity in late 2011 and early 2012. Yet Hedges, his supervisor at that time, gave Picarella a "3-Strong" rating in July and December of 2011, and told Picarella in December 2011 that she would have given him a "2 – Exceeds" if he had been at the bank longer. (PDecl. ¶ 16) (HDecl. Ex. 20).

HSBC also asserts (Def. Memorandum at 20) that Picarella was unable to identify at his deposition any "direct evidence of retaliation," citing Facts ¶¶ 259-266.  Each of these alleged facts is disputed in Plaintiff's Local Rule 56.1 Statement. In addition, each of the deposition questions cited asked Picarella why "he believed" certain HSBC employees retaliated against him for reporting the sexual harassment of Jane Doe, or had retaliatory animus toward him, and in each case, including over objection that the question called for a legal conclusion, he answered. *See* (HDecl. Ex. 2) (Picarella 234-254).

IV.    **Picarella's Retaliation Claim Under the NYCHRL**

Courts are required to "analyze NYCHRL claims separately and independently from any federal and state law claims . . . construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs . . . .'" *Mihalik v. Credit Agricole Cheuvreusx North America, Inc*., 715 F.3d 102, 111 (2d Cir. 2013). The significant difference is that because of its broader scope,

NYCHRL plaintiffs are not required to show "a material adverse action" but can prove their claim instead by showing that "the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Id.* at 112. Because HSBC has failed to demonstrate the absence of a material dispute of fact with respect to Picarella's prima facie proof, and pretext, and in light of the substantial evidence of HSBC's retaliatory animus against Picarella, HSBC's arguments addressed to the NYCHRL also fail under its broader scope.

## **CONCLUSION**

For the foregoing reasons, and based upon the foregoing arguments, Plaintiff Michael Picarella respectfully prays that the Court enter its order denying Defendant HSBC's Motion for Summary Judgment.

Dated: July 17, 2015

/s/James R. Hubbard
   James R. Hubbard
   Marc A. Susswein

LIDDLE & ROBINSON, L.L.P.
800 Third Avenue
New York, New York 10022
Phone:  (212) 687-8500
Facsimile: (212) 687-1500
jhubbard@liddlerobinson.com
msusswein@liddlerobinson.com

*Attorneys for Plaintiff Michael Picarella*