UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL PICARELLA,

                    Plaintiff,                    14-cv-4463 (ALC) (AJP)

          -against-

HSBC SECURITIES (USA) INC.,

                    Defendant.

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Damien J. Marshall
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Phone: (212) 446-2300
Facsimile: (212) 446-2350
dmarshall@bsfllp.com

Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Facsimile: (202) 467-0539
escalia@gibsondunn.com

*Attorneys for HSBC Securities (USA) Inc.*

## **Table of Contents**

Preliminary Statement.................................................................................................... 1

Statement of Facts ........................................................................................................... 2

    A.    Picarella's Managers and Co-Workers Recognized His Performance Problems Before He Ever Engaged in Protected Activity ........................................................ 3

    B.    After Picarella Complained to Human Resources About Hedges, HSBC Investigated and Removed Her from Her Managerial Position........................................ 4

    C.    Picarella's Second and Third Managers Reached the Same Conclusions About His Poor Performance ................................................................................................ 5

    D.    Picarella's Fourth Manager Also Concluded That Picarella Was a Poor Performer ..... 8

Legal Standard ............................................................................................................... 12

Argument ....................................................................................................................... 13

    I.    HSBC Had Legitimate, Non-Discriminatory Reasons for Terminating Picarella's Employment ........................................................................................................... 14

    II.    Picarella Cannot Establish a *Prima Facie* Case Because He Cannot Show Causation ....................................................................................................... 19

    III.    Picarella's Remaining Retaliation Claims Fail Because He Cannot Make Out a *Prima Facie* Case and Because HSBC Had Legitimate Business Reasons for Acting As It Did ................................................................................................ 22

    IV.    Picarella's NYCHRL Claim Also Fails ............................................................... 24

Conclusion ..................................................................................................................... 25

## Table of Authorities

**Cases**

*Anaya v. Donahoe,*
No. 08-cv-3842, 2011 WL 3841403 (E.D.N.Y. Aug. 26, 2011) .......................................... 15

*Bowen-Hooks v. City of New York,*
13 F. Supp. 3d 179 (E.D.N.Y. 2014) ................................................................................. 19

*Brooks v. Blank,*
No. 10-cv-08124, 2014 WL 1495774 (S.D.N.Y. Mar. 31, 2014)......................................... 18

*Bryant v. Merrill Lynch, Pierce, Fenner & Smith,*
No. 12-cv-2940, 2013 WL 2359109 (S.D.N.Y. May 30, 2013) ........................................... 24

*Burlington N. & Santa Fe Ry. Co. v. White,*
548 U.S. 53 (2006).................................................................................................... 21, 24

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).......................................................................................................... 12

*Clark Cnty. Sch. Dist. v. Breeden,*
532 U.S. 268 (2001).......................................................................................................... 21

*Davis v. Avaya, Inc.,*
295 F. App'x 380 (2d Cir. 2008) ....................................................................................... 14

*Dixon v. Int'l Fed'n of Accountants,*
416 F. App'x 107 (2d Cir. 2011) ....................................................................................... 16

*Dixon v. Int'l Fed'n of Accountants,*
No. 09-cv-2839, 2010 WL 1424007 (S.D.N.Y. Apr. 9, 2010) ........................................... 17

*El Sayed v. Hilton Hotels Corp.,*
627 F.3d 931 (2d Cir. 2010).............................................................................................. 13

*Evans v. N.Y. Botanical Garden,*
253 F. Supp. 2d 650 (S.D.N.Y. 2003)................................................................................ 18

*Flanagan v. N. Shore Long Island Jewish Health Sys.,*
No. 11-cv-5246, 2014 WL 4905124 (E.D.N.Y. Sept. 30, 2014) ........................................ 18

*Flood v. UBS Global Asset Mgmt.,*
No. 10-cv-374, 2012 WL 288041 (S.D.N.Y. Feb. 1, 2012) ................................................ 21

*Greene v. Brentwood Union Free Sch. Dist.,*
966 F. Supp. 2d 131 (E.D.N.Y. 2013), *aff'd,* 576 F. App'x 39 (2d Cir. 2014) ...................... 20

*Hahn v. Bank of Am.*,
    No. 12-cv-4151(DF), 2014 WL 128521 (S.D.N.Y. Mar. 31, 2014) ................................ 18, 19

*Herrington v. Metro-N. Commuter R. Co.*,
    118 A.D.3d 544 (1st Dep't 2014) ........................................................................... 25

*Johnson v. IAC/Interactive Corp.*,
    2 F. Supp. 3d 504 (S.D.N.Y. 2014) ....................................................................... 14, 15

*Joseph v. Owens & Minor Distrib., Inc.*,
    5 F. Supp. 3d 295 (E.D.N.Y. 2014), *aff'd*, 594 F. App'x 29 (2d Cir. 2015) ......................... 25

*Lomotey v. Connecticut Dept. of Transp.*,
    355 F. App'x 478 (2d Cir. 2009) ........................................................................... 24

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ........................................................................................ 12

*McWhite v. N.Y.C. Hous. Auth.*,
    No. 05-cv-991, 2008 WL 1699446 (E.D.N.Y. Apr. 10, 2008) ....................................... 22

*Moccio v. Cornell Univ.*,
    889 F. Supp. 2d 539 (S.D.N.Y. 2012) ................................................................. 21, 23

*Moore v. Metro. Transp. Auth.*,
    999 F. Supp. 2d 482 (S.D.N.Y. 2013) ..................................................................... 14

*Murray v. Visiting Nurse Servs. of N.Y.*,
    528 F. Supp. 2d 257 (S.D.N.Y. 2007) ..................................................................... 21

*Orisek v. Am. Inst. of Aeronautics & Astronautics*,
    938 F. Supp. 185 (S.D.N.Y. 1996) ......................................................................... 18

*Quarless v. Brooklyn Botanic Garden Corp.*,
    No. 14-cv-2590, 2015 WL 2146248 (2d Cir. May 8, 2015) .......................................... 12

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ........................................................................................ 12

*Ricks v. Conde Nast Publ'ns*,
    92 F. Supp. 2d 338 (S.D.N.Y. 2000) ....................................................................... 13

*Risco v. McHugh*,
    868 F. Supp. 2d 75 (S.D.N.Y. 2012) ....................................................................... 20

*Rozenfeld v. MTA Bus Co.*,
    No. 13-cv-4847, 2015 WL 1174768 (S.D.N.Y. Mar. 16, 2015) .................................. 12, 13

*Russo v. N.Y. Presbyterian Hosp.*,
   972 F. Supp. 2d 429 (E.D.N.Y. 2013) .................................................................... 25

*Shih v. JPMorgan Chase Bank, N.A.*,
   No. 10-cv-9020, 2013 WL 842716 (S.D.N.Y. Mar. 7, 2013) ................................... 25

*Smith v. Dep't of Corr.*,
   No. 07-cv-1862, 2009 WL 2487981 (D. Conn. May 12, 2009) ............................... 20

*Tepperwien v. Entergy Nuclear Operations, Inc.*,
   663 F.3d 556 (2d Cir. 2011) ....................................................................................... 24

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   133 S. Ct. 2517 (2013) ................................................................................................ 13

*Weinstock v. Columbia Univ.*,
   224 F.3d 33 (2d Cir. 2000) ......................................................................................... 12

*Wilcox v. Cornell Univ.*,
   986 F. Supp. 2d 281 (S.D.N.Y. 2013) ....................................................................... 25

*Woodman v. WWOR-TV, Inc.*,
   411 F.3d 69 (2d Cir. 2005) .................................................................................. 12, 13

*Zann Kwan v. Andalex Grp. LLC*,
   737 F.3d 834 (2d Cir. 2013) ....................................................................................... 17

**Statutes**

28 U.S.C. § 1367(c)(3) ....................................................................................................... 26

42 U.S.C. § 2000e-5(e)(1) .................................................................................................. 23

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................................... 12

Plaintiff Michael Picarella brings retaliation claims under Title VII (Count 1), the New York City Human Rights Law ("NYCHRL"; Count 2), and the New York State Human Rights Law ("NYSHRL"; Count 3) against Defendant HSBC Securities (USA) Inc. ("HSBC").  HSBC respectfully submits that summary judgment should be granted on all claims.

**<u>Preliminary Statement</u>**

This case is a clear example of termination for poor performance.  As Picarella admits in his sworn charge filed with the Equal Employment Opportunity Commission ("EEOC"), his direct supervisor told him months before he ever allegedly engaged in protected activity that his performance was poor and that he should look for another job.  In December 2011, Picarella's direct supervisor informed him that HSBC senior management "did not think highly of him" and that he should "do what was right for his family."  Although Picarella testified that he did not take this warning seriously, it could not have come as a surprise.  During his first year at HSBC, Picarella clashed with numerous co-workers, was cited repeatedly by senior HSBC employees for bad judgment and subpar work, and received what he considered a disappointing bonus.  He was absent from his desk so often that his co-workers referred to him as "where's Waldo."  His supervisors noted that he was not "capable of doing what we needed" and discussed firing him or changing his role.  All of these things occurred prior to him ever engaging in protected activity.

Picarella's poor performance was documented by four successive managers, three of whom had not previously worked directly with Picarella. The concerns they raised echo those cited by Picarella's prior employer, Barclays Capital ("Barclays"), which also terminated his employment.  Even the people Picarella himself selected to provide input for his performance review reported that Picarella was "unreliable," "offensive," unfamiliar with the rules and

procedures applicable to his field, and lazy.  Although Picarella's supervisors gave him numerous opportunities to improve—through training, coaching, and one-on-one meetings to discuss his tasks—he had performance problems throughout his tenure at HSBC.  As a result, HSBC terminated his employment on March 26, 2015, roughly three years after he first allegedly engaged in protected activity and almost two years after he filed his EEOC Charge.

Picarella's case suffers from defects beyond his poor performance: he cannot establish a *prima facie* case because he cannot show the requisite causal connection between his protected activity and the actions about which he complains.  Nor can he offer any evidence of pretext.  But, at the end of the day, this is a case about an employee who had performance problems throughout his tenure, was given ample opportunities to improve, failed to do so, and the inevitable consequences that followed.  Summary judgment should be granted on all claims.

### Statement of Facts[1]

In May 2011, Picarella joined HSBC as a Senior Vice President ("SVP") and Business Manager in the Sales Business Management department of Global Markets (Americas). (Statement of Material Facts in Supp. of Def.'s Mot. for Summ. J. ("Facts") ¶ 2.)  Throughout his employment at HSBC, he held the same title and role, was paid the same salary (███████ per year), and his job responsibilities remained substantially the same. (Facts ¶¶ 255-57.)

Problems with Picarella's performance began to surface within months of his hiring.  By the end of 2011, Picarella's co-workers and superiors had complained about his work ethic, the quality of his work product, his communication skills, and his attitude.  (Facts ¶¶ 45-53, 60-62, 66-71.)  Over the next three years, four separate managers worked with Picarella to improve his

---

[1] Although largely chronological, the facts below are organized according to topic.  A more strictly chronological statement of facts is contained in HSBC's Statement of Material Facts, filed concurrently.

performance.  All came to the same conclusion: Picarella was unwilling and unable to perform at the SVP level.  (Facts ¶¶ 73, 77, 181, 233.)  By 2014, despite the fact that his responsibilities had not appreciably changed, Picarella had effectively stopped working altogether—by his estimate, he worked only 10% of the work day.  (Facts ¶ 227.)  HSBC terminated Picarella for poor performance in March 2015.  (Facts ¶ 253.)

## A.  Picarella's Managers and Co-Workers Recognized His Performance Problems Before He Ever Engaged in Protected Activity

When Picarella joined HSBC in May 2011, he reported to Eileen Hedges, the Head of Business Development (Americas).  (Facts ¶¶ 2, 7) ██████████ an analyst, also reported to Hedges.  (Facts ¶¶ 3, 8.)  That fall, █████ complained that Picarella was "not the most helpful person," "dumped things on [her]," and did not do work he thought was "beneath him."  (Facts ¶¶ 60-61, 67.)  █████ and a colleague noted that Picarella spent hours on his personal phone at work, calling him "where's Waldo" because he was "always MIA."  (Facts ¶ 66.)  In the same period, Hedges expressed concern that Picarella was "trying to take credit" for her work, and later confronted Picarella and "read him the riot act . . . about his attitude to people."  (Facts ¶¶ 45-46, 48.)  In December, █████ observed that Picarella stopped working and threatened to call his lawyer when told his bonus would not be as high as he expected.  (Facts ¶ 62.)

In Picarella's 2011 year-end review, Hedges identified deficiencies in his ability to communicate "among all relevant parties" and "up and across layers of management."  (Facts ¶ 51.)  During an in-person discussion of the review, Hedges informed him that two senior Global Markets executives, Pablo Pizzimbono, a Managing Director ("MD") and Head of Sales, and Suzy White, an MD and the Chief Operating Officer, "did not think highly" of him.  (Facts ¶ 53.)  She told Picarella that he should consider looking for another job.  (Facts ¶ 55.)

3

In 2012, Picarella's performance and attitude deteriorated further.  (Facts ¶¶ 72-90.)
Despite the fact that, as an SVP, he was expected to work with relative autonomy, Hedges
observed that Picarella "was unable to do his work appropriately" and others "always had to help
him."  (Facts ¶¶ 72-73.)  He was never "on the desk" and "was not getting the work [HSBC]
need[ed] him to get done, done."  (Facts ¶¶ 65, 86.)  Because he was frequently "walk[ing]
around socializing," it was clear to his co-workers that "mike doesn't handle anything." (Facts ¶
85.)  In February 2012, ███ complained that Picarella "organizes his meetings etc but when it
comes down to doing work he doesn't really do it."  (Facts ¶ 79.)

By early 2012, Pizzimbono felt Picarella was underperforming.  Pizzimbono
communicated this to Didier Descamps, Co-Head of Global Markets (Americas), suggesting
possible personnel changes to the Sales Management group.  (Facts ¶¶ 75-78.) White reached a
similar conclusion about Picarella.  By December 2011, she believed that Picarella was not
competent enough to attend meetings in Hedges' place, and in March 2012 she complained that
Picarella "really isn't capable of doing what we needed."  (Facts ¶¶ 71, 81-82.)

**B.    After Picarella Complained to Human Resources About Hedges, HSBC Investigated
and Removed Her from Her Managerial Position**

Following several months of well-documented poor performance, in or around April
2012, Picarella raised concerns about Hedges' conduct.  Picarella met with Human Resources
("HR") on April 11, 16, and 18 and complained about alleged inappropriate behavior by Hedges,
some of which dated back to 2011.  (Facts ¶¶ 94-98.)  Following Picarella's discussions with
HR, an HR representative had a conversation with Hedges on April 26 without disclosing the
source of the complaint.  (Facts ¶¶ 100-01.)  On or about July 24, after a thorough investigation,
HSBC removed Hedges from her managerial role, a decision that both Pizzimbono and White

4

were involved in and supported.  (Facts ¶ 108.)  Hedges was also subject to additional

repercussions, including a final written warning, mandatory training by outside counsel, and a

reduction in pay and performance rating.  (Facts ¶¶ 109-11.)

## C.   Picarella's Second and Third Managers Reached the Same Conclusions About His Poor Performance

White served as Picarella's interim direct supervisor from July 2012 through September

2012.  (Facts ¶ 115.)  Because she had only supervised him briefly at the time of his 2012 mid-

year review, White asked Picarella to provide her with a list of individuals at HSBC who could

provide feedback.  (Facts ¶¶ 141, 143.)  The feedback White received from the co-workers

Picarella selected was consistent with his prior HSBC and Barclays reviews:

- an SVP in Equities reported that Picarella "can come across as abrasive and sometimes offensive, which gets in the way of getting results delivered" (Facts ¶ 144);

- an SVP in Global Markets reported that, when working with Picarella, "on more than one occasion the root cause of the issue was not corrected," and that he needed to "work on process, operational risk, and management skills" (Facts ¶¶ 145-46);

- the Head of U.S. Credit Sales (MD) commented that Picarella was "unreliable," "lacked follow through on the projects," and was not "the go to professional we need in that role" (Facts ¶ 147);

- an SVP in Fixed Income and Derivatives Compliance said that Picarella needed to be "more familiar with the rules, materials and/or relevant procedures" (Facts ¶ 148); and

- the Head of U.S. Rate Sales (MD) observed that Picarella's work for his team had "fits and starts" and contributed "little more than e-mails that ask for follow ups rather than understanding the issues and suggesting solutions, making the process more efficient, etc." (Facts ¶¶ 149-50.)

There is no evidence that any of these individuals held retaliatory animus towards

Picarella.  (Facts ¶ 151.)  Indeed, Picarella's selection of these reviewers demonstrates that he did

not believe them to hold retaliatory animus.

5

Picarella received a "3" (on a scale of 1 (highest) to 5 (lowest)) on his 2012 mid-year review, placing Picarella in the middle 70% of HSBC employees.  (Facts ¶ 138.)  The review noted deficiencies in Picarella's performance, stating that Picarella was "not always reliable to follow through an issue to resolution," and that "[w]hile there is evidence of issue escalation and identification, feedback was that you need to work on developing the skills required to resolve the problems.  It is also felt that you lack detailed knowledge of the Global Markets business." The review added: "We can assist with this point by providing training."  (Facts ¶¶ 139-40.)

In late summer 2012, White and Pizzimbono recommended that Carol Semetulskis, a business manager for Wealth Management Sales, succeed Hedges.  (Facts ¶¶ 117, 121.)  White and Pizzimbono recommended Semetulskis because of her stellar performance reviews for the previous two years—she had received a "2" rating, which placed her in the top twenty percent of HSBC employees.  (Facts ¶ 119.)  In addition, White and Pizzimbono believed that Semetulskis was a natural fit for the role because she had significant experience in operational risk at HSBC and JPMorgan—she was an Operational Risk Manager at HSBC from 2007-2010—and there were a number of operational risk issues in Sales.  (Facts ¶ 122.)  White and Pizzimbono considered Picarella for the position but found him to be a less qualified candidate.  (Facts ¶¶ 118-20.)  They believed that he had been at best an average performer at HSBC, that he did not have the depth of Semetulskis' background in operational risk, and that he lacked the leadership qualities needed for a managerial role.  (Facts ¶¶ 120, 123.)  Semetulskis assumed her new role on or about September 5, 2012, and was later promoted to Senior Vice President.  (Facts ¶ 124.)

Prior to becoming his supervisor, Semetulskis had not interacted frequently with Picarella.  (Facts ¶ 126.)  White introduced her to the team on September 12, and during that

meeting, she and Semetulskis solicited Picarella's input on how to change the Sales Business Management department.  (Facts ¶¶ 126-27.)  Although he did not initially oppose Semetulskis' new role, Picarella subsequently started shirking assigned responsibilities, and took an increasingly aggressive and confrontational approach in interactions with his colleagues.  (Facts ¶¶ 177-78.)  On October 5, 2012, Picarella told White in an email that he had "zero capacity . . . actually in deficit," noting that he was covering all his "normal job functions" in addition to new tasks.  (Facts ¶ 157.)  Indeed, at that time, Picarella actively requested that Semetulskis take on many of his responsibilities, and complained to HR about being buried in work.  (Facts ¶ 158.)

Throughout 2012, both White and Pizzimbono observed that Picarella frequently escalated issues outside of his chain of command and based on inaccurate information or a fundamental misunderstanding of the applicable rules and regulations.  (Facts ¶¶ 133, 176.)  Following one such incident, White observed that Picarella was "[o]verall not very impressive," that "Mike does not see himself part of the team and does not take ownership of the issues or the resolution." (Facts ¶ 131.)  She also wrote that he was "quick to raise a problem before really understanding it but does not take the right approach to escalation or resolution."  (Facts ¶ 131.)

In Picarella's 2012 year-end review, Semetulskis and White once again raised concerns about Picarella's communications skills and his failure to adequately resolve issues, noting that "Mike could be more proactive and involved for example by increasing the timeliness of communication," and that he "should work towards helping to resolve the issues he raises." (Facts ¶ 175.)  White and Semetulskis offered Picarella training or coaching in the specific areas that he had flagged as being difficult for him, but Picarella declined.  (Facts ¶ 165.)  Picarella was awarded a discretionary bonus of ███████ for 2012.  (Facts ¶ 166.)

Semetulskis found Picarella particularly difficult to manage.  (Facts ¶¶ 176-78.)  For much of her time as Picarella's supervisor, Picarella refused to speak to Semetulskis in person, communicating solely by e-mail, even when Semetulskis approached Picarella to speak to him personally.  (Facts ¶ 177.)  On April 23, 2013, Picarella refused to take on an assignment that he incorrectly believed would require working on the weekend, labeling that consequence "inappropriate" in light of his family responsibilities and his preference to spend the weekend at his family's vacation home.  (Facts ¶¶ 169-70.)  Pizzimbono explained that the task would not require weekend work and that, as a Senior Vice President, Picarella should not assume that weekend work was "inappropriate."  (Facts ¶¶ 171-73.)  Based on her experience as his supervisor, Semetulskis believed that Picarella did not demonstrate the leadership and follow-through she would expect of a Senior Vice President at HSBC.  (Facts ¶ 17.)

**D.      Picarella's Fourth Manager Also Concluded That Picarella Was a Poor Performer**

By May 2013, Semetulskis had grown tired of Picarella's "adversarial and unprofessional behavior" and asked to no longer manage him.  (Facts ¶¶ 178-79.)  White granted the request and selected Michael Karam, a business manager from Metals Sales, as Picarella's new manager.  (Facts ¶ 182.)  White hoped that Karam's strong management skills and calm demeanor would aid Picarella's professional development.  (Facts ¶ 185.)

Karam tried to change the course of Picarella's downward trajectory by assigning him new responsibilities that might allow him to excel, including client on-boarding duties.  (Facts ¶ 190.)  In the spring of 2013, Karam worked extensively with Picarella to ensure that his objectives were clearly identified and understood.  (Facts ¶ 188.)  Despite his efforts, Karam noted in Picarella's mid-year 2013 review that the responsibilities Picarella had assumed still

"f[e]ll short of those typically expected of a SVP."  (Facts ¶ 206.)  The day after Karam delivered Picarella's mid-year 2013 review, Picarella elevated a purported issue involving "give-up accounts" directly to Pizzimbono, bypassing Karam.  (Facts ¶ 203.)  Ironically, it was Picarella who had failed to perform the work required to resolve the issues related to the "give-up accounts."  (Facts ¶ 208.)

Picarella's performance problems continued under Karam.  Despite Karam's efforts to spell out for Picarella the "minimum" responsibilities an employee of Picarella's seniority and role was expected to fulfill and the regular "catchup meetings" he held to help Picarella remain on track, Picarella failed to perform the tasks required of him. (Facts ¶¶ 189, 193-201, 206, 208.)  In addition to the give-up accounts, Picarella was unreliable in solving issues related to a monthly report dubbed the "GMB submission," on which individuals within HSBC—including senior executives—relied for market data.  (Facts ¶¶ 200-02.)  Far from taking ownership of his work, Picarella "required a lot of hand holding" to coordinate HSBC's participation in the Greenwich Survey, an industry survey of enormous importance to HSBC.  (Facts ¶¶ 197-99.)  As a result of Picarella's unresponsiveness, HSBC missed the deadline to respond to the survey and others were required "to step in and fill in a gap where [Picarella] failed." (Facts ¶ 198.)   On May 16, 2014, Karam delivered Picarella's year-end 2013 review.  (Facts ¶ 210.)  It noted that Picarella "has demonstrated a weakness in proactively devising meaningful solutions to tasks which has required intervention and guidance that should have been unnecessary."  (Facts ¶ 212.)  Picarella was granted a discretionary 2013 bonus of ███████  (Facts ¶ 213.)

Karam spent the better part of 2014 attempting to get Picarella to propose and finalize his annual objectives, which is required of all HSBC employees.  (Facts ¶¶ 215-18.)  In May 2014,

Karam first asked Picarella to propose his objectives, and Karam followed up on September 22 requesting that Picarella finalize them.  (Facts ¶¶ 215-16.)  Picarella did not meet the deadline Karam set in his email, and as of October 7, 2014, Picarella still had not finalized his objectives for the year.  (Facts ¶¶ 217-18.)  On or around November 21, 2014, Karam delivered Picarella's mid-year 2014 review, in which he received a rating of "Off Track" (bottom 10%) under HSBC's revised rating system.  (Facts ¶¶ 219-25.)  It noted that "Mike's lack of initiative, lack of productivity, and refusal to take ownership for strategically defining his role or his work is contrary to his [Global Career Band] level and is significantly below the performance of his peers."  (Facts ¶ 226.)

On January 13, 2015, Daniel Silber, HSBC's Head of Markets for Institutional Sales (Americas), led an internal sales call that Picarella dialed into from home.  (Facts ¶ 240, 242.) The call included a confidential—and potentially privileged—briefing by HSBC counsel.

(Facts ¶ 241.)  The following day, Silber received a phone call from a reporter who asked

questions regarding information that Silber purportedly provided on the sales call.  (Facts ¶ 243.)

The information the reporter referenced included information that only a participant on the call

could have known.  (Facts ¶ 243.)  Because that same reporter had previously published an

article that discussed Picarella and ███████ November 24 meeting, HSBC identified Picarella as

a possible source of a leak of confidential HSBC information to one or more third parties and

placed him on paid administrative leave pending the outcome of an investigation.  (Facts ¶¶ 244-

45.)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████  The investigation concluded that Picarella or someone associated with him

was likely the source of the leak. (Facts ¶ 249.)

    In March 2015, after more than three years of documented failure to perform and

unwillingness to improve, Karam recommended that Picarella's employment be terminated

based on his continued poor performance.  (Facts ¶ 251.)  Based on Picarella's long history of

performance issues, Descamps approved the termination.  (Facts ¶ 252.)  Karam and HR

attempted to inform Picarella of the termination of his employment by telephone.  (Facts ¶ 254.)

Picarella was eventually notified by letter dated March 26, 2015 that his employment at HSBC

was terminated "due to [his] significant performance issues which have been previously

discussed with [him]."  (Facts ¶ 253.)

## **Legal Standard**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A non-moving party cannot avoid summary judgment simply by asserting a metaphysical doubt as to the material facts. Instead, she must set forth specific facts showing that there is a genuine issue for trial." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005); *see Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("The time has come . . . to put up or shut up . . . unsupported allegations do not create a material issue of fact.").[2] "Summary judgment is appropriate even in discrimination cases." *Weinstock*, 224 F.3d at 41. Indeed, the Supreme Court has "reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). Thus, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Plaintiff's claims for retaliation under Title VII and the NYSHRL are subject to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)." *Rozenfeld v. MTA Bus Co.*, No. 13-cv-4847, 2015 WL 1174768, at *7 (S.D.N.Y. Mar. 16, 2015); *see Quarless v. Brooklyn Botanic Garden Corp.*, No. 14-cv-2590, 2015 WL 2146248, at *1 (2d Cir. May 8, 2015) (summary order) (same). The first step under *McDonnell Douglas* requires Picarella to establish a *prima facie* case—"that [i] he engaged in

---

[2] Unless otherwise noted, all internal citations, quotation marks, and brackets are omitted; all emphases are added.

protected activity; [ii] the employer was aware of that activity; [iii] the employee suffered a materially adverse action; and [iv] there was a causal connection between the protected activity and that adverse action." *Rozenfeld*, 2015 WL 1174768, at *8. To demonstrate the requisite "causal connection," Picarella must establish but-for causation, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

If a *prima facie* case is established, "that shifts the burden of production to the defendant, who must proffer a legitimate, nondiscriminatory reason for the challenged employment action. If the defendant articulates such a reason, the presumption of discrimination drops out, and the plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. In short, the ultimate burden rests with the plaintiff to offer evidence sufficient to support a reasonable inference that prohibited [retaliatory] discrimination occurred." *Woodman*, 411 F.3d at 76. "The mere fact that an employee disagrees with the employer's assessments of her work . . . cannot standing on its own show that her employer's asserted reason for termination was pretextual." *Ricks v. Conde Nast Publ'ns*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000). In addition, a plaintiff cannot rely on temporal proximity to establish pretext. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) (noting that "temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.").

## Argument

Due to the overwhelming evidence of legitimate, non-discriminatory reasons for HSBC's actions, that argument is presented first. Parts II and III demonstrate that Picarella cannot

establish a *prima facie* case of retaliation, and are analytically prior to Part I, but it has become routine for courts to omit the *prima facie* case analysis where the defendant has established a clear justification for its actions, and the Court may do the same here.  *See, e.g.*, *Moore v. Metro. Transp. Auth.*, 999 F. Supp. 2d 482, 495 (S.D.N.Y. 2013).  Part IV addresses Picarella's NYCHRL claim and, *inter alia*, demonstrates that the arguments in Part I justify summary judgment on that claim also.

## I.     HSBC Had Legitimate, Non-Discriminatory Reasons for Terminating Picarella's Employment

The evidence indisputably demonstrates that HSBC terminated Picarella's employment for the legitimate, non-discriminatory reason of poor performance.  An employee's poor performance is a quintessentially legitimate business purpose for terminating his employment. *See Davis v. Avaya, Inc.*, 295 F. App'x 380, 381 (2d Cir. 2008) (summary order) ("[A] failure to perform satisfactorily is a legitimate, nondiscriminatory reason . . . .").

"Poor performance" as determined by a "supervisor and others who directly reviewed" plaintiff's work constitutes a "legitimate nondiscriminatory reason[]."  *Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 514-15 (S.D.N.Y. 2014).  The record in this case makes clear that all of Picarella's successive supervisors found his work to be unsatisfactory— both before and after his claimed protected activity.  At the time of his year-end review in 2011, Hedges warned him that White and Pizzimbono were already unhappy with his performance. (Facts ¶ 53.)  This occurred before Picarella engaged in any alleged protected activity. (Facts ¶ 271.)  His mid-year 2012 and year-end 2013 reviews noted that Picarella failed to follow through and resolve his performance issues, and that his failures required the intervention of others.  (Facts ¶¶ 139, 212.)  Picarella's mid-year 2014 review—his last—rated him as "Off

Track" due, among other things, to his "lack of initiative, lack of productivity, and refusal to take ownership." (Facts ¶¶ 220, 226.)

That all four of Picarella's successive supervisors reached the same conclusion about his performance is all the more striking for the fact that, after his complaints HSBC twice afforded Picarella a new manager with no previous work experience with him. (Facts ¶¶ 126, 186.) Neither Semetulskis nor Karam had any connection to Picarella's complaints or any involvement in the resulting investigations. Each worked diligently to ensure Picarella understood his responsibilities and had the resources necessary to execute them. (Facts ¶¶ 127, 188-189.) Yet each independently concluded that, notwithstanding their efforts, Picarella's management skills and overall performance fell well short of that expected of a Senior Vice President. (Facts ¶¶ 181, 195-201, 206, 232-233.) Each observed that Picarella failed to adequately and timely complete his work and could not be relied upon to execute even ministerial tasks, let alone projects requiring the business judgment HSBC expected of its senior-level employees. (Facts ¶¶ 175-76, 181, 195-201, 206-08, 230-33.)

As Picarella concedes, his allegations of retaliation against Semetulskis and Karam are no more than "speculation" because there is no evidence that either was motivated by retaliatory intent or had any reason to retaliate against Picarella. (Facts ¶¶ 260-261.) *See Johnson*, 2 F. Supp. 3d at 518-19 (summary judgment is "well beyond the stage at which mere speculation can sustain plaintiff's claim"); *Anaya v. Donahoe*, No. 08-cv-3842, 2011 WL 3841403, at *6 (E.D.N.Y. Aug. 26, 2011) (Carter, J.) (granting summary judgment where "Plaintiff has offered no evidence of discrimination or retaliation other than his own impressions and speculations.").

But it was not just Picarella's supervisors who concluded Picarella's performance was

15

wanting.  The very people Picarella selected to provide input to White for his mid-year 2012 review also savaged his performance.  He was described as "abrasive," "unreliable," "lack[ing] follow through," and in need of training on rules and procedures.  (Facts ¶¶ 144-48.)  Certainly complaints of incompetence, laziness, and poor performance—reflected in the full excerpts, *supra* page 5—are legitimate bases for termination.  *See Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110-11 (2d Cir. 2011) (summary order) (upholding grant of summary judgment because plaintiff's "poor work performance constituted a legitimate, non-retaliatory reason for her termination").

In addition, Picarella's supervisors' conclusions are corroborated by and consistent with the reviews Picarella received from his previous employer, Barclays (*see* Facts ¶¶ 29-35):

| Barclays | HSBC |
|---|---|
|  | 2012 Mid-Year Review: "Areas for development are related to execution and completeness.  **There is a general feeling that while you are keen to help, you are not always reliable to follow through an issue to resolution.**" |
|  | 2013 Year-End Review: "**Mike . . . needs to work towards creating solutions and taking initiative where appropriate.**  A standing catch up session has been established to discuss progress, weaknesses and hurdles to overcome." |
|  | 2014 Mid-Year Review: "There remains a commitment to work with Mike to function within those expectations of an SVP, but this is becoming increasingly challenging given his **lack of initiative.**  This is a theme that has carried over from last year's review.  **Mike's lack of initiative, lack of productivity, and refusal to take ownership for strategically defining his role or his work is contrary to his GCB level and is significantly below the** |

16

| Barclays | HSBC |
|---|---|
| ███████████████████████████████ ████████████ | performance of his peers." |
| ██████████████████████████████████ ██████████████████████████████ ██████████████████████████████ ██████████████████████████ | 2012 Mid-Year Review: "While there is evidence of issues escalation and identification, feedback was that **you need to work on developing the skills necessary to resolve the problems**.  It is also felt that **you lack detailed knowledge of the Global Markets business**." 2014 Mid-Year Review: "A common theme is one where **Mike is elusive, doesn't take ownership of his work, and lacks initiative**." |

Picarella has no reason to believe or evidence to support that HSBC's stated basis for termination—poor performance—was pretextual.  To prove pretext, a plaintiff must "demonstrat[e] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  HSBC's stated reason for terminating Picarella's employment is entirely consistent with the downward trajectory demonstrated by contemporaneous evidence and corroborative testimony.

More fundamentally, Picarella was told to consider alternative employment before he ever engaged in alleged protected activity.  (Facts ¶¶ 55, 271.)  Pretext is logically impossible when the employer's recognition of the poor performance predates the protected activity.  *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (affirming summary judgment where adverse employment action due to deficient performance commenced before protected activity); *Dixon v. Int'l Fed'n of Accountants*, No. 09-cv-2839, 2010 WL 1424007, at *6 (S.D.N.Y. Apr. 9, 2010) ("[Plaintiff] was subjected to repeated critiques and complaints about her management and performance skills before she ever lodged any complaints about

17

discrimination and, as such, her retaliation claim must be dismissed."), *aff'd*, 416 F. App'x 107.

Picarella's "own disagreement with [HSBC's] perception of [his] job performance does not satisfy [his] burden of showing that the [HSBC's] proffered justification was a pretext for discrimination."  *Evans v. N.Y. Botanical Garden*, 253 F. Supp. 2d 650, 660-61 (S.D.N.Y. 2003) (citing *Orisek v. Am.  Inst. of Aeronautics & Astronautics*, 938 F. Supp. 185, 191 (S.D.N.Y. 1996)), *aff'd*, 88 F. App'x 464 (2d Cir. 2004); *see also Brooks v. Blank*, No. 10-cv-08124, 2014 WL 1495774, at *10 (S.D.N.Y. Mar. 31, 2014) (Carter, J.) ("Plaintiff's evidence that her employer's reasons are pretextual consists of nothing more than conclusory assertions that her employer's stated reasons are 'not accurate'"); *Hahn v. Bank of Am. Inc.*, No. 12-cv-4151, 2014 WL 1285421, at *21 (S.D.N.Y. Mar. 31, 2014) ("Plaintiff has not come forward with any evidence capable of showing that her job performance did not actually warrant the criticisms she received."), *aff'd*, No. 14-1454, 2015 WL 3498800 (2d Cir. June 4, 2015).

To the contrary, "the multitude of contemporaneous documentation from Plaintiff's supervisors" attesting to his performance failures "cuts against [his] arguments of pretext." *Brooks*, 2014 WL 1495774, at *11.  So too does the well-documented seriousness with which HSBC treated each of Picarella's complaints weigh against a finding of pretext.  *See Flanagan v. N. Shore Long Island Jewish Health Sys.*, No. 11-cv-5246, 2014 WL 4905124, at *11 (E.D.N.Y. Sept. 30, 2014) (granting summary judgment where defendant's officers "immediately met with [plaintiff] to discuss his allegations, and . . . conducted an independent investigation of the allegations").

Picarella's termination letter also informed him that the investigation into providing confidential, and potentially privileged, information to a third-party resulted in a finding that he

was "highly likely the source" of leaked information.  (Facts ¶ 249.)  This apprised Picarella of

the results of an investigation in which he had been implicated, and was not the basis for his

termination.  (Facts ¶ 253.)  But even if it were, "[w]hether Defendants' actions were

unreasonable, unfair or even untrue, as Plaintiff alleges, without any showing of retaliatory

motive, they do not support Plaintiff's retaliation claim."  *Bowen-Hooks v. City of New York*, 13

F. Supp. 3d 179, 232 (E.D.N.Y. 2014).  Plaintiff has not presented any evidence to suggest that

███████████████████████████████████████████████████████

████ Kutas harbored any retaliatory animus toward Picarella, and that is as far as the Court

need go in its query.  (Facts ¶ 266.)

## II.   Picarella Cannot Establish a *Prima Facie* Case Because He Cannot Show Causation

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause

of the challenged employment action."  *Nassar*, 133 S. Ct. at 2528.  In other words, Picarella

must show that HSBC would not have terminated his employment—or taken any other alleged

adverse action—absent a motive to retaliate against him for his alleged protected activity.  This

standard is intended to provide courts with a tool "to dismiss dubious claims at the summary

judgment stage."  *Id*. at 2532.  Picarella may show causation (1) directly, through evidence of

retaliatory animus directed against the plaintiff by the defendant; or (2) indirectly by showing

that the protected activity was followed closely by retaliatory action.  *See Hahn*, 2014 WL

1285421, at *18.  Picarella can do neither.

Picarella cannot establish causation directly because, despite HSBC's production of

hundreds of thousands of documents and nearly twenty depositions, he fails to adduce any

evidence of retaliatory animus directed against him by relevant decision makers—or, indeed,

19

anyone—at HSBC.  *See Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 153 (E.D.N.Y. 2013) (direct evidence must be "a smoking gun or at least a thick cloud of smoke"), *aff'd*, 576 F. App'x 39 (2d Cir. 2014).  Indeed, at his deposition, Picarella was unable to identify any direct evidence of retaliation, and admitted that he is relying on speculation.  (Facts ¶¶ 259-66.)  *See Risco v. McHugh*, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) ("A nonmoving party must offer some hard evidence showing that its version of events is not wholly fanciful.").

The scope of the conspiracy Picarella speculates must have existed demonstrates the implausibility of his allegations.  The crux of Picarella's retaliation theory is that Pablo Pizzimbono (an indirect supervisor) and Suzy White (his direct supervisor for less than two months in the summer of 2012) had influence over each of the two dozen individuals he accuses of retaliating against him.  (Ex. 113 (Picarella 201:4-6, 203:12-14.))  Picarella's conspiracy includes: (i) a trader who allegedly looked at Picarella's computer "throughout the day"; (ii) unnamed "senior managers" who allegedly made inappropriate comments to Picarella in an elevator bank; (iii) various HR personnel who Picarella believed did not properly investigate his claims; (iv) Semetulskis, because she "distracting[ly]" hummed while she worked; and (v) administrative assistants who "huddled up." [3]  (Facts ¶ 258.) Notwithstanding the improbable breadth of Picarella's assertions, with each new allegation HR expanded its investigation to include Picarella's new claims.

Nor can Picarella establish causation indirectly, as his complaints were not followed closely in time by any adverse employment action and he has no comparators.  *See Smith v. Dep't of Corr.*, No. 07-cv-1862, 2009 WL 2487981, at **4-5 (D. Conn. May 12, 2009) (finding

---

[3] The conspiracy apparently extends to include in-house counsel at HSBC and one (but oddly not both) of the outside firms retained to defend against this lawsuit.  (Marshall Declaration Exhibit ("Ex.") 98).

*prima facie* case of retaliation not established where neither was present).  "The cases that accept

mere temporal proximity between an employer's knowledge of protected activity and an adverse

employment action as sufficient evidence of causality to establish a prima facie case uniformly

hold that the temporal proximity must be very close."  *Clark Cnty. Sch. Dist. v. Breeden*, 532

U.S. 268, 273 (2001) (per curiam)).  "[C]ourts in this Circuit have consistently held that a

passage of more than two months between the protected activity and the adverse employment

action does not allow for an inference of causation."  *Moccio v. Cornell Univ.*, 889 F. Supp. 2d

539, 587 (S.D.N.Y. 2012) (citing *Flood v. UBS Global Asset Mgmt.*, No. 10-cv-374, 2012 WL

288041, at *17 (S.D.N.Y. Feb. 1, 2012)).  Picarella filed his EEOC Charge on June 27, 2013—

21 months prior to his termination.  He filed the present suit on June 20, 2014—nine months

prior his termination.  And Picarella repeatedly testified that he was retaliated against because of

his complaints to HR made early in 2012—nearly ***three years*** prior to his termination. (Ex. 113

(Picarella 20:8 – 21:5)).  ████████████████████████████████████████████

████████████████████████████████████████  As for comparators,

Picarella has established none.  *See Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257,

272 (S.D.N.Y. 2007) (dismissing retaliation claim where "plaintiff has failed to offer evidence of

disparate treatment of individuals similarly situated to plaintiff").

 Moreover, there can be no adverse employment action for the purpose of a retaliation

claim when the employer's actions would not "have dissuaded a reasonable worker from making

or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

53, 68 (2006).  The record in this case is replete with Picarella's various complaints to HSBC's

HR Department as it is with evidence of that department's prompt and thorough response to each

complaint:  Picarella complained about Hedges, and Hedges was promptly disciplined and ultimately removed; Picarella complained that the investigation into Hedges' conduct was mishandled, and new HR personnel were mustered to investigate Picarella's claims and address his concerns; Picarella claimed he was being excluded from meetings and that his responsibilities were diminished, and HR worked with Picarella and his managers to ensure that Picarella's role was clearly defined and maintained; Picarella reported that he is being mistreated by his coworkers, and HR investigated his claims; ███████████████████████████████ ████████████████████████████████████████████████████████████████  At every turn, HSBC's actions encouraged Picarella to make valid complaints safe in the knowledge they would be investigated thoroughly and promptly, and Picarella continued to lodge complaints.

In sum, there is no evidence that HSBC's conduct deterred him from reporting harassment—indeed, HSBC's conduct encouraged him to freely raise his concerns, which he clearly continued to do for nearly three years.  *See McWhite v. N.Y.C. Hous. Auth.*, No. 05-cv-991, 2008 WL 1699446, at *13 (E.D.N.Y. Apr. 10, 2008) (granting summary judgment where the alleged adverse actions "did not deter plaintiff").

### III.   Picarella's Remaining Retaliation Claims Fail Because He Cannot Make Out a *Prima Facie* Case and Because HSBC Had Legitimate Reasons for Acting As It Did

Picarella claims that he was passed over for Hedges' position because "just three months prior to that, [he] went to visit Ellen Weiss to report sexual harassment of █████████."  (Ex. 113 at 109:22-110:7).  In fact, at least four months elapsed between Picarella's report to Weiss on April 11, 2012 and Semetulskis' promotion in late summer 2012.  (Facts ¶¶ 94,117.)  But either way, the amount of time between the protected activity and the promotion decision does

not support an inference of causation.  *See Moccio*, 889 F. Supp. 2d at 587-88 (noting two-month

outer limit).[4]  Picarella's uncorroborated allegation that he was denied a promotion to Managing

Director that he was "perhaps" entitled to by the end of 2012—eight months after he met with

Weiss—suffers from the same infirmity.  (Ex. 114 at 307:17-21).

More fundamentally, Picarella's failure-to-promote claims fail because HSBC had

legitimate business reasons to act as it did.  With respect to Hedges' position, White and

Pizzimbono considered Semetulskis and Picarella for the job and concluded that Semetulskis was

the better candidate.  (Facts ¶¶ 117-18, 121.)  She was a natural fit for the role because of her

background in operational risk and risk management, impeccable performance reviews, and

strong leadership abilities.  (Facts ¶¶ 119, 121-22.)  They believed that Picarella, by contrast, had

a track record of poor to mediocre performance and less experience with operational risk, which

White had already observed was not his "thing."  (Facts ¶¶ 82, 120, 123.)  Given this assessment

in September 2012—and Picarella's performance issues and behavior over the following two-

and-a-half years—it is hardly surprising that Picarella was never made a Managing Director.

Picarella's allegations that various responsibilities were taken away from him in the

months following his complaints are contradicted by his own contemporaneous pleas that that he

had "zero capacity" and was "actually in deficit."  (Facts ¶ 157.)  Picarella's other allegations on

this front relate to responsibilities that were allegedly taken away months—and in some cases

years—after he engaged in protected activity.  For example, he claims that Pizzimbono removed

him from his role with a hedge fund committee in February 2013, *see* Ex. 97 ¶ 80, nearly one

---

[4] To the extent Picarella claims, as he did during his deposition, that he was passed over for the job in July 2012 (Ex. 113 at 98:9-13)—which HSBC disputes—his Title VII failure-to-promote claim is barred under 42 U.S.C. § 2000e-5(e)(1), which requires a complainant to file an EEOC charge within 300 days of an alleged adverse employment action.  Picarella filed his EEOC charge on June 27, 2013.  (Facts ¶ 191.)  Thus, summary judgment should be granted as to any Title VII claim based on an adverse action alleged to have taken place prior to August 31, 2012.

year after he insists that he told Pizzimbono about the alleged sexual harassment of ███

███ (Ex. 113 at 37:18-24).  As evidence of causation for this and other allegations of lost

responsibilities, Picarella has only speculation and a belief that everything that happened to him

at HSBC was "all connected."  (Ex. 113 at 117:6-12).  His claims that he was excluded from

various meetings are likewise unsupported.

Most of Picarella's remaining allegations of retaliation, even when viewed in

conjunction, are exactly the sort of harmless "petty slights or minor annoyances" that are not

actionable under Title VII, the NYSHRL, or the NYCHRL.  *Tepperwien v. Entergy Nuclear*

*Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 67-68).  His

many accusations—that his supervisor hummed too loudly, that co-workers looked at his

computer screen, that his name was omitted from an organizational chart, that secretaries might

be gossiping about him (Facts ¶ 258)—describe events that "often take place at work and that all

employees experience."  *Tepperwien*, 663 F.3d at 568.  The rest of Picarella's allegations, which

relate to his conflicts with managers and co-workers, have no basis in evidence.  Even if they

did, such evidence would not be probative of retaliatory animus, but rather simply support "an

inference that [Picarella's] superiors and co-workers disliked him."  *See Lomotey v. Conn. Dep't*

*of Transp.*, 355 F. App'x 478, 482 (2d Cir. 2009) (summary order).

## IV.    Picarella's NYCHRL Claim Also Fails

"Because the federal and state retaliation claims on which summary judgment is granted

fail because of the absence of retaliatory animus, they also fail under the broader NYCHRL."

*Bryant v. Merrill Lynch, Pierce, Fenner & Smith*, No. 12-cv-2940, 2013 WL 2359109, at *5

(S.D.N.Y. May 30, 2013).  "In the absence of evidence beyond Plaintiff's speculation that his

supervisor . . . and/or the human resources department . . . were motivated to terminate Plaintiff in response to Plaintiff's complaints . . . Plaintiff cannot establish retaliation under the less stringent standard of the NYCHRL." *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 322 (E.D.N.Y. 2014), *aff'd*, 594 F. App'x 29 (2d Cir. 2015).  In other words, HSBC's legitimate non-discriminatory reasons for its actions defeat the NYCHRL claim.  *See Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 456-57 (E.D.N.Y. 2013) (lack of "temporal proximity" and "legitimate reason" for termination warranted summary judgment); *Shih v. JPMorgan Chase Bank, N.A.*, No. 10-cv-9020, 2013 WL 842716, at *9 (S.D.N.Y. Mar. 7, 2013) (summary judgment warranted where defendant "proffered legitimate, non-retaliatory reasons for its actions that the plaintiff has not refuted").

A plaintiff who fails to show temporal proximity in support of his Title VII or NYSHRL retaliation claims cannot show temporal proximity or a causal nexus under NYCHRL, either. *See Wilcox v. Cornell Univ.*, 986 F. Supp. 2d 281, 288 (S.D.N.Y. 2013) (NYCHRL retaliation claim failed because "no retaliatory nexus exists" where defendant continued to employ plaintiff for three months after EEOC charge); *Herrington v. Metro-N. Commuter R.R. Co.*, 118 A.D.3d 544, 545 (1st Dep't 2014) (alleged adverse actions occurring a year after protected activity were too remote to establish the requisite causal nexus for a NYCHRL retaliation claim).[5]

<u>**Conclusion**</u>

For the foregoing reasons, the Court should grant summary judgment on all claims and dismiss this case in its entirety.

---

[5] In the alternative, "while courts in this District tend to retain jurisdiction over NYSHRL claims when deciding federal discrimination claims on the merits, they frequently decline to exercise supplemental jurisdiction over NYCHRL claims." *Guzman v. City of New York*, No. 13-cv-5445, --- F. Supp. 3d ---, 2015 WL 1239988, at *13 (S.D.N.Y. Mar. 18, 2015) (collecting cases); *see also Johnson*, 2 F. Supp. 3d at 518 (granting summary judgment on federal discrimination claim and declining to exercise supplemental jurisdiction over an NYCHRL claim).

Dated: June 12, 2015                                    /s/ Damien J. Marshall

                                                       Damien J. Marshall
                                                       Camille Oberkampf
                                                       Ilana Miller
                                                       Joshua J. Libling
                                                       BOIES, SCHILLER & FLEXNER LLP
                                                       575 Lexington Avenue
                                                       New York, New York 10022
                                                       Phone: (212) 446-2300
                                                       dmarshall@bsfllp.com
                                                       coberkampf@bsfllp.com
                                                       imiller@bsfllp.com
                                                       jlibling@bsfllp.com

                                                       Eugene Scalia
                                                       GIBSON, DUNN & CRUTCHER LLP
                                                       1050 Connecticut Avenue, NW
                                                       Washington, District of Columbia 20036
                                                       Phone: (202) 955-8206
                                                       Facsimile: (202) 530-9606
                                                       escalia@gibsondunn.com

                                                       *Attorneys for HSBC Securities (USA) Inc.*

26