GC5TPIC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MICHAEL PICARELLA,

                    Plaintiff,

            v.                          14 CV 4463 (ALC)

HSBC (USA) SECURITIES, INC.,

                    Defendant.

------------------------------x
                                        New York, N.Y.
                                        December 5, 2016
                                        9:30 a.m.

Before:

                    HON. ANDREW L. CARTER,

                                        District Judge

                         APPEARANCES

LIDDLE & ROBINSON LLP
     Attorneys for Plaintiff
BY:  JAMES R. HUBBARD
     BLAINE H. BORTNICK
     ASA F. SMITH
     CHRISTINE PALMIERI

BOIES, SCHILLER & FLEXNER LLP
     Attorneys for Defendant
BY:  RANDALL W. JACKSON
     DAVID L. SIMONS
     NICHOLAS STANDISH

GIBSON, DUNN & CRUTCHER LLP
     Attorneys for Defendant
BY:  GABRIELLE F. LEVIN

GC5TPIC1

```
 1              (Jury not present, case called)
 2              THE COURT:  Good morning everyone.
 3          So I have been informed by my wonderful and talented
 4     deputy that the jurors should be ready around 10:15, so we'll
 5     make that call then and proceed with jury selection.
 6              I received the back-and-forth requests for a premotion
 7     conference regarding the defendant's request for an adverse
 8     inference.  I'm not going to rule on that now.  Defense counsel
 9     is free to inquire of the witness on the stand about these
10     issues or potential issues with these documents and then we'll
11     figure that out when we give the final instructions to the
12     jury.  It seems to me that I won't prejudge it much more than
13     that.  I will allow defense counsel to inquire as to that, but
14     I don't think it's appropriate for me to rule on that right
15     now.
16              Any thoughts on that by plaintiff or defense?
17              MR. JACKSON:  No, your Honor.
18              MR. HUBBARD:  No, your Honor.
19              THE COURT:  Is there anything else that take up before
20     jury selection?
21              MR. HUBBARD:  Your Honor, I have an amended list of
22     exhibits.  With the pretrial order your Honor will recall that
23     we each have an exhibit, the Plaintiff's Exhibit A to the
24     pretrial order.  And what I have done -- obviously I need your
25     permission to do this, but I have added ten exhibits at the end
```

GC5TPIC1

```
 1   of my list from the defendant's list.  They're not new, they're
 2   from the defendant's list.  I put a plaintiff's number on them
 3   and added them to this list just so that I can kind of keep
 4   them in my order of proof and that kind of thing, it's easy for
 5   me.
 6          The defendant obviously has not had a chance to object
 7   to them because they didn't go through the pretrial order
 8   process, but they are all from the defendant's exhibit list.
 9          THE COURT:  And have you shown this to defense counsel
10   yet?
11          MR. HUBBARD:  Yes, sir.
12          THE COURT:  Defendants have any view on this?
13          MR. JACKSON:  Your Honor, this isn't a major issue.
14   We have had a chance --
15          THE COURT:  You said this is or is not?
16          MR. JACKSON:  This is not a major issue.  We haven't
17   had a chance to look at all this in detail, but what we just
18   told Mr. Hubbard is that we think for most of these it won't be
19   a problem.  We would reserve our right to object on evidentiary
20   bases that may apply depending where there may be a slightly
21   different situation with him offering it, but I think for most
22   of these it shouldn't be an issue, it's just remarking.  And
23   there may be some exhibits that would be offered duplicatively
24   just if we don't have the time to sort of sync up and make sure
25   exactly what he has is the same as ours, but this is not a
```

GC5TPIC1

1     major issue, your Honor.

2            THE COURT:  And while we're on that topic, again we're

3     get close to the end of the year holiday season.  Let's try to

4     make sure we can move this case as expeditiously as possible.

5     Obviously counsel have an obligation to object to any evidence

6     that they feel is inappropriate, but if, for example, there are

7     documents that one side seeks to move into evidence, and if we

8     know ahead of time there is no objection, instead of going

9     through laying the foundation for this, if counsel could just

10    try to confer, or at least at that time if counsel could just

11    say there's no objection to this being admitted we can cut

12    through the laying of the foundation and all that, because

13    that's typically not the most rivetting testimony for jurors.

14            MR. JACKSON:  We completely agree, your Honor.  We

15    understand.

16            THE COURT:  Anything else that we need to take up

17    before we start jury selection?

18            MR. HUBBARD:  Not for the plaintiff, your Honor, thank

19    you.

20            MR. JACKSON:  Just very briefly, your Honor.  One, we

21    wanted to confirm, is there an instruction -- your Honor had

22    suggested at the final pretrial conference that there was an

23    instruction that Court intended to give to certain of the

24    witnesses potentially related to the pseudonym issue.  There

25    may be confusion on our part on that.

GC5TPIC1

1      THE COURT:  I had not planned on doing that.  My hope

2  is that we dealt with that in advance enough so that counsel

3  could have those witnesses prepped.  And I think that with the

4  pseudonym that was chosen I wanted to avoid any issue where I

5  had to say to a witness please refer to this person as so and

6  so.  So I would hope to avoid doing anything like that.

7      MR. JACKSON:  Yes.  Your Honor.  And it's our

8  understanding that the jury is not going to be exposed to any

9  of that and they're not going to be exposed to the fact that

10  we're using a pseudonym, so we attempted to do that.  We may

11  need to confer with some people briefly before they come in,

12  but thank you.

13      THE COURT:  Anything else at this time?

14      MR. HUBBARD:  Not from the plaintiff.

15      MR. JACKSON:  No, your Honor.

16      THE COURT:  Have the parties come to an agreement if

17  during the course of the trial there are potential witnesses in

18  the audience?  What is the parties' position about potential

19  witnesses being in the audience when other witnesses are

20  testifying?  Do the parties have any position on that?

21      MR. HUBBARD:  Your Honor, I don't have strong feelings

22  about invoking the rule against witnesses.  I would abide by

23  the Court's guidance with respect to that.

24      MR. JACKSON:  Your Honor, we would prefer if witnesses

25  who have not yet testified don't sit in the courtroom while

1    other witnesses are testifying, but apart from that we don't

2    have any views on it.

3           THE COURT:  Okay.

4           MR. JACKSON:  I was just going to ask if the Court

5    could perhaps -- we got the questionnaire that the Court's

6    deputy was kind enough to pass out to us, we just wanted to

7    clarify, is this the preliminary questionnaire?  Does the Court

8    intend to ask additional questions specific to the case?

9           THE COURT:  Yes, I plan -- I will ask the potential

10   jurors lots of qualifying questions.  At the end of the

11   qualifying questions that I ask the potential jurors, as well

12   as making statements about the issues in this case and asking

13   questions, some general questions about this case, when I have

14   done that, I will confer with counsel and find out if counsel

15   have any additional questions you would like to me to ask to

16   the panel as a whole or to any particular juror.  And counsel

17   will exercise any challenges, any final challenges for cause at

18   that point.  The jurors will go one by one and read out the

19   answers to the questionnaire.  So this is sort of at the end to

20   help counsel exercise their peremptory challenges, but all of

21   the sorts of challenges for cause and all those sorts of

22   questions will be asked first.

23          MR. JACKSON:  That's fine, your Honor, thank you.

24          And I was going to ask if the Court could just -- I

25   think that the Court was planning to help us, but we are going

GC5TPIC1

1   to use a struck panel type method?

2          THE COURT:  Correct.  So we will qualify 16 jurors.

3   Once we have gone through the challenges for cause we will have

4   16 jurors seated here, each side has three peremptory

5   challenges, and assuming each side exercises all three

6   peremptory challenges, we'll have ten jurors left.

7          MR. HUBBARD:  Your Honor, when we do that, do we do

8   that in the presence of the jury, exercise the peremptory

9   challenges in the presence of the jury?

10          THE COURT:  No.  What will happen is I will ask

11   questions of the jurors, and from time to time there will be

12   jurors who have to be excused and replaced with other jurors

13   for cause challenges and the like.  And then once we have done

14   that, the jurors will go through this questionnaire, each

15   individual juror will give the answers to the questionnaire.

16   Then we will take a recess, counsel can confer with their own

17   tables briefly, and then we will go in the back and counsel

18   will exercise their challenges, again one through 16.  And when

19   we come back, counsel aren't going to say anything, my deputy

20   will let the jurors know who has been selected and who hasn't

21   been selected, so that will not be done in the presence of the

22   other jurors.

23          MR. HUBBARD:  Is the exercise of the peremptory

24   challenge alternating?

25          THE COURT:  Yes.

GC5TPIC1

1          MR. HUBBARD:  May I make one other comment?

2          THE COURT:  Sure.

3          MR. HUBBARD:  With respect on the preliminary

4    questionnaire, the last question relates to service as a juror.

5    Is there a question somewhere in your qualifying questions

6    related to prior participation as a plaintiff or a defendant in

7    a piece of litigation?

8          THE COURT:  Yes.

9          MR. HUBBARD:  Thank you.

10          THE COURT:  Anything else for me at this time?

11          MR. HUBBARD:  Not for the plaintiff.

12          THE COURT:  Okay, I will see you soon.

13          MR. JACKSON:  Thank you very much.

14          MR. BORTNICK:  10:15, your Honor?

15          THE COURT:  Yes.  Let me ask, does counsel have --

16    counsel have had some more time to think about their opening

17    statements.  Have counsel been able to sort of trim the opening

18    statements any, or what's the anticipated time for plaintiff's

19    opening statement?

20          MR. HUBBARD:  I think I'm the guy that is supposed to

21    be doing the trimming because I said an hour.  Your Honor, I am

22    going to try for 45 minutes, with your permission.

23          THE COURT:  Okay.  And defense counsel?

24          MR. JACKSON:  Your Honor, I still expect to be 25

25    minutes, 30 at the very most.

GC5TPIC1

1            THE COURT:  Okay, thank you.  See you soon.

2            (Recess taken and jury selection was conducted off the

3   record)

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC59PIC2

```
1                        AFTERNOON SESSION

2                            2:38 p.m.

3           (Jury not present)

4           THE COURT:  Please be seated.  So I'm going to start

5    with opening statements soon.  First I want to let the parties

6    know what we're going to do.  When the jurors get in I will

7    have my deputy swear the jurors.  I will give them a couple of

8    quick instructions about note-taking, I will give them quick

9    instructions about that.  I will let them know about opening

10   statements just generally that opening statements are not

11   evidence, it's an outline of what the lawyers believe the

12   evidence is going to show in the case.  And I will give them an

13   instruction about objections and how to treat objections.  And

14   then we'll proceed with the opening statements.

15           Again, from plaintiff's counsel what's the estimated

16   length of your opening statement?  Is it an hour, 45 minutes?

17   I want to give the jurors, especially since it's the afternoon,

18   I want to give them a sense of what to expect.

19           MR. HUBBARD:  Forty-five minutes.

20           MR. JACKSON:  Twenty-five to 30 minutes, your Honor.

21           Judge.

22           THE COURT:  Yes.

23           MR. JACKSON:  Does the Court plan to give any

24   afternoon -- does the Court plan to take any break in between

25   the opening statements or is it just going to be wait and see
```

GC59PIC2

1    how it plays out.

2              THE COURT:  You mean in between the opening

3    statements?

4              MR. JACKSON:  I'm not saying there needs to be.  I'm

5    just saying is that something the Court --

6              THE COURT:  I don't anticipate taking a break between

7    the opening statements.  We'll see what happens.

8              As soon as all the jurors are here we will get going.

9              Who is the first witness that's going to be called?

10             MR. HUBBARD:  Your Honor, Mr. Picarella will be the

11   first witness.

12             THE COURT:  Are counsel planning on using the

13   projector during the opening statement?

14             MR. HUBBARD:  I'm not, your Honor.

15             THE COURT:  Defense counsel?

16             MR. JACKSON:  No, your Honor.

17             THE COURT:  Okay.

18             MR. JACKSON:  Actually, your Honor, I think I will use

19   it just for a couple of brief moments.  So it probably should

20   be left up.

21             THE COURT:  And have you shown plaintiff's counsel

22   what it is you plan to put up there?

23             MR. JACKSON:  I've talked with plaintiff's counsel

24   about whether or not there are any objections to certain

25   exhibits.  There are just a couple of exhibits I'm going to

GC59PIC2

1    talk about that we have no objection on.

2              THE COURT:  Have you shown this to plaintiff's

3    counsel?

4              MR. JACKSON:  They've seen the exhibits.  I was

5    potentially going to call up a couple of the exhibits.

6              MR. HUBBARD:  I don't have any objection as long as

7    it's one of the exhibits -- as long as it's an exhibit we

8    didn't object to.

9              THE COURT:  Why don't we just confirm that.

10             MR. JACKSON:  I will confirm that, your Honor, right

11   now.

12             THE COURT:  Let's get confirmation of that.

13             MR. JACKSON:  Absolutely.

14             THE DEPUTY CLERK:  They're all here, Judge.

15             THE COURT:  Okay.  Let's bring them in.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

GC59PIC2

1              (Jury present)

2              THE COURT:  Thank you.  Please be seated.  Welcome

3     back.  I hope you had a wonderful lunch.  Now I'm going to ask

4     my wonderful and talented deputy to swear you all in.

5              (A jury of ten was impanelled and sworn)

6              THE COURT:  We're going to proceed to opening

7     statements soon.  Just a couple of quick instructions.  I will

8     allow you to take notes if you wish.  You are not required to

9     take notes.  And we have provided notebooks for you to use.

10    Here are a couple of rules about taking notes.  You should not

11    allow your note-taking to interfere with your ability to pay

12    attention to what's happening during the course of the trial.

13    Also, any notes that you take are an aid to your memory and

14    must not take precedence over your independent recollection.

15             Also, as you can see, we have a fantastic court

16    reporter sitting right here who is taking down everything

17    that's being said.  If your notes are in conflict with the

18    official transcript, you should rely on the official transcript

19    and not your notes.

20             At the end of the day my deputy will collect the

21    notebooks.  The parties will not see the notebooks.  We will

22    not look into them.  But we will take them just so that they

23    can be safeguarded.  We'll give those to you at the start of

24    the next day.

25             In addition, let me give you an instruction about

GC59PIC2                    Opening – Mr. Hubbard

1   objections.  Counsel have an obligation to make objections.

2   I'm sure you've seen that on television.  What happens is when

3   a lawyer makes an objection you should wait for me to rule on

4   the objection.  If I overrule the objection, then you should

5   listen to the answer to that question and you shouldn't give

6   any sort of special consideration to the question because an

7   objection was raised to that question.

8          On the other hand, if I sustain an objection, you are

9   to disregard the question and you are not to speculate as to

10  what the answer might have been.

11         Having said that, we're going to proceed with opening

12  statements.  Opening statements are not evidence.  They are an

13  outline given by the lawyers based on what they believe the

14  evidence will show.  We will start off with plaintiff's counsel

15  who anticipates his opening statement will take about 45

16  minutes.

17         Go ahead counsel.

18         MR. HUBBARD:  Thank you, your Honor.

19         Good afternoon, ladies and gentlemen.  May it please

20  the Court.

21         As his Honor just indicated, now is the time for the

22  lawyers to give you an overview of what the evidence in the

23  case is expected to be.  We're able to do that because, as

24  we've been preparing for the case, obviously we've been

25  studying the documents and preparing the testimony.  So we have

1    a pretty good feel for what you'll hear here in the courtroom.

2    So, what we try to do is give you somewhat of a roadmap of how

3    we will proceed in terms of the witnesses who you'll hear, the

4    evidence you'll hear, and an overview to some extent of what --

5    how the evidence fits into the issues you'll be asked to decide

6    at the conclusion of the case.  So my purpose this afternoon is

7    to give you hopefully a helpful overview of what we expect the

8    evidence to be.

9          The plaintiff in this case seated here at our left is

10   Michael Picarella.  Mr. Picarella is a former senior

11   vice-president of the defendant in this case, HSBC Bank.  He

12   was employed by HSBC for approximately four years as a senior

13   vice-president of business development in their Manhattan

14   headquarters at 425 Fifth Avenue.

15         In 2012 the evidence in this case will show, we say,

16   he stood up for a young female coworker who was sexually

17   harassed by senior HSBC executives in his sales group by

18   reporting that unlawful conduct to his management and to the

19   firm's human resources section.  Though HSBC concedes here that

20   he was right, that she was sexually harassed in violation of

21   the law and the bank's own rules, the evidence will show that

22   his senior management did not like it and they retaliated

23   against him for reporting that conduct.

24         So this is a retaliation case.  Unlawful retaliation

25   is the issue you will be asked to decide.

GC59PIC2                    Opening - Mr. Hubbard

1              You will not be asked to decide if the young woman, in

2      fact, was sexually harassed.  That issue is beyond us now.  The

3      bank has admitted that she was.  And so while there will be

4      some evidence about it because we have to demonstrate what the

5      complaints were and that Mr. Picarella engaged in protected

6      activity, protected from retaliation by reporting it, your

7      issue will be whether or not there was retaliation and not

8      whether or not she was sexually harassed.

9              You will learn from this evidence that after

10     Mr. Picarella reported the harassment to his management he was

11     passed over within a year for the management position he had

12     been hired to fill.  He was soon, we say the evidence will

13     show, stripped of his major responsibilities as a senior

14     vice-president.  And in March of 2015 he, in fact, was fired by

15     the circumstances that you will hear in some detail.

16             The bank will say it was because of poor performance

17     and not retaliation.  The bank will show you a series of

18     performance reviews and from those reviews they'll lift

19     evidence that comments that in some places are critical.

20             Some of you have had performance reviews in your own

21     work.  There will be constructive criticism in these

22     performance reviews.  But one thing will be clear.  There's a

23     big S on all of these reviews until he had been stripped, we

24     say, of all of his responsibilities.  We say you'll see a big S

25     on all of those evaluations.  And that S at HSBC stands for

1    strong.  He was rated a strong performer until he was stripped

2    of his responsibilities.  And then in late 2014 his performance

3    was downgraded and the train was on the termination track.

4            So the issue in this case that you'll be asked to

5    decide is whether the adverse employment actions he suffered,

6    including his termination, were motivated in any part by the

7    complaints he made of the sexual harassment of his young

8    coworker and of the retaliation he suffered.

9            Was his termination, were these adverse actions,

10   passing him over for his promotion, taking his responsibilities

11   away, there's some other adverse employment actions, were those

12   things motivated by the complaints he made to management about

13   their treatment of his coworker, or were they solely, solely

14   based on his performance?

15           Because you will learn that the issue is not

16   whether -- the law will allow other reasons for termination.

17   What it will not allow -- the judge will give you the

18   controlling instructions, I'm just trying to give you an

19   overview of it -- but the law will not allow -- it will not

20   allow the retaliation to be motivated in any part by that kind

21   of animus.

22           So, you'll hear in this case perhaps some contention

23   that at some point he became a poor performer.  But the best

24   evidence I think you'll see, the best evidence we say you'll

25   see that he was not terminated for poor performance because of

1    his complaint; but because of his complaints, is that even

2    after rating him off track in 2014 when he had no work to do,

3    the bank was not content to write a performance review and say

4    you're a poor performer and now you're being managed out of the

5    bank.  The evidence in this case will show they made up a false

6    reason to fire him; that they weren't confident enough that

7    they had the goods to terminate him simply on his performance.

8    And you'll see that at the end of this case when he was

9    terminated, and they'll concede it, I say, that he was -- that

10   he was, in fact, terminated for a reason that they admit they

11   had no proof of.

12        In the first part of 2014 -- '15, '15 he was accused

13   by the bank of leaking some confidential business information

14   after a conference call on January 12 of 2015.  There was a

15   conference call on January 12, the evidence will show.  The

16   next day a call from a New York Post reporter went to the

17   business section that had held this conference call.

18   Mr. Picarella was on the conference call.  It was a group of 20

19   or so executives.  The executive who -- reporter called, and

20   the executive recognized it's a reporter, had information that

21   could only have been obtained on that conference call.  Two

22   days later a letter arrives for Mr. Picarella.  You have been

23   suspended because we have reason to believe that you violated

24   our rules by leaking this confidential information to the

25   newspaper.  They later admit, despite putting their financial

1   crimes investigation unit on it to investigate it for months,

2   they later admit they found no evidence whatsoever.  Yet two

3   days after that call they suspended saying that they had reason

4   to believe.  They had no evidence that day and they had no

5   evidence when he was terminated, we say the evidence will show.

6           The head person in this group, this group he worked in

7   was called global banking and markets, the head of that group

8   was Didier Descamps.  He now works for HSBC in Paris and he

9   will testify here on Friday.

10          I believe he will tell you that when, after that full

11  investigation by their financial crimes group, that no proof,

12  no proof was available about where the leak was from; and yet

13  in the termination letter, Mr. Picarella says that he's being

14  fired for performance, for poor performance, and because we

15  believe that you have leaked this information.

16          These complaints, I mentioned to you that he made to

17  the firm about the sexual harassment of his young coworker,

18  that activity is called protected activity.  And the reason it

19  is called protected activity is that the law punishes

20  retaliatory reaction to reporting that kind of conduct.  So the

21  law provides a degree of protection by punishing retaliation

22  for that kind of conduct.

23          And so one question you'll be asked here today is, in

24  fact, this week is whether or not he engaged in protected

25  activity by reporting -- by reporting this sexual harassment.

GC59PIC2                    Opening - Mr. Hubbard

1          Mr. Picarella worked in a grouped called business

2     development.  His supervisor was a woman by the name of Eileen

3     Hedges.  She was the head of business development.  You will

4     learn from the evidence that Mr. Picarella was hired to be her

5     deputy.  The bank anticipated that she would move into another

6     position.  Testimony from some of the management will be that

7     the group was not performing well, that it was viewed to be

8     weak and that they needed a stronger -- some stronger

9     succession.  And so they went out and they recruited and they

10    hired Mr. Picarella to be Ms. Hedges's deputy and obviously her

11    successor.

12          Shortly after that happened Ms. Hedges was moved by

13    her boss, Mr. Pizzimbono, who I think will testify here, she

14    was moved up to another floor and no longer reported to

15    Mr. Picarella.

16          By the summer of the next year, by the summer of 2012

17    she had been relieved of her management duties and a year later

18    she had been terminated.  And the reason for both of those

19    things is the conduct that he complained about.

20          When Mr. Picarella was hired, Ms. Hedges' deputy --

21    Ms. Hedges' assistant was a 26-year-old analyst by the name of

22    Michelle Parker.  And Ms. Parker set -- I may not get this

23    right but Mr. Picarella will get it right -- Ms. Parker I think

24    sat on the left of Mr. Picarella, Ms. Hedges on the right, on a

25    trading desk on the 9th floor at UBS headquarters here in

1    Manhattan.  So Mr. Picarella is in between Ms. Hedges, the

2    supervisor, and the young analyst.

3          In November, 2011 Mr. Picarella reported privately to

4    the chief operating officer, who will testify here, probably

5    tomorrow, Mr. Mullen.  You'll see him here.  He called

6    Mr. Mullen, who was working here in New York as a chief

7    operating officer, and said that Ms. Hedges had done something

8    that had shocked both he and the young woman.  And you'll see

9    that it was the beginning of a pattern of misconduct.  In this

10   case what she did was she exposed her breast on the trading

11   floor in front of these two employees.

12         Mr. Picarella is a grown man.  And he's married.  He

13   has two teenage children.  And he saw this young woman react

14   visibly to what happened.  Yet he's brand new to the firm.

15   He's trying to help Ms. Hedges make the group successful.  He

16   doesn't want to cause any problem.

17         He goes to see Mr. Mullen.  He's obligated to report

18   what happened because she reacted to it in such a way.  But he

19   says to Mr. Mullen, please, let me speak to her.  She's my

20   boss.  Let me speak to her.

21         You'll find that she tended to be somewhat -- used

22   sexually aggressive language and that kind of thing, and you'll

23   hear some more about it.  But he said let me go and see I'll

24   talk to her about it.  No big deal.  Big deal to the young

25   woman.  But let me speak to her.  He did.  It goes worse.

1      In the summer and fall of 2011 and into the spring of

2   2012 Mr. Picarella began to observe that Ms. Hedges began to

3   harass the young woman even more.  She would, I use my word,

4   the evidence I think will show that she would drag her out to

5   bars near the office.  She would come back to the office and

6   spread word that she had been sleeping with bank customers,

7   with bank clients and bank employees.  She would address her

8   with sexually intimidating language.  She would ask her what

9   kind of underwear she was wearing, if she had sex the night

10  before.  This on the trading desk.

11      Mr. Picarella is sitting right in the middle.  He's

12  not snooping.  He's sitting there listening.  He reports it.

13  He reports it to her.  He doesn't go to HR now.  He doesn't go

14  to management.  He goes back to Ms. Hedges and he says you've

15  got to stop this.  She's crying.  She's emotionally upset.  She

16  is ill.  It's not -- it's very bad for her.  You've got to stop

17  this.  And he was concerned about her health.  And, again, no

18  desire to harm Ms. Hedges, just to try to get it stopped.  He

19  says please stop it.

20      She didn't.  It continued.

21      He goes to his boss or her boss that he indirectly

22  reported to Mr. Pizzimbono and he reports what happened, what

23  she was saying about the young woman.

24      And Mr. Pizzimbono says you need to go talk to the

25  head of human resources, a woman by the name of Eileen Weiss

GC59PIC2                          Opening - Mr. Hubbard

1   who will testify here maybe tomorrow, maybe Wednesday.  You go

2   tell Ms. Weiss what's going on.  That's her job to take care of

3   this.

4           So the evidence will show that Mr. Picarella then

5   engaged in this protected activity, that he went to see the

6   head of human resources.  He reported this sexually harassing

7   conduct, the language she was using, that she, in fact, was now

8   bullying him because she got mad at him because he was

9   reporting this to her.

10          At about that time word spread in the division that

11  Ms. Hedges and two male executives had sexually harassed this

12  young woman at an offsite conference down at the -- down at a

13  resort in Key Largo.  And Ms. Parker eventually told

14  Mr. Picarella about it.  He heard about it, her talking on the

15  phone about it.  The management had heard rumors about it.

16  They came to him and said:  Have you heard any of this?  The

17  first time he said:  No, I hadn't.  But by late June he heard

18  rumors of what happened at Key Largo.  I'll save that for later

19  this afternoon when Mr. Picarella testifies.  But the long and

20  short of it was that the information was that Ms. Hedges was

21  encouraging this young woman to have sex with some of the men

22  that work for her in her presence at this meeting and that she

23  was visibly upset about it.  Again, obviously sexual harassment

24  which he's obligated to report and which he did.

25          Mr. Picarella reported this to Ms. Weiss.  She asked

1   him to meet with some of her deputies.  There's some memos

2   about this, about what he reported.  And you'll see those.

3   You'll see those memos about what he reported.  And by the

4   middle of 2012 Ms. Hedges had been placed on a final warning,

5   no management responsibility, and really was no longer involved

6   in the business group that Mr. Picarella was.

7           So we come to the issue of retaliation.  What happened

8   next?

9           After he reported this sexual harassment, he began to

10  suffer what we say were adverse employment actions.  And by

11  September -- he had been hired to take Ms. Hedges' place to be

12  her successor, he was her deputy.  In September he was

13  approached by his two main managers, Ms. White and

14  Mr. Pizzimbono, and they told him that he was not getting the

15  job; that the job was going to Ms. Jenner who was a very

16  talented but much junior vice-president.  He was a senior

17  vice-president.  She was a very talented but much less

18  experienced employee.  And she was given this job.  He was

19  passed over.  You'll see, for example, you'll see an e-mail

20  where somebody says Ms. Jenner was not on the promotion list at

21  the end of 2012 to become a senior vice-president because they

22  all knew that now Mr. Picarella was going to have to report to

23  her and it was going to look bad for him to report to a

24  vice-president.  You'll see a memo in there.  Somebody writes

25  and says she needs to be higher than him because they could see

GC59PIC2                    Opening - Mr. Hubbard

1   that that reporting relationship would be visibly out of whack.

2            He's passed over.  He complains about it.  Now he says

3   now I'm being retaliated against.  There will be a bunch of

4   other things in here, without going into detail this afternoon,

5   there will be a bunch of other places where he was a senior

6   vice-president in this group and gradually he got stripped of

7   most of his major responsibilities to the time -- by the time

8   in 2014 when he had -- when he would say with shame that he

9   only had enough work to do about ten percent of the day.  And

10  in order to keep from being embarrassed, he would be sitting at

11  his computer looking at financial news on the internet, and

12  going around the building and talking to colleagues.  But he

13  had only enough work to fill ten percent of his time.  You'll

14  hear -- there will be some debates about what he was doing in

15  2014, whether he was performing, how much work he had to do.

16  But the long and short of it is that you'll hear evidence as to

17  how his responsibilities were gradually pulled away from him in

18  2013 and 2014 until by the end of 2013, the end of '14 he

19  virtually had nothing, nothing to do.

20           A couple of examples.  His responsibility, his major

21  responsibility for monitoring the bank's suitability

22  requirements for federal regulators were reassigned to

23  Ms. Jenner.  His responsibility for on-boarding new clients and

24  clearing new clients and that kind of thing were taken away

25  from him.

1          He complained again.  And you'll see some memos in the

2     fall of 2013.  And you'll then begin to see that he gets a new

3     manager, a gentleman by the name of Mr. Karam becomes his

4     manager.  Mr. Karam is the man who ultimately recommends firing

5     him.  Mr. Karam, we'll say, the evidence will show, was hostile

6     to him from the very beginning.

7          One of the things you'll want to look at as you go

8     through is to see if Mr. Picarella complains and reports this

9     unlawful activity.  You've got to see if that is what generated

10    this punishment, these adverse actions.  And so it doesn't just

11    come out of the blue.  You've got to see if the people who were

12    complained about, if this generated some anger and some

13    hostility and some reason to try to retaliate.  And we'll say

14    that you'll see that in this evidence.  You'll see evidence of

15    hostility.  His new boss, Mr. Karam, one month after he takes

16    over in May of 2012, the evidence will show Mr. Karam in a

17    written e-mail to Ms. Jenner, Ms. Jenner says, you know, he's

18    just sitting here drafting a letter.  I'm going to redraft it

19    for him and send it back to him but I don't know if he'll sign

20    it.  The evidence will be Mr. Karam writes back and says:

21    Don't worry.  If he doesn't, I'll marginalize him.

22         This is a senior vice-president that he was managing,

23    a senior vice-president whose performance reviews he was doing,

24    yet he's threatening to marginalize him in the workplace.  No

25    question about it.

1          Mr. Karam continues to strip him of further

2     activities.  One of the human resources folks sends a memo to

3     management saying:  Do you want to fire Mike?  Human resources

4     had nothing to do with whether this man continued to work or

5     not.  Obviously, word was spreading that they were looking for

6     some way to manage him out of the firm.

7          Do you want to fire Mike?  You'll see that in the

8     evidence.

9          Mr. Karam writes to the most senior management in the

10    company in London.  Ms. White from the U.S. was there.

11    Mr. Descamps from the U.S. was there.  They were meeting with

12    some senior HSBC people in London and somebody says:  What do

13    you want to put on the list?  Mr. Karam says:  Picarella.  And

14    the person in London, David Rose, writes back and says:  What

15    about Picarella?  And he writes back and says:  You know, the

16    human resources problem.

17         He was an employee trying to do his job and his

18    manager puts him in the problem department.  You'll determine

19    whether or not that was retaliatory or whether or not it was

20    motivated by animus.

21         Then you'll see that five days after he was passed

22    over for that job to report to Ms. Jenner, five days after that

23    he was put by Ms. Weiss, the woman he went to, to protect him,

24    she puts him on the bad boy list.

25         They have a list of performance conduct cases in the

1    firm.  It's circulated worldwide, senior management.  One of

2    those managers will be here tomorrow or Wednesday to tell you

3    about it.  There's a performance -- list of performance conduct

4    cases.  The man who complained ends up accused on the

5    performance list.  And it happens five times.  Five times it

6    happens.  She just keeps putting him on the list.  And this is

7    the head of human resources he went for to report this activity

8    and to try to stop it.

9             In 2014 there is a meeting on November 21 of 2014.

10   Mr. Picarella meets with Mr. Karam.  We're sort of getting near

11   the end now here of his tenure.  And he meets with Mr. Karam

12   who is the managing director and is his manager.  You'll see it

13   from the evidence that he has been brought in as a special

14   manager for Mr. Picarella.  Mr. Picarella wasn't in his group.

15   Ms. Jenner was but, again, they don't want Mr. Picarella

16   reporting to someone who is obviously a junior person.  So now

17   Mr. Karam is his manager.

18            They meet on November 21, 2014 here a few days before

19   the Thanksgiving holiday.  And Mr. Karam gives Mr. Picarella

20   his -- either 2013 year-end review or 2014 mid year review,

21   we'll have to look at it and get to it.  But he rates him off

22   track.

23            They don't have a very good meeting.  Mr. Picarella's

24   testimony is that Mr. Karam was hostile to him; that he

25   threatened him; that he leaned over the table right in his

1    face; that he pointed his finger in his chest.  He felt

2    threatened enough to go down to human resources and say this

3    man just threatened me in my review.

4            He gets this negative review.  And Mr. Picarella calls

5    human resources and complains about it.  It's the 21st or so

6    of November.  He works -- there are two or three more days

7    before the Thanksgiving holiday.  And on December 1, the Monday

8    after that Thanksgiving holiday, he arrives at the office to

9    work.  He's locked out.  His pass has been disabled.  And he --

10   employees streaming in the building.  He can't get in.  He's

11   locked out.

12           Human resources had sent him an e-mail.  This is

13   Thanksgiving weekend.  The testimony will be that he had left a

14   little bit earlier with his family to take one of the kids to a

15   hockey tournament.  The testimony will be that HSBC had sent an

16   e-mail to him about 4:50 on the Friday afternoon before

17   Thanksgiving saying we've got your complaint about Mr. Karam.

18   For your own safety you should work from home and not come to

19   the building.  So that works out.  He can't get in.  He calls

20   up.  They say you -- we want you to work from home because of

21   this complaint.  He never, ever goes back to work until he's

22   fired on March 27, 2015 for what you're about to hear.

23           So he's put on -- he's told to work from home now on

24   December 1.  There is this -- he doesn't get access to the

25   systems again until the 18th of December.  Could have been a

GC59PIC2                              Opening - Mr. Hubbard

1    glitch.  But his access to the office systems and all, his

2    BlackBerry and all are turned off.  He gets that on the 18th

3    of December.  Holiday season.  Returns to work early January.

4    He returns to work at home.  He's working from home now because

5    he's out of the building.  So he returns to duty in early

6    January.

7              On the 12th there's the sales meeting I told you

8    about.  He attends by phone.  The 20 or so more senior

9    executives around the United States attend this meeting.

10   There's some discussion about this meeting about some earlier

11   article in the New York Post about what some banker who had

12   done something questionable.  You'll see it.  But anyway the

13   executives of that meeting considered that discussion

14   confidential and private, which it likely was.  Mike attends by

15   phone.

16             The next day the New York Post reporter calls the head

17   of that meeting and says I heard you had a meeting yesterday

18   and you talked about A, B, and C, and D.  Rightly so that

19   executive was alarmed that this information had leaked out from

20   that meeting, calls human resources said what's going on.  And

21   two days later -- I think you'll see it's two days later --

22   they accuse Mr. Picarella of having leaked that information.

23   No evidence whatsoever.  You'll see the letter.  The letter is

24   actually written by a lawyer for HSBC who says we have reason

25   to believe that you leaked this information.

GC59PIC2                       Opening - Mr. Hubbard

1             Accusing an executive in the financial services

2     industry, we will argue to you when the case ends, is a pretty

3     serious thing.  Because the confidentiality of this financial

4     information is a serious thing.  So he's accused of being a

5     leaker.  And he now no longer works from home because he's now

6     completely shut out of the HSBC system.  So from December 1

7     until roughly the time he was fired he never works again.

8             HSBC investigates this allegation.  And he's

9     completely off the system.  Then on March 27 of -- I think

10    March 27 is right -- of 2015 he's at home, picks up his son to

11    go to a hockey game or something.  They're in the driveway.

12    The son sees a package on the front door, thinks it's a bar

13    mitzvah invitation and he jumps out of the car and he goes over

14    to get the package.  And the package is not -- it's a package

15    from HSBC.  He opens it.  It's a letter terminating his

16    employment.  He hands it to his father.  He's fired on that

17    day.  And that's why we end up here.

18            During the course of these events in 2013

19    Mr. Picarella filed a charge with the Equal Employment

20    Opportunity Commission.  It's called a charge of

21    discrimination.  Retaliation is a form of discrimination.  He's

22    still there.  He's still working.  At least these federal

23    filings are confidential not made public.  He files that, the

24    charge of discrimination.  Nothing happens.

25            He continues to get retaliated against.  That EEOC

1    charge is a form of protected activity.  Retaliation follows

2    it.  It's unlawful.  The Court will give you those instructions

3    and, of course, you will follow the Judge's instructions and

4    not my description of it.

5            But, about a year later he files this case.  In 2014,

6    the fall of 2014 he then files this case here under federal

7    law, New York state law, and New York city law alleging

8    retaliation in violation of those statutes.  And that's what

9    brings us here.

10           The last thing that you'll be asked to decide in this

11   case in the event you determine that the law was violated and

12   Mr. Picarella was unlawfully retaliated against, you'll be

13   asked to determine if he suffered damages as a result of that

14   termination and, if so, what the amount of those damages is.

15           You will learn from the evidence that Mr. Picarella

16   was in the financial services industry for 45 -- for 25 years

17   before he was fired; that his compensation at HSB was

18   approximately $282,000; that the position, Ms. Hedges'

19   compensation was about $500,000, the job he was supposed to

20   step into.  And you will learn that he has sent job

21   applications all over the place looking for a job in this

22   industry and, based upon what happened to him, has not been

23   able to be re-employed in the industry.

24           You'll hear that he has interviewed for some jobs.

25   He's interviewed for some jobs in accounting departments, in

1    the villages out on Long Island where he lives.  But so far the

2    door to Wall Street, the evidence will say, has been shut.

3            There are other elements of damages you'll be asked to

4    consider such as emotional distress resulting from the conduct

5    that we say has destroyed a 25-year business career.  And

6    you'll be asked to determine if he has suffered reputational

7    damages as a result of it.

8            The last thing you will be asked to decide if you

9    determine that he was unlawfully retaliated against is whether

10   or not you should award what are called exemplary or punitive

11   damages.  They are damages to make an example.  If you find

12   that the violation of the law -- if you find that the

13   retaliation that you see was a product of reckless disregard of

14   his rights under the law, or spite, or ill will, if you find

15   that, then you'll be permitted to make some judgment as to

16   whether punitive damages should be awarded to make an example

17   out of the defendant.

18           We look forward to presenting the case to you.  Thank

19   you for your time.

20           THE COURT:  Now we'll hear from defense counsel.

21   Defense counsel estimates his opening statement will be between

22   25 and 30 minutes.

23           Go ahead, please.

24           MR. JACKSON:  Thank you, your Honor.

25           2014, mid year review of Michael Picarella.  This is a

1    review that was written by somebody you will see during the

2    course of this case had no motivation to retaliate against

3    Mr. Picarella.  The person said that, and I quote:  Mike has

4    demonstrated inconsistent results and is offtrack as of

5    mid year 2014.  A common theme is one where Mike is illusive,

6    lacks initiative, and fails to take advantage of the

7    opportunities.  Mike's lack of initiative, lack of

8    productivity, refusal to take ownership for strategically

9    defining his role or his work is contrary to his GCB level and

10   is significantly below the performance of his peers.

11            Now, ladies and gentlemen, if you have even a passive

12   level of familiarity with the way performance reviews are

13   conducted typically in corporations you will realize that the

14   words, the clarity and the harshness of the review of

15   Mr. Picarella, it's the type of language that is reserved only

16   for the very worst performers.  And when you get a chance to

17   actually look at the evidence in this case and you get an

18   opportunity to actually hear from the witnesses it's going to

19   be clear to you that that's precisely what Mr. Picarella was,

20   one of the worst performers at his level in the bank and a

21   person who frankly failed to live up to professional standards

22   in pretty much every way that an employee could fail.

23            Now, the laws that are at issue that Mr. Hubbard just

24   alluded to, these laws are serious.  These laws are extremely

25   serious.  They're not a joke.  They're not a game.  There are

GC59PIC2                         Opening – Mr. Jackson

1   laws that have been enacted in order to protect women,

2   vulnerable people, really all of us from what are

3   unquestionably some of the most unacceptable forms of work

4   harassment and work retaliation.  The evidence in this case is

5   going to show, you will see, the evidence in this case is going

6   to show that Mr. Picarella is attempting to make a mockery of

7   these laws and it's unacceptable.

8          Now, Mr. Hubbard a moment ago said a number of things

9   about sexual harassment.  And as he told you there is no real

10  dispute about whether sexual harassment in this case took

11  place.  But that sexual harassment is not what this case is

12  really about.  Because let me be just entirely clear.  HSBC

13  took and continues to take any issues, any issues whatsoever

14  involving sexual harassment extraordinarily seriously.  That's

15  going to be clear to you when you see how professionally the

16  responses were handled to everything that Mr. Picarella raised

17  and to any other issues that HSBC came across with regard to

18  sexual harassment.  It's going to be clear to you that HSBC

19  found sexual harassment in its workplace to be unacceptable.

20  But that's not really what this case is about.

21         This case is about three things:  Greed, opportunism

22  and exceptional laziness.

23         Greed, opportunism and exceptional, astounding

24  laziness.

25         And I want to talk about each one of those three

1   things in the short time that I'm going to talk to you today

2   and about how they relate to the evidence that you're going to

3   see during the course of this case.

4         Let me take one brief moment to reintroduce myself

5   because I know it was quick.  My name is Randall Jackson.

6   Along with my colleagues, we have the privilege, we have the

7   responsibility of representing HSBC.

8         We know that jury service is hard.  We know that it's

9   an imposition.  We deeply appreciate your attention and we

10  deeply appreciate your jury service.

11        Now, I want to talk first about the -- one of the

12  three things that I talked about which is laziness.  And

13  Mr. Hubbard, in describing the details of what he said happened

14  at HSBC, he told a very nice tale, okay.  It's a very nice, a

15  very neat tale that supports the idea of retaliation.  But the

16  reality of the situation that you're going to see unfold

17  through the evidence, I promise you, is quite different.  You

18  cannot understand, you absolutely cannot understand the

19  astounding story of Mr. Picarella's time at HSBC without

20  understanding first that Mr. Picarella was extraordinarily

21  lazy.

22        Now, the evidence is going to show that in 2011

23  Mr. Picarella came to HSBC after having worked at two prior

24  banks.  In May of 2011 Mr. Picarella was hired as a senior

25  vice-president in sales management in the business markets

1    group.

2             And ladies and gentlemen, he was hired at an initial

3    starting salary of $225,000 per year with the possibility of

4    getting an additional bonus over that.  There was no bonus

5    promised but he was told he had a possibility of getting a

6    bonus on top of that.

7             This was a senior level position and it required

8    Mr. Picarella to perform at an executive level, handle a number

9    of different complex responsibilities, executive senior

10   functions in connection with HSBC's work on behalf of its

11   customers.

12            The evidence is going to show that almost immediately

13   after Mr. Picarella got there problems started to surface with

14   him.  Within months of his being hired complaints about

15   Mr. Picarella were coming in from a number of different parts

16   of the bank.  Complaints were coming from supervisors.

17   Complaints were coming from his coworkers.  People were

18   complaining about all three aspects of what I'll refer to as

19   the Picarella work experience.

20            People were complaining that his work product was not

21   up to standards; that his communication with others at work,

22   his communication with his colleagues was not up to appropriate

23   professional standards.  And people were complaining that

24   probably most importantly his attitude about almost everything

25   at work was just poor.  His attitude about the work that he was

1     asked to do, his attitude about the way that he dealt with his

2     colleagues was just poor.

3            And I wish -- I deeply wish that I could tell you that

4     over the years that followed that Mr. Picarella was working at

5     HSBC that he improved.  But he didn't.  The evidence is going

6     to show that Mr. Picarella was given every opportunity by HSBC

7     to become a better worker.  Every opportunity.  He was given

8     numerous chances to improve the way he worked.  But he

9     approached every opportunity he was given with the same poor

10    work product, poor collegiality and just poor attitude that he

11    had started with.

12           The evidence is going to show that HSBC assigned

13    several different supervisors to Mr. Picarella over the time

14    that he was working there.  And these different supervisors

15    were assigned to him in order to make sure that he would have

16    an opportunity with fresh people to try to do his job.  They

17    were given to him in the hopes that somebody would be able to

18    motivate him to do the thing that he was hired to do.  And

19    you're going to see that they all failed.  All of those

20    supervisors failed.  They all found that he was continuing to

21    engage in the same type of functions that he started with that

22    led to -- that was his poor performance.

23           Now, I want to take a look at DX-258.  And as we're

24    calling up DX -- what will later be DX-258 let me just point

25    out also that one of the things that happened to Mr. Picarella

GC59PIC2                        Opening – Mr. Jackson

1    is that he actually refused to do a number of assignments that

2    were given to him over the years that he was working there.

3    And another thing that happened is Mr. Picarella simply failed

4    to show up a lot of the time.  He was just absent from his

5    desk.  People were constantly asking:  Where is Michael

6    Picarella?  Where is he?

7            You're going to see some of the people in his job,

8    some of his coworkers referred to him as Where's Waldo.

9            This is DX-258.  You look at DX-258.  The relevant

10   point, this was from Mr. Picarella's 2013 year-end review.

11   Mike has demonstrated a weakness in proactively devising

12   meaningful solutions to tasks which has required intervention

13   and guidance that should not have been necessary.  Mike's

14   overall handling of these responsibilities has fallen short of

15   those typically expected of an SVP in the COO/business

16   management role.

17           Let's also take a quick look at what will be marked as

18   DX-232.  This is from Mr. Picarella's own EEOC complaint, the

19   very complaint that Mr. Hubbard was talking about a moment ago.

20   And there is a portion in this where he says by year end 2011

21   when I met with Hedges for my performance review, that's his

22   supervisor you're talking about, she told me that Pizzimbono

23   and Suzy White, who was COO of Global Markets America, did not

24   think highly of me and that it might be a good idea if I looked

25   for another job.  I had been employed at the bank at that time

1    for only six months and Hedges was telling me to do what's best

2    for you and your family.

3            Now you can take that down.

4            Why is this important?  Because this is Mr. Picarella

5    in his own words saying that only a few months, only six months

6    after he got there his supervisors were already telling him

7    that his work was bad, you need to start looking for another

8    job bad.  And this is before he had made any complaints

9    relating to sexual harassment.

10           So the idea that there was retaliation, that this was

11   some made-up reason that he was ultimately fired is not going

12   to match up with the evidence that you're actually going to see

13   and the testimony that you're actually going to see from the

14   witnesses here.  It's not going to match up at all.

15           What you're going to see is there are just conspiracy

16   theories on top of conspiracy theories and no real evidence of

17   any retaliation.

18           What you're going to see is that Mr. Picarella was

19   given repeated second chances, third chance, and fourth chances

20   by HSBC until finally in 2015 the bank finally made the

21   decision that they had to let him go.  Okay.  After years of

22   him not doing his job.  And this was done for one reason.  And

23   it was done for one reason only.  And that's because

24   Mr. Picarella was not doing his job and he hadn't done his job

25   for a very long time.

1          Now, you may be asking yourself:  Given the fact that

2     there is not going to be any real evidence of retaliation,

3     given the fact that people were saying his performance was

4     terrible before he made any complaints, why are we even here?

5     That's a good question.  And it brings me to the second point

6     of what this trial is really going to be about.  What you're

7     going to see unfold through the evidence.  And it's

8     opportunism.

9          Now, there is no dispute, there is no dispute, as

10    Mr. Hubbard was alluding to that there's certain HSBC employees

11    that didn't behave appropriately with regard to the young woman

12    that Mr. Hubbard was talking about.  And the fact of the matter

13    is HSBC has taken full responsibility for that.  HSBC has taken

14    full responsibility for that.  Does not condone sexual

15    harassment.  Some of the details of the number of that, I think

16    Mr. Hubbard's account is not quite accurate.  But the point is

17    there is no dispute about it.  And HSBC has dealt with that

18    appropriately, completely separately from anything having to do

19    with this case.

20         Now, nevertheless, you're going to see in early 2012

21    after Mr. Picarella had been told by his supervisors that his

22    job was already on the line, Mr. Picarella started thinking

23    about what he could do to preserve his job.  At some point in

24    early 2012 Mr. Picarella went to human resources and made a

25    complaint about his boss, the woman we referred to earlier,

GC59PIC2                    Opening - Mr. Jackson

1   Eileen Hedges.  And he made a complaint about her.  He was

2   complaining essentially about her treatment of him.  And you're

3   going to see that in the complaint one of the things that he

4   was complaining about, in fact, was the very woman, Ms. Parker,

5   that he later on would claim to be the white knight for in

6   terms of his complaints that he claims are the subject of

7   retaliation, he was complaining about the fact that he was

8   forced to endure the conversations between the two of them.

9   And this is important because what didn't happen in early 2012

10  when Mr. Picarella made these complaints is he did not say

11  anything at that time about the sexual harassment of

12  Ms. Parker.  Nothing at all.  You're going to see when you

13  actually see the evidence that in those early meetings, in

14  those early meetings in 2012 that was not what Mr. Picarella

15  was talking about.  However, at some point later in 2012 after

16  Mr. Picarella had a long time to think about it, much later in

17  the year, after he had a long time to think about it and after

18  he had the opportunity to consult with lawyers, Mr. Picarella

19  finally made a complaint that related to some sexual harassment

20  that he had heard about third hand.

21         Now, the evidence is going to show Mr. Picarella is

22  not -- was not a close friend of Ms. Parker's.  He wasn't her

23  confident at work.  In fact, the evidence is going to show that

24  she is one of the people who was complaining about his near

25  constant invisibility in the office and one of the people who

1    was complaining about his poor work, about the fact that he

2    wasn't doing his job.  She was one of a chorus of people who

3    was asking:  Where is Michael Picarella during the workday?

4              Nevertheless, this is the complaint that Mr. Picarella

5    made.  And the answer, by the way, to where is he, is that he

6    was anywhere other than doing his job.  Sometimes he was doing

7    personal things.  Sometimes he was doing -- no one knows what.

8    But the point is what we do know is that at some point in late

9    2012 he was in HR and that was part of a plan for him to

10   benefit based on the misfortune that he observed from someone

11   else.

12             Now, ladies and gentlemen that is plain and simple

13   what is known as opportunism.  It's attempting to take

14   advantage of someone else's unfortunate situation in order to

15   benefit yourself.  And I think when you see the evidence it's

16   going to be very clear that this entire case is a particularly

17   sad and cynical example of opportunism.

18             You may be asking yourselves:  Why would he do that?

19   Well he wanted to save his own job.  And because he also viewed

20   making the complaint, taking advantage of another person's

21   misfortune as a way to get a lottery ticket and perhaps some

22   day get a jackpot from this jury.

23             And that brings me to the third thing that I said this

24   case is really about.  The third thing that this case is really

25   about that you will see unfold from the evidence and that is

GC59PIC2                    Opening – Mr. Jackson

just greed.  Because once you put aside Mr. Picarella's poor

work habits, once you put aside his poor collegiality, once you

put aside his opportunism, this case is, more than anything,

just about pure unadulterated greed.  And you're going to see,

as you look through the evidence, that Mr. Picarella is

attempting to suggest that the bank engaged in retaliation

against him after it learned that he had made a complaint about

the sexual harassment of this young woman.

        Well, this is not true.  It's not true at all.  It's

not going to match up with the evidence.  You're going to see

that when Mr. Picarella made his complaints, and his complaints

were many, the bank took essentially two steps.  First, the

bank conducted a very thorough, a very thorough and

exceptionally professional investigation of everything that

Mr. Picarella had complained about and things that other people

said and talked to everyone.  And you're also going to learn

that, in connection with that, the bank, as Mr. Hubbard has

already talked about, ultimately dismissed the one person

who -- one of the employees that it determined was -- had

behaved inappropriately.

        This was a responsible investigation.  This was a bank

that was dedicated to making sure that sexual harassment didn't

take place.  And when you see the professionalism of the

investigation it's going to be clear that this was not

retaliation.

1      The second thing that the bank did, and I've alluded a

2  little bit to this, but they assigned Mr. Picarella to new

3  supervisors.  They took him away from the person that he

4  claimed initially on he felt was treating him inappropriately.

5  And this is really important because HSBC was making a very

6  genuine attempt to get Mr. Picarella a new start.  They

7  assigned him to multiple different supervisors.  And they all

8  found that Mr. Picarella still was refusing to do his job.

9      Now, this gets to -- gets us to probably the biggest

10  problem with Mr. Picarella's case.  Because when you hear about

11  all the new supervisors you may be thinking how long was he

12  working there?  The evidence is going to show that

13  Mr. Picarella continued to work at HSBC for years after he made

14  his initial complaints.  Okay.  And he collected years worth of

15  paychecks.  And if you look at what those paychecks added up

16  to, you will see that Mr. Picarella collected over a million

17  dollars in salary from HSBC during the time period that he was

18  working there and the vast majority of that money, almost all

19  of it, was collected after he made his complaints about sexual

20  harassment.

21      (Continued on next page)

22

23

24

25

 1              MR. JACKSON:  Now that is, you will see, completely

 2     inconsistent with any common sense or logical notion of how

 3     retaliation works.  It will not make sense to you when you

 4     actually look at the timing of what happened.  You actually

 5     look at what happened, that the bank elected to pay him a small

 6     fortune after he was making his complaints, and he claims that

 7     was some form of retaliation.  When you get chance to look at

 8     all that it will be obvious to you that his claims are

 9     completely disconnected from the law and completely

10     disconnected from reality.

11              Now I'm coming close to the end, but let me say a

12     couple of things about the law that I think you should take

13     into consideration.  There are federal and local statutes at

14     issue in this case, as Mr. Hubbard talked about.  And Judge

15     Carter will give you much more detailed instructions later on

16     the case and all will be explained to you, but the important

17     point is Mr. Picarella has the burden in this case.  He has the

18     burden at all times, and he has the burden of demonstrating

19     that an adverse employment action in retaliation for the

20     complaint that he made about Ms. Parker was the reason that he

21     experienced those adverse employment actions.

22              He has to demonstrate retaliatory adverse employment

23     action.  And there are really two that he is focused on.  One

24     is this failure to promote him to managing director that he

25     talked about, this position involving Ms. Jenner, and the other

1    one is his termination in 2015.

2              When you actually look at what happened and see all

3    the evidence, it will be obvious to you that the idea that

4    these were retaliatory adverse employment actions, it's just a

5    complete lie.  It's a complete lie.  It's false.

6              When you look at, just first in terms of the

7    promotion, what happened with regard to Ms. Jenner, you will

8    hear from other witnesses and see her performance evaluation,

9    this woman was one of the most respected employees at the

10   entire bank.  She was a person who was universally respected

11   for her hard work, for her collegiality, for all the things

12   that she did, her businesses skills.  And in contrast with

13   Mr. Picarella, there was no real comparison between them.  This

14   is the woman that he is going to allege he should have had her

15   job, and it's not going make sense.  The whole story of how

16   Ms. Jenner gets the promotion has nothing to do with

17   retaliation, and he's not going to be able to establish

18   anything that is even going to suggest that it is a retaliatory

19   thing.  He is not going to meet his burden.

20             The second piece is termination.  Again, his

21   termination happened years after he made his complaint because

22   of the issue in this case and after he collected an enormous

23   amount of money from HSBC.  When you actually look at that and

24   look at everything that led up to his termination, it will be

25   clear to you this is just another attempt by Mr. Picarella to

GB5TPIC3                       Opening - Mr. Jackson

1   get another payday.  His termination and the reasons for it are

2   a million light years away from any retaliatory motive, and

3   that will be completely clear when you examine that and hear

4   from Judge Carter how you're supposed to apply the law in this

5   case.

6            So I want to wrap up.  I just want to say I know it's

7   been a long day and a long afternoon, but this is difficult.

8   As the judge said, jury service is one of the most important

9   things that you can do as a juror, but it's also one of the

10  most difficult.  It's hard to focus on that and engage in a

11  problem that you haven't engaged in before.

12           But the laws that are at issue here in this case, as I

13  said before, are incredibly important.  They are incredibly

14  important, and we take them extremely seriously.  And we ask

15  you to take them extremely seriously during this case, because

16  these are laws that are designed to protect people.

17           The evidence is going to show Mr. Picarella is

18  attempting to make a mockery of these laws.  He's attempting to

19  mislead this jury about what happened for his own personal

20  benefit.  So at the end of the case when we come back and walk

21  through all the evidence and talk about how it demonstrates

22  what the appropriate verdict is, I'm going to ask you to return

23  a verdict:  No liability against HSBC.  It's going to be the

24  only verdict that actually matches up with the evidence.

25           Until that time, I just ask you to do three things:

GB5TPIC3

1    Pay close attention to evidence, listen to Judge Carter's

2    instructions throughout the case, and at the end of the case

3    use your own common sense.  Please your own common sense

4    throughout the case.  Don't put that aside when you walk

5    through the metal detectors and come into this courthouse.

6         If you do those three things, use your own common

7    sense, follow the judge's instructions and listen closely to

8    the evidence, you are going to come away with the only verdict

9    that is going to be consistent with the evidence and consistent

10   with the law, and that is a verdict of no liability in favor of

11   HSBC.

12        Thank you very much for your attention.

13        THE COURT:  Let's do this, let's take a quick

14   twelve-minute break and then we will have the first witness.

15   Don't discuss the case among yourselves or with anyone else and

16   I'll see you in twelve minutes.

17        MR. HUBBARD:  Your Honor, we have to unpack some of

18   our stuff, but I think we can do it in twelve minutes.

19        Your Honor, could we have a moment with you?

20        (Jury not present)

21        (Continued on next page)

22

23

24

25

GB5TPIC3

```
 1            THE COURT:  Okay.

 2            MR. HUBBARD:  Your Honor, I'm not encouraged in what I

 3   see from counsel in that opening statement.  It was severe

 4   argument.  It was largely, in my view, argument, and I want to

 5   complain about it.  I didn't object to it because I'm not going

 6   to interrupt in front of the jury, but it was heavy, heavy

 7   argument.  Number two, he virtually accused opposing counsel of

 8   lying to the jury.  Number three, he used evidence in his

 9   argument that the Court has ruled inadmissible at this point in

10   time in the case.  So I'm concerned that the rules that we live

11   by here are not being followed by the defendant.

12            THE COURT:  Okay.

13            MR. JACKSON:  May I respond?

14            THE COURT:  Are you asking me to do anything at this

15   point?

16            MR. HUBBARD:  No, sir.

17            THE COURT:  Okay.  Anything from defense counsel?

18            MR. JACKSON:  No, your Honor.  We disagree.

19            THE COURT:  All right.  See you soon.

20            (Recess taken)

21            (Continued on next page)

22

23

24

25
```

GB5TPIC3                          Picarella - direct

1              (Jury present)

2              THE COURT:  We're ready to proceed with the first

3      witness.  Plaintiff please call your first witness.

4              MR. HUBBARD:  The plaintiff, Mr. Picarella, your

5      Honor.

6       MICHAEL PICARELLA,

7          called as a witness by the Plaintiff,

8          having been duly sworn, testified as follows:

9      DIRECT EXAMINATION

10     BY MR. HUBBARD:

11     Q.  Mr. Picarella, give us your full name, please, and tell us

12     where you reside.

13     A.  My name is Michael Picarella.  I live at 221 Barton Avenue,

14     Melville, New York.

15     Q.  Are you married?

16     A.  Yes.

17              THE COURT:  Hold on just a second.  Make sure you lean

18     into the microphone.

19              Can the jurors all hear?

20              Okay.

21              MR. HUBBARD:  Thank you, your Honor.

22     BY MR. HUBBARD:

23     Q.  Are you married?

24     A.  Yes.

25     Q.  What are the ages of your children?

1  A.  I have twin daughters that are 17, I have a boy that is 14

2  and a boy that's 12.

3  Q.  Can you tell us briefly where you grew up and the secondary

4  school.

5  A.  Sure.  I grew up in Levittown, Long Island, and I graduated

6  in 1984 from Levittown Division Avenue High School.

7  Q.  Give us the benefit of your educational background after

8  you graduated from high school.

9  A.  I attended Hofstra University, graduating in 1989 with a

10  bachelor's in business administration.  I also have an MBA from

11  Fordham University and graduated in 1995.

12  Q.  Did there come a time when you began working in the

13  financial services industry?

14  A.  Yes.  Shortly after graduating from Hofstra University in

15  1989 I joined Morgan Stanley.  I worked there for 13 years in

16  operations management as a vice president.

17  Q.  Did you obtain your MBA while working at Morgan Stanley?

18  A.  Yes, I did.

19  Q.  Did there come a time when you left Morgan Stanley for

20  other employment?

21  A.  Yes.

22  Q.  When was that?

23  A.  In 2003 I left as part of the firm-wide reduction in force.

24  I joined Deutsche Bank as a vice president in information

25  technology.

GB5TPIC3                        Picarella - direct

1    Q.  That was in 2003?

2    A.  2003.

3    Q.  And how long were you there?

4    A.  I was there for one year and I was recruited by Lehman

5    Brothers.

6    Q.  Let me ask the questions.

7    A.  Sorry.

8    Q.  One at a time.

9         What happened next?

10   A.  I was recruited by Lehman Brothers.

11   Q.  When was that?

12   A.  That was in 2004.

13   Q.  Did you join Lehman Brothers?

14   A.  Yes, I did.

15   Q.  In what position?

16   A.  I joined as a vice president.  I was global head of fixed

17   income product management.

18   Q.  May I ask you to give us a very short description of what

19   fixed income product management is, please.

20   A.  Sure.  Prime brokerage and fixed income prime brokerage is

21   financing of large institutional clients, including hedge

22   funds.  We provide many services in addition to financing,

23   trade execution, clearance and settlement, basically the back

24   office for execution and reporting.

25   Q.  How long were you at Lehman Brothers?

1  A.  I was at Lehman Brothers until 2008 until Lehman went

2  bankrupt as a result of the 2008 financial crisis.

3  Q.  What happened to the Lehman work force?

4  A.  We merged immediately with Barclays Capital Group bought

5  Lehman Brothers a couple days after the bankruptcy.

6  Q.  Can you tell us if you remained at Barclays?

7  A.  Yes, I did.

8  Q.  What was your position at Barclays?

9  A.  I was vice president, head of U.S. fixed income prime

10  brokerage until 2011.

11  Q.  So looks like you had the same job there, except this was

12  U.S. and the other was global.

13  A.  Yes.

14  Q.  How long did you work at Barclays?

15  A.  It was a little over two years until January 2011.

16  Q.  What, if anything, happened at that time?

17  A.  I was let go as a firm-wide reduction in force as a result

18  of the merger of the two companies.

19  Q.  How did you come to go to work at HSBC?

20  A.  I was recruited by a head hunter that was employed by HSBC.

21  Q.  What was the head hunter's name?

22  A.  Kevin Freer.

23  Q.  Do you know the name of his firm?

24  A.  I believe it was Mitchell Martin.

25  Q.  Do you know how they got your résumé?

1    A.  No, I don't.

2    Q.  Did you interview at HSBC in the spring of 2011?

3    A.  I did.

4    Q.  Do you recall who interviewed you?

5    A.  Yes.

6    Q.  Who was it?

7    A.  Eileen Hedges, Mark Baker, Ian Mullen, Ellen Weiss, and

8    Pablo Pizzimbono.

9    Q.  What part of the bank were these executives employed in

10   when they interviewed you?

11   A.  Global banking and markets of the Americas.

12   Q.  When you say for the Americas, can you tell us what

13   region -- probably self-explanatory, but what area of the world

14   is that?

15   A.  North America, which was U.S. and Canada, and Latin

16   America.

17   Q.  What were the titles of these folks that interviewed you?

18        Ms. Hedges, what was her title?

19   A.  She was a senior vice president.  Mark Baker was a managing

20   director.  Ian Mullen was a managing director.  Ellen Weiss was

21   a senior vice president, and Pablo Pizzimbono was a managing

22   director.

23   Q.  What positions did they hold at that time?

24   A.  Eileen Hedges was head of business development for the

25   Americas.  Mark Baker was in charge of client development.  Ian

GB5TPIC3                          Picarella - direct

1    Mullen was COO for markets in the Americas.

2    Q.   You say COO, tell us what that means.

3    A.   Chief operating officer.

4    Q.   Okay.

5    A.   Ellen Weiss was head of human resources for markets, and

6    Pablo Pizzimbono was held of sales for the Americas.

7    Q.   You mentioned that you were in this global markets sales

8    area, what type of sales are we talking about?  Just give us a

9    brief description of the type of sales we're talking about.

10   A.   Products that we sold were, just to keep it simple, bonds

11   and stocks, foreign exchange products.

12   Q.   Do you recall the reporting relationship among

13   Mr. Pizzimbono, Mr. Mullen, Ms. Hedges?

14   A.   Yes.  Ms. Hedges reported in to Mr. Pizzimbono and

15   Mr. Mullen.  Mr. Pizzimbono and Mr. Mullen reported in to

16   Didier Descamps, who was the head of global markets for the

17   Americas.  Mark Baker also reported into Pablo Pizzimbono.  And

18   Ellen Weiss was in human resources, which is a separate group.

19   Q.   Tell us again the position that Mr. Pizzimbono held.

20   A.   He was head of sales for the Americas.

21   Q.   Was Suzanne White at that time in this organizational

22   structure?

23   A.   Yes.

24   Q.   What was her position?

25   A.   She was deputy COO or chief operating officer reporting in

GB5TPIC3                    Picarella - direct

1    to Ian Mullen.

2    Q.   Take a moment now, Mr. Picarella, and show you on the

3    screen --

4                MR. HUBBARD:  Peter, do you have this?

5    Q.   Show you a demonstrative exhibit that we have used, a chart

6    that tried to simplify it a little bit, but what is -- it says

7    January 2011.  What organization does this reflect here,

8    Mr. Picarella?

9    A.   That's the senior management for global markets Americas.

10   Q.   And the two gentlemen at the top are the co-heads of global

11   markets?

12   A.   Yes, Didier Descamps.

13   Q.   Who is beneath -- Mr. Descamps is shown as co-head of

14   global markets Americas?

15   A.   Yes.

16   Q.   What is Mr. Mullen shown as, please?

17   A.   He is shown as the chief operating officer for global

18   markets Americas reporting in to Mr. Descamps.

19   Q.   Let's go a couple of pages over to where Mr. Mullen is in

20   the middle.

21            What does this chart depict?

22   A.   This is the global markets Americas COO/business management

23   organizational chart.

24   Q.   What does it show?

25            Does it show Ms. White on the chart?

1    A.  Yes, it does, just to the left of Mr. Mullen.

2    Q.  It shows her as deputy COO?

3    A.  Correct.

4    Q.  Is Mr. Karam on this chart?

5    A.  Yes, he is.  He is underneath the business managers over

6    there in metals.  He was a business manager in metals.

7    Q.  Looks like there are several business managers on this

8    chart.

9    A.  Yes.

10   Q.  What were their jobs?

11   A.  Their jobs were for each different business area or

12   product.  They operated in the COO function for that particular

13   product or business area.

14   Q.  When you say they operated in the COO function, what do you

15   mean by that?

16   A.  The responsibilities were that of a COO.

17   Q.  Meaning?

18   A.  That their daily tasks were similar to what Mr. Mullen or

19   Ms. White would be conducting.

20   Q.  What does the chief operating officer do?

21   A.  He's in control -- there's many aspects to that job.  He's

22   in control of ensuring that the markets organization is in

23   compliance with all external regulatory requirements, that

24   we're in charge of everything from costs -- what we call T and

25   E, travel and expense cost, is maintained within budget.

1    They're in charge of basically allocating what employees are

2    getting paid by desk.  They work with human resources to ensure

3    that compensation is paid.  There's many aspects to the job,

4    it's a long list.

5    Q.  You call them COO, chief operating officer, I guess in sum

6    it means operations.

7    A.  Yeah, the operations of the business.

8    Q.  Okay.  Is Ms. Hedges on this chart?

9    A.  Yes, she is, where it's being highlighted down below for

10   sales.

11   Q.  What was her position?

12   A.  She was head of business development for sales for the

13   Americas.

14   Q.  And is Ms. Jenner on this chart, J-E-N-N-E-R?

15   A.  Yes, she is, she's under wealth management.

16   Q.  What is Ms. Hedges' title on this chart?

17   A.  Vice president.

18   Q.  Sorry, Ms. Hedges' title.

19   A.  Sorry, Ms. Hedges is senior vice president.

20   Q.  What is Ms. Jenner's title on this chart?

21   A.  Vice president.

22   Q.  You told us about Mr. Pizzimbono and Ms. Hedges in sales.

23          What is sales?

24   A.  Sales is part of -- sales and trading within markets.  So

25   for the products I had mentioned before, the sales team works

GB5TPIC3                    Picarella - direct

1  generally with large institutional clients, governments, and

2  corporates, and they will have relationships with these

3  organizations that are managing assets.  And those clients will

4  want to execute in the market, so they will use a salesman that

5  is covering them to go out into the market and execute the

6  sales staff, who will then work with the trading desks to put

7  that client order out into the market for an execution, and

8  when it's done it's relayed back to the salesperson.

9  Q.  Are these two staffs, the sales staff and the trading

10 staff, are they at HSBC?

11 A.  Yes, they are.

12 Q.  Let's see if we can go through one more.

13        What is the department at the top left?

14 A.  Global market sales.

15 Q.  So this is a sales operation?

16 A.  This is a sales.

17 Q.  Who is shown at the top?

18 A.  Mr. Pizzimbono.

19 Q.  And is Ms. Hedges on this chart?

20 A.  Yes, she is, under business development.

21 Q.  She's shown as the head of business development.

22 A.  Yes.

23 Q.  Does this fairly depict the organization of the sales,

24 global market sales, at HSBC in the spring of 2011 when you

25 were interviewing with the department?

GB5TPIC3                          Picarella - direct

1    A.  Yes, it does.

2    Q.  When you were being interviewed, did you learn whether or

3    not you were being interviewed for any specific position?

4    A.  Yes.

5    Q.  What was it?

6    A.  The position was for deputy head of business development in

7    Americas reporting in to Eileen Hedges.

8    Q.  So down near the block that we're looking at?

9    A.  Yes.

10   Q.  And was there any discussion from the offices you were

11   interviewing with about succeeding Ms. Hedges when she moved to

12   a new job?

13   A.  Yes.

14   Q.  What were you told?

15           MR. JACKSON:  Objection, your Honor.

16           THE COURT:  Basis?

17           MR. JACKSON:  Hearsay.

18           THE COURT:  Overruled.  Go ahead.

19   A.  Primarily from Ms. Hedges and Mr. Mullen that Ms. Hedges

20   would be moving into a new role in the organization, and that I

21   was being hired to succeed her.

22   Q.  Were you interviewed at any other Wall Street firms at the

23   time that you were interviewing with HSBC in the spring of

24   2011?

25   A.  Yes.

1    Q.   Which ones?

2    A.   UBS.

3    Q.   What was the status of your interviews at UBS when you

4    interviewed at HSBC?

5    A.   I was offered a job at UBS for director in their capital

6    markets division.

7            MR. HUBBARD:  Peter, may we have PX 304, please.

8    Q.   You have an exhibit book there, Mr. Picarella, it's kind of

9    hard to see on that screen.

10           Exhibit 304, in the third volume.

11   A.   Got it.

12   Q.   Take a look at the top, and what position -- what is the

13   date of this letter, Mr. Picarella?

14   A.   April 13, 2011.

15   Q.   What position were you being offered?

16   A.   Senior vice president in sales management department

17   reporting to Eileen Hedges.

18   Q.   Does it show the title that you received?

19   A.   Yes, title was senior vice president.

20   Q.   What does it say about your compensation?

21   A.   That my base salary would be $225,000 a year.

22   Q.   Is there any provision down below that?  Is there any

23   reference to that?

24           What were you -- were you eligible under this letter

25   to receive a discretionary bonus?

1    A.  Yes.

2    Q.  And what were you told about -- by Ms. Hedges and others

3    about what that bonus would be?

4    A.  I was told the bonus would be in the 150,000 range to match

5    what was offered by UBS.

6    Q.  Was that amount guaranteed?

7    A.  No, it was a handshake.

8            MR. JACKSON:  We have no objection, but this should

9    probably be offered.

10           THE COURT:  Are you offering this?

11           MR. HUBBARD:  Yes, your Honor.  I guess I sort of

12   thought that there was no objection.

13           THE COURT:  Hold on.  The previous documents, can we

14   list those, and are you offering those into evidence?

15           MR. HUBBARD:  Not the first one.  The first one was a

16   demonstrative exhibit, but I move the admission of 304.

17           MR. JACKSON:  No objection.

18           THE COURT:  It's in.

19           (Plaintiff's Exhibit 304 received in evidence)

20           MR. HUBBARD:  May we see Plaintiff's 249, please.

21   BY MR. HUBBARD:

22   Q.  Do you have 249 in your book, Mr. Picarella?

23   A.  Yes, I do.

24   Q.  What is Exhibit 249, Mr. Picarella?

25   A.  This is a role profile form.

```
 1                THE COURT:  And are you offering 249?

 2                MR. HUBBARD:  Yes, your Honor.

 3                THE COURT:  Any objection?

 4                MR. JACKSON:  No objection, your Honor.

 5                THE COURT:  It's in.

 6                (Plaintiff's Exhibit 249 received in evidence)

 7      Q.  What is 249?

 8      A.  It is a role profile form.

 9      Q.  And what is the business?

10      A.  Global market sales management.

11      Q.  What is the date?

12      A.  May 5, 2011.

13      Q.  Is this role profile for you?

14      A.  Yes, it is.

15      Q.  What is the role title?

16      A.  Senior vice president.

17      Q.  Does it show your supervisor?

18      A.  Yes, it does.

19      Q.  Does it show her title or position?

20      A.  Yes, it does.

21      Q.  There seems to be a section there that reads role purpose

22      deputy-business development.  Do you see that?

23      A.  Yes.

24      Q.  Can you read us the description of that position?

25      A.  Sure.  Responsible for developing relationships with sales,
```

1    credit, relationship managers and senior management.  Promote

2    strategic client alignment to maximize profitability by

3    analyzing management information for global markets customer

4    base to ensure priority clients fit within developed models.

5    Q.  If you look down beneath the top portion there's a section

6    called principal accountabilities.

7          Do you see that, Mr. Picarella?

8    A.  Yes, I do.

9    Q.  What were these accountabilities?

10   A.  This is basically some but not all of our primary

11   responsibilities.

12   Q.  Just to look at a couple of them real quick.  There's a

13   note there about global markets commentary.  What was that?

14   A.  That was a monthly commentary basically highlighting

15   events -- sales revenue and big events that would take place on

16   either a weekly or monthly basis.  We had a number of different

17   reports.

18   Q.  The top said establish priority clients in U.S., Canada and

19   Latam.  What was that?

20   A.  They had a very large client base.  There were strategic

21   clients that we would isolate and basically put client planning

22   around.

23   Q.  There's a section toward the bottom that reads:  On

24   boarding/off boarding clients.  What does that mean?

25   A.  Any new clients that wanted -- salespeople wanted to bring

1    on to the firm, they had to go through a process and committee

2    that that was responsible for.

3    Q.  There's section that reads GM BIRO.  I guess that stands

4    for business information risk officer.

5    A.  Correct.

6    Q.  Did you have that position?

7    A.  Yes, that was my responsibility.

8    Q.  What was that responsibility?

9    A.  It was basically to ensure integrity of information within

10   the organization, that there was no chance for leakage, and

11   that everybody was following proper protocol by desk to ensure

12   that all information was contained in the appropriate manner

13   within the firm.

14   Q.  Was there any operational risk component to this job as

15   deputy head of business development?

16   A.  Yeah, it was a part of it.

17   Q.  So with this background can you summarize for us just

18   briefly what your principal job responsibilities were when you

19   joined in May of 2011 as deputy head of business development?

20   A.  Yeah, some of the major ones were strategic client

21   planning, onboarding and exiting of clients, monitoring and

22   managing industry surveys, the business information risk

23   officer that you mentioned.  We had a number of initiatives,

24   some of them were regulatory, like Project Topaz, which was

25   know your client, anti-money laundering, the Dodd-Frank

1    regulations, and various reporting to senior management in the

2    organization for global markets.

3    Q.  Just briefly, Dodd-Frank regulations, we may not be

4    familiar with those.  What type of regulations were they?

5    A.  Well, they were related to derivative products and ensuring

6    that there were proper controls and clearance around

7    Dodd-Frank.  It's a little complicated.

8    Q.  How long were you employed by HSBC?

9    A.  Approximately four years.

10   Q.  How did your employment end?

11   A.  I was terminated in March of 2015.

12   Q.  These responsibilities you just described to us from the

13   exhibit and the ones you described to us in summary, how long

14   did you have these responsibilities at HSBC?

15   A.  By the middle of 2013 almost all of them had been taken

16   away.

17   Q.  Who was responsible for taking those responsibilities away

18   from you?

19   A.  Initially Ms. White and Pizzimbono, and eventually

20   Mr. Karam when he became my supervisor.

21   Q.  Did there come a time in 2012 when Ms. Hedges was relieved

22   of her management responsibilities?

23   A.  Yes.

24   Q.  Did you then succeed her?

25   A.  I did not.

1   Q.   Who did?

2   A.   Carol Jenner.

3   Q.   Were you interviewed for the job?

4   A.   No.

5   Q.   When you joined HSBC, where was your office?

6   A.   The headquarters at 452 Fifth Avenue in Manhattan.

7   Q.   In the headquarters building where was your office?

8   A.   I was on the 9th floor, trading floor.  We had two trading

9   floors, 9th floor and 10th floor.  I was on the 9th floor.

10  Q.   How many employees were on that trading floor?

11  A.   The 9th floor was the smaller of the two trading floors.

12  It was about 300 -- I would say about 300 employees on that

13  floor.

14          MR. HUBBARD:  Do you have a demonstrative exhibit of

15  the trading floor, Mr. Fitzgerald.

16  Q.   Let me show a picture.  This is not an HSBC trading floor,

17  this is a picture from the internet.

18  A.   Correct.

19  Q.   Can you tell us whether or not this has a reasonable

20  relationship to the trading desk that you worked on?

21  A.   Yes, very similar.

22  Q.   How is it similar?

23  A.   Well, the trading desks, we call them turrets, they weren't

24  like cubicles that separated employees, they were lines of

25  desks, and they would be sort of face to face.  So this row of

GB5TPIC3                          Picarella - direct

1    desks where this lady is sitting, right along the side is

2    another row of the desks facing, and there were usually --

3    those rows, those turrets were in line throughout the course of

4    trading floor.  And typically you would have on perimeter of

5    the trading floor offices and conferences rooms.

6    Q.  When you were set up there with Ms. Hedges and Ms. Parker,

7    were you set up in a similar setting?

8    A.  Yes, I was.  If we took the lady as an example where I was

9    sitting, to my right was Ms. Hedges and to my left was

10   Ms. Parker.

11   Q.  Who did Ms. Parker report to?

12   A.  She reported to Ms. Hedges.

13   Q.  What kind of work did she do?

14   A.  For the most part she supported Ms. Hedges and myself, but

15   she had some of her own responsibilities.

16   Q.  I think we saw that she may have had the title "analyst."

17   Do you know what her actual work title was?

18   A.  She was an analyst.

19   Q.  And what was her age at the time that you joined in 2011,

20   if you know?

21   A.  She was about 26 years old at that time.

22   Q.  Do you know how long she had been at the bank when you

23   joined?

24   A.  She was at the bank I want to say about three years, and in

25   business development about a year before I got there.

1             MR. HUBBARD:  Let me see Plaintiff's Exhibit 311,

2      please.

3      Q.  What is the date on this organizational chart, please,

4      Mr. Picarella?

5      A.  November 2011.

6      Q.  The earlier one was January of 2011?

7      A.  Correct.

8      Q.  So is this again the global markets sales group in

9      November 2011?

10     A.  Yes, that's correct.

11     Q.  Does it show Mr. Pizzimbono?

12     A.  Yes.

13     Q.  Is Mr. Goodwin on this chart?

14     A.  Yes, he is.

15     Q.  What is his title?

16     A.  Managing director.  He ran the sales desk for the credit

17     product.

18             MR. HUBBARD:  Let's go over about two pages, please.

19             I should offer this, your Honor, offer Plaintiff's

20     311?

21             THE COURT:  Any objection?

22             MR. JACKSON:  No objection.

23             THE COURT:  Okay, it's in.

24             (Plaintiff's Exhibit 311 received in evidence)

25     Q.  Are we looking at a chart that is entitled -- a section

GB5TPIC3                         Picarella - direct

1    entitled wealth management and EQD sales?

2    A.  Yes.

3    Q.  And the date at the top is what?

4    A.  November 2011.

5    Q.  Who is the MD in the middle, head of wealth management

6    sales, please?

7    A.  Todd Fruhbeis.

8    Q.  Is Ms. Jenner on this chart?

9    A.  Yes, she is.

10   Q.  What does this say her job title is?

11   A.  Business manager vice president.

12   Q.  We go over a couple of pages, business development

13   Americas.

14          This page, Mr. Picarella, business development

15   Americas, is that your shop?

16   A.  Yes, it was.

17   Q.  Who does it show the head of business development Americas

18   is?

19   A.  Eileen Hedges.

20          (Continued on next page)

21

22

23

24

25

1   Q.  And who is beneath that?

2   A.  Myself and Ms. Parker.

3   Q.  Does it show your title?

4   A.  Yes, it does.

5   Q.  Senior vice-president?

6   A.  Yes.

7   Q.  And then does it shows Ms. Parker?

8   A.  Yes.  Analyst.

9   Q.  And did the two of you work for Ms. Hedges?

10  A.  We did.

11          THE COURT:  Hold on one second.  Go ahead.

12          MR. HUBBARD:  Give me Plaintiff's 19, please.

13          THE COURT:  Are you offering 19?

14          MR. HUBBARD:  Yes, your Honor.

15          THE COURT:  Any objection?

16          MR. JACKSON:  No objection.

17          THE COURT:  Okay.  It's in.

18          (Plaintiff's Exhibit 19 received in evidence)

19          MR. HUBBARD:  I should offer it before I put it up on

20  the screen.

21  Q.  What is Exhibit 19, Mr. Picarella?

22  A.  That is my 2011 mid year review.

23  Q.  If you look at the top of the document.

24  A.  Yes.

25  Q.  You have it there beside you as Exhibit 19 if you want to

GC59PIC4                          Picarella - direct

1   look at it in the hard copy.

2           MR. HUBBARD:  Peter you need to highlight that.  Can

3   you show us the top there?

4           THE COURT:  Members of the Jury, if you need to move

5   around in the jury box to help you see that a little bit

6   better, feel free to do so.  Okay.

7   Q.  Do we now have it on the screen there, Mr. Picarella.

8           What is a global score card plus AR?

9   A.  It's the title of the form they used for your reviews.

10  Mid year and year-end reviews.

11  Q.  That was my question.  Is this a performance review form?

12  A.  Yes, it is.

13  Q.  And this one is for mid year?

14  A.  Mid year 2011.

15  Q.  And it's a manager review?

16  A.  Yes.

17  Q.  Is there a date on it?

18  A.  Yes.  August 17, 2011.

19  Q.  What is the review period?  Is that reflected?

20  A.  It reflects the first three months that I was working there

21  from May 5 -- even less.  It was given to me in August but it

22  was just a couple months of time that I was there.

23  Q.  So it's given to you in August of '11?

24  A.  Yes.

25  Q.  Who gave it to you?

GC59PIC4                    Picarella - direct

1    A.  Ms. Hedges.

2    Q.  What was the rating?

3    A.  Three strong.

4    Q.  There's a rating system at the firm.  Is it a numerical

5    system?

6    A.  Yes, it is.

7    Q.  One, two, three, four, five?

8    A.  One through five.

9    Q.  What is one?

10   A.  One is outstanding.

11   Q.  What is two?

12   A.  Two I believe is exceeds.

13   Q.  What is three?

14   A.  Strong.

15   Q.  Do you remember what four is?

16   A.  Inconsistent.

17   Q.  And what is five?

18   A.  Poor.

19   Q.  What did you receive in this one?

20   A.  Three strong.

21           MR. HUBBARD:  Let's go to 50, please, Mr. Fitzgerald.

22   Q.  Turn to 50, Mr. Picarella, in your book.

23           THE COURT:  Are you offering 50?

24           MR. HUBBARD:  Yes, your Honor.  Sorry.

25           MR. JACKSON:  No objection, your Honor.

1           THE COURT:  Okay.  Fifty is in.

2           (Plaintiff's Exhibit 50 received in evidence)

3    Q.  What is the Exhibit 50?

4    A.  That is my year-end review for 2011.

5    Q.  And what is the date?

6    A.  December 21, 2011.

7    Q.  The document period shows from May 5 through the end of the

8    year, right?

9    A.  Yes.

10   Q.  Who gave you this review?

11   A.  Ms. Hedges.

12   Q.  And is this a three strong rating?

13   A.  Yeah.  The grade is different than the rating.  The rate's

14   on the last page.  But, yes, it was a three strong as well.

15           MR. HUBBARD:  Let's go to the last page, please.

16   Q.  Do you see the rating there?

17           And Ms. Hedges, your supervisor, gave you this rating

18   at the end of 2011?

19   A.  Yes, she did.

20   Q.  Did you meet with her when she gave you the rating?

21   A.  Yes.

22   Q.  Did she say anything to you at that time as we heard here

23   in the opening statement about Mr. Pizzimbono or Ms. White not

24   thinking much of you or something like that?

25   A.  Yeah.  At this review meeting and the bonus meetings in the

GC59PIC4                          Picarella - direct

1   same timeframe, a little later in the bonus meeting she said

2   something to the effect that Mr. White -- Mr. Pizzimbono and

3   Ms. White did not think highly of me and I needed to work on my

4   relationship with them.

5   Q.  Did they think highly of you or did they not think highly

6   of you at that time?

7          MR. JACKSON:  Objection.

8   Q.  Do you know at that time?

9          THE COURT:  Sustained.  Can you rephrase the question.

10         MR. HUBBARD:  Yes, your Honor.

11  Q.  Do you know whether or not what she told you at that time

12  was true?

13  A.  I didn't believe it to be true, no.

14  Q.  Why?

15         MR. JACKSON:  Objection, your Honor.

16         Withdrawn.  Withdrawn.

17         THE COURT:  Go ahead, counsel.

18         THE WITNESS:  I had only been working there a few

19  months and I was getting to know them.  And I believe I had a

20  good relationship with both of them.  In fact, a couple weeks

21  before that review Mr. Pizzimbono took myself and our wifes to

22  dinner at his restaurant and I thought the relationship was

23  very good.

24  Q.  Is that a couple weeks before Ms. Hedges told you that he

25  did not think much of your performance?

GC59PIC4                         Picarella - direct

```
 1    A.  Yes.

 2    Q.  Had Mr. Pizzimbono in this period of time, did

 3    Mr. Pizzimbono or Ms. White say anything like that to you?

 4    A.  No.  They did not.

 5    Q.  Did they say in this period of time anything complimentary

 6    or encouraging to you?

 7    A.  Yes, they did.

 8    Q.  How about into the spring of 2012?

 9    A.  Yes.

10    Q.  Do you know of any source other than Ms. Hedges of that

11    comment about them not thinking much of you?

12    A.  She was the only source.

13    Q.  Had anything happened to Ms. Hedges' status in the

14    organization by the time of that review meeting?

15    A.  Yes.

16    Q.  What?

17    A.  She was moved off of the 9th floor trading floor to the

18    10th floor away from Mr. Pizzimbono.  She considered it to be

19    a bit of a downgrade.  She was moving closer to Suzy White.

20    There was a change in the organization --

21    Q.  Let me ask the question.

22    A.  Okay.

23    Q.  Was her reporting relationship changed?

24    A.  Yes.

25    Q.  Was she -- how was it changed?
```

GC59PIC4                    Picarella - direct

1   A.  There was a change at the COO level, chief operating

2   officer level.  Mr. Mullen moved into another senior role in

3   the organization and his deputy, Ms. White, succeeded him as

4   the COO.

5   Q.  My question -- what I was trying to find out is was there a

6   change in who Ms. Hedges reported to?

7   A.  Yes.  She was going to be reporting to Ms. White.

8   Q.  Did she express any concern about that to you?

9   A.  Yes.

10  Q.  What did she say?

11  A.  She was very concerned.  She did not want to work for Suzy

12  White.  She thought it was a bit of a demotion.

13  Q.  Did she know -- do you know if she knew that you had been

14  hired to succeed her?

15  A.  Yes.  She knew that.

16  Q.  Did she tell you that you were being hired for that reason?

17  A.  Yes.

18  Q.  When she interviewed you?

19  A.  Yes.

20  Q.  When you had this review with Ms. Hedges that she commented

21  about Mr. Picarella and Ms. White, did she say anything to you

22  about the rating she gave you, the three strong?

23  A.  Yes, she did.  She said there were discussions with

24  management about perhaps giving me a two but I had not been

25  there, at the firm long enough in order to do that.  I was only

GC59PIC4                          Picarella - direct

 1    there eight months and it's unusual for them to do that for

 2    somebody that hasn't been there a year or greater.

 3                MR. HUBBARD:  Just a minute.  Excuse me one minute,

 4    your Honor.

 5    Q.   What review -- did she tell you that there was a review

 6    that she considered giving you had you been there longer?

 7    A.   Yes.  She said --

 8    Q.   Wait.  Let me ask the question.

 9    A.   I'm sorry.

10    Q.   Did she tell you that?

11    A.   Yes.

12    Q.   And what number did she tell you she was considering giving

13    you?

14    A.   Number two.

15    Q.   And is number two higher or lower than number three?

16    A.   It's higher.

17    Q.   Thank you.

18                Did there come a time when you met with Ms. Hedges and

19    complained to her about her treatment of Michelle Parker?

20    A.   Yes.

21    Q.   When was the first time you can recall doing that?

22    A.   In the February March time frame.

23    Q.   Why did you do that?

24    A.   I was concerned for -- well I was concerned about the

25    impact that her behavior was having on Ms. Parker.

GC59PIC4                          Picarella - direct

1   Q.  What did you observe -- what kind of behavior had you

2   observed that concerned you?

3   A.  Well, I complained to her that she was dragging Ms. Parker

4   out to bars in the middle of the afternoon and in the evenings,

5   getting her drunk, coming back into the office the next day

6   telling stories of how Ms. Parker was sleeping with employees,

7   sleeping with executives, sleeping with clients.  She was

8   continually using sexually explicit and intimidating language

9   with Ms. Parker.

10  Q.  Did -- had you said anything at this point in time to

11  Mr. Pizzimbono about it?

12  A.  No.

13  Q.  So you're now talking to Ms. Hedges about it?

14  A.  Yes.  Directly to Ms. Hedges.

15  Q.  Did you make any requests in connection with reporting that

16  conduct to her?

17  A.  Well, yes.

18  Q.  Did you ask her to do anything about it?

19  A.  Yes.  I told her to stop.

20  Q.  Did she respond in any significant way?

21  A.  No.

22  Q.  Did that con -- do you know whether or not that conduct you

23  complained about continued in that timeframe?

24  A.  It did.

25  Q.  Did you complain about it to anybody else?

GC59PIC4                       Picarella - direct

1           MR. JACKSON:  Your Honor, I'm just objecting to form.

2           THE COURT:  I'll allow it.  Go ahead.

3           THE WITNESS:  Yes, I did.  I then reported it to

4     Mr. Pizzimbono, our boss.

5     Q.  Did you observe anything about Ms. Hedges -- I mean

6     Ms. Parker's reaction to the language you described from

7     Ms. Hedges?  Did you observe anything about the impact of that

8     language on her in the workplace?

9     A.  Yes.  She was crying all the time.  At the desk.  In

10    conference rooms.  In the lobby.  She was very distraught.

11    Q.  Did you talk to Mr. Pizzimbono?

12    A.  I did.

13    Q.  In what timeframe?

14    A.  In the March time frame, March 2012.

15    Q.  Did you report to him the conduct you observed -- did you

16    report to him similar to what you complained about to

17    Ms. Hedges?

18    A.  Yes.  And I also let him know that I was having

19    conversations directly with Ms. Hedges.

20    Q.  Did he suggest at any time that you go to the human

21    resources department and report her conduct?

22    A.  Not at that time.

23    Q.  You say that you had overheard her at the desk using

24    sexually explicit language with Ms. Parker.  Can you summarize

25    it.  Not in great detail.  But just summarize some of the

GC59PIC4                    Picarella - direct

1    language that you heard.

2    A.  Some of the --

3            MR. JACKSON:  Your Honor, objection.  This is not

4    relevant.  We have an agreement.

5            THE COURT:  Overruled.  Go ahead.

6            THE WITNESS:  She would say things to her like:  What

7    underwear are you wearing?  Did you have sex last night?  With

8    who?  What type of sex?  You need to show more.  She would talk

9    about her own extramarital affairs, explicitly extramarital

10   affairs she was having with a couple of executives.  And that

11   was Ms. Hedges talking about her own affairs.  She would also

12   talk about her own sexual relationship with her husband in

13   detail.

14   Q.  Did you, in speaking to Ms. Hedges, object to that conduct?

15   A.  Yes.

16   Q.  Did you report that conduct to Mr. Pizzimbono?

17   A.  Yes.

18   Q.  Did he say anything to you about going to human resources?

19   A.  Not at that time.

20   Q.  Did you have any discussion with him about you continuing

21   to work with her yourself?  To try to ameliorate this conduct?

22   A.  Yeah.  Well I'm not sure I understand the question.

23   Q.  I'll rephrase it.

24   A.  Okay.

25   Q.  Did you have any discussion with Mr. Pizzimbono about you

GC59PIC4                          Picarella - direct

```
 1   yourself attempting to speak to Ms. Hedges about it?
 2   A.  Yes.  I told him --
 3              MR. JACKSON:  Objection.
 4              THE COURT:  Basis.
 5              MR. JACKSON:  Just the leading, your Honor.
 6              THE COURT:  Okay.  Please rephrase the question.
 7              MR. HUBBARD:  Thank you, your Honor.
 8   Q.  Did you at any time speak to any of these executives about
 9   an effort on your part to work with Ms. Hedges on this conduct?
10   A.  Yes.  I told Mr. Pizzimbono that I was having periodic
11   conversations directly with Ms. Hedges about her conduct and
12   telling her it needed to stop.
13   Q.  Did you have any recollection of what her reaction to it
14   was?
15   A.  She ignored it.  The behavior would continue.
16   Q.  Did Mr. Pizzimbono -- do you know if Mr. Pizzimbono took
17   any action with respect to the conduct that you had reported?
18   A.  No.
19              THE COURT:  Okay.  Let's stop for the day.  We're
20   getting close to five o'clock.  Let's go ahead and break for
21   the day.
22              Members of the Jury, I'll ask that you be here bright
23   and early tomorrow at 9:30 and we'll continue with the
24   testimony.
25              Don't discuss this case amongst yourselves or with
```

GC59PIC4                          Picarella - direct

1    anyone else.  Don't do any research related to any of the

2    issues pertaining to this case.  Have a wonderful evening and

3    we'll see you tomorrow at 9:30.

4              (Jury excused)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC59PIC4                        Picarella - direct

1              (In open court)

2              THE COURT:  I'll ask counsel to try to get here at

3      9:15 tomorrow just to avoid any unnecessary bumping into

4      jurors.

5              Anything else we need to address today?

6              MR. HUBBARD:  Judge, just one question.

7              THE COURT:  Should the witness leave for this?  Is

8      this something relating to the witness's testimony?

9              MR. JACKSON:  Your Honor, we have no objection.

10             MR. HUBBARD:  Nothing --

11             THE COURT:  You can sit down.

12             MR. HUBBARD:  Nothing he didn't hear in terms of our

13     earlier discussion.

14             I'm just concerned that there might be some

15     misunderstanding on the defendant's part about your ruling on

16     the motion in limine that was filed with respect to all of

17     those Where's Waldo Sametime messages.  Counsel referred to it

18     in his opening statement as if it was a part of the evidentiary

19     fabric in this case and your Honor granted the motion.  So I

20     just want to make sure that if there's any confusion about

21     that, that counsel lets us know that he's confused and he

22     believes he's able to address that evidence because it's not

23     admitted and your Honor granted the motion.

24             THE COURT:  Let me hear from defense counsel.

25             MR. JACKSON:  Your Honor, I didn't say anything about

1    the Sametime Chats in my opening statement.  As I informed

2    defense counsel, we have a witness who is going to testify to

3    this and the Court made clear that you could call witnesses to

4    talk about contemporaneous performance.  The question of

5    whether or not the Sametime Chats would be admitted the Court

6    left opened in terms of whether or not the door would be opened

7    by the nature of the testimony and said that it might be

8    rebuttal evidence but we haven't made any reference to the

9    Sametime Chats.

10        THE COURT:  That was my recollection as well as the

11   motion in limine was dealing with the Sametime Chats and not as

12   we talked about the last time if there were witnesses who were

13   actually going to testify about this depending on what they

14   say.

15        MR. HUBBARD:  I understand.

16        So -- but -- I understand that.  The Waldo that we're

17   talking about comes from those Sametime Chats.  I understand we

18   had a discussion about maybe some other witness.

19        THE COURT:  Hold on.  Hold on.  Hold on.

20        It does seem to me that given the content of what

21   we're talking about that -- well, okay.  Again, we have a

22   witness who is on the stand.  It seems that a lot of this may

23   be something that that's going to be addressed with the

24   witness.  But that's fine if neither side has an objection to

25   the witness being here.  Okay.  Go ahead, counsel.

1          MR. HUBBARD:  I don't think it's going to be addressed

2     with me but when we get to cross-examination.

3          THE COURT:  Right.

4          MR. HUBBARD:  The suggestion I hear is that someone

5     from HSBC will attempt to report that what's in the Sametime

6     Chats and then with these two employees where talking about

7     Waldo and that would be hearsay.  So you can't evaluate what

8     you've already found to be inadmissible that way.  So I'm just

9     concerned about something that is so plainly inadmissible, that

10    is these Waldo stuff in these Sametime Chats circulating into

11    the opening statement.

12         THE COURT:  My recollection of this the last time that

13    we dealt with this is that defense counsel claim that there

14    were witnesses who were going to testify themselves as to their

15    own personal knowledge that someone reported to them these

16    Where's Waldo comments, not that they observed them in the

17    Sametime Chat or something like that.

18         MR. HUBBARD:  I understand that, your Honor, and they

19    might do that but that -- wouldn't that be hearsay?

20         THE COURT:  I thought we -- I think we ruled on that

21    before but we can deal with that again as it comes up.  It

22    seems to me that that is certainly -- you certainly in your

23    opening statement certainly did talk a lot about these

24    pretextual nature of the reasons that the defendants gave for

25    firing Mr. Picarella, but we'll cross that bridge when we get

GC59PIC4                    Picarella - direct

 1    to it.  Doesn't seem that that's anything that's going to

 2    necessarily come up with this witness.

 3              MR. HUBBARD:  Thank you, your Honor.

 4              THE COURT:  Is there anything else we need to deal

 5    with?

 6              MR. HUBBARD:  Not from the plaintiff, your Honor.

 7              MR. JACKSON:  Your Honor, I don't think we need to

 8    address this any further.  I'll just say I think we'll have to

 9    see what the rest of the testimony is but cross-examination I

10    think is going to cover a number of subject matters with this

11    witness.

12         I would ask the Court if the Court could inquire of

13    Mr. Hubbard as to a projection for how much time he anticipates

14    just so that we can -- we're making his witnesses available to

15    him so we want to make sure that we're understanding where we

16    are in the case.

17              THE COURT:  Okay.  That seems to make some sense.

18    Mr. Hubbard, do you have a sense of how much longer you have on

19    direct?

20              MR. HUBBARD:  I just started, your Honor.  I think

21    it's going to take a few hours.  It could take three or four

22    hours.  He's the main witness on our end.  The other witnesses

23    are defense witnesses we're calling in for brief, you know, or

24    less extensive testimony.  So I would think that it would take

25    certainly the morning tomorrow and maybe into the afternoon for

1    Mr. Picarella's direct to end.

2            THE COURT:  Can you give me an offer of proof?  I

3    think I understand what Mr. Picarella's testimony is going to

4    be about, but can you give me an offer of proof because it

5    seems that you've certainly -- I know you said you just

6    started.  It seems that you've gotten close to a lot of the

7    meat of some of this in terms of the alleged retaliatory motive

8    here.  But can you give me a sense.

9            MR. HUBBARD:  A lot of that was in the opening, your

10   Honor, but I haven't through the -- I've only gone through with

11   him the very first complaint he made of many and I've only gone

12   through with him virtually none of the retaliatory acts that

13   took place, including what we say was the trumped up reason to

14   fire him.  It's extensive.

15           I mean I could tell your Honor that it's -- I'm going

16   as fast as I can but I can't say it's going to be brief.

17           THE COURT:  Okay.  I'm just trying to get a sense

18   again of whether or not -- it seemed that in your opening

19   statement you were doing sort of a -- equivalent of what would

20   be called a double direct.  I'm going to make sure we're not

21   going to get in that situation where you're going to go over

22   all of this briefly with this witness and then go over this

23   same information again in further detail along with this

24   witness.  We want to keep things moving along.  The jurors are

25   here.  They're active.  There have already been some moments

GC59PIC4                     Picarella - direct

1     where they've been starting to get a little restless.  We want

2     to keep things moving.  I understand this is the plaintiff and

3     I certainly want to be lenient and give you time but it seems

4     to me that both parties seem to be going at sort of

5     cross-purposes here if the goal was to try to move things along

6     and get to the real issues here.

7              I am inclined to allow plaintiff's counsel to lead a

8     little bit to get to some of this preliminary stuff so that we

9     can move things along.  If the defendant wants to object to

10    that, that's fine.  But if we're going to have open-ended

11    questions when we're talking about did you make this complaint

12    and when did you make this complaint, it's going to slow things

13    down a little bit.

14             MR. HUBBARD:  I had to prepare it that way because I

15    didn't know how it would be and I certainly can move it along,

16    but the questions that I was asking the gentleman, other than a

17    couple of questions, I asked just to -- just to deal with what

18    he said in the opening.  I'm only on -- I'm only on February,

19    March of 2012.

20             THE COURT:  Right.

21             MR. HUBBARD:  That's where we are.  That's very early

22    in this episode.  But I take your Honor --

23             THE COURT:  I'm saying that it very well may be that

24    it takes three or four hours.  I just want to try to make sure

25    that you can move things along efficiently.

GC59PIC4                        Picarella - direct

1              So, again, if we're getting to some certain

2      preliminary matters I will give counsel some leeway to lead so

3      we can get through some of this stuff in terms of the -- I

4      don't believe there's going to be any dispute in terms of the

5      date of some of these complaints, or is this there?  Is there

6      any dispute about that?

7              MR. JACKSON:  There is, your Honor.  We disagree with

8      the timeline that Mr. Picarella is suggesting in terms of when

9      he made his complaints.  It's something of an important

10     dispute.

11             But I will just say, your Honor, we take the Court's

12     point.  I was trying -- I think I only made a couple of leading

13     objections.  I was trying to allow leading.  It was really only

14     on the points that I thought get to sort of the nature of some

15     of the complaints.

16             But we trust the Court's judgment about what will make

17     it faster.  We thought it would make it faster with some of

18     that if there was just one open-ended question like:  What

19     happened?  What did you say to him?  But we definitely defer to

20     the Court's wisdom on that and we will take the Court's advice

21     not to object where the leading --

22             THE COURT:  That's fine.  You're free to object if you

23     feel an objection is appropriate.  But I guess what I'm trying

24     to figure out is is there actually a dispute between the

25     parties as to when Mr. Picarella made complaints?

1          I'm not talking about his motivation for making the

2     complaint.  I'm not talking about the substance of his

3     complaints.  But in terms of the timeline in terms of when

4     certain complaints were made, is there actually a dispute about

5     that?

6          MR. JACKSON:  The dispute, your Honor, is about what

7     the nature of the complaints was at the time because there's

8     only one type of complaint that is protected activity in this

9     case and that is the complaint about Ms. Parker.  That in our

10    view doesn't take place until late in 2012.  Mr. Picarella I

11    think, his testimony is that it took place early in 2012.  And

12    this is the subject of discussion at depositions and a number

13    of other places.  But we do have a dispute about that that we

14    think is material.

15         THE COURT:  It seems again, and I'll hear from

16    counsel, because it seems again to make sense from an

17    efficiency standpoint to again allow plaintiff's counsel to

18    lead a little bit in terms of the dates of these complaints.  I

19    understand that there is a dispute between the parties as to

20    what may have constituted a complaint or what the nature of the

21    complaints was.  But in terms of moving these things along, the

22    fact that the defense has a different view about the nature of

23    the complaints, that's something that you can deal with on

24    cross-examination.  But in terms of getting these dates out of

25    the way because it seems that there are several dates it does

1    seem that it's in everyone's interests to move that along since

2    there is no dispute about the dates.

3            MR. JACKSON:  That's fine, Judge.  Thank you.

4            MR. HUBBARD:  We will work toward that goal, your

5    Honor.

6            The thing that I'm trying to deal with is the

7    defendant contests protected activity.  So that's why I have to

8    go into detail about what was said.

9            THE COURT:  No.  That's fine.  I'm not saying that you

10   shouldn't go into what was said.  But in terms of instead of

11   saying what happened next, you can talk about, as you've done:

12   Did you complain to so and so about this?  When was that?

13           MR. HUBBARD:  Yes, sir.

14           THE COURT:  Then what did you say as opposed to what

15   happened next and then going back and forth to try to get out

16   these dates.

17           MR. HUBBARD:  I'm just trying to do it the

18   old-fashioned way.  It's not necessary.  We can do it that way.

19           THE COURT:  One other thing that we can do that maybe

20   can speed things up to the extent that there seem to be, I'm

21   thinking about at least 88 percent of the documents that the

22   parties wish to submit into evidence, there is no dispute

23   about, counsel can confer about that, give me a list and then

24   we can do this even, I guess we can do this in the presence of

25   the jury, but just have plaintiff's counsel say:  I move to

GC59PIC4                    Picarella - direct

1   admit blank, blank, blank, blank, blank, blank, blank, blank.

2   No objection.  They're all in.  We don't have to keep going

3   through all of that in front of the jury.

4          MR. HUBBARD:  Yes, sir.  We should do that.

5          MR. JACKSON:  If Mr. Hubbard will send us a list

6   tonight of the exhibits that he intends to admit we will

7   definitely be able to do that, your Honor.  It would just be

8   difficult if we're hearing it right at that moment.

9          Your Honor, related to that with the demonstratives.

10  I think it probably makes sense -- all the demonstratives have

11  been admitted, but I think it probably makes sense right before

12  the directs in this case if we could have a practice of just

13  flashing what the demonstratives will be so that we know what

14  they are before they are going up.

15         THE COURT:  Okay.  That makes sense to me.

16         MR. HUBBARD:  I have a list right here, so we're off

17  and running.

18         MR. JACKSON:  Thank you.

19         THE COURT:  Okay.  Sounds good.  Anything else from

20  plaintiff's counsel?

21         MR. HUBBARD:  No.  Thank you, your Honor.

22         THE COURT:  Anything else from defense counsel?

23         MR. JACKSON:  Given the representation, your Honor, we

24  just would want to confirm.  We're going to -- we had talked

25  about having two short witnesses available tomorrow.  We're not

GC59PIC4                    Picarella - direct

1    going to ask those people -- our plan would be not to ask those

2    people to come tomorrow but to plan to come Wednesday because

3    if it's going to be three or four hours that's going to take up

4    the bulk of tomorrow and then there's cross-examination, so.

5             THE COURT:  Are there other witnesses who are

6    available just in case?

7             MR. HUBBARD:  We have -- we have a witness who is here

8    from London, Mr. Mullen, to testify after Mr. Picarella.  So he

9    is here and available.  And then I think Ms. Weiss, they tell

10   us Ms. Weiss is ready to go first thing Wednesday morning.  And

11   we had discussed having Ms. Malanga.  I think she's at the firm

12   so she's just right down the street.  She can be on call to

13   come if we need.

14            THE COURT:  Okay.  Sounds good.  So let's ask counsel

15   to get here at 9:15 tomorrow.

16            Anything else from either side?

17            MR. HUBBARD:  No.  Thank you, your Honor.

18            MR. JACKSON:  No, your Honor.

19            THE COURT:  Okay.  Good night.

20            (Adjourned)

21

22

23

24

25

1                   INDEX OF EXAMINATION

2  Examination of:                   Page

3  MICHAEL PICARELLA

4  Direct By Mr. Hubbard  . . . . . . . . . . . .51

5                 PLAINTIFF EXHIBITS

6  Exhibit No.               Received

7  304  . . . . . . . . . . . . . . . . . . . .63

8  249  . . . . . . . . . . . . . . . . . . . .64

9  311  . . . . . . . . . . . . . . . . . . . .70

10  19  . . . . . . . . . . . . . . . . . . . .72

11  50  . . . . . . . . . . . . . . . . . . . .75

12

13

14

15

16

17

18

19

20

21

22

23

24

25