GC69PIC1                        Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MICHAEL PICARELLA,

                Plaintiff,

          v.                          14 CV 4463 (ALC)

HSBC (USA) SECURITIES, INC.,

                Defendant.
------------------------------x
                                      New York, N.Y.
                                      December 6, 2016
                                      10:09 a.m.

Before:

                    HON. ANDREW L. CARTER,

                                          District Judge

                        APPEARANCES

LIDDLE & ROBINSON LLP
     Attorneys for Plaintiff
BY:  JAMES R. HUBBARD
     BLAINE H. BORTNICK
     ASA F. SMITH
     CHRISTINE PALMIERI

BOIES, SCHILLER & FLEXNER LLP
     Attorneys for Defendant
BY:  RANDALL W. JACKSON
     DAVID L. SIMONS
     NICHOLAS STANDISH

GIBSON, DUNN & CRUTCHER LLP
     Attorneys for Defendant
BY:  GABRIELLE F. LEVIN

          (Trial resumed; jury not present)

          THE COURT:  So my deputy informed you a couple of the

GC69PIC1                    Trial

1    jurors were running a little late.  They're all here now.  So

2    we're ready to proceed.  I think at this point it's not

3    necessary for me to say anything to the jurors about getting

4    here on time but if it becomes a recurrent problem we'll have

5    to do something about that.  Counsel in agreement with that?

6              MR. HUBBARD:  Yes, your Honor.

7              MR. JACKSON:  Yes, your Honor.

8              THE COURT:  So let's bring the jury in.

9              MR. JACKSON:  Your Honor, just very, very briefly

10   address.  I passed to your Honor's deputy a booklet containing

11   a number of the stipulations that had been reached between the

12   parties and we just wanted the Court to be aware of them.  The

13   only one that we wanted to emphasize right at this moment is

14   that there is a stipulation between the parties that the

15   parties agree that any evidence offered to prove the sexual

16   harassment of Ms. Parker did or did not occur is inadmissible.

17   So we understand that there needs to be a little bit of

18   testimony on this issue related to what exactly Mr. Picarella

19   claims that he did but it's our position that going any further

20   into the details of any of that would exceed our stipulation

21   about admissibility and the relevant scope of this trial.

22   We'll reference these, your Honor, to the extent that they come

23   up.

24             THE COURT:  Plaintiff's counsel, do you have any

25   position on that or anything you want to add?

GC69PIC1                    Trial

1          MR. HUBBARD:  I disagree, your Honor.  They're tipping

2     the tape.  The stipulation about attempting to --

3          THE COURT:  Which number stipulation are we talking

4     about?  And is this going to affect the testimony right now,

5     the direct testimony?

6          MR. JACKSON:  I'm not sure, your Honor.  I just -- we

7     went into this.

8          THE COURT:  Which stipulation are we talking about,

9     which number?

10         MR. JACKSON:  Number four, your Honor.  Tab four.

11         We went into this a little bit more than we

12    anticipated yesterday, but we understand that it had to be

13    touched on, which is what we discussed.  But the point is

14    that -- number three your Honor.  I'm sorry.

15         THE COURT:  Hold on.  Let me look at it.  You're

16    talking about three?

17         MR. JACKSON:  Yes, your Honor.

18         THE COURT:  And do you plan on introducing these

19    stipulations into evidence?

20         MR. JACKSON:  Your Honor, most of these would not be

21    offered in evidence.  The basic point is that we don't intend

22    to offer them into evidence.  It's possible that we may need to

23    have a different type of stipulation if we ultimately did need

24    to establish some of these facts.  But these are just between

25    the parties, not to be filed, not to be offered in evidence.

GC69PIC1                         Trial

```
 1  To establish our agreement we wanted the Court to be aware of

 2  them about the scope of appropriate evidence.

 3            THE COURT:  Hold on.

 4            I think we're ready to bring the jury in.  Is there

 5  anything you need to say, plaintiff's counsel?

 6            Okay.  Let's bring the jury in.

 7            One thing if the parties -- well we'll deal with that

 8  later.  In terms of the stipulations, there need to be some

 9  redactions to those stipulations as well.

10            MR. JACKSON:  Absolutely, your Honor.  But these

11  aren't to be filed.  Thank you, Judge.

12            THE COURT:  Let's bring the jury in.  Let's go ahead

13  and have Mr. Picarella take the stand.

14            MR. HUBBARD:  Mr. Picarella.

15    MICHAEL PICARELLA, resumed

16            (Continued on next page)

17

18

19

20

21

22

23

24

25
```

GC69PIC1                           Picarella - direct

1              (Jury present)

2              THE COURT:  Please be seated.  Welcome back.  Hope you

3     had a pleasant evening.  Let's resume with the case on trial.

4     Go ahead, counsel.

5              MR. HUBBARD:  Thank you, your Honor.

6     DIRECT EXAMINATION CONTINUED

7     BY MR. HUBBARD:

8     Q.  Mr. Picarella --

9              THE COURT:  Again, make sure you lean into the

10    microphone.

11             Go ahead, counsel.

12    Q.  Yesterday in the defendant's opening statement do you

13    recall hearing the statement that within months of you being

14    hired that complaints about you were coming in from a number of

15    different parts, coming in from supervisors, people were

16    complaining about all aspects of what they referred to as the

17    Picarella work experience, people were complaining that his

18    work product was not up to standards and so on within months of

19    you being hired.  Do you recall hearing that yesterday?

20             MR. JACKSON:  Objection.

21             THE COURT:  Sustained.  Please rephrase the question.

22    That objection is sustained.

23    Q.  My question was -- I want to ask Mr. Picarella if he heard

24    that statement made in the courtroom yesterday.

25             THE COURT:  That objection is sustained.  Please

GC69PIC1                    Picarella - direct

1    rephrase the question.

2    Q.  Is the statement -- is the sense of what I just said to you

3    true or not true?

4            MR. JACKSON:  Objection.

5            THE COURT:  Sustained.  Please rephrase the question.

6    Q.  Within six months of you being hired at HSBC were

7    complaints about you coming in from your supervisors and other

8    parts of the bank?

9    A.  Absolutely not.

10   Q.  Turning to Exhibit 50, please.  What is Exhibit 50 please?

11   Just on the top there, Peter.  What is Exhibit 50?

12           THE COURT:  Just to be clear is this already in

13   evidence or are you offering this?

14           MR. HUBBARD:  I think it's in evidence.  Yes.

15           Yes, your Honor.

16   Q.  Mr. Picarella, is this -- this is a review that we reviewed

17   with you yesterday?

18   A.  Yes, this is --

19   Q.  For what portion of your performance?

20   A.  For the first year that I was at HSBC.

21   Q.  For what period of time?  What months?

22   A.  From May when I joined through December.

23   Q.  About the first six months?

24   A.  About the first -- yes.

25           MR. HUBBARD:  The second page, Mr. Fitzgerald, please.

GC69PIC1                    Picarella - direct

1              May I publish to the jury, your Honor, please?

2              THE COURT:  Yes.

3    Q.  Under the rating section, Mr. Picarella, do you see where

4    the comments begin, "Mike has just completed his first eight

5    months at HSBC.  Mike came from Lehman Barclays.  While

6    spending most of his career in prime sales Mike has done a good

7    job in jumping into supporting sales.  Mike has taken good

8    initiatives in terms of putting organization around onboarding

9    and prioritization.  He's developed good relationships and is

10   starting get within the HSBC processes.  As discussed with

11   Mike, he needs to be better at communicating among all relevant

12   parties when decisions are being made.  This includes up and

13   across layers of management.  We start weekly staff meetings in

14   2012 to help this.  In 2012 we discussed Mike to take on

15   further responsibilities from myself which will round out his

16   knowledge base.  I thank Mike for his hard work in 2011 and

17   look forward to an even better 2012."

18              Did you receive that review?

19   A.  Yes, I did.

20   Q.  Did Ms. Hedges accuse you of being lazy when you had that

21   review?

22   A.  She did not.

23   Q.  Mr. Picarella, when you -- what were the years that you

24   worked at Morgan Stanley?

25   A.  I worked at Morgan Stanley from 1989 through 2002.

GC69PIC1                         Picarella - direct

1    Q.  You told us you worked in operations?

2    A.  Operations management, yes.

3    Q.  About ten years?

4    A.  Yeah, about 13 years total at Morgan Stanley.

5    Q.  What were your hours?

6    A.  I worked on the trading floor so our hours were start time

7    was approximately 7 a.m. and the first few years of my career I

8    would work until 7, 8, 9 o'clock at night, usually.

9    Q.  Did you go to school for your master's in finance while you

10   were working at Morgan Stanley?

11   A.  I did.

12   Q.  Did you go in the day or in the evening?

13   A.  In the evening.

14   Q.  What time were your classes?

15   A.  Generally they would start at 8 or later in the evening.

16   Q.  Let me direct your attention to the time period of

17   November 2011.  Did you have occasion any time in that period

18   of time to report some misconduct by Ms. Hedges on the trading

19   floor to any senior management at the firm?

20   A.  I did.

21   Q.  What did you do?

22   A.  In November 2011 I approached Mr. Mullen, the COO at the

23   time, chief operating officer, privately to let him know that

24   Ms. Hedges had exposed her breast on the trading floor on the

25   desk to Ms. Parker and myself.

GC69PIC1                          Picarella - direct

1   Q.   Had you gone to human resources with that complaint?

2   A.   I had not at that time.

3   Q.   Did you -- did he say anything to you about going to human

4   resources with that complaint?

5   A.   Yes.  Mr. Mullen advised me to go to human resources with

6   that complaint.

7   Q.   What was your response?

8   A.   Well, I was only at the firm about six months at that time.

9   I was the new guy.  And I didn't want to get Ms. Hedges in

10  trouble.  But I thought, you know, Ms. Parker was -- she was

11  shocked by the incident, as I.  And I also felt it was a, as a

12  senior person, it was my responsibility to have that addressed.

13  Q.   But you didn't go?

14  A.   I did not go to HR at that time.

15  Q.   And did there come a time when you spoke to Ms. Hedges

16  about it?

17  A.   I did.

18  Q.   And did you speak to Ms. Hedges about it before or after

19  you talked to Ms. Weiss at human resources?

20  A.   Before.

21  Q.   In the first six or eight months that you were at HSBC did

22  you have any second thoughts about your job choice?

23  A.   A couple of times, yes.

24  Q.   Did you speak to any of the headhunters that had recruited

25  you before about possible other jobs?

1   A.   Yes.   I was in contact with one headhunter that had

2   employed me at HSBC.

3   Q.   Why did you do that?

4   A.   I was reaching out to him in regards to the bonus that was

5   promised when I had joined just a few months earlier.   And in

6   the course of conversation, e-mail conversation I made a

7   comment to keep me in mind if there were any other senior

8   positions available.

9   Q.   Were you having second thoughts about your job choice?

10  A.   I did have a couple of second thoughts, yes.

11  Q.   Did you pursue any other job?

12  A.   No, I did not.

13  Q.   Let me return you to the period of time in February, March

14  of 2012 and go back, let's go back to where we were yesterday.

15  You told us, I believe, that in that timeframe you complained

16  directly to Ms. Hedges?

17  A.   That's correct.

18  Q.   About the conduct that you had described here yesterday?

19  A.   Yes.

20  Q.   Following that did you complain to any other member of

21  management?

22  A.   Yes.

23  Q.   And when was that and who was it?

24  A.   It was in the March 2012 timeframe.   I approached

25  Mr. Pizzimbono who was Ms. Hedges' boss -- our boss, my boss as

1   well.

2   Q.  What did you say to him?

3   A.  Well, I basically let him know that I was having

4   conversations with Ms. Hedges about the sexual harassment of

5   Ms. Parvis -- Parker and I basically made the same complaints

6   to him that had been given to Ms. -- without going through the

7   details again, I gave him the same general complaints.

8   Q.  Did you discuss with him -- was there any discussion in

9   that meeting about taking those complaints to human resources?

10  A.  No.

11  Q.  Did there come a time after that that you did approach

12  human resources and tell them the facts that you had seen and

13  that you had complained about?

14  A.  Yes.  Not too long after.

15  Q.  When was that?

16  A.  That was in early April -- I believe April 11, 2012.

17  Q.  And who did you speak to?

18  A.  Ms. Weiss who was the head of HR for global markets in the

19  Americas.

20          MR. HUBBARD:  Mr. Fitzgerald, may I have Plaintiff's

21  Exhibit 303 please.

22          Your Honor, we have conferred over the recess and

23  exchanged a list of exhibits that we think most likely we'll

24  use with Mr. Picarella, and counsel has been kind enough to

25  indicate the ones that can be admitted without objection.  This

GC69PIC1                           Picarella - direct

```
 1    is one.
 2                THE COURT:  Okay.
 3                MR. JACKSON:  No objection.
 4                THE COURT:  It's in.  Go ahead.
 5                (Plaintiff's Exhibit 303 received in evidence)
 6    Q.  What is this document, Mr. Picarella?
 7    A.  This appears to be an HSBC anti harassment summary section
 8    which may be from a handbook, an employee handbook or a policy
 9    book.  I don't know.
10                MR. HUBBARD:  Let's go down to the next section.
11    Q.  This harassment policy, were you aware of it at the time
12    frame we've been talking about.
13    A.  Yes.
14    Q.  How?
15    A.  Well when I joined there was training, initial training for
16    all new employees.  And the employee handbook that had this
17    policy, these types of policies was given to all employees.
18                And I was aware, I was in the industry for about 25
19    years.  I was aware of sexual harassment policies.
20                MR. HUBBARD:  Can we go down to the sexual harassment
21    policy, Mr. Fitzgerald.
22                At the bottom, Mr. Fitzgerald.  The definition of
23    sexual harassment.
24    Q.  Were you aware of this sexual harassment and these
25    definitions at the time frame that we're talking about?
```

1   A.  Yes.  Absolutely.

2   Q.  What, if anything, did you say to Ms. Weiss who -- let me

3   backup a second.

4          When was the meeting that you told us about that you

5   had with Ellen Weiss, the head of human resources in April of

6   2012?

7   A.  I believe the date was April 11, 2012.

8   Q.  What, if anything, did you say to her during this period of

9   time?

10  A.  It was a lengthy meeting.  It was a number of things we

11  covered.  But in general I told her that Ms. Hedges was

12  sexually harassing Ms. Parker and that I felt like it was

13  having a psychological impact on Ms. Parker.

14          I told her also that Ms. Hedges began to bully me in

15  that timeframe, the previous couple months.  And I also let her

16  know that I had had conversations directly with Ms. Hedges and

17  Mr. Pizzimbono.

18  Q.  You said bullying you.  What kind of conduct are you

19  talking about?

20  A.  She would -- she was doing things like pounding on -- I

21  would be in office rooms in meetings and they were glass walls.

22  She'd pound on the glass and call me out of the office.  It

23  seemed like she was angry but when I would come out of the

24  conference room there was nothing other than she wanted me to

25  go to another meeting with her.  You know, the manner it was

1   done was just -- it was a public display.  We were in meetings

2   at times and it seemed like she was -- she was doing things

3   when I would begin to talk to cut me off and started to

4   embarrass me at that point in time in front of senior people in

5   meetings.

6   Q.  Did you discuss with Ms. Weiss what -- was there any

7   discussion between you and Ms. Weiss as to whether or not human

8   resources at that time would investigate the sexual harassment

9   complaints that you were making?

10  A.  There wasn't in subsequent conversations.  Again initially

11  I went to Ms. Weiss who was close friends with Ms. Hedges.  I

12  went with her as a friend to help.  I still did not want to get

13  Ms. Hedges in trouble.  You know, I thought the behavior -- I

14  liked her.  But her behavior was something I had never seen

15  before and it needed to be addressed.  And Ms. Weiss and her

16  were very close friends.  So I felt comfortable going to her

17  and explaining and hoping that she could help without getting

18  Ms. Hedges in trouble, if that makes sense.

19  Q.  What did you believe would happen next after you had that

20  meeting with Ms. Weiss?

21  A.  You know, Ms. Weiss, her reaction to me was that she had

22  thought that Ms. Hedges' behavior -- this type of behavior had

23  stopped.  So it was an indication to me that this was a history

24  of behavior by Ms. Hedges.  But you know initially I was

25  talking about setting up -- I had told Ms. Weiss that I had

1   these meetings with Ms. Hedges and I talked to her about giving

2   me an opportunity to set up like a weekly standing meeting

3   where I could talk about work but also bring up these

4   behavioral issues.  And that any investigation -- it wasn't

5   really something that was going to happen at that moment but

6   over time.  And in general so that she knew it didn't come from

7   me.

8            I know I'm talking a lot.  But I think Ms. Hedges was

9   concerned at that time, because of the direct conversations I

10  was having with her, that I was going to do something with it.

11  Q.  Did you set up any of these one-on-one meetings with

12  Ms. Hedges before human resources began its investigation?

13  A.  Yeah, I'm not exactly sure I know when HR started to look

14  into it.  But I did -- it took me a couple of weeks to meet

15  with Ms. Hedges.  And Ms. Weiss was following up with me to see

16  if I did have a meeting with Ms. Hedges.  And I finally did.

17  It was brief.  And it was -- really the goal of it was to set

18  up a standing weekly meeting.  I think we called it a

19  fifteen-minute one-on-one.  And I thought that would help.

20  Because when I did talk to her it seemed to work for a couple

21  of days, her behavior would calm down, and then she would go

22  right back to her behaviors.

23  Q.  Did Ms. Weiss takes any notes at this April 11 meeting when

24  you complained to her?

25  A.  She did not that I recall.

GC69PIC1                          Picarella - direct

1    Q.  Again, just to make sure I'm clear.  In that meeting with

2    Ms. Hedges -- I mean with Ms. Weiss, did you complain about the

3    way that Ms. Hedges was treating you?

4    A.  I did.  It came up.  But that wasn't the primary concern at

5    that time.

6    Q.  After that meeting with Ms. Weiss were you questioned about

7    Ms. Hedges' conduct by Mr. Pizzimbono?

8    A.  Yeah.  It was shortly after, a week or two later he did.

9    Q.  Did there come a time when Weiss and Pizzimbono questioned

10   you about some alleged misconduct at a firm conference in

11   Florida?

12   A.  Yes.  Towards the end of April or a couple weeks after I

13   initially went to Ms. Weiss they both independently had asked

14   me in different ways if I had heard any stories from the Key

15   Largo conference.

16   Q.  What was the Key Largo conference?

17   A.  It was in HSBC sponsored event held in Key Largo.  It was a

18   LatAm, Latin American conference for our clients.  We had some

19   key speakers and we would invite international clients to come

20   to this.

21   Q.  Did you attend?

22   A.  I did not.

23   Q.  And when you were asked that question by Mr. Pizzimbono

24   there in April did you have any information to give him?

25   A.  No.  I hadn't heard anything about the Key Largo conference

GC69PIC1                    Picarella - direct

1   at that time.

2   Q.  What, if anything -- did they say anything to you about

3   continuing that discussion?

4   A.  I was under the impression that Mr. Pizzimbono was looking

5   for information regarding the Key Largo conference.  So over

6   the next few weeks I happened to have the opportunity of

7   overhearing some of the events and stories that had taken place

8   there.

9   Q.  Where did you overhear them?

10  A.  Well, sitting at my desk on the trading floor that we

11  described yesterday, Ms. Parker was sitting to my left and she

12  was on the phone at times talking to other people.  And I

13  couldn't help but overhear some of the stuff she was talking

14  about.

15  Q.  When you heard what she was talking about at this Key Largo

16  conference did you at some point in time take that information

17  to Mr. Pizzimbono?

18  A.  I did.

19  Q.  What did you report to him?

20  A.  I told him in the -- it was in the middle of June or

21  towards the end of June timeframe now that I had overheard

22  Ms. Parker, you know, telling stories -- or talking about

23  events that had happened in Key Largo.  She was, at that point

24  in time too, I don't know how much I'm allowed to say, but she

25  was terminated just shortly before I went to Mr. Pizzimbono.

GC69PIC1                        Picarella - direct

1    And she had called me asking to be a reference over the summer.

2    And for -- she asked me for a job reference, I'm sorry, over

3    the summer.

4             I had gotten a little more information I believe from

5    her then as well as what happened in Key Largo.  I let

6    Mr. Pizzimbono know that some of the things that I had heard

7    was Ms. Hedges was at the event ossified drunk and falling

8    down, pushing Ms. Parker onto a senior executive that reported

9    in to Mr. Pizzimbono.  He was the head of Mexican sales.  And

10   tried to push her to sleep with him.  That --

11            MR. JACKSON:  Objection, your Honor.

12            THE COURT:  Overruled.  Go ahead.

13            THE WITNESS:  And it was the other way around too.

14   According to Ms. Parker she was pushing that same executive to

15   sleep with Ms. Parker.  She ended up groping -- he ended up

16   groping her that evening.  And it was another senior executive

17   that made very crude and obscene gestures to Ms. Parker at the

18   same event at one of the bars.

19   Q.  When you told Pizzimbono this did he ask you to do anything

20   about it?

21   A.  Well, he told me he was going to call Ms. Weiss and let her

22   know and that I was going to have to speak with her and let her

23   know.

24   Q.  What, if anything, happened next?

25   A.  Later that day Ms. Weiss called me and let me know that she

GC69PIC1                           Picarella - direct

```
 1   spoke with Mr. Pizzimbono and wanted me to come to her office.
 2   Q.  Did you go?
 3   A.  I did.
 4   Q.  Did she ask you about these Key Largo events?
 5   A.  She did.
 6   Q.  And did you give her the information that you related to us
 7   here today?
 8   A.  I gave her as much as I could, yes.
 9   Q.  Did there come a time when you were asked to collect names
10   of HSBC people in attendance at the Florida conference to your
11   knowledge?
12   A.  Yes.  At that same meeting Ms. Weiss asked me if I could
13   come up with as many names as I could that were at the
14   conference and potentially had seen and heard these events.
15   Q.  Did you do that?
16   A.  I did.  Took me a couple days but I got it to her.
17   Q.  Do you know if Ms. Weiss' office began any investigation of
18   those events you described in Key Largo?
19   A.  I am not really sure.  But she did call me the next day --
20   well a couple days after meeting with her I sent her a list of
21   names.  I would say it was about ten or so.  And she called me
22   the very next day to tell me that she's investigated the Key
23   Largo stories that I had told her and the investigation had
24   concluded.  Ms. Hedges had denied all of the -- I don't know
25   what you want to call it, claims or reports that I gave to HR.
```

1   And that they spoke to some of the witnesses and no one saw

2   anything.  And so she said it had concluded at that point and

3   she'd be back to me with the new management structure.

4   Q.  Did you know if her investigation ended at that time?

5   A.  Well she told me it did on the phone.  She told me it was

6   over.

7   Q.  Did you know if any investigation of Ms. Hedges continued

8   by anyone after that point in time?

9   A.  I came to know later but at that point in time I did not.

10  Q.  What did you come to know later about the investigation of

11  misconduct?

12  A.  Well, after I had -- I had to recap that meeting, that

13  phone conversation with Ms. Weiss and I sent her an e-mail.

14           MR. JACKSON:  Your Honor, objection.

15           THE COURT:  Sustained.  Please rephrase the question.

16  Q.  Did you have any further conversations with Ms. Weiss about

17  these Key Largo events in this June timeframe?

18  A.  The only conversation I had with her was after I had sent

19  an e-mail recapping her conversation that the investigation

20  concluded.  She called me briefly to say they've reopened the

21  investigation and she'll get back to me.

22  Q.  What timeframe was that?

23  A.  That was -- she called me on -- I gave her the list on a

24  Thursday.  She called me on Friday to say it concluded.  Over

25  the weekend I had sent her an e-mail.  She called me Monday to

GC69PIC1                         Picarella - direct

 1    say she was reopening the investigation.

 2                MR. HUBBARD:  Exhibit PX-111 please, Mr. Fitzgerald.

 3                Let's skip that one just a moment and go to -- skip

 4    that one a moment and go to PX-126.

 5                THE COURT:  Before you skip that one are you going to

 6    be offering that one, 111?

 7                MR. HUBBARD:  I'm not going to offer it.

 8                THE COURT:  Are you offering this one?

 9                MR. HUBBARD:  Yes.

10                THE COURT:  What number is this?

11                MR. HUBBARD:  126.

12                THE COURT:  Any objection?

13                MR. JACKSON:  One moment, your Honor.

14                No objection.

15                THE COURT:  Okay.  That's in.

16                (Plaintiff's Exhibit 126 received in evidence)

17    Q.  What is this document Mr. Picarella?

18    A.  That is a final written warning.

19    Q.  And who is the subject of the warning?

20    A.  Ms. Hedges.

21                MR. HUBBARD:  May I publish this, your Honor?

22                THE COURT:  It's already published.  Yes.

23    Q.  Mr. Picarella, what does this reflect in the first

24    paragraph?  Does it reflect that human resources has completed

25    their investigation into a harassment complaint made by one of

GC69PIC1                    Picarella - direct

1    your direct reports?

2    A.  Yes, it does.

3    Q.  And in the second paragraph?

4           MR. JACKSON:  Excuse me, your Honor.

5           THE COURT:  Yes.

6           MR. JACKSON:  Just for clarity of identification can

7    we clarify Mr. Picarella knows about this because of discovery.

8           THE COURT:  I'm not going to do that here.  No

9    speaking objections.  Go ahead.  Continue your question.  Go

10   ahead.

11   Q.  What does the memorandum say about the formal

12   investigation?

13   A.  Would you like me to read it?

14   Q.  You can.

15   A.  "As you are aware, a formal investigation was conducted and

16   it was evident that there were several incidents that called

17   into question your professional judgment.  Based on this

18   conclusion, senior management has made a decision to issue you

19   this final warning and remove you from your management

20   responsibilities."

21   Q.  All right.  Let's go down to the next paragraph.  "HSBC is

22   committed to creating and maintaining a collegial and

23   collaborative work environment in which all are treated with

24   respect and dignity.  Harassment, whether verbal or graphic in

25   form or through creation of a hostile work environment is

1    against the law, is unacceptable, and will not be tolerated.

2    As a result of these circumstances this final warning is being

3    issued to you."

4         If you know, what happened to Ms. Hedges' management

5    responsibilities as a result of this final warning?

6    A.   Her management responsibilities of staff was removed.

7    Q.   Now, let's go back to the -- let's go to this June, July,

8    August timeframe in 2012.  Did you have occasion to meet with

9    Ms. White about what would happen to -- who would assume

10   Ms. Hedges' responsibilities as the head of business

11   development?

12   A.   I did.  I met with Ms. White and Mr. Pizzimbono as well.

13   Q.   And at that time what did they tell you their plans were

14   for replacing her?

15   A.   They told me that they were aware of all of the complaints

16   and that the group was going to be restructured and I was going

17   to be a part of helping them restructure that team and what it

18   would look like.

19        They were also, you know, very supportive of me and

20   the steps I took.  They said these incidents were very serious

21   and they were taking action to address it.  And I remember

22   Mr. Pizzimbono telling me that, you know, he thought it took a

23   great deal of courage to stand up for that lady.

24   Q.   Did he say anything negative to you at all about your

25   participation in this complaint process?

1   A.  No, he did not.

2   Q.  Did he -- at the time of that conversation were you

3   Ms. Hedges' deputy?

4   A.  I was.

5   Q.  Did he say anything to you about whether or not you would

6   succeed her?

7   A.  He did not.  But he was supportive.  It was suggested that

8   I would be part of helping him and Ms. White restructure the

9   group.

10  Q.  What did you -- what's the next thing you learned about

11  what was going to happen -- what the succession plan was for

12  Ms. Hedges?

13  A.  Well the next time we met was right after Labor Day.  There

14  was nothing that happened during the month of August.  I was

15  called into Mr. Pizzimbono's office a couple days after Labor

16  Day and they informed me that I would be reporting in to

17  Ms. Jenner.

18  Q.  At that time what was her rank?

19  A.  She was a vice-president.

20  Q.  And did they meet with you to explain how the new structure

21  would work?

22  A.  Yeah.  It was a brief meeting.  Yes.

23  Q.  And following that what was your reaction to learning that

24  you would not succeed Ms. Hedges as the head of business

25  development?

1   A.  I met with Mr. Pizzimbono the next two days and let him

2   know that I felt that this step was in retaliation.  It was in

3   essence -- selecting Ms. Jenner was in essence retaliation for

4   all the complaints I had made about the sexual harassment of

5   Ms. Parker that included senior executives in his organization.

6   Q.  Did you believe that the selection of Ms. Jenner had any

7   effect upon your position?

8   A.  Absolutely.

9   Q.  What?

10  A.  You know, I felt it was -- one, it was recognized by most

11  people in the organization that I was now reporting to

12  Ms. Jenner.  She was significantly -- I thought she was very

13  nice and she was a very talented person but she was

14  substantially less experienced for that type of role.

15          MR. HUBBARD:  All right.  Let me have Exhibit 125,

16  please.

17          MR. JACKSON:  No objection, your Honor.

18          THE COURT:  Okay.  You're offering that?  That's

19  admitted.

20          MR. HUBBARD:  Yes, your Honor.

21          THE COURT:  Okay.

22          (Plaintiff's Exhibit 125 received in evidence)

23  Q.  Let's look at the top of this please, Mr. Picarella.  This

24  is a memorandum from Mr. Pizzimbono to Ms. Weiss.  The subject

25  is discussion with Mike.  The date is July 30, 2012.  This is a

1   month or so before you are told about the selection of

2   Ms. Jenner, right?

3   A.  Yeah.  That's the conversation I was referring to.

4          MR. HUBBARD:  Okay.  Right.  Let's go down to the

5   bottom, Mr. Fitzgerald please where it says -- go to the Mike

6   paragraph beginning "Mike told me."

7   Q.  Do you see where it says "Mike told me he was afraid of

8   being labeled as a problem or a tattletale."  Do you see that?

9   A.  I do.

10  Q.  Did you say that in that meeting?

11  A.  Not in those words, but yes.

12  Q.  Did he tell you that you should realize that he and others

13  had encouraged you to provide details and examples of what he

14  experienced so that we could address and we would never hold

15  that against him as it was our responsibility to provide him

16  with a comfortable and safe work environment.  Did he say that

17  to you?

18  A.  He did.

19  Q.  Additionally, we are all subject to the same rules and

20  standards and we understand that it is critically important

21  that they be upheld.  It takes courageous integrity to do that.

22  Did he say that to you?

23  A.  He did.

24  Q.  Did you feel at that time -- did that signal to you in any

25  way that you were about to be -- that you were about to be

GC69PIC1                      Picarella - direct

1   passed over for that job?

2   A.  Not at all.

3   Q.  Again, when Ms. Jenner was selected for that position, were

4   you interviewed at all by Jenner or White?

5           At that time were you interviewed for the position of

6   succeeding Hedges?

7   A.  No, I was not.  You had mentioned Jenner's name.

8   Q.  I meant White.  I meant by either Pizzimbono or White.

9   A.  No.  I had not.

10  Q.  Were you consulted in any way about that transition?

11  A.  No.

12  Q.  When you met with Pizzimbono on the 6th and complained

13  about the selection of Ms. Jenner, what, if anything, did

14  Mr. Pizzimbono say to you about that process?

15  A.  He understood and he seemed to indicate that it was more

16  Ms. White's decision and that he was going to speak with her

17  about reversing the decision.

18  Q.  Anything happen?

19  A.  He never got back to me on that.

20  Q.  Remind us again the date that you were told that Ms. Jenner

21  had been selected to succeed Ms. Hedges?

22  A.  I believe the date was September 5, 2012.

23  Q.  And what did you do next?

24  A.  Well there were a couple of meetings approximately a week

25  later with Ms. White and Ms. Jenner to go over the new

GC69PIC1                         Picarella - direct

```
 1   structure of the group and responsibilities and things like

 2   that.

 3   Q.  Did you complain about being passed over?

 4   A.  Not at that meeting, no.

 5   Q.  Within that two or three week timeframe, did you complain?

 6   A.  No.  No.  Not to --

 7   Q.  Did you call --

 8   A.  Yes.

 9   Q.  Did you complain to human resources that you had been

10   passed over for that job?

11   A.  Yes --

12             MR. HUBBARD:  Can I have PX --

13             THE COURT:  Hold on.  Let him finish answering the

14   question.

15             THE WITNESS:  I'm sorry.  When I first answered I was

16   thinking about the Jenner White meetings.  I didn't complain to

17   them.

18   Q.  The latter part of September did you file a complaint with

19   human resources about the selection of Jenner for that job?

20   A.  I did.

21             MR. HUBBARD:  May I have Exhibit 143, please.

22             THE COURT:  Is that offered without objection?

23             MR. HUBBARD:  I think it is, your Honor.

24             MR. JACKSON:  No objection, your Honor.

25             THE COURT:  Okay.  That's in.
```

1          (Plaintiff's Exhibit 143 received in evidence)

2    Q.  Would you look at 143 with us, please, Mr. Picarella.  This

3    is an e-mail from you dated September 28, 2012.  Who is it

4    addressed to, please?

5    A.  Mary Bilbrey.  She was head of human resources for all of

6    the Americas.

7    Q.  And the subject is?

8    A.  Escalation.

9    Q.  What did you write to her?

10   A.  "Hi Mary.  I have a serious issue that I need to escalate.

11   I have raised issues with HR, Ellen Weiss, also regulatory and

12   internal control issues with senior management and markets over

13   the past few months.

14   Q.  Slow down a bit.

15   A.  I'm sorry.  And as a result of doing so I have been

16   targeted and retaliated against in the markets organization.

17   Q.  You say something there at the bottom.  You say:  Please do

18   not let this information get back to Ellen Weiss or others in

19   markets.  Why did you say that?

20   A.  Well, Ellen Weiss was the head of HR for the Americas, was

21   extremely close friends with Ms. Hedges.  In fact, when I

22   interviewed there they both let me know how -- what good

23   friends they were.  Over the years their families would

24   vacation together.  They would do things.  They would have

25   girls' weekends together.  In fact, when I interviewed with

GC69PIC1                         Picarella - direct

```
 1   Ms. Weiss she pointed to a picture on her desk of Ms. Hedges'
 2   kids.
 3   Q.  Let me interrupt you.  I don't understand.  You've already
 4   complained to Ms. Weiss.
 5   A.  I did.
 6   Q.  About what happened to you?
 7   A.  Yes, I did.
 8   Q.  So why are you worried about this information getting back
 9   to Ms. Weiss?
10   A.  Because I felt that --
11   Q.  I mean getting back to Ms. Weiss.
12   A.  I felt that my complaints were sort of -- I was retaliated
13   against in the organization and I didn't feel that they were
14   addressed appropriately.  I didn't know at that time that
15   Ms. Hedges had a final written warning.  She was still in the
16   organization operating almost as business as usual.  And then
17   you know I was selected to work for another friend of
18   Ms. Hedges which was Ms. Jenner.
19   Q.  So when you wrote this did you know that Ms. Hedges had
20   received final written warnings and that her management
21   responsibilities had been removed?
22   A.  I knew that her management responsibilities had been
23   removed.  I didn't know about the written warning.
24   Q.  All right.  Did you know that within days of your being
25   passed over for that job on September 5, did you know that
```

GC69PIC1                          Picarella - direct

1   the -- that Mrs. Weiss -- Ms. Weiss' team had put you on a list

2   of personal conduct cases?

3              MR. JACKSON:  Objection to leading.

4              THE COURT:  Sustained.  Please rephrase the question.

5   Q.  Did you know on or around September 10, 11, 12, in that

6   timeframe, did you know that Ms. Weiss and her staff had put

7   your name on a list of problem employees called personal

8   conduct cases?

9              MR. JACKSON:  Objection.

10             THE COURT:  Sustained as to form.  Please rephrase it.

11             MR. HUBBARD:  May I have just a moment, your Honor,

12  please.

13  Q.  At that time in mid September of 2012 did you know there

14  was such a list of personal conduct cases maintained for the

15  group by human resources?

16  A.  I did not.

17             MR. HUBBARD:  131.

18             Bear with me just a moment, your Honor.

19             131.

20             THE COURT:  Is this already in evidence?

21             MR. HUBBARD:  I don't think there's any objection to

22  it, your Honor.

23             THE COURT:  Okay.

24             MR. JACKSON:  No objection.

25             THE COURT:  It's in.

 1          (Plaintiff's Exhibit 131 received in evidence)
 2   Q.  Take a look at the top of this document please.  Ask you a
 3   foundational question.  Did you ever know while you were
 4   employed at HSBC before you were terminated that human
 5   resources had put you on this global personal conduct case
 6   list?
 7   A.  I did not know that.
 8   Q.  Ever learn it at any time before discovery in this case?
 9   A.  No.
10   Q.  Look at this document, please.  It appears to be an e-mail
11   from Jennifer Whang to Ellen Weiss, Park, Pak, Jang, re:
12   personal conduct cases.  Who is Jennifer Whang?
13   A.  Jennifer Whang works in human resources for Ms. Weiss.
14   Q.  Lets go back to the time -- rephrase the question -- back
15   to the time of this e-mail, Monday September 10, 2012.  What
16   function did Ms. Whang work?
17   A.  Human resources.
18   Q.  Who did she work for?
19   A.  Ellen Weiss.
20   Q.  And the e-mail is to Ms. Weiss.  And you see the people
21   copied.  Who are they?  Ms. Park, Ms. Pak, and Ms. Jang?
22   A.  Those are all human resource employees that worked for
23   Ms. Weiss.
24          MR. HUBBARD:  Let's go down Peter, please, in the
25   document to the bottom.

GC69PIC1                       Picarella - direct

1  Q.  Do you see this bottom e-mail from Ms. Weiss to Jang, Park,

2  Whang, Pak, dated September 10, 2012, personal conduct cases?

3  A.  Yes.

4  Q.  How many days is this after you've been told that you are

5  being passed over for that job?

6  A.  Five days.

7  Q.  Do you see where she's writing Rachel Prebble and asking

8  her to collect personal conduct cases since the beginning of

9  January 1, 2012?

10  A.  Yes.  I see that.

11          MR. HUBBARD:  Go down to the bottom of the e-mail,

12  please, Peter.

13  Q.  We need to have this collected by Thursday.  This may be

14  done on spreadsheet.  Going forward on a monthly basis.  I will

15  ask that this be updated.

16          Cases that I can think of that should be included in

17  the below.

18          MR. HUBBARD:  Just raise that up, please, Peter.

19  Q.  So Ms. Weiss lists, Mr. Picarella, you see she lists

20  Ms. Parker?

21  A.  I see that.

22  Q.  Mr. Rist?

23  A.  Yes.

24  Q.  Mike Picc?

25  A.  That's me.

GC69PIC1                          Picarella – direct

1    Q.  And some other person.

2            And do you know why on this date she put you on this

3    personal conduct case list?

4    A.  Absolutely not.

5            MR. HUBBARD:  Let's go to the next page, please,

6    Peter.

7            I'm sorry.  Yes.  Yes.

8    Q.  There's a note there beneath Mike Picc it says:  I'm

9    checking Paolo Ilida as I'm not sure as this falls in HSBC

10   values but I'm pretty sure Rachel will say to include.  Who is

11   Rachel?

12   A.  I believe she is referring to Rachel Prebble who is a more

13   senior executive in human resources.

14   Q.  She says I can't think of any cases in GB in the US.  Can

15   you?

16   A.  I see that.

17            (Continued on next page)

18

19

20

21

22

23

24

25

GC6TPIC2                    Picarella - direct

1    BY MR. HUBBARD:

2    Q.  Do you see where she says:  Jennifer, can you update for

3    Michelle and James, Jenny, you update for Pablo, and I will

4    update for Mike.

5    A.  I see that.

6    Q.  Did you know Weiss was updating you on this personal

7    conduct case list?

8    A.  I had no idea.

9    Q.  Go to the bottom, please.

10          Do you see where she says a reminder of the

11   categories?

12   A.  I see that.

13   Q.  What's the first category?

14   A.  Bullying.

15   Q.  Second category?

16   A.  Discrimination.

17   Q.  Third category?

18   A.  Harassment.

19   Q.  And D, other cases that involve allegations of

20   contravention of HSBC values, e.g., employee fraud?

21   A.  I see that.

22   Q.  At this point in time or at any time while you were

23   employed there were you ever accused or was there any complaint

24   against you or any accusation that you had bullied anyone, that

25   you had discriminated against anyone, that you harassed anyone,

```
 1    or that you committed fraud?

 2    A.  No, absolutely not.

 3    Q.  Let me give you some names.

 4              Ms. Hedges.  Had you complained about Ms. Hedges?

 5    A.  Say that again?

 6    Q.  Ms. Hedges.  Had you complained about Ms. Hedges --

 7    A.  Yes.

 8    Q.  -- prior to the date of this memo?

 9    A.  Yes.

10    Q.  Had you complained about Mr. Legoretta at the conference

11    before this?

12    A.  I did.

13    Q.  Had you complained about Mr. Goodwin before this

14    conference?

15    A.  I did.

16    Q.  With respect to the Latam conference?

17    A.  Yes, sir.

18    Q.  Do you see any of those names on that list that I read to

19    you?

20    A.  No, I don't.

21    Q.  I won't go back to top, but if you look at the written

22    document there was a reference there to Ms. Prebble.  Who is

23    Ms. Prebble?  What function was she in?

24    A.  She was a very senior executive in human resources.

25    Q.  Go to page 134, please.
```

1          MR. HUBBARD:  I don't think there's any objection to

2    this document.

3          THE COURT:  Any objection to 134?

4          MR. JACKSON:  No, Judge.

5          THE COURT:  134 is received.

6          (Plaintiff's Exhibit 134 received in evidence)

7    Q.  Look at the top of the document, please, Mr. Picarella.

8    A.  Yes.

9    Q.  This is an email from Mr. Pizzimbono to Ms. White and

10   Ms. Weiss dated September 11, 2012.  And he says:  This is all

11   very accurate.  I have since had other communication that I

12   will summarize in an email.  The follow-up conversation I had

13   reinforced our support for him, and that we wanted to

14   understand from him if there were any issues remaining we

15   wanted to identify them.

16         Do you see that?

17   A.  I see that.

18         MR. HUBBARD:  Go down to the next one, please,

19   Mr. Fitzgerald, beginning Suzy White.

20   Q.  Do you see this email from Ms. White to Ms. Weiss and

21   Mr. Pizzimbono?

22   A.  Yes.

23   Q.  Who was Suzy White?

24   A.  Suzy White was at that time the chief operating officer for

25   global markets.  She had succeeded Mr. Mullen.

1    Q.  Did she report to Mr. Pizzimbono?

2    A.  No, Mr. Pizzimbono and Ms. White reported in to

3    Mr. Descamps.

4    Q.  Do you see the first paragraph she says quick note to

5    summarize the conversation that Pablo and I had with Mike

6    Picarella.  I tried to capture comments from both of as we

7    managed the meeting as a management team.  Pablo, please make

8    any corrections or additions as you wish.  We met with Mike to

9    explain at a high level the new restructuring plan for the

10   sales business management team.

11           Is this a reference to the meeting you had with White

12   and Pizzimbono when you were told that Jenner had been selected

13   to replace Hedges?

14   A.  Yes.

15           MR. HUBBARD:  Let's go down, please, to the paragraph

16   that begins Pablo explained, Ms. Fitzgerald.

17   Q.  Pablo explained to Mike that we were taking this

18   opportunity to reevaluate the focus and priorities of what will

19   be run.  We explained to Mike that in today's regulatory

20   environment the business management team needed to increase

21   focus on operational risk and internal control.  With that in

22   mind we assessed our options and felt that Carol Jenner had the

23   strongest background to lead a team with increased focus in

24   this space.  I also advised Mike that Carol was a very strong

25   performer who had been highly rated in the past and was already

GC6TPIC2                       Picarella - direct

1    an important part of the sales BM team with strong experience

2    in one of the riskier areas of Pablo's business.

3              Throughout 2011 and 2012, what was your rating at

4    HSBC?

5    A.  Strong.

6    Q.  At the time of this memo was written here by Ms. White, how

7    much operational risk and internal control experience had you

8    had on Wall Street?  How many years?

9    A.  I would say approximately 15 years.

10   Q.  What companies did you gain that is experience at?

11   A.  I would say Morgan Stanley, Lehman Brothers, Barclays and,

12   of course, HSBC.

13   Q.  How many -- did you know how many years of experience at

14   that time Ms. Jenner had?

15   A.  I believe she had approximately two to three years of

16   operational risk experience.

17   Q.  Do you know of your own knowledge or have you ever learned

18   whether or not Ms. Jenner was interviewed at the time you were

19   chosen to be Ms. Hedge's deputy?

20   A.  Yes.

21   Q.  What is the answer?

22   A.  Yes, I saw her being interviewed.

23   Q.  Going back to 2011.

24   A.  2011?

25   Q.  The spring of 2011.

GC6TPIC2                        Picarella - direct

1    A.  Sorry, I thought you meant at that time.  Sorry.

2    Q.  When you were being interviewed to succeed Ms. Hedges, was

3    Jenner employed at the firm?

4    A.  Yes, she was.

5    Q.  As a vice president?

6    A.  Yes.

7    Q.  Was she interviewed by management when they interviewed you

8    in making a selection for Ms. Hedges' deputy?

9             MR. JACKSON:  Objection, foundation.

10            THE COURT:  Overruled.

11   A.  No, she was not.

12   Q.  After you had the meetings that this memo refers to when

13   you were told about Jenner taking the job, did anything happen

14   in the immediate time frame to the responsibilities that you

15   had been assigned in your position?

16   A.  Yes, almost immediately Suzy White had removed some of my

17   significant responsibilities around FINRA suitability,

18   compliance, and reassigned it to John.

19   Q.  Anything happen with your responsibility for know your

20   customer requirements?

21   A.  Yes, there were several other significant responsibilities

22   in the following days that were taken away.

23   Q.  Slow down a bit.  I want you to listen for me, please.

24            The ones that -- the responsibilities that were of

25   significance --

GC6TPIC2                          Picarella - direct

1   A.  Yes.

2   Q.  -- in, say, within a two-week time frame --

3   A.  Yes.

4   Q.  -- that were taken away from you.

5   A.  Yes.  In addition to the FINRA suitability responsibility,

6   management of sales authority letters, my role as business

7   information risk officer, initiatives, high priority

8   initiatives around Dodd-Frank and know your client anti-money

9   laundering were taken away as well.

10  Q.  I assume that you had other responsibilities that you

11  continued with after these were taken away.

12  A.  Yes.

13  Q.  What were they in this time frame?

14  A.  Some of the significant ones were still on-boarding of

15  clients, exiting clients, client planning, industry surveys, a

16  whole host of day-to-day stuff.

17  Q.  Can you tell us for the responsibilities that were taken

18  from you assigned to others, what portion of your significant

19  responsibility they comprised?

20  A.  I would say about 25 percent.

21  Q.  At about this time did you have occasion to observe that

22  you actually had no capacity, that your plate was full?

23  A.  Yes.

24  Q.  What were the circumstances?

25  A.  There were several at that time, and it was temporary.

1    Ms. Jenner had not transitioned from her old role into our

2    role, and I was given -- she took a lot of the significant

3    responsibilities that Ms. White had given her, but I was

4    assigned lower level tasks that I was previously assigning

5    myself to a temporary worker and analyst there.  And so both

6    the temporary worker was removed from my responsibility and

7    given to someone else, and the analyst, whose partner was

8    terminated, and Ms. Hedges was no longer doing the day-to-day

9    stuff, so I was taking on a lot.  But the significant

10   responsibility was taken away and I was doing reconciling

11   spreadsheets and things that I had a temp worker doing.  So I

12   was overburdened with very, very low level work.

13   Q.  How long did that administrative type work remain on your

14   plate?

15   A.  For a few months.  Until the end of the year, maybe.

16            MR. HUBBARD:  129, please.

17            MR. JACKSON:  No objection.

18            THE COURT:  129 is in.

19            (Plaintiff's Exhibit 129 received in evidence)

20   Q.  Mr. Picarella, what is Exhibit 129, please.

21   A.  This is a PowerPoint document that I had put together at a

22   request from Mr. Pizzimbono regarding the FINRA suitability

23   issues I had discovered in the firm.

24            MR. HUBBARD:  If we could look at it on the screen,

25   Mr. Fitzgerald, go to the next page.

1  Q.  Do you see the executive summary, it refers to the

2  suitability process.  Do you see that?

3  A.  Yes.

4  Q.  GB and M refers to global banking and markets?

5  A.  Correct.

6  Q.  So looks as if you're pointing at some places that need

7  some work.

8  A.  Yes.

9  Q.  Go to the second page.  And the third page.

10         There were some issues apparently related to FINRA

11  compliance and internal controls.

12  A.  Yes, there were, significant.

13  Q.  Did you prepare this report?

14  A.  I did.

15  Q.  Who asked you to do it?

16  A.  Mr. Pizzimbono.

17  Q.  And was this done before you were told that you were not

18  going to succeed Ms. Hedges?

19  A.  Yes, it did.

20  Q.  When you prepared Exhibit 129 did you give it to

21  Mr. Pizzimbono?

22  A.  Yes, we met and I took him through.

23  Q.  Did he approve it?

24  A.  Yes, he did.

25  Q.  Did Ms. White or anyone else complain about the document?

GC6TPIC2                          Picarella – direct

1   A.  No.

2   Q.  Anyone complain about its accuracy?

3   A.  No.

4   Q.  Let me take you to the time frame after you initiated

5   contact with the head of human resources, Ms. Bilbrey.

6   A.  Yes.

7   Q.  You saw your email there was on September 18 of 2012?

8   A.  Yes.

9   Q.  Did she contact you?

10  A.  Yes.

11  Q.  And did you meet with her?

12  A.  I did meet with her directly.

13  Q.  Did you -- what did -- in summary, what did you say to her?

14  A.  I told her that I had been complaining to senior management

15  about the sexual harassment of Ms. Parker.  As a result, I felt

16  I was retaliated in the organization.

17  Q.  Did she ask you any questions?

18  A.  Yes.  I gave her a high level, but some detail, as to what

19  was taking place.

20  Q.  Where was the meeting?

21  A.  In her office.

22  Q.  In New York?

23  A.  In New York.

24  Q.  How long was the meeting?

25  A.  About an hour, maybe a little longer.

GC6TPIC2                          Picarella - direct

1   Q.  What was her reaction?

2   A.  She told me that she believed me, she knew these people,

3   and she told me she was going to help me.  She had tears in her

4   eyes and --

5   Q.  Did she begin to start helping you?

6   A.  Yes.

7   Q.  Did she ask you to meet with some of her deputies to

8   discuss the details --

9   A.  Yes.

10  Q.  -- of these incidents?

11  A.  Yes.

12  Q.  And did there come a time in the fall of 2012 when you in

13  fact met with her deputy, Marie Malanga, and a couple of other

14  human resources folks?

15  A.  Yes.

16          MR. HUBBARD:  Your Honor, maybe -- I'm at kind of a

17  point if we could take a mid-morning break, if you're

18  comfortable with that.

19          THE COURT:  That's fine.  We're going to take our

20  morning break.  Let's take a 15-minute break.  Don't discuss

21  the case among yourselves or with anyone else.  I will see you

22  in 15 minutes.

23          (Recess taken)

24          THE COURT:  Let's continue.

25          MR. HUBBARD:  Thank you, your Honor.

GC6TPIC2                         Picarella - direct

1   BY MR. HUBBARD:

2   Q.  Mr. Picarella, would you turn in your book to 148, I think

3   that's still in volume one.

4            MR. HUBBARD:  Mr. Fitzgerald, could we see 148,

5   please.

6            THE COURT:  148 offered without objection?

7            MR. HUBBARD:  I believe it's offered without

8   objection, your Honor.

9            MR. JACKSON:  No objection.

10            THE COURT:  Okay.  148 is in evidence.

11            (Plaintiff's Exhibit 148 received in evidence)

12   Q.  Mr. Picarella, do you see this memo here reports a meeting

13   between Ms. Malanga and Ms. Harmon from human resources -- or

14   meetings on September 28, October 2 and October 3, and

15   indicates that it summarizes the concerns that you raised.

16            Did you meet with those human resources

17   representatives on those three days?

18   A.  Yes, I did.

19   Q.  And beneath that it says list of concerns Mike emailed to

20   Maria on October 2.  Do you see those?

21   A.  Yes.

22   Q.  Number one is sexual harassment from Eileen Hedges.

23            Number seven is sexual harassment of Michelle Parker

24   by Eileen and Eduardo Legoretta in Key Largo in March 2012.

25            Do you see those two?

1   A.  I do.

2   Q.  Number six is what?

3   A.  Retaliation by Suzy and Pablo.

4   Q.  If you go down to the harassment section, you see that

5   section?

6   A.  Yes.

7   Q.  Was this memo provided to you after these three meetings?

8   A.  Yes, it was.

9   Q.  You have seen this before?

10  A.  I have.

11  Q.  And in fact, I suppose that to some point you responded to

12  it.

13  A.  I did.

14  Q.  You see the section entitled sex harassment complaint

15  against Eileen.  Do you see that?

16  A.  Yes, I do.

17  Q.  And in that section it looks as if Ms. Malanga reports

18  several things that you reported to her about Eileen Hedges'

19  conduct, right?

20  A.  Yes.

21  Q.  I'm not going to go into any detail, but --

22          MR. JACKSON:  Excuse me, your Honor, could we take

23  this document down and could I speak to counsel?

24          THE COURT:  Hold on a second.

25          (Pause)

```
 1              THE COURT:  Go ahead.

 2              MR. HUBBARD:  Your Honor, with the consent of the

 3    counsel, I think we didn't do some of the redactions we

 4    intended to do on this document.  May we go on to others and

 5    come back?

 6              THE COURT:  Yes.

 7              MR. HUBBARD:  Let's go to 155.  Just let me see the

 8    top of it, please.

 9              We may have the same problem with this one.

10              Your Honor, there are -- apparently these memos --

11              THE COURT:  Just hold it.  Is there another area that

12    you can turn to now?

13              MR. HUBBARD:  Yes.

14              THE COURT:  Let's do that.

15    BY MR. HUBBARD:

16    Q.  So just to put a place holder here, Mr. Picarella, there in

17    the middle of October Ms. Harmon and Ms. Malanga interviewed

18    you about your reports at the request of Ms. Weiss.  They wrote

19    a summary of the meeting.

20              Just yes or no.

21    A.  Yes, with one correction, it was at the request of

22    Ms. Bilbrey, not Ms. Weiss.

23    Q.  They work for her.

24    A.  They work for her.  There's a lot of names.

25    Q.  And they sent it you.
```

1   A.  Yes.

2   Q.  And you prepared a written response and sent it back to

3   them in that time frame.

4   A.  Yes.

5   Q.  In this period of time, let's take October, December now,

6   2012, near the end of the year, can you tell us if Ms. White

7   made any changes in your responsibility with respect to

8   including you in operational risk meetings, October or so of

9   2012?

10  A.  Yeah, I was excluded from those meetings.

11  Q.  Were you ever excluded from client strategic planning

12  sessions with HSBC bankers at or around this time?

13  A.  Yes.

14  Q.  Did you determine that there had been any affect on your

15  group's organizational chart, your employee organizational

16  chart there, as a result of being passed over for Ms. Jenner?

17  A.  Yes.

18  Q.  What happened?

19  A.  My name was removed from the organizational chart and

20  prematurely Ms. Jenner was promoted to senior vice president.

21  Q.  Did you find out about it?

22  A.  I did.

23  Q.  Did you let Ms. White know that you found out about it?

24  A.  Yes, I did.

25  Q.  And what was the result after you reported that deletion of

GC6TPIC2                          Picarella - direct

1    your name?

2    A.  She had the organizational charts corrected.

3    Q.  We come to the end of 2012.  Did you receive any increase

4    for the new performance year 2013, did you receive any increase

5    in your base compensation?

6    A.  No, I did not.

7    Q.  For the performance year 2012, did you receive any bonus in

8    excess of the one you received for 2011?

9    A.  No, I did not.

10   Q.  What bonus were you paid for 2011?

11   A.  It was down about five percent.

12   Q.  The amount.

13   A.  I don't know the exact amount, maybe 57,000.

14   Q.  And were you paid the same amount for 2012?

15           I want you to compare the bonus in '11 and '12, if you

16   can.

17   A.  For 2011 it was 60,000, and for 2012 it was about 56,

18   57,000.

19   Q.  And just so I'm clear, your base compensation remained the

20   same.

21   A.  Correct.

22   Q.  See 164, please.

23           MR. JACKSON:  No objection.

24           THE COURT:  Okay, that's in evidence.

25           (Plaintiff's Exhibit 164 received in evidence)

1    Q.  Did you communicate with Ms. Bilbrey in January of 2013

2    about your job responsibilities?

3    A.  Yes, I did.

4    Q.  Tell us again, had she asked you to do this?

5    A.  She did.  She wanted me to let her know anything further

6    that was happening to me in the organization.

7    Q.  Who were you reporting to now on January 16 of 2013?

8    A.  Ms. Jenner.

9    Q.  You see there she says at the top -- you say at the top

10   that these client plan meetings you referred had been your

11   responsibility but now you were completely excluded.

12           Do you see that?

13   A.  Yes, I do.

14   Q.  You say the conduct toward me by HSBC employees continues

15   to be harassing, you list some comments there, derogatory

16   comments you say from another gentleman at the bottom.

17   A.  Yes.

18   Q.  And at the end of the memo you say:  I have been excluded

19   by Pablo, Suzy and others and I continue to be harassed by

20   employees.

21           Did you report that to her at that time?

22   A.  I did.

23   Q.  Now as we move into 2013, can you give us a sense in 2013

24   of what happened to your major responsibilities as that year

25   progressed?

1   A.  They continued to be removed from me more aggressively at

2   different times in the beginning of the year, but by the middle

3   of 2013 virtually all of them were removed.

4   Q.  In the beginning of 2013 were you asked to participate in

5   some way in the review process for the previous year by

6   providing names of employees to review?

7   A.  Yes.

8   Q.  And sometime in January, February 2013, did you give names

9   for these 360 reports to your management?

10  A.  Yes, I did.

11  Q.  Do you recall providing the names of Michael Anthony,

12  Michael O'Leary, David Wilens, Dan Bliss, Raul Valdes, Sandra

13  Nicotra, David Peison, Paul Lashmet?

14          Who were these individuals?  Did you work with them?

15          MR. JACKSON:  Your Honor, objection.

16          THE COURT:  Sustained.

17  Q.  The names I just mentioned, were they employed by HSBC?

18  A.  Yes, they were.

19  Q.  And did you assemble these names for the human resources

20  function or your management at the beginning of 2013?

21  A.  Yes, I did.

22  Q.  For what purpose?

23  A.  For 360 review.

24  Q.  And do you know if they provided reviews for you?

25          Do you know if they provided 360 reviews for you?

GC6TPIC2                          Picarella - direct

1    A.  Yes.

2            MR. HUBBARD:  May I have 170, please.

3    Q.  Do you see this 360 report from Mr. Anthony to Ms. Jenner?

4    A.  Yes.

5    Q.  Subject is year end feedback, the date is February 7, 2013.

6    A.  Yes.

7    Q.  Do you see he says:  I enjoyed working with Mike.  I found

8    him to be professional and realistic.  He gave you honest

9    feedback and he did not tell you what you wanted to hear.

10           Were these given to you in the course of this

11   evaluation process?

12   A.  Those comments, I did not see those.

13   Q.  They went to your manager?

14   A.  They went to my manager.

15   Q.  This was all evident when working --

16           He takes responsibilities for his projects.  He brings

17   in the right resources.  This was all evident when working on

18   the suitability project.  He could improve on timeliness of

19   communication.  If there are changes or bugs that need to be

20   worked out, make sure that the group knows in a timely fashion.

21           MR. HUBBARD:  Turn to 171, please.

22           Your Honor, did I move that exhibit?

23           MR. JACKSON:  No objection.

24           THE COURT:  Moving in 170 and 171?

25           MR. HUBBARD:  Yes, sir.

1              THE COURT:  Any objection to either of those?

2              MR. JACKSON:  No objection, your Honor.

3              THE COURT:  They're both in.

4              (Plaintiffs' Exhibits 170 and 171 received in

5    evidence)

6              MR. HUBBARD:  172, I don't think there's any objection

7    to 172, your Honor.

8              MR. JACKSON:  No objection.

9              THE COURT:  172 is received also.

10             (Plaintiff's Exhibit 172 received in evidence)

11   Q.  Did Mr. Wilens work with you?

12   A.  He worked with me.  He was a peer.

13   Q.  Look in the second paragraph:

14             Strong operational risk.  Mike identified operational

15   risks to the GM sales suitability process and systems linkages

16   and proposed solutions to eliminate risks.

17             Strategic thinking.  Mike highlighted issues and

18   proposed both tactical and strategic solution.

19             Continuing on, he was instrumental in helping to

20   remediate higher risk CMB clients who were identified as having

21   open CATB lines with no sales suitability in place.

22             Business acumen and partnership.  Mike is viewed as a

23   valuable business partner to CMB.  I was told by the former

24   CMB/GM sales manager that he was valued with GM as a person

25   that can cut through issues and resolve problems.  He has

1  fostered strong relationships with CMB and partners to resolve

2  business issues, risks and opportunities.

3          MR. HUBBARD:  May we have 173, please.  I don't think

4  there's any objection to this exhibit, your Honor.

5          MR. JACKSON:  No objection, your Honor.

6          THE COURT:  173 is in.

7          (Plaintiff's Exhibit 173 received in evidence)

8  Q.  Who is Dan Bliss?

9  A.  He works in the business reporting group.

10 Q.  Says Mike is a pleasure to work with and always carries

11 himself in a professional manner.  Any requests are always well

12 thought out and have an ultimate purpose in mind.  Mike is well

13 prepared for any organized meetings and contributes meaningful

14 solutions and deliverables.  Mike also has the best interest of

15 the firm foremost in his actions and is an asset to the firm.

16 Looking forward to working with Mike in the future.

17          174, please.

18          Before I go to this one, you then received in this

19 time frame a year end review for the year 2012?

20 A.  Correct.

21 Q.  What was the rating?

22 A.  Strong.

23 Q.  Go to 174.

24          Mr. Valdes says:  Hi, Carol.  My comments regarding

25 Mike are he is very professional in requesting info from the

```
 1    team.  He takes into account the task/bandwidth available in

 2    the team.  He does not request information on an urgent basis

 3    unless it is needed.  I do appreciate this a lot.  I cannot

 4    comment on his performance on what he does with the information

 5    he is provided because I do not see that.

 6            MR. HUBBARD:  May I have 176 -- I didn't move 174.

 7            THE COURT:  Is 174 is being --

 8            MR. HUBBARD:  Yes.

 9            THE COURT:  -- moved without objection?

10            MR. JACKSON:  No objection.

11            THE COURT:  That's in.

12            (Plaintiff's Exhibit 174 received in evidence)

13            THE COURT:  What are the numbers of the next few?  We

14    can put them in at one time.  175 to 180?

15            MR. HUBBARD:  Just two more, your Honor, 177 and 178.

16    I do not believe there is -- there is 179, I don't think there

17    are any objections to those three.

18            THE COURT:  So 176 through 179?

19            MR. HUBBARD:  176, 177 and 179.

20            THE COURT:  Not 178?

21            MR. HUBBARD:  No, sir.

22            THE COURT:  So any objection to them?

23            MR. JACKSON:  No objection.

24            THE COURT:  Okay, so those are in.

25            (Plaintiff's Exhibit 176, 177 and 179 received in
```

GC6TPIC2                          Picarella - direct

 1    evidence)

 2              MR. HUBBARD:  176 on the screen.

 3    BY MR. HUBBARD:

 4    Q.  Who is Sandra Nicotra?

 5    A.  She worked on the client documentation team.  She ran it at

 6    the time.

 7    Q.  She says:  Very approachable and personable.  Has a good

 8    understanding of the bank's business needs.  Good handle in

 9    assisting with the prioritization of new business/onboarding.

10    Coordinates well across desks/businesses with respect to

11    prioritization and resolution of documentation issues,

12    onboarding issues.  Ran both the hedge funds governance and

13    regulated funds governance biweekly meetings in 2011-2012.

14    Mike produced and maintained the spreadsheet dedicated to desk

15    heads.  These are what come to mind.  If you need something

16    more specific, let me know.

17              Did you in fact run the hedge funds governance and

18    regulated funds governance biweekly meetings in '11 and '12?

19    A.  Yes, I did.

20    Q.  What happened to that job?

21    A.  That was removed from my responsibility.

22    Q.  When?

23    A.  In early 2013.

24    Q.  Who took them away from you?

25    A.  Mr. Pizzimbono.

1  Q.  Let's go to 177.

2           This is from David Peison, right?

3  A.  Yes.

4  Q.  What position did Mr. Peison have?

5  A.  He was a trader -- sorry, salesperson on the emerging

6  markets desk.

7  Q.  He says:  Michael seems to have been going through the

8  motions in the last few months.  When he first joined he was

9  far more proactive, active, and involved.  Now he appears to be

10 far less interested and motivated.

11          Do you see that?

12 A.  I see is that.

13 Q.  Let's go over to 179.

14          MR. HUBBARD:  Your Honor, I don't think there's any

15 objection to 177 or 179.

16          THE COURT:  They're already in.

17 Q.  This one reads:  Mike was very supportive of me and IT

18 during a challenging time.  He level set expectations between

19 parties, which requires a good deal of relationship management

20 skill.  He also had the foresight to get Sales IT and

21 SalesForce.com IT introduced and talking during preliminary

22 discussions.  If that project does proceed, it won't be out of

23 left field and an initial relationship is already in place.

24 With regard to areas of improvement, I use an example with our

25 dealings with CMB.  I think he could have more robustly

 1   challenged established ideas and assumptions that they had when

 2   they were working out requirements.

 3              Do you see that?

 4   A.  I see that.

 5   Q.  185, please.

 6              THE COURT:  Are you moving 185 in without objection?

 7              MR. HUBBARD:  Yes.

 8              THE COURT:  It's in.

 9              (Plaintiff's Exhibit 185 received in evidence)

10              MR. JACKSON:  No objection.

11   Q.  Do you see this is an email from Ms. Jang to Ms. Weiss,

12   Ms. Park, Ms. Whang, Ms. Hunter, Ms. Pak, says action required

13   PCC reporting?

14   A.  I see that.

15   Q.  Do you know that to be the same PCC reporting we discussed

16   earlier?

17   A.  Yes.

18   Q.  Down to the middle we see email from Ellen Weiss to

19   Ms. Jang and others, same subject, can you guys provide any

20   additional names to me and I will try to complete.  Jenny, can

21   you collect for Latam.

22              Do you see the names here for these PCC cases?

23   A.  Yes.

24   Q.  Is Ms. Hedges on it?

25   A.  Yes, she is.

GC6TPIC2                          Picarella - direct

1    Q.  And she's the person who had been complained about and

2    disciplined?

3    A.  Yes.

4    Q.  Whose name is beneath hers?

5    A.  That's my name.

6    Q.  How did your name get on here?

7    A.  I have no idea.

8    Q.  Anybody complain about you?

9    A.  No.

10   Q.  Beneath that is Cary Goodwin.  Did you complain about him?

11   A.  I did.

12   Q.  Beneath that is Mr. Legoretta.  Did you complain about him?

13   A.  I did.

14   Q.  Go down to the bottom of the page, beginning with "Good

15   afternoon," this email is from -- looks like

16   Ms. DeNisi-Twarowski to Ms. Weiss, a copy to Rachel

17   Montgomerie, dated 4/10/2013, subject action required, PCC

18   reporting Q1 2013.  This email requests completion of personal

19   conduct case reporting for Q1.

20          Go to the second page.  See at the top there under the

21   purpose, does this memorandum tell you what the purpose of this

22   report is?

23   A.  Yes, it does.

24   Q.  And does it say it's a group-wide report of conduct cases

25   that are alleged or determined to contravene HSBC values and

1   behaviors?

2   A.  Yes.

3   Q.  Did you know you had been listed in that category --

4   A.  Absolutely not.

5   Q.  -- as contravening HSBC values and behaviors?

6   A.  Absolutely not.

7   Q.  Had you reported conduct that did that?

8   A.  Yes, I did.

9   Q.  Do you see the same list there we reviewed before, bullying

10  and harassment, discrimination, staff fraud, leakage of

11  information?

12          Do you see that?

13  A.  Yes, I do.

14  Q.  Let's go to the end of the document, please.  Again I can't

15  pronounce that name, Twarowski, Catherine.  It shows her as

16  acting head of HR governance, risk, audit and compliance,

17  right?

18  A.  Correct.

19  Q.  186, please.

20          THE COURT:  Are you moving this into evidence without

21  objection?

22          MR. HUBBARD:  Yes, your Honor.  I thought I moved with

23  without objection.

24          THE COURT:  Are there several documents you want to go

25  through next?  If so, what are the numbers on those documents?

GC6TPIC2                    Picarella - direct

1          MR. HUBBARD:  Let's go do 185 -- I don't know I can go

2     that fast, your Honor -- 185, 186, 187.  May I do those for a

3     moment, your Honor?

4          THE COURT:  Okay.  Any objection to 185 through 187?

5          MR. JACKSON:  I believe 185 is already in, so 186 and

6     187 no objection.

7          THE COURT:  186 and 187 are in.

8          (Plaintiffs' Exhibits 186 and 187 received in

9     evidence)

10         MR. HUBBARD:  186, please, Mr. Fitzgerald.

11    BY MR. HUBBARD:

12    Q.  This is an email from you to Mr. Pizzimbono, right?

13    A.  Yes.

14    Q.  Copies to Jenner and Bilbrey, weekly commentary.

15    A.  Yes.

16    Q.  You say:  Since Suzy and yourself have had me report into

17    Carol Jenner starting in early September of 2012, I have had

18    most responsibilities taken away from me by Carol, Suzy and

19    yourself and redistributed to the COO team, RMs and Carol

20    herself, including suitability, sales authority, client

21    planning, hedge fund committees, client on-boarding.

22         Are these the responsibilities that you were telling

23    us about that had been taken away from you?

24    A.  Yes.

25    Q.  187, please.

GC6TPIC2                           Picarella - direct

1            MR. HUBBARD:  I don't think there's an objection to

2    this, your Honor.

3            THE COURT:  It's already in.

4            MR. HUBBARD:  Sorry, it's the one I listed.

5    Q.  You see this email, Mr. Picarella, from you to yourself,

6    copy to Ms. Bilbrey, and a copy of the organizational chart?

7    A.  Yes.

8            MR. HUBBARD:  Go over to the first page of it, please,

9    Mr. Fitzgerald.

10   Q.  It's hard to read, the top block there.

11           Mr. Picarella, can you read that, the top block?

12           MR. HUBBARD:  I don't think this is the right one.

13   Can you go back to global market sales?

14   Q.  Do you have that there?

15           Do you have it in your book, Mr. Picarella?

16           MR. HUBBARD:  There it is, Mr. Fitzgerald.

17   Q.  Look at the screen, please, sir.

18           Do you see this has global markets sales?  That's your

19   organization?

20   A.  Yes.

21   Q.  And what did you report here with respect to this chart to

22   Ms. Bilbrey on April 24, 2013?

23   A.  That my name still was not on the organizational chart.

24   Q.  Were you working at the firm?

25   A.  I was.

GC6TPIC2                          Picarella - direct

 1  Q.  Who were you reporting to?

 2  A.  Ms. Jenner.

 3  Q.  Did there come a time in the middle of 2013, roughly, that

 4  your reporting relationship was changed?

 5  A.  Yes.

 6  Q.  And you were reporting to Ms. Jenner?

 7  A.  Correct.

 8  Q.  And who was the new report that was assigned to you?

 9  A.  Mike Karam.

10  Q.  Was he in global market sales?

11  A.  No, he was not.

12  Q.  He was in another group?

13  A.  He was.

14  Q.  How did you find out he was going to be your new manager?

15  A.  He scheduled a meeting with me.

16  Q.  Do you see on this chart, for September 2012, do you see

17  Ms. Jenner's name?

18  A.  Yes, I do.

19  Q.  Under sales management, Ms. Jenner is listed as head of

20  sales management, right?

21  A.  Yes.

22  Q.  And Ms. Hedges is on the chart?

23  A.  Correct.

24  Q.  This is September 2012?

25  A.  Yes.

GC6TPIC2                          Picarella - direct

1    Q.   You're not listed?

2    A.   No.

3                (Continued on next page)

1   Q.  Just a point of information.  RTB sales management.  What

2   does RTB sales management mean?

3   A.  That stood for run the bank.

4   Q.  And Hedges is CTB?

5   A.  Change the bank.

6           MR. HUBBARD:  So, let's go to PX-190, please.

7           THE COURT:  Is there a set of documents that you're

8   going to seek to introduce starting with 190?

9           MR. HUBBARD:  Your Honor, I'm trying to -- 190, 193,

10  308, 203, 205.

11          THE COURT:  Okay.  Any objection to 190, 193, 203,

12  205, and 308?

13          MR. JACKSON:  Just one moment, your Honor.

14          No, your Honor.  No objection.

15          THE COURT:  Okay.  Those are in.

16          (Plaintiff's Exhibits 190, 193, 203, 205, and 308

17  received in evidence)

18          MR. HUBBARD:  Top of 190, please.

19  Q.  What is this document, Mr. Picarella?

20  A.  This is the HSBC year-end review for myself for 2012.

21  Q.  And who is the manager you reported to in that year?

22  A.  Ms. Jenner.

23  Q.  And you see the name Semetulskis on the top?

24  A.  Yes, I do.

25  Q.  She had gotten married?

GC69PIC3                        Picarella - direct

```
 1   A.  That was --

 2   Q.  Maiden name?

 3   A.  Yes.

 4   Q.  So what's the date of this review?

 5   A.  May 13, 2013.

 6   Q.  Is May 13, 2013 about the time that your management

 7   structure was being changed and you were going to report to

 8   Mr. Karam?

 9   A.  Yes.

10   Q.  Let's look at the review for a minute.

11           MR. HUBBARD:  Mr. Fitzgerald, let's go over to --

12   let's go over to the fourth page on the year-end summary.

13           Mike, can you find it in your book there.

14           THE WITNESS:  Yes.

15           MR. HUBBARD:  Year-end summary.  Bates number is 113.

16           Peter, couple more pages over.

17           Yes.  That's good.

18   Q.  Okay.  Do you see the section, Mr. Picarella, on the

19   year-end summary?

20   A.  Yes.

21   Q.  Do you see the rating three strong?

22   A.  Yes.

23   Q.  And the comments section reads:  In receiving the feedback

24   from various stakeholders in the bank selected by Mike and

25   myself, Mike is an easy person to work with, is found to be
```

GC69PIC3                         Picarella – direct

1   professional and realistic, and is a good partner to CMB and

2   COBAM.  It was also suggested by stakeholders that Mike could

3   be more proactive and involved, for example, by increasing the

4   timeliness of communication.  Based on three months of being

5   Mike's manager last year.  He excels at raising issues to

6   management's attention.  However, Mike should work towards

7   helping to resolve the issues he raises.  Part of the business

8   management function involves not only the identification of

9   issues but also working, fixing problems.

10          MR. JACKSON:  Excuse me, your Honor.  There's a word

11   missing.

12          MR. HUBBARD:  Working on solutions and fixing problems

13   identified.  Do you see that?

14          THE WITNESS:  I do.

15   Q.  And you got this review from Ms. Jenner?

16   A.  Correct.

17   Q.  Before your responsibilities were changed?

18   A.  Right.

19   Q.  Your reporting line was changed?

20   A.  Right.  I know what you meant.

21   Q.  Let's go to 1 –– let's go to 308, please.

22          THE WITNESS:  What number was that?

23   Q.  Sorry?

24          THE COURT:  308.

25          MR. HUBBARD:  You have to go to another book.  It's on

GC69PIC3                        Picarella - direct

1    the screen.

2    Q.  Did there come a time in 2013, Mr. Picarella, in response

3    to these complaints that you made to HSBC that you retained

4    counsel and filed a charge of discrimination with the U.S.

5    Equal Employment Opportunity Commission?

6    A.  Yes.

7    Q.  What is the date of this document?

8    A.  (No response).

9    Q.  Can you see?  Might be down at the bottom.

10   A.  It was in June.  I think the 27th.  I could be wrong.

11        June 25, 2013.

12   Q.  Just in summary fashion can you tell us if in this document

13   you alleged that you had been retaliated against?

14   A.  Yes.

15   Q.  Let me finish.

16   A.  I'm sorry.

17   Q.  That you had been retaliated against by HSBC in response

18   to --

19        MR. JACKSON:  Your Honor, just objecting.

20        THE COURT:  Okay.  Let me just get clarification from

21   counsel.  What exactly are you asking the witness.  This

22   document is in evidence.  Are you asking the witness what the

23   document says?

24        MR. HUBBARD:  Your Honor, rather than publishing parts

25   of the document I thought I would just get a brief summary.

GC69PIC3                        Picarella - direct

1        THE COURT:  Go ahead.  Overruled.

2   Q.  Can you tell us if in this document you in summary fashion

3   alleged that --

4        MR. JACKSON:  Objection to form, your Honor.

5        THE COURT:  I'll allow it.  Go ahead.

6   Q.  That you had been retaliated against -- that your rights

7   under the law had been violated; that you had been retaliated

8   against for reporting sexual harassment?

9   A.  Yes.

10  Q.  Can you tell us if you were retaliated against by HSBC

11  after you filed this EEOC charge?

12  A.  Yes.

13  Q.  Beginning in -- after this charge was filed in June of 2013

14  did Mr. Karam indicate to you that your responsibility for new

15  client business cases had been changed?

16  A.  Yes.

17  Q.  In that timeframe were any of your other major

18  responsibilities removed?

19  A.  Yes.

20  Q.  Can you list them in summary fashion, please.

21  A.  Yes.  My attendance and involvement with the monthly

22  committee for operational risk was removed.  I believe the name

23  of the group was called BCC or the meetings were called BCC.

24        My involvement in industry surveys was also removed.

25  Q.  Was that your responsibility for the Greenwich Associates

GC69PIC3                          Picarella - direct

1   Surveys?

2   A.  Yes.

3   Q.  Did you have responsibility at or about this time before

4   Mr. Karam took over to log and track business cases in your

5   group?

6   A.  Yes.

7   Q.  Did Mr. Karam make any change in that responsibility?

8   A.  Yes, he did.

9              MR. HUBBARD:  193, please.

10  Q.  Do you see this June 7, 2013 chat logging document?  What

11  type of document is this?

12  A.  It's called Sametime Chat.  It's an IBM application that

13  goes along with Lotus Notes e-mail.  So it's like realtime sort

14  of messaging.

15  Q.  Instant message?

16  A.  Instant messaging is another way.

17  Q.  Fair way to describe it?

18  A.  Yes.  Exactly.

19  Q.  And it looks as if the people involved are Carol Jenner and

20  Michael Karam.  Do you see that?

21  A.  Correct.

22  Q.  Follow it with me please.  You may have it in your book

23  there.  I don't know if you can follow on your screen.  We'll

24  see.

25              At 11:24 a.m. Ms. Jenner indicates that she needs to

GC69PIC3                          Picarella - direct

1    write response e-mail to MP.  I want to write a response as to

2    sufficiently address his point so that I am not engaged in back

3    and forth on e-mail nor have to deal with this again at the

4    Monday BCC.

5              What was the Monday BCC?

6    A.  That was the meeting I was referring to which was the

7    monthly operational risk form.

8    Q.  At or about this time were you corresponding with

9    Ms. Jenner about that meeting?

10   A.  Yes.

11   Q.  And then she says, she says:  How is this?

12             And then it says Carol Jenner:  Mike, I'll update the

13   attendee list to reflect your participation that is well

14   documented in the detailed minutes.  I have to add Suzy as

15   well.  Regarding your second point, I will clarify the minutes

16   as follows.  From speaking with Mike Karam it sounds like

17   several of these accounts are found to have RMS.  Then it goes

18   on.

19             Then you see at 11:25 Mr. Karam says:  I would say the

20   following.  No need to explain yourself.

21             Raise it back up, Peter.

22             No need to explain yourself.  And he says I'll update

23   the attendee -- it says Mike -- I guess he's suggesting what to

24   write.  Mike, I'll update the attendee list to reflect your

25   participation.  That is well documented in the detailed

GC69PIC3                         Picarella - direct

1   minutes.  There are other attendees that I need to add as well.

2   Regarding your second point, I've updated -- I've update the

3   minutes to reflect that the accounts are remaining from the

4   Topaz exercise.  Thanks for help on this.

5             You see that he proposed that language for this

6   correspondence?

7   A.  Yes.  I see that.

8   Q.  At 11:28 you see he says:  Feel free to drop the thanks?

9   A.  I see that.

10  Q.  And Jenner says:  Okay.  I like that.  Jenner says:  Should

11  I copy you in?

12            He says:  Nah.

13            Jenner says:  Cool.  Thanks.  She says I really need

14  to get some chutzpah.  She says:  But this situation gives me

15  the willies.

16            He says:  You have plenty of it.  Just use it.

17            She says:  True.

18            Mr. Karam says:  Feel free to bounce them off me.  Me.

19  Karam says, he responds:  We'll marginalize his behavior.

20            Did you know that he had made that threat at this time

21  in your -- the shifting of your responsibility?

22  A.  No.

23  Q.  This man writing this instant message, this man, Mr. Karam,

24  he's your boss.  He's your supervisor?

25  A.  Yes.

 1   Q.  He is the man from that point forward did your year-end

 2   reviews?

 3   A.  Yes.

 4   Q.  How long when he wrote this had he been your manager?

 5   A.  Less than a month.

 6   Q.  Who appointed him as your new manager?

 7   A.  Ms. White.

 8   Q.  This same period of time here in 2013 did Mr. Karam say

 9   anything to you about your responsibility for new client

10   business cases?

11   A.  Yes.

12   Q.  What did he say?

13   A.  He said that Mr. Pizzimbono will now be approving all new

14   clients that we look to onboard and Mr. Karam himself will take

15   care of the client exiting.  And James Long was going to be

16   logging the cases in a spreadsheet.

17            MR. HUBBARD:  203, please, Mr. Fitzgerald.

18            I don't know if I moved that last one, your Honor.

19            THE COURT:  You did.

20            MR. HUBBARD:  203 I think we listed.

21            MR. BORTNICK:  Yes.

22   Q.  Do you see this chat, Sametime Chat?

23   A.  Yes.

24   Q.  This appears to be between Mr. Karam and Ms. Edelman.  Who

25   was Ms. Edelman at the time this writing took place?

1   A.  She was a business manager that reported to Ms. White.

2            MR. HUBBARD:  Let's go down to 12:43 p.m., please,

3   Peter.  Just want to take a small part of this.

4   Q.  Ms. Edelman says:  Neil is waiting to tell the traders

5   unless we have some more clarity on dates.  So if you could

6   keep it under your hat that would be great.  Absolutely.

7   Thanks.  If there is anything that I can do to help, Mr. Karam

8   says, let me know.  Ms. Edelman says:  Seems there's a lot of

9   mixed, happy and sad.  Mr. Karam says:  Even if it means

10  playing interference.  Good for you.  Bad for us.

11           Next page.

12           Ms. Edelman says:  Ha ha, thanks.  Well not sure your

13  capacity.  Wondering if you had time to get a bit more involved

14  in -- not sure what that is.  Involved in -- can't read that.

15  Says:  Happy to look at it.

16           Do you see where Mr. Karam responds may be a nice

17  excuse to dump the whole Picarella saga?

18  A.  I see that.

19  Q.  She says:  Exactly what I was thinking.  I'm sitting with

20  Suzy tomorrow to go through my list.  I'll leave with her to

21  manage but wanted to make sure you wouldn't hate me if I made a

22  soft recommendation to get you a bit more involved.  She might

23  handle and review who she sees.  Edelman:  Might be refreshing

24  compared to the saga.  She said:  Indeed.

25           That's all we need from that.

GC69PIC3                         Picarella - direct

1              At or about this time I gather that Mr. Karam

2    continued to be your manager?

3    A.  Yes.

4              MR. HUBBARD:  205, please.

5    Q.  This is an e-mail from you to Ms. Bilbrey and Mr. Alderoty?

6    A.  Correct.

7    Q.  You say:  Hi, Mary.  Mike Karam has not met with me or

8    spoken with me in person in approximately three months or about

9    the time of my filing with the EEOC.

10             You go on to say:  At the timeframe of that filing

11   Mike Karam has participated in continued retaliation against me

12   by assuming my role of coordinating business case approvals and

13   prioritization with Pablo Pizzimbono and the relationship

14   managers.

15             And you talk about his approval and prioritization of

16   business cases.

17             Last paragraph.

18             Let's just go to the -- let's just go to the

19   next-to-the-last paragraph.

20             You say:  In summary, I'm being publicly belittled and

21   humiliated by Mike in front of several senior staff in the

22   e-mail below.  I have continued to escalate behavioral issues

23   in the organization.  I continued to do the right thing while I

24   continue to be retaliated against and mistreated.

25             Did you get any response from Ms. Bilbrey to that

GC69PIC3                          Picarella - direct

1    e-mail?

2    A.  I believe so.

3    Q.  Could you recall what she said to you?

4    A.  That she had asked Mike Karam to set up a meeting with me

5    immediately.

6              MR. HUBBARD:  206, please.

7              THE COURT:  Are you moving 206 into evidence without

8    objection?

9              MR. HUBBARD:  Yes, your Honor.

10             THE COURT:  And do you have a few others that you plan

11   to deal with right after this?

12             MR. HUBBARD:  209, 211.

13             Your Honor, this might be a good point.  I don't know

14   about your Honor's schedule but this might be a good point to

15   take a break.  I could go --

16             THE COURT:  Let's go through a few more and then we'll

17   take a break.

18             MR. HUBBARD:  Yes, sir.  Okay.

19             THE COURT:  So you're moving in 206, 209, 211.  Is

20   there any objection to those?

21             MR. JACKSON:  No objection, your Honor.

22             THE COURT:  Okay.  Those are in.

23             (Plaintiff's Exhibits 206, 209, 211 received in

24   evidence)

25   Q.  206.  What is this document, Mr. Picarella?

GC69PIC3                      Picarella - direct

```
 1   A.  That is an e-mail from Mike Karam to myself following a

 2   meeting that we had on September 27.

 3   Q.  Second paragraph.  Do you see he makes reference to your

 4   role in the business manager COO community?

 5   A.  Yes.  I see that.

 6   Q.  And he referred to you in that fashion from time to time?

 7   A.  Yes, he did.

 8            MR. HUBBARD:  209.

 9   Q.  This one I think 209 we've -- I guess your Honor has

10   admitted.

11            MR. HUBBARD:  Start at the bottom please

12   Mr. Fitzgerald, the bottom e-mail.

13   Q.  Mr. Picarella do you see this e-mail from Mr. Rose to

14   Mr. Karam?

15   A.  Yes.

16   Q.  Dated October 17, 2013?

17   A.  Yes, I do.

18   Q.  Do you see the subject is Suzy/Didier.

19   A.  Yes.

20   Q.  Who are Suzy and Didier?

21   A.  Suzy is Suzy White.  She was the COO in global markets

22   Americas at the time.  And Didier Descamps at the time was her

23   boss.  He ran all of global markets for the Americas.

24   Q.  And it looks as if Mr. Rose is asking Mr. Karam:  Please

25   prepare a list of items today which are on the above radar
```

GC69PIC3                    Picarella - direct

1    which I need to be prepared for tomorrow.

2              Who was Mr. Rose at this time?

3    A.  He was a senior executive in London.

4    Q.  Did you know him?

5    A.  I did not.

6    Q.  All right.

7              MR. HUBBARD:  Let's go to the one above that then

8    please, Peter.

9              I think it stops at -- starts at the bottom of 209 but

10   it's an e-mail from Mr. Karam to Mr. Rose.

11             That's fine.

12   Q.  This appears to be an e-mail from Mr. Karam to Mr. Rose.

13             That would be October 17, 2013.  Same subject.  He

14   says:  Dave, the big issue on their radar is this certificate

15   issue.  Will provide you an update in the AM on that status.

16   Then he goes on talking about another matter.  He says:

17   Finally Suzy has asked that I help out on the sales issues.  It

18   may be good for you to leverage that ask into some goodwill.

19   Regards, Karam.

20             First page, please.

21             About an e-mail from Mr. Rose to Mr. Karam.  He

22   responds.  Okay.  Speak tomorrow.  Then he says:  Sales issues

23   question mark.  Do you see that?  At 4:45 p.m.?

24   A.  Yes.

25   Q.  And above it is a response from Mr. Karam to David Rose.

GC69PIC3                      Picarella - direct

1    Same subject.  What does he write, Mr. Picarella?

2    A.  Picarella, the HR related problem.

3    Q.  At the top David Rose says:  Ahh yes TX.

4          Had Mr. Karam ever referred to you in your presence as

5    an HR-related problem?

6    A.  No.

7          MR. HUBBARD:  Your Honor, I think this might be -- we

8    just have to kind of shift here.  We'll go ahead and take our

9    lunch break.  So I'll ask you to be back here at 2 o'clock.  So

10   don't discuss the case amongst yourselves or with anyone else.

11   Don't do any research related to anything pertaining to this

12   case.  Have a great lunch.  We'll see you at two o'clock.

13         (Jury excused)

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

GC69PIC3                          Picarella - direct

1              (In open court)

2              THE COURT:  In terms of scheduling, how much further

3    do you have with this witness?

4              MR. HUBBARD:  Your Honor, I think it will take another

5    hour-and-a-half to finish his testimony.  Go through his

6    termination.  I will try to go through it faster.  I'll sit

7    down at lunch and go through it.  I will try to do it in an

8    hour.

9              THE COURT:  Okay.  Anything else?

10             All right.  See you at two o'clock -- actually let's

11   have counsel get back here at let's say 1:45, 1:50 just to

12   avoid any unnecessary bumping into jurors.

13             (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                            2:08 p.m.

3          (Trial resumed; jury not present)

4          THE COURT:  I think we're still waiting for a couple

5   of jurors.  Is there anything else we need to take up before

6   the jury comes in from either side?

7          MR. HUBBARD:  Your Honor, there may be one thing.  One

8   of the exhibits on our list, it's either 300 or 311, is a set

9   of mitigation documents.  It's a set of Mr. Picarella's records

10  from his job search since he was terminated and we have not

11  used a -- we have not used a summary exhibit.  I'm going to try

12  to do one but it's a very voluminous, thick notebook and I

13  would show it to him.  He's obviously -- he compiled these

14  documents.  I'll ask him what they are.  And it may be that

15  we'll end up trying to lodge something different in the record

16  than these big books.  But we'll have to use those for today.

17  That's the best I could do.  But they've all been produced and

18  this exhibit has been made available.

19         THE COURT:  Okay.

20         MR. JACKSON:  You know, your Honor, the basic gist is

21  that plaintiff's counsel shared with us their list of numerous

22  documents that they might introduce today.  We went over it.  I

23  think we basically had agreement with the exception of a

24  handful.  One of them was this PX-300 which is 1269 pages.

25  It's a combination of a lot of different kinds of things.  Some

1   of them are I believe -- they're all what's been represented is

2   that they're all related to Mr. Picarella's mitigation.  But

3   it's so voluminous and it's so multifaceted that we just

4   can't -- it's not like an exhibit.  It's not one thing.  It's

5   hard for us to -- we have a number of different potential

6   issues with different parts of it.  So I think if it could be

7   parsed out somehow we could do it, but a 1300-page document is

8   really not helpful.

9           THE COURT:  So what is it you want me to do, counsel?

10          MR. HUBBARD:  I don't want you to do anything.  I knew

11  that he was going to raise some issues.  I'm going to offer it.

12  They've had it for months.  And it's been produced and it's

13  been on the exhibit list since September.

14          THE COURT:  Give me a sense, defense counsel, of what

15  the issues might be, if any.

16          MR. JACKSON:  Some of it, your Honor, is these are

17  just Mr. Picarella's -- some of it is Mr. Picarella's own notes

18  of things that he purportedly did.  I believe -- there's

19  hearsay issues.  There are -- there are a number of different

20  foundational issues.  It's a bunch of different things all put

21  together and we don't believe that they're generally -- that

22  they're all admissible.

23          Maybe -- I've tried to ask plaintiff's counsel for --

24  there are a bunch of different e-mails from other people.

25  There are LinkedIn messages.  It's just an amalgam of all these

1    different things that are somehow related to mitigation.  And

2    to our mind that's not really an exhibit.

3         THE COURT:  What is it that you want to do with this

4    stuff, plaintiff's counsel?  You said something about a summary

5    exhibit that you want to put in later?

6         MR. HUBBARD:  Well there's a provision in the rules

7    for when you have a voluminous document like this for creating

8    a summary exhibit obviously to make it smaller.  I think that's

9    one thing that we could do.  But since there's a challenge to

10   mitigation here these are documents that were produced to the

11   defendant that were collected by the defendant that reflect his

12   activities in finding a job after he was fired.

13        THE COURT:  And what is the relevance and the

14   usefulness of giving a jury 1300 pages of documents?

15        MR. HUBBARD:  I really don't think -- I don't think

16   there is much use.

17        THE COURT:  So what is it you want to do -- are there

18   any specific documents you want to go over with Mr. Picarella

19   from these binders at all today or you just want some of these

20   documents to go into evidence for the jury to look at later or

21   what is it you want to do with these documents?

22        MR. HUBBARD:  I just want to prove mitigation by

23   showing that he has -- that this is indicative of the effort he

24   made to find a job and as he collected it and ask if they've

25   all been collected in these notebooks.  I don't know of any

1   other way to do it.  I can't go through -- we don't have time

2   to go through each one of them.  I could just ask him on the

3   stand what he did to look for a job, but I can't do that,

4   they'll argue that it's not sufficient.  I certainly know you

5   don't want me to go through each one of these e-mails -- most

6   of these are job applications.  Internet job applications.

7           THE COURT:  Okay.  I guess what I'm trying to figure

8   out is we've got a jury potentially waiting now.  Is it

9   possible to deal with the number of documents later?  I don't

10  want to hold the jury up waiting on this.  But I guess I'm

11  trying to figure out what is it you wish to -- Mr. Picarella is

12  here.  I assume he's going to be here throughout the course of

13  the trial.

14          MR. HUBBARD:  Yes.  We could deal with it later.  I

15  could simply ask him without -- I simply could ask him what his

16  mitigation efforts were, if he's collected, and reserve the

17  documents, the applications, and that kind of thing, and deal

18  with it later.

19          MR. JACKSON:  That's fine for us, Judge.

20          THE COURT:  Seems to make sense to me.

21          MR. HUBBARD:  Yes, sir.

22          THE COURT:  All right.  Everyone ready?  Let's bring

23  the jury in.  Mr. Picarella can take the stand.

24          MICHAEL PICARELLA, resumed.

25          (Continued on next page)

 1              (Jury present)

 2              THE COURT:  Please be seated.  I hope you had a

 3    pleasant lunch.  Let's resume with the case on trial.

 4              Go ahead, counsel.

 5              MR. HUBBARD:  Your Honor, there are about a dozen of

 6    exhibits here that I don't think there's objection to.  I'd

 7    like to read them to you.

 8              THE COURT:  Okay.

 9              MR. HUBBARD:  218, 219, 220, 231, 236, 237, 240, and

10    242 I don't think there's objection to.

11              THE COURT:  Any objection to any of those documents?

12              MR. JACKSON:  No objection, your Honor.

13              THE COURT:  Okay.  Those are all in.  Go ahead.

14              (Plaintiff's Exhibits 218, 219, 220, 231, 236, 237,

15    240, and 242 received in evidence)

16    DIRECT EXAMINATION CONTINUED

17    BY MR. HUBBARD:

18    Q.  Mr. Picarella, would you turn to Exhibit 218 in your book

19    there.

20              MR. HUBBARD:  Just go to the top, please, Peter.

21    Q.  Mr. Picarella you see this -- you want to find the hard

22    copy there?

23    A.  I have it.  Yes.

24    Q.  This is an e-mail from you to Mr. Karam, copy to

25    Ms. Bilbrey, on May 5, 2014.  And the subject is year-end

GC69PIC3                          Picarella - direct

1   review.

2          Did you send this -- did you participate in this

3   e-mail chain with Mr. Karam and Ms. Bilbrey?

4   A.  Yes, I did.

5   Q.  Was this in connection with your 2013 year-end performance

6   review?

7   A.  Yes, it is.

8   Q.  Turn to the second page, please.

9          Look at the bottom e-mail dated May 2, 2014.

10          There's an e-mail there from you to Mr. Karam and

11   Ms. Bilbrey dated May 2.  Year-end review.  Do you see it?

12   A.  Yes.  I see it.

13   Q.  You say you have submitted the 2013 year-end

14   self-assessment into the system.  Is this self-assessment a

15   part of the annual review process?

16   A.  Yes, it is.

17   Q.  Did you prepare?

18   A.  Yes, I did.

19   Q.  And you submitted it to Mr. Karam and his group?

20   A.  Yes.

21   Q.  Look at the first paragraph.  You say that following the

22   filing of your EEOC charge at the end of June 2013 that you

23   experienced additional and continued actions of retaliation

24   from HSBC.  You say you've had nearly all of your

25   responsibility removed by my boss, Mike Karam, from July

1    through September -- presumably based on the instructions of

2    senior management.  During the three-month timeframe I did not

3    go to any meetings or have any verbal communication with my

4    boss, Mike Karam, who I believe is afraid to interact with me

5    based on the fear that he will be retaliated against.

6            When you say here that you have had nearly all of your

7    responsibility removed, how much of your time in 2014 were you

8    able to devote to HSBC business when you were in the office

9    based on the work assigned to you?

10   A.   Based on the work that was assigned to me it was about ten

11   percent of my time that I was able to work on business

12   activities.

13   Q.   During the course of 2014 did you complain to Ms. Bilbrey

14   and others about that -- about the change in your workload?

15   A.   Yes.  Continually to Ms. Bilbrey.

16   Q.   When you went to work if you only had enough work to take

17   up ten percent of your time, how did you occupy your time?

18   A.   It wasn't easy.  I would read at my desk, read news

19   articles related to the business.  I would talk to colleagues

20   in the building.  Try and talk about business.  And work on

21   personal stuff.

22   Q.   Did -- do you know of your own knowledge if your colleagues

23   in the office could see that you had no real work to do?

24   A.   Yes.

25   Q.   Where you were doing these things was it conspicuous?

GC69PIC3                          Picarella - direct

1   A.  I sat on the trading floor.  I tried to be.  But I think it

2   was my impression that most people knew I was being -- I was

3   sidelined by management at that point.

4   Q.  Let's go to the second page please -- the third page now of

5   218.

6           You're writing this to Mr. Karam now in connection

7   with your review, right?

8   A.  Correct.

9   Q.  You say down at the end:  There were many other damaging

10  events during the second half of 2014, including receiving my

11  mid year review on a last minute request in mid-December,

12  defamation of character and other career damaging events which

13  I won't go into here.  In sum, the actions of Karam, Weiss, and

14  White have forever damaged my standing in the bank.  I look

15  forward to the next steps in the review process as prescribed

16  by policy.

17          Did you receive a response to this self-assessment

18  from Mr. Karam?

19  A.  Yes, I believe so.

20  Q.  Did he talk to you about it?

21  A.  I don't remember.  I think we may have had a brief

22  conversation.

23  Q.  Did he tell you anything to the effect that he thought it

24  was insulting?

25  A.  I think he may have sent an e-mail.  I remember him telling

GC69PIC3                        Picarella - direct

1    me that I was at one point in time -- I don't know if it was

2    here -- I think he thought it was insubordinate or something to

3    that effect.

4    Q.  Do you remember any specific comment he made to you about

5    the self-assessment that you sent him?

6    A.  About this self-assessment?

7    Q.  Yes.

8    A.  No.

9            MR. HUBBARD:  219, please, Peter.

10   Q.  Do you see this e-mail from Ms. Jang, May 14?

11   A.  Yes.

12   Q.  To Ms. Weiss, Ms. Park, Ms. Whang.  The subject is

13   restructuring.

14   A.  Yes.

15   Q.  Look at the bottom e-mail, please.  From Ms. Weiss to the

16   same group.  Same subject.  May 13, 2014.  Ms. Weiss says:  I

17   haven't heard much on markets restructuring.  Other than the

18   names below is there anyone else the business wants to let go.

19            Do you see that?

20   A.  Yes.

21   Q.  What does Ms. Jang say in response?

22   A.  Can we add MP.

23   Q.  Who is MP?

24   A.  That would be me.

25   Q.  Was Ms. Jang in any place at any time in your chain of

1     command?

2     A.  No, she was not.

3     Q.  Where was she?

4     A.  She was in human resources working for Ellen Weiss.

5     Q.  Do you know why she was asking if you could be added to the

6     termination list?

7     A.  No.

8              MR. HUBBARD:  Exhibit 220, please.

9     Q.  What is this document please, Mr. Picarella?

10    A.  This is a 2013 year-end review for myself.

11    Q.  What is the date of it?

12    A.  May 16, 2014.

13    Q.  Did you have a -- who is it prepared by?

14    A.  Michael Karam.

15    Q.  Michael Karam was still your manager at this time?

16    A.  Yes.

17    Q.  Do you know if any effort was made by HSBC senior

18    management to remove Mr. Karam as your manager after they

19    learned that he was treating you as a HR --

20             MR. JACKSON:  Objection.

21             THE COURT:  Sustained.  Please rephrase that.

22    Q.  Was there any -- during the course of 2015 were you aware

23    of any effort by HSBC management to change your reporting

24    structure away from Mr. Karam?

25    A.  No.

GC69PIC3                          Picarella - direct

1    Q.  When did you -- did you have a meeting to discuss this 2013

2    year-end review with him?

3    A.  It was in May so I'm assuming the date on there, May 16,

4    2014.

5            MR. HUBBARD:  Let's go, please, to the third page,

6    Peter.  On the year-end summary at the bottom.

7    Q.  What is the rating, Mr. Picarella?

8    A.  Strong.

9    Q.  Let me review this with you real quick, please.

10   A.  Mike has demonstrated mixed results with the agreed

11   objectives.  The Dealogic implementation is progressing and he

12   has maintained the monthly GMB submission and client

13   rationalization objective.  Objectives have been expanded to

14   include validation of the GUP customer base and the Greenwich

15   survey.  Mike has demonstrated a weakness in proactively

16   devising meaningful solutions to tasks which he has -- which

17   has required intervention and guidance that should have been --

18   that should have been unnecessary.  Mike's overall handling of

19   these responsibilities has fallen short of those typically

20   expected of an SVP in the COO business manager's role.  Mike

21   also needs to work towards creating solutions and taking

22   initiative where appropriate.  His standing catch-up session

23   has been established to discuss progress, witnesses and hurdles

24   to overcome.  Finally, Mike should maintain a professional tone

25   in all of his e-mail communications.

1          Did you have these two jobs -- backup please, Peter,

2    to the e-mail.  No.  The one on the right.  The summary.  Yes.

3    Q.  Do you see where he refers to the Dealogic implementation?

4    A.  Yes.

5    Q.  And the GMB submission?

6    A.  Yes.

7    Q.  And then he says objectives have been expanded to include

8    validation of the GUP client base and the Greenwich survey.

9          Did you have those jobs added back into your plate in

10   2014?

11   A.  Yes.  They were added in September 2013 after I had

12   complained to Ms. Bilbrey.  Yes.

13   Q.  And by the middle of 2014 did you still have those jobs?

14   A.  Not all of them.  The Dealogic implementation was complete

15   in about the January February timeframe.  So he gave it to me

16   in September.  I rolled it out into the equities division.  It

17   was completed the latest early February.  And the GMB monthly

18   submission was a monthly commentary that London used to collect

19   from me and I would copy Mike Karam on it.  But they ended the

20   submission after March of 2014.

21          (Continued on next page)

22

23

24

25

GC6TPIC4                        Picarella - cross

1    BY MR. HUBBARD:

2    Q.  By April of 2014 did any of these jobs take up more than

3    ten percent of your time?

4    A.  No.

5    Q.  All together collectively did they take up more than ten

6    percent of your time?

7    A.  Probably less.

8    Q.  Turn to 231.  I think it's in the third binder.

9            You recognize this as an email from you to Ms. Bilbrey

10   on or about October 20, 2014?

11   A.  Yes.

12   Q.  Did you write this?

13   A.  I did.

14   Q.  Why?

15   A.  I was desperate, still looking for help.

16   Q.  You refer to an email at the top, you say I found an email

17   from Maria to be disturbing and upsetting on many levels.

18           What was the email to Maria you were talking about?

19   A.  We had an objectives meeting for that year, 2014.  We had

20   that meeting in October.  Usually there were objectives set in

21   January for the year, Mike Karam and I, and Maria Malanga from

22   HR came to the meeting to set the objectives.  I was given

23   eleven objectives.  They were generic firm-wide objectives.

24           And when I had gone through each of those in a meeting

25   with Mr. Karam, I was asking him specifically how that

1    translates into my day-to-day work, because eleven objectives

2    sounds nice, but I had hardly any work to do.  I was trying to

3    understand what I was going to be doing on very firm-wide set

4    objectives, and on nine of the eleven there was nothing for me

5    to do, and on the two it was the current work that I had.

6    Q.  Go down to the third paragraph, please.

7         You say:  I have continued to complain in desperation

8    to HR and still I sit with no more than one hour of work a week

9    on average.

10        Was that true when you wrote this?

11   A.  Absolutely.

12   Q.  Even that minimal effort is that of an admin or cutting and

13   pasting commentary.

14        Was that true when you wrote it?

15   A.  Yes.

16   Q.  At times months have gone by with no work at all.  My

17   reviews are given many months after the firm-mandated deadline,

18   if they are given all, and they last only a few minutes.  A

19   year and a half has passed with hardly any purpose or work.

20        What was your state of mind at this point in time

21   about your job at HSBC?

22   A.  It was desperate.  I felt my career was ruined at that

23   point.

24   Q.  Did you anticipate that shortly after this you would

25   receive a year end -- a 2013 year end review from Mr. Karam?

GC6TPIC4                      Picarella - cross

1   A.  Yes.

2   Q.  What was the next interaction you had with Mr. Karam?

3   A.  I believe it was the review.

4   Q.  236, please.

5           In the month of November 2014, did you have a review

6   meeting with him?

7   A.  Yes.

8   Q.  Where was the meeting?

9   A.  I'm sorry?

10  Q.  Where was the meeting?

11  A.  Where was the meeting?

12  Q.  Yes.

13  A.  In a conference room on the 9th floor.

14  Q.  Who attended the meeting?

15  A.  Just Mr. Karam and myself.

16  Q.  At that meeting -- let me step back for a moment.

17          Did you have occasion after that meeting to file a

18  complaint with human resources about the way he treated you at

19  that meeting?

20  A.  Yes, I did.

21  Q.  What did you report?

22  A.  That he got physically threatening with me in that meeting.

23  Q.  How would you describe his -- how would you describe that

24  to us?

25  A.  It was in an office but an office that's vacant and used as

1    a conference room.  And we were sitting at a very small, round

2    table, very small, across from each other.  He handed me a Word

3    document.  Normally you will get a review in a system form.  It

4    was a Word document, and he told me to read it as opposed to

5    him talking through it.  He thought it would be easier that

6    way.

7            As I was reading, every point that I was reading

8    didn't make sense to me.  And I was questioning, asking a

9    couple of questions as I was reading it, and he started to

10   speak and he said:  Look at me when I'm talking to you.  And he

11   said it again.  As I looked up when he said it the second time

12   he was leaning over the table with his finger in my face, and

13   he was loud.  I remember seeing the veins in his neck, his face

14   was beet red.  He was threatening me at that point.

15   Q.  What did he tell you -- what kind of review did he give

16   you?

17   A.  Off track.  They had they had changed the rating system at

18   that point.

19   Q.  Off track meaning what?

20   A.  It used to be the one through five, now it was on track,

21   off track.  And so I was off track.  He said off track fail is

22   what he was giving me.

23   Q.  Let's took at this summary that he writes here.

24           He writes off track.  Mike has demonstrated

25   inconsistent results and was off track as of midyear '14.  The

1   common theme is one where Mike is elusive, doesn't take

2   ownership of his work, and lacks initiative.

3           Had you seen these comments as you went through that

4   document at that meeting?

5   A.  Yes.

6   Q.  Down at the bottom it says:  It is important that you and

7   your manager have regular structured discussions on areas for

8   your development.  Development actions should balance both what

9   and how and show how increased levels of performance can be

10  achieved.

11          That's not what I'm looking for.  I'm looking for the

12  bottom of the review.  Just give me a moment, please.

13          (Pause)

14          MR. HUBBARD:  Last paragraph, please, Peter, of that

15  section.

16  Q.  You see he says:  There remains a commitment to work with

17  Mike to function within those expectations of an SVP, but this

18  is becoming increasingly challenging given his lack of

19  initiative.  This is a theme that has carried over from last

20  year's review.  Mike's lack of initiative, lack of productivity

21  and refusal to take ownership strategically defining his role

22  or his work is contrary to his GCB level and is significantly

23  below the performance of his peers.

24          Do you see that?

25  A.  I see that.

1    Q.  Now when he gave you this off track review, did he then

2    give you a performance improvement plan to address these

3    concerns that he articulates here?

4    A.  No, he did not.

5    Q.  Did he ever, before you were terminated, give you a

6    performance improvement plan?

7    A.  No.

8    Q.  Is that part of the policy and practice for this off track

9    rating system?

10   A.  I believe so.

11   Q.  Did you have any additional performance meeting with him

12   between then and the time you were terminated?

13   A.  No.

14   Q.  Turn to 237, please.

15         What is this document, Mr. Picarella, dated

16   November 24, 2014?

17   A.  This is an email from myself to Mary Bilbrey.

18   Q.  And do you relate here the events of that November 20

19   meeting that we discussed earlier?

20   A.  Yes.

21   Q.  Did she begin an investigation?

22   A.  Yes.

23   Q.  Exhibit 240, please.

24         What is this exhibit dated November 26, 2014, please,

25   sir?

1    A.  That is a response that I put together to the mid year

2    review that Mike Karam gave me.

3    Q.  Did you submit that on November 26, 2014?

4    A.  I did.

5    Q.  Assume for a moment that November 26 was the Wednesday

6    before Thanksgiving.

7    A.  Okay.

8    Q.  It may or may not be.

9    A.  Right.

10   Q.  What is your best recollection of what the date was,

11   Wednesday, November 26?

12   A.  I think that was the Wednesday before Thanksgiving.

13   Q.  When is the next time you returned to the office?

14   A.  I never did.

15   Q.  Did you go to the office on December the 1st?

16   A.  Yes, that was the Monday after -- the Monday after

17   Thanksgiving, I don't know if that was the date.

18   Q.  Did you report to work on the Monday, December 1st?

19   A.  I did.

20   Q.  What happened when you got there?

21   A.  My employee ID card didn't work.

22   Q.  Had you received -- did there come a time that day when you

23   saw an email dated November 26 to you from Ms. Malanga saying

24   that they were going to have you work from home in light of

25   your complaint about Mr. Karam?

GC6TPIC4                          Picarella - cross

1    A.  I did when I got to my desk.

2    Q.  When is the first time you ever saw that email?

3    A.  Monday, 9, 10 o'clock in the morning or so.

4    Q.  241, please.

5              THE COURT:  Are you moving 241 into evidence?

6              MR. HUBBARD:  Yes, your Honor.

7              THE COURT:  Any objection to 241?

8              MR. JACKSON:  No objection, your Honor.

9              THE COURT:  241 is in evidence.

10             (Plaintiff's Exhibit 241 received in evidence)

11   Q.  Ms. Malanga writes you and she says:  Mike, sorry we are

12   not able to connect today as I would have liked.  I wanted to

13   speak to you because we are concerned about the information you

14   provided in your email to Mary.  We are going to have you work

15   from home until we are able to fully investigate your concerns

16   and address the safety issues you have expressed.  Let me know

17   if you have any questions.

18             When did you first see this email?

19   A.  Monday morning.

20   Q.  What time was it sent to you?

21   A.  Wednesday before Thanksgiving at 4:46 p.m.

22   Q.  Were you in the office at 4:46 p.m. on the Wednesday before

23   Thanksgiving?

24   A.  No, that tends to be a day when most people leave a little

25   early.

GC6TPIC4                        Picarella - cross

1    Q.  Let's look at 242, please.

2              As we are doing that, what did you do when you got to

3    the office on December 1?  What happened?

4    A.  Well, I sent this email -- after I received the email?

5    Q.  Let me go back.  When you got to the office on Monday

6    morning, December 1 --

7    A.  Yes.

8    Q.  -- what happened?

9    A.  Well, I couldn't get in the turnstile.  After that?

10   Q.  No, I want to know what happened when you got to building.

11   A.  When I got to building I tried to get in the building with

12   my employee ID card and I could not.

13   Q.  What did you do next?

14   A.  I tried several times, and I tried getting in from the

15   front desk and they said my card had been deactivated.  And I

16   tried for a while, I guess maybe an hour or so, trying to get

17   in.  And I was calling random people to come down and vouch for

18   me that I was a guest.  And I finally contacted a friend that

19   came down and -- a colleague that came down.

20   Q.  When you got in the building, what did you do?

21   A.  Well, I logged in.  My card wasn't working on any of the

22   hallways and doors and stuff, and I first thought maybe it was

23   a glitch with my card.  So I got to my desk and I checked the

24   emails and I saw that email from Marie Malanga.

25   Q.  What did you do next?

1   A.  I believe I sent her an email saying I just received this.

2   Q.  This is 242?

3   A.  Yes, I'm sorry, 242.

4   Q.  And you say:  My card has been inactive all morning and

5   it's difficult to get around.  And you say please instruct if

6   you would like me to leave.

7            Did she contact you?

8   A.  Yes.

9   Q.  What did she say?

10  A.  She told me she would like me to leave.

11  Q.  Did she tell you why?

12  A.  She said they're conducting an investigation into my

13  complaints and she would like me to leave.

14  Q.  Did you leave on that day?

15  A.  I did.

16  Q.  Did you ever return to the office?

17  A.  I did not.

18  Q.  When in December did you -- so I guess you start working

19  from home at this point, right?

20  A.  That's what she had said, but -- yes, yes.

21  Q.  Did you start working from home after you left the building

22  that day?

23  A.  Yes.

24  Q.  When was your access to the Blackberry and the systems

25  restored?

1  A.  I would say close to three weeks later.

2  Q.  Throughout the month of December were you still instructed

3  to work from home?

4  A.  Yes.

5  Q.  Let me take you into January.  So by December 18, the date

6  you told me, your Blackberry access had been restored?

7       You could access email and that kind of stuff?

8  A.  The Blackberry was fine, I didn't just have the remote

9  access, so from like a computer.  Yes, that was restored.  They

10 had to send me --

11 Q.  When did you get it restored?

12 A.  It was about three weeks later, I don't know the exact

13 date.

14 Q.  And in the first couple of weeks of January, were you

15 working from home?

16 A.  Yes.

17 Q.  Had there been any change in those instructions about

18 working from home?

19 A.  No, I was waiting.

20 Q.  Did you attend a sales meeting chaired by Mr. Silber, the

21 head of the markets institutional sales, on or about

22 January 13, 2015?

23 A.  Yes.

24 Q.  How did you attend?

25 A.  I dialed in.

1   Q.  And do you know how many people were either in attendance

2   or on that conference call?

3   A.  I don't -- they took a roll call, but there's generally 30

4   people on that weekly call.

5   Q.  And what kind of call is that that Mr. Silber chairs?

6   A.  It's a weekly sales management meeting.

7   Q.  And you attended by telephone?

8   A.  Yes.

9   Q.  Do you recall what the discussion was about that day,

10  January 13, on that call?

11  A.  It's vague.  I don't remember.  General sales roll call

12  where each desk gives an update on what they were doing.  There

13  were some compliance issues that were discussed.

14  Q.  Was there any discussion about Bloomberg chats that had

15  been leaked by someone?

16  A.  There may have been.  It was on one of those weekly calls,

17  I remember that.

18  Q.  In the next 24 hours did you speak to any person about the

19  subject of that the meeting?

20  A.  No.

21  Q.  In the next 48 hours?

22  A.  No.

23  Q.  In the next two weeks?

24  A.  No.

25  Q.  Did there come a time when you saw or read or were told

GC6TPIC4                        Picarella - cross

1    about an article in the New York Post that appeared in the

2    early part of February about that sales call?

3    A.  I remember either getting -- reading it in the paper myself

4    or somebody sent me a link that there was an article in the

5    Post about that meeting.

6    Q.  Had you spoken to any person anywhere about that sales call

7    before you saw that article on February 11, 2015?

8    A.  Absolutely not.

9    Q.  Exhibit 245, please.

10              MR. JACKSON:  We have an objection.

11              THE COURT:  There's an objection to 245?

12              MR. JACKSON:  Yes, your Honor.

13              THE COURT:  Let me see 245.

14              MR. HUBBARD:  There's no objection on the pretrial

15   exhibit list.

16              THE COURT:  Let me see 245.

17              MR. HUBBARD:  Here it is, your Honor.

18              THE COURT:  Let's do this, let's take a break.  I know

19   we had lunch not too long ago.  Let's take our afternoon break

20   early and I can discuss some legal issues with the lawyers.

21   Don't discuss the case among yourselves or with anyone else.

22   See you soon.

23              (Continued on next page)

24

25

1          (Jury not present)

2          THE COURT:  Could you put 245 up on the screen and

3    tell me what the objection is.  Tell me what 245 is and what

4    your objection is.

5          MR. JACKSON:  So Judge, just to be very clear, this is

6    an article that was written about the leaks, and it's an

7    article that we had on our list of exhibits we may admit.  We

8    wanted to see what was going to come in.

9          And what I told Mr. Hubbard this morning, when we were

10   talking about the exhibits, is that we wouldn't necessarily

11   object to this, but I needed to hear how this was relevant to

12   Mr. Picarella's testimony and what Mr. Picarella was going to

13   say about it that actually made this relevant.  Otherwise, it's

14   hearsay.  And it may become relevant at some other point in the

15   case to some other point that needs to be made, but I don't

16   really understand at this point why a news article was

17   necessary for Mr. Picarella to tell his story of whatever

18   supposedly happened.

19         THE COURT:  This is a news article that indicates that

20   HSBC singled out worker for leaks.  Is Mr. Picarella the person

21   that is mentioned in this article?

22         MR. HUBBARD:  Yes, your Honor.  But the significance

23   of this document is apart from that.  The significance of the

24   document is he was accused of leaking information from that

25   meeting, and this document is when he first learned about the

GC6TPIC4                         Picarella - cross

1    allegation that a reporter had called.

2            THE COURT:  Okay.  Defense counsel?

3            MR. JACKSON:  It's the same objection, your Honor.  I

4    don't understand why the article itself needs to come in,

5    but --

6            THE COURT:  Well, Mr. Picarella already testified

7    about reading this article or hearing about the article, and is

8    indicating that he did not in fact leak any of this

9    information.  I anticipate there is going to be some sort of --

10   I don't want to put words in anyone's mouth, but I anticipate

11   there will be some testimony related to his belief as to why he

12   was terminated or to statements given to him or made to him

13   about this leak, or I don't know, what --

14           MR. HUBBARD:  He was accused, when he was terminated,

15   of having been the source of this article.

16           THE COURT:  Okay.  Sounds good.  I will overrule the

17   objection.

18           MR. JACKSON:  That's not accurate, your Honor.  There

19   was an investigation as to whether or not he was the source of

20   it.  The investigation -- it was never cited as the reason that

21   he was terminated.

22           THE COURT:  Okay.  Well, again, if that's going to be

23   the testimony, the fact that you disagree with the statement or

24   you have a factual disagreement is not a valid legal objection

25   to this.  I overrule the objection.  That can come in.

GC6TPIC4                          Picarella – cross

1              MR. HUBBARD:  Thank you.

2              THE COURT:  Is there anything else that you plan to

3     put in that there's going to be an objection to anytime soon?

4              MR. HUBBARD:  I don't think so, your Honor.

5              THE COURT:  All right.

6              MR. HUBBARD:  I hope I can live up to it.

7              THE COURT:  All right.  See you soon.

8              Let's try to get here about 3:05.

9              (Recess taken)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Welcome back.  Let's continue with the

 3    case on trial.  The objection is overruled.

 4              Go ahead, counselor.

 5              MR. HUBBARD:  Thank you.

 6              THE COURT:  Are you moving 245 in evidence?

 7              MR. HUBBARD:  Yes, your Honor.

 8              THE COURT:  That's admitted.

 9              (Plaintiff's Exhibit 245 received in evidence)

10    BY MR. HUBBARD:

11    Q.  Mr. Picarella, do you see the date on this document?

12    A.  Yes.

13    Q.  What is the date of the article?

14              What is the name of the news report?

15    A.  HSBC singles out worker for leaks, sources.

16    Q.  Who is the writer?

17    A.  Kevin Dugan.

18    Q.  And what is the date?

19    A.  February 11, 2015.

20    Q.  And tell us again when you believe is the first time you

21    saw this news report.

22    A.  It was either on February 11 or the next day.

23    Q.  After that did you speak to any person -- sorry, let me ask

24    a preliminary question.

25              Is there reference in that article to the Silber sales

1   conference call?

2   A.  I haven't read it in a while, but I believe there is.

3        Yes, there is.

4   Q.  After you saw this article, did you speak to your

5   attorneys -- sorry, one more foundational question.

6        Does this article also refer to this case, this

7   litigation?

8   A.  Yes, it does.

9   Q.  You see at the bottom of the second page it says Picarella

10  had, in early 2014, filed a complaint with HSBC's human

11  resources department, and then it speaks about a retaliation

12  suit in federal court.  Do you see that?

13  A.  I see that.

14  Q.  When you read that, did you contact your attorneys about

15  this article?

16  A.  Yes, I did.

17  Q.  Had you spoken to them about it at any time before that?

18  A.  No.

19  Q.  Exhibit 247, please.

20        Do you have it in your book?

21        THE COURT:  Are you moving that into evidence?

22        MR. HUBBARD:  I'm sorry, let me go back for a moment,

23  your Honor, I skipped one.

24        I need 244, please.

25        THE COURT:  Do you wish to move that in evidence?

 1              MR. HUBBARD:  Yes, your Honor.

 2              THE COURT:  Is there any objection to 244?

 3              MR. JACKSON:  No objection, your Honor.

 4              THE COURT:  244 is in.

 5              Are you planning to move later 247 in evidence?

 6              MR. HUBBARD:  Yes, your Honor.

 7              THE COURT:  Is there an objection to 247?

 8              MR. JACKSON:  No objection.

 9              THE COURT:  Okay, those are in.  Go ahead.

10              (Plaintiffs' Exhibits 244 and 247 received in

11     evidence)

12     Q.  You see Exhibit 244 --

13     A.  Yes.

14     Q.  -- dated January 15, 2015?

15     A.  Yes.

16              MR. HUBBARD:  Give me the full letterhead, please,

17     Peter.

18     Q.  Is this letter addressed to me?

19     A.  Yes, it is.

20     Q.  On the masthead of Boies, Schiller & Flexner in New York

21     City?

22     A.  Yes.

23     Q.  And what is the date?

24     A.  January 15, 2015.

25     Q.  What is the subject?

1              What is the reference in the letter?

2     A.  Michael Picarella.

3     Q.  Would you read the first paragraph of the letter to me,

4     please.

5     A.  I write to inform you that HSBC has placed Mr. Picarella --

6     Q.  Speak up a tiny bit.

7     A.  Sorry.  I write to inform you that HSBC has placed

8     Mr. Picarella on paid administrative leave effective

9     immediately.  HSBC has reason to believe that Mr. Picarella has

10    conveyed confidential and potentially privileged HSBC

11    information to one or more third parties not entitled to hold

12    such information in violation of HSBC policies and the terms of

13    his employment.  His access to HSBC's systems and premises has

14    been suspended.  This action is necessary to protect the

15    confidential information and assets of HSBC.

16    Q.  Thank you.  And on that date was your access to HSBC

17    systems and premises suspended?

18    A.  Yes.

19    Q.  247, please.

20              MR. HUBBARD:  Can you capture that letter, Peter,

21    first of all in its entirety.

22    Q.  What is this document, Mr. Picarella?

23    A.  This is a letter from HSBC to myself.

24    Q.  And what is the date?

25    A.  March 26, 2015.

1   Q.  Is it sent to your address in Melville?

2   A.  Yes, it is.

3   Q.  Who is it signed by?

4   A.  Susan Roskell, managing director, head of human resources.

5   Q.  How did you receive this letter?

6   A.  It was sent Fed Ex.

7   Q.  Did you receive it on the date that -- on the date it bears

8   or any dates nearby?

9   A.  I believe it was March 27, the next day.

10  Q.  Did you sign for the letter or was it left at your house?

11  A.  It was left.

12  Q.  If you look at the first paragraph of the letter, going

13  down to the third sentence you see where it reads:  Because we

14  wanted to communicate this information promptly, and the three

15  of us have not been able to speak today, this letter is to

16  inform you that your employment with HSBC Securities (USA) Inc.

17  is terminated effective immediately.  Your employment is being

18  terminated due to your significant performance issues which

19  have been previously discussed with you.

20          Do you see that?

21  A.  I see it.

22  Q.  Look at the next paragraph, please.

23          What else did it say about the termination of your

24  employment in the second paragraph?  In addition.

25  A.  Do you want me to read it?

GC6TPIC4                          Picarella - cross

1    Q.   Yeah.

2    A.   In addition, you should know that the investigation into

3    the disclosure of the internal confidential discussions from

4    the January 13, 2015 sales group meeting resulted in a finding

5    that you were highly likely the source of that information,

6    either directly or indirectly.

7    Q.   Did anybody ever show you any such evidence --

8    A.   No.

9    Q.   -- that you disclosed that information?

10   A.   No.

11   Q.   In the months following your termination in 2015, did you

12   begin any efforts to obtain comparable employment?

13   A.   Yes.

14   Q.   Describe generally for us what you did in the summer and

15   fall of -- if any, in 2015?

16   A.   I started looking almost immediately, but there was a lot

17   of litigation work at that point in time.  But when that ended

18   in the middle of I would say June, I began looking aggressively

19   for a new job.

20   Q.   How did you do that?

21   A.   My normal course of action historically has been through a

22   couple of headhunters that I used for 20 years or so, and

23   through my network of friends and former colleagues and bosses

24   on the street, general conversation.

25   Q.   Did you apply for any jobs?

GC6TPIC4                     Picarella - cross

1    A.  Yes.

2    Q.  And over what period of time did you apply for jobs?

3    A.  From I mean at that point in time all the way through

4    aggressively applying online.  There's a couple of different

5    phases, so I was going through my normal route for a few months

6    there.  And headhunters I had used basically told me that they

7    were having difficulty, given my name was in the papers and

8    easily Googleable.  I was on a few interviews, Morgan Stanley.

9    Q.  You did interview at Morgan Stanley?

10   A.  I did.

11   Q.  What happened?

12   A.  They needed a COO, business manager in the private wealth

13   group, and I met with human resources.  It went extremely well.

14   They told me that they liked that I worked there in the past

15   and had a good record, and that I had all the tools and

16   different products knowledge that they were looking for, and I

17   seemed like a perfect candidate.  And in the last five minutes

18   of the meeting we brought up why I left HSBC.  And under the

19   instruction of the headhunter who set it up, I tried to give a

20   very positive explanation as to why I left, and basically never

21   heard back from them again.

22   Q.  Did you make application online for a comparable positions?

23   A.  Yes, I did.

24   Q.  Have you received any offers of employment in the financial

25   services industry since this article appeared in the New York

1   Post?

2   A.   No.

3   Q.   Have you interviewed for jobs off of Wall Street?

4   A.   Yes, I have.

5   Q.   Give us an example.

6   A.   I tried venturing outside the industry, health care, and

7   had an interview at a retirement home on Long Island.  They

8   needed an operations manager, so I applied there and I

9   interviewed there.  It's not easy at my age --

10  Q.   I don't need an explanation.

11          Have you interviewed in the last six months for any

12  job with any businesses or government entity?

13  A.   Yes.

14  Q.   Tell us, please.

15  A.   There's two that come to mind.  One is for a town job.

16  There's a deputy treasurer for a village on Long Island.  And

17  another one is through the SEC.  I have a friend in my church

18  that works there and he's trying hard to help me out.

19  Q.   Have you received any definitive response from either of

20  those opportunities?

21  A.   No, but I'm hopeful.

22  Q.   Did you have any medical issues arise following your

23  termination that were new to your health history?

24  A.   Yes, I had a couple of panic attacks.

25  Q.   When did that happen?

GC6TPIC4                    Picarella - cross

1   A.  At the end of summer 2015.

2   Q.  Did they happen at home or outside your home?

3   A.  One at home, one outside at the beach with my family.

4   Q.  Who was with you at the beach?

5   A.  My family.

6   Q.  Did you seek medical care?

7   A.  I was airlifted.

8   Q.  Where to?

9   A.  Hospital.

10  Q.  And were you admitted to the hospital?

11  A.  For the day.

12  Q.  And when you were discharged, do you know what the

13  diagnosis was?

14  A.  They weren't sure.  I was told to see my regular doctor,

15  and I tried to set up an appointment, which I did a couple of

16  days later, but I had another panic attack before that.

17  Q.  Did you end up in the hospital that time?

18  A.  Yes, I did.

19  Q.  After this were you prescribed any type of antianxiety

20  medication?

21  A.  Yes, two of them.

22  Q.  What were they?

23  A.  Xanax and Lexapro.

24  Q.  And how long did you take that medication?

25  A.  Until about February of 2016, this year.

```
 1   Q.  And since that time I gather you have not needed that

 2   medication and you're not taking it.

 3   A.  Yeah, I didn't like the way the medication was making me

 4   feel, and so I learned different management techniques if I

 5   start getting anxious.

 6   Q.  Are you on any medical -- unusual medical care today?

 7   A.  No.

 8   Q.  Do you have Exhibit 223 in front of you?

 9           MR. HUBBARD:  Your Honor, may I approach for a moment,

10   please?

11           THE COURT:  Yes.

12           MR. HUBBARD:  I got to find out first if there's any

13   objection to this.

14           THE COURT:  Is there an objection to 223?

15           MR. JACKSON:  Your Honor, we cleared it with defense

16   counsel, and we would just put on the record this is admitted

17   pursuant to the business records exception.  This is admissible

18   pursuant to that exception.

19           THE COURT:  Okay.

20           (Plaintiff's Exhibit 223 received in evidence)

21           MR. HUBBARD:  Thank you.

22   BY MR. HUBBARD:

23   Q.  What is 223, Mr. Picarella?

24   A.  This is my calendar, my work calendar from Lotus Notes, for

25   a period of time.
```

GC6TPIC4                          Picarella - cross

1    Q.   And is it from a work computer or your home computer?

2    A.   Work computer.

3    Q.   And if you look at the lower right-hand corner of the first

4    page it says printed on 6/10/2014.

5    A.   Yes.

6    Q.   Did you print this?

7    A.   Yes, I did.

8    Q.   At your office?

9    A.   Yes.

10   Q.   Does it reflect -- or what period of time does it reflect

11   your office calendar?

12   A.   Looks like it starts in November 2011.

13   Q.   And goes through?

14   A.   April -- June 2014.

15   Q.   Can you tell us from reviewing this if it reflects the

16   daily calls or meeting appointments that you had in this period

17   of time at HSBC?

18   A.   Yes, it looks to be accurate.

19   Q.   Can you tell us if the appointments that are on this

20   exhibit took place, these calls and these meetings took place,

21   or if any of them were canceled?

22   A.   It's hard to say from looking at this if there were

23   cancellations, but for the most part the meetings took place or

24   would be rescheduled.

25   Q.   Well, let me ask you, if they appear on this calendar, how

1   were things deleted -- how were things deleted from the

2   calendar if they did not occur or if they were canceled?

3   A.   That's a good point.  Most times somebody, if they were

4   hosting a meeting and canceled it, they would send a

5   cancellation out, and you would accept that and take it off

6   your calendar.

7   Q.   Are you prepared to tell us from the system at your office

8   if the things that remained on your calendar were things that

9   actually occurred?

10  A.   Yes, I would say so.

11  Q.   Look at the first page of the document.  I want to spend

12  one minute with you.

13  A.   Sure.

14  Q.   Just give us a brief view of what -- where these meetings

15  take place in your office.

16  A.   Where they take place?

17  Q.   Yes.  Where did they take place?

18  A.   Conference rooms, meeting rooms, offices.

19  Q.   Did you leave your desk -- when you sat there between

20  Ms. Parker for a while and Ms. Hedges, did you leave your desk

21  for any of the meetings?

22  A.   Oh, yes, all the meetings were held in conference rooms

23  away from my desk.

24  Q.   Were they on the same floor or other floors?

25  A.   Various floors, depending on the business group I'm working

GC6TPIC4                          Picarella - cross

1    with.

2    Q.  During this period of time would -- let me strike that for

3    a moment.

4              MR. HUBBARD:  Nothing further of this witness at this

5    time, your Honor.

6              THE COURT:  Okay.  Any cross-examination?

7              MR. JACKSON:  Yes, please, your Honor, thank you.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC69PIC5                         Picarella - cross

1              MR. JACKSON:  Thank you very much, your Honor.

2    CROSS-EXAMINATION

3    BY MR. JACKSON:

4    Q.  Good afternoon, Mr. Picarella.

5    A.  Good afternoon.

6    Q.  Sir, it is correct, isn't it, that you were paid over a

7    million dollars during the time period that you were working

8    for HSBC?

9    A.  Can I do the math for a second?

10   Q.  Please.

11   A.  Yes.

12   Q.  The vast majority of that money was paid after you started

13   making your complaints that relate to this case, correct?

14   A.  Yes.

15   Q.  And just to be clear it's your claim that during that

16   entire period that you were collecting hundreds of thousands of

17   dollars from HSBC all these people were engaged in some massive

18   attempt to retaliate against you?

19   A.  I'm sorry.  What is the question?

20   Q.  Yeah.  It's your claim that during this period when you

21   were collecting hundreds of thousands of dollars from HSBC all

22   of the people that you've mentioned in HSBC were retaliating

23   against you?

24             MR. HUBBARD:  Objection, your Honor.  The word

25   collection.

1           THE COURT:  What's your objection?

2           MR. HUBBARD:  The word collection is inappropriate.  I

3    object to it.

4           THE COURT:  Overruled.  Go ahead.  He can answer the

5    question.  Overruled.

6           THE WITNESS:  Yes.  I was paid by the bank while I was

7    there.

8    Q.  Right.  And it's your testimony that all of these people

9    that you've been talking about today were trying to retaliate

10   against you during that time period, right?

11   A.  Which names in particular?

12   Q.  Why don't you give us the names of all of the people that

13   you believe were engaged in an attempt to retaliate against you

14   during the time that you were working at HSBC.

15   A.  I would say Ellen Weiss from human resources.  Eileen

16   Hedges.  Suzy White.  Mr. Pizzimbono.  And Mr. Karam.

17   Q.  Is that it?

18   A.  There may be more that participated.  I don't know.  That's

19   all I can think of.

20   Q.  Wait a minute.  You have been preparing for this testimony

21   for some time, haven't you, sir?

22   A.  Yeah.  For the last couple weeks.

23   Q.  It's been more than the last couple weeks, hasn't it, sir?

24   A.  Not preparing for the testimony.

25   Q.  Well, you have been preparing for your participation in

GC69PIC5                        Picarella - cross

1    this case for years, right?

2    A.  Yes.

3    Q.  You've been going through voluminous documents that you

4    obtained in discovery, correct?

5    A.  Yes.

6    Q.  You've been sitting through depositions, correct?

7    A.  Yeah.

8    Q.  You sat through a number of different depositions in this

9    case, didn't you?

10   A.  Yes.

11   Q.  You sat through all of them, right?

12   A.  No.

13   Q.  The vast majority, right?

14   A.  I'm not sure of that.

15   Q.  Okay.  Numerous hours of depositions though, right?

16   A.  Sure.

17   Q.  At one point you said that preparing for this litigation

18   had basically become your full-time job, right?

19   A.  No.  I don't think I said that exactly.  I mean there were

20   periods in time where it took a lot of my time but it all

21   depended in points of time.

22   Q.  Well there were some weeks where you spent the entire week

23   working on preparing this litigation, right?

24   A.  Yes.  At different points in time.

25   Q.  There were whole months where that was the majority of the

GC69PIC5                      Picarella - cross

1    work that you were doing was dealing with things related to

2    this litigation, right?

3    A.   I wouldn't say months on end.  If you add it up, it might

4    have been a couple of months of time.

5    Q.   Okay.  So what your testimony now is you think that there

6    could be additional people who were involved in the attempt to

7    retaliate against you but in all that time you haven't had

8    enough time to think about it?

9            MR. HUBBARD:  That's argumentative.  Objection.

10           THE COURT:  Please rephrase the question.

11           MR. JACKSON:  Sure.  Excellent, your Honor.

12   Q.   Let me just ask you.  What other people do you think were

13   involved in the attempt to retaliate against you besides the

14   five people that you just named?

15           MR. HUBBARD:  Objection.  Asked and answered.

16           THE COURT:  Overruled.

17           THE WITNESS:  After looking at documents and evidence

18   an example might be Kerry Goodwin.

19   Q.   And who is Kerry Goodwin?

20   A.   Kerry Goodwin was a direct report of Mr. Pizzimbono.  He

21   was an executive that ran the credit sales group.

22   Q.   Okay.  We'll get to that.  Who else?

23   A.   Perhaps Mr. Pietroforte.

24   Q.   Who is Mr. Pietroforte?

25   A.   He was the deputy to Suzy White.

1    Q.  Who else?

2    A.  I'm not sure.

3    Q.  You can't think of any other names of people that you

4    believe were engaged in an attempt to retaliate against you

5    besides these seven?

6    A.  That's a lot.  Yeah.  Not offhand.

7    Q.  That is a lot, right?

8    A.  That is a lot.

9    Q.  There were even more people that you have accused over the

10   course of the years that you were collecting paychecks at HSBC

11   of engaging in an attempt to retaliate against you, aren't

12   there?

13   A.  I'm not sure of that.

14   Q.  You're not certain?

15   A.  (No response).

16   Q.  Let's take a look -- let's take a look at DX-2 -- let's

17   take a look at DX-199.

18              THE COURT:  Are you offering that in evidence?

19              MR. JACKSON:  Yes, your Honor.  I'm going to offer

20   DX-199 into evidence.

21              THE COURT:  Is there any objection?

22              MR. HUBBARD:  No objection.

23              THE COURT:  199 is in.  Go ahead.

24              (Defendant's Exhibit 199 received in evidence)

25              MR. JACKSON:  Thank you, Judge.

GC69PIC5                        Picarella - cross

1              Can we blow up that top part.

2   Q.  And let me just ask you, Mr. Picarella.  You see this

3   e-mail.  Do you recognize this e-mail?

4   A.  Yes, I do.

5   Q.  This is an e-mail that you sent from your personal e-mail

6   which is redacted, right?

7   A.  Okay.

8   Q.  And this is an e-mail that you sent to Maria Malanga,

9   correct?

10  A.  Yes.

11  Q.  By the way, Maria Malanga is another person that you've

12  alleged was attempting to retaliate against you?

13  A.  She worked in human resources.

14  Q.  That wasn't my question, sir.

15  A.  Yes.

16  Q.  She is another person that you have alleged was attempting

17  to retaliate against you, isn't she?

18  A.  Perhaps.

19  Q.  Perhaps?

20  A.  Yeah.

21  Q.  You don't remember?

22  A.  Well she handled a lot of the investigations.

23  Q.  The answer is yes, right?  She's a person that you have

24  accused of attempting to retaliate against you?

25  A.  Sure.

1   Q.  Okay.  Now we have Maria Malanga.  This is an e-mail that

2   you sent to her October 17, 2012.  Can you read us what you

3   wrote in this.

4   A.  Sure.  Hi, Maria.  Thanks for time this morning.  There

5   must be something happening because Mary-Jo and Margaret have

6   been huddling up a great deal more today, including right now,

7   and someone overheard them talking about an HR meeting.  I

8   would once again suggest that Sametime is run on Mary-Jo and

9   Margaret from April 2012 to date.

10  Q.  Who are Mary-Jo and Margaret?

11  A.  They were part of Mr. Pizzimbono's inner circle.

12  Q.  So these are two other HSBC employees who worked there?

13  A.  Yes.

14  Q.  And what you're talking about for Ms. Malanga at this point

15  is that you saw these two women, your colleagues, huddling up?

16  A.  Yes.

17  Q.  Right?  And you said you saw them huddling up a great deal

18  more today because you had seen then huddling up previously,

19  right?

20  A.  Yes.

21  Q.  And you couldn't hear what they were saying?

22  A.  I didn't hear it.

23  Q.  You didn't actually hear it?

24  A.  No.  Someone else did.

25  Q.  I'm asking about you.  You didn't hear it, did you?

GC69PIC5                          Picarella - cross

 1   A.  No, I didn't.

 2   Q.  What you saw was two women talking in the office, right?

 3   A.  Right.

 4   Q.  And you assumed that they must be conspiring against you

 5   when you saw them huddling up in the office, right?

 6   A.  I thought it could have had something though do with the

 7   investigation that was taking place at that time.

 8   Q.  Right.  And as a result of that you e-mailed human

 9   resources and asked them once again if they could run a check

10   to look through these women's communications so that you could

11   see if they were engaged in some sort of conspiracy against

12   you, right?

13   A.  I don't think I called it a conspiracy.

14   Q.  Well you were talking about them huddling, up, right?

15   A.  Yeah.

16   Q.  Because you thought that they were conspiring against you

17   potentially, right?

18   A.  There was an investigation, yes.

19   Q.  And you thought that these two women might be somehow

20   coordinating against you, Michael Picarella, right?

21   A.  Well, Maria Malanga works for Mary Bilbrey and when I first

22   met --

23              MR. HUBBARD:  Sir --

24              THE COURT:  Let him answer the question.

25              THE WITNESS:  When I met first with Mary Bilbrey she

1   told me that she knew the people involved in my claims and she

2   asked me to let her know anything and everything that was going

3   on.  And she said at certain points in time if I'm busy,

4   because she runs HR for the Americas, let Ms. Malanga know.  So

5   I was -- there's a lot of these complaints.  They may seem

6   petty.  But I was following the instructions of Ms. Bilbrey to

7   let her and her team know of anything that was happening

8   against me from the time I met with her.

9   Q.  Are you finished?

10  A.  Yes.

11  Q.  Finish your whole answer?

12          MR. HUBBARD:  Your Honor, I'm just going to object.

13          THE COURT:  Overruled.  Go ahead.

14          MR. HUBBARD:  That kind of comment --

15          THE COURT:  Overruled.  Overruled.  Go ahead, counsel.

16  Q.  My question is at this point it was your suspicion that

17  Mary-Jo and Margaret were conspiring against you in some way?

18  Yes?

19  A.  Yeah.

20  Q.  Now, you had never done anything to Mary-Jo or Margaret,

21  right?

22  A.  No.

23  Q.  And as far as you know Mary-Jo and Margaret had no personal

24  reason to hate Michael Picarella, right?

25  A.  They were very close friends with Eileen Hedges.

GC69PIC5                          Picarella - cross

1    Q.  I see.  So when you saw them talking because they knew

2    Ms. Hedges, because they were friends of Ms. Hedges, you

3    assumed that they must be conspiring against you?

4    A.  It wasn't just an assumption.

5    Q.  Okay.  Let me backup.

6            You said in this e-mail:  I would once again suggest

7    that Sametime is run, right?

8    A.  Yes.

9    Q.  And how many times prior to that had you asked HR to go

10   into people's communications and run checks to see if they were

11   conspiring against you?

12   A.  I think it was during the meetings with Ms. Malanga

13   following my complaints to Ms. Bilbrey.

14   Q.  My question, sir, is how many times --

15   A.  I don't know.

16   Q.  -- had you done this?  You have no idea at this point?

17   A.  Prior to that, to run Sametime messages, I think the first

18   time was in the meetings with Mrs. Malanga and Debra Harmon.

19   Q.  As we sit here today you don't remember how many times you

20   asked HR to run Sametime checks to see what people's

21   communications were, right?

22   A.  I don't remember.

23   Q.  But we can add Mary-Jo and Margaret to the list of people

24   that you have accused of potentially retaliating against you,

25   right?

GC69PIC5                      Picarella - cross

1    A.   Yeah.

2    Q.   So now we have Ms. Weiss, Ms. Hedges, Ms. White,

3    Mr. Pizzimbono, Mr. Karam, Maria Malanga, Kerry Goodwin,

4    Mr. Pietroforte, Mary-Jo, and Margaret, right?

5    A.   Yes.

6    Q.   Is there anyone else that was involved in the global

7    conspiracy against you?

8             THE COURT:   Sustained as to form.   Please rephrase.

9             MR. JACKSON:   Let me rephrase it.   Thank you very

10   much, your Honor.

11   Q.   Is there anyone else who was involved in the attempt to

12   retaliate against you?

13   A.   Not that I can think of at this moment.

14   Q.   Can't think of anyone else.

15            Let's take a look at DX -- actually I'd like to offer,

16   your Honor, DX-222.

17            THE COURT:   Any objection to Defense 222?

18            MR. HUBBARD:   Just look, your Honor, please.

19            No, your Honor.

20            THE COURT:   Okay.   That's in.

21            (Defendant's Exhibit 222 received in evidence)

22            MR. JACKSON:   Can we zoom in on the bottom part of

23   this first.   That's good.   Just -- let's just do the first --

24   the top half of this e-mail here where it says Hi, Mary.

25   Q.   Now this is an e-mail again that you sent, Mr. Picarella,

GC69PIC5                         Picarella - cross

1    right?

2    A.   Yes.

3    Q.   And it's an e-mail that you sent to Mary Bilbrey?

4    A.   Yes.

5    Q.   Let's just take a pause.  Mary Bilbrey was a high ranking

6    HR person at HSBC, right?

7    A.   Head of HR for the Americas.

8    Q.   For the entire Americas, right?

9    A.   Yes.

10   Q.   How many people was she responsible for in terms of her

11   role in HR?

12   A.   I don't know.

13   Q.   Do you know how many employees HSBC has in the Americas?

14   A.   I don't know of the exact number, no.

15   Q.   Well you were a senior vice-president.  You must have some

16   estimate.

17   A.   In the Americas, I wouldn't want to guess.  We had about

18   three hundred thousand globally.  I don't know what -- how many

19   were in the Americas.

20   Q.   Okay.  Safe to say thousands of people in the Americas that

21   HSBC had?

22   A.   Sure.

23   Q.   Right.  And you were repeatedly e-mailing Mary Bilbrey

24   to -- with your personal concerns, right?

25   A.   She wanted me to.

GC69PIC5                              Picarella - cross

```
 1    Q.  My question was you were repeatedly e-mailing Mary Bilbrey

 2    with your personal concerns, correct?

 3    A.  Under her instruction, correct.

 4    Q.  Correct?

 5    A.  Under her instruction, correct.

 6    Q.  The answer is yes?

 7    A.  Sure.

 8               MR. HUBBARD:  Objection, your Honor.

 9               THE COURT:  Overruled.

10    Q.  Now, at this point can you read us what you wrote to

11    Ms. Bilbrey?

12    A.  Yes.  My boss, Carol Jenner, moved her seat next to me in

13    the past few weeks as directed by Suzy White.  Continually

14    throughout the day Carol hums, sings, laughs and talks to

15    herself out loud.  It is very distracting.  Paul Mea sits on

16    the other side of Carol and has mentioned that to me that he is

17    distracted by the conduct.

18    Q.  Continue reading, please.

19    A.  Perhaps you can have someone speak with Carol about this?

20    If you do have someone speak with her please do not have my

21    name mentioned.

22    Q.  Can we go to the next page.

23               Can you read what you wrote next.

24    A.  Separately and as an FYI, I was responding to an e-mail

25    send by Suzy White yesterday.  As I started typing my response,
```

1   Carol Jenner said to me you are sending an e-mail to Suzy.

2   When I turned to respond to Carol, she was looking directly at

3   my screen and e-mail.  As I have mentioned numerous times in

4   the past, Margaret Murray (Pablo's inner circle) and others

5   sitting around me are aware of my involvement with HR and have

6   aggressively looked at my screens.  There is no respect for my

7   privacy.

8   Q.  Now just a couple of questions.  First of all, what does it

9   mean to aggressively look at a screen?

10  A.  Well they're not trying to be inconspicuous about it.

11  Q.  What do you mean by that?  How can you tell someone is

12  aggressively looking at your computer screen?

13  A.  Well in that instance Carol Jenner, her head was actually

14  looking at my computer screen reading the e-mail.  That's how

15  she knew I was sending an e-mail to Suzy White.

16  Q.  Now on the trading floor we've looked at a demonstrative

17  that your attorney showed us.  There are like hundreds of seats

18  out on this floor, right?

19  A.  Yeah.

20  Q.  And people are sitting right next to each other, behind

21  each other?

22  A.  Yes.

23  Q.  Everyone can see a lot of people's screens, correct?

24  A.  Yeah.

25  Q.  In fact, you've looked at other people's scenes at times,

GC69PIC5                              Picarella - cross

```
 1    correct?

 2    A.  No.  Not purposely.

 3    Q.  Well, you've certainly eavesdropped on people's

 4    conversations purposefully, right?

 5    A.  Well when they're talking out loud sitting next to you

 6    sometimes it's hard to not overhear the conversations.

 7    Q.  I see.  You accidentally looked at people's screens, right?

 8    A.  Perhaps.

 9    Q.  I mean you've sent e-mails, haven't you, talking about

10    things that you saw on other people's screens, correct?

11    A.  I don't think so.

12    Q.  You don't remember that?

13    A.  No.

14    Q.  Now, here, your complaint that you were sending to the

15    global head of HR for the Americas was that you thought

16    Ms. Jenner, your colleague, was humming too much in the office?

17    A.  It was very distracting, the things she was doing at the

18    desk.

19    Q.  And you thought that that was an appropriate type of

20    complaint to send to the global head of HR for the Americas?

21    A.  It may seem petty but in the course of the day there was

22    continuous animus towards me and there was a lot of little

23    things going on and Mary Bilbrey had told me to report these

24    things to her.

25    Q.  I see.  So you believed that this humming was part of the
```

GC69PIC5                         Picarella - cross

1   retaliatory attempt to antagonize you?

2   A.  A little bit, yeah.

3   Q.  So it was your belief that Ms. Jenner was also one of the

4   people engaged in the attempt to retaliate against you?

5   A.  Perhaps.

6   Q.  Okay.  So we can add to the list we had before Ms. Jenner,

7   right?

8   A.  Yeah.  I'm not sure if that was retaliatory or just strange

9   behavior but I was adding it to the list.

10  Q.  Okay.  And so when you also are talking about the fact that

11  she was aggressively looking at your computer screen you were

12  talking about that in the context of your suspicion that this

13  was part of an attempt to retaliate against you, right?

14  A.  Yeah.

15  Q.  Now, we've now added Carol Jenner after Mary-Jo and

16  Margaret.

17          Are there any other people during the time period that

18  you were working there that you suspected of being engaged in

19  the attempt to retaliate against you?

20  A.  There may have been other people with similar circumstances

21  that you're bringing up that I might have mentioned to Mary

22  Bilbrey.

23  Q.  I'm just asking right now can you help us identify who

24  these people are at HSBC that were all trying to retaliate

25  against you.

GC69PIC5                          Picarella - cross

1    A.   I forget offhand.

2    Q.   Now, you again, you've had an opportunity to look through

3    voluminous discovery, right?

4    A.   Yes.

5    Q.   And you've studied these documents, haven't you?

6    A.   Not all of them.

7    Q.   A lot of them, right?

8    A.   There was over 80,000 documents.

9    Q.   Right.  And you've looked at a lot of them, right?

10   A.   A lot but not all of them.

11   Q.   Certainly you've looked at a lot of them in preparation for

12   your testimony, right?

13   A.   Yes.

14   Q.   And so you're saying that as you sit here now you just

15   don't know whether there are additional people who might have

16   been involved in the attempt to retaliate against you?

17   A.   Like I said there was animus towards me on a daily basis,

18   right.  So the example you gave before with Margaret and

19   Mary-Jo, there was another instance where Margaret Murray

20   accused me of trying to trip her and stealing stuff from her

21   desk, which I had done neither.  So I reported that to Mary

22   Bilbrey.

23   Q.   I see.  Let's take a look at that.  That's interesting.

24   A.   Yeah.

25           MR. JACKSON:  Your Honor we offer DX-220.

| 1 | THE COURT:  Any objection to 220? |
| 2 | MR. HUBBARD:  No, your Honor. |
| 3 | THE COURT:  Okay.  220 is in. |
| 4 | (Defendant's Exhibit  220 received in evidence) |
| 5 | MR. JACKSON:  Can we blow up the bottom part of this. |

Q.  Now this is another e-mail that you were again sending to the global head of HR, right?

A.  Yes.

Q.  By the way, you don't accuse Ms. Bilbrey of being one of the people who was engaged in an attempt to retaliate against you, do you?

A.  No.  But she just never helped me as she promised that she would.

Q.  You looked unsure.  When you say she never helped you as she promised she would, does that mean that you believed that she's a possible person who is engaged in an attempt to retaliate against you?

A.  I'm not sure.

Q.  You're just not sure right now?

A.  I'm just not sure.

Q.  So you would place her in the category of it's impossible for you to tell?

A.  Yeah.

Q.  But it's a fact, isn't it, that you sent numerous e-mails to Ms. Bilbrey, right?

GC69PIC5                    Picarella - cross

1   A.  I sent a lot.  What may seem to be petty complaints, but

2   she wanted me to.

3   Q.  I'm not asking about the pettiness.  I'm not accusing you.

4   I've never used that word.

5        What I'm just asking you is you've sent numerous

6   e-mails to her, right?

7   A.  I did.

8   Q.  And she always responded to you in a professional manner

9   didn't she?

10  A.  Yes.

11  Q.  In fact, she took your concerns seriously as far as you

12  could tell, right?

13  A.  She did.

14  Q.  Let's go to the top.  Just to glance back at that.  Let's

15  just look at the top -- you can take off this box.

16       Now, you know, let's go to the bottom again.  And I

17  want to ask Mr. Picarella if he could read what he wrote to

18  Ms. Bilbrey.

19  A.  Sure.

20       Hi, Mary.  Just a few examples from yesterday of what

21  I continue to experience at work each day across the

22  organization:

23       I was sitting at my chair at my desk reading a

24  document and Margaret Murray (Pablo's assistant and inner

25  circle) walked by and in a serious tone told me that I tried to

1      trip her and that she almost tripped.

2              Separately, Margaret had her desk drawer open next to

3      me -- next to me open while she was away from her desk.  When

4      she returned, she accused me of stealing from her drawer.  She

5      was not joking.

6              Trader, Bo Prempeh --

7              THE COURT:  Hold on.  The question is just to read

8      that.  Don't add anything that's not there.

9      A.  Okay.  What did -- did I add something in?

10             THE COURT:  Go ahead.  That's fine.

11             THE WITNESS:  Trader, Bo Prempeh, who sits behind me

12     was consistently looking at my computer and desk throughout the

13     day.  At one point I went to get out of my chair and it bumped

14     into him because he was standing right behind me looking over

15     my shoulder.

16     Q.  So, first of all, who is Bo Prempeh?

17     A.  He was a trader who sat behind me.

18     Q.  And what you're talking about here when you say -- what is

19     the date of this e-mail?

20     A.  I can't see.

21             MR. JACKSON:  Can we show what the date of this is,

22     please.  If you could just zoom in on the whole top half.

23     Q.  Does that seem accurate to you --

24             MR. JACKSON:  No, no, no.  I meant where you were

25     before.  I'm sorry.

GC69PIC5                        Picarella - cross

1    Q.   March 13, 2013?

2    A.   Yes.

3         MR. JACKSON:   Now, go back to the text of it, beneath

4    that, please.

5    Q.   And what you said is:  Just a few examples from yesterday

6    of what I continue to experience at work each day across the

7    organization; right?

8    A.   Yes.

9    Q.   And what you're talking about is what you were experiencing

10   in terms of retaliation for your complaints, right?

11   A.   Yes.

12   Q.   And so these are additional incidents that you claim were

13   part of this across-the-organization attempt to retaliate

14   against you, right?

15   A.   Yes.

16   Q.   And so Bo Prempeh who is a trader, you are -- just to

17   understand the nature of what you're suggesting, you're saying

18   that he sits right behind you, right?

19   A.   Well a few feet behind me, yes.  His desk is aligned behind

20   me.

21   Q.   Because on the trading floor there is sometimes a chair

22   right immediately behind you, right?

23   A.   Well there was enough space between us there.

24   Q.   Well what I'm saying is there's sometimes a chair right

25   behind you, right?

GC69PIC5                        Picarella - cross

1   A.  Yes.  Somebody sitting behind me.

2   Q.  And somebody is working on a different screen?

3   A.  Yes.

4   Q.  And it was your suspicion that because your chair -- your

5   chair when you backed up bumped into Bo Prempeh that this must

6   be part of an attempt to retaliate against you?

7   A.  Well, when I bumped into Bo he was standing with his arms

8   folded like this staring at my screens.  And I looked --

9   Q.  So, let me just get this straight.

10  A.  Yeah.

11  Q.  You're sitting in the chair, right?

12  A.  Yeah.

13  Q.  You start backing up.  Did you look back before you started

14  backing up?

15  A.  No.  I just started to push away from my desk and it moved

16  a couple inches and it hit into him.

17  Q.  So you hadn't looked back before you started backing up?

18  A.  No.

19  Q.  Is this funny?  I'm just asking.  I'm trying to understand.

20  A.  No.  I didn't know -- I didn't know -- no.

21  Q.  So you had not looked back, correct?

22  A.  I had not looked back.

23  Q.  And you bumped into him?

24  A.  Well it wasn't a hard bump because I didn't get too far.

25  Q.  I'm not asking how hard it was.

1   A.   I bumped into him, yes.

2   Q.   You bumped into him.

3          And so at that point you turned around and you saw Bo

4   Prempeh, right?

5   A.   Yes.

6   Q.   So you don't know what he was doing immediately before you

7   bumped into him, right?

8   A.   Well, I think I do because as soon as it hit I turned and I

9   saw him -- he was right there with his arms folded reading my

10  e-mail on my screen.

11  Q.   I see.  Okay.  So it's your suspicion that because of this

12  incident where you bumped into him with his chair, because he

13  had his arms folded that he was -- that he was looking -- and

14  he was looking in the direction of your screen, that he was

15  involved in the across-the-organization attempt to retaliate

16  against you?

17  A.   He was very close friends with, yes, the people that were a

18  part of Pablo's inner circle.

19  Q.   So the answer to my question is yes?  You believe that he

20  was -- when he did this, because you saw this, he was part of

21  the across-the-organization attempt to retaliate against you?

22  A.   Yeah.  There was a great deal of animus towards me on a

23  daily basis.

24         Like those examples that we were reading with Margaret

25  Murray, she was serious.  There was no attempt to trip her.  I

GC69PIC5                    Picarella - cross

1   did not steal anything from her desk.

2   Q.  Sir, we'll get to that.

3   A.  Okay.

4   Q.  I just want to clarify.  We can add Bo Prempeh to a list of

5   people across the organization who were attempting to retaliate

6   against you, you believe, right?

7   A.  I don't know if it's animus or retaliation but it was not

8   friendly behavior.

9   Q.  I see.

10  A.  Retaliation is somebody senior who takes an action

11  potentially and does something to your career.  So, I don't --

12  Bo wasn't in a position to affect my career but he was friends

13  with Margaret and Mary-Jo and Eileen Hedges.  He had worked

14  there a long time.  He was very close with them.  I believe he

15  lived in the same town as a couple of them.  His behavior and

16  action towards me changed over time.  Same thing with Margaret.

17  Q.  Sir, sir, sir.  I'm only asking you a very simple yes-or-no

18  question.  Can we add Bo Prempeh to the list?

19  A.  Sure.  Go ahead.

20  Q.  So now we have Ms. Weiss, Ms. Hedges, Ms. White,

21  Mr. Pizzimbono, Mr. Karam, Maria Malanga, Kerry Goodwin,

22  Mr. Pietroforte, Mary-Jo, Margaret, Carol Jenner and Bo

23  Prempeh, right?

24  A.  Sure.

25  Q.  Is there anyone else that we need to add to this list of

GC69PIC5                          Picarella - cross

1    people who were attempting to retaliate against you?

2    A.  Not that I can think of.

3    Q.  At this moment you can't think of anyone else?

4    A.  Not at the moment.

5    Q.  Now, we'll come back to that.

6         By the way, this is -- let's go to the top of this

7    just to close this out and can you just read what Ms. Bilbrey

8    responded to you?

9    A.  Yes.

10        Mike, thank you for raising the issues and I remain

11   concerned that you continue to have these experiences in the

12   workplace.  I have discussed this matter at length with the

13   head of employee solutions team and have asked Maria Malanga to

14   reach out to you either today or tomorrow to discuss possible

15   next steps.

16   Q.  And this was a professional response in your mind, correct?

17   A.  Absolutely.

18   Q.  It was a courteous response, correct?

19   A.  Yes, and consistent with what she wanted me to tell her

20   these things.

21   Q.  And Maria Malanga did, in fact, speak to you about that,

22   right?

23   A.  I believe so.

24   Q.  Right.  There was an investigation even of these types of

25   complaints, right?

GC69PIC5                          Picarella – cross

```
 1   A.  I'm not sure of that.
 2   Q.  Okay.  Now what was the point that you first began to
 3   observe that Ms. Hedges was engaged in the type of
 4   inappropriate conduct that you described in your direct
 5   testimony with regard to Ms. Parker?
 6   A.  (No response).
 7   Q.  Let me just clarify.  When I say "what was the point," I
 8   mean what was the date?
 9   A.  Maybe my first day of work.
10   Q.  Your very first day of work?
11   A.  May 5, 2011 I would say.
12   Q.  Right.  And you continued to observe that throughout the
13   first few months that you were there, right?
14   A.  Yes.
15   Q.  And it's your testimony this had a serious impact that you
16   could see right at that time, was having a serious impact on
17   Ms. Parker?
18   A.  I didn't see that at first.
19   Q.  How long did it take for you to see that this was having an
20   impact on Ms. Parker?
21   A.  A few months.
22   Q.  What is the date that you began to see that this had an
23   impact on Ms. Parker?
24   A.  I don't know the exact date.
25   Q.  What is your estimate?
```

1   A.  I would say in the fall of 2011.

2   Q.  Okay.  And but to be clear from May up until that point

3   you're observing this and you didn't approve of the way

4   Ms. Hedges was behaving towards Ms. Parker during that time,

5   right?

6   A.  I didn't fully understand what was happening at that time.

7   Q.  But you said you were observing it right from your first

8   day, right?

9   A.  Yeah.

10  Q.  And is it your testimony that you approved of what you saw

11  initially?

12  A.  No.  I didn't say I approved it.  I just wasn't sure of

13  what was happening.  It took me a while to figure things out.

14  Q.  Did you -- let me just ask you.  You filed on EEOC

15  complaint that we looked at, correct?

16  A.  Yes.

17  Q.  And we also marked that as an exhibit.  I'd like to offer

18  that.  DX-232.  Is there any objection?

19          MR. HUBBARD:  No objection.

20          THE COURT:  All right.  232 is in.

21          (Defendant's Exhibit  232 received in evidence)

22          MR. JACKSON:  Can we look at DX-232, page four.

23          Can you just zoom in to paragraph eleven.

24  Q.  What you said is almost immediately after I joined the

25  bank, I observed that Hedges regularly disparaged Parker's

GC69PIC5                          Picarella - cross

1    character in conversation with other employees outside Parker's

2    presence, accusing her of sleeping with bank customers.  Right?

3    A.  Yes.

4             MR. JACKSON:  Can we take this down.

5             You can take this exhibit down.

6    Q.  But in this you're talking additionally about the fact that

7    you were observing, and you said in this paragraph, almost

8    immediately after joining the bank, you were observing Hedges

9    was constantly harassing Parker, insisting that she accompany

10   her in the late afternoon to bars and then to the office and

11   then criticizing her for doing so, right?

12   A.  Yes.

13   Q.  And you did not approve of that, right?

14   A.  Like I said, I didn't understand what was happening at that

15   point.  Ms. Hedges had had me believing for the first few

16   months that Ms. Parker was toxic and she was on the verge of

17   being fired.  So a lot of the stories that Ms. Hedges was

18   coming back and telling me, I was a new employee, I worked for

19   Ms. Hedges.  I had no reason at that time to doubt what she was

20   telling me.

21   Q.  Sir, I'm not --

22   A.  In retrospect --

23             MR. HUBBARD:  Objection, your Honor.  May he finish

24   his answer.

25             THE COURT:  Hold on.  Go ahead.  Finish your answer.

1        THE WITNESS:  Thank you.  At that point in time I had

2    no reason to doubt what Ms. Hedges was telling me and whether

3    these stories were true or not.  She was telling me she was

4    going out with her and coming back and she was sleeping with

5    this one and sleeping with that one.  And I did see Ms. Parker

6    upset.  Yes.

7    Q.  I'm not asking whether you had reason to believe it.  What

8    I'm asking you is, yes or no, did you approve of what you were

9    seeing Ms. Hedges doing with Ms. Parker?

10   A.  I didn't understand it at that time.

11   Q.  What didn't you understand?

12        MR. HUBBARD:  Objection, your Honor.  I mean --

13        THE COURT:  Overruled.

14        MR. HUBBARD:  May we approach?

15        THE COURT:  What did you mean when you said you didn't

16   understand?

17        THE WITNESS:  I didn't understand that Ms. Hedges was

18   basically -- I don't know how else to put it and maybe this

19   might not be -- you're making faces every time I'm talking.

20   It's distracting me a little bit.

21        THE COURT:  Hold on.  Just please, just answer the

22   question.

23        THE WITNESS:  I didn't fully understand at that point

24   in time.  I was listening to Ms. Hedges, my boss, telling me

25   that she was a problem employee, that she had problems, that

1   Ms. Parker had problems.  And I didn't understand until a few

2   months later that it was really Ms. Hedges that was sort of,

3   and excuse the term, pimping Ms. Parker out to other executives

4   and people in the bank.

5           And it took me a little while to figure out that the

6   problem wasn't Ms. Parker, that it was Ms. Hedges.  And that's

7   why I don't know an exact date.  It took me a few months.

8           And did I see crazy things from day one?  I did.  And

9   you know I'm -- it's not my style, right.  I'm a man of faith.

10  I didn't approve of anything I saw.  But I didn't know that

11  Ms. -- it was Ms. Parker or Ms. Hedges, what was really

12  happening here, okay.

13          And it took me a little while.  It's hard to say.  And

14  I'm a new guy.  I'm the new guy.  I'm learning.  I'm learning

15  the organization.  I'm doing new work.  It wasn't something

16  that I figured out on day one that, you know, this stuff was

17  happening and it was -- it was the result of one person and not

18  the other.

19  Q.  I see.  Whatever the case may be, during this time period

20  you were having numerous conversations with Ms. Hedges where

21  you were disparaging Ms. Parker, correct?

22  A.  (No response).

23  Q.  And that's a yes or no, sir.

24  A.  Disparaging or in agreement with some of the things I

25  thought I was seeing that Ms. Hedges was telling me.

1   Q.  My question is during that time period, yes or no, you were

2   having numerous conversations with Ms. Hedges where you were

3   disparaging Ms. Parker, correct?

4   A.  Disparaging, I would like the definition of what you mean,

5   disparaging.  Because, yes, I was having conversations with

6   Ms. Hedges on some of the things that I thought I was

7   understanding from Ms. Hedges, right.  And, again, it was early

8   on.  I didn't fully understand what was taking place.

9   Q.  Mr. Picarella, I'm not trying to confuse you.  You're --

10  you have a business degree, correct?

11  A.  Yes, I do.

12  Q.  You have a bachelor's degree from Hofstra, right?

13  A.  Yes.

14  Q.  An educated man, right?

15  A.  Yes.

16  Q.  You understand what the word disparaging means, don't you?

17  A.  I do.  And I view it in -- some people could view

18  disparaging as name calling, right, which is not something I

19  partake in, but I did notice behavioral stuff was going on with

20  Ms. Parker, right, when she was crying at her desk or speaking

21  with different people.  And then I'm listening to my new boss

22  tell me that this Ms. Parker is toxic.  I'm engaged with

23  conversations with my boss.  And it was with my boss that I

24  was -- I was seeing things that she was telling me.  And but I

25  didn't fully understand it at that point.

GC69PIC5                           Picarella - cross

```
 1    Q.  Sir, I just want to ask just very simply, yes or no, during
 2    this time period you were having a number of conversations with
 3    Ms. Hedges where you were disparaging Ms. Parker, correct?
 4    A.  Yes.
 5    Q.  And just to be clear this is during a time period where you
 6    claim that you were concerned about what was happening to her,
 7    right?
 8    A.  I think it took me a little while to become concerned with
 9    what was happening.  It wasn't a right away.
10    Q.  So initially you weren't concerned and then after September
11    you became concerned?  Is that your testimony?
12    A.  May have been a little later than that.  I'm not exactly
13    sure of the timeframe.
14    Q.  You're not completely sure when it was that you became
15    concerned?
16    A.  Well, when I realized that Ms. Parker wasn't the toxic
17    person that Ms. Hedges was pointing her out to be and that it
18    was actually the behavior of Ms. Hedges that was having an
19    impact on Ms. Parker.  It took me some time to figure it out.
20    Q.  When you -- by the way, when you filled this EEOC complaint
21    out you signed it, right?
22    A.  Yes, I did.
23    Q.  And you said:  I swear or affirm that I have read the above
24    charge and that it is true to the best of my knowledge,
25    information, and belief, right?
```

1   A.  Yes.

2   Q.  You signed it under the part where it says:  I declare

3   under penalty of perjury that the above is true and correct,

4   didn't you?

5   A.  Yes.

6   Q.  Did you think that you were correct when you said:  Almost

7   immediately after I joined the bank I observed that Hedges

8   regularly disparaged Parker's character in conversations with

9   other employees outside Parker's presence accusing her of

10  sleeping with bank customers?

11  A.  Yes.

12  Q.  You believed that was accurate?

13  A.  That was happening, yes.

14  Q.  And it's your testimony that even though you observed this

15  starting on day one it wasn't clear to you until some months

16  later whether or not this was okay?

17  A.  Yes.

18  Q.  I see.

19          Now, it's also the case, isn't it -- I mean there are

20  conversations that you had, there was a conversation that you

21  had in July with Ms. Hedges over Sametime where you said to her

22  about Ms. Parker, I can't take the drama and that you try to

23  keep your distance, right?

24  A.  Yes.

25  Q.  And you said I don't know what to believe with her

GC69PIC5                         Picarella - cross

1    boyfriend.  It's a tangled web.  Right?

2    A.  Yes.

3    Q.  And so you were talking with Ms. Hedges about Ms. Parker's

4    personal life, right?

5    A.  I'm sorry?

6    Q.  You were talking with Ms. Hedges about Ms. Parker's

7    personal life, right?

8    A.  Yes.

9    Q.  And how you were exasperated with the drama that you

10   associated with her, right?

11   A.  Yes.

12   Q.  And this is months after you started, correct?

13   A.  What was the date?

14   Q.  July 12, 2011.  Correct?

15   A.  Right.

16   Q.  So this is a couple of months after you had already been

17   there, right?

18   A.  Yes.

19   Q.  Observing what you said was inappropriate conduct on behalf

20   of Mrs. Hedges, right?

21   A.  Well at that time I didn't know it was Ms. Hedges'

22   inappropriate conduct.  That's what I'm trying to say.

23   Q.  I see.  Now, you also had conversations with -- we talked

24   earlier, your attorney took a look at the -- at some of the

25   policies of HSBC, correct?

1   A.  Yes.

2   Q.  And you saw one of the policies of HSBC has to deal with

3   not making comments that are inappropriate, right?

4   A.  Sure.

5   Q.  You made some inappropriate comments during the time that

6   you were communicating with Ms. Hedges, right?

7   A.  I don't think so.

8            MR. JACKSON:  Let's take a look -- I'd like to

9   offer --

10  Q.  Let me just ask you.  Do you recall a conversation that you

11  had in June of 2011 with Ms. Hedges where you said to her that

12  your wife just tortured you for the last hour.  She was

13  supposed to do the benefits online but couldn't access so I had

14  to do it with her on the phone.  Ugh.  I mentally strangled her

15  half a dozen times.

16           Do you remember saying that?

17  A.  I don't.  But I might have said that at the time.

18  Q.  Do you remember saying to her, after Ms. Hedges says bring

19  home flowers, do you remember saying:  I was thinking a lead

20  pipe?

21  A.  I don't remember that.  But I might have said it.

22           MR. JACKSON:  Your Honor, may I approach and I'd like

23  to show a document which is marked with a Bates stamp 3780 to

24  the witness.

25           THE COURT:  Counsel, you have that?

1            MR. HUBBARD:  I have no idea what it is.

2            THE COURT:  Just show it to counsel first.

3            MR. HUBBARD:  Your Honor, it's not on the exhibit list

4    but for purposes of refreshing recollection I don't have any

5    objection.

6            THE COURT:  Well which purpose are you using this for?

7    Is that for --

8            MR. JACKSON:  Right now I'm just refreshing his

9    recollection.

10           THE COURT:  Okay.  Go ahead.

11   Q.  Having looked at this document, Mr. Picarella, does that

12   refresh your recollection of the conversation that you had with

13   Ms. Hedges on June 3, 2011?

14   A.  I don't -- still don't remember it but reading it we

15   obviously had it.  It was a longer conversation than what you

16   had just read and we were clearly joking around with each

17   other.

18   Q.  But what you said was:  I was thinking a lead pipe, right?

19   A.  Yes.  It was a joke.

20   Q.  You were making a joke about beating your wife with a lead

21   pipe with Ms. Hedges?

22           MR. HUBBARD:  Objection, your Honor.

23           THE COURT:  Sustained.

24   Q.  Now, you also during this time period -- now, certainly,

25   sir, by November of 2011 you had come to recognize that the

GC69PIC5                         Picarella - cross

1  behavior of Ms. Hedges you viewed as inappropriate, right?

2  A.  Yes.

3  Q.  And you were concerned about what was happening with

4  Ms. Parker at that time period, correct?

5  A.  Yes.

6  Q.  But you continued to engage in further conversations

7  disparaging her during this time period, didn't you?

8  A.  I don't remember.

9  Q.  You think it's possible?

10  A.  Sure.

11  Q.  It is a fact, isn't it, that on November 3, 2011 you had a

12  conversation with Mary-Jo Rogers where you reference -- where

13  you said they feed on each other -- I'm sorry.  Where she said

14  they feed on each other.  And you said:  Yes, needs to be

15  broken up.

16        Correct?

17  A.  I might have said that, yes.

18  Q.  And what you were talking about is Ms. Hedges and

19  Ms. Parker, right?

20  A.  Yes.

21  Q.  And so you were talking about the fact that at that point

22  that you were bothered by the interaction between the two of

23  them in saying that they feed on each other, right?

24  A.  I don't recall being bothered by it.  I just -- I know

25  there were points in time I had made other comments similar to

1   that where they needed to be separated and split up.

2   Q.  I see.

3              MR. JACKSON:  Can we -- I'd like to offer DX-25.

4              THE COURT:  Any objection to 25?

5              MR. HUBBARD:  No, your Honor.

6              THE COURT:  Okay.  It's in.

7              (Defendant's Exhibit  25 received in evidence)

8              MR. JACKSON:  Can you zoom in on the bottom half of

9   this.  Start at the 8:11 mark.  All the way down to the bottom.

10  Q.  Now this is a conversation between you and Ms. Hedges,

11  correct?

12  A.  Yes.

13  Q.  And this is in the end of the summer 2011, right?

14  A.  I didn't see the date.

15  Q.  It's in August 2011, right?

16  A.  Yes.

17  Q.  And you're talking here -- there's a point where you guys

18  are talking about Ms. Parker, right?

19  A.  Yes.

20  Q.  That's what you refer to as MP, right?

21  A.  Yes.

22  Q.  And Ms. Hedges says:  No MP.  And your response is:  She's

23  very sneaky.

24             Right?

25  A.  Yes.

1    Q.  And then you say:  A lot of whispering with her friends

2    that stop to see her here?

3    A.  Yes.

4    Q.  I'm sure she has painted herself as the victim?

5    A.  Yes.

6    Q.  And this is you disparaging Ms. Parker to Ms. Hedges at the

7    end of the summer of 2011, right?

8    A.  Yeah.  At that point in time I was still listening to

9    Ms. Hedges.  She had told me that often Ms. Parker would say

10   that she works from home and that she had done her own

11   investigating calling the Hampton jittery and found out that

12   Ms. Parker had tickets.

13            So, yes, I engaged in some of that banter at that time

14   not realizing that that was probably not the case.

15   Q.  Let me just repeat my question.  This is you disparaging

16   Ms. Parker to Ms. Hedges at the end of the summer of 2011,

17   correct?

18   A.  Yes.

19   Q.  And so you're talking about her painting herself as the

20   victim, right?

21   A.  Yes.

22   Q.  Which you're writing because at that point you didn't

23   believe that she was a victim, right?

24   A.  I was listening -- Ms. Hedges' stories made me feel like,

25   yes, she would do that.  She would paint herself as the victim.

1   She was crying at the desk or complaining about things.

2              Ms. Hedges' version to me was that she was always

3   trying -- drumming up drama and she's the victim.  But, again,

4   at that point in time I tended to believe my new boss.  I

5   was -- she was a senior vice-president.  She was running

6   business development Americas.  I was her deputy.  Ms. Parker

7   was an analyst.  You know, I didn't know she was --

8   Q.  Sir, sir, I'm just asking you a very simple question.

9   A.  Sure.

10  Q.  At this time you did not believe she was a victim?

11  A.  Right.

12  Q.  And I just want to go back to what you said in your EEOC

13  complaint.

14  A.  Yes.

15  Q.  You said:  Almost immediately after you joined the bank you

16  observed that Hedges regularly disparaged Parker's character.

17  And then you said some other things accusing her of sleeping

18  with bank customers, right?

19  A.  Right.  And that is true.

20  Q.  So these are things that you had been observing, the stuff

21  you describe in your EEOC complaint?

22  A.  Yes.

23  Q.  For months by this point, right?

24  A.  Yeah.

25  Q.  And you still at this point, your view, you didn't view her

GC69PIC5                          Picarella - cross

1    as the victim?

2    A.   Who?

3    Q.   Ms. Parker?

4    A.   Right.  I wasn't sure.  Right.  Exactly.

5    Q.   You thought it was appropriate at this point to disparage

6    her in e-mails with Ms. Hedges?

7    A.   Yeah, it was some banter, yes.

8    Q.   You're using the word banter.  You're disparaging her,

9    right?

10   A.   Yes.

11   Q.   You're calling her sneaky?

12   A.   Yes.

13            MR. JACKSON:  Can we take that down.

14   Q.   By October of 2011 had you figured out in your view that

15   Ms. Hedges was the bad actor?

16   A.   October -- I'm not sure of the exact time when.  It could

17   be -- she was out, I know, for most of October with a stomach

18   reduction surgery.

19   Q.   Mr. Picarella --

20   A.   I don't know the exact timing.

21   Q.   Before you filed your EEOC complaint --

22   A.   Yes.

23   Q.   -- you sat down and you tried to figure out the timing of

24   when stuff happened, right?

25   A.   Yes.

1    Q.  You understood that this was very serious for you to file a

2    sworn complaint to the EEOC, correct?

3    A.  Yes.

4    Q.  You took it seriously, didn't you?

5    A.  Absolutely.

6    Q.  And before you did that you endeavored to understand the

7    timeline, didn't you?

8    A.  Yes.

9    Q.  That was more than two years ago, right?

10   A.  Yes.

11   Q.  Since that time you've had additional years to try to

12   figure out the timeline, right?

13   A.  Yes.

14   Q.  And you've listened to numerous hours of deposition

15   testimony from all of the people that you've gotten involved,

16   right?

17   A.  Yes.

18   Q.  And you've looked at numerous documents, right?

19   A.  Yes.

20   Q.  And it's your testimony today that you still can't figure

21   out when it was that you determined that Ms. Hedges was the bad

22   actor?

23   A.  It was around that timeframe, October, November.  I don't

24   know the exact, you know, date.

25   Q.  Okay.

GC69PIC5                        Picarella - cross

1          MR. JACKSON:  I'd like to offer DX-33, please.

2          THE COURT:  Any objection to 33?

3          MR. HUBBARD:  No, your Honor.

4          THE COURT:  Okay.  They're in.

5          (Defendant's Exhibit  33 received in evidence)

6          MR. JACKSON:  Thank you, Judge.

7          Can you zoom in on the text part.

8  Q.  By the way at the beginning -- this is in October 7, 2011,

9  Sametime Chat between you and Ms. Hedges, right?

10 A.  Yes.

11 Q.  And you still have a very chummy relationship with her at

12 this point, correct?

13 A.  Yeah.

14 Q.  You start this out:  Hello, how's dinner?

15 A.  Okay.

16 Q.  Right?

17 A.  Yes.

18 Q.  And you used very friendly language generally in your

19 communications with Ms. Hedges throughout most of 2011,

20 correct?

21 A.  Pretty much always, yes.

22 Q.  Sometimes you would say to her love you?

23 A.  Maybe.

24 Q.  You don't remember?

25 A.  I might have.

GC69PIC5                        Picarella - cross

```
 1   Q.  It's possible?

 2   A.  Right.

 3   Q.  Okay.  Now what you wrote here, right, there's a point if

 4   we look at the 7:47:15 mark, you wrote:  He's working against

 5   me and making it obvious.  I'm concerned he's trying to use

 6   you.

 7           Right?

 8   A.  Okay.

 9   Q.  And that refers back to the 7:42 part, correct?

10   A.  It may, yes.

11   Q.  It may or it does?

12   A.  I don't remember the specifics about this particular text.

13   Q.  Do you remember a situation that you had with someone named

14   Kieran at that point?

15   A.  I worked with Kieran.  He was a relationship manager.  He

16   was one of hundreds of relationship managers.  And I worked a

17   lot with him and his team.

18   Q.  Did you have some sort of beef with him at this point?

19   A.  There may have been a business difference at that point in

20   time.

21   Q.  You don't remember?

22   A.  Well, we worked with -- the sales team worked with

23   relationship managers a lot.  There may have been -- there was

24   a lot of disputes over taking clients onboard or not.

25   Q.  I see.  But you were going to Ms. Hedges at this point
```

1    because you viewed her as someone that you could trust, right?

2    A.  Yeah.  She was my boss.

3    Q.  So by October of 2011 even though you had been observing

4    for months what you viewed as improper activity between her and

5    Ms. Parker you still viewed her as sort of like a confidant?

6    A.  Yes.  I -- in general, I liked Ms. Hedges.  I didn't like

7    her behavior.

8    Q.  I see.  And one of the things that you say here is I'm

9    concerned he's trying to use you.  Right?

10   A.  Yeah.  I'm not sure I remember what that was in reference

11   to.  But she was my boss.  We talked in confidence a lot about

12   business and getting things done.

13   Q.  To be clear, this is before you made any complaints about

14   alleged sexual harassment, correct?

15   A.  Yes.

16   Q.  So to whatever extent you had any beef with Kieran, he's

17   not someone that you would add to the list of people who were

18   engaged in an attempt to retaliate against you, right?

19   A.  I don't know.

20   Q.  You think it's possible that he was attempting to retaliate

21   against you before you ever made any complaints?

22   A.  No.  No.  No.  Not -- no.  I was talking in general.  No.

23   He's not retaliating against me.

24   Q.  At this point clearly Kieran was not retaliating against

25   you, right?

GC69PIC5                          Picarella - cross

1    A.   Yeah.

2    Q.   But you think it's possible at some later point he may have

3    been engaged in an attempt to retaliate against you?

4    A.   I don't know.  He was very close friends with Ms. Hedges.

5    Q.   Okay.  So he's a name that we should add to the list of

6    people that you suspect were attempting to engage in

7    retaliatory-- I'm not joking.

8    A.   Yeah.

9    Q.   Yes?

10   A.   I don't know.  I don't know.

11              MR. JACKSON:  Can we take this down.

12   Q.   Now, sir --

13              MR. JACKSON:  Can you call up again DX-232 at page 6.

14              Can we go to paragraph 18.

15   Q.   Can you read what you wrote at paragraph 18 in your sworn

16   EEOC complaint?

17   A.   Yes.

18              By year end 2011, when I met with Hedges for my

19   performance review, she told me that Pizzimbono and Suzy White,

20   who was the COO of global markets Americas, did not think

21   highly of me and that it might be a good idea if I looked for

22   another job.  I had been employed by the bank for only six

23   months and Hedges was telling me to do what's best for you and

24   your family.

25   Q.   At this point you had not made any reports about the

GC69PIC5                          Picarella - cross

1    alleged sexual harassment that's at issue in this case, right?

2    A.   Reports to HR?

3             (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC6TPIC6                          Picarella - cross

1   BY MR. JACKSON:

2   Q.  You hadn't made any reports to HR?

3   A.  Not to HR.

4   Q.  You hadn't made any reports that Ms. Hedges would have been

5   aware of, correct?

6   A.  I don't know.

7   Q.  Had you reported it to anyone?

8   A.  Had I reported what?

9   Q.  The alleged sexual harassment that you claim in this

10  federal case led to your retaliation.

11  A.  Yes.

12  Q.  Who had you reported it to?

13  A.  In November of 2011 I reported to Ian Mullen, the COO, that

14  Ms. Hedges had exposed her breasts on the trading desk to

15  Ms. Parker and myself.

16  Q.  We'll talk about that more, but apart from Ian Mullen, you

17  hadn't said anything to anyone, right?

18  A.  No.

19  Q.  And the only thing you had told Ian Mullen at that time was

20  that Ms. Hedges showed her breasts to you and to Ms. Parker,

21  correct?

22  A.  Yes.

23  Q.  Now to be clear, you have no information indicating that

24  Mr. Mullen communicated that to Ms. Hedges, right?

25  A.  Right.

1   Q.  And you don't believe that he would have done that, do you?

2   A.  I don't think so, but I'm not a hundred percent sure.

3   Q.  Well, Mr. Mullen is someone that you talked to about your

4   problems, right?

5   A.  Yeah, he was an adviser to me.

6   Q.  And he's never told you, has he, that he communicated that

7   to Ms. Hedges?

8   A.  No, no.

9   Q.  So you have no reason to believe that, at the end of 2011

10  when she told you this, that she had any reason to know that

11  you were complaining about sexual harassment, right?

12  A.  Right.

13          MR. JACKSON:  Your Honor, I could continue.  This

14  may -- do you want to continue?

15          THE COURT:  We're going to break.  We can break now or

16  15 minutes.

17          MR. JACKSON:  It's up to the discretion of the Court,

18  your Honor.

19          THE COURT:  Let's go ahead and break for the day.

20  Let's come back tomorrow.

21          Let's have the jurors get here at 9:30 tomorrow

22  morning.  Try to leave a little earlier, because obviously

23  there are sometimes issues with traffic and trains and the

24  like, and we'll start bright and early at 9:30.

25          Don't discuss the case with anyone else.  Don't

1    discuss the case among yourselves.  Have a good evening.  See

2    you tomorrow morning.

3              (Jury not present)

4              THE COURT:  So is there anything that we need to

5    address this afternoon?  Again I ask counsel to try to get here

6    at 9:15 tomorrow to avoid any unnecessary bumping into the

7    jurors.

8              Anything else that we need to address this afternoon?

9              MR. HUBBARD:  No, your Honor.

10             THE COURT:  From defendants, anything that we need to

11   address?

12             MR. JACKSON:  No, your Honor.

13             THE COURT:  Okay.  I will see you tomorrow morning.

14             MR. JACKSON:  Your Honor, I would like to be clear,

15   obviously I still have substantial cross-examination to do

16   tomorrow.  It's our understanding that Mr. Mullen would be

17   potentially the next witness.

18             MR. HUBBARD:  He is the next witness, yes.

19             MR. JACKSON:  And we intend -- in the later part of

20   the day we will evaluate it, but we intend to have -- we'll

21   talk to plaintiff's counsel, but we intend to make available,

22   if necessary, either -- it has to be Mary Bilbrey actually, we

23   talked about this, who is a witness.

24             MR. HUBBARD:  No, we didn't.  We talked about

25   Ms. Weiss.

GC6TPIC6

1              MR. JACKSON:  No, Ms. Bilbrey is the one flying in

2     from Chicago.

3              MR. HUBBARD:  Okay.  I think Ms. Weiss is the next

4     witness on the witness list.

5              THE COURT:  You need me to do anything with this?

6              MR. JACKSON:  No, your Honor, I wanted to let you

7     know.

8              THE COURT:  Okay.

9              (Adjourned to December 7, 2016 at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION
 2   Examination of:                          Page
 3    MICHAEL PICARELLA
 4   Direct By Mr. Hubbard . . . . . . . . . . . 101
 5   Cross By Mr. Jackson . . . . . . . . . . . 219
 6                      PLAINTIFF EXHIBITS
 7   Exhibit No.                            Received
 8    303  . . . . . . . . . . . . . . . . . 108
 9    126  . . . . . . . . . . . . . . . . . 117
10    125  . . . . . . . . . . . . . . . . . 121
11    143  . . . . . . . . . . . . . . . . . 125
12    131  . . . . . . . . . . . . . . . . . 128
13    134  . . . . . . . . . . . . . . . . . 133
14    129  . . . . . . . . . . . . . . . . . 138
15    148  . . . . . . . . . . . . . . . . . 142
16    164  . . . . . . . . . . . . . . . . . 146
17    170 and 171  . . . . . . . . . . . . . 150
18    172  . . . . . . . . . . . . . . . . . 150
19    173  . . . . . . . . . . . . . . . . . 151
20    174  . . . . . . . . . . . . . . . . . 152
21    176, 177 and 179  . . . . . . . . . . . 152
22    185  . . . . . . . . . . . . . . . . . 155
23    186 and 187  . . . . . . . . . . . . . 158
24    190, 193, 203, 205, and 308  . . . . . . . 162
25    206, 209, 211  . . . . . . . . . . . . . 173
```

1    218, 219, 220, 231, 236, 237, 240, and  . . . 182

2              242

3    241   . . . . . . . . . . . . . . . . . . 197

4    245   . . . . . . . . . . . . . . . . . . 206

5    244 and 247   . . . . . . . . . . . . . . 208

6    223   . . . . . . . . . . . . . . . . . . 215

7                     DEFENDANT EXHIBITS

8    Exhibit No.                              Received

9    199   . . . . . . . . . . . . . . . . . . 223

10   222   . . . . . . . . . . . . . . . . . . 229

11    220   . . . . . . . . . . . . . . . . . . 236

12    232   . . . . . . . . . . . . . . . . . . 245

13   25   . . . . . . . . . . . . . . . . . . 256

14    33   . . . . . . . . . . . . . . . . . . 261

15

16

17

18

19

20

21

22

23

24

25