GC7TPIC1                          Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MICHAEL PICARELLA,

4                  Plaintiff,

5             v.                            14 CV 4463 (ALC)

6   HSBC (USA) SECURITIES, INC.,

7                  Defendant.
    ------------------------------x
8                                      New York, N.Y.
                                       December 7, 2016
9                                      9:25 a.m.

10  Before:

11                  HON. ANDREW L. CARTER,

12                                     District Judge

13                        APPEARANCES

14  LIDDLE & ROBINSON LLP
         Attorneys for Plaintiff
15  BY:  JAMES R. HUBBARD
         BLAINE H. BORTNICK
16       ASA F. SMITH

17  BOIES, SCHILLER & FLEXNER LLP
         Attorneys for Defendant
18  BY:  RANDALL W. JACKSON
         DAVID L. SIMONS
19       NICHOLAS STANDISH

20  GIBSON, DUNN & CRUTCHER LLP
         Attorneys for Defendant
21  BY:  GABRIELLE F. LEVIN

22

23

24

25

GC7TPIC1                         Trial

1              (In open court, jury not present)

2              THE COURT:  Okay.  Is defense counsel here?  I see

3    Mr. Jackson is not here, but there are other defense counsel

4    here.

5              Let me share a few things with counsel.  We're still

6    waiting for some jurors, juror number four, Ms. DiCioccio,

7    expressed to my deputy last evening that Ms. DiCioccio is

8    hosting a holiday party at work that starts at 5 o'clock, and

9    she would like to know if she could leave at 3:30 this

10   afternoon.

11             So I wanted to share this with counsel and find out

12   what counsels' thoughts are.  My inclination is to accommodate

13   her, sort of.  My inclination is to perhaps break at 4 o'clock

14   today.  That will give her time hopefully to get to work and do

15   what she needs to do, but I think 3:30 is a little bit early.

16             Also with the current pace that we're on, I am

17   concerned about the pace.  We need to pick things up a little

18   bit.  There is also a strong likelihood that I be able to

19   adjust some things on my calendar Friday, so we can work almost

20   a full day Friday, which I think we will need to do given the

21   pace of things now.

22             But my inclination is to let Ms. DiCioccio know that

23   we will work until 4 o'clock -- we understand the concerns, we

24   will work until 4 o'clock today to try to accommodate her.

25             But let me find out what counsels' thoughts are,

1   starting with plaintiff's counsel.

2            MR. HUBBARD:  Yes, your Honor, thank you.

3            Well, there are two witnesses who are here from out of

4   town, one from Europe who is here to testify today, and our

5   witness, Mr. Mullen, has been here a long time and I guess his

6   plane is tonight.  But Mr. Jackson was kind enough to say where

7   we are in the case that we could -- if we haven't reached him

8   by midday break, that if there is still cross-examination, that

9   we could put Mr. Mullen in somewhat out of turn.

10           Mr. Jackson also has a witness, Ms. Bilbrey.  I think

11   we called Ms. Bilbrey, but she is here from out of town.  So

12   the idea is to get the witnesses in this afternoon, so I guess

13   that's the only thing we would be trying to coordinate to

14   finish by 4:00.  We should be able do it.  Ms. Bilbrey is very

15   short.

16           THE COURT:  What's your proposal?

17           MR. HUBBARD:  4 o'clock is fine.  I'm saying I wanted

18   to alert the Court to the fact that we're trying to fit these

19   two witnesses in.

20           THE COURT:  Defense counsel.

21            MS. LEVIN:  Your Honor, Mr. Hubbard is correct that

22   we have two witnesses from today that have come in out of town

23   that I think need to be accommodated today.  So I am mindful of

24   the need to accommodate the juror, and I defer to the Court's

25   wisdom on the schedule for today.  I think that we just need to

1    make sure that we get both of those two witnesses done today

2    since they have flown in and they need to fly out later today.

3            THE COURT:  Are the witnesses here now?

4            MR. LEVIN:  Ms. Bilbrey can be here in 15, 20 minutes.

5    She's just in midtown.

6            THE COURT:  Okay.  And the other?

7            MR. HUBBARD:  Your Honor, Mr. Mullen, I have arranged

8    to have him here at 12:30.  I didn't anticipate -- having

9    talked to Mr. Jackson about the cross-examination, I didn't

10   think that we would reach Mr. Mullen this morning.

11           THE COURT:  And give me a quick offer of proof on

12   Ms. Bilbrey.  How short you believe the examination of

13   Ms. Bilbrey will be?

14           MR. HUBBARD:  From the plaintiff, very short.  She was

15   the HR head that Mr. Picarella accessed at some point in time

16   to get her sense of where that investigation was going, but not

17   a very long witness for the plaintiff.

18           THE COURT:  And can you give me an estimate in terms

19   of minutes or what we're talking about here?

20           MR. HUBBARD:  30 minutes.

21           THE COURT:  Okay.  And does the defense have an

22   estimate, in terms of cross-examination of Ms. Bilbrey, how

23   short that would be?

24           MS. LEVIN:  Approximately 30 minutes, your Honor.

25           THE COURT:  And what about Mr. Mullen?

1          MR. HUBBARD:  30, 40 minutes.

2          THE COURT:  Okay.

3          MR. HUBBARD:  Direct.

4          THE COURT:  What about cross-examination of

5   Mr. Mullen, if any?

6          MS. LEVIN:  Same as direct, your Honor, approximately

7   20 minutes.

8          THE COURT:  I think he said 40 minutes on direct.

9          MR. LEVIN:  For Mr. Mullen?

10         THE COURT:  Yes, 30 to 40 minutes.

11         MS. LEVIN:  Then 30 minutes on cross.

12         THE COURT:  Okay.  Since these witnesses have flown in

13  from out of town, perhaps in an abundance of caution it may

14  make sense to -- a suggestion might be that we interrupt or we

15  take a break in the cross-examination of Mr. Picarella at say

16  11 o'clock and then go ahead.  And I will explain to the jurors

17  that there are scheduling issues and sometimes we take

18  witnesses out of order, and then get these two witnesses done.

19  And then if there is still cross-examination of Mr. Picarella,

20  that can continue after that.  That seems that that may make

21  the most sense.

22         Counsel have any thoughts on that?

23         MR. HUBBARD:  I'm certainly happy to accommodate that

24  schedule.  I have to find Mr. Mullen and get him down here

25  earlier, but I think we can do that.

GC7TPIC1                     Trial

1           THE COURT:  And is it your anticipation to call

2      Mr. Mullen first or Ms. Bilbrey first?

3           MR. HUBBARD:  Mr. Mullen first.

4           THE COURT:  Okay.  Then perhaps you should have

5      yourself or one of your associate counsel reach out to

6      Mr. Mullen and see if we can get Mr. Mullen here at 11 o'clock.

7           MR. HUBBARD:  We'll do it right now.

8           THE COURT:  What is defense counsel's position in

9      terms of this juror and this accommodation for 4 o'clock?

10          MS. LEVIN:  The Court's proposal is acceptable.

11          THE COURT:  So what I propose to do with Ms. DiCioccio

12     is to ask my deputy, when she gets here -- when Ms. DiCioccio

13     gets here, to ask Ms. DiCioccio to come out here to the court,

14     explain to her that we heard her concern, and we'll try to

15     accommodate her the best we can, we can't break at 3:30 but we

16     will break at 4 o'clock today.  And then I will tell her that

17     she should not discuss with any of the other jurors what we

18     have discussed with her out here.

19          Counsel for the plaintiff, any position on that?

20          MR. HUBBARD:  Perfectly fine, your Honor.

21          THE COURT:  Counsel for the defense?

22          MS. LEVIN:  Sounds good, your Honor.

23          THE COURT:  So we're waiting for jurors to get here.

24     When the jurors get here, or as soon as Ms. DiCioccio gets

25     here, I will have that colloquy with Ms. DiCioccio here in open

GC7TPIC1                    Trial

1    court, and then we'll go ahead and continue with the

2    cross-examination of Mr. Picarella.

3              MR. HUBBARD:  Your Honor, one other point,

4    Ms. Palmieri is not here today.  She has a summation in a FINRA

5    arbitration.  So I would ask your Honor's permission to excuse

6    her today.  She will be back tomorrow.

7              THE COURT:  That's fine.

8              MR. HUBBARD:  I didn't want you to think that she was

9    leaving without any notice.  And I may have Mr. Smith, one of

10   our colleagues, come up and sit with us.  He's admitted in this

11   case.  I guess I haven't introduced him to the jury.

12             THE COURT:  I would be -- I don't want to run into any

13   issues if one of the jurors by some chance knows Mr. Smith.  I

14   mean we can make that --

15             MR. HUBBARD:  He doesn't need to sit at the table.

16             THE COURT:  It may not be necessary for him to sit at

17   the table.  Was it your anticipation that Mr. Smith would

18   actively do something in front of the jury?

19             MR. HUBBARD:  No, your Honor, he was going to help

20   with a couple of things but not present anything.  That's fine.

21             THE COURT:  Okay.

22             MR. HUBBARD:  Not necessary.

23             THE COURT:  I will be back as soon as Ms. DiCioccio

24   gets here, we'll have that colloquy and start the trial.

25             (Recess taken)

1          THE COURT:  I just want to let counsel know that all

2     the jurors are here but one.  The one juror that is missing is

3     Ms. DiCioccio.  When she gets here we'll have our inquiry and

4     we'll proceed.

5          MR. HUBBARD:  Thank you, Judge.

6           MS. LEVIN:  Thank you, your Honor.

7          (Recess taken)

8          THE COURT:  So Ms. DiCioccio is here, so let's ask her

9     to come on out and I'll have this colloquy with her.

10         Let me, just in case -- I will have this colloquy with

11    Ms. DiCioccio and I will explain to her that we understand she

12    wants to leave early.  She was the last juror getting here

13    today.  It might be, I don't know, that she is late because she

14    was trying to take care of this issue ahead of time and maybe

15    doesn't need to leave early.  Let me just find out.  If she

16    says that she doesn't need to leave early, I just wanted to

17    clear with counsel that we're okay working until 4:30 or 4:45

18    if not.

19         MR. HUBBARD:  Yes, your Honor, for the plaintiff.

20         MR. JACKSON:  Yes, your Honor.

21         THE COURT:  Okay, that's fine.  Let's ask

22    Ms. DiCioccio to come out.

23         (Juror present)

24         THE COURT:  Good morning, Ms. DiCioccio.

25         JUROR:  Good morning.

1            THE COURT:  My understanding from my deputy is that

2       you have a holiday party at work at 5 o'clock and you would

3       like to leave a little early.

4            JUROR:  Yes.

5            THE COURT:  Is that correct?

6            JUROR:  If possible.

7            THE COURT:  I discussed this with counsel.  We can't

8       let you go at 3:30, but we will try to accommodate you and

9       break at 4 o'clock today.  Does that help with your schedule?

10           JUROR:  Yes.

11           THE COURT:  So we will do that.  We will break at

12      4 o'clock today.  When you go back in the jury room do not

13      discuss with the other jurors our colloquy out here, what we

14      discussed.  Okay?

15           JUROR:  Okay.

16           THE COURT:  Thank you very much.

17           JUROR:  Thank you.

18           (Juror not present)

19           THE COURT:  Counsel, any objection to my colloquy with

20      the juror?

21           MR. HUBBARD:  No, your Honor.

22           MR. JACKSON:  No, your Honor.

23           THE COURT:  All right, let's bring the jury out and

24      have Mr. Picarella take the stand.

25           (Continued on next page)

GC7TPIC1                    Picarella - cross

1            (Jury present)

2            THE COURT:  Welcome back.  I hope you had a pleasant

3     evening.  We'll continue with the case on trial.

4            Go ahead, counsel.

5            MR. JACKSON:  Thank you, your Honor.

6      MICHAEL PICARELLA,  (Continued)

7        having been previously sworn, testified as follows:

8     CROSS-EXAMINATION

9     BY MR. JACKSON:

10    Q.  Good morning, Mr. Picarella.

11    A.  Good morning.

12    Q.  How are you today?

13    A.  Very good.  How are you?

14    Q.  Good.

15            Mr. Picarella, did you have an opportunity to have a

16    restful evening?

17    A.  Somewhat.

18    Q.  Did you speak to anyone at all about your testimony between

19    the end of yesterday and today?

20    A.  No, I was instructed not to.

21    Q.  Okay.  Mr. Picarella, did you have an opportunity to

22    reflect on any aspects of our questioning yesterday?

23    A.  Sure.

24    Q.  Having reflected, are there any other names that you think

25    it would be appropriate for us to add to the list of people

1    that you believe participated in any way in the retaliation

2    that you allege happened against you?

3    A.  Well, reflecting on our time yesterday, I guess the one

4    thing that I was thinking a lot about is you were sort of

5    putting a list of names together that constituted what I

6    thought was retaliation.  And I almost didn't know how to

7    answer your questions, and maybe I could take a second and

8    clarify what I'm thinking.

9    Q.  Sir, your attorney is going to get up after I finish and he

10   will ask you any additional questions that are necessary.  In

11   the interest of efficiency today, I just want you to, if at all

12   possible, try to focus on my question.  You can say no, you can

13   say yes, or you can tell me that you can't answer it that way,

14   but my question simply is:  Are there any other names that you

15   would include as people that you believe participated in any

16   way in the retaliation against you?

17   A.  I don't know.

18   Q.  You don't know.  Okay.

19          Now I'm going to try to frame, in the interest of

20   efficiency, most of my questions as questions that I believe

21   can be answered yes or no.  You are free to answer them any way

22   that you think is appropriate, but in the interest of

23   efficiency I will try to structure it that way.  And I

24   appreciate, if you believe you can't answer it yes or no,

25   please let me know and I will try to reframe the question.

1    A.   Okay.

2    Q.   Now one of the things, Mr. Picarella, that you would agree

3    with me on is that you had issues with the bank in 2011, at the

4    end of 2011, that had nothing to do with sexual harassment.

5    A.   I don't understand what you mean by "issues."  Can you

6    clarify?

7    Q.   There were some things that you were upset with your

8    employer about at the end of 2011 having nothing to do with

9    sexual harassment, correct?

10   A.   There was a discrepancy in the bonus that I was not happy

11   with, but, you know, in general, the way you phrased it with

12   the bank, I did not have a problem with the bank at the end of

13   2011.

14   Q.   So let's focus in on the discrepancy with the bonus.  At

15   the end of 2011 you got an indication of what your bonus was

16   likely to be, is that correct, Mr. Picarella?  Yes or no.

17   A.   Yes, there was some conversations.

18   Q.   You had an indication about what your bonus was going to

19   be, correct?

20   A.   No, I didn't get an exact number, no.

21   Q.   You got an indication of an approximate number in terms of

22   what your bonus range might be, yes?

23   A.   No.

24   Q.   Well, whatever the case may be, at the end of that year you

25   expected a very large bonus, correct?

GC7TPIC1                     Picarella - cross

1   A.  I was anticipating getting the bonus that had been agreed

2   upon when I joined the firm.

3   Q.  I didn't ask you about an agreement.  I want you to focus.

4           You were expecting a very large bonus.  Yes or no.

5   A.  Well, the bonus that I was promised when I joined, whether

6   you call that large or not, is a matter of perspective.  There

7   was a number that was promised on a handshake.  I was expecting

8   that number.

9   Q.  Again, you can answer my questions any way that you think

10  is appropriate and we can be here all day.  Yes or no, were you

11  expecting a large bonus?

12          MR. HUBBARD:  Objection.

13          THE COURT:  Objection sustained.  Please rephrase the

14  question.

15  Q.  You were expecting a large bonus.  Yes or no.

16  A.  I think I answered that the best I can.

17  Q.  Okay.  Well, is it yes or no?

18          MR. HUBBARD:  Objection, your Honor, asked and

19  answered.

20          THE COURT:  Overruled.

21  A.  I think that in my industry the number that I was expecting

22  that was promised, whether you think that's large or not, is a

23  matter of perspective.  I was expecting -- it was a handshake

24  agreement, and I was expecting that number at the end of the

25  year.

1    Q.   What was the number that you were expecting?

2    A.   I was expecting a number in the $150,000 range.

3    Q.   And your salary at that time was what?

4    A.   $225,000.

5    Q.   You were expecting a $150,000 bonus at the end of the year?

6    A.   Correct.

7    Q.   Now what were you told your bonus was likely to be?

8    A.   Ms. Hedges a couple of times in December and -- December

9    time frame was trying to lower my expectations based on the

10   European crisis in the markets, and she was trying -- I believe

11   she was strike to lower my expectations that it wasn't going to

12   be what we had talked about when I joined the firm.

13   Q.   What did she indicate to you that it was going to be?

14            MR. HUBBARD:   May we have a time frame, your Honor,

15   please?

16            THE COURT:   Overruled.   Go ahead.   You can answer the

17   question.

18   A.   She made different comments at different times.   I remember

19   one time she said she was expecting a zero bonus herself.   She

20   told me that if we get a bonus we should all be lucky this

21   year, things like that, but there was no number given.   I think

22   she was trying to lower my expectations.   I knew what she was

23   doing.

24   Q.   So it's your testimony she didn't give you any number ever?

25   A.   Well, she did give me a bonus at the bonus communication

1    day, but she didn't give me the number and say -- I don't think

2    she knew at that time.  That stuff was being finalized and

3    numbers were being communicated sometime in February of 2012.

4    Q.  But based on your communication with her, you believed, yes

5    or no, that your bonus was likely to be less than $150,000 you

6    were hoping for, correct?

7    A.  I was hopeful that wasn't going to be the case, but I

8    understood what the message was she was trying to deliver.

9    Q.  So the answer is yes?

10   A.  What was the question?

11   Q.  Yes or no, based on your conversation with her, you were

12   expecting a bonus that was going to be less than what you had

13   anticipated.

14            MR. HUBBARD:  Objection, your Honor, these questions

15   are not questions that can be answered --

16            THE COURT:  Overruled.

17   A.  No, I don't know if I agreed with it or not.  I was still

18   hopeful -- I had conversations back with her that we had a

19   handshake agreement, and I would say things like I hope you're

20   joking, or are you serious, but in retrospect, of course I know

21   she was trying to lower my expectations.

22   Q.  Well, is that in retrospect or is that at the time, because

23   you're saying no.  Is it in retrospect, or was it at the time

24   you believed you were going to get a lower bonus?

25   A.  At the time I recognized what she was doing, that she was

1    trying to lower my expectations.  I understood it.  And I

2    understood the crisis in the financial market.  But I was also

3    hopeful that since I had joined in May, and the European

4    markets were already in the beginning of a financial crisis,

5    that it wasn't going to impact what the bonus would be at the

6    end of the year.  I understood -- I did understand that bonuses

7    are not just performance based, they're also division based and

8    firm based.  So when I signed up there was a handshake

9    agreement, but there's an understanding that if the stock

10   market tanks or there's a financial crisis, all bets are off

11   because none of the bonuses are guaranteed.

12   Q.  Let me -- I understand all that.  I'm asking very, very

13   basic.  At that time, talking about the end of 2011 --

14   A.  Yes.

15   Q.  -- I'm not talking about in retrospect, the end of 2011,

16   yes or no, you were expecting to get a lower bonus than what

17   you had hoped for.

18   A.  I don't think it's a yes or no.  I'm trying to answer it

19   the best I can for you.  But I understood what she was saying

20   to me.  I was still hopeful that I was going to get the bonus

21   that we had agreed upon.

22          THE COURT:  Mr. Picarella, you indicated that you had

23   hoped that your bonus was going to be approximately $150,000,

24   is that correct?

25          THE WITNESS:  Correct.

1          THE COURT:  And you indicated that you had some

2     conversations with your supervisor related to your bonus, is

3     that correct?

4          THE WITNESS:  Yeah, they were like off the cuff at the

5     desk.  She was saying things every once in a while.

6          THE COURT:  And the communications that she was having

7     with you, you indicated you felt were to lower your

8     expectations?

9          THE WITNESS:  Yes.

10          THE COURT:  And the communications that she had with

11     you, did those communications, in your mind, were they intended

12     to lower your expectation about the amount of your bonus?

13          THE WITNESS:  Yes, that's what she was driving at.

14          THE COURT:  Okay, go ahead, counsel.

15          MR. JACKSON:  Thank you, Judge.

16     BY MR. JACKSON:

17     Q.  And just to be clear, you talked about a handshake

18     agreement earlier, right?

19     A.  Yes.

20     Q.  You got an actual offer letter in connection with your job

21     offer, correct?

22     A.  Yes.

23     Q.  The offer letter didn't say that you were going to get

24     $150,000 bonus, did it?

25     A.  No.

GC7TPIC1                      Picarella - cross

1   Q.  Yes or no?

2   A.  No.

3   Q.  No?

4   A.  No.

5            MR. JACKSON:  Your Honor, at this time I'm going to

6   offer DX-4.

7            MR. HUBBARD:  No objection, your Honor.

8            THE COURT:  Okay, it's in.

9            (Defendant's Exhibit 4 received in evidence)

10           MR. JACKSON:  Can we zoom in on --

11  BY MR. JACKSON:

12  Q.  The date of this is April 13, 2011, correct?

13  A.  Correct.

14  Q.  And do you see this -- can you just read for us what it

15  says in the first sentence.

16  A.  You will also be eligible to receive a discretionary bonus.

17  Q.  What does it say in the second sentence?

18  A.  Any discretionary bonus will be awarded at the sole

19  discretion of the company and based on factors including

20  performance and the profitability of the company and your

21  business area, as well as your own performance and

22  profitability.

23           MR. JACKSON:  Can you take this down.

24  Q.  And that's your offer letter, correct?

25  A.  Yes.

GC7TPIC1                      Picarella - cross

1   Q.  Nowhere in there does it say that you were going to get a

2   150,000 bonus, right?

3   A.  No.

4   Q.  So regardless, though, after you found out -- after you got

5   your communication from Ms. Hedges to alter your expectations,

6   you were upset?

7   A.  I was disappointed.  My reaction to Ms. Hedges was that

8   this is not what was promised or that what we had agreed upon

9   when I joined.

10  Q.  And one of the things that you did is you expressed how

11  upset you were to other people around the office.

12  A.  Yeah, there may have been a couple of colleagues that I

13  communicated with.

14  Q.  You were complaining to people that you had been promised a

15  $150,000 bonus and that the bank was now giving you the shaft.

16  A.  I don't know if I used those words, maybe, but I wasn't

17  walking around the office, there was one or two colleagues that

18  perhaps I confided in.

19  Q.  Two of the colleagues that you confided in were Ms. Parker

20  and Mr. DeLuca, right?

21  A.  I don't recall.

22  Q.  You don't remember if you had any conversations with

23  Ms. Parker about that?

24  A.  I might have.  She was at the desk.  These things --

25  Ms. Hedges talked about these things pretty openly at times.

GC7TPIC1                          Picarella - cross

1  Q.  Well, do you know how much money Ms. Parker was making at

2  this time?

3  A.  I don't know.

4  Q.  It was substantially less than you though, right?

5  A.  I believe so.  I don't want to speculate on the number.  I

6  have an idea, but I don't know what she was making.

7  Q.  What's your idea?

8  A.  Speculation, but I would say $80,000 a year.

9  Q.  And you were complaining to her about the fact that you

10 didn't think you were going to get your $150,000 bonus on top

11 of your 200-some-odd thousand dollars salary, right?

12 A.  I don't think I ever said that to Ms. Parker.  At least I

13 don't recall saying that to Ms. Parker.

14 Q.  Well, you are aware, aren't you, that Ms. Parker complained

15 that you were doing very little work after you found out that

16 you weren't going to get your bonus.

17 A.  I only learned that through the discovery process.

18 Q.  You are aware of that now, right?

19 A.  Not at the time, but now I am, yes.

20 Q.  Now you're aware.

21       You're also aware that Mr. DeLuca, who is one of the

22 people, was also aware of the fact that you were complaining

23 about the fact that you didn't expect to get your $150,000

24 bonus, right?

25 A.  I'm only aware of that now.  I don't believe I ever had

1   conversations with Mr. DeLuca.  He didn't work in our business

2   area, but he was friends with Ms. Parker.  I don't believe I

3   had a conversation with him.  But only through discovery did I

4   see some of the Sametime Chats that Ms. Parker and Mr. DeLuca

5   were having about each other.  They were speculating that I was

6   not happy with my bonus.

7   Q.  But you saw -- you know that they couldn't have known that

8   you were upset about your bonus unless you had communicated it,

9   right?

10  A.  No, that's not true.

11  Q.  Well, you believe that they knew because you stopped

12  showing up for work?

13  A.  No, that's not true.

14  Q.  But they certainly complained that you had a lousy attitude

15  and that you had been MIA since you found out about your bonus,

16  right?

17  A.  I saw the chats that they were having with each other.  But

18  for one thing I could say is that Ms. Hedges was a person that

19  would gossip and provide personal and confidential information

20  to people throughout the organization.  So as an example, when

21  I received my review, she told me all about her own review, she

22  told me all about Ms. Parker's review.  When she got her --

23  when she gave me my compensation she told me about

24  Mr. Pizzimbono's compensation, she talked about her own

25  compensation, she talked about Ms. Parker's compensation.

1          So my take on it is I don't recall having a

2    conversation -- I'm almost positive I never -- I talked to

3    Chris DeLuca very infrequently.  I don't believe I spoke to

4    Ms. Parker.  If she had that information, my speculation would

5    be that Ms. Hedges somewhere along the line told her that Mike

6    was not happy with his bonus, because she told me the same

7    thing about Ms. Parker.

8    Q.  So I wanted to go back to my question.  I believe this

9    could be answered yes or no.  Please let me know if you think

10   it can't.  You're aware now as you sit here now that they said

11   that you had been MIA and had a lousy attitude since you found

12   out that you weren't going to get your $150,000 bonus, correct?

13   A.  I have seen the Sametime Chats, but I don't know where they

14   got that from.

15   Q.  But you know it was said, right?

16   A.  Yeah, these were two more junior people to me gossiping

17   more than anything else.

18   Q.  Okay.  Now you also complained to one of your other

19   co-workers, a gentleman named Mr. Rist, about the fact that you

20   weren't getting this bonus, right?

21   A.  Yeah, I believe I confided in Mr. Rist at the time.

22   Q.  Now Mr. Rist was another employee at HSBC, right?

23   A.  Correct.

24   Q.  You didn't work with Mr. Rist directly, right?

25   A.  We didn't have the same reporting line, but we worked

GC7TPIC1                          Picarella - cross

1   together on a regular basis.

2   Q.  In December of 2011 Mr. Rist was married?

3   A.  I believe so.  I'm not a hundred percent.

4   Q.  But he was involved in a relationship, right?

5   A.  In December 2011, I'm not sure of that.

6   Q.  We'll come back to that.

7          After you found out about the bonus situation, you

8   started looking for another job, didn't you?

9   A.  I did not.

10  Q.  Well, in early -- at the end of 2011 it's correct that you

11  had communications about the fact that you might need to be

12  looking for another job, right?

13  A.  I had communication with Kevin Freer, who is a recruiter

14  from Mitchell Martin.  Mr. Freer -- I had reached out to him to

15  see if there was anything in writing regarding the handshake

16  agreement on the bonus range, so I was looking to see if he had

17  anything for me.  And I believe there was a point in time when

18  I said to him if he comes across anything, any senior

19  positions, just to keep me in mind.

20  Q.  Okay.  And at this time you had only been working for the

21  bank for six months, right?

22  A.  It was eight months at that time.

23  Q.  Let me back up before the eight-month point.

24         Before you even found out about the bonus situation,

25  Ms. Hedges communicated to you that it was the view of some at

1   the bank you were doing a very bad job and you might need to

2   start looking for another job, right?

3   A.  No, that's not correct.

4   Q.  She didn't say anything like that to you?

5   A.  No.

6   Q.  She did say that you might need to start looking for

7   another job, right?

8   A.  No.

9   Q.  She did say you should do what is best for your family,

10  correct?

11  A.  Correct.  At the time she gave me the bonus she said to me

12  I know you are going to be disappointed.  Pablo thinks --

13  Mr. Pizzimbono thinks you're upset and is afraid you're going

14  to leave.  Can you tell me what you're going to do?

15          And I looked at it and I told her -- it was $60,000,

16  so significantly less, and I told her that this was what not

17  what we had agreed upon, but I wasn't going to be leaving.  And

18  she said look, this is the HSBC way, and you just have to get

19  used to it, and the bonuses are only going to go down from

20  here.  And it was said in a way if you don't like it, then do

21  what is best for you and your family.  I don't believe

22  Ms. Hedges really wanted me to leave, but the presentation of

23  it I found to be a little on the unprofessional side.

24  Q.  She also told you that you should expect a zero bonus,

25  right?

A.  Well, as I mentioned before, in December she indicated that

for herself as well.  I think it was a way -- she was trying to

lower my expectations.  It was a way of saying -- I have heard

similar talk in the industry like this before:  This is a tough

year, there's a financial crisis, if we all get a bonus we

should be lucky.  So I'm not expecting any, you should not

expect any, and if we get anything we should be happy.  And

that was her way, as I said before, of trying to lower my

expectations.

Q.  I'm not asking you what her reason was, I'm asking you, yes

or no, she told you you should expect a zero bonus.

A.  Along with herself.  She was using it as sort of, like I

said.  I am not going to change my answer.  I know how she said

it.

Q.  I'm not asking to you change it, I'm asking you, yes or no,

she told you to expect a zero bonus, sir.

A.  Yes, in different words.

Q.  The answer is yes, right?

A.  The answer is yes, but not in the exact words that you're

phrasing it.

Q.  What were the exact words that she used to communicate to

you that you should expect to get a zero bonus?

        MR. HUBBARD:  Objection, your Honor, asked and

answered.

        THE COURT:  Overruled.

GC7TPIC1                    Picarella – cross

```
 1    A.  Like I said, a couple of times in the December time frame
 2    she was indicating that she wasn't expecting a bonus, I
 3    shouldn't expect a bonus, given the European financial crisis
 4    the European markets, there was a bond crisis all over Europe,
 5    the firm wasn't doing well, we should all expect a zero bonus.
 6    If we get anything, we should consider ourselves lucky.
 7    Q.  So didn't you communicate in October of 2011 to one of your
 8    co-workers that you thought your time at HSBC could be, "The
 9    shortest stint ever?"
10    A.  I may have said that.  You have to refresh my memory.
11              MR. JACKSON:  I would like to offer DX-43.
12              THE COURT:  Any objection to 43?
13              MR. HUBBARD:  May I have one moment, your Honor,
14    please?
15              THE COURT:  Sure.
16              (Pause)
17              MR. HUBBARD:  No objection, your Honor.
18              THE COURT:  Okay, it's in.
19              (Defendant's Exhibit 43 received in evidence)
20              MR. JACKSON:  Thank you.
21    BY MR. JACKSON:
22    Q.  Can we go to the next page.
23              You see this here?
24    A.  I see it.
25    Q.  Can you tell us what you wrote at 6:22:54?
```

GC7TPIC1                        Picarella - cross

```
 1  A.  Having lunch with an old boss today, JPM, JP Morgan, not a
 2  bad company.
 3  Q.  What is date of this communication?
 4  A.  October 28, 2011.
 5          MR. JACKSON:  I would like to offer DX-44 at this
 6  time.
 7          MR. HUBBARD:  No objection.
 8          THE COURT:  It's in.
 9          (Defendant's Exhibit 44 received in evidence)
10  Q.  By the way, who is Mary Jo Rogers?
11  A.  She was a colleague.  She worked for Mr. Pizzimbono.  She
12  sat directly across from me.  She was part of our inner circle
13  at the time.
14  Q.  Is this the same Mary Jo that you had on your list of
15  people that you suspected of retaliating against you?
16  A.  You were putting this list together.  That wasn't my list,
17  that was your list that you were putting together yesterday.
18  You asked me -- I was going to try to explain this before.  You
19  asked me who I thought the primary people were that were
20  responsible for retaliating.  I gave you five names of people
21  that I thought were really involved, and we went through a list
22  of complaints that I made over time to human resources, and we
23  were adding those to your list of people that were retaliating.
24          I don't know if those people were retaliating against
25  me or not.  Those were complaints about people that were --
```

1   there was a great deal of animus within the organization, and

2   at a certain point of time on a daily basis Ms. Bilbrey was

3   asking me to let her know of anything that was going on in the

4   organization that I was having a problem with.

5          So the examples of they moved my desk next to Margaret

6   Murray and between Carol Jenner, and then on one day that

7   Margaret Murray, who is Mr. Pizzimbono's assistant, accused me

8   of tripping her and stealing stuff from her desk, I thought she

9   was going to go to human resources and have me fired.

10         MR. JACKSON:  At this time I ask if the witness could

11  be instructed to pause with the answer.

12  A.  Well, I'm trying to explain that you asked me --

13         THE COURT:  Hold on a second.  Can you rephrase the

14  question?

15         MR. JACKSON:  Yes, your Honor.

16  BY MR. JACKSON:

17  Q.  Let me rephrase it and I will let you hear it.  I can't

18  offer any testimony.  My only question is you mentioned Mary Jo

19  yesterday, do you remember that?

20  A.  Yes, I do.

21  Q.  That Mary Jo was a person that you identified as a person

22  that you believe had potentially participated in retaliation

23  against you, yes or no?

24  A.  I may have said that yesterday, and I don't think that's

25  the right thing for me to have said.  Because I was making

1    complaints to Mary Bilbrey, as she asked me to, of animus and

2    aggression that was happening to me on a daily basis in the

3    organization.  And it was a list that you're putting together.

4    I gave you the five names of people that I thought really

5    retaliated against me.

6            But if we're going against a list of complaints that

7    Mary Bilbrey asked me to submit on whenever anything happened,

8    and I could have submitted emails to her every day and we

9    probably would have a hundred names on your list, but I don't

10   know if those people, if they're assistants to the very senior

11   executives, are just doing it as part of a group animus that

12   everybody knows I complained and had been sidelined, or if

13   they're retaliating.

14           But I was instructed by Ms. Bilbrey to let her know of

15   things that were happening to me in the organization.  And the

16   example of Margaret and Mary Jo yesterday, I felt they were not

17   joking, she was very serious.  I thought she was going to go to

18   HR and have me fired that day, and I thought I should send that

19   email and let Ms. Bilbrey know what Margaret Murray was doing.

20   If you want to call that retaliation and put it on a list with

21   the other names, I don't know.  She had no authority over me.

22   Q.  Mr. Picarella --

23           THE COURT:  Hold on a second.

24           Mr. Picarella, putting aside the list that you and

25   counsel have referred to, did you mention a Mary Jo yesterday?

1            THE WITNESS:  Yes, we did.

2            THE COURT:  Did you mention Mary Jo when defense

3    counsel was asking you questions?

4            THE WITNESS:  Yes.

5            THE COURT:  And is that the same Mary Jo that is on

6    this chat?

7            THE WITNESS:  It is.

8            THE COURT:  Go ahead.  Move on, counsel.

9            MR. JACKSON:  Thank you very much, Judge.

10   BY MR. JACKSON:

11   Q.  Now at this time you considered Mary Jo Rogers to be a

12   friend of yours, correct?

13   A.  Yes, I did.  We were very friendly at that time.

14   Q.  She was a friend of yours at that time?

15   A.  We were very friendly at that time, yes.

16   Q.  The answer is yes?

17   A.  Yes.

18   Q.  Now you said:  This could be the shortest stint ever, ha,

19   ha, ha.  Correct?

20   A.  Yes.

21   Q.  And Ms. Rogers said:  Stop it, two exclamation points.

22   Right?

23   A.  Yes.

24   Q.  And it was your understanding of her saying "stop it" was

25   because she didn't want you to leave?

1   A.  Correct.

2   Q.  And then you said:  He's pursued me for years.  I know this

3   isn't a how-are-you-doing lunch.  Correct?

4   A.  Correct.

5   Q.  What you were talking about there is talking to another

6   person about getting a new job, right?

7   A.  No, I was more teasing Ms. Rogers.  It was joking around.

8   Q.  Well, you were actually communicating with someone about

9   having this lunch, right?

10  A.  With Ms. Rogers, yes.

11  Q.  But you were also communicating with the person that you

12  were talking about to Ms. Rogers about having this lunch,

13  correct?

14  A.  Who is that?  I'm sorry.

15  Q.  Well, aren't you talking about in this communication about

16  having lunch with someone?

17  A.  Yes.

18  Q.  Who were you going to have a lunch with?

19  A.  It was a former boss of mine.

20  Q.  Right.  And the reason you thought -- for the lunch, the

21  reason that you believed the purpose of the lunch for you was

22  to discuss the possibility of you getting a job there, right?

23  A.  Not really.  I was teasing her.  She was -- Mary Jo

24  Rogers -- and there are Sametime Chats you may have showing

25  this, but there were Sametime Chats where she was telling me

1    that the behavior that was going on in the group she was

2    advising me to ignore it, that Mr. Pizzimbono thought I was

3    different than the behavior that was taking place, and to

4    ignore it and just keep being professional.  She said things

5    like:  You're shining on your own.  She knew that I saw the

6    behavior that was existing in the area in the group, and she

7    was worried that I was going to leave.  And that is, to me --

8    it's hard to read, when you're reading it you could read it

9    different ways -- it was me just teasing her.

10   Q.  Okay.  So you were having this lunch with the person but it

11   had nothing to do with you getting another job?

12   A.  No, I actually had lunch with a former boss, Hamilton

13   Reiner, and he did not mention a job.  It was very cordial.  I

14   thought maybe he might have, but seriously this was just

15   teasing Ms. Rogers.

16   Q.  But whatever the case may be, you talked to -- a few months

17   later you were in conversations with Mr. Freer about getting a

18   new job?

19   A.  Well, again, I answered that before.  I had reached out to

20   him about to see if there was anything in writing about the

21   bonus, and in the course of conversation I had said that to

22   him.  But we never had any other conversation about job

23   opportunities, and I never -- didn't pursue any other job

24   opportunities.

25   Q.  Mr. Picarella, yes or no, you were having conversations

GC7TPIC1                    Picarella - cross

1   with Mr. Freer a few months later about getting a new job.

2   A.  Yes.

3   Q.  And those conversations had nothing to do with any

4   retaliation, right?

5   A.  No, I mean I think it was -- I don't know the exact time

6   frame.  It might have been January, February, around bonus

7   communication time that I had reached out to him and was asking

8   if he had anything.  I was trying to prepare myself because,

9   again, Ms. Hedges was making these comments on a regular basis

10  not just to me, other people in the group, about bonus

11  expectations.  I wanted to see if there was something in

12  writing.

13          At one point in time she indicated to me -- I had

14  talked about the number, I tried to remind her of the number,

15  because the way I have gone to Wall Street, people in her

16  position, she's part of meetings and making sure that bonuses

17  are allocated, especially in the COO role she was in.  So I was

18  letting her know, and I was hoping -- at one point in time she

19  said:  I don't remember that number, was it that number?  And I

20  was trying to find some communication to back up our

21  conversations a little bit at that time.

22          So I know -- I got the point that she was trying to

23  lower expectations.  I was trying to find something I could

24  show her what the number was, and at least hopefully get the

25  number close to what we were talking about.

GC7TPIC1                        Picarella - cross

1   Q.  Yes or no, your conversations with Ms. Freer at that time

2   had nothing to do with retaliation?

3   A.  Right.  Yeah.

4   Q.  You agree with that?

5   A.  Yeah, I wasn't retaliated against at that time.

6           MR. JACKSON:  I would like to offer in evidence DX-92.

7           THE COURT:  DX-90 or 92?

8           MR. JACKSON:  Sorry, your Honor, DX-92.

9           THE COURT:  Okay.  Any objection to DX-92?

10          MR. HUBBARD:  No, your Honor.

11          THE COURT:  Okay, DX-92 is in.

12          (Defendant's Exhibit 92 received in evidence)

13  BY MR. JACKSON:

14  Q.  Mr. Picarella, is this a January 22nd, 2012 Sametime Chat

15  between you and Margaret Murray?

16  A.  Yes.

17  Q.  Yes or no, is this Margaret the same Margaret that you were

18  talking about yesterday?

19  A.  Yes.

20  Q.  And this is a person, yes or no, we were talking about

21  yesterday when you were talking about something of a conflict

22  that you had, right?

23  A.  Right, that was -- you showed the email of a complaint to

24  Mary Bilbrey, yes.

25  Q.  Yes.

1    A.  Okay.

2    Q.  You made a complaint to Marie Bilbrey later on about

3    Margaret, right?

4    A.  Correct.

5    Q.  And at this time you are friends with Margaret?

6    A.  Yes.

7    Q.  And this communication you had with her was -- you said:

8    Time for me to find a new job.  Correct?

9    A.  Correct.

10   Q.  And the reason you were saying that is because you were so

11   upset about your bonus that you thought it was time for you to

12   find a new job?

13   A.  That's not true.

14           MR. JACKSON:  Your Honor, let me offer DX-98.

15           THE COURT:  Okay.  Any objection to 98?

16           MR. HUBBARD:  No objection, your Honor.

17           THE COURT:  DX-98 is in.

18           (Defendant's Exhibit 98 received in evidence)

19           MR. JACKSON:  Thank you.  Zoom in on the top half.

20   Q.  This is a February 22nd, 2012 email from you to Mr. Freer,

21   the recruiter, correct?

22   A.  It's from him to me, actually.

23   Q.  This is from Mr. Freer to you, right?

24   A.  Yes.

25   Q.  Actually let's go down to the bottom first, the bottom of

GC7TPIC1                        Picarella – cross

1    this.  And you are saying to Mr. Freer in this communication,

2    this February 7, 2012, 6:26 a.m. communication:  Kevin, do you

3    have any positions that fit my background?  Thanks, Mike.

4           Correct?

5    A.  Correct.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC79PIC2                        Picarella - cross

1          MR. JACKSON:  Can you go back up.

2   Q.  You say Mr. Freer said to you:  Hi, Mike.  Nothing at the

3   moment, right?

4   A.  Yep.

5   Q.  And then he says some other things stuff to you about what

6   will happen, right?

7   A.  Right.  Yeah.  It looks like he's saying:  Nothing at my

8   level, just mid level positions.

9   Q.  Then he says:  Send me the resume and I'll see what I can

10  do, right?

11  A.  Right.

12  Q.  Did you send him your resume?

13  A.  I don't think I did.

14          MR. JACKSON:  You can take this down, please.

15  Q.  The reason you were communicating with Mr. Freer at this

16  time is because you were upset about how the bonus situation

17  was playing out?

18  A.  Yes.

19  Q.  And that had nothing to do with any alleged retaliation,

20  right?

21  A.  Right.  I didn't feel -- I wasn't retaliated against in the

22  firm at that time.

23  Q.  Because at that time you hadn't told anyone about all the

24  details of sexual harassment that you've talked about apart

25  from the one comment that you made to Mr. Mullen about

GC79PIC2                    Picarella - cross

1    Ms. Hedges showing you her breast, right?

2    A.  Well, I had started to address Ms. Hedges directly around

3    that time.

4    Q.  Now, apart from conversations that you've described with

5    Ms. Hedges and the one comment that you made to Mr. Mullen, you

6    hadn't said anything to anyone about any alleged sexual

7    harassment, right?

8    A.  Those were the two individuals at that point in time that I

9    had mentioned it to.

10   Q.  By the way, when was the first point that you began telling

11   Ms. Hedges that you were upset about anything that she had

12   done?

13   A.  I believe I told her prior to all of this in -- I have seen

14   it in Sametime chats as well in October of 2011 I told her

15   that -- and this was for her own benefit, that I didn't think

16   it was a good idea for her to keep her work BlackBerry in her

17   bra.  So, she would store her BlackBerry in her bra.  I don't

18   need to be demonstrative.  But she was very upset that she was

19   passed over for managing director.  She found that out in

20   September.  And I told her -- I was trying to help her and

21   begin maybe coaching her in a more professional manner.  I felt

22   she was very smart, very talented.  But it was the behavior

23   that was holding her back.  And the one thing that the

24   BlackBerry would come in and out of the bra throughout the

25   course of the day a thousand times and I did not -- I don't

GC79PIC2                        Picarella - cross

1   think anybody thought that was professional and it was one of

2   the very first things that I had said to her.  And I did see in

3   discovery is a Sametime chat between Ms. --

4   Q.   There is no need to address anything else.  I'm just asking

5   you can you approximate a date that you did as a first point

6   that you began telling Ms. Hedges that you were dissatisfied

7   with her conduct?

8   A.   I don't think I used those words but I was going to try

9   and -- try and help coach her into a more proper conduct.  So I

10  would say it was either in September she was out on -- she had

11  an ulcer and stomach reduction for most of the month of

12  October.  So I saw the chats in, I think it was October 2011

13  between Ms. Rogers and Murray that said:  Did you overhear MP

14  senior.  They used initials.  MP -- Ms. Parker was MP junior.

15  I was MP senior.  And I heard one of them say did you hear the

16  comments from MP senior telling her to -- that she should stop

17  putting the BlackBerry in her bra.

18  Q.   Sir, I'm not asking you about any communication.  I'm just

19  asking for a date.

20  A.   I gave you a timeframe.  I don't remember.

21       It's 2016.  That was the fall of 2011.  I don't have

22  an exact date.

23  Q.   So you think it was sometime in the fall of 2011 you began

24  expressing your dissatisfaction with Ms. Hedges?

25  A.   Those are your words.  I think -- I think I answered you.

GC79PIC2                    Picarella - cross

```
 1    I mean I was -- in my mind I saw what was holding her back and
 2    I saw the behavior.  I began to understand her behavior with
 3    Ms. Parker.  And I was going to try and address these things
 4    myself.  I thought I could help.
 5    Q.  What about, specifically about her behavior with
 6    Ms. Parker?  What is the first point that you began saying
 7    something to her about that?
 8    A.  I don't recall the first time I may have said something to
 9    her.  It may have been -- there may have been some comments in
10    the fall of 2011.  But I had specific meetings with her to
11    address it in early February.
12             She was out from Christmas on another medical leave.
13    She was out -- I think Christmas Eve was the first day out and
14    she came back on January 23 or 24.  And I began addressing it
15    very shortly after that.
16    Q.  I'm not asking you to speculate.  I'm just asking you what
17    is the first date that you remember telling her that you were
18    dissatisfied with the way she was dealing with Ms. Parker.
19    A.  The direct conversations were within a week or two of her
20    coming back from her double knee replacement surgery.  So she
21    was out a good month almost.
22             The end of December.  I don't know the date.  I'm just
23    trying to give you a timeframe.
24    Q.  What is the timeframe that you're trying to give me?
25    A.  Towards the ends of January.  I've had many meetings with
```

GC79PIC2                    Picarella - cross

1    her, several meetings with her directly -- it was in

2    February -- I'd say February, March timeframe.  For all I know

3    it could have been January 30 or 31, you know when I go back

4    and tell these things.  I know she was out for most of January.

5    So when I've testified, I've given it a February start

6    timeframe to March.

7    Q.  Your best estimate is February to March time frame is when

8    you first started communicating with Ms. Hedges your

9    dissatisfaction with how she was dealing with Ms. Parker?

10   A.  Well I met with her -- the reason why I give the timeframe

11   is because I met with her several times.  The first time I

12   would say early February.  It could have even been into late

13   January.

14   Q.  All I'm asking is your best estimate is what you describe

15   as the February, March timeframe, right?

16   A.  Yes.

17   Q.  Now, do you remember yesterday you testified that you

18   didn't -- you were asked a question:  You sent e-mails, hadn't

19   you, talking about things that you saw on other people's

20   screens, right?

21   A.  I'm sorry.

22   Q.  Do you remember being asked that question?

23   A.  Yeah, I remember you were asking me.

24   Q.  And your answer was I don't think so, right?

25   A.  In general I try not to look at other people's screens.

GC79PIC2                          Picarella – cross

```
 1   You know, we're on a trading floor.  The screens are out on
 2   display.  But I try not to invade people's privacy and look at
 3   screens.  If I stop at somebody's desk and I'm having a
 4   conversation, they've got three or four big monitors up on the
 5   screen, it's hard not to see the screens, but I'm trying not to
 6   invade anybody's privacy, work privacy.
 7   Q.  But there had been times when you did try, right?
 8   A.  I don't recall offhand.
 9   Q.  Do you think it's possible?
10   A.  I'm not sure.
11   Q.  Well you just said that you don't try to look at other
12   people's screens?
13   A.  Right.
14   Q.  All I'm asking you is do you think it's possible that there
15   are times that you did try to look at other people's screens?
16   A.  Maybe.
17   Q.  So that wouldn't be in conflict with your values?
18   A.  I'm not sure I understand.  If there was ever a time I was
19   sitting at somebody's desk and we were looking at something on
20   screens -- I'm not purposely looking at somebody's screen in a
21   malicious way.
22   Q.  Well sometimes you were purposely trying to spy on
23   Ms. Parker's screen, weren't you?
24   A.  I don't recall.
25   Q.  You don't have any recollection of that at all?
```

1    A.  No.

2              MR. HUBBARD:  I don't know what this is.  This is not

3    an exhibit in the case, your Honor.

4              THE COURT:  Find out.  Counsel, are you using this to

5    refresh or impeach?

6              MR. JACKSON:  I'm using it to impeach and I do intend

7    to offer it.

8              MR. HUBBARD:  Objection.  It's not -- it's not listed.

9              THE COURT:  Let me see this.  What is it?

10             This is being offered for impeachment.  It will not be

11   received into evidence, but you may use it for that purpose.

12             MR. JACKSON:  Thank you, your Honor.  May I display

13   it?

14             THE COURT:  No.  You may not display it.  It's not in

15   evidence.  You may use it to impeach the witness.  Have you

16   shown it to the witness?

17             MR. JACKSON:  Yes, your Honor.  I'm going to show it.

18             THE COURT:  You may approach.

19   Q.  Do you see this, Mr. Picarella?

20   A.  Yeah.

21   Q.  This is the Sametime chat between you and Mary-Jo Rogers on

22   November 15, 2011, isn't it?

23   A.  Yeah.

24             MR. HUBBARD:  Your Honor, I have no objection to the

25   use of this as an exhibit if he'd like to use it.

1          THE COURT:  So you have no objection to it being

2     introduced into evidence?

3          MR. HUBBARD:  I have no objection to it being

4     introduced into evidence if counsel would like to use it.

5          THE COURT:  Okay.  Then it's in evidence.  What

6     exhibit is that again?  What exhibit is that going to be?

7          MR. JACKSON:  I'm going to mark it as DX-300.

8          THE COURT:  Okay.  DX-300 is in.

9          (Defendant's Exhibit 300 received in evidence)

10    Q.  What you write here at 8:41 a.m. is:  MP has the IM for EH

11    up on desktop, correct?

12    A.  Correct.

13    Q.  Again you're talking with Mary-Jo Rogers, right?

14    A.  Yeah.

15    Q.  At this time you still believe Mary-Jo to be your friend,

16    right?

17    A.  Sure.

18    Q.  This is before later on when you ended up in conflict with

19    Ms. Rogers?

20         THE COURT:  Sustained.  Let's move on, counsel.

21    Q.  Now, what you're talking about here is that you are looking

22    at Michelle Parker's screen and trying to see her

23    communications with Ms. Hedges, right?

24    A.  It looks to me, right, that Ms. Rogers is asking me -- it

25    says:  Michelle Parker has the instant message for Eileen

GC79PIC2                         Picarella - cross

1    Hedges up on her desktop.  I can't read but will try.

2            There may be a piece of information that Ms. Rogers

3    may be trying to get from Ms. Hedges.  This is not something

4    that I am doing -- it looks to me there is some type of

5    communication.

6            There were times, we were in meetings all day away

7    from the desk, and Ms. Hedges would be looking for pieces of

8    information or communication.

9            In that -- there is nothing malicious there from what

10   I can see; that I see Ms. Rogers, who sat on the other side of

11   our desk, asking me to check to see if there's something on

12   Melissa's desk for Ms. Hedges.  It sounds like a request is

13   coming from Ms. Hedges for information on Ms. Parker's desk.

14   Q.  You don't actually remember, it's your testimony, what this

15   communication was about, do you?

16   A.  Right.  But this is a pretty common occurrence.  We were

17   all in meetings and away from the desk all the time.  And there

18   was always a need for getting pieces of information back to

19   each other, especially for Ms. Parker because she was an

20   analyst and she would have a lot of data that we would be using

21   in meetings.  She supported the two of us.

22           So, yes.  I don't know a hundred percent but that

23   doesn't look like anything malicious.  It looks like Mary-Jo

24   was asking me for something.

25   Q.  Sir, at this time you and Ms. Parker were having some

1    substantial disagreements about your level of work, right?

2    A.  I don't think I had disagreements with Ms. Parker.

3    Q.  You are aware Ms. Parker was complaining that you were

4    passing off work to her and that you weren't at your desk,

5    right?

6    A.  Well, I -- through discovery and Sametime chats I saw her

7    complaining to Mr. DeLuca, another junior employee in another

8    group, that I was not at my desk quite often and that I was

9    delegating work to her.

10          But, my meeting calendar, it was passed to me

11   yesterday.  There was a good percentage of my time was in

12   meetings.  And Ms. Parker did support me and Ms. Hedges and we

13   did delegate work to her.

14   Q.  And the fact of the matter is at this point you're saying:

15   I can't read but will try.

16          Right?

17   A.  Yeah.  I don't know exactly what she was asking for there.

18          It looks like they're asking for some piece of

19   information, business information.  Mary-Jo was asking me to

20   look at the screen.  I don't recall exactly what it is she's

21   asking me for.

22   Q.  Okay, Mr. Picarella.  If it were the case that you were

23   trying to look at the screen in a way that wouldn't be without

24   Ms. Parker's consent, you wouldn't have to try, right?

25   A.  It all depends on what it is she was asking for.

1   Q.  Ms. Parker sat right by you, didn't she?

2   A.  She sat to my left.

3   Q.  How far away was her screen from yours?

4   A.  A couple feet.

5   Q.  So if it were actually okay with her for you to be looking

6   at her screen, you wouldn't have to try, right?

7   A.  I'm assuming she's not there.

8   Q.  Right.  And you wouldn't have to try?  You could just get

9   up and look at the screen, correct?

10  A.  Yeah.  But if it's a spreadsheet where there's information

11  I don't understand.  It all depends on what she's asking for.

12  And at this point in time, you know, I can't speculate if she's

13  asking me to look at some business data or, you know, what it

14  may be; a report of some sort.  And there were some things that

15  at that point in time I really needed somebody like Ms. Parker

16  to interpret for me.

17          MR. JACKSON:  Okay.  We can take this down.

18  Q.  Now, throughout 2011 you reported to Ms. Hedges, correct?

19  A.  Correct.

20  Q.  And at no point did Ms. Hedges work for you, right?

21  A.  Correct.

22  Q.  But that's something that you communicated to people

23  sometimes, right?

24  A.  No, I don't believe so.

25          MR. HUBBARD:  Your Honor, can we approach, please?

1    May we approach, please, with counsel?  I have some concern

2    about the use of these documents that are not in evidence.

3            THE COURT:  Maybe we can find out.  Counsel do you

4    plan to introduce these into evidence?  What do you plan to do

5    with these?

6            MR. JACKSON:  Not necessarily, your Honor.  I plan to

7    question him and impeach him with it.

8            MR. HUBBARD:  No objection for that purpose.

9            THE COURT:  Go ahead.  Show it to counsel and show it

10   to the witness.

11   Q.  Do you see this communication, sir?

12   A.  Yes.  I'm just reading it, trying to understand it.

13           Okay.

14   Q.  This is a June 14, 2011 communication between you and a man

15   named Bernardo Coindreau, right?

16   A.  Yes.

17   Q.  And in this communication you sent him a message at

18   4:28 p.m., correct?

19   A.  Yes.

20   Q.  What you said to him is --

21           MR. HUBBARD:  Your Honor, that's inappropriate.

22           THE COURT:  Hold on.  Hold on.  Hold on.

23           Please rephrase the question.

24           MR. JACKSON:  Yes.

25   Q.  In this communication you told Mr. Coindreau that Eileen

1   works for you, didn't you?

2              MR. HUBBARD:  That's not impeachment, your Honor.

3   He's offering direct evidence.

4              THE COURT:  Overruled.  You may answer the question.

5              THE WITNESS:  Yeah, but, again, this is in a joking

6   manner.  I was there one month.  Bernardo was actually a very

7   comical person.  We were joking around all the time.  There is

8   no way that -- yes, I said it.  But it was in a joke.  I was

9   doing some work for him and it was not meant in a serious way.

10  Q.  Okay.  Yes or no, what you wrote is:  Eileen works for me?

11  A.  Yes.  In a joking manner.

12  Q.  Yes or no, what you wrote was:  Eileen works for me?

13  A.  Yes.

14  Q.  There is no smiley faces on this, right?

15  A.  Well it's hard to determine tone in text messages.

16  Q.  There is no smiley faces on this, right?

17  A.  No smiley faces on the text.

18  Q.  There is no emoticons of any kind, right?

19  A.  I don't know if they had them at this point in time.

20  Q.  And this is 2011?

21  A.  Yeah.  I was there one month.

22  Q.  And there's nothing on this communication that says that

23  you're joking, correct?

24  A.  No.  But we would often.  Bernardo and I were joking around

25  quite a bit.

1    Q.  Well you know from what you described yesterday as your

2    participation in voluminous discovery Ms. Hedges complained

3    about the fact that you would tell people that she worked for

4    you, right?

5    A.  I don't know if she was telling people that.

6    Q.  Well you've seen that, haven't you?

7    A.  I have seen it in her chats but there was nothing I ever

8    said to her or people.

9    Q.  Well you've seen in her chats she was complaining to other

10   people that you were telling people that she worked for you,

11   right?

12              MR. HUBBARD:  Objection.

13              THE COURT:  Sustained.

14              THE WITNESS:  You'd have --

15              THE COURT:  Sustained.  No.  No.  No.  There's not a

16   question before you.

17              Go ahead, counsel.

18              MR. JACKSON:  Thank you very much, Judge.

19   Q.  Now you participated in a deposition in this case, didn't

20   you?

21   A.  Yes.

22   Q.  At that deposition you swore to tell the truth, didn't you?

23   A.  Yes.

24   Q.  And one of the things that you were asked in your

25   deposition was whether or not you had spoken to an individual

GC79PIC2                     Picarella - cross

1    named Ian Mullen the night before his deposition?

2              THE COURT:  Hold on.  Hold on.

3              Let's go ahead and take our morning break.

4              So, Members of the Jury, don't talk about this case

5    amongst yourselves or with anyone else.  We'll take a

6    fifteen-minute break and we'll see you soon.  Okay.

7              Don't discuss this case with anyone.  Don't do any

8    independent research related to any of the issues in this case.

9    Thank you.

10             (Jury excused)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Before we get into the back and forth on

3    this question, is Mr. Mullen here now?

4           MR. HUBBARD:  Your Honor, I don't know.  I asked him

5    to come.  I called him and I have to go find him.

6           THE COURT:  I believe Mr. Mullen is here, the

7    information that I have.  So when we come back from the break

8    it's my inclination to inform the jury that sometimes we have

9    to take witnesses out of order for scheduling reasons and we're

10   going to do that now.  They shouldn't infer anything from that.

11   Let's have Mr. Mullen testify, direct, cross, try to get that

12   done before lunch and then we'll go with the next witness,

13   Ms. Bilbrey -- may be butchering her last name.

14          What is the -- let me just find out from defense

15   counsel.  Where are you going with this?  You're going to the

16   deposition and where are you going with this?

17          MR. JACKSON:  You know, your Honor, on this question

18   alone I would ask if Mr. Picarella -- I would just ask if

19   Mr. Picarella could be excused potentially.

20          THE COURT:  Okay.  That seems to make sense for me.

21          MR. JACKSON:  And Mr. Mullen.

22          THE COURT:  Let's ask them to perhaps go in the robing

23   room because I think there may be jurors out -- let's ask them

24   to step back here.  They can step into the robing room.

25          MR. HUBBARD:  Mr. Mullen, you can just step out.

1              THE COURT:  Just come on through.

2              (Witnesses excused)

3              THE COURT:  Go ahead, counsel.

4              MR. JACKSON:  This is a short area of inquiry but at

5      Mr. Picarella's deposition he testified, he was asked the

6      question did you call Mr. Mullen the evening before his

7      deposition.  And he answered the question no.

8              Then after his deposition he submitted an errata sheet

9      where he changed his answer and said that he had spoken -- he

10     had spoken over the phone to Mr. Mullen the night before his

11     deposition.  So I just intended on confronting him with the

12     fact that he offered that testimony in his deposition and then

13     he subsequently submitted an errata sheet that indicated that

14     the testimony that he gave about that was false.

15             THE COURT:  Wait.  I'm trying to figure out.  What is

16     it -- I'm not sure that that's proper.  What is it exactly that

17     you're trying to get at?

18             If you're trying to ask him if he spoke to Mr. Mullen

19     prior to the deposition, you can ask him that question and see

20     what his answer is.  But what is it you're trying to get at?

21     You're trying to say --

22             MR. JACKSON:  I'm trying to say, your Honor, that he

23     has offered in his prior testimony related to this case

24     testimony that was incorrect related to how he has dealt with

25     witnesses.  And I think that that's a material fact that we

GC79PIC2                         Picarella - cross

1    should be able to confront him with.

2           It's actually quite strange, your Honor, to submit an

3    errata sheet after a deposition that substantively changes

4    answers as opposed to simply correcting, you know, a typo or

5    something that a court reporter may have believed was

6    incorrect.  We think that we should be allowed to probe him

7    just a bit on how it is that he gave one answer, one definitive

8    answer in a deposition, and then subsequently comes to a

9    completely different conclusion in an errata sheet.

10          MR. HUBBARD:  Your Honor, it's a massive waste of

11   time.  That was an exchange between counsel.  The errata sheet

12   was submitted.  The defense did not -- and after I wrote an

13   explanation accompanying it, counsel did not elect to continue

14   to take -- to ask him further questions under oath about it.

15          So it's just a massive waste of time because he

16   corrected it.  He corrected it promptly.  And there was no

17   further -- the defendant elected not to pursue it further in

18   any follow-up deposition.

19          So I agree with your Honor.  He certainly can ask him

20   if he had that communication.  He'll either say yes or no and

21   he can impeach him.

22          THE COURT:  I guess that's what I'm trying to get at.

23   It seems you may be reversing the order of this.  If you ask

24   him did you speak to Mr. Mullen immediately prior to your

25   deposition, he will say yes or no.  If he says no -- or if he

1   says yes, then you can impeach him with what he said previously

2   at the deposition.  If he says no -- whatever.  But I guess

3   there's the issue with the errata sheet and I suppose he can

4   explain it.

5           Can someone just tell me what was the explanation in

6   the errata sheet or what was the explanation?

7           MR. HUBBARD:  He just got it wrong.  He just -- after

8   the deposition he called me and he said I answered a question

9   yesterday that I now believe is wrong.  I wrote a letter.  He

10  corrected it.  And that was it.

11          MR. JACKSON:  I think the way your Honor is suggesting

12  it makes perfect sense.  I'll just ask that.  I don't expect

13  that to last more than a couple seconds.

14          MR. HUBBARD:  The deposition testimony now is the

15  errata sheet.  He can't impeach him with the underlying

16  statement.  That's the purpose.

17          MR. JACKSON:  That's wrong as a matter of law.  We've

18  researched this issue.  There is actually a significant opinion

19  that was written by a district court recently addressing the

20  fact that the submission of errata sheets that are in complete

21  conflict with what the testimony was at the time of a

22  deposition is improper under Rule 30 in the first instance.  It

23  certainly it is not the case that that errata sheet negates the

24  testimony.

25          THE COURT:  How soon after the deposition was this

1    errata sheet prepared?

2            MR. HUBBARD:  I don't know but it was within days or

3    weeks.  I know the communication was within days.

4            THE COURT:  All right.  If you want to ask him that

5    question, I'm not sure where we're going with this.  So it

6    sounds like you want to ask him a question about whether he

7    spoke to Mr. Mullen.  Perhaps he will say yes, I did.  You will

8    attempt to impeach him with the fact that he said something

9    different in the deposition.  And I suppose on redirect or

10   probably on the stand, the way things have been going, he will

11   say yes but I corrected that immediately thereafter and we'll

12   have that; that the witness voluntarily corrected something

13   that was wrong.  If that's what you wish to do, that's fine.

14           MR. JACKSON:  I appreciate that, your Honor.

15           MR. HUBBARD:  Your Honor I don't want to belabor this

16   but I think it would be wrong for counsel to ask that question

17   without providing the witness at the same time the errata

18   sheet -- I understand I could do it on redirect -- but I think

19   it would be somewhat deceptive to ask that question and attempt

20   to impeach him without giving him the full deck of cards.

21   That's just my view.

22           THE COURT:  I'm just trying to make sure I understand

23   what's happening.  So defense counsel wants to potentially

24   impeach Mr. Picarella with an inconsistent statement that was

25   made in a deposition that Mr. Picarella later voluntarily

1   corrected.  And plaintiff's counsel is objecting to defense

2   counsel going down this line of questioning without providing

3   Mr. Picarella the errata sheet at the time.  Is that where we

4   are?

5             MR. HUBBARD:  I don't think he can impeach him with

6   the deposition because the deposition is the errata sheet.

7   That's my point.

8             THE COURT:  All right.  Well we have some time to

9   think about this.

10             MR. HUBBARD:  Yes.

11             THE COURT:  We're going to deal with Mr. Mullen first.

12   Again I'll tell the jury that they shouldn't infer anything

13   from the fact that we take witnesses out of order.  It's just a

14   scheduling issue.  They shouldn't be concerned about that.

15   We'll go with it.  Let's have everyone here in about seven

16   minutes.

17             MR. JACKSON:  Thank you very much.

18             THE COURT:  I guess while we're thinking about that

19   since counsel both have associate counsel here, to the extent

20   defense counsel claims there are cases on this have your

21   associates send that to me and plaintiff's counsel as well send

22   it to me.  We'll certainly have -- I'll have certainly over

23   lunch to look at this because we're not going to deal with the

24   cross-examination of Picarella until later on.

25             So counsel I'll open the door.  You can get your

GC79PIC2                          Picarella - cross

1    witnesses out of the robing room.

2              (Recess)

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC79PIC2                       Mullen - direct

1                (Jury present)

2                THE COURT:  Welcome back.

3                Members of the Jury, due to some scheduling issues

4     we're going to take a break in the cross-examination of

5     Mr. Picarella by defense counsel and plaintiff's counsel is

6     going to call his next witness.  You shouldn't infer anything

7     from that.  We just sometimes have to do that for scheduling

8     reasons.

9                So plaintiff's counsel please call your next witness.

10               MR. HUBBARD:  Thank you, your Honor.  Your Honor, we

11    call Mr. Ian Mullen.

12      IAN MULLEN,

13         called as a witness by the Plaintiff,

14         having been duly sworn, testified as follows:

15               THE COURT:  Go ahead, counsel.

16               MR. HUBBARD:  Thank you, Judge.

17    DIRECT EXAMINATION

18    BY MR. HUBBARD:

19    Q.  Good morning, Mr. Mullen.

20    A.  Good morning, Mr. Hubbard.

21    Q.  I guess you see there's a microphone there so to the extent

22    you can --

23    A.  Is that okay.

24               THE COURT:  Just try to lean into the microphone.

25    Keep your voice up.  The acoustics aren't great.

GC79PIC2                          Mullen - direct

1              THE WITNESS:  Sure.

2              THE COURT:  Can all the jurors hear the witness okay?

3              Go ahead counsel.

4    Q.  Thank you, sir.

5              Mr. Mullen, where do you reside?

6    A.  Reside in Ascot Berkshire, which is in the United Kingdom,

7    about 20 miles outside London.

8    Q.  Was there a time when you were employed by HSBC Securities?

9    A.  Absolutely.  For ten years.

10   Q.  And what were the years that you were employed by them?

11   A.  From October 2006 until June '15.

12   Q.  While you were there did you know Michael Picarella, the

13   plaintiff in this case?

14   A.  During my time in the USA, correct.  I was in the USA for

15   just over three years.

16   Q.  So I gather some of your time at HSBC you were posted in

17   other places?

18   A.  Geneva, London, and New York.

19   Q.  Thank you.  Let's start perhaps with, if you would give us

20   a bit of your educational background before you entered the

21   business world?

22   A.  Yeah.  I went to Manchester University in England.  I

23   studies economics and politics.  I then went to Price

24   Waterhouse and qualified as a chartered accountant.  And then I

25   moved into investment banking.  And I've spent my whole career,

GC79PIC2                    Mullen - direct

1   20 years plus, in investment banking and private banking.

2   Q.  Let's talk a little bit about your career in investment

3   banking and even into private banking.  From the time that you

4   left the university and you obtained your accounting

5   certification, give us an overview of your work experience,

6   where you worked and the kind of work you did, please, prior to

7   joining HSBC.

8   A.  I did a number of -- well I worked in three continents.

9   I've worked in multiple areas of the investment bank.  So by

10  that I mean in the front office, in a COO capacity multiple

11  times, and CFO capacity.  I've worked in strategy.  I've worked

12  on regulatory projects.

13          In terms of countries I worked in, it would be --

14  Australia would be the only addition to what I've already said,

15  the three that I told you.

16  Q.  How about your -- the actual jobs that you had in the

17  financial services industry before you joined HSBC?

18  A.  So basically I spent ten years at Merrill Lynch.  And I

19  spent -- I've always worked at blue chip companies.  Ten years

20  outside Merrill.  I worked at Barclays Capital.  And I worked

21  at Bankers Trust.  So I've had teams of several hundred people

22  working for me throughout my career.  And I've worked in a

23  variety of different roles in those organizations.

24  Q.  Give us just a brief overview of the roles you had at those

25  three banks, please.

GC79PIC2                         Mullen - direct

1   A.   So if we were to talk about -- let's go through them in

2   order.   Bankers Trust is where I started.   I worked in the

3   finance department as what's called a product controller, happy

4   to explain that.

5   Q.   That's all right.

6   A.   Anything like that.

7            And I then moved to Merrill Lynch.   And at Merrill I

8   did a series of jobs in two countries which was COO related,

9   CFO related, and finance/product control related across

10  multiple continents.   So throughout my career I worked in all

11  of the asset process in global banking and global markets.   And

12  then to move on.

13           Then I moved to Barclays Capital.   At Barclays Capital

14  I was the global head of equity derivatives product control,

15  managing over a hundred people globally in multiple locations.

16  Q.   Where were you stationed or posted when you were at

17  Barclays Capital?

18  A.   London.   In London.

19  Q.   Did you have a rank or title in the firm?

20  A.   Yeah.   The equivalence of one below manager director.   So I

21  became manager director at HSBC.

22  Q.   Before we move to your work experience at HSBC let me

23  backup for a moment and ask you if in preparation for coming to

24  testify here today, if you had the opportunity to meet with

25  Mr. Picarella's counsel to discuss the case and prepare for

GC79PIC2                          Mullen - direct

1   your testimony?

2   A.  With yourself, correct.

3   Q.  And I gather that earlier on your deposition was taken in

4   this case?

5   A.  In April of last year, yes.

6   Q.  I took your deposition?

7   A.  Yes.

8   Q.  At the time I took your deposition were you represented by

9   counsel?

10  A.  HSBC counsel.

11  Q.  So at the time I took your deposition in this case you were

12  actually still working at HSBC?

13  A.  Correct.

14  Q.  Right.  Let's go to the time that you joined HSBC, please.

15  And can you tell us when that was and where you joined the

16  bank?

17  A.  Yeah.  So my ex-boss from Merrill Lynch moved to HSBC.  So

18  he basically headhunted me across to -- he was at Merrill.  He

19  moved to HSBC.  I followed him.

20          I started off as the COO and CFO for the global

21  equities division.  And so that was a very large business,

22  close to a thousand people.

23  Q.  What was your rank?  Were you promoted to managing

24  director?

25  A.  Not -- I think it was two or three years into being at HSBC

GC79PIC2                        Mullen - direct

1    that I got managing director.

2    Q.  And when you joined HSBC was it in the United States or in

3    London?

4    A.  No.  I joined in London.  So -- yeah.  London.

5    Q.  And when did you -- did there come a time when you came to

6    the United States to work with HSBC?

7    A.  Yes.  So in Q1 of 2010 I was really in a transition period

8    with my family in the UK doing both jobs for a period of time

9    and then full time here from May 2010.

10   Q.  How long were you with HSBC in the United States during

11   that tour?

12   A.  I left in the summer of 2013 when the school term ended for

13   my children.

14   Q.  And when you left did you continue to work for HSBC?

15   A.  Correct.  I moved on and did three different jobs.

16   Q.  Did you return to London?

17   A.  Yes.

18   Q.  And then you remained there until you said 2014?

19   A.  (No response).

20   Q.  '15?

21   A.  Yeah.  '15.  June '15.

22   Q.  When you were -- when your duty station was the United

23   States were you officed in New York?

24   A.  Yes.  At all times I was in 452 Fifth Avenue.

25   Q.  Which is -- maybe you can tell us.  Is that the HSBC

1  headquarters here in New York City?

2  A.  Yes.  Absolutely.

3  Q.  When you came to the United States in 2010 or so for HSBC

4  job what was your position or title?

5  A.  I was COO of global markets for the Americas.

6  Q.  And for those of us who don't know like me what does COO

7  mean?

8  A.  Sorry.  Chief Operating Officer.

9  Q.  And what were your responsibilities generally?

10  A.  Extremely diverse.  Really looking at -- I mean I could

11  talk for ten minutes about it, but I mean to summarize very

12  briefly:  Looking at operational risk around business, making

13  sure that financials are correct, making sure that -- liaising

14  with all of the different support groups, making sure that

15  every single asset class is moving smoothly, dealing with

16  things that senior management regard as high property,

17  mitigating risks.  Everyday was different.  It's not like I

18  could say I'm going to come in and do this on any given day.

19  It could be a multitude of things.

20  Q.  In that position of COO for global banking and markets, who

21  was your --

22  A.  Global markets.

23  Q.  Yes.  Who did you report to directly?

24  A.  I had two reports.  So in the USA it was Didier Descamps

25  and I also reported to the COO of global markets who is called

GC79PIC2                    Mullen - direct

1    John O'Sullivan based in London.

2    Q.   What was Mr. Descamps' position at that time?

3    A.   Sorry.  At that time he was the joint head of global

4    markets for the Americas.

5              MR. HUBBARD:  May we have, Mr. Fitzgerald, the

6    demonstrative exhibit that shows the structure of the bank in

7    2011.

8    Q.   This is a depiction of the organizational structure we've

9    seen before, Mr. Mullen for Global Markets Americas senior

10   management.  If we start here -- it appears to be January 2011.

11   In January of 2011, are you in place?  Your name is on this

12   chart.  Are you in that spot?

13   A.   Yes.

14   Q.   And shows you as MD, COO Global Markets Americas?

15   A.   Yes.  That was my job.

16   Q.   And we see Mr. Descamps who you just mentioned.  There

17   seems to be a line between you and Mr. Descamps' box.  Does

18   that mean that you have a reporting relationship in to him?

19   A.   Absolutely.

20   Q.   And you see a section down below the Descamps level.  You

21   see a section called sales.

22   A.   Yes.

23   Q.   And Mr. Pizzimbono's name is there?

24   A.   Correct.  Yes.

25   Q.   While you were in your position here did you work with

1   Mr. Pizzimbono?

2   A.  Yes.  I worked with him closely.  On several things.

3   Q.  And this chart shows him reporting directly in to

4   Mr. Descamps and Mr. Brandao.  Did he report directly to you?

5   A.  No.  We were -- so all those people that you see were peers

6   with the exception of the assistant on the right, Marie.

7   Q.  All these we see on the top list?

8   A.  All those people on the first row where Pablo is and myself

9   were peers.

10           MR. HUBBARD:  Mr. Fitzgerald, can we go to the next

11  page that has Mr. Mullen's organizational structure on it, may

12  be a page or two over.  I think there's one more.  Can we get

13  to Mr. Mullen's -- yeah.

14  Q.  Take a look at this chart for a moment, Mr. Mullen.  Does

15  that recently depict your COO organization around the beginning

16  of 2011 at HSBC?

17  A.  It does.

18           I was just making sure that I'm, a hundred percent,

19  giving you the right answer.  It does.  There are also

20  additional people that reported to me as well as that.  Just to

21  clarify.  There were certain parts of like for instance

22  facilities which didn't naturally fit into any area.  So as

23  well as that.  There was also other areas with maybe three or

24  four that reported in to me.  But in terms of the COOs or

25  business managers, you have them listed all there.

1    Q.  There is Ms. Suzy White.  SVP.  Deputy COO Global Markets

2    shown on this chart.  What was her job at this time?

3    A.  So she was my deputy COO.

4    Q.  And moving in order in 2011 did there come a time in 2011

5    when you changed jobs at the bank?

6    A.  Yeah.  November 2011 I moved to a role reporting to Patrick

7    Nolan who is the COO of global banking and markets.

8    Q.  And did you remain in New York?

9    A.  In the same office.

10   Q.  And there is a group of business managers down beneath you

11   there.  And just very quick fashion, summary fashion, what did

12   those business managers do?

13   A.  So the way that I described what I did, which could have

14   been a multitude of things, they were doing it specifically for

15   that asset class.  So if you take somebody like Alex -- well

16   that's a bad example.  Caroline Kulik right in the middle.

17   Rates.  Her role was specifically to look at all of the risks,

18   all of the issues, the financials around rates and escalate as

19   appropriate up the chain, Suzy and myself.

20   Q.  Down in the second column there you see a section called

21   sales?

22   A.  Correct.

23   Q.  There are two individuals there Mary-Jo Rogers

24   vice-president and Eileen Hedges a senior vice-president.  Did

25   you know them while you were there in this period of time?

1    A.   Yes.

2    Q.   What was Ms. Hedges' role as of January 2011?

3    A.   She was the head of sales, business management, COO.

4    Q.   Did there come a time in the first part of 2011 that you

5    and your colleagues in senior management in Global Markets

6    Americas believed that it was necessary to recruit a successor

7    for Ms. Hedges?

8    A.   Yes.  The theme below Eileen was junior.  And there was no

9    obvious successor for her internally in the organization.  So

10   we started an external search to find somebody to basically be

11   a number two to Eileen with the ultimate being that that person

12   would ideally be a replacement for her.

13   Q.   Were there any discussion as of January 2011 of, in fact,

14   having her assigned to a different position?

15   A.   Sorry.  Just so I'm clear.  Eileen moving to another

16   position?

17   Q.   Yes.

18   A.   In 2011?

19   Q.   Yes.

20   A.   Not in January of 2011 or Q1 of 2011, no.

21   Q.   Did there come a time when the bank began to recruit a

22   person to take this deputy slot under Ms. Hedges?

23   A.   Yes.  Probably we commenced it at the end of 2010, I would

24   guess.  It normally takes several months to get the right

25   person.  People have sometimes three to six months periods

GC79PIC2                    Mullen - direct

1   where they can be in an organization before they can leave, so

2   yes.

3                  (Continued on next page)

1    BY MR. HUBBARD:

2    Q.  Were you involved in that process?

3    A.  Yes.

4    Q.  And just briefly, which other senior members of management

5    were involved in searching for a deputy?

6    A.  Almost certainly it would be Eileen Hedges would have been

7    involved, Pablo would have been involved, and Suzy White would

8    have been involved.  And maybe one other person from another

9    area to look at another perspective, but HR would have those

10   records.

11   Q.  Did there come a time that a candidate was identified for

12   this job?

13   A.  Yes.

14   Q.  Who was that candidate?

15   A.  It was Mike.

16          THE COURT:  Let me check in with the jury, is the jury

17   still able to hear the witness?

18          JUROR:  Yes.

19          THE COURT:  Make sure you keep your voice up.

20          Go ahead, counsel.

21   BY MR. HUBBARD:

22   Q.  And did there come a time in fact when Mr. Picarella was

23   chosen for this role as deputy to Ms. Hedges?

24   A.  Yes, May 2011 he started out in the organization.

25   Q.  Were you involved in the decision to select him for that

1    purpose?

2    A.  Yes, I was part of that process.  I probably would have

3    seen him last, I would guess.  And my role was probably to sell

4    the role to him.  That would be normal the way it would work

5    for any hire.  And then after I had seen him we would have

6    consulted all the people that had interviewed Mike to decide

7    whether he was or was not the right candidate for the role, and

8    they decided he was.

9    Q.  When you decided he was, what is your recollection of your

10   review of his qualifications and experience for that job?

11   A.  He had a significant amount of sales experience, which is

12   exactly what we were looking for somebody in that role.  And we

13   saw him as a viable take out for Eileen.

14   Q.  When he joined the bank, did he receive -- what rank did he

15   receive, do you remember?

16   A.  SVP.

17   Q.  When you were searching for a deputy to succeed Ms. Hedges,

18   did you explore the credentials of any candidates who were

19   working in the bank at that time in gold markets Americas?

20   A.  There were no internal candidates that were viable at that

21   time.

22   Q.  Did you know Carol Jenner?

23   A.  Yes.

24   Q.  Was she in this the organization at that time?

25   A.  Yes.

GC7TPIC3                       Mullen - direct

1    Q.  Was she ever considered?

2    A.  No, never even spoken about as an option.

3    Q.  Did you know her depth of experience at that time?

4    A.  Yeah, I worked with her for a period of time.  She wasn't a

5    viable candidate for that role.  She wasn't a viable candidate

6    to take out Eileen Hedges.  That wasn't just my view, by the

7    way, there was a group of people that were making this

8    decision.  So there was no viable internal candidate.  If there

9    was a viable candidate internally, generally any bank would go

10   with the internal candidate that was viable rather than doing

11   this type of search.

12   Q.  Did you consider, in making this choice of Mr. Picarella,

13   whether or not he had any operational risk experience in

14   addition to sales experience?

15   A.  Yes, he had operational risk experience.  To be honest, the

16   primary reason he was hired was sales.  But what I would say

17   about sales is a large part of that role is actually related to

18   operational risk.  If you don't understand operational risk,

19   you can't be successful in that role.

20   Q.  Did you have the opportunity to observe Mr. Picarella's

21   performance from the time he joined the bank in early May of

22   2011 until the time you changed assignments?

23   A.  Yes.  Just to be clear, we're talking about the period of

24   May to November 2011 that Mike directly worked within my

25   department.  So my views of Mike and what sort of Mike did in

1    that period of time is that he highlighted a number of issues

2    that no one highlighted before.  One of them was one of the

3    most material risks we ran as an organization, and he basically

4    brought it to the attention of senior management and worked on

5    resolving it.  And that had not been highlighted by any

6    individual before.  That would be the first thing I would say.

7            The second thing he did, which again, nobody had

8    highlighted, was we used to have weekly meetings about the

9    on-boarding of new clients or new business, et cetera.  Mike

10   highlighted the fact that there was a shortage of people in a

11   certain area, and that area was actually hedge fund sales, and

12   if we could resource that area correctly we could generate a

13   significant amount of revenue because there was a roadblock in

14   the area.

15           So those are two material things that I recall him

16   highlighting that had never been brought up before during that

17   time.

18   Q.  Mr. Mullen, if you had -- at the time that you assumed your

19   new responsibilities in November, I think we may have asked you

20   this before, if you had to put Mr. Picarella in the performance

21   evaluation queue, where would you have placed him?

22   A.  So I have never known anybody that has been in an

23   organization for part of year to get --

24           So the rating that HSBC uses, are people aware of them

25   or do I need to explain them?

1    Q.  I think they know generally.

2    A.  So generally if you have been there for less than a year

3    and you are doing a good job you will get a three, which is

4    regarded as a strong performer.  If Mike had continued to work

5    at that level for twelve-month period or had been doing that --

6    been there since January, let's say, he would have been a two.

7    Q.  You remained in the headquarters office -- we'll talk about

8    your new job in a moment, but you remained in the headquarters

9    office through -- into how far beyond November 2011?

10   A.  Sorry?

11   Q.  How long did you remain working in the headquarters office

12   in New York?

13   A.  The whole time I was in the USA, so until the summer of

14   2013.

15   Q.  And in that period of time, from the time you changed jobs,

16   so to speak, until you left, did you have occasion to observe

17   Mr. Picarella in the office?

18   A.  Yes.

19   Q.  Did you know him?

20   A.  Yes.

21   Q.  Did you socialize with him?

22   A.  We had lunch twice.  That was the extent of our

23   socializing.

24   Q.  But you knew him professionally?

25   A.  Professionally.

GC7TPIC3                    Mullen - direct

Q.  If I were to say that someone characterized him as lazy,

what would you say?

A.  That would be incorrect.  I was generally one of the

earlier people in to work, and Mike would have been, in that

sales team, generally the earliest person to work within that

sales team.

        When I was working late, he was generally -- and I

left the office, I would generally see Mike there.  And not --

there's two ways of looking at that.  You could say someone is

putting in long hours but not actually doing anything.  In

reality, not only was he working long hours, he was actually

substantively bringing material risks forward, as I just

highlighted.

Q.  At any point in time while you were in New York did you

hear any criticism of his work performance from any source?

A.  No.  And just to clarify, when I left the role of COO in

November '11, there was not one conversation that I ever had

with anybody that Mike was not the logical successor to Eileen

Hedges.

Q.  Just briefly let's talk a moment about the work you were

doing for HSBC in this period of time between November 2011 and

2013 when I gather you returned to London.  Describe generally

what that assignment was and who you reported to.

A.  So for that period of time, so we're talking now about

November '11 to summer of '13, I worked for the COO of global

GC7TPIC3                        Mullen - direct

1    banking and markets.  His name is Patrick Nolan, and he was the

2    boss of Didier Descamps.  My role was two things, I was head of

3    what was called business transformation and cultural

4    transformation.

5            Now business transformation was focused around three

6    specific areas, I would say.  It was 14 programs of work I was

7    working on, regulation, business reengineering, and demise and

8    disposal of business.

9            And on the cultural transformation side, I was one of

10   ten what they called master trainers for cultural

11   transformation.  And what that meant is I was one of the lead

12   traders that had to train -- me and relatively small group --

13   every individual in the USA on cultural transformation.

14   Q.  I gather these types of things you're talking about are

15   things that most banks would think important and work on.

16   A.  Yes.  I mean those things all banks should be doing in some

17   shape or form, or if they weren't, they should have been.

18   Q.  Did there come a time when you learned that Eileen Hedges

19   had been removed from her management position mid 2012 or so,

20   and that in the late summer or early fall that Carol Jenner had

21   been selected for that position over Mr. Picarella?

22   A.  Yes.

23   Q.  Can you tell us from your experience, both in the

24   investment banking business and at HSBC, what the practical

25   effect of having him passed over for that position and

1    reporting to a less experienced executive would be?

2              MR. JACKSON:  Your Honor, I'm just going to object.

3              THE COURT:  Would be on whom?

4              MR. HUBBARD:  On Mr. Picarella.

5              THE COURT:  I'll allow it.

6    A.  Yeah, the practical effect for Mike in that situation --

7    bear in mind Carol Jenner is a VP and Mike is an SVP.  It's

8    basically saying to him he has no future in the organization.

9              And I would also like to draw on my experience in

10   banking, in 20-plus years of working in banking, I never once

11   have seen a situation such as the one that we're now talking

12   about where you have a more junior person as the boss of a more

13   senior person.  So it was tantamount to saying no future.

14   Q.  Just a couple of follow-up questions since you're all the

15   way here.  Are you married?

16   A.  Married with three kids, yes.

17   Q.  What does your wife do?

18   A.  She is a doctor.

19   Q.  And are you here today pursuant to some kind of compulsion,

20   or are you here at my request to testify in this case?

21   A.  That's a difficult question to answer, Mr. Hubbard.  I'm

22   here at your request, but I would also say I would be here at

23   the request any individual that had come to me with the issues

24   that somebody such as Mr. Picarella did, and I would mentor

25   them the way that I have Mr. Picarella in how I felt they

GC7TPIC3                    Mullen - direct

1   should be dealing with such a situation that they were in, and

2   that person saw my trust in that, and I would do that for

3   anybody.

4   Q.  We talked a little bit earlier about your -- about you

5   giving a deposition in the case when you were working at HSBC.

6   Before that deposition, did you meet with the bank's lawyers to

7   prepare you for the deposition?

8   A.  Yes.

9   Q.  What did you do in terms of meeting with Mr. Picarella's

10  lawyers to prepare for your testimony here?

11  A.  Sorry, for the deposition itself?

12  Q.  No, let's put the deposition aside.  We talked about the

13  fact that you met with HSBC counsel.  That's perfectly proper

14  to prepare for your deposition because you were an HSBC

15  employee.

16  A.  Mm-hmm.

17  Q.  In preparing to testify here in this court, have you had

18  occasion to speak to and meet with Mr. Picarella's lawyers to

19  assist you in getting ready for this?

20  A.  You mean yourself?

21  Q.  Yes.

22  A.  Yes, absolutely.

23  Q.  I should say myself.

24  A.  Yes, I talked with you to discuss this.

25  Q.  And in the last six months or so, have you spoken to

GC7TPIC3                      Mullen - cross

1      Mr. Picarella?

2      A.  I have spoken to Mr. Picarella occasionally, because he's

3      had to advise me that I may be in such a situation as this.

4      Q.  And in those occasions when you discussed -- when you

5      talked to him, did you discuss the logistics of appearing here?

6              A better question would be:  Did you talk to him

7      substantively about the case is about, what your testimony

8      would be?

9      A.  Not about what my testimony would be, no.  We spoke about

10     logistics.  And the only things that we have spoken about are

11     things that are in the public domain anyway that anyone could

12     find on the internet.

13             MR. HUBBARD:  May I have just a moment, your Honor,

14     please.

15             (Pause)

16             MR. HUBBARD:  Mr. Mullen, thank you, no further

17     questions.

18             THE COURT:  Any cross-examination?

19             MR. JACKSON:  Yes, please, your Honor, thank you.

20             THE COURT:  Okay.

21     CROSS-EXAMINATION

22     BY MR. JACKSON:

23     Q.  Good morning, Mr. Mullen.  How are you?

24     A.  Very good.  How are you?

25     Q.  Good.  Thank you.

GC7TPIC3                         Mullen - cross

1          You said that you spent time in Manchester?

2   A.  Yes, I spent a large part of my life in Manchester, yes.

3   Q.  Let me ask you, Mr. Mullen, during your time at HSBC, you

4   understood the bank's policies with regard to sexual

5   harassment?

6   A.  Of course.

7   Q.  Something that you took very seriously yourself, correct?

8   A.  Yeah.

9   Q.  Certainly to the extent that you were aware of any sexual

10  harassment, that was something that you found to be

11  unacceptable in the workplace, correct?

12  A.  Yes, of course.

13  Q.  And something that you found to be inconsistent with HSBC

14  values?

15  A.  Yes.

16  Q.  During the time that you worked at HSBC, overwhelmingly you

17  saw that that was the overwhelming belief of people at the bank

18  that you worked with, correct?

19  A.  Can you clarify what you are getting at with that question?

20  Q.  Yeah, I guess what I'm asking you is in terms of -- you

21  worked at HSBC for how long?

22  A.  Ten years.

23  Q.  The vast, vast majority of the people that you dealt with

24  over the course of those ten years, in your opinion, took that

25  sexual harassment policy very seriously, right?

1    A.   Correct, yes.

2    Q.   Now one of the things that you talked about was there was a

3    period of time when Mr. Picarella was working underneath your

4    organization, correct?

5    A.   Yes, he was in the COO organization, and worked, yes, for

6    me and all my group, yes.

7    Q.   And again, what was the name of your group?

8    A.   Chief operating officer group.

9    Q.   Right, but for a specific part of the bank, right?

10   A.   Global markets.

11   Q.   And can you just explain to our jury what is the

12   overarching objective or goal of the global markets group.

13   A.   To basically sell -- so I would really need the org chart

14   back up, but if you go to Mr. Hubbard's organization chart, you

15   would have global banking, global banking had all the clients.

16   Global markets produced the product.  And so basically the way

17   that it would work is markets would produce the product, they

18   would then liaise with banking, who owned the clients, and try

19   and sell that product to the clients.  And separate to that

20   there was also -- that's client-related transactions, we also

21   had proprietary positions as well, which the bank was allowed

22   to take at that point in time.

23   Q.   Now one of the things that you described was the role for

24   which Mr. Picarella was hired, right?

25   A.   Sorry, repeat the question?

1    Q.  One of the things you were describing in your direct

2    testimony was role for Mr. Picarella was hired.

3    A.  Yes.

4    Q.  And you would agree with me, Mr. Mullen, that effective

5    communication with colleagues is something that was important

6    in that role, right?

7    A.  Of course.

8    Q.  You would agree with me that it would be very difficult to

9    perform that role if one wasn't operating at the appropriate

10   level of collegiality, correct?

11   A.  Yes.  I mean obviously, yes.

12   Q.  Now you were -- what was the time period that Mr. Picarella

13   was actually working under you?

14   A.  So we're talking about May 11 to November 11 that I was

15   head of the COO group, and Mike worked in the COO group.  He

16   continued to work in the COO group while I moved into the role

17   that I described to Mr. Hubbard in which I was working for

18   Patrick Nolan.

19   Q.  Just be clear, where were you physically after you moved

20   into that new role in November?

21   A.  In exactly the same building.

22   Q.  What floor did you work on?

23   A.  I worked on the 9th floor when I was a COO, and I worked on

24   the third floor with Patrick Nolan.

25   Q.  Which floor did Mr. Picarella work on?

1    A.  The 9th floor.

2    Q.  So after November 2011 you didn't work on the same floor

3    anymore with Mr. Picarella, right?

4    A.  Correct.

5    Q.  And as I think Mr. Hubbard alluded to, you testified before

6    in a proceeding connected to this.  You agree with me, correct,

7    that after November 2011 you didn't really have an opportunity

8    to observe anything about Mr. Picarella's actual work product,

9    right?

10   A.  No.  Well, sorry, your question is I had -- I knew nothing

11   about his work product from November 11 onwards, is that your

12   question?

13   Q.  That's correct?

14   A.  No, that's not correct.  I did have -- I was aware of

15   things that Mike was working on post November 11.

16   Q.  Okay.  But just to be clear, most of your perception or

17   impression of Mr. Picarella's quality of work, impression that

18   you described before, that was focused on May to November of

19   2011, correct?

20   A.  When you say "most," most can be 55 percent.  In answer to

21   your question, I clearly had more exposure to him when he

22   worked on my team.  I also had exposure to Mike and what he did

23   when I was on global banking and markets transformation and

24   cultural transformation manager as well.

25   Q.  One of the things that you said previously is that you had

1  very little engagement with your old team after November 2011,

2  correct?

3  A.  Correct.  But then I would say that was person by person,

4  so some of those people on that list I had nothing to do with,

5  and then there's some I had a reasonable amount to do with.

6  Q.  The only thing I'm asking you is you agree with me that you

7  had very little engagement with your old team after

8  November 2011, correct?

9  A.  Not really correct, no, because global banking and markets

10  transformation and cultural transformation involved every

11  single one of those individuals, so I trained every one of

12  them.  So no, incorrect.

13  Q.  I'm not really trying to -- I'm only trying to clarify, I'm

14  not trying to confuse you.  But didn't you testify, Mr. Mullen

15  at your deposition:  To the role that I moved into, I had very

16  little engagement with my old team, so it's not like I would

17  have been heavily involved in any incidents that were ongoing

18  beyond that date.

19  A.  I suppose that was very little engagement around the COO

20  aspects that the majority of the them would have been doing.

21  That would be correct, if that's what you're asking.

22  Q.  I'm only asking:  Was that your previous testimony?

23  A.  Around the COO side, yes.  But I had a lot of engagement

24  with them around the role they were going to be doing because

25  it was integral at global markets, my role at global banking

1    and markets.

2    Q.  Now you consider Mr. Picarella a friend, correct?

3    A.  No.

4    Q.  You don't consider him in any way a friend of yours?

5    A.  No.

6    Q.  But you have been friendly with Mr. Picarella throughout

7    the time that you have known him?

8    A.  No.

9    Q.  You haven't been friendly with him?

10   A.  No.

11   Q.  Were you -- you did help him put together some of his

12   complaints, right?

13   A.  I mentored him, like I said when Mr. Hubbard asked me the

14   question, just as I would any other individual in the

15   organization that had come to me with such an issue.  And I

16   mentor anybody that, again, was an exactly the same scenario.

17   So just to clarify, being as you brought up the word "friend,"

18   Mike and myself have never been for dinner, we have never been

19   for a drink together, we have never -- I have never met his

20   family.  99 percent of our liaison has been professional.

21   Q.  That's completely fine.  All I'm asking you is there were

22   occasions, as you described, where you were monitoring him at

23   work, right?

24   A.  Monitoring and friendship are very different things.

25   Q.  Okay.  So you were monitoring him through dealing with the

1   complaints that he was raising, right?

2   A.  Correct.

3   Q.  You actually helped him draft some of his emails that he

4   sent to HR, correct?

5   A.  Correct.

6   Q.  But you actually had no idea whether what he was

7   investigating was valid or not, right?

8   A.  I don't want to -- I don't know whether what he was

9   investigating was valid or not.  I was the first person, I

10  believe, that he came to speak to about -- I don't know if

11  we're allowed to talk about it, mention it in court or not, but

12  I was the very first person that he came to about the specific

13  allegation.

14  Q.  Right.  All I'm asking you is if you agree with me, sir,

15  that you have no idea whether what he was investigating was

16  valid or not.

17  A.  There were witnesses to it.  I have very little doubt it

18  was true.  He had no reason to come to my office and lie.

19  Q.  You testified at your deposition, sir, didn't you, that

20  whether what Mike was investigating was valid --

21          THE COURT:  Counsel, do you have a page number and

22  line number?

23          MR. JACKSON:  Yes, your Honor.  I would direct us to

24  page 33 of the deposition.

25          THE WITNESS:  Call it up on the screen or not?

1          MR. JACKSON:  We'll come back to that.

2          MR. HUBBARD:  Page and line?

3          MR. JACKSON:  We'll come back to that.

4          THE COURT:  You'll withdraw the question?

5          MR. JACKSON:  I'll withdraw it, your Honor.

6          THE COURT:  Go ahead.

7   BY MR. JACKSON:

8   Q.  Now at the time that Mr. Picarella told you about the

9   incident that you talked about at the end of 2011, that's

10  something that you took seriously, right?

11  A.  Of course.

12  Q.  And you encouraged Mr. Picarella to talk to HR about it,

13  correct?

14  A.  I encouraged him to do the right thing, and obviously I

15  asked him if he wanted me to get involved.  He didn't at that

16  point in time work directly for me.  He came to me and asked me

17  not to escalate it, and said he would like to try and deal with

18  it himself with his management.  And he was new to the

19  organization, and I think that he probably felt that escalating

20  something of that severity, when he had only been in the

21  organization for a relatively short space of time, was not

22  going to put him in a very good situation.  So he was trying to

23  resolve it with his management, was my understanding.  My

24  natural inclination -- well, if he hadn't worked for me I would

25  have escalated it straight away.

1    Q.  I'm asking one question:  You encouraged him to talk to HR

2    about it, correct?

3    A.  I told him that was the correct approach, and I advised him

4    all the way -- whenever he asked me, I told him the correct

5    channel I felt that he should go down for such an issue.

6    Q.  Mr. Mullen, you do agree with me that after November 2011

7    you were not the best person to observe exactly what the nature

8    of Mr. Picarella's work was, right?

9    A.  Correct.

10   Q.  There were a number of other people at the bank who were

11   working much more closely with Mr. Picarella during those years

12   that followed after the end of 2011, right?

13   A.  There were, but I also worked with Mike.

14   Q.  I'm asking:  There were a number of other people, right?

15   A.  Yes, but that was actually the case when I was COO as well,

16   there were a lot of people that worked more closely with Mike

17   than I did.

18   Q.  And when you were COO you were working several levels above

19   him, correct?

20   A.  Yes, I was very impressed with the things that he actually

21   highlighted in a very short space of time.

22   Q.  What portion of the day would you spend with Mr. Picarella

23   during that time period?

24   A.  To clarify, which time period?

25   Q.  During the May to November '11.

GC7TPIC3

1   A.  Sixty-five people reported to me globally, a very demanding

2   boss, very hard to put a percentage on it, but my door was

3   always open.  I had business managers in all areas.  I used

4   them interchangeably.  Two percent.

5   Q.  Okay.

6   A.  Maybe one percent, two percent.  But bear in mind the

7   amount of stakeholders I had to deal with, every single support

8   group I had, I had all of my COO team, and my boss, and bosses

9   in London.

10           MR. JACKSON:  I appreciate that.  Thank you very much,

11  Mr. Mullen.  I don't have any other questions for you at this

12  time.

13           THE WITNESS:  Thank you very much.

14           THE COURT:  Any redirect?

15           MR. HUBBARD:  Nothing further, your Honor.

16           THE COURT:  Okay, the witness is excused.

17           THE WITNESS:  Thank you.

18           THE COURT:  Let's do this, let's take a quick

19  eight-minute break while I discuss some scheduling matters with

20  counsel.

21           Don't talk about the case with anyone.  I will see you

22  soon.

23           (Continued on next page)

24

25

1          (Jury not present)

2          THE COURT:  Is the next witness already here?

3          MR. JACKSON:  Yes, your Honor.

4          THE COURT:  Great.  Plaintiff is going to call

5   Ms. Bilbrey, and I will again instruct the jury that they

6   shouldn't infer anything from the fact that we're taking

7   witnesses out of order, this is due to scheduling concerns, and

8   we'll get back to the cross-examination of Picarella at a later

9   time.

10          I think it may also make sense for me to let the

11  jurors know when they come back from this break, or at least

12  before lunch, that we're going to break at 4 o'clock today, so

13  the jurors can make appropriate plans.  There is one juror who

14  has a ten-month old child and had some child care concerns and

15  will probably be glad to know they don't have to keep the

16  baby-sitter staying late.

17          MR. HUBBARD:  Your Honor, again I indicated I don't

18  have very long with Ms. Bilbrey.  Mr. Jackson said he might

19  have half an hour.  Does it make any sense to start after

20  lunch?

21          THE COURT:  No, I think we should start her now.  We

22  may have to finish her after lunch, but let's go ahead while we

23  have a little bit of momentum going.

24          Regarding that other issue that counsel discussed, let

25  me check something.

GC7TPIC3

1          Let me just ask Mr. Picarella, I guess, to just step

2     outside again for a second.  We have an issue that counsel were

3     discussing before.  You can step right outside.  You can use

4     the robing room.  There's a restroom that you can use.

5          (Plaintiff not present)

6          THE COURT:  And again we'll get to the

7     cross-examination of Mr. Picarella sometime after lunch.  I was

8     doing a little bit of research myself regarding the issue that

9     counsel had talked about.  And counsel are free again over the

10    lunch break to send me any cases that you have.  It seems to be

11    a good starting point may be Podell v. Citicorp Diners Club,

12    112 F.3d 98, where the Second Circuit has stated that Rule

13    30(e) allows deponents to make changes in form or substance to

14    their testimony and prevent any changes that are made to the

15    final transcript.  The deponent invoking this privilege must

16    sign a statement citing such changes and reasons given for

17    making.  But the language of rule places no limitations on the

18    type of changes that may be made, nor does the rule require a

19    judge to examine any sufficiency, reasonableness or legitimacy

20    of the reasons for the changes, even if those reasons are

21    unconvincing.  Citing Lugtig v. Thomas, 89 F.R.D. 639, 641

22    (N.D. Ill. 1981).

23         But the circuit goes on to continue at the same time:

24    When a party amends his testimony under Rule 30(e), the

25    original answer to the deposition questions will remain part of

GC7TPIC3

1    the record and can be read at the trial.  Citing Usiak v. New

2    York Tank Barge Company, 299 F.2d 808 (2d Cir. 1962).  Nothing

3    in the language of Rule 30(e) requires or implies that the

4    original answers are to be stricken when changes are made.  And

5    this court has recognized that because any out-of-court

6    statement by the party's admissions, deponent's principal

7    answer should be admitted into evidence, et cetera, et cetera,

8    et cetera.

9             So counsel should start their analysis of this issue

10   perhaps with that case.

11            MR. HUBBARD:  Sounds likely.

12            THE COURT:  It does seem to me that, looking at that

13   case, and I Shepardized it, that that is part of the -- to the

14   extent that plaintiff's counsel is making point that the errata

15   sheet replaces the prior statement, that seems to be incorrect.

16            MR. HUBBARD:  It does sound that way, yes.

17            THE COURT:  So we'll deal with that again after lunch.

18            On the other hand, obviously counsel is free, if

19   counsel wants, to go down this road.  I want to try to not have

20   testimony that is -- I guess it's not cumulative.  I'm not sure

21   how persuasive any of this is, but if counsel wants to go down

22   that road I will let counsel do that.

23            But I would like to move things along and don't want

24   to -- I don't think it's necessary for me to force defense

25   counsel to give Mr. Picarella the errata sheet during the

1    examination, but again, I'm not sure how -- I'm not sure what

2    this means, and I will not tell counsel how to try their case,

3    but if the question will be did you speak to this other witness

4    before your deposition, and then the answer to that I assume

5    might be yes, and then to -- I'm not sure where that is going.

6    If the implication is because he spoke to that witness that the

7    testimony at the deposition is somehow shaded or his testimony

8    here is somehow shaded seems to contradict that to then go back

9    to the other stuff.  But I will let counsel do what they want

10   to do, but I wanted to let counsel know that's the case that I

11   see, and counsel should start with that case.

12           Anything else?

13           MR. JACKSON:  Your Honor, I do have one issue.  I want

14   to say point taken, your Honor, and we will take it under

15   advisement, and we appreciate that.

16           I want to raise -- Mr. Picarella is out of the room.

17   Mr. Picarella has been answering some of my questions with what

18   we view to be very long, narrative answers.  That's fine, we

19   haven't been interrupting him.  However, my cross could be done

20   much more quickly if, to the extent that it is clear that

21   Mr. Picarella has veered beyond it, I could be permitted to

22   stop Mr. Picarella and say:  That's not necessary, I would like

23   you to refocus on my question.  Because we're getting like

24   literally two minute long answers to questions that are like

25   was it red or was it blue, and it's just making what should be

1    a relatively concise cross into something that is going to last

2    forever.

3            THE COURT:  What's plaintiff's counsel's position on

4    this?

5            MR. HUBBARD:  Your Honor, the problem is when you

6    attempt this kind of straitjacket cross-examination of a

7    witness, it's not always clear cut that there is a yes or no

8    answer.  And we have seen that our entire professional lives.

9            So it's not easy for a witness who is trying to be

10   fair but trying to be fair to himself to always answer yes or

11   no, so that's what he's doing.  I have no problem with bringing

12   him in before he testifies and perhaps having the Court say to

13   him that he should be more concise.  I don't have any objection

14   to that at all, and that might be helpful for both of us.

15           THE COURT:  What's defense counsel's position on that?

16           MR. JACKSON:  I'm not sure, your Honor.  It's a little

17   bit of a -- what I don't want is for him to say he's not

18   answering the questions, that he's not getting the opportunity

19   to answer questions.  But I just feel like we have to figure

20   out a way without -- we have to figure out a way of stopping

21   some of the super long answers.  Whether I am stopping him or

22   just offering an objection at some point in these narratives

23   and then asking the Court, as we're taking it piece by piece,

24   to instruct him however is appropriate, I think that's fine,

25   but I don't know that an overarching instruction is necessarily

GC7TPIC3

1    helpful.

2              THE COURT:  Okay.  We'll see what happens.

3              MR. HUBBARD:  Can we have a couple of minutes?

4              THE COURT:  Make it quick.

5              MR. JACKSON:  Thank you, Judge.

6              (Recess taken)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Jury present)

 2          THE COURT:  Just a bit about scheduling.  We'll break

 3    for lunch about one o'clock, and I will let you know we'll

 4    break for the day today at 4 o'clock.  So you should know that

 5    in case you need to make arrangements, whatever the case may

 6    be.  Again, plaintiff's counsel is going to call his next

 7    witness.  We're doing things a little bit out of order again

 8    because of scheduling issues.  Don't infer anything from that.

 9          Go ahead, plaintiff's counsel, you may call your next

10    witness.

11          MR. HUBBARD:  Thank you, your Honor.

12          Your Honor we call Mary Bilbrey.

13     MARY BILBREY,

14        called as a witness by the Plaintiff,

15        having been duly sworn, testified as follows:

16    DIRECT EXAMINATION

17    BY MR. HUBBARD:

18    Q.  Mr. Bilbrey, give us your full name and your current

19    address, please.

20    A.  Mary Ellen Bilbrey, I live at 1627 North Hermitage Avenue

21    in Chicago, Illinois.

22          THE COURT:  Let me check in with the jury.  Can jury

23    hear the witness okay?

24          Okay.

25    Q.  Are you employed today?

GC7TPIC3                        Bilbrey – direct

1    A.  Yes, I am.

2    Q.  How are you employed?

3    A.  I am the chief human resources officer for Jones Lang

4    LaSalle for the Americas.

5    Q.  How long have you been in that position?

6    A.  Since February 1st of 2016.

7    Q.  And before that time, where were you employed?

8    A.  With HSBC.

9    Q.  Can you give us the benefit for your employment history in

10   just summary fashion before you get to HSBC, your employment

11   history in the human resources arena?

12   A.  Prior to HSBC?

13   Q.  Yes, ma'am.

14   A.  I worked very shortly as a manager trainee at an Osco store

15   right out of college, and then worked about a year, year and a

16   half at American National Bank in Chicago prior to joining

17   Household International, which was eventually acquired by HSBC.

18   Q.  And as a result of that did you end up at HSBC?

19   A.  I ended up at HSBC via the acquisition, yes.

20   Q.  And did you -- when did you -- did there come a time when

21   you located to the HSBC headquarters here in New York City?

22   A.  Yes, in 2012 I moved to New York to take on the role of

23   head of HR for the U.S. for HSBC.

24   Q.  And when in 2012 was that, so we can get a time frame?

25   A.  It was about May, April or May of 2012.

GC7TPIC3                           Bilbrey - direct

1   Q.  And let me ask you a little bit about the structure of your

2   human resources office there at that time you joined.

3           Circle back for a minute.  How long did you stay in

4   that job?

5   A.  Until I left the organization at the end of January of

6   2016.

7   Q.  And again, the structure of the human resources function at

8   the bank headquarters, who was the head of human resources?

9   A.  Globally?

10  Q.  Yes.

11  A.  Ann Armeda.

12  Q.  And that person would have been located in Europe?

13  A.  In London, yes.

14  Q.  How about in domestically in -- how about in the United

15  States?

16  A.  I was the head of HR for the United States.

17  Q.  And did you have -- were there HR executives who were

18  directly reporting to you?

19  A.  Yes.

20  Q.  Who would they have been?

21  A.  I had a combination of HR business partners, or

22  generalists, who are the relationship managers directly with

23  the different lines of the businesses within the bank.  So I

24  had several -- probably three or four, or four or five of

25  those, then I had heads of our centers of expertise, so I had a

1    head of reward, talent, I had a head of employer relations, a

2    head of HR operations.  So roughly that would have been kind of

3    structure.

4    Q.  Were there human resources executives who had

5    responsibility for specific areas of the bank?  I understand

6    you have overall responsibility, but let's take sales, global

7    markets and sales, for example.

8    A.  Yes.

9    Q.  There would be someone who had responsibility for HR for

10   that?

11   A.  It would have responsibility for HR as the HR business

12   partner, but the shared resources, such as benefits and

13   compensation, were shared resources across the U.S., and those

14   reported in to me.

15   Q.  We have heard the name Ellen Weiss here.

16   A.  Yes.

17   Q.  Was Ellen Weiss in the human resources area when you

18   joined -- when you came to New York for the bank?

19   A.  Yes.

20   Q.  What was her role at that time?

21   A.  She was an HR business partner, a generalist supporting

22   some of the clients within our global banking and markets

23   division.

24   Q.  And if we are talking about global market sales, is there a

25   time when she was sort of the principal person for that area?

GC7TPIC3                     Bilbrey - direct

1   A.  She would have been a generalist supporting, yes.

2   Q.  Would there have been other people doing that job other

3   than Ms. Weiss?

4   A.  There are more junior business partners who would have been

5   reporting in to the team, yes, and also a more senior business

6   partner that had relationships across all of banking and

7   markets at the time, so it was a team.

8   Q.  Sounds like she was the senior person here for banking and

9   markets in the HR area.

10  A.  For the sales group at the time, yes.

11  Q.  For the sales group.  Okay.

12          Do you have any direct reporting responsibility --

13  we'll go back now to the time going from May 2012 forward, did

14  you have direct reporting responsibility into the legal

15  function at HSBC?

16  A.  I did not.

17  Q.  Did you -- would you have -- in relation to specific

18  matters, would you, on a regular basis, investigations and that

19  kind of thing, would you report in to the legal function?

20  A.  I didn't report in to the legal function, no.

21  Q.  Would you communicate with the legal function?

22  A.  Absolutely, yes.

23  Q.  And who would have been the person in your area more --

24  most often that you communicate with?

25  A.  Given my responsibilities for HR across all of the U.S. at

1    the time, at times I would have direct conversations with

2    general counsel for the U.S. at that period of time for some

3    matters.  In other matters I would have conversations with

4    members of the legal team who were responsible for employee

5    matters, and in some cases there were parts of the legal team

6    who were involved more specifically with different business

7    lines within the bank.  So I had conversations with multiple

8    different contacts within the legal.

9    Q.  When Mr. Picarella's complaints rose to your level, who was

10   the person in the legal function that you communicated with

11   about?

12   A.  I believe it was Jane Kauh.

13   Q.  Were there any guidelines, rules, protocols -- when you

14   communicated with Ms. Kauh about such an investigation or

15   matter like Mr. Picarella, were there any rules or protocol as

16   to as how -- the extent to which she could communicate -- she

17   or you could communicate with management about those issues?

18   A.  I'm sorry, I don't really understand the question.

19   Q.  That might not have been a good question.

20           Were there any rules, guidelines, internal regulations

21   about the extent to which you or the employment counsel you

22   spoke to about a matter could communicate with management about

23   those matters?

24   A.  Well, our guidelines would be that any matters that we

25   would be involved with we would of course always handle

GC7TPIC3                      Bilbrey - direct

1    confidentially, but there would be times when we would need to

2    involve other individuals in determining, A, either

3    corroborating claims that had been made and/or determining if

4    we felt that there was -- we needed to advise on any

5    disciplinary actions that needed to occur.  So we would be

6    guided by good principles within both of our HR and legal

7    professions.

8                 (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC79PIC4                          Bilbrey - direct

1   Q.  Who in senior management, if you can recall, did you meet

2   with regarding Mike Picarella when legal counsel, internal

3   in-house counsel was with you?

4   A.  The issues regarding Mr. Picarella lasted over a fairly

5   long period of time.  So I'm going to just ask to be a bit more

6   specific in terms of which -- yeah.

7   Q.  That's fair.  If I were to say to you we remember that in

8   September of 2012 there was an integrity tip line call and

9   Mr. Picarella sent you a memo and said he wanted to escalate an

10  issue.  From that point in time in September of 2012 say into

11  2014 did you, can you recall specific -- let me strike that and

12  ask it differently.

13          Was there a member of senior management who you along

14  with employment counsel reported to about the investigations

15  related to Mr. Picarella?

16  A.  There were senior managers who eventually we spoke with

17  regarding the matters, yes.

18  Q.  His complaints?

19  A.  Yes.

20  Q.  Who were they?

21  A.  His direct supervisor -- well at the time forward to the

22  end of the period, Mike Karam, and there was a more senior

23  individual by the name of Didier Descamps that we eventually

24  also had conversations with.

25  Q.  About Suzanne White?

1           THE COURT:  Hold on a second.  Go ahead, counsel.

2     Q.  How about Suzanne White?

3     A.  (No response).

4     Q.  Was she a person who --

5     A.  Suzy White, yes.

6     Q.  Suzy?

7     A.  Sorry.

8     Q.  I didn't mean to use a fancy name.  Suzy White who at some

9     point was the COO for global banking markets?

10    A.  Yes.

11    Q.  From time to time she would have been a person who you

12    would have discussed his complaints with?

13    A.  Yes.  I generally wasn't in the direct conversations but HR

14    would have had discussions with Suzy White, yes.

15    Q.  And Mr. Pizzimbono?

16    A.  And Pablo Pizzimbono, yes.

17    Q.  I should ask you, because I had prefaced all of this about

18    speaking with these executives with counsel.  Fair to say that

19    from time to time there would be discussions with them when

20    counsel was not present?

21    A.  Yes.

22          MR. HUBBARD:  Can I have 143, Mr. Fitzgerald, please.

23    Q.  There are some -- Ms. Bilbrey, there are some books there

24    beside you.  We could look at some hard copy.  Can you see that

25    screen without hurting your eyes?

GC79PIC4                         Bilbrey - direct

1   A.   Yes.

2   Q.   This appears to be an e-mail from Mr. Picarella to you

3   dated September 18, 2012.   Taking a look at that, have you seen

4   that e-mail before coming here today?

5   A.   Yes.

6   Q.   Sort of refresh your recollection?

7   A.   Yes.

8   Q.   He says he has a serious issue that he wants to escalate.

9   He says he's raised issues with HR, Weiss, regulatory internal

10  counsel, issues with senior management over the past few

11  months.   And as a result of doing so I have been targeted and

12  retaliated against in the markets organization.   He says he's

13  gone to the integrity hotline and he asked you not to let the

14  information get back to Ms. Weiss or others in markets.

15         As a result of this did you then contact Mr. Picarella

16  and ask him to come in and explain to you what he was raising?

17  A.   I absolutely responded and let him know we took all sort --

18  those type of issues very seriously and that we would like to

19  investigate the matter further.   I don't recall if my response

20  on this one was to invite him into my office or have responded

21  in a different form of way, but.

22  Q.   I see.   Did there come a time when you learned what his

23  issue -- he says he's raised issues with Ms. Weiss.   Did there

24  come a time when you learned what those issues were?

25  A.   Yes.

GC79PIC4                          Bilbrey - direct

1    Q.   What were they?

2    A.   They were issues in relation to inappropriate behavior in

3    the office, specifically by an individual Eileen Hedges.  And

4    that was the general nature of the complaints at that time.

5    Q.   Did you understand that he was complaining about sexual

6    harassment?

7    A.   At the first meeting I had with Mr. Picarella the

8    content -- the context of the issues raised were more around --

9    they were very inappropriate behavior that was occurring within

10   the office.  And it was not at that point that it was really

11   raised that there was an issue of harassment, more that there

12   was inappropriate behavior.

13   Q.   Some point in time there was some information about some

14   level of harassment at some offsite conference at sometime?

15   A.   Yes.

16   Q.   And do you recall when you first talked to him or first had

17   contact with him did he have any complaints about the way --

18   about Ms. Hedges treating him poorly?

19   A.   There was an incident where Ms. Hedges had exposed her

20   breast in the office and he was witness to that which he found

21   very offensive.  But, again, the complaints were then generally

22   more around very inappropriate behavior in the office.

23   Q.   I guess my question was do you have any recollection of him

24   saying to you or even to your staff that, in fact, she had

25   bullied him to some extent by yelling at him in the office or

GC79PIC4                         Bilbrey - direct

1   trying to embarrass him in the office?

2          MR. JACKSON:  Your Honor, objection.  Just the staff

3   part.

4          THE COURT:  Okay.

5          MR. HUBBARD:  I'll take the staff out.

6          THE COURT:  Please rephrase the question.

7          MR. HUBBARD:  Yes.  I'll take the staff out.

8   Q.  Do you recall in your communications with him if he raised

9   complaints about the treatment of him and not Ms. Parker?

10  A.  I do recall some levels of complaint regarding her request

11  to have him perhaps bring in a purse or comments that she made

12  that he felt were very inappropriate to him.

13  Q.  Did you then, after you contacted him in some way here send

14  his complaint out to -- for investigation?

15  A.  Yes.

16  Q.  Did you understand when he sent you this e-mail that he was

17  complaining that he had been retaliated against as a result of

18  the complaints he had made?

19  A.  In this e-mail, yes.

20  Q.  Do you remember who it was that you in your function that

21  you assigned the investigation of this complaint to?

22  A.  We had a centralized employee relations team.  It was

23  headed by an individual who reported directly to me, Paula

24  Zagora and Paula recommended a senior investigator on her team

25  by the name of Maria Malanga.

GC79PIC4                       Bilbrey - direct

1    Q.  Did she then to your knowledge conduct an initial

2    investigation?

3    A.  Yes.

4    Q.  And did that investigation report come back to you?

5    A.  It does not generally come back to me directly, no.

6    Q.  And why would it not come back to you?

7    A.  As I mentioned, I had responsibility for HR across all of

8    the US.  There were multiple levels of employee investigations,

9    complaints, issues that were regularly reviewed by the employee

10   relations team.  Reports -- summaries of higher level

11   investigations and outcomes I would generally discuss with my

12   head of employee relations to get updates.  And so I was very

13   likely appraised of the outcome as a result of those

14   conversations.  But I wouldn't regularly get all of the -- all

15   of the formal reports reported back to me.  That's not part of

16   the function.

17            MR. HUBBARD:  See if we can get Exhibit 159, please.

18            Go back to 150 first.  Hold on just a minute, Peter.

19            Go back to 148 please, for a moment.

20   Q.  This appears to be a memorandum of some form regarding a

21   meeting with Mr. Picarella with Maria Malanga and Debra Harmon

22   from human resources there are three dates; one in September,

23   two in October.  Is this the kind of memorandum that the HR

24   specialists would prepare after interviewing an executive about

25   a complaint?

1    A.  I can't see the whole document.

2    Q.  Let me give you the first page.  That would be better.

3    A.  Yes.  This looks like a summary of the documents that she

4    would have done.

5            MR. HUBBARD:  May I have that first part back there.

6    Q.  This says -- we read the top part.  There's a list of

7    concerns there that it indicates Mike e-mailed to Maria on

8    10-2-12.  Then it goes on to discuss -- just stick with the

9    headings, you don't need to change the screen -- it goes on to

10   discuss sexual harassment complaint against Eileen, bullying

11   from Suzy, Eileen, and Pablo there's some reference to some

12   regulatory issues.

13           MR. HUBBARD:  Go to the fourth page, Pete, if I can

14   find the retaliation section.

15   Q.  You see that it says:  Mike stated that he was demoted in

16   retaliation for having raised the issues to HR about Eileen and

17   for being vocal about the internal control issue and the

18   E-suitability issue.

19           Did you understand that there came a point in the fall

20   of 2012 when he was passed over for the head of business

21   development in favor of Ms. Jenner?

22   A.  I was aware that Carol Jenner was promoted to a role above

23   Mike Picarella, yes.

24   Q.  Did you participate in the activities related to whether or

25   not she was going to be promoted to senior vice-president?

1   A.  I would not have been involved in that decision.

2   Q.  Did you understand that she was -- that her promotion at

3   the end of 2012 was initially denied?

4   A.  I was -- I don't recall.

5   Q.  Okay.  This report that we're looking at here now, did --

6   was this report sent to you?  Can you tell us of your own

7   recollection?

8   A.  I can't tell from this one paragraph.

9          MR. HUBBARD:  Yes.  Go back to the first page.

10  Q.  Actually what we should do, there's a book besides you

11  there.

12         MR. HUBBARD:  Mr. Smith, would you please come up and

13  get one of these books please and help the witness to Exhibit

14  148, please.  Just walk up this way to the side of the table --

15  to the side of the table.  The books on the witness stand.

16         Would you find 148, please.  That might be easier for

17  you to look at the actual memo.

18  Q.  Just take a second and look at it.  It's three or four

19  pages.

20  A.  Yes.

21  Q.  Have you seen this before?

22  A.  Yes.

23  Q.  So you were aware of the fact that she does record in here

24  the -- his statement that -- if you go over to the fourth page

25  or so, to the retaliation section.

1          Do you see that they write retaliation by Suzy and

2   Pablo.  Mike stated he was demoted in retaliation for having

3   raised the issues.  Do you see that?

4          He says Mike says he was demoted and constructively

5   dismissed because Suzy and Pablo were making the environment so

6   unbearable for him by having him report to someone more junior

7   than him.  Do you see that?

8          Were you aware --

9   A.  Okay.  I see it.

10          As I recall, the document I'm looking at was an e-mail

11   from Mr. Picarella.

12   Q.  Well, not this one.  There is one I'm going to show you --

13   I'm going to show you the next one.

14          MR. JACKSON:  Objection, your Honor.

15          THE COURT:  Please just rephrase the question.

16   Q.  Does this document not appear to be a document prepared by

17   Ms. Malanga or Ms. Harmon?

18   A.  I don't know if this was a document prepared by Marie

19   Malanga or Debra Harmon.

20   Q.  Would you go to the last page of it, please.

21   A.  Yes.

22   Q.  Do you see there's a signature line there for Mike

23   Picarella with the date?

24   A.  Yep.

25   Q.  Is this not the formal form of interview reports that's

1   done in human resources?

2   A.   Generally we wouldn't -- I wouldn't have seen it with a

3   signature on it.  I recall this as being an e-mail that

4   Mr. Picarella had forwarded on to us.  And it was written in

5   the third party as such, but --

6   Q.   Well let me show you -- hold on to that one, if you would,

7   please.  And just bear with me a moment.  Hold on with that

8   and, Peter, let me have 159.

9        MR. JACKSON:  Your Honor this document is not in

10  evidence.

11       THE COURT:  Are you moving --

12       MR. HUBBARD:  I move the admission of 159.

13       THE COURT:  Any objection?

14       MR. JACKSON:  No objection.

15       THE COURT:  Okay.  That's in.

16       (Plaintiff's Exhibit 159 received in evidence)

17  Q.   Do you see the masthead there?

18       MR. HUBBARD:  Mr. Smith, give me volume one, please,

19  of these books.

20  Q.   This is the third person Picarella memo, right?

21  A.   Correct.

22  Q.   Not the one we were looking at before.  Refresh your memory

23  that this is the --

24       MR. JACKSON:  Objection, your Honor.

25       THE COURT:  Sustained as to form.

GC79PIC4                    Bilbrey - direct

1    Q.  Ms. Bilbrey, is this document, Exhibit 159, the document

2    that you know to be the one you're referring to as the memo --

3    the e-mail by Mr. Picarella?

4    A.  Yes.

5    Q.  And you received this?

6    A.  Yes.

7    Q.  On or about October 11, 2012?

8    A.  Correct.

9    Q.  And you see there that he indicates in this summary of

10   meetings what his complaints are, unacceptable behavior, sexual

11   harassment, ongoing bullying, fraud.

12       You see he says:  To date the unacceptable behavior

13   has been handled inappropriately.  There's legal, reputation,

14   regulatory and operational risk to the firm.  An he talks about

15   escalating to the head of HR Americas is an act of last resort

16   as the allegations have not been handled appropriately.

17       Do you see that?

18   A.  Yes.

19       MR. HUBBARD:  164 please, Mr. Fitzgerald.

20   Q.  Ms. Bilbrey are you okay looking at this screen.  It's

21   mighty bright.  I can give you the hard copy if you think it's

22   easier?

23   A.  Okay.

24   Q.  This is an e-mail from Mr. Picarella dated January 16,

25   2013.  Mr. Picarella to you.  Fair to say that you received

GC79PIC4                        Bilbrey – direct

1    this?

2    A.  Yes.

3    Q.  And he mentions in number one there that he seems to be

4    complaining that some response -- he's been completely excluded

5    from something that was his previous responsibility?  Yes?

6    A.  Yes.

7    Q.  He says the conduct toward me -- and then you see that

8    going down to the third paragraph he talks about employee

9    conduct that he believed to be -- that continued to be

10   harassing?  Right?

11   A.  Yes.

12   Q.  Let's look at this for a minute.  He says as an example at

13   the end of the day yesterday Margaret Murray, Pablo's

14   assistant, and Simon Neilson, a trader who sits behind me, made

15   the following comments as I opened my iPad.  Simon was standing

16   and looking over my shoulder at my iPad.  Quotes.  Mike day

17   trading stocks is a violation of company policy and is using

18   your personal iPad.  Margaret, should we report him to HR and

19   compliance?  Margaret says:  Yes, definitely.

20          Mike reports this conversation to you, right?

21   A.  Yes.

22   Q.  Now when you first met with Mr. Picarella as the head of

23   human resources and he raised these retaliation issues with

24   you, what advice did you give him about how he should conduct

25   himself if he believed that he was being -- events took place

1   that were events in retaliation?  What did you tell him?

2   A.  My advice to Mr. Picarella, and every time I met with him,

3   is that we absolutely take all claims of inappropriate behavior

4   and any allegations of retaliation seriously and that we will

5   investigate.  We offered him opportunities to try to provide

6   him any adjustments to his work environment that he needed and

7   certain -- turn it back over to my team to make sure that the

8   allegations were fully investigated.

9   Q.  Did you give him any guidance as to how he should

10  communicate with human resources if he believed something

11  happened was of a retaliatory nature?

12  A.  We always recommended that he would report any concerns to

13  us but I don't recall our conversation beyond that.

14  Q.  But that would have been the normal practice?

15  A.  Yes.

16  Q.  Okay.  This report here that we see here talking about

17  Margaret Murray and some trader who sits behind him making

18  comments as he opened an iPad.  Did this seem to you to be a

19  specific report -- a specific complaint of retaliation?

20  A.  I'm not sure I understand your question.

21  Q.  When you read that did you believe when he reported that to

22  you that he was complaining that that was retaliation against

23  him?

24          MR. JACKSON:  Objection, your Honor.

25          THE COURT:  Basis.

 1              MR. JACKSON:  He's asking the witness to speculate on

 2      his mind-set.

 3              THE COURT:  No.  That wasn't the question.  It's

 4      overruled.  You may answer.

 5      Q.  Do you want me to rephrase it?

 6      A.  Mm-hmm.

 7      Q.  I'm not sure I can.  I will try.

 8              When you read that, did you believe that he was

 9      sending that to you as an actual complaint that these employees

10      were retaliating against him for having reported this

11      misconduct?

12      A.  I mean I read the e-mail verbatim which is he's saying that

13      he continues to be harassed and this was an example of which he

14      was raising that.  I can't -- I don't know other than that if I

15      would have made the connection between that being a point of

16      retaliation, no.

17      Q.  Did you, in fact, when he sent these kinds of

18      communications about these incidents, about somebody looking

19      over his shoulder or these kinds of things, didn't you, in

20      fact, take them as complaints about harassment as opposed to a

21      formal complaint of retaliation?

22      A.  I didn't differentiate.

23              Any complaint that would come in that was raised in

24      the context of --

25      Q.  Go ahead.  I'm sorry.

1   A.  That was brought to our attention either reporting

2   misconduct, behavior that wasn't aligned with our desired

3   culture and values within HSBC, whether they were reference to

4   specific complaints on harassment or retaliation, we would

5   investigate.  It wasn't my job at the time when claims were

6   raised to make the judgment as to what category they fell in.

7   It was the proper process for us then to thoroughly investigate

8   and then make a determination if any of those behaviors fall

9   into the categories of retaliation or harassment.

10  Q.  Did you have a form in human resources that when you got

11  this e-mail that you went on the computer and you filed this as

12  a complaint of retaliation?

13  A.  There was an employee relations case log that all

14  complaints were logged and the employee relations specialist at

15  the time would make a determination of which category to log it

16  in and then the outcome of it would be based on the

17  determination after the investigation.

18  Q.  And would this e-mail by Mr. Picarella have been turned

19  over to that function?

20  A.  I would have shared it with my employee relations team,

21  yes.

22  Q.  And what choices would that person have had --

23  A.  I don't recall what the system has -- choices at that time.

24          THE COURT:  Let's go ahead and take our lunch break

25  now.  Members of the Jury, don't discuss this case amongst

GC79PIC4                         Bilbrey – direct

1   yourselves or with anyone else.  Don't do any independent

2   research relating to any of the issues pertaining to this case.

3   Let's have you back at 2:10 p.m.  So I'll see you then.  Have a

4   pleasant lunch.

5              (Jury excused)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC79PIC4                        Bilbrey - direct

1          THE COURT:  Let's just have -- you can all be seated.

2    I'll ask counsel to get back here at 2 just again so we don't

3    run into jurors unnecessarily.

4          Plaintiff's counsel, can you give me a sense of how

5    much longer you have?

6          MR. HUBBARD:  Fifteen minutes.  May I have fifteen

7    minutes?

8          THE COURT:  All right.  Yes.  Let's just keep this

9    moving.

10          MR. HUBBARD:  I understand.

11          THE COURT:  Give me a sense of who else you have --

12    not just today but what other witnesses you're calling.  You

13    can be seated.

14          MR. HUBBARD:  I'm not sure I can tell you off the top

15    of my head but let me try.  I can -- I will give you a list

16    when we come back.  But the next witness after Mr. Picarella's

17    cross is finished is Ms. Weiss, Ellen Weiss who you've seen.

18    Followed by Ms. Jang, Ms. Malanga, and then we get into Silber,

19    Karam, Roskell, and Descamps.

20          THE COURT:  Okay.  All right.  Anything else we need

21    to discuss?

22          MR. JACKSON:  No.  Thank you, your Honor.

23          Judge, actually I'm sorry.

24          THE COURT:  Yes.

25          MR. JACKSON:  Just to clarify.  On the point that the

1    Court was making earlier, because you had asked us to send the

2    cases we referenced, we'll send the law, but I don't think that

3    there's any disagreement on the law of the matters.  There is a

4    case you'll see that we're going to send, and I don't think

5    we'll have to discuss it anymore, but it talks about -- it

6    comes to the same conclusion but it just talks about the fact

7    that in that view -- in that Court's view there's been debate

8    among the courts as to whether or not it's appropriate to amend

9    an errata sheet.  But the important point is the point that the

10   Court made at the end about --

11           THE COURT:  Which is the case that you're citing?  Is

12   that the John Keenan opinion from before dealing with a summary

13   judgment issue?

14           MR. JACKSON:  Unfortunately, Judge, I don't have it in

15   front of me.  I can't remember but I will -- I just wanted to

16   let you know.  I don't think we need to discuss it anymore but

17   I just didn't want to Court to think --

18           MR. HUBBARD:  We have the guidance on that case you

19   gave us.

20           MR. JACKSON:  Yes.

21           THE COURT:  All right.  See you at two o'clock.

22           (Luncheon recess)

23

24

25

GC79PIC4                        Bilbrey - direct

1                       AFTERNOON SESSION

2                           2:12 p.m.

3              (Trial resumed; jury present)

4              MARY BILBREY, resumed

5              THE COURT:  I hope you had a pleasant lunch.  Welcome

6     back.  Let's continue with the case on trial.  Go ahead

7     counsel.

8     DIRECT EXAMINATION CONTINUED

9     BY MR. HUBBARD:

10    Q.  Your Honor, I think -- Ms. Bilbrey when we broke I think we

11    were looking at Plaintiff's Exhibit 164 which was the -- if you

12    can highlight that a bit, Mr. Fitzgerald, a little bit easier

13    to read.

14             Ms. Bilbrey, you see this e-mail we looked at earlier

15    from Mr. Picarella to you January 16, 2013.

16    A.  Yes.

17    Q.  And if you look down in number three.

18             He speaks there about some conduct he is reporting to

19    you by employees that he says continues to be harassing.

20    Right?

21    A.  Yes.

22    Q.  And he talks about some folks who said some stuff about him

23    and are you breaking HSBC rules and that kind of thing.

24             My question to you is when you read that did you

25    believe that he was complaining about harassment in the

1     workplace or was he complaining about retaliation?

2                 MR. JACKSON:  Objection, your Honor.  Asked and

3     answered.

4                 THE COURT:  I'll allow it.  You may answer it.

5                 THE WITNESS:  I read it verbatim that he is raising

6     issues about being harassed.  I wouldn't have made any further

7     categorization of putting that into a different category of a

8     complaint.

9     Q.  And so when you were asked about this in your deposition in

10    this case do you recall that you told us that he was speaking

11    about his treatment in the workplace?

12                THE COURT:  Is there a page and line you're going to,

13    counsel?

14                MR. HUBBARD:  Page 105.

15                THE COURT:  Which line?

16                MR. HUBBARD:  Lines 12 through about 19.

17    Q.  You looked at this, Ms. Bilbrey, as he's raising issues

18    regarding his treatment in the workplace?

19    A.  Yes.

20                MR. HUBBARD:  Take a look at 205, please,

21    Mr. Fitzgerald.

22    Q.  This appears to be an e-mail from Mr. Picarella to

23    Ms. Bilbrey and Mr. Alderoty, copy to Mr. Karam, September 23,

24    2013.

25                Do you recall that there were times in the years 2013

1    and '14 when Mr. Picarella came to you and indicated that he

2    had some concern about the way he was being treated by his

3    manager, Mr. Karam?

4    A.  Yes.

5    Q.  Now, when that happens -- look at the second paragraph

6    there.  He says -- this one he uses the R word.

7          In the same timeframe of my filing with the EEOC Mike

8    Karam has participated in continued retaliation against me by

9    assuming my role of coordinating business case approvals and

10   prioritization with Pablo Pizzimbono and the relationship

11   managers.

12         When he makes such a direct claim of retaliation, I

13   want to ask you again how that goes into your system, how is it

14   recorded in your records?

15   A.  I just -- it did not get to the level of detail in my

16   position to actually see how those things are recorded into the

17   tracking system.  So really just don't know.

18   Q.  Fair enough.  When you got this complaint about retaliation

19   what, if anything, did you do about it?

20   A.  I think I followed the process.  I would have responded to

21   Mr. Picarella and told him that we would absolutely look into

22   his concerns that he's raised and I would have asked a member

23   of the employment relations team to take it and to do an

24   investigation.

25   Q.  Did you speak to Mr. Karam about it?

GC79PIC4                        Bilbrey - direct

1   A.   I would not have personally spoken to Mr. Karam.

2   Q.   Did you have any -- ask anybody on your team to speak to

3   him about it?

4   A.   I don't recall at the time.

5   Q.   How many times did you send -- you or your staff send out

6   direction to Mr. Picarella's managers, just take the year --

7   let's take 2013 and 2014.  How many times did you and human

8   resources write his managers and tell him that -- remind them

9   that retaliation is against the law and against company policy?

10  Did that happen?

11  A.   I don't know the frequency but we do have -- HSBC has

12  policies against anti harassment and retaliation and they were

13  regularly reviewed and published.  I couldn't answer how

14  many -- how frequently those were sent to employee managers.

15  Q.   How about when there's a specific complaint about a

16  specific manager, specific facts.  Do you do -- do you rely

17  upon the general training in the past that this stuff should --

18  is not appropriate or do you take some steps to meet with the

19  manager and sort of remind them -- tell them there's been a

20  complaint and remind them that there should be no retaliatory

21  conduct?

22  A.   So all cases are different.  And we, first of all,

23  investigate the cases -- the claims that have been raised.

24  Sometimes we actually find that there are issues where we

25  believe that the manager does need to have additional training

GC79PIC4                          Bilbrey - direct

1    or reminders on our policies on this.  Other times we would

2    investigate and find that the claims wouldn't be substantiated

3    and then, therefore, we wouldn't take those steps.

4              So all cases were different.  And we had many, many

5    claims in my period of time.

6    Q.  Do you remember personally meeting with Mr. Karam, his new

7    manager about this time, in the two thousand -- late 2013

8    timeframe through late 2014 and specifically discussing with

9    him whether or not -- the allegations that Mr. Picarella had

10   made about his treatment?

11   A.  I don't remember personally meeting with Mr. Karam.

12             MR. HUBBARD:  May we have Exhibit 237, please.

13   Q.  This is an e-mail from Mr. Picarella on Monday,

14   November 26, 2014 to you.  Looks like it's a copy to me.

15   Subject.  His complaint.  And it says:  Mary, on Friday

16   November 20, 2014 I had my 2014 mid year review.  And he said

17   that his review deteriorated into a physically threatening

18   situation.  And explained, you know, what he explained.

19             Did you receive this note from Mr. Picarella?

20   A.  Yes.

21   Q.  Did you talk to Mr. Karam.

22   A.  I personally -- I don't recall if I personally talked to

23   Mr. Karam, but there was obviously an investigation, as there

24   was in every issue that was raised, and there would have been a

25   conversation with Mr. Karam about this incident.

GC79PIC4                          Bilbrey - direct

Q.  At any time in 2013 and 2014 when Mr. Picarella was

complaining that Mr. Karam had complained about him do you know

if any steps were taken to assign a different manager to do his

employee evaluations?

A.  I don't recall assigning a different manager to him for his

evaluation.  The evaluation was on performance.  And so, you

know, Mr. Karam at the time would have been the person who

would have been evaluating his performance.

Q.  What if the person doing the evaluation had demonstrated

some unusual hostility to the employee?

         MR. JACKSON:  Objection.  Objection, your Honor.

         THE COURT:  Please rephrase the question.

         MR. HUBBARD:  Yes.

Q.  What if you had learned that the employee at issue had

expressed a view that the manager had repeatedly expressed

unusual hostility toward that employee?

         MR. JACKSON:  Objection, your Honor.

         THE COURT:  Please, can you rephrase the question.

         MR. HUBBARD:  Yes, sir.

Q.  If you knew that an employee had formally complained about

hostile treatment, even physically hostile treatment by his

manager, was there a process by which you considered providing

that employee with a different manager to do his performance

evaluations?

A.  Again, first of all, we would have investigated the claim

to see if we would substantiate that claim by the employee and

believed that there was reason to believe that the employee was

in an environment where he was being threatened either verbally

or physically by his manager.

A normal protocol would have been to instead advise

that manager of maybe perhaps different ways they could handle

the conversation and oftentimes would have an HR representative

attend a meeting with the manager and the employee to help

facilitate that conversation.

Q.   In this case, the response was to ask Mr. Picarella to work

from home for a while?

A.   In this case, while we investigated to see if there was an

environment where he was being threatened physically or

otherwise, we thought best to keep him out of the environment

until such time that we could investigate and see if there was

a concern within the workplace that put him at risk.  He raised

a serious issue.

Q.   And did there come a time when you told him he could return

to the workplace?

A.   We, if I recall, made several attempts to contact

Mr. Picarella over a period of time to advise him to work from

home and had not been able to get in contact with him and he

did return back to the office and we had the conversation at

that time with him in terms of remaining and working at home or

coming to the -- back to the environment at that time.

GC79PIC4                          Bilbrey - direct

1   Q.  Did you have that conversation with him?

2   A.  I did not -- I don't believe I had that conversation

3   directly with him.

4   Q.  Can you tell us here under oath that there was a single

5   date after -- let me strike that.

6           He e-mailed you that Monday morning after Thanksgiving

7   and said he had been denied entry to the building and you said

8   you would look into it and somehow or another you told him that

9   he had been sent a letter the previous Wednesday asking him to

10  work from home, right?

11  A.  Correct.

12  Q.  When did you write him back and say we've investigated it

13  and you may return to the office?

14  A.  I don't recall.

15  Q.  That never happened, did it?

16  A.  I don't recall.

17  Q.  Let me ask you --

18          MR. HUBBARD:  Can we pull up 126, please, Peter.

19  Q.  When this happened, when the decision was made to review --

20  remove Ms. Hedges' management responsibilities, right?  Do you

21  remember this?

22  A.  If I could read it, please.

23  Q.  Sure.

24  A.  Yes.

25  Q.  Did you -- were you in charge of this process by which she

1   received this written warning?

2   A.  No.  This action was taken within the context of the HR

3   business partners who were supporting the global banking and

4   markets business at the time.  We had not yet merged our

5   employee relations teams at this time so this was being handled

6   by the business partners within banking and markets.  And while

7   I was new in role I had not been involved in this particular

8   case at this particular time.

9   Q.  And she received this final warning and apparently she was

10  removed from her management responsibilities?

11  A.  Yes.

12  Q.  Was there further investigation of her conduct?

13  A.  When there were further issues raised there were further

14  investigations, yes.

15  Q.  And what was the result of that?

16  A.  Many of the issues raised had already been reviewed and

17  resolved.  Eventually the decision was made to terminate

18  Ms. Hedges.

19          MR. HUBBARD:  May I just have a moment, your Honor?

20          THE COURT:  Yes.

21          MR. HUBBARD:  Thank you.

22          THE WITNESS:  You're welcome.

23          THE COURT:  Any cross-examination?

24          MR. JACKSON:  Yes, please.  Thank you, your Honor.

25          Your Honor, just to speed things along we have a

GC79PIC4                        Bilbrey - direct

1    binder of exhibits that we will seek to admit with the witness.

2    Is it permissible if Mr. Simons passes that up to Ms. Bilbrey?

3            THE COURT:  Yes.  Can you tell us the numbers of the

4    exhibits.

5            MR. JACKSON:  Yes, your Honor.  I have a copy for the

6    Court and also a copy for Mr. Hubbard.

7            THE COURT:  Which of these -- are you seeking to

8    introduce all of these exhibits into evidence?

9            MR. JACKSON:  Yes, your Honor.  I could enumerate

10   them.  It's DX-6, 188, 189 --

11           MR. HUBBARD:  Can we slow down just one moment.

12           MR. JACKSON:  Sorry about that.

13           THE COURT:  It's the first page of the binder.

14           MR. HUBBARD:  I've got it.

15           MR. JACKSON:  I believe I said 198, 210, 241, 244,

16   269, 270, 272, 297, 298, and I'm not sure if we've already

17   admitted PX-166.

18           And also PX-166.

19           THE COURT:  Okay.  Any objection to any of those

20   exhibits?

21           MR. HUBBARD:  Your Honor I -- this index does not tell

22   me whether there were objections to them or not so I've got to

23   look at it.

24           MR. JACKSON:  I can get started, your Honor.  We can

25   revisit this.

1          THE COURT:  Go ahead.

2          MR. JACKSON:  Thank you.

3   CROSS-EXAMINATION

4   BY MR. JACKSON:

5   Q.  Good afternoon, Ms. Bilbrey.

6   A.  Good afternoon.

7   Q.  How are you today?

8   A.  Good.  Thank you.

9   Q.  Did you have a good flight in from Chicago?

10  A.  It was very nice.  Thank you.

11         THE COURT:  Let me just ask the witness to continue to

12  remember to speak into the microphone.

13         Go ahead.

14  Q.  Now, Ms. Bilbrey, I think Mr. Hubbard asked you some

15  questions about your background.  Just to be clear could you

16  tell us where you went to school and what degrees you got.

17  A.  I went to my undergraduate in Illinois State University and

18  had a degree in business administration.  And a master's in

19  industrial relations from Loyola University in Chicago.

20  Q.  And can you just explain for us really quickly what does a

21  master's in industrial relations mean?

22  A.  It's a master's in basically the profession of human

23  resources.

24  Q.  How long have you been working in the field of human

25  resources?

1   A.   About 30 years.

2   Q.   The company that you work for now, without getting into

3   details, can you just explain what type of company it is?

4   A.   It's a commercial real estate company.

5   Q.   What part of Chicago are you guys located in?

6   A.   Downtown Chicago, uptown.

7   Q.   Do you see the lake?

8   A.   No.

9   Q.   So, Ms. Bilbrey, before you were working in New York during

10  the period of time that you were talking about during your

11  direct testimony, where were you working for HSBC?

12  A.   Prior to New York I was in London for three years and prior

13  to that I actually worked out of Chicago.

14  Q.   When was it that you came to New York?

15  A.   In 2012, about April or May of 2012.

16  Q.   When you got to New York how many direct reports did you

17  have?  How many people reported directly to you?

18  A.   Probably roughly eight to ten.

19  Q.   And in terms of your role how many employees were you

20  responsible for in terms of your role dealing with human

21  resources?

22  A.   When I landed probably a staff of probably about two

23  hundred, maybe slightly less than that.

24  Q.   Two hundred human resources employees?

25  A.   Yes.

GC79PIC4                        Bilbrey - cross

1   Q.  And how many different HSBC employees did all of those

2   human resources employees working underneath you, how many

3   different employees did they service?

4   A.  We had about 17,000 employees when I first landed in 2012

5   and about a little over 14,000 when I left in January '15 --

6   '16.  Sorry.  '16.

7   Q.  Now, one of the things that you described is that -- some

8   of the issues that human resources deal with.  Can you give us

9   a brief sort of -- well, first of all, am I correct that human

10  resources departments deal with a number of different types of

11  problems?

12  A.  Yes.

13  Q.  What are some of the types of problems that a human

14  resources department at a large financial institution would

15  deal with?

16  A.  Yep.  So the bank had at the time a number of different

17  business lines within the bank.  We had global banking and

18  markets which is the division that this case is referring to.

19  We had retail bank.  We had the commercial bank.  And we had

20  private bank.

21         In addition to that we had a lot of corporate

22  functions.  So legal, finance, HR, technology and operations

23  and compliance and risk.

24         So the nature of things that we would be working on

25  would be a lot of needing to acquire the right talent.  So

GC79PIC4                    Bilbrey - cross

1   during my tenure there I had to build up the compliance team

2   from roughly about 300 to 1200 in that period of time.

3          We had a number of retention issues.  We had a very

4   large cultural transformation issue.  We had employee relations

5   concerns.  A lot of -- from complaints, just interactions with

6   managers, to very serious allegations by employees.

7          We had issues relating to compensation, to training.

8          So, a variety.  And I personally was involved with a

9   lot of the regulatory conversations.  As a large global bank, I

10  had a very heavy regulatory presence.  So that was a large

11  portion of my role at that time as well.

12  Q.  If an employee at HSBC had performance issues is that a

13  problem that the human resources department would be involved

14  with?

15  A.  In most cases, no.  But in some cases we would.  And

16  generally tried to provide some counseling and advice and to

17  help the managers work directly with their employees.  That

18  would be our first line of defense, is to try to insure that

19  the relationship between the manager and the employee could

20  continue to be appropriate.

21  Q.  So in some cases the answer would be yes?

22  A.  In some cases the answer would be yes.

23  Q.  And with regard to -- you talked earlier about some of the

24  investigations that you were involved in or that your division

25  handled.  In general, what was your role in those

GC79PIC4                      Bilbrey - cross

1    investigations?

2    A.  Usually I would not get involved in the detail.  We had a,

3    as I mentioned earlier, a team of employee relations

4    specialists who were trained to both do the investigations and

5    to track the findings.

6            I would meet periodically, usually about quarterly,

7    and review the claims that were coming in and the outcome of

8    those claims at a very high level, very general level with a

9    team of my employee relations specialists.  And sometimes it

10   would include our employment attorney as well in that room and

11   make sure we had kind of a consistency in approach and just so

12   I was aware at a very sort of higher level.  And then I would

13   get involved in those cases where there was something that was

14   either extremely egregious and/or we thought there was a

15   reputational risk issue or senior level of manage.

16           So there were a few where they would get escalated to

17   me or in cases where the employee might escalate it directly to

18   me.  Again, I would usually respond but refer back to my team

19   to do the investigation and then to follow up on the

20   appropriate actions, if any, to be taken.

21   Q.  How did the human resources -- how did human resources at

22   HSBC determine what the appropriate scope was for an

23   investigation?

24   A.  There were a number of channels to report claims.  You

25   could have a conversation directly with your manager if you had

GC79PIC4                    Bilbrey - cross

1   some issues.  And in those cases generally we wouldn't

2   investigate.  And that would be handled just locally.

3          There are channels though for integrity tip lines by

4   bringing information directly to your HR manager, a couple

5   different forums by which employees could raise issues.

6          And we would generally, if they came through any of

7   those forums, we would work with our kind of legal and security

8   and fraud team and determine based on the nature of that claim

9   whether or not security and fraud might want to investigate

10  from a fraud perspective, whether it was a legal issue and

11  legal or -- or we wanted finance and tax, you know, a legal

12  perspective about it.  Or if it was a relation -- if it was an

13  issue with an employment issue and then we would investigate

14  it.  But we investigated any -- virtually any claim that would

15  come to us that would raise concerns about the employment

16  relationship.

17  Q.  Thank you.

18          MR. JACKSON:  At this time I'd like to offer DX-297.

19          THE COURT:  Any objection to 297?

20          MR. HUBBARD:  No, your Honor.

21          THE COURT:  Okay.  297 is in.

22          MR. HUBBARD:  No objections to any of these documents

23  in this book.

24          THE COURT:  Okay.  So they're all in.

25          MR. JACKSON:  Thank you very much, your Honor.

GC79PIC4                        Bilbrey - cross

1              (Defendant's Exhibits 6, 188, 189 198, 210, 241, 244,

2       269, 270, 272, 297, 298 received in evidence)

3              (Plaintiff's Exhibit 166 received in evidence)

4       Q.  Now, Ms. Bilbrey, do you see on the screen DX-297 is this

5       HSBC anti harassment policy?

6       A.  Yes.

7       Q.  Can you just read for us just the first line in the

8       summary, if possible.  I'm sorry.

9       A.  That's okay.

10             The company is committed to creating and maintaining a

11      collegial and collaborative work environment in which all are

12      treated with respect and dignity.

13      Q.  And I'm just going to ask you to read just one more line,

14      the next line.

15      A.  All of our employees have the right to work in a

16      professional atmosphere that promotes equal opportunities and

17      prohibits unlawful discriminatory practices, including sexual

18      harassment and harassment based on age, ancestry, color, race,

19      national origin, disability, genetic information, military

20      service, religion, creed, sex, pregnancy, childbirth, marital

21      status, citizenship, sexual orientation, gender identity or any

22      other trait protected by applicable law.

23             MR. JACKSON:  We can take this down.

24      Q.  Over the course of the time that you were working there

25      were these policies sometimes amended?

GC79PIC4                    Bilbrey - cross

1    A.  Periodically we would amend them.

2    Q.  Does that policy reflect essentially what the policy was

3    throughout the time that you were there?

4    A.  Yes.

5    Q.  In your experience as -- was that policy taken seriously

6    there at HSBC?

7    A.  It was taken very seriously.

8    Q.  Why do you say that?

9    A.  We -- for a couple of reasons.  HSBC has a very high set of

10   values and subscribes to holding ourselves up to behaviors that

11   we believe should be very ethical.  So, the whole company took

12   a very serious approach from the CEO down that we were to have

13   a culture of -- which values were going to be a strong part of

14   that.

15         Within our HR department then we absolutely tried to

16   administer and make sure that that policy was being adhered to.

17   And, again, any time issues were raised to us we would take

18   them very seriously and we would investigate each and every one

19   of them and make a determination if anybody had violated that

20   policy.

21         (Continued on next page)

22

23

24

25

GC7TPIC5                    Bilbrey - cross

BY MR. JACKSON:

Q.  Now you mentioned earlier there was a tip line.

A.  Yes.

Q.  Who ran that tip line?

A.  There were a couple of different lines.  The tip line in particular was actually managed by an external firm, whose name I don't recall, who would help intake the information in an objective way and then help to triage that back into the organization based on whether or not it was a tip referring to a compliance issue, and it might go to one venue versus a fraud issue versus an employee relations issue.  So we would get information from that tip line intake if it was in fact related to an employment issue.

Q.  If there were already so many HSBC employees who worked at HR, why was it necessary to have a tip line anyway in this situation?

A.  It goes back to the seriousness that HSBC placed on having an environment that was compliant, that was adhering to all the policies and values and ethics that we held as on organization.  And HSBC wanted to give employees multiple venues by which they could raise their concerns.  So if you were uncomfortable bringing a concern directly to your manager or to HR, you had a third-party place that you could call in and register your complaints, and we encouraged people to raise complaints in that regard.

412

1    Q.  Can you look quickly at page 3 of the DX-297.

2              MR. JACKSON:  Can you zoom in on the parenthesis,

3    confidentiality.

4    Q.  Can you read for us this part, please, Ms. Bilbrey.

5    A.  Reported allegations will be handled by the company in a

6    sensitive and discrete manner to the extent consistent with a

7    fair and thorough investigation.  Accordingly, the company will

8    endeavor to limit disclosure of facts relating to the alleged

9    harassment to those whom it believes have a legitimate need to

10   know.

11             MR. JACKSON:  Now could we take that down, please.

12   Q.  Ms. Bilbrey, is that a part of the policy that, in your

13   experience, was taken seriously at HSBC?

14   A.  Yes.

15   Q.  Did that mean that you were able to keep any reports of

16   harassment completely confidential?

17   A.  No.

18   Q.  Can you explain why?

19   A.  If a complaint came in of harassment, again we take it very

20   seriously, we take our responsibility to investigate, to

21   determine whether or not there was any actions that would have

22   been considered harassment, and to take appropriate actions.

23   So once we have knowledge of somebody saying there is behavior

24   that they would identify as harassment, we took the

25   responsibility that we had to investigate that.

1    Q.  In the course of investigating, sometimes you would have to

2    speak to the people who were actually accused of wrongdoing?

3    A.  Yes.

4    Q.  Now can we look at DX-298.

5           Ms. Bilbrey, is this the HSBC

6    anti-retaliation/whistleblower protection policy?

7    A.  Yes.

8    Q.  Did HSBC maintain a substantially similar whistleblower and

9    anti-retaliation policy throughout the time you were working

10   there?

11   A.  Yes.

12   Q.  Can you read the very first line of -- the first two lines

13   of that.

14   A.  HSBC is committed to strong governance standards.  To

15   support its culture of compliance, HSBC has established

16   procedures for employees to raise complaints or concerns.

17           MR. JACKSON:  And can we just read from -- zoom out,

18   actually.  Go to the bottom where it says no retaliation.

19   Q.  Can you read that line, the first two sentences there?

20   A.  HSBC recognizes the importance of providing a safe

21   environment for individuals to report incidents of possible

22   unlawful activity or violations of company policy.  The company

23   strictly prohibits all forms of retaliation against an

24   individual who in good faith reports any such incident to the

25   company or to a government agency.

1              MR. JACKSON:  Thank you.  Can you take that down.

2   Q.  Was the anti-retaliation policy something that you

3   considered to be important in your role as the head of HR?

4   A.  Absolutely.

5   Q.  In your experience, is it something that was taken

6   seriously at HSBC?

7   A.  Yes.

8   Q.  There was a question -- some questions posed to you about

9   Ms. Hedges, and you did have some involvement with some

10  incidents relating to Ms. Hedges, correct?

11  A.  Yes.

12  Q.  When was it that Mr. Picarella first reached out to you

13  regarding the behavior of Ms. Hedges?

14  A.  I believe about September 2012.

15  Q.  And we already talked about this, but I think you said in

16  your direct testimony that the disciplinary process had gotten

17  started before you got involved.

18  A.  Yes.

19  Q.  What do you mean by that?

20  A.  So as I moved into the role in about April or May of 2012,

21  at the time the HR department for the global banking and

22  markets businesses was not fully integrated into the whole

23  regional HR support, but that was a process that we started and

24  were able to achieve over the time I was there.  So earlier on

25  the investigations for complaints were being done by the HR

1    business partners that were supporting banking and markets

2    prior to going over to the centralized employee relations

3    group.

4            So in my early months there, the issues with

5    Ms. Hedges had been raised up and investigated by the HR team

6    supporting global banking and markets at the time.  And as a

7    lot of cases, it was resolved, and action taken, and those

8    actions wouldn't necessarily always have been elevated to my

9    position if they didn't require me to be involved at that time

10   or they didn't need any further input from me.

11   Q.  And Ms. Hedges ultimately -- one of the things that we saw

12   during your direct testimony was a final written warning.

13   A.  Yes.

14   Q.  What is a final written warning?

15   A.  A final written warning is a very serious disciplinary

16   action that ultimately says this is your last opportunity, and

17   if there are any further behaviors or repeating of whatever the

18   incident was, that the next step will be termination.

19   Q.  How serious is a final written warning in the context of

20   certain levels of discipline that HSBC deals with in terms of

21   employee misconduct?

22   A.  It is one of the highest level, short of the termination.

23   So we have generally counseling would be probably the first

24   line of dealing with a disciplinary action, there's verbal

25   warnings, but a final written warning is the very highest level

GC7TPIC5                          Bilbrey - cross

1    prior to termination.

2              MR. JACKSON:  Now can we look at DX-188, please.  By

3    the way -- take this down one second.

4    Q.  To be clear, Ms. Hedges was terminated because HSBC didn't

5    believe she operated consistent with HSBC values, correct?

6    A.  Correct.

7              MR. JACKSON:  Could we look at DX-188.

8              And can we just go down -- could we go down to the

9    second page and can we zoom in on the top there.

10   Q.  Now this is an email that Mr. Picarella sent to you,

11   correct?

12   A.  Correct.

13   Q.  And can you just read what that says in the first

14   paragraph.

15   A.  Hi Mary.  I received a call from Laura Kane in HR, who is a

16   peer of Ellen Weiss, regarding the integrity hot line call I

17   placed.  I have concerns about reviewing this with a peer/same

18   group as Ellen.

19   Q.  Then it says:  I understand you are off-site this week.  Do

20   you have any suggestions regarding Michael Picarella?

21   A.  Yes.

22   Q.  Can we go to the top.

23             And you responded -- first of all, what was the date

24   of the first communication, can you see it, from Mr. Picarella?

25   A.  9/20.

GC7TPIC5                      Bilbrey - cross

1    Q.  September 20, 2012?

2    A.  Yes.

3    Q.  5:43 p.m.

4         What time did you -- when did you respond to him?

5    A.  9/20 at 5:21.

6    Q.  Does that say CDT there?

7    A.  Yes.

8    Q.  What was the response, if you could read the response?

9    A.  Sure.  Michael, Laura is acting in her capacity of

10   supporting HR for HR, so handle appropriately and

11   professionally.  So I think you should be comfortable sharing

12   with her and I can follow up with her when I return.

13   Alternatively, you can wait and discuss with me directly.

14   Please let me know your preference.  I will be happy to handle

15   either way.

16   Q.  So you made a personal offer to meet with Mr. Picarella?

17   A.  Yes.

18   Q.  Why did you do that?

19   A.  I felt if an employee was raising an issue to my level that

20   I had a courtesy to respond to them and felt an obligation to

21   take it seriously and to offer to have the personal

22   interaction.

23   Q.  Did you have any concerns about Laura's ability to

24   professionally handle this?

25   A.  I did not.

GC7TPIC5                        Bilbrey - cross

1    Q.  Could we look at what Mr. Picarella's response was.

2                He said:  Hi, Mary understood.  I would prefer to wait

3    and speak to you directly.  Thank you.  Regards, Mike.

4                Can we look at DX-198.

5                MR. JACKSON:  Could we zoom in at the top.

6    Q.  This is some of what you were talking about before, but

7    Mr. Picarella is emailing you and Maria Malanga and Debra

8    Harmon about all of his concerns?

9    A.  Yes.

10   Q.  By the way, were all of the concerns that Mr. Picarella was

11   raising, were they all new concerns?  Was he the first person

12   that ever raised them?

13   A.  No.

14   Q.  Some of them had been raised before by other people?

15   A.  Yes.

16   Q.  Were these concerns taken seriously by the HR department?

17   A.  Absolutely.

18   Q.  Were they investigated?

19   A.  Absolutely.

20                MR. JACKSON:  You can take this down.

21   Q.  Now Mr. Picarella made a number of complaints to you about

22   perceived retaliation, correct?

23   A.  Yes.

24   Q.  When he made those complaints to you, how did you respond

25   to those complaints generally?

GC7TPIC5                        Bilbrey - cross

1    A.  Every complaint that was raised I responded and asked our

2    team to investigate and do a thorough investigation, and if

3    there were merits to the claims that were raised we would take

4    appropriate action as needed.

5    Q.  Could we take a look at DX-210.

6            And this is an email we were talking about earlier

7    where he was complaining about Pablo's assistant and someone

8    else was looking over his shoulder at his iPad.

9    A.  Yes.

10   Q.  By the way, how frequently did Mr. Picarella raise

11   complaints with you over the time you were there?

12   A.  Very frequently.

13   Q.  Was that typical of your experience of senior vice

14   presidents at HSBC?

15   A.  It was not.

16   Q.  In terms of your experience with Mr. Picarella, did you --

17   in the course of your career, did you ever have any other

18   person at that executive level who raised complaints of this

19   frequency to you?

20   A.  No.

21   Q.  Now just looking at this, was this complaint investigated?

22   A.  All the complaints that he raised were investigated, yes.

23   Q.  Was any evidence of any actual retaliation in regard to

24   this ever discovered?

25   A.  No.

1    Q.  Can we look at PX-166.

2             Can we go to the next page.

3             MR. JACKSON:  Can we zoom in on the bottom there.

4    Q.  Now you see here we have an email from Maria Malanga saying

5    your emails to Mary with were forwarded to me.  Will you have

6    some time to talk today?  Thanks, Maria.  Right?

7    A.  Yes.

8    Q.  Maria Malanga was a person who worked on the HR staff?

9    A.  Yes.

10   Q.  Did you ever have any problems with Maria Malanga's level

11   of professionalism in dealing with investigations?

12   A.  No.

13   Q.  Could we look at the top here.

14             What is this email from Mr. Picarella that we're

15   looking at after the email that Maria Malanga sent to

16   Mr. Picarella?

17   A.  Basically back to me saying that he doesn't see any need to

18   have any further conversations and felt that his complaints had

19   been ignored.

20   Q.  This is in January of 2013?

21   A.  Yes.

22   Q.  So the HR department was still trying to reach out to

23   Mr. Picarella and communicate with him?

24   A.  Yes.

25   Q.  And what he sent to you is an email saying he did not want

GC7TPIC5                    Bilbrey - cross

1   to meet with Maria Malanga?

2   A.   Correct.

3   Q.   Can we look at DX-220.

4           MR. JACKSON:   Can you just zoom in on the bottom part

5   there.   Can you include the date?

6   Q.   So this is a 3/13/2013 email, correct?

7   A.   Correct.

8   Q.   And this is an email that Mr. Picarella sent to you giving

9   examples of some of the stuff that he was continuing -- he said

10  that he was continuing to experience at work each day across

11  the organization?

12  A.   Correct.

13  Q.   And he talks in this email about sitting at his chair at

14  his desk reading a document, and that Margaret Murray, Pablo's

15  assistant and inner circle, walked by and in a serious tone

16  told me that I tried to trip her and that she almost tripped.

17  Right?

18  A.   Correct.

19  Q.   Then there's a communication where Margaret had her desk

20  drawer open while she was away from her desk, and Mr. Picarella

21  alleged that when he got back she returned and accused him of

22  stealing from her drawer.

23  A.   Correct.

24  Q.   Could we go back and look at what your response was to

25  Mr. Picarella?

1          What did you say to Mr. Picarella in this email?

2     A.  I thanked him for raising his concerns and advised that we

3     would continue to look into them.

4     Q.  Did you take these complaints -- did you treat these

5     complaints in a serious and professional way?

6     A.  I did.

7     Q.  Had you ever seen complaints of this nature being made by a

8     person at the executive level of HSBC, this kind of thing about

9     a desk drawer?

10    A.  No.

11    Q.  And was this investigated by HR?

12    A.  It was.

13    Q.  Was any evidence supporting the idea that any of these

14    people were trying to retaliate against him ever discovered?

15    A.  No.

16    Q.  Could we look at DX-222.

17         MR. JACKSON:  Could we just zoom in just on the date

18    and on the top line there.

19    Q.  So this is a 4/11/2013 email that Mr. Picarella sent to

20    you?

21    A.  Yes.

22    Q.  And in this one he was complaining that his boss, Carol

23    Jenner, hums, sings, laughs and talks to herself out loud

24    during the day.  Correct?

25    A.  Correct.

1   Q.  Did you ever have any other executive complain to you that

2   a colleague was humming too much?

3   A.  No.

4   Q.  Was this investigated by HR?

5   A.  It was.

6   Q.  Was any evidence of retaliation ever discovered?

7   A.  No.

8   Q.  By the way, did anyone else in the organization that you're

9   aware of ever complain that Ms. Jenner was humming too much?

10  A.  No.

11  Q.  Mr. Picarella was ultimately terminated in 2015?

12  A.  Yes.

13  Q.  Is that a decision that you made independently?

14  A.  No.

15  Q.  Were you consulted as the decision was made?

16  A.  I was consulted.

17  Q.  Do you know why he was terminated?

18  A.  Performance.

19          MR. JACKSON:  I have no further questions, your Honor.

20          THE COURT:  Any redirect?

21          MR. HUBBARD:  Just a couple.

22  REDIRECT EXAMINATION

23  BY MR. HUBBARD:

24  Q.  While you were in your seat at HSBC, did you have

25  experience with any senior vice presidents --

1    A.  Yes.

2    Q.  -- complaining to you about the sexual harassment of a

3    female colleague?

4    A.  Yes.

5    Q.  And in those cases were those allegations investigated?

6    A.  Yes.

7    Q.  And on those occasions were there times when the

8    allegations were true and occasions when they were not true?

9    A.  Yes.

10   Q.  In this case --

11   A.  In which case?

12   Q.  In this case, Mr. Picarella's case, the determination was

13   that the reports he had made of the sexual harassment of

14   Ms. Parker were substantiated to the point that Ms. Hedges was

15   removed from her management position and ultimately terminated.

16   A.  Ms. Hedges was ultimately terminated for behavior that she

17   took against Ms. Parker.  Those allegations, though, were

18   raised outside of this case as well.

19   Q.  You mean other people --

20   A.  Yes.

21   Q.  -- raised the same complaints?

22   A.  Yes.

23           MR. HUBBARD:  Thank you.  That's all I have, your

24   Honor.

25           THE COURT:  Okay.  Thank you.  The witness is excused.

1          Let's do this, let's take a twelve-minute break while

2     I discuss some scheduling matters with counsel.  Don't discuss

3     the case with anyone else.  Don't do any research related to

4     any of the issues in this case.  See you soon.

5          (Jury not present)

6          THE COURT:  So in terms of scheduling, what I believe

7     is going to happen is now we're going to have continued

8     cross-examination of Mr. Picarella.  As I indicated to the

9     jury, we're going to break at 4 o'clock.

10          There's something I wanted to raise with counsel,

11     though.  I have been checking and my staff have been checking

12     to make sure there hasn't been any -- to see if there's been

13     any recent media coverage in this case to see if anything needs

14     to be addressed with the jurors.  And I discovered just now

15     while I was sitting here there is an article I will share with

16     counsel, I have a copy for each side, that was written on Law

17     360, so not in a major news publication or a newspaper or

18     anything like that, but seems to be related to the proceedings

19     in this case.

20          I want counsel to look at it and figure out if there's

21     anything that you want me to do about that, if there's any sort

22     of colloquy you want me to have the jurors.  It seems that it

23     very well may be unlikely that any of the jurors saw that

24     because it's in Law 360, but I don't know what counsel want me

25     to do.

GC7TPIC5

```
 1          Perhaps it might make sense for me to generally remind
 2     the jury not to discuss this case with anyone else, not to
 3     allow anyone to discuss the case with them, not to do any
 4     independent research on this case, and if they see anything
 5     about this case that they should -- or anyone tries to
 6     communicate anything to them about this case they should not
 7     continue with that communication, they should stop reading
 8     anything that they see, and they should report it to me,
 9     perhaps.
10          But let me hear what counsel want me to do, if
11     anything.
12          MR. JACKSON:  Your Honor, we're aware of this article,
13     and I believe there have been other articles written about the
14     trial.  We think that the Court's suggestion is entirely
15     appropriate.  I don't think anything specific needs to be asked
16     about any of the articles, but just that general instruction I
17     think will be sufficient.
18          THE COURT:  Plaintiff's counsel?
19          MR. HUBBARD:  Judge, we were aware of this.  The Law
20     360 reporter was in the courtroom yesterday, may still be here,
21     I think he is.  And I think yesterday there was a press feed of
22     the courtroom outside.  I'm not an expert on that, but I
23     understood that there was some type of --
24          THE COURT:  Members of the press have requested and
25     were given permission to have a press feed for -- some of the
```

press have offices in the courthouse or near the courthouse.
There is a feed, an audio feed going to their offices, it's not
a feed that goes out --

MR. HUBBARD:  I understand that, but the point is that
I don't think this article today is the end of the publicity
from this trial, and so I think that it would be entirely
appropriate, if the Court is willing to do it, for you to tell
the -- remind the jury about your instruction and tell them
that there may be some and may have been a few articles or
online articles about the case, and remind them that they
should not read them.  Because otherwise this stuff does get --
it's all over the internet.

So if the jurors are internet -- and for most lawyers,
particularly here in Manhattan, some of our jurors are lawyers
and who have relatives that are lawyers, the stuff pops up
pretty regularly.  So I think that, without making a big deal
out of it, it would make some sense for your Honor to mention
that there may be or might have been some press coverage, and
remind them of the instruction you gave them.

MR. BORTNICK:  Your Honor, an article like this -- I
don't subscribe to Law 360, but it pops up in my inbox every
day and you see the headline part, and if you subscribe you can
read more.  So it's quite likely that the lawyers or jurors who
have relatives or children that are lawyers could get this in
their inbox and they pass it on and then they would see the

1    headline.  So that would be the concern when I saw this.

2            THE COURT:  That's why I raised this with counsel, to

3    figure out what, if anything, you want me to do.  I think

4    counsel seem to be on the same page.  I don't think it's

5    appropriate for me to address this particular article because I

6    don't want them to particularly look it up.

7            My concern, again, is just generally, because there

8    may be more press related to this case, what language counsel

9    wish me to use, if any, with the jury just to sort of remind

10   them, because I have certainly told them over and over again

11   not to have any communications with anyone about this case or

12   to do any independent research.  I don't believe that I have

13   specifically given them any instructions about newspaper

14   articles or internet articles or the like.

15           MR. HUBBARD:  I think that's what would be

16   appropriate, to expand on that and just say:  By the way,

17   you're not supposed to be reading news reports about the trial.

18   If you see it, tear away from it, I think, if that's an

19   appropriate instruction.

20           MR. JACKSON:  Your Honor, I think you did

21   appropriately instruct them on that in the beginning of the

22   case, and I think reiterating that would be sufficient.

23           THE COURT:  If any counsel wants to give me language

24   on that, but it makes sense to me to say to them if you read or

25   see anything about the case, you should stop reading or seeing

1    that, and you shouldn't talk to any jurors about that.  If

2    anyone tries to communicate anything to you about this case,

3    you should report that to me.

4           Do you want me to say to them if they see anything

5    about this case they should stop reading and they should also

6    report that to me without discussing that with the other

7    jurors?

8           MR. HUBBARD:  Your Honor, I think first, yes, I think

9    you should tell them that they should turn away from it and

10   they're instructed not to read it.

11          In terms of -- I just don't know how far we can go

12   policing it.  I think to tell them to report to you, we may

13   spend 30 minutes every morning with jurors saying I saw it, I

14   didn't read it, but there's really no way to police that.  But

15   I would -- as well as your Honor gives them the instruction, I

16   think we have to respect they will follow it.

17          MR. JACKSON:  Your Honor, I agree with Mr. Hubbard, I

18   think the instruction would be perfectly sufficient and there's

19   no need to ask them to report.  If they understand the

20   instruction, which is if they see something, don't read it, and

21   continue on.

22          THE COURT:  Okay.  Should I go further?  I don't

23   anticipate television coverage, but also if you see anything

24   about this on television or the internet stop looking at it.

25   If you see it on television, you should turn off the TV, or if

1    you hear it on the radio you should turn it off.

2              MR. JACKSON:  I think that's fine, your Honor.

3              MR. HUBBARD:  I think not, unless we get some --

4    unless some juror reports it's all over the television or

5    something, I don't expect that will be the case.

6              THE COURT:  Okay.  So defense counsel's position is

7    there's no need to go into television or radio?

8              MR. JACKSON:  That's our position, your Honor.

9              THE COURT:  Okay.  That's fine, I won't do that.

10             So let's bring the jury back in soon, and we'll have

11   continued cross-examination of Mr. Picarella and we'll finish

12   by 4 o'clock today.

13             And at the end of the day I will give the jurors that

14   instruction that we just discussed.

15             MR. BORTNICK:  What time should we be back?

16             THE COURT:  I believe you have like four and a half

17   minutes if you want to take a quick break.

18             (Recess taken)

19             THE COURT:  In terms of scheduling we'll continue --

20   the cross-examination of Mr. Picarella will end by 4 o'clock or

21   3:55 so I could give the jury the instructions, and I will tell

22   the jurors to come back tomorrow at 9:30 and counsel get here

23   by 9:15.  Any objection?

24             MR. HUBBARD:  No, your Honor.

25             THE COURT:  And to be clear, because counsel I believe

1    both indicated that you do not want me to instruct the jurors

2    that if they read anything or see anything, to report it to me,

3    you simply want me to instruct them if you see anything or hear

4    anything you should stop.

5           MR. JACKSON:  Yes.

6           MR. HUBBARD:  I think not yet, I think we are

7    satisfied not to do that at this time.

8           Does that make sense?

9           THE COURT:  Not really.  Because if you want me --

10   when would you want me to change that?  It seems odd -- if you

11   want me to give them an instruction, it seems like that's the

12   instruction.  If the instruction is in terms of reading things

13   you would should stop reading it and nothing else, it seems

14   like we're creating more of a problem and drawing attention to

15   something if I say later based on something that they need to

16   report it.

17          MR. HUBBARD:  Well, I understand, your Honor, perhaps

18   it is better to give the full instruction to report it if they

19   see it and we'll deal with it.

20          THE COURT:  Okay.  Defense counsel?

21          MR. JACKSON:  We still have the same view, Judge, that

22   just asking them to report it is going to make -- I don't think

23   we should distract the jurors by turning them into detectives

24   to see if they're following the instruction to avert their eyes

25   if they see anything.  That's fine.  I don't think either of us

GC7TPIC5

1   is going to have an application if somebody reports that they

2   saw something, they stopped reading, and then moved on.

3          THE COURT:  It seems to me if one party wants it, it

4   seems to me that in an abundance of caution it can't hurt.  It

5   may take some time if a juror sees something to have that

6   individual juror report it and we'll have a colloquy and make

7   sure that whatever they read they stopped reading and it won't

8   have any affect on them and we'll come on going.

9          So I will instruct the jurors if they do read anything

10  or see anything they should stop reading it and also let us

11  know that they have seen something.

12         Is that correct, plaintiff's counsel?

13         MR. HUBBARD:  Yes, your Honor.

14         THE COURT:  Okay, let's bring the jury in.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Welcome back.  You may be seated.  We are

3   going to continue with continued cross-examination of

4   Mr. Picarella by defense counsel.

5        Go ahead, counsel.

6    MICHAEL PICARELLA,  (Continued)

7       having been previously sworn, testified as follows:

8   CROSS-EXAMINATION

9   BY MR. JACKSON:

10  Q.  Good afternoon again, Mr. Picarella.

11  A.  Good afternoon.

12  Q.  Mr. Picarella, one of the things that happened during your

13  first year at HSBC is that you got into confrontations with a

14  number of your co-workers that had nothing to do with any

15  retaliation.

16  A.  Is that a question?  I'm sorry.

17  Q.  That is a question.

18  A.  I wouldn't call them confrontations, they were -- give me

19  an example.

20  Q.  What would you call them?

21  A.  If you could be more specific I will address it.

22  Q.  I'm asking you, you said you wouldn't call it

23  confrontation, what would you call it?

24  A.  Well, the things that are coming to my mind are things like

25  when I was implementing a hedge fund governance committee in

1  the organization and making some changes implementing some

2  changes, at times there were people that were incumbents in the

3  organization in certain roles that felt a little uneasy with

4  change.  But I wouldn't call them confrontations, I would call

5  them sort of change or growing pains.

6  Q.  Well, in June of 2011 you had only been there for a month,

7  right?

8  A.  Yes.

9  Q.  And during that time you got into a dispute with a

10 gentleman that had to do with a difference of opinion, you got

11 into a dispute with a gentleman name Patrick Brady, right?

12 A.  Patrick, yes, I know Patrick Brady.

13 Q.  You got into a dispute with him, correct?

14 A.  I don't know if it was a dispute.

15 Q.  Well, it ended up leading to a situation where he was

16 saying to you on the trading floor:  I don't want to get into a

17 shouting match with you.  Right?

18 A.  I vaguely remember him bringing something up that we could

19 discuss something without shouting, but I don't know why he was

20 saying that.

21 Q.  You have no idea why he was telling you that he did not

22 want to get into a shouting match with you?

23 A.  No, I vaguely remember it, and I remember it being a very

24 odd comment that he made.

25 Q.  You remember that he said that, though, right?

1    A.   I vaguely remember, yes, something along those lines.

2    Q.   When you say "vaguely," do you think that happened or not?

3    A.   Yeah, I think he did -- I don't know whether it was in an

4    email or he said it to me, I do vaguely remember.

5            MR. JACKSON:  At this time I would like to offer

6    DX-19.

7            THE COURT:  Any objection to 19?

8            MR. HUBBARD:  No objection, your Honor.

9            THE COURT:  19 is in.

10           (Defendant's Exhibit 19 received in evidence)

11           MR. JACKSON:  Could we zoom in on the top half.

12   BY MR. JACKSON:

13   Q.   Now this is a communication that had taken place in June

14   between you and Ms. Hedges, right?

15   A.   Yes.

16   Q.   This is when you were still friends with Ms. Hedges, right?

17   A.   Well, friends or -- she was my boss.

18   Q.   You said that you viewed her as a friend initially, right?

19   A.   A friendly colleague.  She was my boss we had a good

20   relationship for a while.

21   Q.   But you also told us, didn't you, that you sometimes had

22   emails with her where you would say "love you," right?

23   A.   Maybe, joking around, yes, we -- in the first few months it

24   was a very good and close relationship.

25   Q.   So just focusing in on this, you said:  I met with Brady.

1    He's a bit of a political animal.  Right?

2    A.  Yes, I said that.

3    Q.  Don't like his approach with me.

4    A.  Yes, he was a little aggressive.

5    Q.  And then you said that you needed to tell Ms. Hedges what

6    happened in person because it was a lot.  Right?

7    A.  Okay.

8    Q.  Yes?

9    A.  Yes, I said that.

10   Q.  And then there was a part later on when we get to 9:36 a.m.

11   where you had some discussion with him and he said -- his

12   response was:  I don't want to get into a shouting match with

13   you.  I said why would we need to do that?  I have a viable

14   solution that, to me, makes sense.

15         Right?

16   A.  Could I take a second and read the whole transcript?

17   Q.  You can take whatever time you need.

18   A.  Okay.

19   Q.  So he actually said to you:  I don't want to get into a

20   shouting match with you.  Right?

21   A.  Correct.

22   Q.  And you have no idea why he said that?

23   A.  Right.

24   Q.  You weren't shouting at him?

25   A.  No, I said why would we need to shout?  That's what I said

1   in my response.

2   Q.  That's what you wrote to Ms. Hedges.  What I'm asking you

3   is:  Do you believe you were shouting?

4   A.  No.

5   Q.  Do you have any idea why he said that?

6   A.  Yes, I do.

7   Q.  This is something that happened to you repeatedly

8   throughout your time at HSBC that, in your view, people got

9   angry at you for reasons that you didn't understand, right?

10  A.  No, I -- no, I disagree with that.  And I understand the

11  reasons why he was feeling threatened at that time.

12  Q.  I see.  So you understand why you feel -- never mind, we'll

13  move along.

14          MR. JACKSON:  Can we go to DX-222.  Sorry, take that

15  down.

16          At this time I would like to offer DX-22.

17          THE COURT:  Any objection to 22?

18          MR. HUBBARD:  Yes, it's hearsay, your Honor.

19          THE COURT:  Hold on.  There's an objection to 22?

20          MR. HUBBARD:  Yes.

21          THE COURT:  Hold on.  Let me see 22.

22          MR. HUBBARD:  Sorry, your Honor, I think I'm looking

23  at the wrong list.  DX-22?

24          THE COURT:  Correct.

25          MR. HUBBARD:  I don't think there's any objection,

GC7TPIC5                       Picarella - cross

```
 1    your Honor.
 2              No objection.
 3              THE COURT:  Okay.  DX-22 is in evidence.
 4              (Defendant's Exhibit 22 received in evidence)
 5              MR. JACKSON:  I would also like to offer DX-20.
 6              THE COURT:  Any objection to 20?
 7              MR. HUBBARD:  No objection.
 8              THE COURT:  22 and 20 are in evidence.
 9              (Defendant's Exhibit 20 received in evidence)
10              MR. JACKSON:  Let's do 20 first.
11    Q.  So what you wrote is does PP know that PB is a BS artist,
12    right?
13    A.  Yes.
14              MR. JACKSON:  I would like to offer DX-21.
15              MR. HUBBARD:  No objection.
16              THE COURT:  21 is in evidence.
17              (Defendant's Exhibit 21 received in evidence)
18              MR. JACKSON:  Please call up DX-21.
19    Q.  Now earlier when we saw PP you were referring to Pablo
20    Pizzimbono, correct?
21    A.  Correct.
22    Q.  And PB was the name for Patrick Brady, right?
23    A.  Correct.
24              MR. JACKSON:  Could we just zoom in on the part which
25    is at -- can you zoom in on the middle part there?
```

GC7TPIC5                              Picarella - cross

1   Q.  What did you write at 1:02 p.m.?

2   A.  Would you like me to read it?

3   Q.  Yes, please.

4   A.  He's trying to portray sales as a lazy bunch of idiots that

5   aren't given proper tools from us, but he is saving the day.

6             MR. JACKSON:  Can we take that down.

7   Q.  You were upset -- you had a dispute with Mr. Brady over the

8   fact that he was saying that your group was lazy, right?

9   A.  I don't believe I disputed with him, I was reporting back

10  to Ms. Hedges.

11  Q.  But you also personally yourself were upset about the fact

12  that you were getting labeled as lazy, right?

13  A.  Absolutely not.

14  Q.  But you had a whole conversation with Ms. Hedges, ongoing

15  conversation about trying to figure out a way to try to put

16  Patrick Brady in check, right?

17  A.  No.  I mean I believe Patrick Brady was insinuating that

18  sales -- he was on the banking side in relationship management,

19  and we were on the sales side, and he was trying to portray us

20  in sales as being lazy.

21            This is an area that I came in, I believe Mr. Mullen

22  spoke about it before, there was a big gap in the organization

23  in the hedge fund space.  It was a big problem.  And when I

24  took over, Ms. Hedges and Mr. Pizzimbono asked me to focus on

25  that particular client sector and figure out what was going on

GC7TPIC5                         Picarella - cross

1   because the sales force was always complaining that hedge fund

2   clients that we were trying to bring on board we could never

3   bring them on board, and Patrick Brady was the senior

4   relationship manager for the hedge fund sector.

5           So I was creating, at the edict from Mr. Pizzimbono, a

6   hedge fund governance committee.  What that committee did was

7   bring all the relevant business areas in the firm into one

8   room, and the salespeople would bring their cases into the

9   room, present them to the room with Patrick Brady in there, and

10  we would basically, as a group, collectively, we had the credit

11  department --

12  Q.  Sir, please.

13  A.  I think you're accusing me of something --

14          THE COURT:  Hold on.  That's not the question before

15  you.  Can you please just restate the question?

16          MR. JACKSON:  Yes, your Honor.

17  Q.  Yes or no, you were personally upset that he was portraying

18  your group as lazy, right?

19  A.  I wouldn't say I was upset.  Those are your words.  I

20  didn't like it.

21  Q.  So the answer is no?

22  A.  I think it's inaccurate.

23  Q.  So the answer is no?

24  A.  I don't remember my initial reaction.

25  Q.  Can we look at DX-22.

1          This is July 14 communication between you and

2     Ms. Hedges, right?

3     A.   Yes.

4     Q.   2011.  What you say is:  I can't ring-fence PB on my own.

5     Need senior management to understand what he is about and keep

6     him in check.  Right?

7     A.   Right.

8     Q.   You were trying to ring-fence Patrick Brady, right?

9     A.   It needs a little bit of an explanation, if you let me.

10    Q.   No, it's a yes or no.

11         THE COURT:  It's a yes or no question.  Is that your

12    words, that you were trying to ring-fence that individual?

13         THE WITNESS:  Yes, those are my words.

14         THE COURT:  When you were talking about ring-fencing

15    someone, were you talking about Mr. Brady?

16         THE WITNESS:  Yes, we were trying to form a committee

17    and he was fighting it, and I needed help.

18         THE COURT:  Go ahead.

19         MR. JACKSON:  Thank you, we can take this down.

20    BY MR. JACKSON:

21    Q.   You also got into a dispute later in the year with an

22    individual that you ended up threatening on the floor at HSBC,

23    right?

24    A.   I don't recall.

25    Q.   This whole thing with Patrick Brady, that had nothing to do

GC7TPIC5                          Picarella - cross

1    with any retaliation issues, right?

2    A.   No.

3    Q.   That was just a personal situation related to whatever

4    business dispute you guys were having?

5    A.   It wasn't -- I don't think it was a personal situation, I

6    think it was a business situation.

7    Q.   Okay.  Now there was an incident in November of 2011 where

8    you had a situation where you went up to a co-worker and you

9    confronted him, and that confrontation led to him turning beet

10   red in the face, right?

11   A.   I don't remember.

12   Q.   You have no recollection of that?

13   A.   No.

14   Q.   I would like to offer DX-64.

15             THE COURT:  Any objection to 64?

16             MR. HUBBARD:  No, your Honor.

17             THE COURT:  Okay.  It's in evidence.

18             (Defendant's Exhibit 64 received in evidence)

19   Q.   So this is a November 22nd, 2011 communication between you

20   and someone named John McNierney, right?

21   A.   Yes.

22   Q.   In this one you're talking about an interaction that you

23   had, right?

24   A.   Yes.

25   Q.   And you wrote at 9:53 a.m.:  Gave your buddy a hard time.

1    Don't know why he came over here and said that.  Right?

2    A.  I wrote that, yes.

3    Q.  And then John McNierney said:  Good.  Put him in his place.

4    Right?

5    A.  Okay.

6    Q.  And then you wrote:  Yes, he turned beet red in the face.

7    Right?

8    A.  Yeah.

9    Q.  You used this phrase "beet red" before.  What does beet

10   red -- when you say someone turned beet red in the face, what

11   are you talking about?

12   A.  I vaguely remember this because John Henry McNierney was a

13   temp, and there was a bunch of temps working there.

14   Q.  I'm only asking:  What does it mean to turn beet red in the

15   face?

16   A.  There are a few situations, maybe embarrassed, or at times

17   angry.  Sometimes I have seen people get beet red in the face

18   out of anger.

19   Q.  Who you were having -- who was the individual that you were

20   talking with about Mr. McNierney?

21   A.  I don't remember.  I believe it was another person that

22   worked in the company he worked at.  He was part of a temp

23   agency, and there were a bunch of young temporary workers in

24   the area.

25   Q.  You don't remember who the person was that you were talking

GC7TPIC5                       Picarella - cross

1   about in this communication?

2   A.  I don't.  It doesn't -- I don't recall.  I said it was his

3   buddy, so I assume it was one of the gentleman that worked with

4   him in the temp agency.  John was about 22, 23 years old.

5   Q.  What you said was -- looking at 9:55 a.m., you said:  I

6   said, why would you walk over to my desk and tell my boss that

7   I don't answer your emails?

8          Right?

9   A.  Yeah, it looks like I said that.

10  Q.  That's because someone had been complaining that you

11  weren't responding to emails, right?

12  A.  That could be the case.  He could have come over, if it was

13  one of the temporary workers that came over and said I didn't

14  answer his email.  But in the course of a workday I would get

15  hundreds of emails and Sametime messages, so I don't really

16  recall the exact scenario here.

17  Q.  So you ended up saying at 9:56:  I said yeah.  And he wants

18  me to approve this business case?  Should I just tear it up

19  now?

20          Right?

21  A.  Yes.

22  Q.  And you are talking about tearing up something that he had

23  asked for approval from you on, right?

24  A.  Yeah.  Again, I vaguely remember.

25  Q.  And then your response was, you said to this individual:

1   And then I said be careful, and walked away.

2           Right?

3   A.  Okay.

4   Q.  You told this individual that he needed to be careful,

5   right?

6   A.  Yeah, looks that way.

7   Q.  And the reason you were telling him he needed to be careful

8   is because he made a complaint to your supervisor that you

9   don't answer his emails?

10  A.  It looks that way.  Again, I really don't remember clearly

11  the situation.

12  Q.  That's a threat, right?  You were making a threat to this

13  individual about what is going to happen to him if he complains

14  about any problems that he has with you at work, right?

15  A.  I don't know if that's what I was really doing there, to be

16  honest with you.

17          MR. JACKSON:  Could you take that down.

18  Q.  The fact of the matter is you had a number of these kinds

19  of disputes with a number of people throughout the time you

20  were at HSBC, right?

21  A.  No, I don't think so.  I thought in my review it was listed

22  I had built good relationships in my first eight months there.

23  I don't have it offhand, but I was complimented on my

24  relationship building with Ms. Hedges.

25          But we, again --

GC7TPIC5                          Picarella - cross

```
 1              THE COURT:  Mr. Picarella, so defense counsel is
 2    asking you questions.  Most of the questions are designed in a
 3    way that you can answer yes or no.  Your attorney will get up
 4    later and give you a chance, perhaps, to give a more full
 5    explanation, but if you can answer the question yes or no, then
 6    you should answer yes or.  If you can't, that's fine, explain
 7    that to counsel.  Okay?
 8              THE WITNESS:  Save it for Mr. Hubbard.
 9              THE COURT:  Correct.
10              Go ahead.
11              (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1   Q.  My only question is you had a number of disputes like this

2   with people throughout your time at HSBC, right?

3   A.  I think they were -- I wouldn't call them --

4   Q.  Yes or no, sir.  Yes or no, you had a number of disputes

5   like this?

6   A.  No.  I would say no.  I generally worked well with people.

7   Q.  So I want to talk about the situation you talked about in

8   your direct testimony when you claim that Mr. Karam threatened

9   you, physically threatened you.  Do you remember that?

10  A.  Yes.

11  Q.  At no other point in your dealings with Mr. Karam had you

12  ever seen him get angry about anything in that way, right?

13  A.  Not in that manner, no.

14  Q.  No.  And you never seen him threaten any other coworkers,

15  right?

16  A.  I had very little interaction with Mr. Karam.

17  Q.  My question is --

18  A.  No, I had not seen --

19  Q.  You never saw?

20  A.  No.

21  Q.  Any other coworkers?

22  A.  No.  I did not.

23  Q.  And you just said you had very little interaction with him.

24  What years was he your supervisor?

25  A.  (No response).
```

GC79PIC6                       Picarella - cross

1    Q.  I'm only asking you what years was he your supervisor.

2    A.  Right.  The middle 2013 through '14 and '15.

3    Q.  Okay.  So from 2013 through your termination in '15?

4    A.  Yes.

5    Q.  Throughout all that time you never saw him physically

6    threaten anyone else?

7    A.  No.

8    Q.  You never saw him behave in a manner that you claim he

9    behaved in this situation with anyone else, right?

10   A.  No.

11   Q.  This took place, this incident that you claim happened,

12   took place in a glass room, right?  A room that had a glass

13   wall, correct?

14   A.  Correct.

15   Q.  And it was on a trading floor that literally hundreds of

16   other people sat out on, right?

17   A.  Correct.

18   Q.  And no one that you're aware of saw anything like what

19   you're describing, right?

20   A.  Right.

21   Q.  Just you?

22   A.  Just me.

23   Q.  And you have no idea -- well let me just ask you.  What was

24   it that you said to Mr. Karam right before he supposedly got so

25   angry that he began physically threatening you in this glass

GC79PIC6                          Picarella - cross

 1  conference room?

 2  A.  I don't recall exactly what I said.  Because I was a little

 3  shaken with the whole situation.  I was taken back.  But I was

 4  reading his review that was in a Word document to me.  And I

 5  think one of the first ones was telling me I had failed on --

 6  I'm not a hundred percent sure -- the GMB review.  And I told

 7  him, I was explaining to him that that wasn't true.  And he

 8  said look at me when I'm talking to you.  And I was just

 9  finishing the sentence.  And by the time I looked up again he

10  was already leaning over the table.

11  Q.  Sir, you don't need to tell the whole story.

12          THE COURT:  Hold on.  Let him finish the answer.  You

13  asked the question.

14          THE WITNESS:  He asked me the last thing I said.

15          THE COURT:  I'm letting you answer the question.  Go

16  ahead answer the question.

17          THE WITNESS:  Then he -- when I looked up the second

18  time he said I said look at -- I don't want to yell.  He said

19  look at me when I'm talking to you.  And he was leaning across

20  the table.  It was a small round table.  And Mike is a pretty

21  big guy.  So he was leaning over and he had his finger in my

22  face.  And I'll use the expression again, his face with was

23  beet red.  I saw the veins coming out of the side of his neck.

24  And he was loud.  And it was threatening.  And all -- when all

25  I was doing was questioning what he had written in the review.

GC79PIC6                         Picarella - cross

```
 1   Q.  Okay.  So it's your testimony that you have no recollection
 2   of what you said immediately before the point where he turned
 3   beet red, veins started popping out of his neck and he
 4   physically threatened you?
 5            MR. HUBBARD:  Objection.
 6            THE COURT:  Hold on.
 7            Could you please rephrase the question?
 8            MR. JACKSON:  Yes, your Honor.
 9   Q.  I think what you said at the beginning of that answer is
10   that you don't recall what you said exactly before this
11   incident supposedly happened, right?
12   A.  Right.
13            I don't know the exact words.
14   Q.  Do you know in summary what you said?  Do you have a
15   generalized idea of what you said immediately before Mr. Karam
16   allegedly began threatening you physically and this other
17   stuff?
18   A.  I'll summarize it without remembering the exact words and
19   the exact, you know, job function.  He was -- I was reading.
20   But basically when I was reading it I told him I disagreed with
21   it.  I said this doesn't make sense.  It's not close to what
22   actually took place, something along those lines.  And he -- he
23   went from telling me to read it because I don't want to -- I'd
24   rather you read it instead of me talking to you, to then
25   telling me to look him in the eye while he's talking to me.
```

GC79PIC6                          Picarella - cross

1    Q.  So all you said to him was something to the effect of the

2    performance review didn't make sense --

3    A.  I disagreed with it.

4    Q.  And he exploded in anger?

5    A.  Yeah, that I disagreed with it, it was wrong.

6    Q.  Going back to 2012, after the point where you spoke to

7    Mr. Freer and you started looking for another job, you didn't

8    ultimately end up finding another job, right?

9    A.  I wasn't actively looking for another job.  The only job,

10   if you want to call looking for a job, the only comments about

11   looking for another job was the e-mail that you put up on the

12   screen that said -- that I said to Mr. Freer something along

13   the lines if -- do you have anything at my level.  And he

14   responded basically saying no, not -- he had mid tier level

15   stuff.  But send me your resume.

16         I don't think I ever sent him my resume and I did not

17   look for a job at that point.

18   Q.  So after that, you continued to work at HSBC, right?

19   A.  Yes.

20   Q.  You continued to work in the same position, correct?

21   A.  Correct.

22   Q.  And you were still working with Ms. Parker, right?

23   A.  Yes.  She was still there.

24   Q.  And you were still working with Mr. DeLuca?

25   A.  I never worked with Mr. DeLuca.

1   Q.  But he sat near you, right?

2   A.  Yeah.  He sat in the group behind us but he wasn't part of

3   our group.  I think he was part of operations.

4   Q.  Now, you are aware now, as you sit here now, that you were

5   referred to at work by a number of your colleagues as Where's

6   Waldo, right?

7               MR. HUBBARD:  Objection.  Hearsay, your Honor.

8               THE COURT:  Overruled.

9               Were you aware of that?  Are you aware of that?

10              THE WITNESS:  Only through discovery.

11              MR. HUBBARD:  It's hearsay.

12              THE COURT:  Go ahead, counsel.

13  Q.  So you are aware of that?

14  A.  I'm aware of comments that Mr. DeLuca and Ms. Parker were

15  saying over Sametime chat when I wasn't around they would say

16  Where's Waldo.

17  Q.  They referred to you as Where's Waldo?

18  A.  Correct.  I didn't know that while I was working there but,

19  yes, they were calling me Where's Waldo.

20  Q.  One of the things that you agree with is that you were

21  frequently away, throughout 2012, you were frequently away from

22  your desk on the trading floor, correct?

23  A.  Yes.  My day was filled with meetings.

24  Q.  Right.  But it wasn't just meetings.  You were also away

25  from your desk doing personal things, right?

1    A.  Not during 2012, no.

2    Q.  Well you were also away from your desk sometimes sitting

3    alone in dark conference rooms, right?

4    A.  Not when -- in 2012, no.

5           I would be away from my desk at meetings.  But we

6    worked on a trading floor and I worked with the sales desks.

7    And so on a floor with three hundred sales people.  I was in

8    conversations with people throughout the course of the day.  I

9    tended to -- I preferred more to get up and talk to people

10   face-to-face as opposed to send a chat or an e-mail.  And I --

11   my calendar was filled with meetings.

12   Q.  Well, you said not in 2012.  There did come a point where

13   you would spend a substantial part of your day sitting in

14   conference rooms with the lights off, right?

15   A.  No.

16   Q.  That never occurred?

17   A.  No.

18   Q.  At no point?

19   A.  No.

20          THE COURT:  Okay.  Let's take our break for the day.

21   Jurors, we're going to break for the day.  Don't discuss the

22   case amongst yourselves.  Don't discuss the case with anyone

23   else.  Do not allow anyone to discuss the case with you.  Don't

24   do any independent research related to any of the issues

25   pertaining to this case.  If you start to read anything

GC79PIC6                         Picarella – cross

relating to this case you should stop reading it.  And then you

should not discuss it with the other jurors.  And you should

report it to me through my deputy.  Okay.  Have a wonderful

evening.  We'll see you tomorrow at 9:30 a.m.

            (Jury excused)

            (Continued on next page)

1           (In open court)

2           MR. HUBBARD:  I am very concerned about the elevation

3    of hearsay, having a witness say that he read hearsay that was

4    attempted to be put on an exhibit list and try to elevate it

5    into testimony.  I don't think that's proper.

6           But more importantly your Honor had earlier said, I

7    believe, that this Waldo stuff wouldn't come in in this hearsay

8    fashion unless they brought a witness in -- they've got

9    Mr. DeLuca.  Let him come in and say that he referred to him

10   that way because DeLuca is the man who started it and he's an

11   employee of the firm.

12          THE COURT:  Or if you opened the door.  And

13   Mr. Picarella opened the heck out of the door throughout his

14   testimony with all sorts of commentary that he gave during

15   direct and cross-examination about the way he was perceived at

16   work, about him having his hours, and not having enough work to

17   do and how he still sat there at his desk reading and doing

18   other things to occupy his time.  There are other things that

19   you've also opened the door to several times.

20          So I understand your point but -- and that's why,

21   again, I was hesitant to make that ruling because I thought

22   that this door was going to be opened and it certainly has been

23   in many ways.  We were talking again primarily about those

24   Sametime chats.  Again, my primary concern with the Sametime

25   chats was not hearsay.  I know that's something that you kept

GC79PIC6

1    talking about.  It's more the cumulative potential nature of

2    that and whether or not that is relevant.

3          The fact that a statement such as he's never here, the

4    fact that that statement if you take that for the truth of the

5    matter asserted could be damaging doesn't make the statement

6    hearsay.  It's only hearsay if it is being offered for the

7    truth of the matter asserted.  And there is certainly the

8    present sense impression exception to hearsay in terms of those

9    Sametime chats, but we're not talking about those Sametime

10   Chats yet.  Those haven't come in yet.

11         But certainly lots of doors have been opened through

12   Mr. Picarella's testimony about lots of things about what he

13   was doing at work, about him being at his desk even when he

14   didn't have enough work to do and about the way he was

15   perceived and about the fact that no one complained about him

16   and no one made any complaints about him engaging in sexual

17   harassment, other things as well, but also fraud and the like.

18   It seems to me that that also potentially opens the door to

19   this sort of information saying that no one had made any

20   complaints about him regarding fraud because it does seem to me

21   that if you are working and supposed to be at your desk and

22   you're not at the desk, that certainly could be considered

23   fraud.

24         So I understand your concerns but that door has been

25   opened.  But I'll hear you further on that.

1          MR. HUBBARD:  No, your Honor.  I simply disagree with

2     you.  I think in any case if a person tries to defend himself

3     against these allegations and it opens the door to all of

4     this -- I mean the gentleman is entitled to say what he was

5     doing and where he was, but to say that that opens the door to

6     this derogatory hearsay, I just don't understand that.

7          THE COURT:  He wasn't simply saying that.  And, again,

8     we might as well do this because I'm sure you're going to

9     object to this later.  It does seem to me, so be prepared to

10    deal with this, he's opened the door to these performance

11    evaluations that you were concerned about before from Morgan

12    Stanley when he volunteered all of this information about how

13    he had a good reputation there and about how he thought he

14    could get there because he had a good reputation.  We'll deal

15    with what.

16         MR. HUBBARD:  Your Honor, I'm sorry.  I disagree with

17    you.  He did not say that.  I asked him the question.  He did

18    not say that at Morgan Stanley -- remember, when we were

19    talking about this, you said what he can do to be safe is to

20    say he had experience at Morgan Stanley.

21         THE COURT:  I'm not saying that's what you asked him.

22    I'm saying in terms of his testimony, but you should look at

23    the transcript.  But in terms of my recollection is he also --

24    it wasn't simply that.  When you were asking him about his

25    efforts to mitigate, he started talking about how he applied at

GC79PIC6

1   Morgan Stanley, how he thought things were going really well

2   because he had done so well there before and had a good

3   reputation and then when he had to tell them about what

4   happened at HSBC everything went south.

5            MR. HUBBARD:  Morgan Stanley is not the company

6   involved.

7            THE COURT:  That's fine.  So which is the company

8   that's involved?

9            MR. HUBBARD:  Barclays.

10           THE COURT:  Okay.  So then fine.  I am mistaken.  I

11   don't believe that's been opened then.  If we're talking about

12   Barclays.

13           But in terms of the Where's Waldo information I

14   believe that that that door has been opened through the

15   voluntariness of Mr. Picarella's testimony.

16           MR. HUBBARD:  I understand your position.

17           THE COURT:  Okay.  So is there anything else we need

18   to deal with today?  Any objection to my instructions to the

19   jury at the end of the day?

20           MR. HUBBARD:  No, your Honor.  Not from the plaintiff.

21           MR. JACKSON:  No.  Thank you very much.

22           THE COURT:  Okay.  Is there anything else we need to

23   deal with this evening?  Again, I'd ask counsel to get here at

24   9:15.

25           Let me get a sense of where we are in terms of timing

GC79PIC6

1    because, again, we got to try to get things moving.

2           How much longer does defense counsel believe you have

3    in cross-examination of this witness?

4           MR. JACKSON:  I'm definitely trying to finish, your

5    Honor, in the next couple hours of testimony.  I'm going -- I'm

6    going to try to approach this more aggressively tomorrow

7    because I think that we've had some delays.  So I think a

8    couple of hours hopefully will get it done and then maybe we

9    should have time to get through -- the next several witnesses,

10   I think, are all relatively short witnesses.

11          THE COURT:  When you say more aggressively, what do

12   you mean?

13          MR. JACKSON:  I just mean that -- I'm just going to

14   start cutting Mr. Picarella off.  He's giving, you know -- it's

15   the only way we're going to get through this.  But I -- I'm

16   going to attempt, your Honor, and obviously the Court will

17   control the proceedings, but every answer -- every question

18   seems to veer into a speech about every theme.  So if we cut

19   that down somewhat I think I could be done with this in a

20   couple of hours.

21          THE COURT:  Well let's do this.  Let me just ask

22   Mr. Picarella to step into my robing room.  We're going to talk

23   about his examination for just a second.

24          (Witness excused)

25          THE COURT:  So let me hear defense counsel again

GC79PIC6

1    because I am concerned about the pace.  I understand, I

2    believe, your position but I think that there are things that

3    can be done that hopefully can speed this up.  But let me just

4    hear from you again because -- let me hear from you.

5              MR. JACKSON:  All I'm saying, your Honor, is I'm just

6    going to just -- every question I'm going to say, yes or no,

7    and try to make it very tight, tight questions.  And I think I

8    can get this done in the early part of the morning tomorrow.

9    If we can -- if he can be reined in just a bit.  I'm very

10   optimistic that we can accomplish that.  I think that we will

11   be done within a couple of hours tomorrow.

12             THE COURT:  Plaintiff's counsel, anything to say about

13   this?

14             MR. HUBBARD:  Well, your Honor, again I am sympathetic

15   to both Mr. Jackson's view and the Court's.  It -- some of the

16   answers have been long.  But the witness, as we know, if he

17   feels trapped by a yes-or-no answer and he feels like it's not

18   a question that, really, he cannot answer yes or no because

19   it's not fair, he tends to try to explain it.  And I -- other

20   than the fact that I think, again, the Court today suggested a

21   few times that he answer the question.  He seemed to get on

22   track.  I don't think it hurts to say that to him.  I mean it

23   might -- because I can't really communicate with him about it.

24   But I would not object at all if your Honor in the polite way

25   you've done it tell him that -- if he can answer that question

GC79PIC6

1    yes or no, please do it and wait for redirect.  That might be

2    the best solution.  But I don't want to just completely muzzle

3    him.

4              THE COURT:  I'll make a suggestion.  I don't want to

5    tell people how to try their case.  But it seems that some of

6    the cross-examination of Mr. Picarella tends to be extended in

7    time because defense counsel tends to sometimes ask perhaps

8    just one question too many and then Mr. Picarella is made very

9    aware of the point that defense counsel is making and

10   Mr. Picarella then tends to try to give explanations.  That's

11   just a suggestion.

12             So if there's a situation in which, for example, if

13   it's established that Mr. Picarella has indicated certain facts

14   sometimes defense counsel tends to reiterate that same fact.  I

15   guess what I'm trying to say is we'll try to move things along.

16   But I think it certainly can be helpful for me to -- but I

17   think that if defense counsel wants to interrupt Mr. Picarella

18   and do that I think that what's going to happen is we're going

19   to still have a lot of back and forth and that's going to

20   actually end up taking more time.

21             So my sense is it's not defense counsel's

22   aggressiveness that's lacking here.  So, those are just sort of

23   my observations, sort of with -- if we were to say, use another

24   witness, for an example.  If Mr. Mullen, I believe his name is,

25   testifies that he supervised Mr. Picarella from May to November

1    of 2011, that's when he directly supervised him and after that

2    he moved to a different division.  I think if I get defense

3    counsel's point is that he didn't have a lot of direct

4    supervision with him after that.  It seemed to me that that was

5    sort of clear to the jury or there's enough for counsel to make

6    that argument.  But by asking that witness that question:  So

7    you didn't have any direct supervisory role over him or you

8    aren't aware of his work product after November 2011, he

9    explains, you get back into some other stuff and end up going a

10   little bit further.

11           Again, I'm not -- counsel know this case better than I

12   do.  You know the facts of this case.  You know what you're

13   doing.  You're both very experienced counsel.  I'm just trying

14   to make sure that we move things along because we're in the

15   middle of December.  I don't want to start losing these jurors.

16   These jurors are probably going to need some time to deliberate

17   here.

18           But let me hear counsel's thoughts.  Again, I'm not

19   saying this to just sort of lecture counsel.  I guess I am kind

20   of, but it seems that for both sides we could kind of move this

21   along.

22           And I do agree with plaintiff's counsel.

23   Mr. Picarella seem to do a somewhat better job once I kind of

24   instructed him that he would have an opportunity on redirect to

25   explain.

GC79PIC6

1        But let me hear counsel's thoughts.

2        MR. JACKSON:  Judge, first of all.  We appreciate the

3    Court's wisdom and the Court's guidance and we'll take that

4    under consideration.  I think that the Court is absolutely

5    correct and we can -- we can certainly improve and we can

6    certainly make some of our areas more concise and so we'll be

7    tidying it up.  And hopefully Mr. Picarella will be tidying it

8    up tomorrow.

9        And, as I'm saying, I'm confident that we'll be able

10   to get it done in the first couple of hours tomorrow.

11        THE COURT:  Then who are the other witnesses that we

12   have left in this case for tomorrow and just in general?

13        MR. HUBBARD:  Judge we have Ms. Weiss, Ms. Malanga,

14   Ms. Jang, and then we have I think Mr. Silber, and Roskell, and

15   Mr. Descamps.  And I think that's it.  Mr. Descamps is

16   scheduled, your Honor may remember, Mr. Descamps is scheduled

17   to testify tomorrow because he was coming from Europe -- I'm

18   sorry.  Friday morning.

19        THE COURT:  And, again, I want to try to reduce any

20   sort of cumulative testimony.  I understand certainly the

21   relevance of Ms. Weiss.  Let met just get clarity here.  I

22   assume that Ms. Hedges is not going to be testifying at this

23   trial.

24        MR. HUBBARD:  No, she's not.

25        THE COURT:  No one is calling Ms. Hedges?

GC79PIC6

1          MR. JACKSON:  We're not calling her, your Honor.

2          THE COURT:  Ms. Malanga.  I'm just trying to get a

3    sense because it seems that there was certainly some reference

4    of some communications between Mr. Picarella -- I guess we

5    could ask Mr. Picarella to come out now.

6          MR. HUBBARD:  I think we could.

7          (Witness present)

8          THE COURT:  So in terms of Ms. Malanga there was

9    certainly some testimony from Ms. Bilbrey, and I may be

10   butchering her last name, regarding some of the communications

11   between Mr. Picarella and Ms. Malanga.  What is there with

12   Ms. Malanga that's not cumulative of that testimony?

13         MR. HUBBARD:  Your Honor, I'm going to try to do two

14   things.  One is make sure that I don't use what's cumulative

15   from her and if I can avoid it at all I won't call her.  But

16   there are some places here where there are some e-mails that

17   seem to have some value, and she's probably the best witness.

18   But I don't think that she will be long.

19         The same with Ms. Jang.

20         But now that we've gotten through Ms. Bilbrey, part of

21   it will depend a little bit upon what Ms. Weiss has to say

22   because Ms. Weiss was sort of running the show there.  So,

23   again, I'll do my best to look forward and see how much of it I

24   can -- some of Ms. Weiss' testimony was covered by Ms. Bilbrey

25   today.  I'll do my best to try to be as, you know, as concise

GC79PIC6

1   as we can.

2              THE COURT:  What about defense counsel's view of

3   Ms. Malanga?  It seems to me, again, a lot of this is sort of

4   cumulative of Ms. Bilbrey.  What's defense counsel's position

5   regarding Ms. Malanga?

6              MR. JACKSON:  We would likely have a few questions for

7   Ms. Malanga, your Honor.

8              We do think that Ms. Jang is cumulative.  Once you

9   have Ms. Weiss, I don't think she has anything additional to

10  add to the equation.

11             MR. HUBBARD:  She has a lot to add to the equation,

12  Ms. Jang does.

13             THE COURT:  Tell me about that.  What does Ms. Jang

14  add to the equation?

15             MR. HUBBARD:  She just has some places where she says

16  things in her e-mails that are supportive of our case and not

17  very complimentary of defendant's.

18             THE COURT:  And not?

19             MR. HUBBARD:  Not very complimentary of the

20  defendant's case.  So there's some important things that she

21  raises.

22             THE COURT:  Okay.  But --

23             MR. HUBBARD:  She's not a long witness, your Honor,

24  but I think she's an important one.

25             THE COURT:  Okay.  And how long do you think that that

GC79PIC6

1  testimony will be?

2          MR. HUBBARD:  For the direct?

3          THE COURT:  Yes.

4          MR. HUBBARD:  Twenty minutes, maybe.

5          THE COURT:  Okay.  And then Silber, what is the

6  relevance of Silber's testimony.  Who is Silber?

7          MR. HUBBARD:  Silber is the executive that chaired

8  this conference call that Mr. Picarella was attending by phone

9  and is alleged to have leaked the information from that call.

10         THE COURT:  And Silber's testimony would be what?

11 That the phonecall happened and the phonecall was there and

12 that Mr. Picarella was there?

13         MR. HUBBARD:  How broad the disclosure was.  And his

14 deposition was taken and he had some things to say.  He accused

15 Mr. Picarella of making the leak that started the ball rolling

16 at the bank.  Again, I don't think he's a real long witness

17 but --

18         THE COURT:  Defense counsel.

19         MR. JACKSON:  Your Honor, I have to say, we're waiting

20 to hear the direct testimony.  We're going to -- I think we

21 would argue that Mr. Silber is completely irrelevant to this

22 case.  It's not clear at all why the leak is actually -- is

23 actually legally relevant.  It's definitely something that

24 happened.  There was an investigation of a leak.  But that's

25 not the proffered justification for why he was terminated.

GC79PIC6

```
 1              So if that's the real reason he was terminated, then
 2     it would have no significance.  It would mean that the
 3     plaintiff loses.  It's not the proffered reason.  So it can't
 4     be pretext.  It's just -- he has no involvement really in any
 5     of this stuff.  So it's not really clear.
 6              THE COURT:  And when was this conference call, again?
 7              MR. HUBBARD:  The conference call was on January 13 of
 8     2015.
 9              THE COURT:  My sense is that -- and I'll hear from
10     plaintiff's counsel -- but my sense is that plaintiff's
11     counsel's theory -- and please correct me if I'm wrong, I don't
12     want to put too many words in your mouth -- is that this
13     accusation accusing Mr. Picarella of leaking this information
14     was still part of this pattern of retaliating against
15     Mr. Picarella.  But maybe I'm wrong.  I don't know.  What is
16     plaintiff's counsel's position on it?
17              MR. HUBBARD:  That's exactly our position.  And, in
18     fact, he was terminated in part for that reason.  It's in the
19     letter.  And the testimony confirms it.
20              MR. JACKSON:  That's not what the letter says.  The
21     letter doesn't say that.
22              But we take the Court's point.  If it's their position
23     that's part of the pattern of retaliation, I guess I can
24     understand why it passes the relevance threshold.  I think the
25     probative value of all of it is remarkably low.  But we defer
```

GC79PIC6

```
 1      to them.  It's their case.

 2                THE COURT:  Then what other witnesses do we have?

 3                MR. HUBBARD:  Ms. Roskell participated in the

 4      termination decision.  She wrote the letter accusing him of

 5      leaking the information.  She was the head of human resources

 6      at that time.  She participated in the termination.  She said

 7      that one of the reasons he was terminated was because he leaked

 8      this information.  She's one of the witnesses that confirms

 9      that was -- some of them will deny that that was a reason, just

10      as counsel does.  Ms. Roskell at deposition admitted it was a

11      reason, the false reason.

12                THE COURT:  Okay.

13                I guess, again, to try to move things along I don't

14      get the sense with any of these witnesses, but counsel can

15      correct me if I'm wrong, that either side is attacking these

16      witnesses for being unqualified for their jobs.  Is that

17      correct?

18                I guess I'm wondering if we can kind of speed

19      through -- I'll certainly give counsel leeway to lead through

20      sort of background information in terms of where they went to

21      school and these other kinds of things.  I'm not sure --

22                MR. HUBBARD:  You're right --

23                THE COURT:  -- how important that is in this

24      particular case, because I don't believe that that's really

25      what the issues are about here.
```

GC79PIC6

1          MR. HUBBARD:  You're certainly --

2          THE COURT:  I will give you leeway to lead through

3     that but it seems like we don't need a lot of information from

4     these witnesses about not only where they went to school but

5     how many other places they worked and what their roles were at

6     all these other places.  I'm not sure that's particularly

7     relevant here.

8          MR. HUBBARD:  I think you're absolutely right.

9          MR. JACKSON:  We agree with you.

10         THE COURT:  I think we can cut that out.  I don't know

11    if we need to -- it seems we're getting into some cumulative

12    stuff -- I will give defense counsel some leeway.  I don't know

13    if we need to have long examinations about the -- if we still

14    need to keep seeing the sexual harassment policy and talk about

15    how everyone takes that seriously.  I think we can probably

16    move through some of that.  Obviously, with some witnesses

17    maybe that's particularly relevant.  I don't know if we need

18    the flow chart a whole lot for the rest of these witnesses.

19    But let me hear counsel's position on that.

20         MR. JACKSON:  No, your Honor.  I mean Ms. Bilbrey was

21    the first witness that we've had that actually worked at HR so

22    we wanted to go through it with her but we don't have a need to

23    go through that with every witness.

24         THE COURT:  So let me just get a sense of timing.  So

25    tomorrow after the cross-examination of Mr. Picarella who do we

GC79PIC6

```
 1    have next up?
 2               MR. HUBBARD:  Ms. Weiss.
 3               THE COURT:  And how long do you anticipate the
 4    examination of Ms. Weiss to be?
 5               MR. HUBBARD:  Not more than an hour.  I've just got to
 6    go back and look and see from what Ms. Bilbrey said, but maybe
 7    45 minutes.
 8               THE COURT:  Remind me again of what Ms. Weiss is going
 9    to say that's different from Ms. Bilbrey.
10               MR. HUBBARD:  She just has a lot to say about the
11    investigation and what the allegations were.  There's just a
12    huge number of written records that are I think are important
13    to the case, your Honor.  We'll be as quick as we can.
14               THE COURT:  I'm not saying that she's not relevant.
15    I'm just trying to get a sense of how we can try to move some
16    things along.
17               MR. HUBBARD:  She's the person that he started
18    reporting to, and then she started helping him, and her
19    relationship to the investigation is important to go back and
20    see that there are a lot of informative documents that she
21    offers.
22               THE COURT:  And how long or how short would the
23    cross-examination of Ms. Weiss be?
24               MR. JACKSON:  25, 30 minutes at the most, your Honor.
25               THE COURT:  And then who is next after Ms. Weiss?
```

GC79PIC6

| | |
|---|---|
| 1 | MR. HUBBARD:  I don't know whether we would call |
| 2 | Malanga or Jang in what order, but I'll let counsel know |
| 3 | tonight if we want Malanga first. |
| 4 | THE COURT:  After Malanga and Jang or switched order |
| 5 | who is next up? |
| 6 | MR. HUBBARD:  Mr. Silber. |
| 7 | THE COURT:  And Mr. Silber is the witness who is |
| 8 | coming from out of town? |
| 9 | MR. HUBBARD:  No, sir.  He's here.  And then there are |
| 10 | Ms. Roskell and then Mr. Descamps is the I guess the last |
| 11 | witness and he's the gentleman who is coming from France to |
| 12 | testify on Friday morning. |
| 13 | THE COURT:  And what's Mr. Descamps going to testify |
| 14 | about? |
| 15 | MR. HUBBARD:  I'm sorry? |
| 16 | THE COURT:  What's Mr. Descamps going to testify |
| 17 | about? |
| 18 | MR. HUBBARD:  The termination.  He made the decision |
| 19 | to terminate, what the basis of the termination -- he was the |
| 20 | chief officer of the company. |
| 21 | THE COURT:  And is Mr. Pizzimbono going to be |
| 22 | testifying here? |
| 23 | MR. HUBBARD:  We are not calling Mr. Pizzimbono or |
| 24 | Ms. White but the defendant may. |
| 25 | MR. JACKSON:  We're going to call those two witnesses, |

GC79PIC6

 1   your Honor.

 2            THE COURT:  How many witnesses does the defense plan

 3   on calling?

 4            MR. JACKSON:  At this point your Honor we plan on

 5   calling three witnesses.

 6            THE COURT:  And who are those witnesses, Pizzimbono

 7   and who else, Ms. White, and who else?

 8            MR. JACKSON:  Mr. DeLuca.

 9            THE COURT:  So I take it Ms. Jenner is not going to be

10   testifying here either, correct?

11            MR. HUBBARD:  No.

12            MR. JACKSON:  No, your Honor.

13            There is one witness that hasn't been mentioned,

14   Mr. Karam.

15            MR. HUBBARD:  I'm sorry.  Mr. Karam.  I'm sorry.  I

16   left Mr. Karam out.  He's before Mr. Silber.  I'm sorry.  I

17   just left him out of the list.  He's the gentleman that we

18   heard about the story about the review and the red face and all

19   that stuff.  I'm sorry.  I just can't --

20            THE COURT:  And Mr. Karam's testimony is going to be I

21   guess about this -- the pointing, beet red face incident.  It

22   is it going to be that?

23            MR. HUBBARD:  I don't think I'll ask him much about

24   that incident.  I'll let Mr. Picarella do that.

25            Mr. Karam was the manager who basically managed him

GC79PIC6

1   out of the firm.  There's a number of critical reviews with

2   Mr. Karam.  There are a number of e-mails he writes that we

3   think are -- reflect adversely upon this process and reflect

4   retaliation.  So he's an important witness.  He's probably the

5   most important of the group I just mentioned.

6   THE COURT:  Okay.  And are there any other disputed

7   documents that we need to talk about now while we have a little

8   bit of time?

9   MR. JACKSON:  I don't believe so, your Honor.

10   THE COURT:  And what is the defense position on these

11   Sametime chats again?  I have a concern about some of the stuff

12   being cumulative.

13   MR. JACKSON:  I think, your Honor, we would like to

14   offer a small subset of those along the lines of what the Court

15   was talking about.  And we certainly won't belabor the point

16   with you but a small subset of them that would speak to the

17   issue as the Court was describing it.

18   THE COURT:  And from whom?

19   MR. JACKSON:  We really could -- we really could talk

20   about them with Mr. Picarella or we could talk about them with

21   one of the witnesses next week.

22   THE COURT:  No.  I meant whose Sametime chats.

23   MR. JACKSON:  I'm sorry.  I think the Sametime chats

24   that are at issue are the -- there's some communications

25   between Mr. Picarella -- I'm sorry, between Ms. Hedges and

1    Ms. Parker and in some instances Ms. Parker and Mr. DeLuca.

2              THE COURT:  And the Parker/DeLuca ones, what's the

3    relevance of those?  The Parker to DeLuca?

4              MR. JACKSON:  Ms. Parker talks about basically

5    Mr. Picarella's poor work, inability to find him in the office,

6    his absence, his shirking work during the time period.

7              THE COURT:  Which time period are we talking about?

8              MR. JACKSON:  It's all 2012.

9              THE COURT:  Okay.  All right.  Anything else from

10   plaintiff's counsel?

11             MR. HUBBARD:  No.  Other than just we had this

12   discussion before when we argued the motion in limine and for

13   the reasons that we had mentioned.

14             THE COURT:  I'm sorry about the Barclays thing.  I got

15   confused it was Barclays.  I don't believe there's anything

16   with Barclays.  But I did take note when he started talking

17   about Morgan Stanley.  I was a little concerned about that.

18             MR. HUBBARD:  My partner was just telling me that we

19   had this discussion about these Parvis -- I mean these

20   Parker/DeLuca Sametime chats before and we know that we argued

21   this and your Honor I know has that issue in mind.

22             THE COURT:  Yes.  Again, I believe that the door to

23   that has been opened but, again, that doesn't mean that all of

24   these need to come in.  Again, some of this seems that it could

25   be certainly cumulative.  But, again, I think that there is

GC79PIC6

1    certainly in terms of the -- in terms of the documents

2    themselves, again, some of that may be cumulative, maybe it's

3    not.  I don't know.  I think there certainly could be some

4    present sense impression stuff.  But a lot of this isn't

5    necessarily going for the truth of the matter asserted.  Some

6    of it is going to rebut certain claims and I do believe that

7    were raised on direct or at least through Mr. Picarella's

8    testimony about people's complaints about him and the way he

9    was perceived and those sorts of things.

10          MR. HUBBARD:  Well, I don't want to belabor it, I know

11   it's late, but I don't see, in light of the prejudice of that

12   stuff, the people that we don't have any access to, those

13   things, there is no indication that any of that stuff was ever

14   a part of the employment decisions relating to him or ever even

15   filed in any place.  It was not to human resources.  It was not

16   to his managers.

17          So, again, for the reason we argued before I just

18   think that that stuff is not only hearsay and not business

19   record but it's highly irrelevant.

20          THE COURT:  Let me hear from defense counsel about

21   that again so I have a clearer sense of how much of this

22   Sametime Chat defense counsel is talking about here.  I believe

23   you had mentioned before something about some witnesses talking

24   about this themselves.  Can you tell me more about that.  Just

25   remind me of that.

GC79PIC6

1          MR. JACKSON:  Your Honor, first of all, we're going to

2     do a very limited thing with this.  We're not going to get

3     anywhere near the cumulative area.  It should be a very brief

4     area.

5          First, it is not correct though -- it is not correct

6     that Mr. Hubbard didn't have access to these people.  He

7     actually had Ms. Parker on his witness list.  Today is the

8     first day that he's withdrawn her.

9          Certainly Mr. DeLuca we expect to call him.  They're

10    free to call him.

11         And he had Ms. Hedges on his witness list until a

12    moment ago.  And Ms. Hedges testified in her deposition that

13    she was aware of these -- such communications and she's

14    actually one of the people on some of the communications that

15    we're talking about.  So I don't think that there's really the

16    issue that plaintiff's counsel --

17         MR. HUBBARD:  I don't think that that deposition was

18    designated, Ms. Hedges, your Honor.  It would be hearsay.

19         THE COURT:  What do you mean?

20         MR. HUBBARD:  Sir?

21         THE COURT:  I'm not sure -- my sense of what defense

22    counsel is saying I think is what he's saying is if you had

23    called Ms. Hedges this wouldn't be a hearsay issue.  I'm not

24    talking about the chats themselves.  I'm talking about the

25    substance of the material in the chats I think is what he's

GC79PIC6

1    saying that in terms of your claim that you didn't have notice

2    of this or an ability to call these witnesses I think is what

3    he's saying.  As we did talk about at the pretrial conference

4    if there's a witness that comes here and says that I observed

5    that Mr. Picarella wasn't at his desk there is no hearsay

6    problem there.

7            MR. HUBBARD:  Absolutely.  And we discussed that and

8    Mr. DeLuca is apparently coming to court and he's going to

9    testify.  That's why I say that anything beyond that is --

10           THE COURT:  Well does defense counsel anticipate

11   Mr. DeLuca is going to testify to that?

12           MR. JACKSON:  He would, your Honor.

13           Now, frankly, we intend to offer these tomorrow.  And

14   we intend to ask a few questions about these to Mr. Picarella

15   and, you know, if the issue is sufficiently closed, then we can

16   revisit whether or not we even need Mr. DeLuca.  But he is

17   prepared to testify and we have him ready to testify next week.

18           THE COURT:  What is it, I guess and maybe we need to

19   ask Mr. Picarella to step out again for a second here, but I

20   guess I'm trying to figure out.  Let's just ask Mr. Picarella

21   to step into the robing room.

22           (Witness excused)

23           THE COURT:  Give me a sense, defense counsel, on what

24   you plan on doing with these in terms of Mr. Picarella.

25           MR. JACKSON:  We don't plan on probing him a lot about

GC79PIC6

```
 1    these.  The real question is we just want to ask him -- there's
 2    specific incidents that are described in a couple of different
 3    moments that he participated in.  And we just want to confirm
 4    that he's familiar with a couple of these details that are
 5    being described in some of those communications.  But I really
 6    anticipate this is going to be a very short part of the
 7    remaining cross.
 8           THE COURT:  I guess what I'm worried again about is
 9    sort of time and this -- is what you're suggesting that you
10    want to show Mr. Picarella a Sametime Chat between say
11    Ms. Parker and Mr. DeLuca that indicates that Mr. Picarella is
12    not at his desk and he's never at his desk, something like
13    that, and then you're going to ask him to comment on that, if
14    that's true?  Is that what we're talking about?
15           MR. JACKSON:  No, your Honor.  No, your Honor.
16           Essentially we're going to offer those documents and
17    we think that we can preserve our arguments about them for
18    later on with the jury.  There are just a couple of details
19    about certain things that transpired that we would ask
20    Mr. Picarella about potentially.  But we're certainly not
21    asking him to comment on other people's observations.  We would
22    just be asking him for -- I can't think of an example right off
23    the top of my head -- but communication references, you know,
24    Project B.  We might ask him, you know, what was Project B.  If
25    he knows the answer, that would be it.  But I assure the Court
```

1     that to the extent that the Court is concerned about time, we

2     plan on spending very minimal time tomorrow on this.  And we

3     will get through that quickly.  And I expect we're going to be

4     more efficient than the Court even expects given the total --

5     in terms of the total remainder of the cross.

6              MR. HUBBARD:  I would just say, your Honor, highly

7     prejudicial to use those documents.  If the witness is coming

8     to the trial and they want to ask Mr. DeLuca what he said about

9     Mr. Picarella being at his desk, we do the best we can.  But we

10    can't cross-examine these out-of-court statements and they're

11    clearly being offered for the truth, as your Honor had --

12             THE COURT:  Well I don't believe -- again, I think

13    that door has been opened, but I've ruled on that.  I guess

14    what I'm more worried about is a waste of time here because one

15    of the issues that we have here is obviously Mr. Picarella is a

16    witness who is hostile to the defense.  And if you put this big

17    thing up here on the screen and it's obvious to Mr. Picarella

18    what you're going for and what you're trying to imply, we're

19    going to be in a situation again in which we have a lot of this

20    going back and forth where he's going to be like, Oh, you're

21    trying to say this, and when this witness said this, or when

22    this person said this they meant this, and there are fifteen

23    other things going on here.

24             If your goal is to simply ask him about, say, Project

25    B and ask him if he was wherever he was supposed to be when he

GC79PIC6

1     was working on Project B it seems to me that it might be more

2     efficient to simply ask him those things.  And if you need to

3     rely on those chats later maybe that's the way to go.

4           But I guess we'll cross that bridge when we get to it.

5     I am just worried about -- it does seem to me that, from both

6     sides, I think both sides have been doing this sometimes, and I

7     understand that in the heat of battle counsel get -- the

8     adrenaline gets going and you get a good point and you want to

9     really kind of hammer it in but I think that sometimes it ends

10    up taking a little bit longer than it might otherwise take.

11          MR. JACKSON:  Judge, we completely understand.  We

12    agree with the Court's wisdom and we'll take that under full

13    consideration.  I promise the Court, the Court will see

14    tomorrow when we deal with this that we are dealing with it

15    completely in accordance with the Court's concerns about all of

16    those matters and it's going to be extremely abbreviated, if at

17    all, any questions to Mr. Picarella.  We may simply offer the

18    documents and just simply ask a couple of points that we need

19    to ask about the things that relates to it, clarify, move on.

20          THE COURT:  Again, I guess make sure you talk to

21    counsel, and I guess I like to get here a little bit early in

22    the morning, and I guess let's try to get here, I'll get here

23    at 9:15 and let me see the documents because, again, I am

24    concerned about the cumulative nature of this.

25          You did bring out through your examination of

GC79PIC6

1    Mr. Picarella that he's aware that individuals had referred to

2    him as Where's Waldo.  That's already in the record.  That's

3    already been done.

4             MR. JACKSON:  Yes, your Honor.

5             THE COURT:  So I'm not sure how much -- I'm not just

6    going to let you do this fifteen more times with him or three

7    more times with him.  That's already been done.  I'm not sure

8    what exactly it is you wish to do.

9             MR. JACKSON:  Absolutely, your Honor.  We agree with

10   that.  We don't need to go through all of that again.  Tomorrow

11   morning we'll identify the limited set of documents that we

12   intend to use.  We'll provide them to defense counsel in

13   advance of court so we can proceed very slowly.  And it will be

14   an efficient -- it will be an efficient morning.

15            THE COURT:  And, again, just to be clear, your point

16   with this is, I believe I understand your point with this but

17   let me just hear from you again the sort of he's not here, the

18   Where's Waldo stuff.  What are the purposes for which you

19   intend to use this?

20            MR. JACKSON:  Your Honor, it is responsive to the

21   witness's testimony.  But essentially it is -- the point is

22   that in real time at the time back in 2012 before there was any

23   pretext, any alleged pretext, and really before and really

24   separate from any -- in a context that is completely devoid of

25   any ability to articulate any real retaliation, coworkers were

GC79PIC6

communicating, who had an opportunity to observe Mr. Picarella,
that he was -- that there were a number of problems and it's
very -- that's the very limited use of it.

MR. HUBBARD:  Your Honor, if we get into this stuff
about Where's Waldo and this Sametime about he's not at his
desk I have to redirect the witness with his appointment books
and things like that.  I don't think it's necessary.

THE COURT:  Well let me get a sense from defense
counsel.  How many witnesses do you want to do this with,
Mr. DeLuca obviously.

MR. JACKSON:  That's it.

THE COURT:  Anybody else?

MR. JACKSON:  That's it, your Honor.  On that point.

MR. HUBBARD:  I thought he said --

MR. JACKSON:  We're only calling -- in our defense
case we really truncated the defense case.  We're calling three
witnesses.  Mr. Pizzimbono and Ms. White are going to talk very
globally about all of the issues.  But frankly neither one of
them is an extremely long witness either.  But I think res ipsa
loquitur, your Honor.

THE COURT:  I guess what I'm still trying to figure
out is where you're going with this with Mr. Picarella on the
stand.

I guess I'm trying to figure out what it is you plan
to do with him and these Sametime Chats.  To draw his attention

GC79PIC6

1    to these chats that talk about Where's Waldo and the like it

2    seems that you are in a situation which we're inviting him to

3    get extremely defensive on the stand and start trying to

4    explain everything in the context of these questions that you

5    ask him.

6           So I'm trying to figure out where it is you're going

7    with him on the stand.

8           I understand with DeLuca and asking DeLuca these

9    questions and DeLuca can answer whatever DeLuca answers.

10          Where is it you plan on going with this information

11   with Mr. Picarella on the stand?

12          MR. JACKSON:  Your Honor, the one thing I need to do

13   tonight is in order to respond to the Court's concerns about

14   cumulativeness I want to make sure that I have the most concise

15   set of this as possible.  And I just want to be sure about what

16   we're talking about.  But the only thing I would ask him -- I

17   may ask him nothing about them.  The only thing I would ask him

18   about them is if there is a specific item, Project B type thing

19   that I'm talking about, just whether or not he can tell us what

20   that was.  I don't intend on confronting him and say this is

21   this document and this means that, but that's really the only

22   point there, your Honor.  I may be able to do without it.

23          THE COURT:  What's the relevance of Project B,

24   whatever the heck Project B would be?

25          MR. JACKSON:  Just to explain what is being discussed

1   in some of these communications, just so we have a little bit

2   of context about what is being discussed.

3           MR. HUBBARD:  I don't have any objection to Project B,

4   even if it's in some of this hearsay, because that doesn't

5   accuse him of being negligent at his job.

6           What I object to, and the prejudice is obvious, are

7   these -- is this gossip -- we've talked about this before --

8   about whether he's at his desk or not by people who have no

9   management responsibility for him, who never reported any of it

10  to anybody, and it was never used.

11          MR. JACKSON:  Your Honor, there is no -- there is no

12  additional articulable concern.  The only thing that

13  Mr. Hubbard doesn't like about these documents is that they

14  predate --

15          THE COURT:  Let's not do that.

16          Let me find out from defense counsel.  Are you

17  planning on making a link from any of this information, these

18  Where's Waldo comments, to management that management was aware

19  of any of these comments?

20          MR. JACKSON:  What we plan on doing with the witnesses

21  who would testify next week is they will testify to the fact

22  that they became aware of a whole range of concerns like this

23  from Mr. Picarella.  We're going to introduce a number of other

24  documents that speak to these same types of concerns that go on

25  throughout this time period.  And these are the types -- these

GC79PIC6

1    are the reasons that management is going to say that he was

2    ultimately terminated.  And these directly --

3            THE COURT:  And who is going to say that?

4            MR. JACKSON:  I believe Ms. White is going to say that

5    and I believe that Mr. Pizzimbono will say that.  I don't think

6    that they're -- they're not going to get into these kind of

7    communications.  What they're going to be talking about is

8    their own -- the information was filtered to them about the

9    types of complaints that were being made about Mr. Picarella.

10           MR. HUBBARD:  And neither one of them, your Honor, I

11   don't believe was involved in the decision to terminate.

12           MR. JACKSON:  That's just not true.

13           THE COURT:  Just to be clear.  You anticipate that

14   Pizzimbono is going to testify that he heard complaints about

15   Mr. Picarella not being at his desk.

16           MR. JACKSON:  I expect that he will.  His lack of

17   availability.

18           THE COURT:  And you believe that Ms. White I think you

19   said is also going to do that?

20           MR. JACKSON:  I believe, your Honor -- I believe that

21   she will talk about those types of concerns, yes, filtered out

22   to her.

23           MR. HUBBARD:  He keeps saying -- counsel keeps saying

24   those types of concerns.  What he's going to do is have these

25   witnesses testify that there was some concerns about his work

1     ethic and the amount of time that he spent at the desk and that

2     kind of thing.  But none of them are going to say anything

3     about what DeLuca or Parker are saying.  Because they obviously

4     weren't communicating with him.  And so to just say that we

5     didn't think he was working hard enough and relate it back to

6     these Sametime messages, Judge, is the prejudice we've

7     complained about.  Because I don't think that either one of

8     them, White or Pizzimbono, participated in this decision.

9     Neither one of them are on these reviews at the end, to my

10    knowledge.  They might be.  I don't think so.

11            But Mr. Karam made the recommendation that he be

12    terminated.  Mr. Descamps made the final decision to terminate.

13    But there is no evidence there that they relied upon any of

14    this gossip from these two, you know, the two folks on the desk

15    there in 2011 almost in early 2012.  Almost all of it isn't

16    even in 2011.  So it's hard to elevate that into the end.

17            THE COURT:  Okay.  Again I want to try to get clarity

18    from defense counsel.  We'll break soon.  But, again, I'm still

19    not seeing the utility of doing this with Mr. Picarella on the

20    stand.  I guess that's what I'm trying to figure out.  What is

21    the utility of doing that and why this isn't somehow

22    cumulative.

23            You're going to have a witness who is going to

24    testify.  You say that Mr. Pizzimbono, you believe -- you

25    certainly say that Mr. DeLuca is going to testify that he

GC79PIC6

1   observed that Mr. Picarella was not at his desk frequently when

2   Mr. Picarella was supposed to be at his desk.

3            Is that correct?

4            MR. JACKSON:  Yes, your Honor.

5            THE COURT:  And you claim that Mr. Pizzimbono would be

6   testifying that he had heard that Mr. Picarella was not at his

7   desk when he was supposed to be; is that correct?

8            MR. JACKSON:  I don't want to put exact -- I don't

9   want -- I get very nervous about putting words in witnesses'

10   mouths.

11            But he's certainly going to testify, your Honor, that

12   among the concerns with Mr. Picarella's performance was his

13   lack of availability.  And he's aware that, you know, people

14   couldn't find the guy.

15            So I think -- even putting aside, your Honor, the fact

16   that the door has been opened, there have been a number of

17   different cases that talk about the fact that contemporaneous

18   evidence demonstrating that the reasons that management offered

19   for firing an individual were not pretextual is relevant.  And

20   so I think that your Honor's ruling earlier was completely

21   correct.  The door has been completely opened.

22            Putting that aside, this goes directly to the pretext

23   that they claim.  And so with Mr. Picarella on the stand we

24   don't need to do very much.  It's only -- in fact, if the Court

25   doesn't want us to, we don't need to do much at all.  The only

GC79PIC6

1   thing we really wanted to leave open would be a couple of

2   questions just about what specific things are in that, that

3   we'd even want to clarify with Mr. Picarella while he's on the

4   stand.  But apart from that I don't think we need to do much.

5   I think we can have a very efficient end of the cross.

6          THE COURT:  Okay.  We'll talk about this more

7   tomorrow.

8          Again, I do believe that the door has been opened.  I

9   do believe that there is certainly some potential exceptions to

10   the hearsay.  But just because the door has been opened doesn't

11   mean that we need to have lots and lots of this.

12          I am concerned about the prejudice of this starting to

13   outweigh the probative value of this under 403 because I'm not

14   sure -- again, there's information out there that Mr. Picarella

15   testified about what he testified many times before about all

16   of the depositions that he'd seen and the stuff that he had

17   observed in court and witnesses testimony and other things and

18   I believe that's the context in which he was talking about

19   seeing these Where's Waldo chats in terms of his review of the

20   discovery.  I don't believe that there has been any direct

21   question to him about Where's Waldo in a general sense.  I'm

22   not saying that there should be.  But there certainly was a lot

23   of examination from defense counsel indicating that there were

24   times when Mr. Picarella -- I don't remember if there were a

25   lot of questions about him not particularly being at his desk

                                                                    489

GC79PIC6

1    but there was certainly a lot of inquiry about him being alone

2    in a dark conference room and not at meetings.  It seems that

3    there has been that sort of inquiry and Mr. Picarella has

4    denied all of that.  He said no to every last one of those

5    questions.

6           So, again, I'm not sure the utility of going through

7    these Sametime Chats with Mr. Picarella on the stand.  Again,

8    to the extent that he did testify about the fact that no one

9    ever complained about him -- not engaging in fraud or no one

10   had any complaints about him and all of these other kinds of

11   thing, I do certainly think that that opens the door to some of

12   this but that doesn't open the door to all of this so we'll see

13   where we are.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

GC7TPIC7

1          MR. JACKSON:  We agree with your Honor, which is why

2     we wanted a truncated set, and we are in total agreement with

3     all the Court's instructions.

4          THE COURT:  So I am concerned about doing this with

5     Mr. Picarella, and I am concerned about, even to the extent

6     that that is done by putting these documents up on the screen,

7     if you're simply trying to draw his attention to something to

8     identify what it is, it doesn't seem it's necessary to put that

9     on the screen, if that's the purpose for this.

10          Anything else from plaintiff's counsel or defense

11     counsel?

12          MR. HUBBARD:  No, your Honor, thank you for your

13     patience this afternoon.

14          MR. JACKSON:  Thank you very much.  We'll be ready

15     tomorrow morning.

16          THE COURT:  And counsel should also -- in terms of

17     Friday, as I indicated I'm a little worried about the pace.  I

18     made myself more available on Friday, so Friday we can work

19     from 9:30 until 1:00 and then take a lunch break and work until

20     4 o'clock.  Is that right, Tara?

21          DEPUTY CLERK:  Yes.

22          THE COURT:  So we can work until 4 o'clock Friday.

23          MR. HUBBARD:  May we ask one question, your Honor, in

24     terms of your availability on Friday afternoon, what would your

25     plan be, assuming we finish the evidence early next week?

GC7TPIC7

1  Would your plan be to try to have a charge conference Friday

2  afternoon, or would you want to wait until all the evidence is

3  in to do that?  Or you may not want to have a charge

4  conference.

5          THE COURT:  We need to have a charge conference.  It

6  probably makes sense to wait until all the evidence is in.  You

7  think all the evidence will be on Friday, plaintiff's case, or

8  all the evidence?

9          MR. HUBBARD:  Plaintiff's case.

10         THE COURT:  No, I think it makes sense to wait until

11 all the evidence is in, although I don't anticipate that

12 there's going to be a lot of debate about the charge in this

13 case, but maybe there will be.

14         MR. HUBBARD:  If we -- the way your instructions work,

15 we each weigh in on the instructions, and it seems to me that

16 the instructions should be pretty clear.

17         THE COURT:  Right.  When we get closer to that we will

18 email you a copy of our draft instructions based on what you

19 have given us, and give you at least hopefully at least one

20 night to look at that and have a charge conference.

21         MR. HUBBARD:  Very good.

22         MR. JACKSON:  Thank you.

23         (Adjourned to December 8 at 9:30 a.m.)

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MICHAEL PICARELLA

Cross By Mr. Jackson . . . . . . . . . . . . . 281

 IAN MULLEN

Direct By Mr. Hubbard . . . . . . . . . . . 330

Cross By Mr. Jackson . . . . . . . . . . . . 351

MARY BILBREY

Direct By Mr. Hubbard . . . . . . . . . . . 368

Cross By Mr. Jackson . . . . . . . . . . . . 403

Redirect By Mr. Hubbard . . . . . . . . . . 423

MICHAEL PICARELLA

Cross By Mr. Jackson . . . . . . . . . . . . 433

                    PLAINTIFF EXHIBITS

Exhibit No.                                   Received

 159  . . . . . . . . . . . . . . . . . . . 384

 166  . . . . . . . . . . . . . . . . . . . 409

                    DEFENDANT EXHIBITS

Exhibit No.                                   Received

 4    . . . . . . . . . . . . . . . . . . . 289

 43   . . . . . . . . . . . . . . . . . . . 297

 44   . . . . . . . . . . . . . . . . . . . 298

 92   . . . . . . . . . . . . . . . . . . . 305

 98   . . . . . . . . . . . . . . . . . . . 306

 300  . . . . . . . . . . . . . . . . . . . 315

493

6, 188, 189 198, 210, 241, 244, 269,  . . . . 409

270, 272, 297, 298

19    . . . . . . . . . . . . . . . . . . . 435

22    . . . . . . . . . . . . . . . . . . . 438

20    . . . . . . . . . . . . . . . . . . . 438

21    . . . . . . . . . . . . . . . . . . . 438

64    . . . . . . . . . . . . . . . . . . . 442