GC89PIC1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MICHAEL PICARELLA,

4              Plaintiff,

5         v.                          14 CV 4463 (ALC)

6    HSBC (USA) SECURITIES, INC.,

7              Defendant.

8    ------------------------------x
                                     New York, N.Y.
9                                    December 8, 2016
                                     9:21 a.m.
10
     Before:
11
                    HON. ANDREW L. CARTER,
12
                                     District Judge
13
                         APPEARANCES
14
     LIDDLE & ROBINSON LLP
15        Attorneys for Plaintiff
     BY:  JAMES R. HUBBARD
16        BLAINE H. BORTNICK
          ASA F. SMITH
17        CHRISTINE PALMIERI

18   BOIES, SCHILLER & FLEXNER LLP
          Attorneys for Defendant
19   BY:  RANDALL W. JACKSON
          DAVID L. SIMONS
20        NICHOLAS STANDISH

21   GIBSON, DUNN & CRUTCHER LLP
          Attorneys for Defendant
22   BY:  GABRIELLE F. LEVIN

23

24

25

GC89PIC1

```
 1                (Trial resumed; jury not present)
 2                THE COURT:  Let me just check in.  Any news
 3     information or anything last night?  I didn't see anything.
 4                MR. JACKSON:  I didn't see anything either.
 5                MR. HUBBARD:  Must not have been a very exciting day.
 6                THE COURT:  Let me just talk a little bit about where
 7     we were talking about yesterday in terms of these chats and the
 8     like.  Has counsel conferred or where are we with that?
 9                MR. JACKSON:  Yes, your Honor.  We conferred this
10     morning.  We were able to reduce the large set that we were --
11     that we had identified down to essentially it's like seven of
12     these and I shared them with Mr. Hubbard.
13                MR. HUBBARD:  You only shared three.
14                MR. JACKSON:  No.  No.  You have that --
15                MR. HUBBARD:  I only saw three.
16                MR. JACKSON:  It's right there.  I think you saw them.
17     You may have thought -- some of them look like they are
18     connected.
19                MR. HUBBARD:  Just make sure.
20                MR. JACKSON:  Oh, yes.
21                MR. HUBBARD:  Excuse me.  I see DX-76, DX-105, DX-117,
22     DX-23, and 107.
23                MR. JACKSON:  Right.
24                THE COURT:  So let me just ask this.  I assume that
25     there's still -- is there still an objection to these Sametime
```

GC89PIC1

1      Chats?

2                    MR. HUBBARD:  Absolutely, your Honor.

3                    THE COURT:  So, go ahead, counsel.

4                    MR. JACKSON:  I'm sorry, your Honor.  What I was going

5      to say, when we talked to Mr. Hubbard, what Mr. Hubbard shared

6      with us is that apart from the objection, the general objection

7      that he had, he didn't have any additional objection except on

8      DX-86 there is a reference to client-attorney confidentiality

9      and we agreed that we could just redact that.  And so we've

10     redacted that.  So it's really just this small set.

11                   THE COURT:  So let me -- I think that I probably

12     haven't been crystal clear with the parties in terms of my

13     thinking about the issues related to these Sametime Chats.  Let

14     me try to do that the best I can now.

15                   It seems to me that there are at least three sort of

16     categories related to the Sametime Chats.  There is -- or there

17     are the documents themselves that contain the Sametime Chats.

18     There is the content of the Sametime Chats.  And then there are

19     references to the existence or references to the Sametime

20     Chats.

21                   It appears to me that defense counsel has taken the

22     position that all of that should come in.  And plaintiff's

23     counsel has taken the position that none of that should come

24     in.  It seems to me that there's some nuances that I see that I

25     just want to share with the parties in terms of my thinking

GC89PIC1

1    about this.

2              I guess first taking the documents themselves that

3    contain the Sametime Chats.  It seems to me that as with many

4    documents there are issues related to potential double hearsay

5    here.  So, for an example, an example you're probably more

6    accustomed to.  If there were a traffic accident in Bedrock

7    with Fred Flintstone and Barney Rubble and Officer Slate fills

8    out a report, police report indicating that Fred Flintstone

9    admitted to him that he ran the red light.  There are two

10   levels of potential hearsay there.  The more obvious one, which

11   is probably the second level of hearsay, is that Fred admitted

12   that he ran the red light.  That would not be hearsay in that

13   particular context because that's an admission by a party

14   opponent.  The more nuanced level of hearsay is the fact that

15   Officer Slate is communicating not just on the report but to

16   the report that Fred Flintstone told him that he ran the red

17   light, admitted that he ran the red light.  It's not just that

18   Officer Slate is putting that on the report.  He is essentially

19   making this out-of-court statement to the report that Fred

20   Flintstone told me this.  And it is being offered for the truth

21   of a matter asserted.  Therefore, there is a hearsay issue with

22   the document itself.

23              Now, that document in this particular context would

24   more than likely have -- fall under the business records

25   exception.  So there is no issue with that document.  And there

GC89PIC1

1    is no issue with the statement.  And counsel, who are very

2    experienced, I'm sure have had situations in which a document

3    comes into evidence but certain statements within the document

4    are redacted because those statements contain hearsay and it's

5    not within an exception, that sort of double hearsay issue.

6           It seems to me that we have a similar situation here;

7    that the document itself containing the Sametime Chats has some

8    serious hearsay issues because whomever or whatever is creating

9    this document or communicating this information to the document

10   is essentially stating that these Sametime messages took place.

11   I am saying to this document, to this report that these

12   Sametime messages took place.  That is being offered for the

13   truth of the matter asserted.  So therefore there is a hearsay

14   issue regarding the document itself.

15          Now I think plaintiff's counsel has referred generally

16   to this is not a business record; perhaps it isn't.  There are

17   certainly lots of other exceptions in Rule 803 that relate to

18   this sort of documentary issue.  And I'm not saying that any of

19   those apply.  But certainly there are court records and

20   certificates and other things that get around that level of

21   hearsay.

22          But to me it seems that -- and I'll hear from counsel

23   later -- that the document itself, that issue of hearsay is one

24   that is not readily obvious to me that there's an exception to

25   that issue.

GC89PIC1

1          Then we move on to the issue of content of the actual

2     Sametime Chats.   To the extent that there is a statement that

3     says Mr. Picarella is never here, Where's Waldo, something to

4     that effect.   Those statements may -- don't seem to necessarily

5     implicate hearsay to me.

6          So, for example, if there is a statement that says

7     that Mr. Picarella is not here or Where is Waldo, something to

8     that effect, as I indicated yesterday, it's not being offered

9     for the truth of the matter asserted.   It's being offered to

10    show that this statement was made and this was a complaint

11    about Mr. Picarella's performance or about the other things

12    that Mr. Picarella talked about during his testimony and the

13    fact that that statement is made rebuts the claim that no

14    complaints were ever made about that.   So it's not being

15    offered for the truth of the matter asserted that he wasn't

16    actually there but to rebut the implication that no complaints

17    were made about fraud or no complaints were made about these

18    other things.   So that's not a hearsay issue in that context.

19    Now, again, I don't think we need a lot more of that for simply

20    rebutting that impression.

21          There is also the possibility that the defense, I

22    think has indicated they wish to introduce some of these

23    statements for the truth of the matter asserted, that

24    Mr. Picarella was not at his desk at that time.   And if that is

25    being offered for the truth of the matter asserted there is a

GC89PIC1

1      hearsay issue.

2              As I indicated, it seems to me that there very well

3      may be an exception to hearsay as a present sense impression.

4      Now, a foundation would have to be laid for that.  It does seem

5      to me that a foundation could readily -- could easily be laid

6      for that.  And that's why I get to this next part about

7      reference to the Sametime Chats in general.

8              If a witness takes the stand and indicates that there

9      were communications that this witness had with someone else

10     through Sametime regarding their present impression about

11     Mr. Picarella not being there or whatever the case may be, I

12     don't believe that that would be a hearsay issue if, in fact,

13     that is a present sense impression, the fact that the

14     communication is made through Sametime is not a hearsay issue

15     anymore than the fact that a communication out of court is made

16     through a telephone or through a face-to-face conversation or

17     through Skype or through something else.  So, again, it's about

18     these prepositions, the difference between on, through, and to.

19     It's the "to" that really is the problem, when these statements

20     are made to a document or to another person, that's when

21     hearsay really gets implicated.

22             So that's my thinking on that.  I think that both

23     sides are going a little too broad saying that none of this

24     could be admissible as violative of hearsay or all of it is

25     admissible because there are no hearsay issues.

GC89PIC1

1          Now once we get past the hearsay issues we've still

2     got to deal with issues of 403 and the probative value of that

3     information weighed against the prejudice to the plaintiff and

4     whether this information is cumulative.  So I wanted to share

5     that with counsel.  That is my thinking on that.  And I'd like

6     to give counsel a chance to think about that to make sure that

7     you're clear that that's what my thinking is on this.

8          To be clear, those documents that plaintiff's counsel

9     has objected to have not been offered into evidence.  They are

10    not in evidence at this point.  And, again, I have raised some

11    concerns not only with -- I don't know if I was clear with my

12    concerns in terms of the hearsay issue of the documents

13    themselves but even if there were an exception regarding the

14    documents themselves or there is no hearsay issue I am

15    concerned about the probative value of putting these documents

16    up on the screen or putting them in evidence when there are at

17    least, it seems to be at least one witness who can testify to

18    this.

19          MR. HUBBARD:  That seems to be my reaction, your

20    Honor.  And I appreciate your analysis of this.  And it's

21    helpful.

22          We do know that Mr. DeLuca is planning to come

23    testify.  He apparently would say here what he observed in some

24    of these documents, that he didn't see Mr. Picarella at the

25    desk, that he thought he was missing in action.  So we have the

GC89PIC1

1    ability to have the best form of testimony is his own

2    observation.  We have the opportunity to cross-examine him.

3             I want to make one observation about the issue of

4    whether or not even what he says relates to a complaint made,

5    because your Honor seemed to think that that was one way it was

6    relevant because Mr. Picarella said there were no complaints

7    and your Honor sees these possibly being a complaint.

8             You'll recall from the briefing we did, your Honor,

9    that none of these employees are under any duty to review him.

10   None of them are under any duty to report.  None did.  None of

11   these things was submitted as a complaint to any person.

12            THE COURT:  But -- that's fine.

13            MR. HUBBARD:  All I wanted to say was I just don't

14   think that putting these in the complaint category.  They are

15   more -- we've talked about this before.  But they're more in

16   the fireside chat, gossip category than they are complaints.

17            Having said that, of course we fall back to the 403

18   issue.  But I can't really quarrel.  If they bring the witness

19   in and the Court thinks it's relevant and it has some probative

20   value that's not outweighed by the prejudice, the gentleman can

21   testify.  If he testifies what he observed, that's fine.  But

22   if he starts talking about what somebody else said to him like

23   Ms. Parker, then we have the traditional hearsay problem.  I

24   can't cross-examine the declarant.

25            THE COURT:  I'm trying to remember who put this in.  I

GC89PIC1

1    believe you put this in when you were examining Mr. Picarella,

2    sort of 360 evaluations and things of that nature.

3              MR. HUBBARD:  Yes.

4              THE COURT:  These are not people who were supervisors

5    of him.  Not all of these people.  Some of these people were

6    not necessarily his supervisors, correct?

7              MR. HUBBARD:  No, your Honor.  But, that was part of

8    the established regular performance review process.  The way

9    it's done at this bank, you know, the manager -- the evidence

10   was the manager asked the employee to give her or him the names

11   of employees who might -- and then those things go through a

12   formal review process.  So there is a formal reporting process

13   there.  This did not take place in that process at all.

14             THE COURT:  I understand.  I'm not saying that this

15   information is dispositive.  But it does seem to me relevant.

16   It does seem related to, again, what I take as potentially an

17   impression made to the jury, especially in the light of these

18   360 evaluations and everything else, that there were no

19   complaints.

20             So I understand your position on that.  But it does

21   seem that, again, I think that was further opening the door of

22   that.  I don't think there needs to be much more of that.  But

23   I do think that there may have been a misimpression, or at

24   least an impression, whether it's a misimpression or not, but

25   an impression given to the jury that everyone there, especially

GC89PIC1

1    even the people who were his subordinates or his peers who

2    thought that he was the greatest thing since sliced bread.

3              MR. HUBBARD:  Of course there are some other 360

4    reviews that say differently, but I didn't put those in.

5              THE COURT:  You didn't put those in.  That's my point.

6              MR. HUBBARD:  But they're available to the defendant.

7              The bottomline is, of course, that I'm left to my own

8    devices if your Honor allows the testimony of Mr. DeLuca in

9    light of 403, that I'm left to essentially cross-examine him.

10   But I can't cross-examine what he says about Parker.  And so

11   that's why I -- and if your Honor does not allow the document

12   itself and he testifies that what Ms. Parker told him that's

13   better than the document.  That's all I can say about that.

14             THE COURT:  Let me hear from defense counsel.

15             MR. JACKSON:  Your Honor, there are a few things I

16   would say.  One, we think that the second part of the Court's

17   hearsay analysis makes perfect sense to us.  The part about the

18   fact that these are not statements that are offered for the

19   truth, they're offered for a number of other purposes.  They

20   also fall into a number of hearsay objections even if they

21   did -- even if they did stand for the truth.

22             There are two things, Judge, that we are not -- I

23   don't think that we see the same as the Court.  One, I don't

24   think that there is any additional hearsay issue just by virtue

25   of these appearing in the documents.  The statements that

GC89PIC1

1       appear in the documents are what they are.  And it is not

2       uncommon for e-mails like this to come into evidence.  It's not

3       uncommon, frankly, from the standpoint of just the evidentiary

4       analysis, regardless of what Mr. Hubbard says about formal

5       versus not formal.  The Court is exactly right.  There is

6       really no difference from an evidentiary standpoint between

7       these types of communications and some of the 360s except that

8       these are even further away from a statement that's offered for

9       the truth.  These are -- and they fall under other exceptions

10      that the 360s wouldn't necessarily fall under.

11              Putting that aside, your Honor, the 403 concern -- the

12      403 analysis, I'm quibbling just slightly with the way your

13      Honor described it.  Because it's not a question of whether or

14      not the probative value outweighs the prejudice.  It's

15      whether -- it's probative value versus unfair prejudice.  And

16      here there is no unfair prejudice to Mr. Picarella.  He's

17      claiming -- he's claimed on the stand -- he's attempting to

18      create a misimpression to the jury about what the actual

19      perception was of his behavior.  There is no unfair prejudice

20      from us just hearing from the person, from us just seeing

21      documents that show --

22              THE COURT:  Okay.  Just -- I was going to -- I don't

23      mean to cut you off but obviously I do.  I guess I'm just

24      wondering before you continue since you're now talking about

25      Mr. Picarella's testimony a little bit in length, I'm wondering

GC89PIC1

 1    if Mr. Picarella should perhaps retire to the robing room or

 2    not.

 3           MR. JACKSON:  No.  That's fine, your Honor.  I

 4    appreciate that.  Because I'm going to shoot back to the pure

 5    legal point.

 6           We would argue that there's a 403 problem for us if

 7    we're not allowed to put these documents in because what

 8    Mr. Picarella is doing in putting 360s, as your Honor has

 9    pointed out, putting in things like his calendar which is, you

10    know, just -- it would be rank hearsay apart from the fact that

11    we are -- because these are things largely that he wrote and

12    put into the calendar.  But we are -- we were operating under

13    the understanding:  One, that the business records exception

14    would allow us to put in rebuttal evidence which runs to

15    everything that's going on -- which allows us to put in

16    business records like these that show what was actually going

17    on at that time period, what the perceptions of his actual work

18    were at the time period.  And there's just a big difference

19    between documents and testimony.

20           Mr. Hubbard is saying right now, he's basically saying

21    if Mr. DeLuca testifies I'll be able to cross him and destroy

22    his credibility.  But the documents speak for themselves.

23    That, to us, goes to the fact that there is a 403 issue in

24    terms of us here because if we're not -- if we're forced to

25    only put in the testimony where Mr. Picarella is allowed to put

GC89PIC1

```
1    in a number of different documents from that time period it's
2    just not clear to us how the prejudice analysis sort of
3    balances out.
4         THE COURT:  I guess I'm trying to figure out.  Are you
5    claiming -- if these -- if this document is a business record
6    and you can lay that foundation, then there is no issue with
7    the documents if it is, in fact, a business record.  The fact
8    that Mr. Picarella through counsel has put these documents in
9    evidence, there was no objection to it.
10        MR. JACKSON:  Right.  And we clarified that they were
11   being admitted as business records under our understanding.
12        But they are business records.  I mean they are --
13   they are documents and obviously we have a stipulation as to
14   authenticity.  They are documents that were produced at or
15   about that time.  They've been maintained.  And they fit within
16   the business records exception.
17        But they also fit within a number of other exceptions.
18   These are -- we just don't see any unfair prejudice to
19   Mr. Picarella.
20        THE COURT:  If they're business records then that gets
21   rid of that hearsay issue.
22        Again the 403 analysis wasn't simply about the unfair
23   prejudice.  It was also about the cumulative nature of this
24   because, again, I don't want to have a mini-trial about this.
25        If Mr. DeLuca is going to testify about his
```

GC89PIC1

1    impressions of Mr. Picarella, it does seem that Mr. DeLuca on

2    the stand, if Mr. DeLuca testified about the fact that he had

3    Sametime conversations with Ms. Parker and that Ms. Parker --

4    Ms. Parker communicated her present impression that

5    Mr. Picarella wasn't there, it seems to me that that doesn't

6    have any hearsay issues.

7             I just got a note we're still waiting on two jurors.

8             That doesn't have the hearsay issues which is what

9    I -- my first concern is with the document itself.  And, again,

10   I don't want to get into a mini-trial on this sort of issue

11   with these Sametime Chats.  But it does seem to me that in

12   terms of -- and that's why I was stating the fact that

13   Mr. DeLuca might say that this statement that was received by

14   him from Ms. Parker happened through Sametime doesn't have that

15   sort of double hearsay issue that the documents have.

16            So, again, my first concern, again, is that the

17   documents themselves have that first layer of hearsay problem.

18   And if you -- if these are business records, then that's fine.

19   I want to hear more from you as to why you believe these are

20   business records.

21            MR. JACKSON:  Well, your Honor, under 803(6) a record

22   of an act, event, condition, opinion, or diagnosis is

23   admissible.  It's excluded.  It's an exception to the hearsay

24   rule if:  (a) the record was made at or near a time by or from

25   information transmitted by someone with knowledge.  That's

GC89PIC1

1   clearly met.

2           These are -- these Sametime messages, as Mr. Picarella

3   testified, are messages that are sent at that time and this is

4   captured at that time.  He admitted Sametime messages for that

5   purpose.

6           The record was kept in the course of regularly

7   conducted activity of a business, organization, occupation, or

8   calling whether or not for profit.

9           These were, as is demonstrated by the record, these

10  were regular method -- this was a regularly used method of

11  communication at HSBC, including used by Mr. Picarella, and his

12  testimony has already demonstrated that making the record was a

13  regular practice of that activity.  Check.

14          All these conditions are shown by the testimony of the

15  custodian or another qualified witness.  And that, you know,

16  Mr. Picarella is a qualified witness who has already testified

17  about what is going on in the Sametimes.  We have a stipulation

18  as to authenticity.

19          And so the only -- so the only other question is

20  whether the opponent does not show -- whether the opponent

21  shows the source of information or the method or circumstances

22  of preparation indicate a lack of trustworthiness.  And, again,

23  that goes back to our stipulation that these documents are

24  authentic.

25          And so there's really, under 803(6), no question.  And

GC89PIC1

1    I think that this is the reason why numerous cases have

2    admitted e-mails showing business communications at or about

3    the time under 803(6).

4         Here we're even –– we're further away –– as the Court

5    has already suggested we don't even –– in terms of the actual

6    content of the document, we're not even really talking about

7    needing to get to the hearsay exception because of the fact

8    that these are not offered for the truth.  They're offered for

9    several other purposes.  But if you even get there the document

10   itself is excepted under 803(6).

11        THE COURT:  What's plaintiff's counsel's response to

12   that.

13        MR. HUBBARD:  Well, your Honor, we of course briefed

14   it in the motion in limine.  And these things are the furthest

15   from documents that qualify under the business –– rule of

16   business record exception.  We say they were under no duty to

17   record these events.  They were not regularly recorded.  They

18   were not stored any place.  They were not filed.  They were not

19   part of any regular process.  They are simply gossipy ad hoc

20   observations.  If these things qualify under the business

21   record exception there couldn't be anything that would not

22   qualify in my view.

23        So without pulling those briefs out, your Honor of

24   course as has seen them.  We think that we were able to

25   establish in those briefs that these –– that these recordings

GC89PIC1

```
 1    of telephone conversations, quick telephone conversations on
 2    the desk, there was no duty to record it.  These people had no
 3    responsibility for him.  They had no obligation to record his
 4    performance.  And so we say that they could not possibly be
 5    qualified as --
 6              THE COURT:  Why is a duty a prerequisite to this being
 7    a business record?  It's helpful but why is that a
 8    prerequisite?
 9              MR. HUBBARD:  Because the law for it to be a -- there
10    are two criteria.  One is that it be a regularly conducted
11    activity.
12              THE COURT:  Right.
13              MR. HUBBARD:  Language of the rule.  And, secondly,
14    that it be a regular -- and that it be a regular practice to
15    record this information.  And that's where the rubber hits the
16    road.  It's not a regular practice to record observations
17    about --
18              THE COURT:  Practice is I guess what I'm saying is a
19    little bit different than having a duty to record it.  It may
20    be your regular practice to record something but you're not
21    under a duty to record.  The fact that you have a duty to it
22    will mean that you will regularly record it.  But the fact that
23    you regularly record it does not necessarily mean that you are
24    under a duty to do so.
25              MR. HUBBARD:  I think the cases that -- without having
```

GC89PIC1

1    them right in front of me I think the cases that we gave your

2    Honor did tie the two together.  They seemed to tie that it was

3    a regular practice to it being the employee having the duty to

4    record it.  Because that's what gives it the trustworthiness.

5    This rule comes from a shop book rule; that is, if a person

6    worked in a mechanics shop and they had the obligation of

7    recording the number of pipes that was shipped out or the

8    number of bolts that were used each day to build a machine,

9    that was called a shop book rule and those things were recorded

10   by the same person everyday in the shop book and that's why

11   they were deemed to be trustworthy.  These documents we say

12   don't fit that exception.

13            THE COURT:  All the jurors are here.  We'll start

14   soon.

15            But let me get clarification from counsel as to what

16   their view of the record is in this case in terms of the

17   record, the business records rule that talks about the record.

18   It seems that maybe counsel have different views about what the

19   record is.

20            Is the record the content of the Sametime Chats in

21   your view or is the record the document containing the Sametime

22   Chats?

23            MR. HUBBARD:  I'm sorry, your Honor.  May I ask you to

24   say that one more time.

25            THE COURT:  Is the record for the business records,

GC89PIC1

1    you're talking about the record, is the record in this case the

2    document containing the Sametime Chats or is the record in your

3    view the actual content of the Sametime Chats?

4            MR. HUBBARD:  I'm not sure that I see a distinction,

5    your Honor.  I think it's more the former than the latter.  But

6    I don't know that there is a distinction.

7            It seems to me that if the rule is designed to keep

8    hearsay out unless it's regularly recorded and it was the

9    regular practice, then to -- then I don't know that it would

10   seem to make a difference.  But I see the distinction your

11   Honor is making.

12           But certainly the former; that is, that because when

13   it's elevated into a document and then it's admitted into

14   evidence which sort of suggests that it is a business record,

15   that gives it some extra clout, it seems to me.

16           THE COURT:  Defense counsel have anything on this?

17   All the jurors are here.  I'm inclined to start soon.

18           Does defense counsel have anything on this?

19           MR. JACKSON:  No, your Honor.  We just say these kind

20   of records come in regularly.  There are a number of cases

21   saying we need to produce contemporaneous evidence to show what

22   the situation was in order to rebut the allegation of pretext

23   that's being alleged here.  This is a key -- this is key

24   evidence in that nature.  And it's different -- it's more

25   important than the testimony which Mr. Hubbard is already

GC89PIC1

1   saying that he's going to be attacking and trying to sabotage.

2   There is no 403 concern.  We submit to the Court there is no

3   403 concern with regard to these because there is no unfair

4   prejudice to Mr. Picarella.

5          THE COURT:  I'll think about this.  It does seem to me

6   that, as I've indicated before, it's inappropriate to get into

7   these documents with Mr. Picarella on the stand.  If defense

8   counsel plans to do that, I guess we'll take a break at that

9   point.  But I'm not sure what utility there is in getting into

10  these documents with Mr. Picarella on the stand.

11         What is defense counsel's view of that?

12         MR. JACKSON:  I would like to display them because I

13  do think that they impeach his testimony.  I don't even need to

14  necessarily ask him any questions.  But as your Honor pointed

15  out, he's offered testimony that is flatly inconsistent with

16  what is in the Sametimes.  And so to the extent that they are

17  admissible, which we think that they are under several

18  different bases, we'd like to be able to impeach him with them

19  just by showing those documents.

20         THE COURT:  Okay.  That is denied at this time.

21  Again, it seems to me that there is that distinction that I

22  made between the content of the chats and the documents

23  themselves even, it seems to me, I'm not sure what kind of

24  impeachment it is of Mr. Picarella to show him these documents

25  and, again, ask him to comment on somebody else's statement.

GC89PIC1

1    So that's denied at this point.  Let's bring in the jury.

2              Do you have a sense of how much longer you have with

3    Mr. Picarella, counsel?

4              MR. JACKSON:  Same as I said yesterday, your Honor, a

5    couple of hours.

6              MR. HUBBARD:  May we approach just one moment, please?

7    I won't take -- just one second.  There's something I need to

8    tell you.

9              THE COURT:  Okay.  All right.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC89PIC1

```
 1              (At the sidebar)

 2              MR. HUBBARD:  I wanted the Court to know that

 3     Mr. Picarella spoke to me this morning.  He was here in the

 4     court early and spoke to me and said that he was ill last

 5     night.  Some anxiety reaction.  Not surprising in light of his

 6     history.  He took some Xanax or some mild, you know,

 7     medication.  He was, according to him, very ill, early this

 8     morning.  He seems to be fine now.  And we're ready to proceed.

 9     I think what we might do if we could take -- have about a

10     ten -- if we could go about an hour and give him about a

11     ten-minute break to get some water and that kind of thing and

12     then of course I wanted to advise the Court that I had spoken

13     to him when he was on cross-examination, of course only about

14     his medical condition.

15              THE COURT:  All right.  Defense counsel.

16              MR. JACKSON:  As long as defense counsel is

17     representing that they don't believe that anything in his

18     medical condition will prejudice his testimony, that's fine,

19     we're fine with taking a break.

20              MR. HUBBARD:  I don't think there's any impairment to

21     his continuation.

22              THE COURT:  Okay.

23              (Continued on next page)

24

25
```

GC89PIC1                    Picarella - cross

1             (In open court)

2             THE COURT:  Okay.  Let's bring the jury in.

3             (Jury present)

4             THE COURT:  Welcome back.  Hope you had a pleasant

5    evening.  Let's continue with the case on trial.  Continue with

6    the cross-examination of Mr. Picarella.

7             MR. JACKSON:  Thank you, your Honor.

8     MICHAEL PICARELLA, resumed.

9    CROSS-EXAMINATION CONTINUED

10   BY MR. JACKSON:

11   Q.  Good morning, Mr. Picarella.

12   A.  Good morning.

13   Q.  How are you today?

14   A.  Okay.  Thank you.

15   Q.  Now, Mr. Picarella, one of the things that --

16             MR. JACKSON:  At this time I'd like to offer DX-21.

17             THE COURT:  Any objection to 21?

18             MR. HUBBARD:  No, your Honor.

19             THE COURT:  Okay.  21 is in.

20             (Defendant's Exhibit 21 received in evidence)

21   Q.  The first page.  This is a July 8, 2011 communication

22   between you and Ms. Hedges?

23   A.  Okay.

24             MR. JACKSON:  Can we go to the second page of this

25   document.

1    Q.  What was it that you said at 1:15 p.m. to Ms. Hedges,

2    Mr. Picarella?

3    A.  Love you.

4              MR. JACKSON:  You can take this down.

5    Q.  The fact of the matter, Mr. Picarella, is that throughout

6    the early time, throughout much of 2011 you found your time at

7    HSBC to be a positive experience for you, correct?

8    A.  Yes.

9    Q.  And, in fact, even after 2011 you on multiple occasions

10   took actions to try to get friends of yours jobs at HSBC,

11   right?

12   A.  Yes, I did.  Several people.

13   Q.  How many different people did you try to get jobs at HSBC?

14   A.  I don't know the exact number but I want to say there was

15   probably four or five friends that were unemployed at the time

16   and looking for jobs that I was trying to help find roles in

17   the firm and which I actually did.  And one that was employed

18   that was actually on the first page of that chat that was

19   employed at another firm when Ms. Hedges was looking for

20   another staff member.

21   Q.  So your answer is you don't know how many?

22   A.  Yeah.  I don't know the number offhand.  I would say half a

23   dozen is my estimate.

24   Q.  And I'm correct, right, that on at least one occasion you

25   suggested to one of your coworkers at HSBC can't you fire

1    somebody in order to get one of my friends a job, correct?

2    A.  I don't recall using those words.  I mean if it was related

3    to that chat I believe there was a former coworker by the name

4    of Kel Wong that Ms. Hedges, I had introduced them to, and

5    Ms. Hedges -- if this is the case, I mean I'm just assuming

6    this is the scenario.

7    Q.  That's fine.  That's fine.  So your answer is you don't

8    remember?

9    A.  Yeah.  I don't remember exactly.  If you could refresh my

10   memory, that would be great.

11   Q.  But regardless you continued in 2013, correct, to continue

12   to try to get friends of yours jobs?

13   A.  I did.  There were a couple of friends that were unemployed

14   looking for help and the bank is a very large -- it's three

15   hundred -- at that time three hundred thousand employees.

16   There was many groups and divisions.  And the friends I helped,

17   I helped place them in different areas of the bank.  They

18   weren't in my division.

19   Q.  Now, at the end of 2011 you had some communications with

20   coworkers where you talked to them about your objective of

21   forcing Ms. Hedges out and assuming her job, correct?

22   A.  No.  That's not correct.

23   Q.  Now, on -- there is a conversation that you had on

24   December 22, 2011 with Mary-Jo Rogers.  Do you recall that?

25   A.  I had a lot of conversations with Mary-Jo.

1    Q.  Do you recall saying to her:  I do have an objective for

2    next year that I'm keeping to myself?

3              Do you recall saying that?

4    A.  I don't exactly but I may have.

5    Q.  I want to show you a document which has been marked as HSBC

6    ST 00003929.  I just want you to look at it.

7              MR. HUBBARD:  I'm not sure what counsel is doing.

8              THE COURT:  Is this being offered -- are you using

9    this for impeachment?

10             MR. JACKSON:  I'm just asking if it refreshes his

11   recollection.  I have a copy I'm going to show plaintiff's

12   counsel.

13             THE COURT:  So you're using it to refresh his

14   recollection?

15             MR. HUBBARD:  It's not an exhibit.

16             THE COURT:  Are you showing it to the witness?

17             MR. JACKSON:  Yes.  I intend to show it to the

18   witness, your Honor.

19             THE COURT:  Okay.  Go ahead.

20             MR. JACKSON:  Thank you.

21             THE WITNESS:  Okay.

22   Q.  You had a chance to look at that?

23   A.  I did.

24   Q.  My only question, please don't talk about the document.

25   Just yes or no.  Having looked at that, does that refresh your

GC89PIC1                          Picarella - cross

1  recollection about the -- about what I just asked you about,

2  the statement I asked you about?

3  A.  Can you repeat your statement because you had said some

4  things about Ms. Hedges and forcing her out.

5  Q.  The only statement I asked you, my last question was did

6  you -- do you recall having a conversation with Mary-Jo Rogers

7  on December 22, 2011 in which you said:  I do have an objective

8  for next year that I'm keeping to myself.

9  A.  I did say that.

10  Q.  Okay.  So your recollection is refreshed?  Yes?

11  A.  Just from reading this Sametime Chat.

12  Q.  And that is something that you said, correct?

13  A.  Yes.

14  Q.  Now -- you can put that down, sir.  Thank you.

15         Now, you also had a conversation with an individual

16  named Michael O'Leary on January 5, 2012 in which

17  Mr. O'Leary asked you about the fact that Ms. Hedges was out

18  for surgery.  Do you recall that?

19  A.  I recall her being out from the end of December through --

20  until almost the end of January she was out of the office

21  having her second surgery, yes.

22  Q.  Right.  And Mr. O'Leary said to you in this conversation:

23  So the group is all yours now.  And your response was:  Soon.

24  A.  I don't remember it but I might have said it.

25  Q.  I'd like to show you a document and ask you if it refreshes

GC89PIC1                          Picarella - cross

1   your recollection which is marked as HSBC ST 00003736.

2              MR. JACKSON:  May I approach, your Honor?

3              THE COURT:  Yes.

4   Q.  Have you had a chance to look at that, Mr. Picarella?

5   A.  Yes.  Just give me one second, please.

6              Okay.

7   Q.  Having looked at that, my question is, yes or no, is your

8   recollection refreshed as to whether or not you had a

9   conversation with Mr. O'Leary on that date where he said:  So

10  the group is all yours now.  And your response was:  Soon.

11             Yes or no?  Is your recollection refreshed?

12  A.  There is more to that.

13  Q.  Yes or no?

14             THE COURT:  Does that refresh your recollection as to

15  his question?

16             THE WITNESS:  Yes.

17  Q.  That's what you said, correct?

18  A.  Yes.  The context --

19  Q.  That's -- that's fine.

20             MR. HUBBARD:  Excuse me, your Honor.

21             THE COURT:  Okay.

22             MR. HUBBARD:  The witness --

23             THE COURT:  Let's just -- again, the witness has

24  answered.  Go ahead.  Move on, counsel.

25             MR. JACKSON:  Thank you, Judge.

1   Q.   Now, at some point you began to speak to -- at some point

2   you relayed some of your concerns that you had about Ms. Hedges

3   to people other than the brief conversations you had with

4   Mr. Mullen, right?

5   A.   Yes.

6   Q.   And one of the people that you spoke to about this months

7   later was Pablo Pizzimbono, correct?

8   A.   Yes.

9   Q.   Pablo Pizzimbono was your supervisor, right?

10  A.   He was the supervisor of our group, yes.

11  Q.   He was above Ms. Hedges?

12  A.   Correct.

13  Q.   And you communicated your concerns, certain of your

14  concerns about Ms. Hedges to Mr. Pizzimbono, correct?

15  A.   If you're talking about the March time frame I reported to

16  him that I was having conversations with Ms. Hedges about her

17  sexual harassment of Ms. Parker and I repeated the same sexual

18  harassment complaints to Mr. Pizzimbono at that time.

19  Q.   We'll unpack that.

20        MR. HUBBARD:  Excuse me.  I didn't understand.

21        THE COURT:  He just said we'll unpack that.

22        MR. HUBBARD:  I'm sorry.  I just didn't hear.

23  Q.   So you started communicating with Mr. Pizzimbono in March

24  of 2012, right?

25  A.   Mr. Pizzimbono and myself communicated everyday.  But on

GC89PIC1                    Picarella - cross

1   that matter I would say in March.

2   Q.  Now, one of the things that you did on certain occasions

3   throughout your time at HSBC was you wrote e-mails to yourself

4   to memorialize conversations that you had, correct?

5   A.  There were a couple of incidents that took place that I

6   took note of.  Yes.

7   Q.  There were occasions, correct, where you wrote e-mails to

8   yourself to memorialize conversations that you had, yes?

9   A.  You could be correct.  I can think of a couple of events

10  offhand that I -- like the breast incident, I thought that was

11  something recording to myself and similar types of acts that I

12  thought were a little -- so, yes.

13  Q.  So your answer is yes?

14  A.  Yes.

15  Q.  Now when you started communicating with Mr. Pizzimbono you

16  did not create at that time a complete record of what your

17  conversation had been with Mr. Pizzimbono, correct?

18  A.  Correct.

19  Q.  And at that time you did not know about what you told us

20  yesterday you overhearing Ms. Parker's conversation about her

21  participation in the Key Largo incident, correct?

22  A.  Right.  Because that happened after.

23  Q.  That happened later?

24  A.  That happened after the conversation with Mr. Pizzimbono.

25  Q.  Right.  And it's a fact, right, that Mr. Pizzimbono told

1    you that you should speak to HR about this, right?

2    A.  Not in the March timeframe.  He told me don't worry about

3    it.  We moved her to another floor.  Keep doing what you're

4    doing.  And "her" meaning Ms. Hedges.

5    Q.  At some point Mr. Pizzimbono told you that you should speak

6    to HR about it, right?

7    A.  When I reported to him what I had heard happening to

8    Ms. Parker in Key Largo, he told me that he was going to speak

9    with Ellen Weiss at HR and have her contact me.  Which she did

10   the same day.

11   Q.  What was that date?

12   A.  That was sometime in June; middle, late, June.

13   Q.  And it's your testimony that that is the earliest point at

14   which Mr. Pizzimbono told you to go speak to HR?

15   A.  Correct.

16   Q.  You had by that point, though, had a number of

17   conversations with HR, right?

18   A.  Starting in April.

19   Q.  Right.

20         You had some conversations with Ms. Weiss in April,

21   right?

22   A.  Yeah, several.

23   Q.  And Ms. Weiss was -- in those conversations Ms. Weiss told

24   you that she viewed what you were describing as inappropriate

25   conduct, right?

1    A.  She did.

2    Q.  And she told you that this was something that was important

3    for the bank to investigate, right?

4    A.  Right.  But she -- her initial --

5    Q.  Sir, sir, I'm just asking is that correct?

6    A.  At a certain point she said that she wanted to investigate.

7    Q.  In her --

8    A.  Not initially.

9    Q.  So it's your testimony in her earlier conversation she

10   didn't tell you that this was something that was important to

11   investigate, yes or no?

12   A.  Yes.  Initially she said that, to me that, after we spent

13   time going through a number of examples, that she first had

14   thought that Ms. Hedges had stopped this type of behavior and

15   that we were in sort of an agreement.  The purpose -- the

16   reason I was there and I went to Ms. Weiss, I didn't want to

17   get Ms. Hedges in trouble, right.  I had like -- if you just

18   give me one second, please.

19            THE COURT:  Hold on a second.  So, again,

20   Mr. Picarella, your attorney will have a chance afterwards.

21            THE WITNESS:  I'm sorry.

22            THE COURT:  To give you an opportunity to explain

23   further if you'd like.

24            THE WITNESS:  I'm sorry.

25            THE COURT:  Many of the questions, again, are designed

GC89PIC1                        Picarella - cross

 1    to elicit either a yes or a no response.  So if you can answer

 2    yes or no, please answer yes or no.

 3              THE WITNESS:  I apologize.  I feel compelled, there's

 4    a jury here, to explain.

 5              THE COURT:  No need to feel compelled.

 6              THE WITNESS:  I keep forgetting that my attorney

 7    gets --

 8              THE COURT:  That's fine.  Go ahead, counsel.

 9              MR. JACKSON:  Thank you, your Honor.

10    BY MR. JACKSON:

11    Q.  Now, Ms. Weiss, one of the things that you just said,

12    correct, is that you initially did not want to get Ms. Hedges

13    in trouble, right?

14    A.  Yeah.

15    Q.  Yes?

16    A.  Yes.

17    Q.  And you communicated that to Ms. Weiss in April, correct?

18    A.  Correct.

19    Q.  And you also -- Ms. Weiss told you that you needed to speak

20    to Ms. Hedges and communicate that this was improper, right?

21    A.  What she had --

22    Q.  Is that correct or incorrect?

23    A.  Not exactly correct.

24    Q.  Okay.  That's fine.

25              Regardless, Ms. Weiss told you, at some point in the

GC89PIC1                    Picarella - cross

1    April meetings, that this was a serious allegation and it
2    needed to be investigated, correct?
3    A.   (No response)
4    Q.   At some -- it's a yes or no.  If you disagree --
5    A.   I don't believe it was in April.
6    Q.   So it's your testimony that at no point in those April
7    discussions did she say to you that this was an important issue
8    you were raising and it needed to be investigated?  Yes or no?
9    A.   She had said --
10   Q.   Yes or no.
11   A.   Part of it is yes.
12   Q.   Yes or no, sir?
13   A.   I'll say yes.  I'll say yes for now.
14           THE COURT:  Again, if you could answer yes or no,
15   answer yes or no.  But it's not appropriate to comment on the
16   question or try to do any extra interpretation of the question.
17   Take the question as it is given.
18           THE WITNESS:  Okay.
19           THE COURT:  And if you can answer yes or no just
20   answer yes or no.  Okay.
21           THE WITNESS:  Okay.  That question has a yes and a no.
22   Q.   Okay.  Now at this time I would like to offer -- I would
23   like to offer DX-138.
24           THE COURT:  Any objection to 138?
25           MR. HUBBARD:  No objection.

1          THE COURT:  Okay.  It's in.

2          (Defendant's Exhibit  138 received in evidence)

3          MR. JACKSON:  Can you zoom in on the top of that.

4   Q.  Now this is a communication from you to Ms. Weiss in April

5   of 2012, right?

6   A.  Correct.

7   Q.  And what you say is:  Okay this is the paranoia again.  So

8   legal hasn't mentioned this to anyone in markets either?

9          Right?

10  A.  Correct.

11         MR. JACKSON:  I'd like to offer DX-144, your Honor.

12         THE COURT:  Any objection to 144?

13         MR. HUBBARD:  No, your Honor, no objection.

14         THE COURT:  Okay.  It's in.

15         (Defendant's Exhibit  144 received in evidence)

16         MR. JACKSON:  Can you go to the second page of that.

17  Can you zoom in on the bottom e-mail, start -- starting, just

18  everything starting from Michael Picarella on down.

19  Q.  So this is a April 26, 2012 e-mail from you to Ms. Weiss,

20  right?

21  A.  Correct.

22  Q.  And what you said to her is:  Please let me know when the

23  meeting has taken place and how it went.  Please make sure my

24  name is kept confidential.  Thanks so much.  Mike.

25         Right?

 1   A.  Yes.

 2   Q.  And you were referring at this point to your expectation of

 3   a meeting with Ms. Hedges, right?

 4   A.  Yes.  She had --

 5   Q.  Yes.  Okay.  And can we please go to the top there -- not

 6   the top.  The middle one.

 7        You see Ms. Weiss' response?  This is her response to

 8   you, correct?

 9   A.  Yes.

10   Q.  And what she says is:  Mike, hasn't happened yet.  At this

11   time, Sue is not going to be bringing up your name, but as

12   mentioned it's possible that Eileen will make her own

13   conclusions as to who she thinks brought this to our attention.

14   Sue will be telling Eileen not to discuss this on the floor.

15   If you feel that something inappropriate is happening after we

16   speak to her, please let Sue or I know.  Thanks.

17        Correct?

18   A.  Did she write that?  Correct.

19        MR. JACKSON:  Can you go to the top.

20   Q.  Your response was:  Okay.  Thank you.  I'm just worried

21   about it.  I'm concerned about her ability to keep things

22   internalized, which in turn could damage my reputation and

23   career here.  Thanks again for all your help.

24        Right?

25   A.  I wrote that, yes.

GC89PIC1                          Picarella - cross

1   Q.  And during this time period every one of the complaints

2   that you raised with Ms. Weiss she was responding to you,

3   right?

4   A.  What do you mean responding to?

5   Q.  She didn't ignore any of your communications to her,

6   correct?

7   A.  Correct.  In fact, Ms. Weiss was calling me quite often to

8   come back to her office.  She wanted to talk to me more about

9   stuff.

10  Q.  Right.  And what this communication -- one of the things

11  that was an issue for you is you were asking HR to be very

12  cautious because you did not want your name to get out in terms

13  of being involved in this, right?

14  A.  Sure.  And the paranoia --

15           THE COURT:  Can you answer that yes or no?

16           THE WITNESS:  Yes.

17           THE COURT:  Okay.

18           MR. JACKSON:  We can take this down.

19  Q.  After you complained to HR about Ms. Hedges HSBC HR took

20  action against Ms. Hedges, right?

21  A.  Yes.

22  Q.  And in July of that year Ms. Hedges was removed from her

23  management role, right?

24  A.  Correct.

25  Q.  And as we looked at yesterday she received a final written

GC89PIC1                         Picarella - cross

1  warning, correct?

2  A.  I didn't know that until after my termination but correct.

3  Q.  Now, after Ms. Hedges was removed from her role supervising

4  you, Mr. Pizzimbono had a number of conversations with you

5  where he communicated to you the bank supported you and wanted

6  you to have a fresh start, right?  That's a yes-or-no question.

7  A.  I don't know the exact words but, yes, we had some very

8  positive conversations following the management change with

9  Ms. Hedges.

10 Q.  Right.  In substance he communicated to you that the bank

11 supported you, wanted you to have a fresh start, correct?

12 A.  Similar.  I remember him telling me that he found it to be

13 very courageous, the steps I took.  He seemed to understand how

14 difficult that situation was and that he thought it was very

15 courageous for me to take the steps to help Ms. Parker.

16 Q.  Now, the next person that you reported to was Carol Jenner,

17 correct?

18 A.  Well technically it was Ms. White for a couple of days

19 or -- that we were in the office together.

20 Q.  Okay.  So it was White, Suzy White, was your direct

21 supervisor for some period, right?

22 A.  Two days that we were in the office because there was

23 vacations and time away.  But it was from July 31 to

24 September 5.  But she had a two-week core vacation.  I had a

25 two-week core vacation in August.  So we both weren't there

GC89PIC1                          Picarella - cross

1    during that time.

2    Q.  And then after that Ms. Jenner got the job that made her

3    your direct supervisor, right?

4    A.  Yes.

5    Q.  Now one of the things that you said on your direct

6    testimony is that it was your belief that she only had two to

7    three years operational risk experience?

8    A.  Yes.  Correct.  That was my understanding.

9    Q.  And what was that based on?

10   A.  That was what was explained to me by -- initially by

11   Mr. Pizzimbono and Ms. White in the September 5 meeting they

12   had told me she worked in ORIC in HSBC for two or three years.

13   Q.  No one actually said to you Ms. Jenner only has two or

14   three years of operational risk experience, correct?

15   A.  Right.  They didn't --

16            THE COURT:  Did anyone say that to you?

17            THE WITNESS:  Correct.

18   Q.  And, in fact, you know that Ms. Jenner had worked at other

19   places before she even worked at HSBC, correct?

20   A.  Correct.

21   Q.  She did work as an auditor dealing with risk issues, right?

22   A.  I'm not aware of that.

23   Q.  You don't really know everything about Ms. Jenner's

24   background in operational risk, correct?

25   A.  Correct.

GC89PIC1                    Picarella - cross

1   Q.  Now one of the things that you talked about on your direct

2   testimony is this idea that your job responsibilities were

3   taken away from you at different points?

4   A.  Correct.

5   Q.  Now, in 2012 there were a number of occasions where your

6   supervisors asked you to do things and you told them that you

7   were much too busy to be doing anything additional, right?

8   A.  Yeah.  We lost a large portion of our staff.

9   Q.  It's a yes-or-no answer.

10  A.  Yes.  There was points in time.  Yes.

11         MR. JACKSON:  I'd like to offer DX-186.

12         THE COURT:  Any objection to 186?

13         MR. HUBBARD:  No, your Honor.

14         THE COURT:  Okay.  It's in.

15         (Defendant's Exhibit  186 received in evidence)

16         MR. JACKSON:  Can you zoom in -- actually can we go to

17  page -- let's go to the -- that's good.  Can we go down to

18  the -- can you zoom in on that part.

19  Q.  This is an e-mail on 9-20-2012 from Carol Jenner to you,

20  right?

21  A.  Right.  And -- right.

22  Q.  Dan Bliss and Raul Valdes?

23  A.  Correct.

24  Q.  And what she was is:  Dan, please send Mike an updated

25  sales book report through August 31, 2012 so we can complete

GC89PIC1                        Picarella - cross

1    the reconciliation again.

2              Right?

3    A.   Correct.

4    Q.   Then she says:  Mike, please review the process with Dan

5    and understand if the reconciliation process is complete and

6    accurate and if any improvements can be made.

7              Right?

8    A.   Correct.

9    Q.   And then she asked you to do a number of other tasks

10   related to that, right?

11   A.   Correct.

12   Q.   And she ends by saying:  If this cannot be complete by

13   then, let me know.  Thanks.  Exclamation point.

14             Right?

15   A.   Right.

16             MR. JACKSON:  Can you go to the top of this.

17   Q.   This is your response on Thursday, September 20, right?

18   A.   Correct.

19   Q.   And what you say is:  Carol:  I can look at the process but

20   for the reconciliation itself I am bogged down with a number of

21   tasks.  Is this something we can use the team of people to help

22   with?  (Carrie, James, Niyati)  Thanks.  Michael Picarella.

23             Right?

24   A.   Correct.

25   Q.   You were claiming --

GC89PIC1                    Picarella - cross

1              MR. JACKSON:  We can take this down.

2              I'd like to offer DX-195

3              THE COURT:  Any objection to 195?

4              MR. HUBBARD:  No, your Honor.

5              THE COURT:  Okay.  It's in.

6              (Defendant's Exhibit 195 received in evidence)

7              MR. JACKSON:  Can you go down to the second page of

8    this.

9              Go to the next page.  Can we zoom in on the top part.

10   Q.  So this is an e-mail from Suzy White, right, to you in

11   October of 2012, correct?

12   A.  Correct.

13   Q.  And what she says is, is:  Mike, at one point, I would like

14   you to please look at this.

15             Right?

16   A.  Okay.

17   Q.  And she talks -- she's talking about a specific project

18   that she wanted you to do, right?

19   A.  I'm not clear which one it is.  She mentions Brian who was

20   a temp that was doing the types of reconciliations that Carol

21   was asking me to do.  So at that point in time where we were

22   already short resources they were taking Brian Goldwasser, a

23   temporary person, away and having me do reconciliations --

24   Q.  Sir, sir.  I'm only asking you this is Suzy --

25             THE WITNESS:  I want to see the whole --

GC89PIC1                    Picarella - cross

1          THE COURT:  He's not asking you a specific program.

2    Please rephrase the question.

3          MR. JACKSON:  Thank you, your Honor.

4    Q.  I'm only asking you:  This was a communication in which she

5    was asking you to complete a project, right?

6    A.  I don't know if it was a project or a task.

7    Q.  A project or a task?

8    A.  A task.

9    Q.  She was asking you to complete some task or project, right?

10   A.  It looks to be a task.

11         MR. JACKSON:  Can we go to your response.

12   Q.  You say:  Suzy, I will highlight all work in flight when I

13   return.  MJ is not a part of BM as well.

14         Right?

15   A.  Okay.

16         MR. JACKSON:  Can we go to the next e-mail.

17   Q.  And she says to you:  Thanks Mike.  I agree that MJ is not

18   part of the BM team either but you have been providing cover to

19   her.  Prior to just stopping something you have been doing we

20   need to ensure that the responsibility is transferred

21   appropriately to avoid increasing operational risk to the

22   business as a whole.  Please go over your work in flight with

23   Carol and agree on priorities.  If assistance is needed, please

24   don't hesitate to call me.

25         Right?

GC89PIC1                    Picarella - cross

1   A.  She said that.

2           MR. JACKSON:  Can you go to the response.

3   Q.  Now you said a number of things here.  You said:  Thank

4   you, Suzy.  Just so you are clear on my perspective.

5           Right?

6   A.  Yes.

7           MR. JACKSON:  Can you go to the sentence that starts

8   with and "I can't remove myself" and highlight that.

9   Q.  What you said to her is:  I can't receive remove myself

10  from an MJ task and I have zero capacity, actually in deficit.

11          Right?

12  A.  Yes.

13          Would you mind if I just read the whole paragraph,

14  please so I remember.

15          (Pause)

16  A.  Okay.  I remember it now.

17  Q.  Right.  You told Ms. White after she asked you to complete

18  a task or a project that you have zero capacity, correct?

19  A.  Correct.

20          MR. JACKSON:  Can we go to the top.

21  Q.  This was Ms. White responding to you essentially asking you

22  to focus on this, right?

23  A.  Can I read this as well, please?

24          MR. JACKSON:  That's fine actually.  We'll move on.

25  Q.  Now, let me ask you, Mr. Picarella.

GC89PIC1                    Picarella - cross

1   A.  Are we still looking at this?

2           MR. JACKSON:  You can take it down.  We can move on.

3   Q.  Now, Mr. Picarella, it's also true during this time period

4   in October you complained to Mary Bilbrey in HR that you were

5   buried in work, right?

6   A.  Right.  I had spoken -- yes.

7   Q.  That's correct?

8   A.  Okay.

9   Q.  That's correct?

10  A.  Correct.  At the end of September.

11  Q.  And so throughout 2012 there were a number of different

12  things that were being assigned to you, correct?

13  A.  Sure.  At different points in time.

14  Q.  Right.  And in 2013 there were also a number of different

15  projects that were given to you by your supervisors during that

16  year, right?

17  A.  I believe -- if there were, they were in substitution of

18  most of my tasks that were taken away in 2013.

19  Q.  Okay.

20  A.  In the middle of 2013 I hardly had any responsibility left.

21          MR. JACKSON:  Let's take a look at DX-195.

22          Before you call that up --

23          THE COURT:  Is 195 in evidence?

24          MR. JACKSON:  I was about to offer it, your Honor.

25  May I offer DX-195.

GC89PIC1                          Picarella - cross

```
 1              THE COURT:  Any objection to 195?
 2              THE DEPUTY CLERK:  It's in already.
 3              THE COURT:  Actually 195 I believe is already in
 4     evidence.
 5              MR. HUBBARD:  No objection.
 6              MR. JACKSON:  Can we call up 195.
 7     Q.  Just going down to the bottom there, this is the -- this is
 8     October of 2012, right?
 9     A.  Yeah.  This document -- same document we were looking at,
10     right.
11     Q.  Yes.  This is the same one we were looking at.
12              One of the things that you talk about here is you say:
13     I'm covering sales functions that Michelle and John Henry are
14     covering in addition to my normal job functions and DF and
15     suitability, right?
16     A.  Correct.
17     Q.  Now, there was an occasion in March of 2013 where you had
18     communications with Ms. Jenner and she said to you:  Mike, do
19     you want to run with suitability for new onboards, right?
20     A.  Correct.
21     Q.  And what that about was giving you responsibility for
22     certain suitability issues, right?
23     A.  It was a small portion of the overall initiative.
24     Q.  And that was one of the projects that was given to you,
25     right?
```

1   A.  It was a short term initiative.  It took me a couple weeks

2   to implement it.

3   Q.  We'll come back to that.

4        Now one of the other things that you talked about

5   yesterday was the fact that you received a three on certain of

6   your reviews, right?

7   A.  I received strong on all of my reviews up until the final

8   review before I was terminated.

9   Q.  Now you're aware that there are five ratings in the HSBC

10  system, correct?

11  A.  Correct.

12  Q.  They go from one to five?

13  A.  Correct.

14  Q.  One is the strongest, right?

15  A.  It's called outstanding, yes.  It's rarely ever given out,

16  to my understanding.

17  Q.  One is reserved for the highest performers, right?

18  A.  Correct.

19  Q.  Then there is a two rating, right?

20  A.  Yes.  Which exceeds.

21  Q.  Between -- you know, right, as a former senior

22  vice-president, that between one and two, the top approximately

23  thirty percent of the bank gets that rating, right?

24  A.  I don't know the percentages that were -- I wasn't

25  privileged to knowing the percentages of how the numbers were

1   handed out.

2   Q.  You were never informed about how -- what percentage people

3   get which ratings?

4   A.  I remember Damien Marshall of your firm --

5   Q.  I didn't say that.

6   A.  I learned -- I'm sorry.  I learned through depositions that

7   there was some percentage scale.

8   Q.  Well you do know now, right, that a three extends all the

9   way from the 30th percentile essentially all the way down to

10  the bottom ten percent of employees in general, right?

11  A.  I'm not aware of that.

12  Q.  You're aware of the fact that 70 percent of the employees

13  receive a three, right?

14  A.  I was told that during the depositions.

15          MR. JACKSON:  I'd like to offer DX-153, please.

16          MR. HUBBARD:  No objection, your Honor.

17          THE COURT:  Okay.  It's in.

18          (Defendant's Exhibit  153 received in evidence)

19          MR. JACKSON:  Can we go down to the bottom of this.

20  Q.  This is an e-mail you sent in the middle of 2012 to a

21  number of people, right?

22  A.  Correct.

23  Q.  And this is one of a number of communications that you sent

24  where your coworkers replied and indicated to you that the

25  information that you were providing was inaccurate, right?

GC89PIC1                     Picarella - cross

1   A.  In this particular instance that was a large

2   institutional -- actually the largest U.S. hedge fund -- fixed

3   income hedge fund --

4   Q.  I'm only asking if you disagree with that statement.

5        This was one of a number of communications where your

6   coworkers communicated to you that you had sent inaccurate

7   information, correct?

8   A.  Based on what I'm reading here, I would say that's

9   incorrect.

10       MR. JACKSON:  Can you go to the top of this.

11  Q.  And what ended up happening is Mr. Brady sent an e-mail

12  saying:  We should discuss the item below.  This type of

13  communication is inappropriate and inaccurate.

14       Right?

15  A.  He said that.

16       MR. JACKSON:  We can take this down.

17       I'd like to take a look at DX-173.

18       I'd like to offer DX-173.

19       MR. HUBBARD:  Your Honor, I think there's an objection

20  to this document.

21       THE COURT:  Okay.  Let me see 173.

22       MR. HUBBARD:  No objection, your Honor.

23       THE COURT:  Okay.  173 is in.

24       (Defendant's Exhibit  173 received in evidence)

25       MR. JACKSON:  Can we go down to the -- can we go to

GC89PIC1                    Picarella - cross

1    the third page of this.  Can you zoom in on the top

2    including -- the first half of the page.

3    Q.  Now this is a September 12, 2012 e-mail that you sent with

4    the subject line suitability regulatory issues recap, correct?

5    A.  Correct.

6              MR. HUBBARD:  I'm sorry your Honor I just got lost.  I

7    was looking at 173.

8              MR. JACKSON:  This is 173.

9              MR. HUBBARD:  Well it doesn't appear to be the 173 I

10   have.  Let me see.

11             MR. JACKSON:  May I hand you a copy.

12             I think you may be looking at page one, Mr. Hubbard.

13   We're at page three.

14             MR. HUBBARD:  Thank you, your Honor.

15   Q.  Now, Mr. Picarella --

16             THE COURT:  Hold on.  Are we all good?

17             MR. HUBBARD:  All good.  Thank you.

18             THE COURT:  Go ahead.

19             MR. JACKSON:  Thank you, your Honor.

20   Q.  Now, Mr. Picarella, what happened in this e-mail, in

21   summary, is that you sent an e-mail about certain suitability

22   issues that you believed needed to be raised, correct?

23   A.  That's incorrect.

24   Q.  Okay.

25   A.  That is --

1      THE COURT:  Hold on.  You've answered the question.

2  Go ahead.

3  Q.  Regardless, there was a response from an individual named

4  John Blizzard, right?

5  A.  Correct.

6  Q.  And Mr. Blizzard was a specialist at the bank in terms of

7  the issues that you were dealing with, correct?

8  A.  The attendees all there --

9  Q.  Sir.  I'm only asking you:  Mr. Blizzard was a specialist

10  at the bank in terms of the issues that you were raising,

11  right?

12  A.  He was one of the compliance officers.  I don't know if he

13  was the most knowledgeable -- in that compliance list --

14      THE COURT:  He's not asking if he's the most

15  knowledgeable.  Can you just rephrase the question.

16      THE WITNESS:  What do you mean specialist?

17  Q.  He was a compliance person whose job was to focus on these

18  types of issues, right?

19  A.  Yes.

20      MR. JACKSON:  Can we go to the first page of this.

21      Can you zoom in just the first paragraph there.

22  Right.

23  Q.  What he says is:  Hi Mike.  Thanks for the recap but I

24  think a few points need clarifying.

25      Correct?

1   A.  Yes.

2   Q.  And then if we look at the fourth paragraph what he wrote

3   was, after giving an explanation:  That being said, I think we

4   need a better understanding of the proposed enhancements so

5   that we can identify how best to improve the suitability

6   process already in place.  Then he said:  Your recap seems to

7   suggest that proper suitability assessments are not in place.

8   To confirm, there is a proper suitability process in place and

9   we identified several areas for possible improvement.

10          Right?

11  A.  He said that.

12          MR. JACKSON:  And can we go to the next page of this.

13  To the third paragraph on this page.

14  Q.  In the last line of this he pointed out to you:  This can

15  be confusing but we will clarify the distinction between the

16  AML and suitability rules in the next update.

17          Correct?

18  A.  (No response).

19  Q.  That's what he wrote?

20  A.  He wrote that, yes.

21          MR. JACKSON:  Okay.  Thank you.  You can take this

22  down.

23  Q.  Now, for your mid year 2012 review you provided a list of

24  names to Ms. White that you thought would be the best people to

25  review you, right?

1    A.  We had a conversation about it.

2    Q.  Sir, it's just a yes-or-no question.  I don't mean to

3    interrupt you.

4            THE COURT:  Just rephrase the question.

5            MR. JACKSON:  Thank you, your Honor.

6    BY MR. JACKSON:

7    Q.  The only thing I'm asking you is you provided a list of

8    names to Ms. White for your 2012 review, right?

9    A.  I did.

10   Q.  And these were people that you believed were in the best

11   position to peer review you, right?

12   A.  Some were my suggestions and some were hers.

13           MR. JACKSON:  I'd like to offer DX-176, your Honor.

14           THE COURT:  Any objection to 176?

15           MR. HUBBARD:  No, your Honor.

16           THE COURT:  Okay.  It's in.

17           (Defendant's Exhibit  176 received in evidence)

18   Q.  This is a list of names that you provided to Ms. White,

19   correct?

20   A.  Correct.

21           MR. JACKSON:  Can we zoom in on the first half of

22   this.

23   Q.  You wrote:  Suzy, here are a few names that I have worked

24   closely with across different business units in 2012.

25           Right?

1    A.  Right.

2    Q.  And you provided a long list of names, right?

3    A.  Right.  Because some of those were -- yes.  It's longer --

4    Q.  It's a long list of names?

5    A.  Yes.

6    Q.  Including you have down at the bottom there Mr. Blizzard

7    that we just looked at in compliance, right?

8    A.  Correct.

9    Q.  And you included Cary Goodwin, correct?

10   A.  Yes.

11   Q.  And a number of other people, right?

12   A.  Yes.

13          MR. JACKSON:  I'd like to offer DX-177.

14          MR. HUBBARD:  No objection.

15          THE COURT:  Okay.  It's in.

16          (Defendant's Exhibit  177 received in evidence)

17          MR. JACKSON:  Can we go to the very bottom.

18   Q.  Was -- what Suzy White wrote to this individual Simon

19   Leonard on 9-13-2012 is:  Simon, Mike Picarella has provided

20   your name as someone he would like feedback from for his

21   mid year review.  Can you please respond with your feedback on

22   Mike's performance for the first half of the year.  Thanks in

23   advance.  Regards, S.

24          Correct?

25   A.  Correct.

1    Q.  Can we go your response.

2            And what Mr. Leonard said was:  Hi.  Mike is keen to

3    help change some of the less efficient processes that we see in

4    equities specifically in COBAM, onboarding and RM client

5    handling.  He clearly has valuable experience and has good

6    ideas on how to make improvements.  Unfortunately, at times he

7    can come across as abrasive and sometimes offensive, which gets

8    in the way of getting results delivered with support functions

9    as relationships tend to be strained.

10           That's what he wrote, right?

11   A.  He wrote that.

12   Q.  And this is one of the people that you identified for your

13   peer review, correct?

14   A.  That's one -- that one I did, yes.

15           MR. JACKSON:  I'd like to offer DX-179.

16           MR. HUBBARD:  No objection, your Honor.

17           THE COURT:  Okay.  It's in.

18           (Defendant's Exhibit  179 received in evidence)

19           MR. JACKSON:  Can we go to the second page.

20   Q.  Here again Suzy White is e-mailing with Mr. -- with an

21   individual Mr. Pietroforte, right?

22   A.  Correct.

23   Q.  And that's somebody that you also identified for your peer

24   reviews, right?

25   A.  She recommended him.  That was her deputy.

GC89PIC1                        Picarella - cross

```
 1   Q.  This is a person that you placed on the list that you

 2   e-mailed to her?

 3   A.  She asked me to.

 4   Q.  Sir?

 5   A.  Yes.

 6   Q.  This is a person you placed on --

 7   A.  Yes.

 8   Q.  Let me just finish my question.  This is a person that you

 9   placed on the list that you e-mailed to her, right?

10   A.  Correct.

11            MR. JACKSON:  Can we go to the next part of this.

12   Q.  Just looking at the third paragraph there.  What he said

13   was:  I have found that he focuses on the issue at hand and is

14   able to resolve the issue.  But on more than one occasion the

15   root cause of the issue was not corrected and the same issue

16   came up more than once.  In this instance, I am referring to an

17   account close remediation process where active accounts were

18   closed and then had to be reopened.  While Mike may not be the

19   person closing the account itself, as business manager I would

20   expect him to understand, manage, and improve the process.

21            In my opinion an area of improvement is for him to

22   work on process, operational risk, and management skills, which

23   are all an important part for him to get to the next level with

24   the business managers team.  I consider Mike a decent junior

25   member of the business managers team who we may be able to get
```

GC89PIC1                    Picarella - cross

1   more value out of with the proper mentoring and training.

2           That's what he wrote, right?

3   A.  He wrote that.

4           MR. JACKSON:  I'd like to offer DX-181.

5           MR. HUBBARD:  May I just have a moment please, your

6   Honor.

7           No objection, your Honor.

8           THE COURT:  Okay.  It's in.

9           MR. JACKSON:  Thank you.

10          (Defendant's Exhibit  181 received in evidence)

11          MR. JACKSON:  Zoom in on the bottom half of this page.

12  Q.  Again, this is Suzy White e-mailing an individual named

13  Cary Goodwin saying:  Mike has provided your name as someone he

14  would like feedback from for his mid year review, correct?

15  A.  Correct.

16          MR. JACKSON:  Can you go to the response.

17  Q.  What Mr. Goodwin wrote was:  Suzy, in my dealings with Mike

18  Picarella I've found him to be unreliable.  He's lacked follow

19  through on the projects we've worked on together.  I don't deal

20  with Mike regularly but find that I'm doing more of the work

21  than I would expect when working on projects together.  I

22  recognize we're in a resource constrained environment but don't

23  find him to be the go to professional we need in that role.

24  CG.

25          That's what he wrote, correct?

1    A.  He wrote that.

2    Q.  Thank you.

3              MR. JACKSON:  Can we look at -- I'd like to offer

4    DX-182, please.

5              MR. HUBBARD:  No objection, your Honor.

6              THE COURT:  Okay.  It's in.

7              (Defendant's Exhibit  182 received in evidence)

8    Q.  Now this is an e-mail from Mr. Blizzard, right?

9    A.  Correct.

10             MR. JACKSON:  Can we zoom in on the part in the middle

11   where Mr. Blizzard's response is.

12             I'm sorry.  Let me backup.

13   Q.  What he wrote is:  Generally I enjoy working with Mike.

14   He's agreeable and a team player and I appreciate the

15   initiative he takes in setting up meetings and getting

16   discussions going.  I believe these meetings can be more

17   productive and efficient if he was more familiar with the

18   rules, materials, and/or relevant procedures in advance of

19   these meetings.  While the GM business is complex (multiple

20   firms offering differently regulated products), an SVP should

21   be able to readily make these distinctions so that pertinent

22   issues, key stakeholders and appropriate solutions can be

23   identified and implemented.

24             Right?

25   A.  He said that.

GC89PIC1                         Picarella – cross

1             MR. JACKSON:  Take that down.

2             THE COURT:  All right.  Let's go ahead and take our

3    morning break.  Let's take a break this morning.  Don't discuss

4    the case amongst yourselves or with anyone else.  I'll see you

5    back here in fifteen minutes.  Okay.

6             (Jury excused)

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC89PIC1                          Picarella - cross

1                    (In open court)

2                    THE COURT:  I'll see counsel in fifteen minutes.

3                    By the way, regarding those -- everyone can sit down.

4                    Regarding those -- the chats, can counsel share with

5          me the exhibits that counsel is contemplating if you have

6          copies of those.

7                    MR. JACKSON:  Yes.  I can pass up copies.

8                    THE COURT:  You can take your break.

9                    (Recess)

10                    (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC89PIC1                        Picarella - cross

1              (Jury present)

2              THE COURT:  Please be seated.  Welcome back.  Let's

3    continue.

4              MR. JACKSON:  Thank you, your Honor.

5              Look at one more document in this series.  I'd like to

6    offer DX-183.

7              MR. HUBBARD:  No objection, your Honor.

8              THE COURT:  Okay.  It's in.

9              Counsel are there several more?

10             MR. JACKSON:  No.  This is the last one, your Honor,

11   in this series.

12             THE COURT:  All right.

13             (Defendant's Exhibit  183 received in evidence)

14   BY MR. JACKSON:

15   Q.  So, Mr. Picarella, this is an e-mail from James Kibbe,

16   correct?

17   A.  Correct.

18   Q.  And Mr. Kibbe was the managing director and the head of

19   U.S. rate sales for global banking and markets, right?

20   A.  Correct.

21             MR. JACKSON:  Can we zoom in on the first -- this is

22   good.

23   Q.  What Mr. Kibbe says, starting with the second sentence

24   there is:  I have to say Mike's participation in this effort

25   has had fits and starts.  One of the issues I have found is

GC89PIC1                    Picarella - cross

1   that the help from business management has been little more

2   than e-mails that ask for follow-ups rather than understanding

3   the issues and suggesting solutions, making the progression

4   more efficient, etc.  My criticism is as follows:  There is a

5   lack of understanding the details needed to effectively

6   challenge logistic functions; e.g., credit, RM's, market risk,

7   etc.  I find the help is limited in scope to e-mail chasers and

8   organizing meetings.  The heavy lifting is left to sales to

9   invest the time and effort to get these things through.

10              That's what he wrote, right?

11  A.  He wrote that.

12  Q.  He also wrote that he would expect follow-up and push

13  through from business management but this does not happen.

14  More often than not this function seems to be more of another

15  layer of compliance or monitoring rather than in place to help

16  us work on the business.

17              He also wrote that, correct?

18  A.  Correct.

19  Q.  Again, this is one of the names that you -- that you

20  included on your list that you sent to Ms. White, right?

21  A.  Correct.  She asked me to --

22              MR. JACKSON:  Thank you.  You can take this down.

23              I'd like to offer DX-196.

24              MR. HUBBARD:  May I have a moment just to look at it?

25              (Pause)

GC89PIC1                        Picarella - cross

1              MR. HUBBARD:  No objection, your Honor.

2              THE COURT:  Okay.  It's in.

3              (Defendant's Exhibit  196 received in evidence)

4              MR. JACKSON:  Can you go to page four of this.

5    Q.  This is Suzy White e-mailing you in October of 2012 saying:

6    Hi, Mike.  Can you please send me the requirements doc for

7    current day suitability by the end of the day, please.  I had

8    hoped I would have received this already.  So even if you have

9    not completed it, please send me the draft by close of

10   business.  As you know, this is just the pre-DFA requirements.

11   I already have the DFA paper.  Also, I sent you a note re: the

12   MI we received against the global 75.  Have you had a chance to

13   look at this yet?

14             That's what she wrote to you, correct?

15   A.  She wrote that to me.

16   Q.  And this related to an assignment that she had previously

17   given you, correct?

18   A.  Correct.

19             MR. JACKSON:  Can you go to the response.

20   Q.  You wrote:  Suzy, I'm out of the office today.  I have

21   given BRD and workload feedback to Carol.  I believe Carol is

22   working towards getting me resource help.  It appears we are

23   all not on the same page.

24             That's what you wrote, right?

25   A.  Correct.

1    Q.  And you talk some more about what was going on with

2    compliance and Carol, right?

3    A.  Can I finished reading that paragraph, please.

4            MR. JACKSON:  It's fine.  We can go to the top.

5    Q.  Ms. White wrote to you:  Hi, Mike.  I'm sorry you do not

6    feel we are all on the same page.  As for me, it is very clear.

7    We met almost a month ago and you were given a deliverable to

8    draft the current requirements for the equitability system.  I

9    would like you to please complete this.

10           That's what she wrote to you, right?

11   A.  She wrote that.

12   Q.  She also said:  I agree Carol is leading the process review

13   as we discussed when we met.  And as you know I have given her

14   temporary resources from my team to assist.  I'm not sure why

15   there is a need for additional resource help but please

16   continue to work with Carol on priorities to ensure you are

17   making the best use of your time.

18           That's what she wrote to you, right?

19   A.  She wrote that.

20           MR. JACKSON:  Can we go to the top.

21   Q.  You wrote that afternoon.  You wrote a response.  The

22   bottomline, the last sentence of this is:  It is not complete

23   at this time but have made significant progress.

24           Correct?

25   A.  Correct.

559

GC89PIC1                        Picarella - cross

1   Q.  And this related to a project she had given you over a

2   month ago, right?

3   A.  Correct.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC8TPIC2                      Picarella - cross

1    BY MR. JACKSON:

2    Q.  Can you go to the next email.

3          Second part of this she says:  At this point I would

4    expect we can draft a document which defines the requirements

5    and highlight the gaps/dependences/open questions.  I'm

6    boarding soon, so this may be my last email.

7          That's what she wrote, right?

8    A.  Yes.  Give me a second to read the next couple of

9    sentences.  That's the same day, so it's an email chain going

10   through the course of the day.

11   Q.  Right.  So Carol chimed in and wrote that to you and Suzy,

12   right?

13   A.  Right, because --

14   Q.  That's fine.  Can we go to the next email.

15         And this is your response at 4:44 p.m., and you wrote

16   a number of things here but you said, at the last line of the

17   second paragraph:  I also need to adjust the doc based on the

18   recent changes from CMB from the past couple of days.

19         Correct?

20   A.  Give me one second, please.

21         Yes, she wrote that.

22         MR. JACKSON:  Can we go to the first page of this,

23   just zooming in on Suzy White response.

24   Q.  She wrote:  Mike, I have recopied my initial request, which

25   very clearly states I will accept draft requirements if you

1    have not finished the doc.  Can you please send me the

2    requirements doc for current day suitability by the end of day

3    today, please.  I had hoped I would receive this already, so

4    even if you have not completed it, please send me the draft by

5    close of business.  This really should not be this difficult

6    and require so many emails.  My initial request stands.  Please

7    respond to that request.  If you would like to discuss

8    anything, please ask Marie for some time next week to do so.

9             Right?  That's what she wrote, correct?

10   A.  She wrote that, yes.

11   Q.  At the time Suzy White was your boss' boss, right?

12   A.  Yes.

13   Q.  Can you look at your response.

14            In your response, the last thing you said, this is on

15   Friday:  I can work on giving you an incomplete draft on

16   Tuesday.

17            Right?

18   A.  I was out --

19   Q.  That's what you wrote.

20   A.  I was out of the office.  I wrote that.

21   Q.  You wrote:  I can work on giving you an incomplete draft on

22   Tuesday.  Correct?  Yes?

23   A.  I wrote that, yes.

24            MR. JACKSON:  Okay.  You can take that down.

25   Q.  Now during your direct testimony you talked about your 2013

GC8TPIC2                     Picarella - cross

1    360 reviews, right?

2    A.   Correct.

3    Q.   Now the 2012 reviews that we just looked at included a

4    number of people who were senior management at HSBC, right?

5    A.   Yes.

6    Q.   In your 2013 reviews, the names you submitted included a

7    number of people who were below you on the org chart, correct?

8    A.   It was --

9    Q.   Sir, it's a yes or no.  If you can't answer, let me know

10   that you can't?

11   A.   I don't know the exact list.

12   Q.   But you do remember that there were a number of names

13   included on there that were people who were beneath you on the

14   org chart, correct?

15   A.   That's the purpose of the 360.

16   Q.   Sir, I'm asking you yes or no, is that correct?

17   A.   Yes.

18   Q.   There were a number of people beneath you on the org chart,

19   correct?

20   A.   I don't know how many.

21   Q.   There were a number of people, correct?

22   A.   In my opinion -- there was a number, definitely.

23   Q.   One of those people -- another one of those people -- one

24   of the people that you suggested was a gentleman named Michael

25   O'Leary, right?

GC8TPIC2                          Picarella - cross

```
 1   A.  Correct.
 2   Q.  And this is a person who is subordinate to you at HSBC,
 3   right?
 4   A.  He managed the client on-boarding and off-boarding group.
 5   He managed the whole team, and I worked with him on a daily
 6   basis.
 7   Q.  My question is:  He was subordinate to you at HSBC, right?
 8   A.  He was, I believe, a vice president.
 9   Q.  He was subordinate to you, right?
10   A.  Yes.
11   Q.  You also identified a person who worked in IT, correct?
12   A.  Paul Lashmet.
13   Q.  He was a person that worked in IT, correct?
14   A.  Correct.
15           MR. JACKSON:  Now I would like to offer DX-224.
16           MR. HUBBARD:  No objection, your Honor.
17           THE COURT:  Okay.
18           MR. JACKSON:  I would also like to offer DX-227.
19           MR. HUBBARD:  No objection, your Honor.
20           THE COURT:  Okay, they're in.
21           (Defendant's Exhibits 224 and 227 received in
22   evidence)
23   Q.  DX-227, this is your review -- your manager review in 2012,
24   right, year end?
25   A.  It was year end 2012 provided to me in May of '13.
```

1   Q.  This is the year end review, right?

2   A.  Six months late, I believe.

3   Q.  Can you look at DX-224.

4          MR. JACKSON:  Can we go down to the next page.  Go

5   gown to the next page, the third page.

6   Q.  So this is an email that you sent to Pablo Pizzimbono,

7   Carol Jenner, and Mary Bilbrey in April of 2013, correct?

8   A.  Correct.

9   Q.  The subject line is "weekly commentary," right?

10  A.  Correct.

11  Q.  And this related to an assignment that was given to you by

12  Mr. Pizzimbono, correct?

13  A.  Ms. Jenner.

14  Q.  So Ms. Jenner had given you an assignment, correct?

15  A.  Correct.

16  Q.  And one of the issues that you raised with the

17  assignment --

18  A.  May have been both, so I correct myself, first Ms. Jenner,

19  then Mr. Pizzimbono may have been involved.  I don't remember.

20  Q.  That's fine.  So one of the issues that you raised in terms

21  of this assignment was you believe it required you to work on

22  weekends, right?  That's a yes or no.

23  A.  Yes, it was work being --

24  Q.  That's fine, sir.

25          And you didn't want to do the assignment, correct?

1    That's a yes or no.

2    A.  No, it wasn't the assignment itself that I was complaining

3    about.

4    Q.  Let's go to the first page of this.

5            One of the things that you talked about is you have a

6    family weekend house that you use during the summer months,

7    right?

8    A.  Yes.

9            MR. JACKSON:  Let's take that down and go to the first

10   page.  And zoom in on the first paragraph, Mr. Pizzimbono's

11   response.  Go to the second paragraph.

12   Q.  Mr. Pizzimbono wrote to you:  With respect to the weekly

13   commentary, you are correct that Carol has chosen to compete

14   that work primarily over the weekends.  This work, however, can

15   be compiled and completed before COB on Friday.  I would

16   suggest that you set appropriate deadlines with the

17   desk/finance.

18           And he has some additional things that he says there,

19   right?

20   A.  He said those things, yeah.

21   Q.  There's a part lower in there where he says:  An as SVP,

22   our expectation will be that if a particular situation requires

23   it, you will get the work completed in a timely fashion, even

24   if it occasionally requires work over the weekends.

25           That's what he wrote, right?

GC8TPIC2                    Picarella - cross

1    A.  He wrote that.

2    Q.  Then he wrote:  I do not think, however, this particular

3    assignment requires work to be done on the weekends.  I'm sorry

4    if you felt our conversation about your weekend and family was

5    in any way connected to this request by Carol to work on the

6    weekly commentary.  It was not connected at all.  I enjoyed

7    catching up with you.

8              Right?

9    A.  He wrote that.

10   Q.  Mr. Pizzimbono was always courteous in his dealings with

11   you, correct?

12   A.  Yes.

13   Q.  Now one of the things that you were required to do in your

14   job is complete mandatory trainings, right?

15   A.  Yeah, it was firm-wide mandatory training that would come

16   monthly or quarterly.  Certain classes you had to take online.

17   Q.  The answer is yes, correct?

18   A.  Yes.

19   Q.  You failed to complete at least ten mandatory trainings

20   between 2012 and 2014, right?

21   A.  That's incorrect, I completed all of the proper training.

22   Q.  Okay.  On November 15, 2012 you had an email chain with

23   Suzy White where she -- where after you got an email that was

24   sent from -- after you get an email that said you have not

25   completed the training, she responded to you:  Mike, please

1    complete this overdue assignment as soon as possible.  Regards,

2    S.

3            Correct?

4    A.  Yeah, anybody who was late --

5    Q.  That's what she wrote to you, right?

6    A.  Yes, she wrote that.

7    Q.  There was another occasion, on November 30, 2012, where you

8    got another email from HSBC, the program that handles the

9    training said:  Dear Michael, you were assigned the training

10   program listed below, but to date, according to our records,

11   you have not completed the training.

12           Right?

13   A.  I'll agree with that without seeing it, yes.

14   Q.  Do you want to see it?

15   A.  It's okay.

16   Q.  You agree that happened, correct?

17   A.  Yeah, there would be deadlines a couple of points in time.

18   Q.  There was another --

19   A.  Hundreds of names on that list of people that needed to get

20   the training done.

21   Q.  There was another occasion where you were sent an email

22   in -- you were sent an email on April 24, 2013 from HSBC

23   training that said:  Dear Michael, you were assigned the

24   training program listed below, and to date, according to our

25   records, you have not completed the training.

GC8TPIC2                        Picarella - cross

1            Right?

2   A.  I will take your word for it.

3   Q.  Don't take my word for it.  Do you think that's correct?

4   A.  Yeah, probably.  But I did complete all those trainings.

5   There was never any that I did not complete.

6   Q.  There was another occasion on -- there was another occasion

7   on August 1st, 2013 where they sent you an email to you and

8   your supervisor that said:  You were assigned to important

9   mandatory training sessions which you were required to complete

10  by 1/08/2013.  You have not completed all training on time, and

11  you must now complete this.

12           And that was sent in August of 2013, correct?

13  A.  Correct.

14  Q.  And this was followed up with an email from Carol Jenner to

15  you reminding you about this a few days later, right?

16  A.  Sure.

17  Q.  Then there was another occasion, on September 19, 2013, you

18  again got an email, global mandatory training, said:  You are

19  required to complete this training by September 19, 2013.  You

20  have not completed all training on time and you must now

21  complete this.

22           Right?

23  A.  Sure.

24  Q.  And then again your supervisor, Ms. Jenner, followed up and

25  sent you an email reminding you to complete the training,

GC8TPIC2                    Picarella - cross

1   right?

2   A.  Those were the procedures.  They would give you warnings,

3   and if you miss a date it would go to you, it would go to your

4   supervisor, and I think I remember Carol at times saying:

5   Mike, when you have a chance, please do this.

6   Q.  Right.  And these continued into 2013 until the end of

7   2013, right, more instances in 2013 where you didn't complete

8   the training?

9   A.  I completed all trainings.  There was never any that I

10  didn't complete.

11  Q.  I see.  You also received emails in 2014 that you had

12  failed to complete mandatory training, right?

13  A.  I completed all training.  There's alerts and email

14  reminders and things like that, system generated, that

15  everybody gets if you're approaching deadlines or missing

16  deadlines.  We had --

17  Q.  That's fine.  September 20, 2014 you got an email from HSBC

18  training saying you were assigned a training program listed

19  below, and to date, according to our records, you have not

20  completed the training.  Correct?

21  A.  Yeah.  I have got those emails.

22  Q.  Now one of the other things that you talked about in your

23  direct testimony was your communications with Mr. Karam.

24  A.  Okay.

25          MR. JACKSON:  Now I would likes to offer DX-236,

570

GC8TPIC2                          Picarella - cross

1   please.

2              MR. HUBBARD:  No objection, Judge.

3              THE COURT:  Okay, it's in.

4              (Defendant's Exhibit 236 received in evidence)

5              MR. JACKSON:  Thank you, your Honor.

6   BY MR. JACKSON:

7   Q.  Mr. Picarella, this is an email that Mr. Karam sent you in

8   August 2013, correct?

9   A.  Correct.

10  Q.  And what he said is:  Mike, I understand you have been

11  communicating that the process to propose new client

12  relationships has changed and you are no longer responsible for

13  collecting business cases for review and managing this

14  pipeline.  Not sure where this confusion is emanating since I

15  haven't implemented any changes to this process.

16             That's what he wrote to you, right?  Yes or no.

17  A.  It's inaccurate.

18  Q.  That's what he wrote to you?

19             MR. HUBBARD:  Excuse me, your Honor, I'm sorry.

20             THE COURT:  Please sit down.

21             MR. HUBBARD:  He's shouting.

22             THE COURT:  No, sit down.

23             Did he write that to you?

24             THE WITNESS:  Yes, he wrote that to me.

25             THE COURT:  Continue.

1              MR. JACKSON:  Could we take this down.

2              Now can we -- I would like to show a demonstrative

3    exhibit of the trading floor.  Can we call up --

4              THE COURT:  This is the one that was shown earlier?

5              MR. JACKSON:  No, your Honor, this is a different one.

6              THE COURT:  Has plaintiff's counsel seen it?

7              MR. JACKSON:  It's right here, your Honor.  I believe

8    they have seen it.

9              MR. HUBBARD:  We have no objection.

10             THE COURT:  Okay, go ahead.

11   BY MR. JACKSON:

12   Q.  Now this is the HSBC trading floor, right?

13   A.  Looks to be portions of -- we had two trading floors and

14   they were there sections of them, correct.

15             MR. JACKSON:  And I also want to call up -- we'll mark

16   this Demonstrative Number 4, which is a conference room

17   picture.

18             THE COURT:  Any objection to that?

19             MR. HUBBARD:  No, your Honor.

20             THE COURT:  Okay.

21   Q.  This is one of the conference rooms that is on the floor

22   that is -- where the trading floors are, this is what they look

23   like, right, some of the conference rooms?

24   A.  Typically -- that one -- typically the conference rooms are

25   on the outer perimeter.  They do have the glass front, but most

1    conference rooms have windows from ceiling to floor.  That one

2    looks a little unusual, but --

3            MR. JACKSON:  I would like to call up now

4    Demonstrative Number 3.

5            THE COURT:  What is the Demonstrative 3?

6            MR. JACKSON:  This is a picture of the office where --

7    that was off the trading floor.

8            THE COURT:  Okay.  Any objection to that?

9            MR. HUBBARD:  Just wondering if it's related to

10   anything in the case or just to demonstrate an office, or is it

11   supposed to be some office that was used in this case?

12           MR. JACKSON:  Well, your Honor, it's one of the

13   offices -- there are a number of offices that look just like

14   this, I believe, at HSBC.  This is a picture of one.

15           THE COURT:  This is just to show what a typical office

16   looks like?

17           MR. JACKSON:  Yes, because one of the offices --

18           THE COURT:  Hold on.  There's no objection.  Go ahead.

19   BY MR. JACKSON:

20   Q.  And this is what some of the offices right off of the

21   trading floor looked like, right?

22   A.  Yeah, it's not the majority like that.  Like I said, most

23   are on the perimeter, but I have seen a few like that, yes.

24   Q.  This is the type of office that you met with Mr. Karam in,

25   right?

GC8TPIC2                        Picarella - cross

1   A.  Yes, Mr. Karam and I met in an office similar to that.

2   Q.  It was this type of office where the incident that you

3   allege happened with Mr. Karam occurred, right?

4   A.  It looks very similar, including the small circular table

5   that I was describing.

6   Q.  What's behind this perspective in the actual office is the

7   actual trading floor with all the desks, right?

8   A.  Yeah, a portion of the trading floor right outside this

9   office.

10  Q.  And people can see into this from the trading floor, right?

11  A.  Yeah, the door -- if you are referring to the meeting --

12  Q.  No, I'm asking generally, can you see into these kinds of

13  offices from the trading floor?

14  A.  Yes.

15  Q.  That's fine.

16  A.  There is a wood door that blocks a portion of the room.

17          MR. JACKSON:  We can take that down.

18  Q.  Now Mr. Picarella, one of the things you did during your

19  time at HSBC, there were certain occasions -- first of all, you

20  were aware that HSBC had a policy you were not supposed to

21  surreptitiously record conversations with other employees,

22  correct?

23  A.  Correct.

24  Q.  You violated that policy, correct?

25          It's a yes or no.

GC8TPIC2                          Picarella - cross

1    A.  Correct.

2    Q.  You recorded certain of your conversations with other HSBC

3    employees?

4            MR. HUBBARD:  Objection.

5            THE COURT:  Basis?

6            MR. HUBBARD:  No foundation.  There was an S on the

7    question.

8            THE COURT:  Please rephrase the question.

9    Q.  Let me ask, yes or no, did you record any conversations

10   with HSBC employees without their knowledge?

11   A.  One.

12   Q.  And that was a conversation with a woman named Maria

13   Malanga, right?

14   A.  Correct, when I was out of the office.

15   Q.  That's fine.

16   A.  Correct.

17   Q.  Is that the only conversation that you recorded throughout

18   your time at HSBC?

19   A.  Correct.

20   Q.  Now in that recorded conversation, to be clear, Ms. Malanga

21   was entirely courteous to you, correct?

22   A.  Correct.

23   Q.  Now you described on your direct testimony that you were

24   only working in 2014 about ten percent of the time that you

25   were at work, right?

1   A.  The work I had only --

2   Q.  I'm asking yes or no, that was your testimony on direct?

3           THE COURT:  Hold on.  Can you answer that yes or no?

4           THE WITNESS:  The way it was phrased, I'm not sure.

5           THE COURT:  It's not about whether you like the

6   question, it's can you answer the question.

7           Please rephrase the question.

8           MR. JACKSON:  Thank you very much, your Honor.

9   Q.  My question is:  Did you testify on your direct that by

10  2014 you were only working about ten percent of your time in

11  the office?

12          THE COURT:  In sum and substance, did you testify to

13  that yesterday?

14          THE WITNESS:  I did, but the concept of the

15  question --

16  Q.  I'm asking yes or no.

17          THE COURT:  Hold on.  Please rephrase the question.

18          MR. JACKSON:  Yes, your Honor.

19  Q.  In substance, you agree you testified on direct that by

20  2014 you were only working on actual work about ten percent of

21  the time that you were at work, is that correct?

22  A.  Can you say it again, please?  I'm sorry, I want to make

23  sure -- if I could answer without a yes or no, and we might

24  then be able to get to the answer you want.

25          THE COURT:  He's asking you about your testimony

1    yesterday, that's what he's asking you about.  He's asking

2    you -- state the question again.

3            MR. JACKSON:  Yes, your Honor.

4    A.  I will say yes.  I will say yes.

5    Q.  So the answer is yes.

6            And during that time, you still had certain work

7    responsibilities, correct?

8    A.  Those work responsibilities --

9            THE COURT:  Hold on.  He's asking if you had certain

10   work responsibilities.

11           THE WITNESS:  A couple, yes.

12   Q.  In 2013 -- moving back from 2014, in 2013, what was the

13   percentage -- I'm only asking percentage -- what was the

14   percentage of time when you were at the office that you were

15   actually working on work?

16   A.  It's points in time, because --

17   Q.  If you can't answer it --

18   A.  I can't answer it.

19           THE COURT:  Hold on.  You asked the question.

20           Go ahead.

21   A.  It's points in time, because from the beginning of '13 I

22   still had responsibilities gradually being taken away.  By the

23   time it got to the middle of 2013 they were diminished

24   significantly.  And then when Mr. Karam became my boss and I

25   filed an EEOC complaint, further responsibilities were taken

1    away over the summer of 2013 until I complained to Ms. Bilbrey

2    in September that he hadn't met or spoken with me.  And then he

3    reassigned some tasks to me, four tasks, two of which I

4    completed by early 2014.  I had two remaining, which probably

5    constituted enough work to take up about ten percent of my

6    time, which is the way I wanted to answer the question

7    previously.

8    Q.  Okay.  So that's fine.  Now throughout the years from 2012

9    to 2015 you were in contact with your attorney about what was

10   happening at work, right?

11          Not asking the substance, but you were in contact with

12   your attorney?

13          MR. HUBBARD:  I'm not sure that's appropriate, your

14   Honor, the defendant --

15          THE COURT:  Hold on.  Please rephrase the question,

16   counsel.

17          MR. JACKSON:  Yes.

18   Q.  Let me ask you this, what was the point that you retained

19   Mr. Hubbard -- scratch that.  Withdrawn.

20          What was the point when you began speaking to

21   Mr. Hubbard about what was going on at work?

22          THE COURT:  Hold on.  For clarification of your

23   question, are you asking when was the point?

24          MR. JACKSON:  Yes, your Honor, when.

25          THE COURT:  Any objection to that?

1              MR. HUBBARD:  Well, your Honor, I don't know that

2      there's any relevance.

3              THE COURT:  Hold on.  Let's take another break.  I

4      will see you in 15 minutes.  Don't discuss the case among

5      yourselves or with anyone else.  See you soon.

6              (Jury not present)

7              THE COURT:  Should Mr. Picarella go to the robing room

8      while we discuss this or can he stay here?

9              MR. JACKSON:  I believe he can stay, your Honor.

10             THE COURT:  Where are you going with this, counsel?

11             MR. JACKSON:  I'm not going anywhere.  I want to know

12     what the date was.  This was the subject of his testimony in

13     his deposition.  It's not privileged.  It's only the date which

14     he began spoking with Mr. Hubbard.

15             THE COURT:  And why is that relevant?

16             MR. JACKSON:  Because at a certain point

17     Mr. Picarella's communications with HR, a focus of what he was

18     describing, changed significantly.  And I think that we would

19     argue to the jury to raise the inference among the things that

20     changed is he began speaking with an attorney, and then the

21     focus of the communications he was having was altered.

22             And we're not going any further than that, but it's

23     part of the timeline on the record.  He cc'd Mr. Hubbard on a

24     number of his communications, as we have already seen in

25     evidence with HSBC HR, and I think it's important for us just

1    to know the point at which that began.

2                THE COURT:  Okay.  Any objection to that, counsel?

3                MR. HUBBARD:  Yes, your Honor.  The reason is that the

4    jury doesn't understand whether or not that's a sinister

5    implication or something improper or whether it affects the

6    validity --

7                THE COURT:  What is improper?

8                MR. HUBBARD:  That he has a lawyer, when he retained

9    the lawyer.  I think that abuses the whole process.  It abuses

10   whole process to start asking someone when they retained a

11   lawyer.  And why?  The defendant has a lawyer all the time.

12   Her name is on many of these e-mails.  I haven't gone into

13   that, but I have go back and say:  When did you start meeting

14   with your lawyer, and how often did you do it, for what reason?

15   I think it's --

16               THE COURT:  So the basis of your objection is -- I

17   want to make sure I'm clear -- is that it implies something

18   sinister in him retaining counsel?

19               MR. HUBBARD:  Well, you just heard what he said.  He

20   is going to try to argue to the jury he retained counsel and

21   somehow or another his communications with counsel affected his

22   communication.  That's basically suggesting that the lawyers

23   were drafting his communications.  It's very ominous, Judge.  I

24   think the prejudice is obvious.  I think the probative value is

25   minute, and the prejudice far outweighs the probative value.

1   If we're going to get into it, we'll have to get into it.

2            THE COURT:  But to the extent that if I were to allow

3   it, why wouldn't a curative instruction that said -- if I said

4   to the jury there's nothing improper about Mr. Picarella

5   retaining counsel?

6            MR. HUBBARD:  Your Honor, I don't think that that

7   would cure it.  I understand you could give the instruction, I

8   don't think you could cure it because -- well, you heard what

9   the gentleman wants to do with it.

10           THE COURT:  Okay.  Defense counsel?

11           MR. JACKSON:  Your Honor, it's already in the record

12   that --

13           THE COURT:  Then why do you want to ask it?

14           MR. JACKSON:  No, what's in the record already is he

15   was cc'ing Mr. Hubbard on communications.  I think it's

16   important for the jury to have a timeline.

17           THE COURT:  But you say that's in the record before

18   the jury.

19           MR. JACKSON:  Not the timeline.  We have

20   communications of the fact that Mr. Hubbard was involved in the

21   communications.

22           MR. HUBBARD:  And there are privilege objections to

23   those in the evidence.

24           THE COURT:  What is your point?  Your point is what

25   with this, counsel?

1              MR. JACKSON:  My point is, your Honor, at some point

2     Mr. Picarella began engaging in strategic thinking on his own

3     part that went beyond simply reporting things to HR.  He was

4     thinking more globally.  And I'm not raising anything sinister

5     about retaining counsel, I think that your Honor's limiting

6     instruction is fine.

7              THE COURT:  What is the point of it, though?  What is

8     the point you want to make to the jury?  The point is that it

9     changed how?  It changed how?

10             MR. JACKSON:  His communications, your Honor, when he

11    was communicating -- and I think this would be more clear with

12    the subsequent witnesses.  What he was communicating with HR,

13    the nature of it, was different at the beginning than it was

14    later on.  There are certain descriptions that changed.

15             THE COURT:  What do you mean?  What are you talking

16    about?  How was it different?  Give me a sense of the

17    characterization that you say it's different, how was it

18    different?

19             MR. JACKSON:  Well, your Honor, maybe we should excuse

20    Mr. Picarella at this point.

21             THE COURT:  Okay.  Mr. Picarella step into the robing

22    room here for a second.

23             (Plaintiff not present)

24             THE COURT:  Okay.

25             MR. HUBBARD:  Your Honor, may I add one point that may

1   save us a little time?  Your Honor may recall that the EEOC

2   charge dated June 2013, with our name on it, is in evidence.

3   So it's obvious at that point in time he had counsel.

4          MR. JACKSON:  That was more than a year after he --

5          THE COURT:  That's fine.  How is the

6   characterization -- how is it that the communication changed

7   and why is that change relevant?  How are you saying that the

8   communication changed?

9          MR. JACKSON:  In Mr. Picarella's earlier

10  communications with HR he was essentially complaining about

11  Ms. Hedges' treatment of him.  Later on he's complaining about

12  Ms. Hedges' treatment of Michelle Parker.  And that sort of

13  transition -- there are a number of different factors at play,

14  but he made a decision in terms of the way he was going to

15  change the way he was approaching things.  And one of the

16  things that he did on this timeline was he started to speak to

17  a lawyer.  That fact is not privileged.  It also can't be

18  prejudicial because they know he was communicating with his

19  lawyer.  We're looking for the date that that began happening.

20         THE COURT:  There seems to be potentially some other

21  issues, since you want to bring out the fact that -- you

22  already started asking questions about not just that retained a

23  lawyer but he retained Mr. Hubbard.  And it seems that there

24  may be an inference not so much that there is something

25  sinister about engaging counsel, but almost sort of a back door

GC8TPIC2                    Picarella - cross

1   way of sort of impuging the integrity of trial counsel.

2           Counsel is sitting here representing Mr. Picarella,

3   and you are essentially basically implying that once

4   Mr. Picarella not only lawyered up but lawyered up with this

5   particular lawyer he changed his story to tailor his testimony

6   or tailor his statements to help the lawsuit.  It seems that

7   that is sort of an implied attack on trial counsel.

8           MR. JACKSON:  Your Honor, I would like to make clear I

9   have the highest opinion and respect for Mr. Hubbard.  I don't

10  need that part of the question.  I would be perfectly happy to

11  say he began speaking to an attorney without actually

12  referencing Mr. Hubbard.

13          MR. HUBBARD:  One thing I should say, your Honor,

14  again, however, there cannot be any question that once he goes

15  down that road he is implying that there is something improper

16  about retaining counsel or retaining this counsel.  And at the

17  same time do I get to question all of their witnesses when they

18  began consulting with in-house counsel at HSBC and what affect

19  that had when they filed a response to the EEOC charge.  It's

20  limitless how that trail continues.

21          And so I just think that certainly, unless there is

22  some -- there's not been anything that has yet come out that

23  would demonstrate the probative value of this information

24  beyond the EEOC charge that they have.  And I frankly think

25  that the date that he retained counsel is privileged.  We

GC8TPIC2                         Picarella - cross

1    can -- I don't know what the law books say.

2              THE COURT:  I don't think that's privileged.

3              MR. HUBBARD:  But in this context it might be, but in

4    any event.  But it doesn't seem the probative value of this --

5    and he is going to -- if he uses this information, he

6    clearly -- once he gets the date he is clearly going to argue

7    to the jury that his protected activity was lawyer manipulated.

8    There's no evidence of that.

9              MR. JACKSON:  I have no intention of making that

10   argument, your Honor.

11             THE COURT:  So what argument do you plan on making?

12             MR. JACKSON:  I plan on making at some point in the

13   middle of that year Mr. Picarella --

14             THE COURT:  Which year?

15             MR. JACKSON:  2012.

16             -- changed his focus, contacted a lawyer, and he

17   subsequently starts speaking to HR with a different focus on

18   things.

19             THE COURT:  And why?  What is your claim as to -- if

20   we play this out, it sounds that your argument is that sometime

21   around the middle of 2012 Mr. Picarella changed his focus, and

22   instead of complaining about the way Ms. Hedges treated him, or

23   the fact that he didn't get his bonus or whatever other

24   complaints there were, that he started using essentially

25   knowledge about the sexual harassment of Ms. Parker as sort of

1    a shield and a sword in his complaints to HR to then try to

2    protect himself or prevent himself from having some adverse

3    employment action.  Is that essentially what your argument is?

4            MR. JACKSON:  Yes, sir, and he was looking for ways to

5    benefit from that situation.

6            THE COURT:  So again, I'm trying to figure out what

7    the link is with counsel.  It seems you already sort of brought

8    out the facts to this jury in which you're going to argue that

9    Mr. Picarella first was arguing or complaining about certain

10   things and then later this changed.  I'm not sure if you're

11   going to bring out or going to argue that I guess there's some

12   facts out there that Mr. Picarella -- there is enough to argue

13   Mr. Picarella learned about the sexual harassment of Ms. Parker

14   and perhaps knew about the sexual harassment of Ms. Parker from

15   the record, and then the focus changed.

16           I'm not sure the necessity or the utility of getting

17   into the fact that he hired counsel for that, if your claim is

18   that he used and is using this sort of as a ruse to hide the

19   fact that he wasn't good at his job and he got fired for other

20   reasons, it seems to me, again, that you don't need to be

21   bringing counsel into it.  That's what I'm concerned about.  I

22   do think there is some unfair prejudice there to bring that

23   fact in there.

24           I think you certainly have enough evidence from which

25   you can make those arguments, so I'm going to sustain that

GC8TPIC2                    Picarella - cross

1    objection.

2              MR. JACKSON:  Thank you.

3              THE COURT:  And are you almost done?

4              MR. JACKSON:  I'm getting very close, your Honor.

5              THE COURT:  How much more time do you have here?

6              MR. JACKSON:  I will be done before lunch, I believe.

7              THE COURT:  All right.  Give me a sense of what the

8    areas are that you have here, because, again, some of this is

9    starting to get a little cumulative again.

10             MR. JACKSON:  I hear you, Judge.

11             THE COURT:  We don't need to go through the

12   evaluations.

13             MR. JACKSON:  We won't go through more reviews.  I

14   want to talk about mitigation issues briefly, mitigation

15   damages issues.  I want to talk a little bit about -- very

16   briefly, I think, about the leak that was raised on direct

17   examination.  I want to talk a little bit about Mr. Picarella's

18   calendar.  And I think those are the basic -- I may have one or

19   two odds and ends, but those are basically it.

20             THE COURT:  Seems that you should be able to be

21   wrapped up in about 45 minutes.  Would you agree?

22             MR. JACKSON:  I agree.

23             THE COURT:  Counsel could take a quick break.  We'll

24   come back with the jury and I will let Mr. Picarella back in.

25             Anything else from counsel?

1          MR. HUBBARD:  Your Honor, I guess I want to think

2     about it for a minute, we don't need to do it now, but I may

3     want to ask you to give the jury a curative instruction about

4     the issue that was raised about when he retained counsel, and

5     to tell the jury that when the various parties retain counsel

6     is not an issue, not relevant, and is not an issue, since he --

7          THE COURT:  It may not be appropriate since I'm going

8     to sustain that objection.

9          MR. HUBBARD:  That would be fine, if you do that in

10    the presence of the jury.

11         THE COURT:  I will do that in the presence of the

12    jury.

13         MR. HUBBARD:  Okay.

14         (Recess taken)

15         THE COURT:  Counsel, we'll resume as soon as possible.

16    Let me check in with counsel, the jurors seem to be quite

17    interested in finding out the time when we are going to dismiss

18    them today.  Again, the cross-examination should be finished

19    before lunch, do you have a sense of how long your redirect

20    will be?

21         MR. HUBBARD:  Well, your Honor, this cross has taken

22    place over three days.

23         THE COURT:  Well, not quite.

24         MR. HUBBARD:  I understand, but it's going to take

25    some time.

```
 1              THE COURT:  Give me an estimate of how much time you
 2    think it will take.
 3              MR. HUBBARD:  Under an hour, 45 minutes.
 4              THE COURT:  All right.
 5              MR. HUBBARD:  I will try to go fast.
 6              THE COURT:  I think it probably doesn't make sense to
 7    try to give them any kind of early dismissal today since we'll
 8    leave by 4 o'clock tomorrow.  So I won't tell them anything
 9    special today, or if you think I could tell them we'll leave
10    before 5 o'clock today.  And if counsel are all right, I could
11    tell them now or at the end of the day that we'll break by
12    4 o'clock tomorrow.
13              Counsel have any preference as to whether I tell them
14    that now or tell them that at the end of the day?
15              MR. HUBBARD:  You can tell them now.
16              THE COURT:  So I will tell them that now.
17              MR. JACKSON:  That's fine.
18              THE COURT:  I will let the jury know in terms of
19    scheduling that we're going to work until no later than
20    5 o'clock today, and tomorrow we anticipate working from 9:30
21    until 4:00.
22              Bring the jury in.
23              (Continued on next page)
24
25
```

```
 1              (Jury present)

 2              THE COURT:  Let me give you some information about our

 3     schedule for the next couple of days.  So today we will work no

 4     later than 5 o'clock.  Tomorrow we will work from 9:30 until

 5     4:00.  We'll dismiss you about 4 o'clock tomorrow.  I wanted to

 6     let you know that in terms of scheduling.

 7              Let's continue with the cross-examination of

 8     Mr. Picarella.

 9              So again, today we'll work no later than 5:00, but

10     tomorrow we'll be out by 4:00.

11              MR. HUBBARD:  Your Honor, would you inform the jury --

12              THE COURT:  Oh, yes.  Go ahead, counsel.

13              I will do that, but counsel, get to the podium.

14              MR. JACKSON:  Thank you, Judge.

15              THE COURT:  The objection to that last question is

16     sustained.

17              Go ahead, counsel.

18              MR. JACKSON:  Thank you very much, your Honor.

19     BY MR. JACKSON:

20     Q.  Now Mr. Picarella, one of the things that you talked about

21     earlier on your direct testimony was your job search after you

22     left HSBC, correct?

23     A.  Correct.

24     Q.  Now that job search didn't begin immediately after you left

25     HSBC, correct?
```

1    A.  That's incorrect.

2    Q.  Now one of the other things that you talked about was your

3    anxiety that you experienced since you left HSBC, right?

4    A.  Yes.

5    Q.  And one of the things that you have previously testified is

6    that that general anxiety began in August of 2015, correct?

7    A.  It was Labor Day weekend, so I don't know if that's August,

8    September of 2015, correct.

9    Q.  And you did testify previously, correct, that you didn't

10   seriously start looking for a new job until July of 2015,

11   correct?

12   A.  My search began immediately after --

13   Q.  Sir, I'm only asking if you previously testified that you

14   didn't start seriously looking for a job until July of 2015.

15   A.  Right.

16   Q.  That's correct?

17   A.  Correct.

18   Q.  Now you've also considered changes in careers since you

19   left HSBC, correct?

20   A.  Yes, I have had to consider that.

21   Q.  You've considered that, correct?

22   A.  I have had to consider that.

23   Q.  Mr. Picarella, yesterday we went over -- sorry, when your

24   attorney had you on direct he went through your calendar,

25   correct?

1   A.  He gave me the calendar -- I don't think that we went

2   through it, but he gave me a folder that had my work calendar

3   for a period of time.  I believe it was 2011 to maybe some

4   point in time in '14.

5   Q.  Right.  And that is -- that's from Outlook, right,

6   downloaded from Outlook?

7   A.  No, Lotus Notes.

8   Q.  It's a similar program to Outlook, correct?

9   A.  Yes, I was being specific.

10  Q.  Lotus Notes is an electronic program that was used by HSBC

11  at the time, right?

12  A.  Yeah, that was our communication system, our email and

13  calendar.

14  Q.  And people can invite other people to meetings, set up

15  group meetings on Lotus Notes, right?

16  A.  Sure.

17  Q.  Nowhere in that calendar is there some system for

18  verification that you actually attended meetings that are on

19  that calendar, correct?

20  A.  I don't know the answer to that.

21  Q.  Okay.  But you can't testify here -- if you can't answer --

22  this yes or no, this is a yes or no question.  You can't

23  testify here that you attended all of the meetings that are

24  displayed on your calendar, correct?

25  A.  I have to look through.  And there were so many, chances

GC8TPIC2                     Picarella - cross

1   are I would not be able to recall going back all the way to

2   2011 whether --

3   Q.  Let me repeat my question.  You can't testify here that you

4   attended all of the meetings that are displayed on your

5   calendar, correct?

6           THE COURT:  Counsel, could you please rephrase the

7   question.

8           MR. JACKSON:  Yes.

9   Q.  You don't know whether you actually attended all of the

10  meetings that are displayed on that calendar, right?

11  A.  I don't know.

12  Q.  Okay.  And in fact, there were certain occasions when some

13  of your colleagues complained to you about your failure to

14  attend certain meetings, right?

15  A.  I don't recall, but go ahead.

16  Q.  Do you recall a July 24, 2012 email that you received from

17  a person named Mike Susoev where he said:  Dude, you haven't --

18  you physically haven't attended the meeting in three-plus

19  months.  When you did, you showed up late and sat there

20  clicking away on your Blackberry.  Not exactly the definition

21  of a fully-engaged participant.

22  A.  What is the date?

23  Q.  July 24, 2012.

24          Do you recall that?

25  A.  I recall that email he sent to me.

1   Q.  So the answer is yes?

2   A.  I dialed into that meeting.

3   Q.  Do you recall that?

4   A.  Yes, I do.

5   Q.  Now you talked a little bit during your direct testimony

6   about a leak that was the subject of some articles in the New

7   York Post, right?

8   A.  I was asked questions about it, yes.

9   Q.  Some of your testimony focused on that, right?

10  A.  I believe so, yes.

11  Q.  Now you are aware, aren't you, that --

12          MR. JACKSON:  Actually I would like to offer DX-274.

13          MR. HUBBARD:  Your Honor, there is probably an

14  objection to this.

15          THE COURT:  To the entirety of 274 or sections of 274?

16          MR. HUBBARD:  I have to look for a moment, but I think

17  there is a privilege objection.  I just have to look and see if

18  these are --

19          MR. JACKSON:  Your Honor, I note there was no

20  objection --

21          THE COURT:  Hold on.

22          MR. JACKSON:  -- previously.

23          MR. HUBBARD:  If I may have a moment, your Honor, I

24  have to find the right exhibit.

25          THE COURT:  Okay.

1          MR. HUBBARD:  No objection, your Honor.

2          THE COURT:  Okay, are there other documents you seek

3     to introduce into evidence as well, counsel?

4          MR. JACKSON:  Not right at this moment, your Honor.

5          THE COURT:  Okay, 274 is in.

6          (Defendant's Exhibit 274 received in evidence)

7     Q.  And this is a communication in December of 2014,

8     communicated that your attorney had called you and told you a

9     reporter from the Post called and may be running a story

10    tomorrow on the recent turn of events.  Correct?

11    A.  Correct.

12    Q.  You can take that down.

13          Now Mr. Picarella, there were multiple communications

14    that you had with Mr. Karam in 2014 discussing certain projects

15    that you were supposed to be working on, correct?

16          THE COURT:  Can you rephrase that question, counselor?

17          MR. JACKSON:  Absolutely, your Honor.

18          Actually, your Honor, I would like to offer at this

19    time DX-250.

20          MR. HUBBARD:  May I have a moment, please, your Honor.

21          (Pause)

22          MR. HUBBARD:  No objection, your Honor.

23          THE COURT:  Okay, it's in.

24          (Defendant's Exhibit 250 received in evidence)

25          MR. JACKSON:  Could we go to page 3 of this document.

GC8TPIC2                    Picarella - cross

```
1    Q.  This is an email that you sent to Mr. Karam and

2    Mr. Pizzimbono, right?

3            The subject:  Forward give ups.  Correct?

4    A.  Yes.

5    Q.  And if you look at that next page, you talked about a

6    number of things you were doing, and you wrote:  I hope this

7    gives you a better understanding of some of the potential risk,

8    the market risk that I am highlighting.  Right?

9    A.  Yeah.

10   Q.  Then if we go down to the bottom of page 4 you wrote:  I

11   think yesterday's conversation could have been better served

12   with both of us having copies of the email below and the

13   compliance giving up suitability of emails exchanged between

14   Pablo and myself on 12/1, since you were referencing those

15   emails several times in the meeting and there seems to be

16   interpretation discrepancies.  Both of us being better prepared

17   would probably be a better use of our time.

18           That's what you wrote, right?

19           MR. HUBBARD:  I'm sorry, I don't know where the

20   gentleman is referring to in the document.

21   A.  You moved a little quick for me, too.

22   Q.  You see this portion?  This is something that you wrote?

23           MR. HUBBARD:  Your Honor, I object.  I don't know

24   where he's talking about.  It looks like page 4.

25           THE COURT:  Strike that.  Rephrase that.  Restate the
```

1   question.  Where are you?

2           MR. JACKSON:  Thank you very much.

3           THE COURT:  Is this the section that you're referring

4   to?

5           MR. JACKSON:  Yes, your Honor.

6           THE COURT:  Go ahead.  Please restate.

7   BY MR. JACKSON:

8   Q.  You wrote:  I think yesterday's conversation could have

9   been better served with both of us having copies of the email

10  below.  Right?

11  A.  Yeah, but I don't know what the email below is referring

12  to.

13  Q.  And then at the end of this paragraph you wrote:  Both of

14  us being better prepared would probably be a better use of our

15  time.  Right?

16  A.  I wrote that.

17  Q.  And this was an email that you were sending to your

18  supervisor, correct?

19  A.  Yeah, just like to see what the whole context of the

20  conversation was.

21  Q.  Can we go to the next page, page 5.

22  A.  Still can I read a little bit more of this just so I

23  recall?

24  Q.  There's no question pending.

25          THE COURT:  He's asking you specific questions about

GC8TPIC2                    Picarella - cross

1    specific sections of the document.

2              MR. HUBBARD:  Your Honor, I understand that that's

3    permissible, but it's also permissible, I would hope, that the

4    witness could be shown the document in its entirety.

5              THE COURT:  Not at this point.  Objection overruled.

6              Go ahead, counsel.

7              MR. JACKSON:  Thank you.

8    Q.  So do you see the third paragraph here?

9    A.  Yes.

10   Q.  You wrote -- sorry, the second paragraph:  You and I are

11   both SVPs in the organization.  I found your approach to the

12   meeting yesterday to be both confrontational and at times

13   condescending.

14             That's what you wrote, right?

15   A.  Yes, because he approached --

16   Q.  Sir, I'm asking if that's what you wrote.

17   A.  Yes, I wrote that.

18   Q.  And then you wrote --

19             THE COURT:  Counsel, how many more sections of this

20   document are you going to go through?

21             MR. JACKSON:  Just two more sections, your Honor, two

22   more sentences actually.

23             THE COURT:  And these are in this section that you're

24   referring to?

25             MR. JACKSON:  Yes, and one other section.

1            THE COURT:  So for this section, Mr. Picarella, is it

2       fair to say that all of the statements in that section were

3       written by you?

4            THE WITNESS:  Yes.  If I could read it to refresh my

5       memory.

6            THE COURT:  That's fine, but is it fair to say those

7       statements were written by you?  I'm not asking you about the

8       content of them or the context, but did you write those?

9            THE WITNESS:  Yes, that's probably --

10           THE COURT:  Counsel, you may read those statements.

11      The document is in evidence.  The statements you wish to refer

12      to, you may read them.  He acknowledged he wrote the

13      statements, so you could highlight the statements you wish to

14      talk about.

15           MR. JACKSON:  I would like to go back to the beginning

16      of this, your Honor, to page --

17      A.  Can I finish reading that paragraph?

18      Q.  You can read that.

19      A.  Okay.  Thank you.

20           MR. JACKSON:  Can we go to the first page of this, and

21      go to the second page.

22      Q.  Mr. Karam wrote to you --

23           THE COURT:  Hold on.

24           Can you see that, Mr. Picarella?

25           Can you magnify that a little bit?

```
 1              MR. JACKSON:  Highlight the third paragraph.
 2   Q.  Mr. Karam wrote to you:  The initial guidance from the
 3   client rationalization committee was quite clear, to review and
 4   validate the GUP customer base.  You still have yet to collate
 5   a listing of customer population that is validated for those
 6   accounts that are active and have the support of GM business
 7   line.
 8              Right?
 9   A.  He wrote that.
10   Q.  Could we go to the first page.
11              You forwarded this communication to an individual
12   named -- to a Mr. Rist, right?
13   A.  Correct.
14   Q.  And that was one of your friends at work, correct?
15   A.  He's a colleague at work.
16   Q.  Right.
17   A.  Who has a similar --
18              THE COURT:  Hold on.
19              Mr. Rist is someone who worked with you?
20              THE WITNESS:  Yes, he is.
21              THE COURT:  Go ahead, counsel.
22              MR. JACKSON:  And we can take that down.
23   Q.  Now Mr. Picarella, I'm correct that besides some of the
24   people that we discussed previously, you also, in certain of
25   your communications, accused various other people of being
```

GC8TPIC2                        Picarella - cross

1    involved in an attempt to retaliate against you, right?

2           THE COURT:  Please rephrase the question, counsel.

3           MR. JACKSON:  Yes, your Honor.

4    Q.  You have accused certain members of the legal staff of HSBC

5    of retaliating against you, right?

6           That's a yes or no.

7    A.  I don't recall at the moment.  I have to give it some

8    thought.

9    Q.  You accused an individual named Mark LoSacco of retaliating

10   against you, right?

11   A.  Again, I don't recall.  I would have to give that some

12   thought.

13   Q.  Regardless, after you made your complaint about Ms. Hedges,

14   Ms. Hedges was ultimately terminated, right?

15          THE COURT:  At some point after you made your

16   complaint, at some point in time Ms. Hedges was terminated.

17          THE WITNESS:  Yes, she was terminated.

18   Q.  And after Ms. Hedges was terminated, you continued to work

19   for HSBC for a period -- for additional years, right?

20   A.  It's not years, it was a year and eight months or so.

21   Q.  Okay.  So Ms. Hedges was terminated, you continued to work

22   at HSBC for some time, correct?

23          THE COURT:  Objection sustained.  That's asked and

24   answered.  He answered that.

25          Move on, counsel.

GC8TPIC2

1          MR. JACKSON:  May I have a moment?

2          THE COURT:  Yes.

3          (Pause)

4    Q.  Your total amount of compensation from HSBC was a million

5    dollars, right?

6    A.  I don't know.  You said -- you asked me that question

7    yesterday and said it was over a million.  I quickly did some

8    math in my head and I assumed you were right.  I didn't have

9    the exact number.

10   Q.  But you believe that's right?

11   A.  Over the years that I worked there, cumulative, it's

12   probably in the neighborhood, yes.

13         MR. JACKSON:  No further questions at this time, your

14   Honor.

15         THE COURT:  Okay.  Any redirect?

16         MR. HUBBARD:  Well, your Honor, I would have to have

17   some time to prepare for redirect.  I have ten pages of notes.

18         THE COURT:  Hold on.  Let me ask the members of the

19   jury to take a four-minute recess and come right back.  Don't

20   discuss the case with anyone.  I will see you soon.

21         (Continued on next page)

22

23

24

25

GC8TPIC2

```
 1              (Jury not present)
 2              THE COURT:  I was planning on just working until 1:00.
 3    Can't you start your redirect?
 4              MR. HUBBARD:  I certainly could, your Honor, but I
 5    have such an avalanche of information, to get it organized I
 6    don't think I could really be fair to us and to what we're
 7    doing, but I can start.  But there's just been such an
 8    avalanche of information, yesterday afternoon and this morning,
 9    to get all of this and do it in an orderly fashion, but I will
10    certainly continue if your Honor requests.  I would rather
11    break for lunch now, but it's up to your Honor.
12              THE COURT:  Okay.  Defense counsel have any take on --
13    any views on this?
14              MR. JACKSON:  Very respectfully, your Honor, I think
15    that there has been adequate time to prepare for redirect, but
16    I have enormous respect for Mr. Hubbard and I defer to the
17    Court's wisdom on this.
18              THE COURT:  Okay.  I guess we'll bring the jury in and
19    take a lunch break and tell them to get back here at 2 o'clock
20    and let's try to keep things moving.
21              MR. HUBBARD:  Thank you, Judge.
22              THE COURT:  I will bring the jury back in here and
23    tell them that we'll break for lunch and they shouldn't discuss
24    the case with anyone and have them come back at 2 o'clock.
25              Let's bring the jury back in.
```

GC8TPIC2

```
 1              (Jury present)

 2              THE COURT:  We're going to break for lunch now.  Come

 3     back at 2 o'clock.  Don't discuss the case among yourselves or

 4     with anyone else.  Don't do any research related to any issues

 5     pertaining to this case.  Have a great lunch.  See you at

 6     2 o'clock.

 7              (Jury not present)

 8              THE COURT:  Okay.  We'll break for lunch.

 9              Who do we have after the redirect of Mr. Picarella?

10     Who is next up?

11              MR. HUBBARD:  Next up is Ms. Weiss.

12              THE COURT:  And how short do we think the direct will

13     be of her?

14              MR. HUBBARD:  Well, she's -- I would say 45 minutes.

15              THE COURT:  Okay.  And how short would the cross of

16     Ms. Weiss be?

17              MR. JACKSON:  30 minutes, your Honor.

18              THE COURT:  Okay.  See you at 2 o'clock.

19              (Luncheon recess taken)

20              (Continued on next page)

21

22

23

24

25
```

GC89PIC3

AFTERNOON SESSION

2:00 p.m.

THE COURT:  We're waiting for the jurors to

reassemble.  Once they're there we'll start.

Let me just -- I think, plaintiff's counsel, let me

get an update estimate from you, if there is any change.  I

don't know if there is or isn't.  What's your estimate of the

length of the redirect at this point?  If it's the same as it

was before, that's fine.  I just wanted to get a sense in terms

of scheduling.

MR. HUBBARD:  I hope half an hour.  May take me a

little bit longer, Judge.

THE COURT:  And in terms of scheduling do you want to

give the jurors like an afternoon break after an hour or like

an hour-and-a-half or how do you want to do that?  Do you think

an hour is good?

MR. HUBBARD:  I think an hour is good.  That way

hopefully we would be ready for our next witness.

THE COURT:  Okay.  While counsel are here, while we're

waiting.  At the end of the day yesterday after consultation

with counsel I gave the jury instructions about not only not

communicating amongst themselves but also instructions about

not reading anything about this case.  If they start to read

anything they should stop and not report that to their fellow

jurors and let us know if they started to read something.  Do

GC89PIC3

```
 1    counsel want me to give a similar instruction at the end of the

 2    day today or what's your take on that?

 3              MR. HUBBARD:  I think for the plaintiff, your Honor, I

 4    think we're okay.

 5              THE COURT:  Okay.

 6              MR. HUBBARD:  So far so good.

 7              THE COURT:  Defense counsel.

 8              MR. JACKSON:  I agree.  We're fine, your Honor.  Thank

 9    you.

10              THE COURT:  So, again, just want to be clear.  I

11    understand we're okay, we're fine.  You don't want me to give

12    that instruction; is that correct?  You don't think it's

13    necessary for me to give that full instruction?

14              MR. JACKSON:  No, your Honor.  It might be a good idea

15    before the weekend again but I think it's fine for now.

16              THE COURT:  And plaintiff's counsel.

17              MR. HUBBARD:  Yes.

18              THE COURT:  Okay.  Sounds good.

19              Bring the jury in.

20              Ask Mr. Picarella to retake the witness stand.

21              MICHAEL PICARELLA, resumed.

22              (Continued on next page)

23

24

25
```

1          (Jury present)

2          THE COURT:  Welcome back.  I hope you had a wonderful

3     lunch.  Let's continue with the case on trial with counsel's

4     redirect of Mr. Picarella.

5          MR. HUBBARD:  Thank you, Judge.

6          Peter, may we have 308 on the screen, please.

7          Plaintiff's 308.

8          Maybe you can highlight the top up there so we can see

9     it a little better.

10    REDIRECT EXAMINATION

11    BY MR. HUBBARD:

12    Q.  What is this document, Mr. Picarella?

13    A.  That is the coversheet I believe to my EEOC charge.

14    Q.  Without looking at the bottom can you tell us the date -- I

15    guess we could go to the bottom.  Do you remember the date it

16    was filed?

17    A.  It appears to be June 25, 2013.

18    Q.  And you signed it?

19    A.  Yes, I did.

20    Q.  And what did -- and who was this filed with?

21          MR. HUBBARD:  Back to the top, Peter.

22    A.  The Equal Employment Opportunity Commission, I think, if I

23    got that right.

24    Q.  Right.

25          And when you filed this were you employed by HSBC?

GC89PIC3                         Picarella - redirect

1   A.  Yes.

2   Q.  And what, in sum and substance, what did you assert in this

3   EEOC charge that you filed?

4   A.  That I was retaliated against by HSBC for raising

5   complaints of sexual harassment for a coworker.

6   Q.  At the time you filed this in June of 2013 had the

7   complaints that you made to HSBC about sexual harassment all

8   been made by that time?

9   A.  Yes.

10  Q.  Did you make complaints to human resources at HSBC after

11  this complaint was filed with the EEOC?

12  A.  Yes.

13  Q.  And what was the nature of those complaints?

14  A.  Continued retaliation.

15  Q.  There was some reference throughout your cross and again

16  this morning to your compensation at HSBC?

17  A.  Yes.

18  Q.  I want to make sure there is no confusion about it.  In the

19  year 2011 when you were hired what was your base salary?

20  A.  225,000.

21  Q.  Were you paid a bonus at the end of 2011?

22  A.  Yes.

23  Q.  How much was it?

24  A.  60,000.

25  Q.  So what was your total compensation for that stub year

1    2011?

2    A.  285,000.

3    Q.  Let's go to the year 2012.  Did your compensation change in

4    any way?

5    A.  Yes.

6    Q.  Can you tell us briefly if there was any difference in the

7    base pay?

8    A.  No change.

9    Q.  Any difference in the bonus?

10   A.  Yes.

11   Q.  How much?

12   A.  About five thousand dollars.

13   Q.  For the year 2013 what was your total compensation base and

14   bonus at HSBC?

15   A.  280,000.

16   Q.  2014?

17   A.  280,000.

18   Q.  Let's go back to 2014.  Did you get a bonus in 2014?

19   A.  I'm sorry.  No, I did not.

20   Q.  So what was your total compensation in 2014?

21   A.  225,000.

22   Q.  And what did that reflect?

23   A.  I'm sorry?

24   Q.  What did the 225,000 --

25   A.  My base salary.

GC89PIC3                          Picarella - redirect

1    Q.   And in 2015 I gather you were paid the monthly portion of

2    your base salary for the months you were there?

3    A.   Yes.

4    Q.   Do you know what the compensation was for the position

5    of -- for Ms. Hedges when she occupied the position of head of

6    business development and you reported to her?

7    A.   Yes.  I was aware.

8    Q.   Do you know how much she was paid for the year 2010?

9    A.   480,000.

10   Q.   Year 2011?

11   A.   I believe it was 400,000.

12   Q.   Throughout the last couple of days while you were on

13   cross-examination we saw some Sametime Chats?

14   A.   Yes.

15   Q.   I guess we're all now familiar with Sametime Chats, right,

16   these instant messages we see?

17   A.   Yes.

18   Q.   Which I guess are recorded telephone conversations?

19   A.   That's one way of looking at it, yes.

20   Q.   When you're having these Sametime Chats at HSBC are you on

21   the telephone?  Are you on a headset?  So what's the mechanics

22   for those Sametime Chats?

23   A.   It can be at your desktop or on your BlackBerry.  But it's

24   not through a headset of any sort.  It's typing into a Lotus

25   Notes application.

GC89PIC3                          Picarella - redirect

1  Q.  I see.  I was thinking it might be a recording of a

2  conversation?

3  A.  No.

4  Q.  So you're using your desktop?

5  A.  Yes.

6  Q.  Or your BlackBerry?

7  A.  Yes.

8  Q.  Let's go back to the period 2011.  Maybe we'll take the

9  first twelve months you were there, May of 2011 up until the

10 spring of 2012, right?

11 A.  Yes.

12 Q.  How many of these Sametime Chats would you participate in

13 on a daily basis?

14 A.  I would say dozens.

15 Q.  How about with Ms. Hedges in that first twelve-month period

16 of time?

17 A.  I would say approximately a couple dozen.  Sometimes more.

18 Q.  Over a year, a period of a year, okay, can you give us your

19 best estimate of how many of these Sametime Chats you would

20 have participated in on your desk in the course of your

21 business activity?

22 A.  In the first year?

23 Q.  First year.

24 A.  I would say at least two thousand.

25 Q.  We saw some e-mails from you from time to time where you

GC89PIC3                        Picarella - redirect

1   raised complaints with human resources about various incidents,

2   people looking over your shoulder, people looking at your

3   screen, people saying things to you.

4           Did you submit those as formal complaints of

5   retaliation?

6   A.  I submitted them as complaints to Ms. Bilbrey as

7   retaliation, continued animus and retaliation in the

8   organization towards me.

9   Q.  Did you submit any of them as claims of harassment?

10  A.  Sure.  Some of them.

11  Q.  We saw some -- we heard some testimony from you and some

12  exhibits in early 2012 where you referred to maybe I should get

13  another job.  I think you contacted the headhunter who had

14  helped you get your job at HSBC and said something to the

15  effect:  Have you got anything for me?

16  A.  Yes.

17  Q.  Were you looking for a new job at that time?

18  A.  No.  But I was beginning to have some doubts as to whether

19  HSBC was the right place for me.

20  Q.  Why?

21  A.  Just based on the -- what I saw as some very toxic

22  relationships between Ms. Hedges and Parker; the bonus was not

23  what it was promised.  It was just a very -- a very toxic

24  environment at that point in time.

25  Q.  And we heard some testimony that Ms. Hedges has said to you

1    maybe you should look for something different?

2    A.   (No response).

3    Q.   Did we hear -- did you say she said that to you?

4    A.   Yeah.  In terms -- in the way she said it was because of

5    the bonus.  She knew I was not going to be happy with the bonus

6    I got.  So she was saying:  This is it, it's HSBC's way of

7    saying take it or leave it.  If you have to do what's right for

8    your family, go ahead.

9    Q.   In that period of time could you tell us if Mr. Pizzimbono

10   and Ms. White were supportive of you?

11   A.   Yes.

12   Q.   Did either of them say to you that you should start looking

13   for another job?

14   A.   No.

15   Q.   Did there come a time when you met with Mr. Pizzimbono in

16   that timeframe, the spring about your concerns about the

17   retaliation that was taking place?

18   A.   Yes.

19   Q.   Did he compliment you at that time in any way?

20   A.   He did.

21   Q.   You referred I think in the memorandum from him and in your

22   testimony to his use of the word courageous integrity, what

23   have you.  What was he -- what did you believe he was referring

24   to?

25   A.   He used the words in his own e-mail courageous integrity.

1   I remember him saying that it took a great deal of courage for

2   standing up for Ms. Parker.

3   Q.  We've seen reference to the performs appraisals that you

4   received from HSBC?

5   A.  Yes.

6   Q.  We saw some individual submissions from various -- we saw

7   that list of coworkers?

8   A.  Yes.

9   Q.  And some of those people submitted these 360 reports?

10  A.  I believe four of them did.

11  Q.  We reviewed some when you were testifying and we reviewed

12  some --

13  A.  Oh, yes, yes, two different.

14  Q.  Right.

15          I think you saw some from 2012 and from 2013?

16  A.  Yes.  Those are the two different timeframes.

17  Q.  And some of those had compliments and some had constructive

18  criticism in it?

19  A.  Correct.

20  Q.  Did any of them change the strong standard -- the review

21  standard strong that you had received in those years, that you

22  received in those years?

23  A.  No.

24  Q.  There is a --

25          MR. HUBBARD:  Let me see if we can have 305, please,

1   Peter.

2   Q.  We should start at the top.

3        MR. HUBBARD:  May I offer this, your Honor?

4   Plaintiff's Exhibit 305.

5        THE COURT:  Any objection to 305?

6        MR. JACKSON:  No objection, your Honor.

7        THE COURT:  Okay.  It's in.

8        (Plaintiff's Exhibit 305 received in evidence)

9   Q.  What does this document purport to be?

10  A.  That is the performance review rating scale that had

11  changed sometime in 2014.  I had only received my review in

12  that scale as my very last one at the end of 2014 which was --

13  Q.  What does it refer to, on/off track.  What do you

14  understand that to mean?

15  A.  They switched from the, the way I understand it, is they

16  switched from the one through five rating scale to either

17  on-track or off-track.

18  Q.  Let's look under the explanation there.  Just go back to

19  the top.

20        Read us what on-track means.

21  A.  Would you like me to read it?

22  Q.  Yes.

23  A.  On-track means on track against objectives, general

24  performance and expected behavior.

25  Q.  Now let's go down a bit and see if we can find the

1   off-track sentences at the bottom.

2          What does that say?

3   A.  Off-track employees should have a performance improvement

4   plan with clearly documented actions.

5   Q.  And underneath it says on/off-track and the performance and

6   development conversation will be recorded in my performance.

7          Right?

8   A.  Yes.

9   Q.  When you met with Mr. Karam in November of 2014 and you had

10  that meeting with -- that we've heard about in the conference

11  room, he gave you an off-track review?

12  A.  Yes, he did.

13  Q.  And for what period of time was that?

14  A.  (No response).

15  Q.  Was that mid year?

16  A.  That was mid year.  It was a few months after -- yeah.

17  Mid year's was supposed to be done in the June, July timeframe.

18  Q.  From the day you met with him until the day you were

19  terminated, were you given any performance improvement plan by

20  anybody at HSBC?

21  A.  Never.

22  Q.  In the review you received, did Mr. Karam tell you that he

23  was going to help you and work with you toward improvement of

24  your performance?

25  A.  No.

1            MR. HUBBARD:  Let me have that exhibit, please, Peter.

2            235, please, Peter.

3            Not a very good exhibit.

4            Can we find in that, at the end where the rating is,

5     Peter.

6     Q.  Mike, can you find it in your book?

7     A.  Believe it or not the print is even finer in the book.

8     It's very tough to read.

9            MR. HUBBARD:  I'll just read it.

10           THE WITNESS:  That's it.

11    Q.  I think I can read it.  The jury probably can't but I think

12    I can read it.

13           Do you see where it says off track, Mike?

14    A.  Yes.

15    Q.  It says Mike has demonstrated inconsistent results and was

16    off track as of mid year 2014.  The client rationalization

17    objective has been satisfactory.  He failed to maintain an

18    adequate pace and deliver without disruption.  And goes on to

19    talk about your performance.

20           MR. HUBBARD:  Go to the last paragraph for me, Peter.

21    Q.  He says there remains a commitment to work with Mike to

22    function within those expectations of an SVP, but this is

23    becoming increasingly challenging given his lack of initiative.

24           Do you see that?

25    A.  I see that.

GC89PIC3                          Picarella - redirect

1   Q.  What commitment did he make to you --

2              MR. HUBBARD:  You can take it down.

3   Q.  What commitment did he make to you from that point forward

4   with respect to your performance?

5   A.  There was no commitment in that meeting or forward.

6   Q.  Did he ever mention a performance improvement plan to you?

7   A.  No.

8   Q.  When did Ms. Jenner actually takeover Ms. Hedges's job?

9   A.  September 5, 2012.

10  Q.  And when was Ms. Hedges relieved of her managerial

11  responsibilities?

12  A.  In -- I believe it was in July of 2012.

13  Q.  In that period of time between the time Ms. Hedges was

14  relieved of those responsibilities and Ms. Jenner came onboard

15  what was the team in sales business management?

16  A.  In that timeframe Ms. Parker had been terminated.

17  Ms. Hedges had moved out of the role.  John Henry McNerney

18  moved into a different role in the organization.  Brian

19  Goldwasser --

20  Q.  Let's do it a different way.

21  A.  It was just me.

22  Q.  Who was left onboard?

23  A.  Me.

24  Q.  Did there come a period of time here where you mentioned

25  that the workload was difficult?

1    A.   Yes.

2    Q.   You saw some reference here to comments about whether or

3    not -- about the difficulty of performing those things in that

4    period of time.

5    A.   Yes.

6    Q.   Did you communicate those difficulties when Ms. Jenner came

7    onboard and even up to Ms. White and explained to them that

8    your team had been diminished?

9    A.   Yes.

10             MR. HUBBARD:   Let me see Defendant's 173, please,

11   Peter.

12             Just to go back for a moment while he's highlighting

13   that.

14   Q.   Were you in any position in September of 2012 when

15   Ms. Jenner was appointed and before she took over, were you in

16   a position to take on additional work at that period of time?

17   A.   No.

18   Q.   When these other folks had left?

19   A.   Correct.   And Ms. Jenner had not, even though she was given

20   the lead on several of my responsibilities she hadn't

21   transitioned over into the role.

22             MR. HUBBARD:   Let's go down, please, to the paragraph,

23   "That being said."

24   Q.   This is Mr. Blizzard's memo, right?

25   A.   Correct.

GC89PIC3                       Picarella - redirect

Q.  He says:  I think we need a better understanding of the

proposed enhancements so we can identify how best.  Your recap

seems to suggest that the proper assessments are not in place.

To confirm, there is a proper suitability process in place and

we identified several areas for improvement.

         Did you have further discussions with Mr. Blizzard

about this issue?

A.  Yes.

Q.  How did you resolve it?

A.  We came to an agreement that with the Dodd-Frank

regulations coming into place and the suitability, old

suitability roles that, in addition to the changes that needed

to be made to the E-suitability system we had to factor in some

complexities around Dodd-Frank.  I don't know if that's clear

to people.

Q.  You were asked about training meetings?

A.  Yes.

Q.  And you were asked if you missed some training meetings.

Was there such a thing as a training meeting?

A.  The meetings that we're referring to were the online

training courses that all employees were required to take.

Q.  Did you ever fail to fill out any of those online training

courses?

A.  No.

Q.  We saw something about something generated by Ms. Jenner

GC89PIC3                        Picarella - redirect

1   saying to you:  Mike, hey Mike, you missed this deadline or

2   something like that.  What happened?

3   A.   That is a standard alert, system-generated alert that

4   would -- sometimes there are alerts a few days before the

5   deadline, on the deadline, and after the deadline.  And they

6   would be automatically sent to the employee and copied with

7   their manager on as well.

8           MR. HUBBARD:  May we have Plaintiff's 190, please.

9           Let's go to the top, please, Peter.

10  Q.   Is this your year end 2012 review dated May 13, 2013?

11  A.   It's in May -- it's year end given to me in May.  Yes.

12          Yes is the answer.  I'm sorry.

13  Q.   And so this is prepared in May of '13 but it's for the year

14  2012?

15  A.   Correct.

16          MR. HUBBARD:  Let's go to the summary section if you

17  can find it, Mr. Fitzgerald.

18  Q.   What is the rating?

19  A.   Strong.

20  Q.   May I review it with you.

21          In receiving the feedback from various stakeholders in

22  the bank selected by Mike and myself, Mike is an easy person to

23  work with, is found to be professional and realistic, and a

24  good partner to CMB and COBAM.

25          Now do you know who completed this review?

1   A.  Ms. Jenner or her name on there was Semetulskis.

2   Q.  Some suggested it might have been Ms. White.  You think it

3   was Ms. Jenner?

4   A.  I believe it was Ms. Jenner.

5   Q.  Did you meet with Ms. Jenner when this was delivered to

6   you?

7   A.  I don't believe so.  I think she put it into the system.

8   Q.  It says:  Mike is an easy person to work with, is found to

9   be professional and realistic and a good partner to CMB and

10  COBAM.  It was also suggested by stakeholders that Mike could

11  be more proactive and involved, for example, by increasing the

12  timeliness of communication.

13          It goes on to say that Mike's managers last year.  He

14  excels at raising issues to management's attention.  Says,

15  however, Mike should help towards resolving the issues he

16  raises.

17          Did she give you any further reviews after this one?

18  A.  No.

19  Q.  The next ones were done by who?

20  A.  Mr. Karam.

21  Q.  And then you received a year end '13 from Mr. Karam?

22  A.  Yes, I did.

23  Q.  You received a midyear '14 from Karam?

24  A.  Yes.

25  Q.  And was the mid year '14 you received from Karam, the one

1  you received in November?

2  A.  The mid year was in November, yes, end of November.

3  Q.  You were asked some questions about when you started

4  searching for a job.  And I want to go back and ask you a

5  couple questions about that.

6        Did you start searching for a job after you were

7  terminated in March of 2015?

8  A.  Yes.

9  Q.  How long did that last at that time?

10  A.  I'm sorry.  Could you --

11  Q.  How long did you do that in that spring timeframe after you

12  were terminated?  How long did you look for a job?

13  A.  I'm still looking.

14  Q.  Did there come -- and when you did that were you looking in

15  the financial services industry or in any other place?

16  A.  No.  The financial services industry.

17  Q.  How long did you look in the financial services industry?

18  A.  Primarily the financial services industry through --

19  through the end of the year.

20  Q.  Of what?

21  A.  Of '15.  I'm sorry.  2015.  Last year.

22  Q.  '15?

23  A.  Yes.

24  Q.  You started -- when in '15?

25  A.  In March -- April.  I was fired at the end of March.  So

GC89PIC3                         Picarella - redirect

1    right after I began looking.  And through the end of the year,

2    I continued to but not as my primary focus any longer.

3    Q.  And what job type or field did you begin to focus on at

4    that time?

5    A.  Similar roles that I've had over my career.

6    Q.  Did there come a time when you stopped focusing the main

7    part of your efforts on the financial services industry and

8    looked for other jobs?

9    A.  Yeah.  I would say I started expanding outside the

10   financial industry in the beginning of this year.

11   Q.  Did you do that for any particular reason?

12   A.  Some suggestions from headhunters and others and not having

13   any luck in the financial industry.

14          MR. HUBBARD:  May I see 196, please.

15          I'm sorry.  I need Defendant's 196.

16          Let's go to the second page.  Go down to the bottom.

17   Q.  You say:  Hi Suzy.  Apologies if I wasn't clear in my

18   e-mails that we are working with compliance on the suitability

19   requirements.  This is something I have been working closely

20   with compliance on and have given Carol updates on this and

21   have asked her to communicate to you.  It is not complete at

22   this time but have made significant progress.

23          What were the circumstances surrounding that

24   communication?

25   A.  I was off.  It was actually a vacation day that this

GC89PIC3                         Picarella - redirect

1    communication was going back and forth.  But I had, prior to

2    Ms. Jenner taking the role, I was already putting requirements

3    together with the technology team, Mr. Lashmet that was

4    mentioned before, and others.  And the problem was that our

5    internal compliance document for FINRA suitability was not

6    correct.  And the tool was built off of the first policy

7    document.  And there were a lot of inaccurate stuff in the

8    application.  So before we could go back to building a tool

9    that accurately reflects the regulation from FINRA we needed

10   compliance to sort out what the exact policy should be

11   internally.

12   Q.  Were you working on it is my question.

13   A.  I was working with compliance the whole time on that.

14   Q.  Did you do anything to stiff arm Ms. White?

15   A.  Absolutely not.  In fact I gave Ms. Jenner the requirement

16   document before I was out that day and any updates and that's

17   why I thought in there somewhere, in that chain I -- Ms. Jenner

18   had said -- she jumped in and said I had given Suzy the

19   updates, Mike.  So.

20   Q.  How many jobs did you apply for in the year after you were

21   terminated?

22   A.  (No response).

23   Q.  In the twelve-month period after you were terminated?

24   A.  (No response).

25   Q.  You don't have to get --

1  A.  I have the answer.  About 250.

2  Q.  And did you -- it sounds like a lot.  Did you -- is there a

3  way -- is that done online?  Is it done in person?  Is it done

4  by personal letters?  How was that done?

5  A.  Online, through headhunters, through colleagues in the

6  industry.

7  Q.  And in that period of time was that effort concentrated

8  primarily upon the financial services industry?

9  A.  No.  It was both.  It was in the financial services

10  industry and out.

11  Q.  There was some material about you getting a note from

12  Mr. Susoev about failing to attend a meeting.  Was that

13  actually a meeting?

14  A.  There was a conference call that we held every couple

15  weeks.

16  Q.  What --

17  A.  It was held at 7 a.m. in the morning.  I dialed in a couple

18  of times.

19  Q.  What was he saying to you in that communication?

20  A.  He said that I wasn't there physically and when I was there

21  in the past he was suggesting I was disinterested, I believe.

22  Q.  Did you attend the meeting?

23  A.  Yes.

24  Q.  By conference call?

25  A.  Yes, I did.

1    Q.  Was there -- to what extent was that custom and practice at

2    HSBC at this time?

3    A.  (No response).

4    Q.  Attending business meetings depending on the schedule by

5    conference call?

6    A.  It was normal business practice.

7    Q.  In fact, the conference call on January 12 of 2015 where

8    the information was given that was allegedly leaked was by

9    conference call?

10   A.  Correct.

11           MR. HUBBARD:  May I see Exhibit 250, please.

12           I'm sorry, Defendant's 250.

13           Go to the second page, please.  And maybe to the third

14   page.  I'm trying to find number three.  Keep going.

15           Go down to three.

16   Q.  You and I are both SVPs in the organization.  I found your

17   approach to the meeting yesterday to be confrontational and at

18   times condescending.  I would very much like a professional and

19   respectful working relationship with you going forward as I am

20   sure you would expect to be treated.

21           What happened here?

22   A.  I was working on -- I believe I was working on some

23   customer related issues for Mr. Pizzimbono and I discovered

24   some areas that were violating internal policies and I

25   highlighted it.  And Mr. Karam, unannounced meeting -- we

GC89PIC3                      Picarella - redirect

1    hardly ever met but unannounced came to my desk very

2    aggressively and wanted to speak with me.  And we went into a

3    conference room and he sort of berated me on the work I was

4    doing and was claiming I had said some things regarding a

5    customer base.  It was aggressive and accusing.  And so here I

6    was just trying to tell him that, you know, we should just

7    treat each other with respect and I think I had some other

8    comments in a paragraph that --

9    Q.  You said this to Mr. Karam?

10   A.  Yes.

11   Q.  That's your words?

12   A.  Yes.

13           MR. HUBBARD:  Your Honor, at one point I had offered

14   Plaintiff's 300 which were a compilation of all of the job

15   search correspondence.

16           THE COURT:  Okay.

17           MR. HUBBARD:  Can we deal with that?  Do I need to

18   deal with that now or can we deal with that at a later time?

19           MR. JACKSON:  We can address that at a later time,

20   your Honor.

21   BY MR. HUBBARD:

22   Q.  You were asked some questions in your cross-examination

23   about when you were supposed to be in your seat at your desk?

24   A.  Yes.

25   Q.  Was there any supposed to be at your desk at HSBC?

GC89PIC3                          Picarella - redirect

```
 1    A.   No.
 2    Q.   You were a senior vice-president.  Were there any rules,
 3    hours, minutes, days, times that you were supposed to be in
 4    your chair on that trading floor?
 5    A.   No.
 6    Q.   Did your obligations take you beyond the trading floor?
 7    A.   Absolutely.
 8    Q.   Was there any time when you were working there that you
 9    were not in communication with your office electronically via
10    the methods that HSBC provided you?
11    A.   I was always reachable.
12    Q.   Did you have a BlackBerry?
13    A.   Yes.
14    Q.   Who provided it to you?
15    A.   HSBC.
16    Q.   Did it have an HSBC number?
17    A.   Yes.
18    Q.   Did HSBC have the number?
19    A.   It was in the corporate directory.
20    Q.   Did you get calls on that BlackBerry from your business
21    colleagues?
22    A.   Yes.
23    Q.   Did you receive business e-mail, HSBC e-mail on that
24    BlackBerry?
25    A.   Yes.
```

GC89PIC3                        Picarella - redirect

1    Q.  Was there any time, maybe you were at the beach or

2    something, but on a regular basis would you generally be in

3    touch with and communicating with your office and your

4    colleagues through that BlackBerry?

5    A.  Yes.

6    Q.  If you were not seated at your desk?

7    A.  Yes.

8         MR. HUBBARD:  May I have just a moment, your Honor,

9    please.

10   Q.  I need to ask you again about the ring fence e-mail.  Do

11   you recall yesterday that counsel showed you it's an e-mail

12   correspondence where you said that you were having, my best

13   recollection is you were having trouble ring fencing -- ring

14   fencing Mr. Brady?

15   A.  Yes.

16   Q.  What was going on there?

17   A.  Can I have two minutes to give a little background.

18   Q.  Let me see if I can do it better.

19        Were you engaged in some project with Mr. Brady at

20   that time?

21   A.  I was mandated by Mr. Pizzimbono and Ms. Hedges to create a

22   governance committee around a hedge fund client sector.

23   Q.  And did that have an impact on Mr. Brady?

24   A.  Absolutely.  He was the senior relationship manager on the

25   banking side for hedge funds.

GC89PIC3                        Picarella - redirect

1    Q.  And did he complain about it?

2    A.  He did not want that governance committee to exist.  He

3    made it clear from day one.

4    Q.  What did you try to accomplish?

5    A.  I tried to accomplish complete transparency of all of our

6    market perspective hedge fund clients that were in the

7    pipeline.  So the frustration when I got there was that sales

8    staff would have -- bring hedge funds to Mr. Brady and it would

9    go into a black hole.  They had no information.  And so this

10   committee was to bring all the right groups in the organization

11   together.  And I created a pipeline of clients --

12   Q.  Hold on.  How did it turn out with Mr. Brady?

13   A.  He was absent from a great deal of the meetings.  He was

14   elusive.  Did not attend.  And he was a key component.  We

15   needed he and his team there.

16         And so he was more senior to me.  He was a managing

17   director and I tried my best.  I set up weekly coffees with

18   him.  It was even on my calendar I noticed when we glanced

19   through it yesterday.  And it was still a challenge for me and

20   he was -- I was a senior vice-president.  He was a partner of

21   the firm.  It -- I needed help.  That reference was I could not

22   bring him into that meeting.  I used the term ring fence by

23   myself and I was escalating that to my boss and asking if Pablo

24   was aware.

25   Q.  Did you ask Mr. Pizzimbono to help you with Mr. Brady's

1    participation in that committee?

2    A.   Several times.  He was aware.

3    Q.   Now this was shown to you as an instance of some type of

4    business disagreement?

5    A.   Yes.

6    Q.   In the marketplace?

7    A.   Yes.

8    Q.   In the four years that you worked at HSBC at your level

9    were there times when there were disagreements between

10   colleagues?

11   A.   Yes.  Pretty regularly.

12   Q.   This was an investment bank?

13   A.   Yes.

14   Q.   And was it unusual for there to be professional

15   disagreements among colleagues about business matters?

16   A.   In my 26 years at the time of working on Wall Street on

17   trading floors, sales and trading staff, men and women are type

18   A personalities for the most part.  Disagreements are regular

19   standing of every given business that you'll see.  And at times

20   you'll see very aggressive and loud ones between sales and

21   trading.  It's common.  It's common.

22   Q.   While you were in your role at HSBC can you tell us if you

23   were able to resolve on an amicable basis the great majority of

24   disputes that arose in your job?

25   A.   Absolutely.

GC89PIC3                          Picarella - redirect

1              MR. HUBBARD:  Nothing further.

2              THE COURT:  Okay.

3              MR. JACKSON:  Your Honor may I?  Very briefly.

4              THE COURT:  Well let's do this.  Let's take a quick

5    recess.  Let's take, just while we talk about the schedule.

6    Let's take another four-minute break.  Don't discuss the case

7    amongst yourselves or with anyone else.  See you soon.

8              (Jury excused)

9              (Continued on next page)

1          (In open court)

2          THE COURT:  Give me a sense of where you plan on

3    going, counsel.

4          MR. JACKSON:  There was just some additional

5    discussion of Mr. Picarella's EEOC complaint.  The only

6    question I want to ask him is whether he submitted an errata

7    sheet after his deposition that denied a number of the

8    statements that he made in his EEOC complaint.  And I'd like to

9    offer that.

10         MR. HUBBARD:  I don't think that's true, your Honor.

11   His errata sheet, which I have on the desk, which I thought

12   counsel was going to use in his cross-examination, I think, was

13   an errata sheet related to his deposition, not his EEOC charge.

14         THE COURT:  Are we talking about a different errata

15   sheet?

16         MR. JACKSON:  I'm talking about a different thing,

17   your Honor.  Yesterday we were talking about --

18         THE COURT:  Just tell me what you're talking about

19   now.

20         MR. JACKSON:  Yes, your Honor.  Right now I'm talking

21   about the fact that there is an errata sheet Mr. Picarella

22   signed -- I don't think we need to have him -- there's an

23   errata sheet that he signed on June 11, 2015 where he signed --

24   he stated two different statements that he made in his EEOC

25   complaint were not actually -- these were things that were not

 1   actually said.

 2                THE COURT:  Which statements?  Are these the

 3   statements that were gone over on redirect?  Because if not,

 4   it's not the proper area for recross.

 5                MR. HUBBARD:  That exhibit was also used --

 6                THE COURT:  Hold on.  Hold on, counsel.  You're

 7   winning this right now.  You may want to just stop.

 8                MR. JACKSON:  Just want to take a quick look, your

 9   Honor.  If we could scroll back to the part -- the EEOC, very

10   short, your Honor.

11                There are two things, your Honor.  In the redirect

12   first he brings up the EEOC complaint and asks if -- and asks

13   him to summarize what was said in the EEOC complaint.  Then a

14   bit later Mr. Picarella offers some testimony that related to

15   what the communications were with Ms. Hedges.

16                The two things that are changed in the errata sheet

17   here, that he writes in the errata sheet, are:  No, Hedges did

18   not tell me it might be a good idea if I looked for another job

19   at my year-end review.  And:  No, Hedges did not tell me to do

20   what was best for my family at my year-end review.  So those

21   two things we think are components of his communications with

22   Ms. Hedges.

23                THE COURT:  Hold on.  Slow down.  The first one again.

24                MR. JACKSON:  He says:  No, Hedges did not tell me

25   that it might be a good idea if I looked for another job at my

1    year-end review.

2              THE COURT:  Hold on.

3              Go ahead.  Next one.

4              MR. JACKSON:  The next one is:  No, Hedges did not

5    tell me to do what was best for my family at my year-end

6    review.  So these are two statements that he explicitly made in

7    the EEOC complaint that he just testified that he summarizing

8    and saying that this was --

9              THE COURT:  When you say he was summarizing.  Did he

10   testify to those statements or the opposite of those statements

11   on redirect regarding Ms. Hedges?

12             MR. JACKSON:  No.  But he talked about his

13   communications with Ms. Hedges after summarizing the EEOC

14   complaint and putting that in the context of this.  And putting

15   that in the context of his narrative of what happened during

16   that time period.

17             The only point that I want to make, your Honor, is

18   that he has submitted a document that is in conflict with his

19   EEOC complaint which was just raised and cited in the redirect.

20             THE COURT:  I believe that was also raised on direct

21   and raised in cross-examination.  This is not something that

22   was newly raised in redirect.  Recross is pretty rare.  And

23   it's supposed to be limited in scope to issues that were newly

24   brought out in redirect.  It doesn't seem to me that this is in

25   the scope of recross-examination.  The simple fact that he

1    summarized his EEOC complaint and my recollection of the

2    testimony was something to the effect of I complained that I

3    was being retaliated against by HSBC for making allegations of

4    sexual harassment on a coworker.  So I don't believe this is

5    within the proper scope of recross-examination.  You certainly

6    could have felt free to do that on cross.  But this is not

7    proper recross.  So I'm not going to allow you to do that.

8              Is there anything else you wanted to do?

9              MR. JACKSON:  I'll think about it for one minute, your

10   Honor.

11             THE COURT:  Well you got to think quick.  We're

12   bringing the jury back out.

13             MR. JACKSON:  Okay, Judge.  That's fine.

14             THE COURT:  So, I guess we'll have Mr. Picarella take

15   the stand and then we'll excuse him in front of the jury.

16             Who is the next witness?  And is the witness here?

17             MR. HUBBARD:  The next witness is Ms. Weiss.

18             THE COURT:  Is she here?

19             MR. HUBBARD:  I think she is.

20             MR. JACKSON:  Yes, she is.

21             THE COURT:  So let's bring the jury in and we'll

22   excuse Mr. Picarella and we'll start with Ms. Weiss for a brief

23   period of time and then we'll take our break.

24             Bring the jury in.

25             (Continued on next page)

1           (Jury present)

2           THE COURT:  Please be seated.  Welcome back.  All

3     right.  The witness is excused.

4           (Witness excused)

5           THE COURT:  I'll ask plaintiff's counsel are you ready

6     to call your next witness.

7           MR. HUBBARD:  Yes, your Honor.  The next witness is

8     Ellen Weiss.

9           THE COURT:  Okay.  Counsel do you want these documents

10    to remain up here or do you need to retrieve these?

11          MR. HUBBARD:  Yes.  Peter can you help me -- never

12    mind.  No, Mike, you sit down.

13          Peter would you put those documents, books together,

14    please, stack them up.  Thank you.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

GC8TPIC4                        Weiss - direct

1    ELLEN WEISS,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. HUBBARD:

6    Q.  Good afternoon, Ms. Weiss.

7    A.  Hello.

8    Q.  How are you?

9    A.  Good, how are you?

10   Q.  Good.

11          THE COURT:  Are the jurors able to hear the witness?

12          Okay, continue.

13   Q.  Let me ask you:  Where you are employed today?

14   A.  HSBC.

15   Q.  Here in Manhattan?

16   A.  Yes.

17   Q.  What is your job role or job title?

18   A.  I'm the head of HR for the retail bank wealth management

19   business.

20   Q.  When did you go to work for HSBC?

21   A.  I worked for HSBC in 2000.  Previous to that I worked for

22   Republic National Bank that was bought out by HSBC.

23   Q.  So since 2000 you have been in the human resources function

24   at HSBC?

25   A.  Yes, although just to clarify, my service date goes back to

GC8TPIC4                         Weiss - direct

1   my Republic days of 1993.

2   Q.  But you are still in the human resources function today?

3   A.  I am.

4   Q.  Did there come a time when you had that human resources

5   responsibility for global banking and markets?

6   A.  Yes.

7   Q.  What period of time was that?

8   A.  Roughly 2000 when we were bought out by HSBC.

9   Q.  In the year 2011, 2012, did you have a reporting

10  relationship in the human resources function?

11  A.  Yes.

12  Q.  To who was that?

13  A.  Rachel Montgomerie.

14  Q.  Ms. Montgomerie's title was?

15  A.  The head of HR global banking and markets and private

16  banking.

17  Q.  Was she officed here in New York?

18  A.  She was.

19  Q.  Did there come a time in -- let me go back a minute.

20          Did you know Mr. Picarella, Mike Picarella, when he

21  first joined HSBC?

22  A.  I don't believe when he first joined, no.

23  Q.  Fair to say there came a time in the 2011 time frame when

24  you met with Mr. Picarella?

25  A.  Correct.

1  Q.  What were the circumstances under which you first had

2  professional engagement with Mr. Picarella?

3  A.  Yeah, in April of 2011 Mike had come to see me, and that

4  was my first interaction.

5  Q.  There's a couple of notes here that tell us that there was

6  an April 11 meeting.

7  A.  Correct.

8  Q.  Sort of sound correct?

9  A.  Yes.

10  Q.  Did you have the chance before coming here today to look at

11  some of the documents, some of the emails and memos that relate

12  to your work with Mr. Picarella?

13  A.  I did.

14        MR. HUBBARD:  Exhibit 68, please.

15  Q.  Let me ask you to take a moment -- there's a book beside

16  you there that might have a hard copy.  Can you see that screen

17  without hurting your eyes?

18  A.  It might be easier for me to -- let me see with my glasses.

19        It might be easier to look at a book.

20  Q.  Look at volume 1, it's at Tab 68.

21  A.  Okay.  I have it.

22        THE COURT:  Any objection to 68?

23        MR. JACKSON:  No objection.

24        THE COURT:  Okay, it's in.

25        (Plaintiff's Exhibit 68 received in evidence)

1    Q.  With you looking at the book and some of us looking at the

2    screen there, what is this exhibit?

3    A.  This is a note that I typed to myself.

4    Q.  You say:  I met with Mike this morning.  Mike came to see

5    me as he wanted my advice on a matter regarding Eileen.

6            THE COURT:  Is there -- this section, do you want to

7    magnify that?  It might by easier for the jury.

8            MR. HUBBARD:  Magnify the top part, Mr. Fitzgerald.

9    Q.  So you start there and you say:  I met with Mike this

10   morning.  The date on this email, this note to yourself, is

11   what?

12   A.  April 11.

13   Q.  And you are writing it in the evening hours?

14   A.  Correct.

15   Q.  You said:  I met with Mike this morning.  Mike came to see

16   me as he wanted my advice on a matter regarding Eileen.

17           Did you know who he was referring to?

18   A.  I did.

19   Q.  Who was Eileen?

20   A.  Eileen Hedges.

21   Q.  Did you have a professional relationship with Ms. Hedges at

22   this time?

23   A.  Eileen was one of the employees that I supported from an HR

24   perspective.

25   Q.  Were you friends?

GC8TPIC4                        Weiss - direct

1    A.  Yes.

2    Q.  Good friends?

3    A.  Yes.

4    Q.  And in what way did you support her group, her business

5    development group?

6    A.  Along with the other people in the global banking and

7    markets business, I supported them.  I was the head of HR, so I

8    supported any kind of needs within the -- that an employee

9    needed within global banking and markets at that time.

10   Q.  You go on to say:  He said he didn't want to file a formal

11   complaint but that Eileen's behaviors on the floor were

12   unacceptable.  Mike said for the first several months things

13   were going okay, although he saw behaviors of

14   inappropriateness.  He says behaviors have gotten worse.  There

15   have been several occasions where Eileen would pull Mike out of

16   a meeting, et cetera.  He said she also talks about going out

17   with Michelle and the things that happen at night, such as

18   Michelle sleeping around.  Mike said Eileen told him several

19   times she plans on firing Michelle.

20             Some notes there:  When Eileen didn't get invited to a

21   meeting, some salty language.  Mike says he sees Michelle

22   winking.  Mike said there's some things out on the desk he

23   knows Eileen would be fired for.  He did not want to share

24   these.

25             Let's go down a bit, please.

1           At some point he says he wants to stay but doesn't

2      know what to do.  He feels that Eileen now sees him as the

3      enemy.  He doesn't know why.  He covered for her on disability

4      and she came back and she yelled at him in front of others.  I

5      told Mike I take these matters very seriously, and if these

6      behaviors are true they're not acceptable.  I told him I wanted

7      to talk to Eileen, but he asked to talk to her first.

8           How did that -- I mean I guess the normal process here

9      would be he comes in with a complaint like this, and you

10     obviously took it seriously, a normal process would be that you

11     would address it.

12     A.  The normal process would be that I address it to find out

13     what the exact matters were.  In this case he asked that he

14     address it first.

15     Q.  And nothing wrong with that?

16     A.  No.

17     Q.  You didn't find anything wrong with him wanting to take a

18     shot at it?

19     A.  No, except I said that I will need to talk to her as well.

20     Q.  Okay.  So you say:  I told him to be up front with Eileen

21     and say the situation needed to be corrected immediately, and

22     if another situation occurred he would need to raise it with

23     her.  Mike will give me an update tomorrow, and I updated Jane

24     and Rachel.

25          Who is Jane?

```
 1    A.   Jane Kauh.

 2    Q.   Who is she?

 3    A.   She's a legal adviser.

 4    Q.   That would be the standard practice?

 5    A.   Yes.

 6    Q.   Okay.  Are you telling us here that you told Mike that he

 7    could do that, he could try first, but did you also tell him

 8    that you were going to speak to her?

 9    A.   Yes.  Me or somebody on my team, yes.

10    Q.   Well, when you wrote this memo -- I don't see anyplace

11    here -- is there anyplace in this email where you record that

12    you told Mike that you were going to speak to her?

13    A.   I just said -- I told him I wanted to talk to Eileen.  I

14    think it's there.  I told him I wanted to talk to Eileen, but

15    he has to talk to her first.

16    Q.   I see.

17    A.   We agreed that he would talk to her first, and that at some

18    point I would talk to her as well.

19    Q.   Well, do you know if he had a chance to talk to her before

20    you spoke to her?

21    A.   Yes, he definitely spoke to her before I spoke to her.  For

22    the record, I did not speak to her, somebody from my team did.

23    Q.   Who was that?

24    A.   Well, multiple people spoke to her over the period of time,

25    but in the first case it was Sue Jang on my team.
```

1          MR. HUBBARD:  Could we have Exhibit 74, please.

2   Q.  Appears to be an email from Mr. Picarella to you two days

3   later, April 13.

4   A.  Correct.

5   Q.  And he says:  Hi, Ellen.  Just keeping you informed.  I

6   have been trying to arrange time for Eileen and I have

7   scheduled something for Monday.  I will let you know how it

8   goes.

9          That is sort of what you set up with him to speak to

10  her.

11  A.  Correct.

12          MR. HUBBARD:  May I move this, your Honor, may I move

13  74?

14          MR. JACKSON:  No objection.

15          THE COURT:  Okay, it's in.

16          (Plaintiff's Exhibit 74 received in evidence)

17          MR. HUBBARD:  83, please.

18          THE COURT:  Is 83 already in evidence?

19          MR. HUBBARD:  I don't think so, your Honor.

20          MR. JACKSON:  No, it's not, but no objection.

21          THE COURT:  Okay.  Is there a series of others that

22  you're aware of at this point?

23          MR. HUBBARD:  There are, Judge, I don't have them all

24  written down.

25          THE COURT:  That's fine.  83 is in.  Go ahead.

1              (Plaintiff's Exhibit 83 received in evidence)

2    BY MR. HUBBARD:

3    Q.  You say you asked Mike to come see me.  As he indicated,

4    Eileen hadn't met with him and scheduled it tomorrow.  Mike

5    said he was not bothered by this and he knew she eventually

6    would.  He says today she yelled at him in front of others for

7    not including Canada.  Mike again said he's not out to get

8    Eileen in trouble, he just wants to be okay coming to work.  I

9    told him that HR would be talking to her and has no issues with

10   this.

11             I gather you contemplated there in that time frame

12   that your staff would begin talking to her.

13   A.  Correct.

14   Q.  I told him he should be more direct when asking to meet.

15   He said he would, but knew she was busy.

16             Now at this point in time, in April 2012, what was

17   Ms. Hedges' status under Mr. Pizzimbono?

18   A.  She was the head of business development.  She worked for

19   Pablo Pizzimbono.

20   Q.  Do know that in November of 2011 --

21             MR. JACKSON:  Objection to form, your Honor.

22   Q.  Do you know that in November of 2011 her reporting

23   relationship had been changed and that she was now reporting to

24   Ms. White?

25   A.  I don't remember.

1    Q.  Fair enough.

2              Certainly she at one point did report to

3    Mr. Pizzimbono.

4    A.  At one point, yes.

5              MR. HUBBARD:  Let's go to Exhibit 87, please.

6              THE COURT:  Are you moving that in evidence?

7              MR. HUBBARD:  Yes.

8              THE COURT:  Any objection to 87?

9              MR. JACKSON:  No objection, your Honor.

10             THE COURT:  Okay, 87 is in.

11             (Plaintiff's Exhibit 87 received in evidence)

12   Q.  This is another one of these internal emails to yourself,

13   right?

14   A.  Yes.

15   Q.  This is from Ellen Weiss to Ellen Weiss.  The subject is

16   Mike, dated April 25, 2012.  You say:  We spoke to Pablo and

17   told him that I received a complaint, not formal, that Eileen

18   was using sexual expression and saying sexual jokes like the

19   three minute rule.  Also the person had said that Eileen was

20   yelling at employees in front of others.

21             This person is Mr. Picarella.

22   A.  Correct.

23   Q.  Pablo asked if it was Mike.  He said he talked to Didier

24   and the plan was to move Mike out and hire two junior people in

25   his place.

1        Did you ever hear of that happening?

2   A.  Not until this point.

3   Q.  What?

4   A.  Not until this point.  Eileen was in the midst of trying to

5   reach Sue and I to talk to us about Mike's performance roughly

6   around the same time.

7   Q.  What she was going to say to you about Mike's performance?

8   A.  I did not talk to Eileen about Mike's performance, Sue did.

9   Q.  Did Mr. Pizzimbono do anything to move Mike out of that job

10  in the next six months or the next twelve months or the next 24

11  months or the next 36 months, to your knowledge?

12         MR. JACKSON:  Objection to form, your Honor.

13         THE COURT:  Please rephrase the question.

14  Q.  You said -- let's look back at the memo, Pablo talked to --

15  let's see:  Pablo had already talked to Didier -- that's

16  Mr. Descamps, he was the head of global sales -- and the plan

17  was to move Mike out and hire two junior people in his place,

18  right?

19         What happened to that plan?

20         THE COURT:  Hold on a second.  The witness -- I see

21  that you're nodding your head in affirmation, but we're taking

22  a recorded transcript, so you have to answer verbally with the

23  microphone.

24         THE WITNESS:  Okay, thanks.

25  Q.  Can you see the screen?

GC8TPIC4                          Weiss - direct

```
 1   A.  Yes.
 2   Q.  My question to you was:  The plan was to move Mike out and
 3   hire two junior people in his place.  What happened to that
 4   plan?
 5   A.  That was the first I heard of that plan, and I am not aware
 6   of any plan since then or afterwards to put two junior people
 7   into that position.
 8   Q.  After April 25, 2012, I gather you didn't participate in
 9   any plan replace Mike with two junior people.
10   A.  No.
11   Q.  Now at the bottom it says:  I told Pablo that Sue was going
12   to talk to Eileen, as Eileen had actually asked to speak to one
13   us of.  Pablo thought this may have to do with Suzy, but he is
14   not sure.
15           Second paragraph, please.
16           You see there, Ms. Weiss, you write:  I called Mike
17   and told him he was going to talk to Eileen -- Sue was going to
18   talk to Eileen.
19           That's Sue Jang?
20   A.  Correct.
21   Q.  Is that the person you designated to talk to --
22   A.  Yes, on my team.
23   Q.  -- Ms. Hedges?
24           Mike said okay, please keep his name out of it.  I
25   said we would do our best, but she might assume it was him.
```

 1              Earlier I heard you say that perhaps you told Mike

 2     that you in fact would have to talk to her.  Here it looks like

 3     maybe you were saying that you could keep his name out of it.

 4     Do you recall how that worked?

 5     A.  So we were always going to talk to Eileen, but we would do

 6     our best to keep it as confidential as possible.

 7     Q.  Mike said that Eileen had yelled at him this morning in

 8     front of others as she was upset given she had received an

 9     email from Christophe who was annoyed at something.  Mike did

10     say Michelle came in crying at 7:15.  Mike continued to say he

11     would have follow-up meetings with Eileen and how this work is

12     progressing and let her know if he sees anything inappropriate

13     in her behavior.  Sue did call Eileen today but she was tied up

14     in meetings.

15              Let's go to Exhibit 97.

16              THE COURT:  Is this already in evidence?

17              MR. HUBBARD:  I would like to move it.

18              THE COURT:  Any objection to 97?

19              MR. JACKSON:  We have no objection, your Honor.

20              THE COURT:  Okay, 97 is in.

21              (Plaintiff's Exhibit 97 received in evidence)

22     Q.  Take a look this.  This is from Ms. Jang to you, May 7,

23     this is a few weeks after Mr. Picarella comes to see you,

24     right?

25              Right?

1    A.  Yes.

2    Q.  And it says:  Pablo asked me about it Friday, too.  He

3    heard from PN also.  He wants Eileen out of the managerial role

4    and is on the borderline of saying out all together.

5            Is it possible when you wrote the earlier memoranda

6    that you confused Ms. Hedges with Mr. Picarella?

7    A.  No.

8    Q.  So this memo indicates that Mr. Pizzimbono wanted Hedges

9    out, right?

10   A.  I just need a minute to read it.

11   Q.  Yes.

12   A.  Okay.

13   Q.  Says wants Eileen out of managerial role and borderline of

14   saying out all together.  He thinks she's too big of a

15   liability for this business and he needs this drama to just

16   end.  Feels she always has too much drama surrounding her.

17   Mike spoke to Pablo.

18           There came a time shortly after this, did there not,

19   Ms. Weiss, that Ms. Hedges was removed from her managerial

20   responsibilities?

21   A.  Correct.

22   Q.  Why?

23   A.  Why was Ms. Hedges removed from --

24   Q.  Yes.

25   A.  It was determined, after we had done an investigation into

1    some of the issues that Mike had raised with us, as well as us

2    talking to Michelle Parker, that we felt -- the business felt,

3    as well as HR and legal, that Eileen should be removed from

4    responsibilities of managing employees.

5            THE COURT:  Let's go ahead and take our afternoon

6    break.  So we'll take a 15 minute break.  Don't discuss the

7    case among yourselves or with anyone else.  We'll see you in 15

8    minutes.

9            (Recess taken)

10           THE COURT:  Welcome back, let's continue.

11           MR. HUBBARD:  Could we have Plaintiff's 98?

12           Your Honor, we move the admission of Plaintiff's 98,

13   Sametime chat between Ms. Hedges and Ms. DiRose.

14           THE COURT:  Any objection to 98?

15           MR. JACKSON:  Your Honor 401, 802.

16           THE COURT:  Okay.  Let me look at 98.

17           (Pause)

18           THE COURT:  Objection sustained.

19           MR. HUBBARD:  Your Honor, there are portions of this

20   document that impact the performance of the group.

21           THE COURT:  I understand, but the objection is under

22   802.

23           MR. HUBBARD:  I understand.  Is there a way for me to

24   publish a portion of this that just relates to looking for a

25   job and that kind of thing without getting into the things that

1    are objected to?

2              THE COURT:  No, the 802 objection is to the entire

3    document.

4              MR. HUBBARD:  I understand that.

5              THE COURT:  So no, that objection is sustained.

6              MR. HUBBARD:  Okay.  Plaintiff's 126.  This is in

7    evidence, your Honor.

8              THE COURT:  Okay.

9              MR. JACKSON:  I believe this is in evidence.

10   BY MR. HUBBARD:

11   Q.  Take a look at this.  Appears to be a memorandum that

12   constitutes a final written warning on August 27, 2012 related

13   to Ms. Hedges' position.  Do you see at the top it says:  This

14   is to confirm -- in the first line:  This is to confirm that HR

15   has completed their investigation into a harassment complaint

16   made by one of your direct reports.

17             Is this the investigation that you were supervising?

18   A.  Yes.

19   Q.  And would it have been your staff that prepared this email,

20   this memo?

21   A.  I don't remember.  I think it was, but I don't remember.

22   Q.  And did you -- how was this communicated to Ms. Hedges?

23   A.  I wasn't part of that communication.

24             MR. HUBBARD:  Give me 127, please.

25             MR. JACKSON:  No objection, your Honor.

1          MR. HUBBARD:  Move the admission of 127.

2          THE COURT:  It's in.

3          (Plaintiff's Exhibit 127 received in evidence)

4    Q.  Lin Li, did she work in human resources?

5    A.  Yes, she worked for me.

6    Q.  And it looks as if -- let's go to the second page, please.

7          August 31, 2012, this is a memo from you, apparently,

8    to Ms. Li, Ms. White, Ms. Jang, and you say:  Lin, can you

9    please send me and Suzy White Mike Picarella's last two year

10   end reviews as well as his résumé.  Sue can tell you where his

11   résumé would be.  Can you also please email me Carol Jenner's

12   last two year end reviews.

13         What's going on here?

14   A.  This is a period of time where we were looking at who is

15   going to take over in the new position after Eileen had left.

16   Q.  And who asked for these résumés?

17   A.  It was Suzy White and I believe Pablo was reviewing them as

18   well.

19   Q.  Did there come a time here in the next few days that you

20   learned that a decision had been made to appoint Ms. Jenner to

21   succeed Ms. Hedges and not Mr. Picarella?

22   A.  Yes, I found business made a decision to move forward on

23   Carol.

24   Q.  When Mr. Picarella was hired did you know he had been hired

25   to be Ms. Hedges' deputy?

 1   A.  No.

 2              MR. JACKSON:  Objection, your Honor, just to form.

 3   Sorry.

 4              THE COURT:  She's already answered the question.

 5              Go ahead, counsel.

 6   Q.  In the week or so after this email here, did you learn that

 7   Ms. White had made a decision to select Ms. Jenner to succeed

 8   Ms. Hedges and not Mr. Picarella?

 9   A.  It was around that time frame, I don't know if it was a

10   week.  Right around that time frame, yes.

11   Q.  Did you participate in that discussion?

12   A.  I was on some of the emails, yes.

13              MR. HUBBARD:  131, please.

14              THE COURT:  Is this already in evidence?

15              MR. HUBBARD:  It is, your Honor.

16              I should make sure about moving it, but I believe it

17   is.

18              MR. JACKSON:  This is in evidence, your Honor.

19              MR. HUBBARD:  Thank you.

20   Q.  This appears to be an email dated September 10, 2012.  Do

21   you know about the date when Mr. Pizzimbono and Ms. White told

22   Mr. Picarella that Ms. Jenner was going to get Ms. Hedges'

23   position?

24   A.  I believe -- I'm trying to think back, sorry.  I think it

25   was sometime around -- Suzy was on maternity leave.  Sorry, she

1    was getting married, so I think it was sometime around October.

2    I'm not exactly sure of the time frame.

3    Q.  If I were to say right around just after Labor Day, would

4    that refresh your recollection?

5    A.  I don't remember the exact time frame.

6    Q.  Okay.  This memorandum from Ms. Whang to you and others,

7    the subject is personal conduct cases.

8    A.  Yes.

9    Q.  Do you see that?

10   A.  Yes.

11   Q.  And it's dated September 10, 2012.

12         Who is Jennifer Whang?

13   A.  Jennifer also worked on my team as a generalist.

14   Q.  Who else in this memo was on your team, Ms. Park, Ms. Pak,

15   Ms. Jang, are they all on your team?

16   A.  Yes, they are, or were.

17   Q.  Let's go down.  This is an email from you, it's like to

18   Ms. Jang, Ms. Park, Ms. Whang, Ms. Pak, and same date, personal

19   conduct cases.

20         What are personal conduct cases?

21   A.  A personal conduct case is a reporting mechanism that HR

22   uses to track cases related to harassment or discrimination.

23   Q.  Let's go down to the memorandum.  The first paragraph in

24   the email, please, starts with the email from Ms. Weiss to

25   Ms. Jenner.

GC8TPIC4                          Weiss – direct

 1            You say:  Guys, Rachel Prebble is asking to us collect

 2    the personal conduct cases since the beginning of January 2012.

 3    Talk about documenting cases in 2012 that have resulted in any

 4    formal investigation and resulted in a written or verbal

 5    warning or termination of employment.  We need to be prepared

 6    to answer questions.  Column A, which should include the name

 7    of the employee, but the names will not be circulated, on and

 8    on.

 9            If you go to the next page, and you say cases that I

10    can think of, you got Parker, Rist, Mike Picc, is that Mike

11    Picarella?

12    A.  Yes.

13    Q.  And you say Jennifer, can you update for Michelle, James

14    Jenny, you update for Paolo and I will update for Mike.

15            Did you update for Mike?

16    A.  Well, it's a summary, so the case was Mike and Eileen, and

17    yes, the PCC case was updated by myself.

18            Just for clarity, there are no names when it's

19    updated.  There are no names on them.

20    Q.  When it's circulated to the group, to management, it does

21    not have the names on them?

22    A.  There are no names on it, that's correct.

23            MR. HUBBARD:  Give me 185, please.

24    Q.  This is Ms. Jang to you, Ms. Park, Ms. Whang, Ms. Hunter,

25    Ms. Pak.  Can you guys provide any additional names to me?  And

1   you go down and see some names at the bottom, right?

2            This is in April of 2013 and Mr. Picarella's name is

3   on this list, right?

4   A.  Yes.

5   Q.  Let's go down, please.

6            And this email is from Ms. Twarowski.  How do you

7   pronounce her name?  Catherine?

8   A.  Catherine, yes, Twarowski.

9   Q.  Let's go down.  And again, you had Mr. Picarella's name on

10  this list, right?

11  A.  Yes, but it's not -- it's the case with Eileen and Mike, it

12  wasn't regarding Mike.

13  Q.  How do we know that?

14           MR. JACKSON:  Objection.

15  Q.  How does anybody know that?

16  A.  I mean I have seen this, I have seen the PCC case.

17  Q.  Let's go down further, please.

18           So what you're saying is that Mr. Picarella's name

19  remains on this personal conduct cases means that he's not

20  accused of any kind of misconduct?

21  A.  That's definite.

22  Q.  He's the person who made the complaint?

23  A.  Correct.  That's how it's recorded on the case.

24  Q.  So in other words, if he makes a complaint of sexual

25  harassment, his name goes on the personal conduct case list?

1   A.  No.  Sorry, for clarity, no names go on the personal

2   conduct list, it's just a case history.  What it does ask for

3   is the years of employment of the person that complained, and

4   it asks for the years of employment for the person they were

5   complaining against, but no names are on that list.

6   Q.  So the only place his name would appear is in the

7   correspondence that you generate, the list of people that you

8   generated here, the cases, the actual cases?

9   A.  Yes, but that list that was above is not a case about Mike,

10  it's a case of Mike complaining about Eileen.

11  Q.  That's what I wanted to ask you.

12          Let's go back to the period right after --

13          MR. HUBBARD:  You can take that down.

14  Q.  Go back to the time frame right after Ms. Jenner is

15  appointed to replace Ms. Hedges.  Okay?

16          Did you do anything to gain access to Mr. Picarella's

17  emails?

18  A.  I had asked to look at Mike's emails at one point in time,

19  but I never opened the email box.

20  Q.  Why did you ask to look at them?

21  A.  As part of our investigation sometimes we look in an email

22  box.  I don't remember exactly what it was at that point in

23  time why we had asked for it.  I have done it in several other

24  cases and asked for it.  And then we discussed it and we made

25  the decision not to look at the email box.

1   Q.  When you testified in the deposition did you testify that

2   you couldn't remember if you opened it or not?

3   A.  I don't know, but I could tell you that I didn't open it.

4   Q.  Today you can say you didn't open it?

5   A.  Yeah.  But I would have thought I would have said the same

6   thing in the deposition, so I don't know.

7   Q.  What did you believe you were going to be looking for if

8   you opened his email box?

9   A.  I don't remember exactly why I requested it at that time.

10  Q.  Did you tell Mr. Picarella that you had asked for

11  permission to look at his email box?

12  A.  I don't remember.  I generally wouldn't do that.  If I was

13  looking at someone's emails I wouldn't request it from the

14  employee.

15  Q.  He wasn't under any kind of investigation at that point in

16  time, was he?

17  A.  No.

18              (Continued on next page)

19

20

21

22

23

24

25

GC89PIC5                          Weiss - direct

1          MR. HUBBARD:  Let's go to 219, please.

2    Q.   This appears to be, the bottom one, appears to be an e-mail

3    from you to Ms. Jang, Ms. Kim Park, Ms. Whang, the subject is

4    restructuring.  You say:  I haven't heard much on markets

5    restructuring.  Other than the names below is there anyone else

6    the business wants to let go.

7          Why would your deputies know who the business wants to

8    terminate?

9    A.   From an HR standpoint we're involved in all of the

10   terminations so we would be involved in any of the names of

11   anybody being released.

12   Q.   So the first folks down here on the bottom are employees

13   who you had reason to believe the business had identified as

14   employees they wanted to manage out of the company?

15   A.   I don't remember this exact e-mail but yes -- yes.  That

16   would -- I can't remember the names of the individuals or this

17   e-mail.  But I do -- but yes to answer your question.

18   Q.   And at the top you see Ms. Jang writes back -- do you see

19   the top she writes back:  Can we add MP?

20   A.   Yes.

21   Q.   Did Ms. Jang --

22          MR. HUBBARD:  Highlight that for me please, Peter.

23   Q.   Did Ms. Jang know who MP was?

24   A.   I'm not sure who MP is in that situation.

25   Q.   I'm sorry?

1   A.  I'm not sure who MP is in that situation.

2   Q.  Who else could it be but Mr. Picarella?

3   A.  There were -- there were -- there were other people that

4   are -- were on a potential list with an MP name.  So I can't

5   say.  I really -- I don't know.

6   Q.  Okay.  The MP name is not at the bottom.  And every MP we

7   see in these e-mails in '13 and '14, true or not, refers to

8   Mr. Picarella?

9   A.  I don't remember other MPs.  But I can tell you there are

10  definitely other names that are MP that I believe around that

11  time we were looking to let go.

12  Q.  Who are those MPs, to the best of your recollection?

13  A.  It could have been Ms. Parker.  I don't remember.

14  Q.  Do you know when Ms. Parker was -- left the firm?

15  A.  (No response).

16  Q.  You participated in that, didn't you?

17  A.  Say that again.  I'm sorry.

18  Q.  You're the person who participated in the circumstances

19  surrounding Ms. Parker's departure from the firm, correct?

20  A.  I am, yeah.

21  Q.  You interviewed her?

22  A.  Yes.

23  Q.  You asked her some questions about her relationship with

24  her boyfriend, right?

25  A.  Yes.

1   Q.  And you determined that she wasn't giving you an accurate

2   response when you said that Mr. So And So was not her

3   boyfriend?

4   A.  Sorry.  Can you repeat that one more time.

5   Q.  You interviewed her and asked her if another co-employee, a

6   man, was her boyfriend and you believe she gave you the wrong

7   answer when she said he was not?

8   A.  She did give me the wrong answer, but yes.

9   Q.  What did you do about it when you believe she gave you the

10  wrong answer?

11  A.  Well I'm -- if Ms. Parker -- sorry.  With Ms. Parker?  What

12  did we do about it?

13  Q.  Yeah.

14  A.  I had asked her twice in two different situations --

15  there's a story behind it.

16  Q.  I just --

17  A.  We exited her as a result of lying to me twice.

18  Q.  As a result of lying to you, you did what?

19  A.  We terminated her.

20  Q.  And you terminated her when?

21  A.  I think it was a little after this period.

22  Q.  Do you recall that you interviewed her in May of 2012 and

23  terminated her?

24  A.  Oh, sorry.  That's my -- that's my mistake.  I was reading

25  this as an older e-mail.  My mistake.  Totally my mistake.

1   Q.  No problem.  But it's not likely that MP here --

2   A.  No.  No.

3   Q.  -- is Ms. Parker?

4   A.  No.  You are correct.  Sorry.  That is definitely my

5   mistake.  I was reading it as 2012.

6         MR. HUBBARD:  Okay.  Let's go back to 131, please.  I

7   missed something.

8   Q.  I just want to ask you real quick to look at the bottom,

9   please, Ms. Weiss.

10  A.  Sure.

11        TOP1:  I'm sorry.  Just the paragraph under guys,

12  Mr. Fitzgerald.

13        Yes.

14  Q.  Do you see at the bottom the e-mail says:  We need to be

15  prepared to answer questions to group REMCO and the FSA when it

16  comes down to how these cases were managed regarding year end

17  compensation.  In column A we should include the name of the

18  employee, but the names will not be circulated past Rachel

19  Prebble.

20        And Ms. Prebble is in your human resources area?

21  A.  Yes.  She's in London.  She's in human resources.

22  Q.  If I'm a manager, if I'm Mr. Ian Mullen and I'm a manager

23  in London and some of my executives are on the personal conduct

24  list, they are the subjects, not the complaining person but the

25  subjects of a personal conduct case, how does Mr. Mullen know

1    that?

2              MR. JACKSON:  Your Honor, just objection.  Form.

3              THE COURT:  Overruled.

4              THE WITNESS:  Sorry.  Can you clarify the question.

5    I'm not sure I understand it.

6    Q.  How do your senior executives who determine compensation

7    for their reports, okay, receive information about these

8    personal conduct cases to the extent it would impact their

9    decisions about compensation?

10   A.  I'm still not sure I understand the question.  Can -- are

11   you asking how a manager would know if there was an employee

12   investigation and how would it affect -- I'm not sure I

13   understand.

14   Q.  Yes.  What I want to know is, is how would a manager know

15   if an employee was put on these personal conduct cases because

16   their personal conduct, like Ms. Hedges, has been called into

17   question?

18   A.  A manager would know because we would, as part of the

19   investigation, we would have spoken to that manager.  So if it

20   was regarding Eileen, Pablo and Suzy would have known about

21   Eileen's situation.  And then we would have taken that from a

22   compensation perspective, we would have looked at that.

23   Q.  Good.  Thanks.

24   A.  Sorry.  Didn't understand the question.

25   Q.  Did you participate, Ms. Weiss, in investigating any of

GC89PIC5                        Weiss - cross

1    Mr. Picarella's complaints regarding Mr. Karam?

2    A.   No.

3    Q.   Did you investigate any of his complaints of retaliation?

4    A.   No.

5            MR. HUBBARD:  May I just have a moment, your Honor,

6    please?

7            Nothing further of this witness, your Honor.

8            THE COURT:  Any cross-examination?

9            MR. JACKSON:  Thank you, your Honor.

10           May I inquire, your Honor?

11           THE COURT:  Yes.

12   CROSS-EXAMINATION

13   BY MR. JACKSON:

14   Q.   Good afternoon, Ms. Weiss.

15   A.   Good afternoon.

16   Q.   How are you today?

17   A.   I'm good.  Thanks.

18   Q.   Ms. Weiss, one of the things that you were asked about on

19   your direct examination was a document that's marked as PX-68.

20   Can you take a look at that.

21           Now, this is an e-mail that you -- where you recorded

22   this note to yourself?

23   A.   Correct.

24   Q.   Why did you have this practice, Ms. Weiss?

25   A.   I did this with employee relations cases that I had so that

GC89PIC5                    Weiss - cross

1   I made sure that the notes from the meeting that I was at I

2   would remember them later on and they would be accurate.

3   Q.  When was it that you first met with Mr. Picarella?

4   A.  When was it that I first met with him?

5          This was I believe the first day that I met with him.

6   April 11.

7   Q.  And during this meeting, as Mr. Picarella was describing

8   his concerns to you, what, in summary, did you understand were

9   his concerns?

10  A.  Yeah.  Mike had come to see me on the 11th.  And he was

11  concerned about Eileen's behavior.  He had said multiple times

12  that he didn't want to get Eileen fired.  But there were issues

13  this he felt he needed to bring to my attention.

14         He was talking about Eileen yelling at him in front of

15  other people.  He was also talking about Suzy yelling at him in

16  front of other people.  He mentioned that Ms. Parker and

17  Ms. Hedges, Eileen, were sometimes, you know, giggling with

18  each other.  And the other thing he mentioned to me was that

19  Eileen would sometimes talk about her comp versus his comp.

20  And he was concerned about it all.  We had a good -- we had a

21  really good conversation.  And I told him that, you know, I

22  thought this was serious and that he should absolutely talk to

23  Eileen.  And that I thought that someone from my team or myself

24  should be talking to Eileen as well.

25  Q.  What did he say to you when you said that you thought

GC89PIC5                          Weiss - cross

1   someone from your team should be talking to her as well?

2   A.   Yeah.  Mike knew -- we had multiple conversations at the

3   beginning, after 4-11 and right around then.  Again, all

4   cordial conversations.  And he was just a little concerned that

5   word would get out with his name regarding Eileen.  And I told

6   him that we would do our best to keep conversations as tight

7   and, you know, as confidential as possible.  But I did -- you

8   know, we talked about this multiple times.  And I told him that

9   eventually, you know, if one talked to Eileen, that she would

10  probably figure out, based on the discussion, that it was Mike.

11  Q.   You mentioned a moment ago that he raised these issues

12  about Ms. Parker giggling with Eileen.  In the context of

13  discussing that, was there any part of this discussion where he

14  was communicating to you concerns about Eileen sexually

15  harassing Ms. Parker?

16  A.   That never came up in any conversation I ever had with

17  Mike.

18  Q.   What was your understanding of what he was saying about the

19  giggling and the winking between the two of them?

20  A.   Mike had said at the beginning, he actually had said at

21  some point that he felt they should be separated because they

22  would giggle and go out together and joke amongst one another

23  and he felt uncomfortable being part of that.

24  Q.   Now, was it important to you that someone from HR would

25  need to eventually communicate with Eileen even if

1   Mr. Picarella spoke to her?

2   A.   As part of, I mean, on this first occasion he wasn't

3   talking about as many sexual remarks as he did when he came to

4   talk to me the second time in April, in early April.   And

5   without a doubt, based on those kind of remarks, we would

6   investigate a case, just as a matter of practice.

7   Q.   Why?

8   A.   I mean the bank has a no sexual harassment -- has a no sex

9   harassment policy.   And we stand firm on that.   Always have.

10  Always will.   And hence as a result when anybody comes to me,

11  and I've had many cases to talk about harassment, we would do a

12  full investigation.

13  Q.   Now, one of the things that you were asked about on direct

14  is the fact that you had a friendship with Ms. Hedges?

15  A.   Correct.

16  Q.   And the fact that you were friends -- that you had been

17  friends with Ms. Hedges, did that impact in any way how you

18  dealt with the situation?

19  A.   Definitely not.

20  Q.   In your role at HR did you sometimes have situations where

21  you had to deal with investigations of employees you may have

22  had friendships with?

23  A.   I've been at the bank 24 years.   So I've had a lot of

24  friends at the bank.   And I mean I could give you two easy

25  examples and there are many more.   I've terminated friends.   I

GC89PIC5                          Weiss - cross

1    have -- one of the women that worked with me, I terminated her

2    husband.  I didn't tell her until the day that I terminated --

3    I mean I didn't even tell her before I terminated him and then

4    explained to her why.

5              But I have a strong view on this that I would never

6    jeopardize professionalism for friendship.  It's not worth it

7    to me.

8    Q.  You mentioned though that you didn't participate in any of

9    the meetings that your group had with Ms. Hedges.  I think you

10   said that.  Why was that?

11   A.  Well, because I have a staff of folks that work for me and

12   at that level I deal more at the higher level.

13             Mike had come to see me.  Normally I think Mike might

14   have gone to see some of the staff that work for me.  But I

15   think he felt comfortable coming to see me.  And as a result

16   the folks on my team do the investigations.

17   Q.  Now, can you just look at PX-83 which came up on direct.

18             This is another one of the notes that you wrote after

19   a subsequent meeting with Mr. Picarella?

20   A.  Correct.

21   Q.  What did you say in the last two lines here?

22   A.  I told him that HR would be talking to her and has no

23   issues with this.  I again told him he should be more direct

24   when asking to meet.  He said he would but knew she was busy.

25   Q.  What are you talking about in that line?

1  A.  I'm just reminding him, and I did several times, just that

2  this was important and critical and that he needed to talk to

3  Eileen to get this matter reviewed.

4  Q.  Why were you reminding him several times to do that?

5  A.  I would do that in any case.  When someone came in to me I

6  would want to assure that the issue got resolved quickly and

7  just doing my -- just doing my job to follow up to make sure

8  that Mike had a conversation with Eileen because I thought it

9  was fairly critical based on what he was telling me.

10          MR. JACKSON:  At this time I'd like to offer DX-139.

11          THE COURT:  Any objection to 139?

12          MR. HUBBARD:  Just a moment, your Honor, please.

13          None, Your Honor.  No objection.

14          THE COURT:  139 is in.

15          (Defendant's Exhibit  139 received in evidence)

16          MR. JACKSON:  Can you zoom in on the top half of this.

17  Q.  Ms. Weiss, is this an April 20, 2012 note that you wrote

18  after a meeting with Mr. Picarella?

19  A.  Yes.

20  Q.  And in this meeting did he describe to you a meeting that

21  he had had with Eileen Hedges?

22  A.  He did.

23  Q.  In sum and substance, what was communicated to you when you

24  met with him before you wrote this note?

25  A.  So Michael had said that he met with Eileen based on our

GC89PIC5                           Weiss - cross

1    conversations and he was basically rehashing what had happened

2    in the meeting.  He indicated that he really didn't talk to

3    Eileen about the issues that he was talking to me about but

4    more Eileen turned the conversation into a conversation

5    regarding his performance and how they would try and work

6    together moving forward on his performance.

7              MR. JACKSON:  Can we go to the bottom of this -- I'm

8    sorry.  Take this down and go to the last paragraph.  Just zoom

9    in beneath that.

10   Q.  Can you read what you wrote on the last line there?

11   A.  I again told him that I couldn't force him to tell me what

12   this were.

13   Q.  Actually let me back up.

14             Can I ask you to read the line before that and then

15   also that line?

16   A.  Sure.

17             Mike also mentioned on our call that it was not his

18   intention to hurt Eileen and that he wanted to be happy coming

19   to work everyday, hence the reason for him not stating what he

20   knows about Eileen that in his view would lead to her

21   termination.  I again told him that I couldn't force him to

22   tell me what this were, but that without knowing what they were

23   I told him we could not address them.

24   Q.  What were you talking about there?

25   A.  Mike and I had had multiple conversations during this time

GC89PIC5                          Weiss - cross

and he had mentioned to me that there were a bunch of matters

he wanted to talk to me about regarding Eileen.  But he did not

come at that point and tell me what all of the details were and

I just reminded him and encouraged him -- again, our

conversations were cordial -- to try and tell me as much as

possible about the matter so that I could do something about

it.

Q.  Now during this meeting that you had before you wrote this

note did he tell you anything about Ms. Hedges sexually

harassing Ms. Parker?

A.  No.

          MR. JACKSON:  Can you take this down.

Q.  Now, just really briefly.  You mentioned that you told him

a couple of times that you would try to keep everything

confidential?

A.  Yes.

Q.  In a brief summary, could you explain why that would be

difficult?

A.  Yeah.  I mean confidential doesn't necessarily mean you're

always going to be able to keep the name of an employee out of

the conversation.  Unfortunately, when you start having

conversations, employees can figure out who that person is.

          What I would say is that we, my team and I would

certainly only approach those folks that were immediately

involved in this investigation.  So from a confidentiality

GC89PIC5                        Weiss - cross

1    standpoint we wouldn't go out and reach out to a whole group of

2    people and we would keep the conversations we had with those

3    individuals to ourselves.

4    Q.  Now at any point during the time that you were meeting with

5    Mr. Picarella did you ever have any conversation with

6    Ms. Hedges about what Mr. Picarella was telling you?

7    A.  No.  I never had a -- I mean I guess I could strongly

8    answer that.  I would not do that and I did not do that.  And

9    I've not done that in any case with any friend that I've ever

10   had before.

11   Q.  Now at some point you did reach out to -- I believe you

12   told us that you did reach out to Ms. Hedges' supervisor.  Who

13   was that?

14   A.  Pablo Pizzimbono at that time.  There was a crossover

15   between Suzy and Pablo.  And in my view they both had some kind

16   of reporting -- she reported in to both at some point for sure

17   functionally in entity, I would say, but both, I would say.

18   Pablo in this case.

19   Q.  Briefly, we looked there before, PX-87.

20              Now, there was a line that Mr. Hubbard read where it

21   said after you describe a complaint that you didn't specify,

22   Pablo immediately asked if it was Mike.  And he said that Pablo

23   had already talked to Didier and the plan was to move Mike out

24   and hire two junior people in his place.

25              Could you explain very briefly what the interaction

1    was that you were talking about there?

2    A.  Yeah.  I was speaking -- as a result of the investigative

3    process I would normally talk to one's manager, which in this

4    case was Pablo.  So I was explaining to Pablo the situation

5    with Eileen.  I was doing my best to keep Mike's name out of

6    the situation.  And in this case as I was talking about the

7    case and saying there was an issue raised about Eileen, Pablo

8    then just came back and said:  Was it Mike?  Because he said

9    that there were issues with his performance.

10   Q.  And he said to you that Mike was not -- he's just not

11   performing well in the role of SVP?

12   A.  Correct.

13            MR. JACKSON:  Can you take this down.

14   Q.  Now, you -- who was the person -- I think you mentioned the

15   person who actually was doing some of the meetings with

16   Ms. Hedges was a person name Sue Jang?

17   A.  Correct.

18   Q.  And this is one of the people who worked on your staff?

19   A.  Yeah.  She worked for me.

20   Q.  Were you present for any of those meetings?

21   A.  No.

22   Q.  Now was there a point after April where there's a break in

23   the frequency of your communications with Mr. Picarella?

24   A.  Yes.

25   Q.  Did you start having conversations with him again or

1   conversations about this issue again in June of 2012?

2   A.  I did.

3         MR. JACKSON:  I'd like to offer DX-155.

4         THE COURT:  Any objection to 155?

5         MR. HUBBARD:  155, your Honor?

6         THE COURT:  Yes.

7         MR. HUBBARD:  No objection.

8         THE COURT:  Okay.  It's in.

9         (Defendant's Exhibit  155 received in evidence)

10        MR. JACKSON:  Can you zoom in on the top half of this.

11  Q.  Now, do you recognize this e-mail, Ms. Weiss?

12  A.  Yeah.  It's an e-mail I wrote to myself.

13  Q.  And did you record this after you had a conversation with

14  Mr. Pizzimbono?

15  A.  I did.

16  Q.  In summary what were you recording?  What was the

17  conversation that you were talking about in this e-mail?

18  A.  Mike had gone to Pablo directly and said that he was

19  concerned over his position, that he heard people talking about

20  that his job was in jeopardy.

21        Mike also then said to Pablo that there was a

22  situation that he wanted to talk to Pablo about regarding

23  Eileen.  Pablo said I really need to know the information.  My

24  understanding from Pablo was that he was a little hesitant but

25  then Mike did tell him about an incident regarding a breast

1    situation regarding Eileen Hedges.

2    Q.  And in brief summary what was the breast incident?

3    A.  Mike had explained it to me that Eileen had been losing

4    weight back I think it was in -- end of 2011 and that she had

5    pulled out her chest out of her shirt to show him that -- and

6    Ms. Parker -- that she was losing weight.

7    Q.  Now when he described this to you did he describe it in the

8    context of something that he thought was directed at Ms. Parker

9    or more generally?

10   A.  Def -- not at Ms. Parker.  It wasn't explained that way.

11   It was Ms. Parker was there.  But it was -- when we were

12   talking about it, it was regarding Mike.

13   Q.  So what did you do after you had this conversation with

14   Mr. Pizzimbono?

15   A.  I had -- I asked Mike to come and see me so that I could

16   fully understand this situation because Mike hadn't mentioned

17   this to me previously.  And I just asked him -- I needed all

18   the facts at the time to further investigate.

19              MR. JACKSON:  Can we very quickly look at the bottom

20   of this.  You can keep going down.

21   Q.  And are you talking at the bottom of this note about your

22   conversation with Mr. Picarella?

23   A.  I am.

24   Q.  Did he mention a Key Largo incident at this time?

25   A.  He did.

GC89PIC5                          Weiss - cross

1    Q.   The Key Largo incident that he mentioned at that time

2    involved allegedly Ms. Hedges engaging in an act with a person

3    in Key Largo?

4    A.   Correct.

5    Q.   Did he say anything to you at that time about anything in

6    Key Largo involving Ms. Parker?

7    A.   No.  I mean -- Michael never talked to me about Ms. Parker,

8    only those -- only twice regarding the comments that they were

9    giggling together with Eileen but never anything about

10   Ms. Parker from a harassment standpoint.

11   Q.   To be clear though these were allegations that HR took very

12   seriously in terms of Ms. Hedges, right?

13   A.   Definitely.

14            MR. JACKSON:  Can you take this down.

15            I'd like to offer DX-158.

16            THE COURT:  Any objection to 158?

17            MR. HUBBARD:  No, your Honor.

18            THE COURT:  Okay.  It's in.

19            (Defendant's Exhibit  158 received in evidence)

20            MR. JACKSON:  Can you zoom in on the top of that.

21   Q.   Here are you discussing a list that you obtained from

22   Mr. Picarella?

23   A.   This is me explaining to -- bear with me one second -- I

24   was giving him an update on the investigation based on the

25   names that he had provided me to investigate in the Key Largo

GC89PIC5                         Weiss - cross

1    situation.

2              MR. JACKSON:  Can we just go down in this e-mail down

3    to the bottom -- I'm sorry -- the very bottom of this page, can

4    you just get the entire bottom half of page one.

5    Q.  Your e-mailing him on June 29 saying:  I wanted to update

6    you.  Are you able to talk?

7              Correct?

8    A.  Correct.

9    Q.  And he responded:  Not really but I could listen.

10             Right?

11   A.  Yes.

12   Q.  And then you said:  Let's talk when you have time.  Are you

13   available at all this week or do you have to wait until Monday?

14   A.  Correct.

15   Q.  Why, in brief fashion, why were you trying to update

16   Mr. Picarella about the status of the investigation?

17   A.  Well, the investigation was serious.  Mike was anxious, and

18   I wanted to give him as much of an update as I could regarding

19   where we were to date.

20   Q.  Now, at some point I think the question was asked about

21   whether Ms. Parker was terminated.  In brief summary, can you

22   explain why Ms. Parker was terminated?

23   A.  Sure.  Ms. Parker was terminated in April.  We had an

24   incident on the trading floor where there was a wife of an

25   employee that came on the floor and had some sort of

1   altercation with Ms. Parker.  And as a result we spoke to

2   Ms. Parker about that altercation.  And she had indicated that

3   she had no relationship with the gentleman that was on the

4   floor.  We then wound up asking her again if there were

5   issues -- I'm sorry -- that if she was having a relationship

6   with somebody on the floor after we had seen some e-mails that

7   prove that she was having a relationship.  And at that time she

8   said, again, that she was not having a relationship with

9   somebody on the floor.

10  Q.  Is providing false information during an investigation of

11  an incident like that something that HSBC takes seriously?

12  A.  Yes.

13  Q.  Is that the reason that Ms. Parker had to be terminated?

14  A.  Yes.

15  Q.  Did the fact that Ms. Parker was terminated -- by the way,

16  the gentleman who was involved in that was a gentleman named

17  Mr. Rist?

18  A.  Correct.

19  Q.  Did the fact that Ms. Parker was terminated mean that HSBC

20  didn't continue to take the investigation of any alleged sexual

21  harassment involving her seriously?

22  A.  Any alleged harassment of --

23  Q.  Of Ms. Parker.

24  A.  I wasn't involved in that -- in Ms. Parker's case.

25  Q.  Just in general let me ask you whether or not a person was

1    terminated, would any allegations involving alleged sexual

2    harassment of them be serious issues for HSBC?

3    A.  We would investigate a sexual harassment case after

4    somebody was terminated or whenever.  So, no, we would not take

5    that into consideration.

6    Q.  At some point did you end up speaking to Ms. Parker about

7    some of the issues related to Ms. Hedges?

8    A.  I did.

9    Q.  When was that?

10   A.  That was at the beginning of -- I think it was around

11   July -- early July, first or second week of July 2012.

12   Q.  And did you learn any new information during the course of

13   your discussion with Ms. Parker?

14   A.  I did.

15   Q.  In substance, without getting into any of the details --

16   let me just ask you:  At that time did Ms. Parker communicate

17   to you information about -- that related to Ms. Hedges sexually

18   harassing her or other people or any employees sexually

19   harassing her?

20   A.  Yes.

21           MR. HUBBARD:  Objection.

22           THE COURT:  Basis.

23           MR. HUBBARD:  Hearsay.

24           THE COURT:  Overruled.

25   Q.  And was that the first time that you have learned about

GC89PIC5                    Weiss – cross

1   information related to a HSBC employee sexually harassing

2   Ms. Parker?

3   A.  The only time.  Yes.

4   Q.  Now, at some point Ms. Hedges was removed from her

5   position?

6   A.  Yes.

7   Q.  And after Ms. Hedges was removed from her supervisory

8   position did you inform Mr. Picarella?

9   A.  Yes.

10              MR. JACKSON:  I'd like to offer DX-167.

11              Is there any objection, Mr. Hubbard?

12              THE COURT:  Hold on.  Is there an objection to 167?

13              MR. HUBBARD:  No, sir.

14              THE COURT:  It's in.

15              (Defendant's Exhibit  167 received in evidence)

16   Q.  Is this a note that you communicated -- that you made on

17   July 30, 2012?

18   A.  Yes.

19   Q.  And were you updating him on at that time what you had

20   learned at that stage of the investigation?

21   A.  Yeah.  At this point the -- from my standpoint the

22   investigation was over and I was providing Mike a full update

23   on the investigation.

24   Q.  At some point though did the investigation continue after

25   this?

1    A.  Sorry.  I should be clearer.  My part of the investigation.

2    And then from here on there were -- I was not involved after

3    this period of time.

4            MR. JACKSON:  Can you take this down.

5    Q.  Last question.  You talked during your direct about some of

6    the communications involving the selection of Ms. Jenner for a

7    position ultimately?

8    A.  Yes.

9    Q.  During the time that that was going on did you ever hear

10   anyone say anything suggesting that they -- in connection with

11   the promotion of Ms. Jenner that they wanted to retaliate

12   against Mr. Picarella?

13   A.  I never heard that.  No.  Definitely not.

14   Q.  Did you ever see any indication that anyone wanted to

15   retaliate against Mr. Picarella?

16   A.  No.

17           MR. JACKSON:  Just one moment, your Honor.

18           No further questions of this witness.

19           THE COURT:  Any redirect?

20           MR. HUBBARD:  Yes, your Honor.  Can we just take a

21   short break.  We've had a long time.  Can we just take a short

22   four or five minute break?

23           THE COURT:  Okay.  Let's take a four-minute break.

24   Don't discuss the case amongst yourselves or with anyone else.

25           (Jury excused)

GC89PIC5                            Weiss - cross

1              THE COURT:  Counsel do you plan to do a redirect?

2              MR. HUBBARD:  Yes.  I just need to go to the restroom.

3              THE COURT:  How long or short do you think that will

4    be?

5              MR. HUBBARD:  I don't think I could finish before five

6    o'clock because she's denying having heard any -- complaints of

7    sexual harassment.  I just don't think I can do it -- because

8    this is really their direct examination.  I will try but I

9    don't think I can finish by five.  I'll do everything I can

10   to --

11             THE COURT:  How long do you think -- how short do you

12   think it would take to do your redirect?

13             MR. HUBBARD:  How short?

14             THE COURT:  Yes.

15             MR. HUBBARD:  I think it will take 30 to 40 minutes.

16             THE COURT:  I don't think it will take that long.

17   Give me an offer of proof why do you think it will take that

18   long -- you can all be seated.  Give me a sense.

19             (Witness excused)

20             You called this witness on your direct case.  I don't

21   know if your direct was quite -- it was not much more than 40

22   minutes on your direct.  I'm not -- that seems like an

23   extremely long time for redirect.  Give me an offer of proof

24   what you want to go into.

25             MR. HUBBARD:  Yes, I will your Honor.  She was then

GC89PIC5                        Weiss - cross

1  taken on what was essentially direct examination by the

2  defendants, their employer.

3           THE COURT:  Just tell me what it is that you're going

4  to go over.

5           MR. HUBBARD:  Because she testified about six times

6  that Mr. Picarella had never complained about the sexual

7  harassment of Melissa Parvis in the timeframe in this case.

8  She said it five or six times.

9           THE COURT:  To her?

10          MR. HUBBARD:  Yes.

11          THE COURT:  So what is it you wish to do with her

12 about their statements to her?

13          MR. HUBBARD:  Impeach her with the documents.

14          THE COURT:  That documents that will show that he made

15 these complaints to her?

16          MR. HUBBARD:  Or that she knew about it.  She said he

17 didn't make it and she didn't know about it.  That's the way I

18 understood her testimony.

19          THE COURT:  That she didn't know about what?

20          MR. HUBBARD:  That Mr. Picarella had complained that

21 Ms. Parker had been sexually harassed.

22          THE COURT:  Okay.  And you have documents that will

23 show that she knew that Mr. Picarella had previously made

24 complaints to her that Ms. Parker had been sexually harassed or

25 there were complaints that she knew about -- give me a sense of

GC89PIC5                        Weiss - cross

1    what we're talking about.

2              MR. HUBBARD:  Some do and some -- I just don't know

3    that -- as long as there is no communication with her -- some

4    are documents written by her staff who was conducting this

5    investigation.

6              THE COURT:  So what is it you plan to do with her?

7    These are documents written by her staff.  If she said she

8    didn't know anything about them.  What is the utility of using

9    these documents written by someone else.  I think she indicated

10   that she didn't do much of this investigation, that some of

11   this investigation was done by other people on her staff.

12             MR. HUBBARD:  I don't think that response was

13   credible.  I would attack the credibility of that.  But I will

14   certainly show that the documents reflect that Mr. Picarella

15   had made those complaints; most importantly that he had made

16   them whether it was to her or to her staff.

17             THE COURT:  Okay.  Fine.  How many documents are

18   there?  It doesn't seem like that takes 40 minutes to do that.

19   Are these documents that are already in evidence?

20             MR. HUBBARD:  I think so, your Honor, yes.

21             I'm not going to belabor it.  I'll do it as fast as I

22   can.  I will try to do it in the 20 or 25 minutes remaining.

23             THE COURT:  You don't have 25 minutes remaining.  We

24   may just let the jury go for the day and deal with this

25   tomorrow.

1          MR. JACKSON:  Your Honor, may we ask if we can attempt

2     to complete this today.  I really rushed through that --

3     Ms. Weiss has vacation scheduled so tomorrow is going to be a

4     real problem.

5          THE COURT:  Well we can't work past five because I

6     already promised the jury that.

7          Let's go ahead with the trial, let's try to move it

8     along.  But it seems to me if you're going to show her

9     documents, the documents are in evidence, you're going to show

10    her documents that this was stated and then what are you going

11    to do with that?  Then you plan to ask her what?  You didn't

12    know about this?  I guess.

13         MR. HUBBARD:  Your Honor, she's left the jury with the

14    impression that Mr. Picarella did not make these complaints.  I

15    believe I can impeach that testimony.

16         THE COURT:  I understand that.  I'm saying what is it

17    you want to do with her.  I understand that there are documents

18    in evidence that rebut what she is saying in your view.  I'm

19    talking about what you want to do with her about that.  I'm

20    saying what is it you -- you're going to show her a document

21    that says that this statement was made to somebody else in her

22    staff and then you're going to do what?  You plan to ask her

23    what?

24         MR. HUBBARD:  If she knew about it.

25         THE COURT:  Okay.  All right.  So that shouldn't take

GC89PIC5                          Weiss - cross

1    long then.

2              MR. HUBBARD:  It shouldn't.

3              THE COURT:  Okay.  Bring the jury in.

4              MR. HUBBARD:  Thank you.

5              THE COURT:  Oh, let's bring the witness back in.

6              Yes.  What is it?  Is there something else?  Hold on.

7              MR. JACKSON:  No I was just asking, bring the witness

8    in?

9              THE COURT:  Bring the witness in and let's bring the

10   jury in.

11             I mean actually it seems to me that -- hold on.  Let

12   me just -- actually let me just ask the witnesses to step

13   outside.

14             THE DEPUTY CLERK:  Jury entering.

15             THE COURT:  Tara, Tara, can we have two more minutes

16   just for a second.

17             (Jury not present)

18             THE COURT:  I believe the witness is out of the room.

19             MR. JACKSON:  Yes, your Honor.

20             THE COURT:  Again, just in terms of efficiencies here

21   this is something -- you can all be seated -- I was talking

22   about it yesterday again in terms of perhaps getting into -- I

23   know counsel are both very experienced but into the sort of one

24   question too many.  If you have a document that indicates that

25   this statement was made to someone in her staff who works for

GC89PIC5                          Weiss - cross

1    her and that document is in evidence it seems to me that you --

2    if you can argue that she knew about it or should have known

3    about it, you have that there.  You can make that argument to

4    the jury.

5           MR. HUBBARD:  I don't disagree.

6           THE COURT:  Asking her about it is potentially --

7    maybe she'll agree with you but if she doesn't then you're

8    going to want to try to unwind all of this.

9           MR. HUBBARD:  Your Honor, I don't disagree with you.

10   I don't disagree with you.  But what I'm trying to say is I

11   believe it's important that the existence of this information

12   that he had complained be presented to the jury at the same

13   time that she denies it.  Because he's made that impact on her.

14   That's all I'm saying.  And although -- I can tell you the ones

15   that are not and I think they'd be admitted without objection.

16          THE COURT:  The one -- the what?

17          MR. HUBBARD:  Some of these --

18          THE COURT:  I thought they are already in evidence,

19   aren't they?

20          MR. HUBBARD:  A couple of them are not.  But I don't

21   think there's any objection to them.  There are HSBC records.

22          THE COURT:  How many different ones are there?  Again,

23   I don't want to get into cumulative testimony.  How many

24   different ones are there?  How many do you feel you need?  If

25   they are multiple ones to the same employee I don't know if

GC89PIC5                    Weiss – cross

1  that's that helpful.  Let's go ahead and see what we can do.

2  Let's bring the jury in.

3          (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

  1              (Jury present)

  2              ELLEN WEISS, resumed

  3              THE COURT:  Please be seated.

  4              Let's continue.  Go ahead, counsel.

  5              MR. HUBBARD:  Peter, may I have PX-113 please.  The

  6      top of the e-mail says Mr. Picarella to Ms. Weiss.

  7              MR. JACKSON:  We have no objection to this, your

  8      Honor.

  9              THE COURT:  Okay.  It's in.

 10              (Plaintiff's Exhibit 113 received in evidence)

 11      REDIRECT EXAMINATION

 12      BY MR. HUBBARD:

 13      Q.  Sunday July 1.  Subject is follow up.  Do you see that?

 14      A.  I do.

 15      Q.  He says:  Per our conversation on Friday it's my

 16      understanding that the sexual harassment and bullying

 17      investigation has been concluded.  It's also my understanding

 18      that HSBC after investigating found nothing to support my

 19      claims.

 20              In summary, it says:  HSBC has concluded that the

 21      investigation of the sexual harassment claims I made against

 22      Eileen that she had exposed one of her breasts to me and

 23      Michelle Parker in the office during work hours and the example

 24      I gave of her behavior in Key Largo.

 25              Were you aware of those examples when this e-mail was

1    sent to you?

2    A.   No.

3    Q.   Let's go to --

4    A.   I'm sorry.  Can you -- do you mean from Michelle Parker or

5    from -- the breast incident I was aware.  Sorry.  Can you go

6    back to that for one second.  I don't know if I understood.

7    Q.   The example he gave of her behavior in Key Largo?

8    A.   I was aware from Mike regarding the fact that he had said

9    somebody earlier, he had talked about the Key Largo event and

10   that was earlier, which I testified to, where he said that

11   there was a breast incident and there was kissing and he

12   thought there was a blow job.  But I hadn't yet talked to

13   Ms. Parker at this point.

14   Q.   When did you learn -- when did you learn that he had

15   reported that a gentleman by the name of Eduardo Legoretta,

16   Ms. Hedges had encouraged Ms. Parker to sleep with

17   Mr. Legoretta.  When did you hear that allegation?

18   A.   Can you repeat the allegation?  But in terms of I hadn't

19   heard it yet.  I hadn't talked to Ms. Parker yet.  I just need

20   to hear.

21   Q.   When did you hear the allegation from Mr. -- the report

22   from Mr. Picarella?

23   A.   (No response).

24   Q.   That Ms. Hedges had participated in encouraging Ms. Parker

25   to sleep with one of her colleagues, Mr. Legoretta, one of the

1    sales heads?

2              MR. JACKSON:  Objection.  Assumes facts.

3              THE COURT:  Overruled.

4              THE WITNESS:  So I had a conversation after this

5    e-mail, a couple of weeks after this, with Ms. Parker where she

6    had indicated there was some issues in the Key Largo event.

7    And that's when she told me what had happened.  But not

8    before -- not at this time.

9    Q.  So your testimony is -- okay.  So when did -- when did you

10   ask your staff to begin investigating those Key Largo

11   allegations?

12   A.  Not until the fact -- not until after I had the

13   conversation with Ms. Parker and then that was discussed at

14   that time, investigated at that time.

15   Q.  And that investigation was undertaken at that time, right?

16   A.  Yes.  Yes.

17   Q.  And after -- after the first of September of 2012 when

18   Mr. Picarella complained to Ms. Bilbrey, the head of human

19   resources, did you participate any further in the investigation

20   of these complaints about sexual harassment?

21   A.  No.

22   Q.  You did not?

23   A.  I did not.

24   Q.  And who picked up the investigation at that time?

25   A.  There were multiple people.  I couldn't answer that.  I

GC89PIC5                          Weiss - redirect

1    don't know.

2              MR. HUBBARD:  May I just have one moment, your Honor,

3    please.

4    Q.  Let me ask you this question.  In June did you have

5    Ms. Jang or anyone in the month of June, any of your deputies,

6    investigate an allegation from Mr. Picarella about the sexual

7    harassment incident in Key Largo?

8    A.  I'm not -- sorry.  I don't understand the question.

9    Q.  In the month of June.  You talked to us about July that you

10   heard something from Ms. Parker?

11   A.  Right.

12   Q.  And I gather you commissioned some kind of investigation?

13   A.  Yes.  After I talked to Ms. Parker, yes.

14   Q.  Going back into June.

15   A.  Yes.  Sorry.

16   Q.  Did you have any of your deputies investigating sexual

17   harassment allegations related to Key Largo?

18   A.  Yes.  Michael had provided a list of witnesses for Key

19   Largo and Jennifer Whang on my team, I believe Sue was on core,

20   Jennifer Whang interviewed some of the folks that were on

21   Michael's list.

22   Q.  She did?

23   A.  Yes.

24   Q.  Did she interview them about allegations related to

25   Ms. Parker?

GC89PIC5                        Weiss - redirect

1   A.   The allegations were not based on Ms. Parker because we

2   hadn't talked to Ms. Parker at that time.   Just to be very

3   clear.   The allegations were based on what Michael had told me

4   that he had heard, which were related to the fact -- Michael

5   had basically come to me and said that he had heard at Key

6   Largo there was an event of Rafael Abeysa kissing Eileen.   And

7   that he had heard that Eileen had had a blow job with somebody

8   in the bathroom.   Those were the only things that didn't have

9   anything to do with Ms. Parker of that investigation.

10          I would not have known about any of those events until

11  I talked to Ms. Parker, which was later.

12  Q.   When did, to your knowledge, when did human resources begin

13  to investigate the allegations of sexual harassment of

14  Ms. Parker at Key Largo?

15  A.   Ms. Parker -- well -- Ms. Parker brought up the issues

16  in -- to me in July.   But this was all regarding Eileen and

17  Mike's situation that I was involved in.   I did not get

18  involved in Ms. Parker's situation so I can't comment on that.

19  Q.   So when the investigation began in September that was under

20  Ms. Bilbrey and not under you?

21  A.   The investigation of -- I'm not clear on who you're

22  referring to.

23  Q.   Of the allegations of sexual harassment of Ms. Parker in

24  Key Largo?

25  A.   I was not involved in that.

1          MR. HUBBARD:  Nothing further, your Honor.

2          THE COURT:  Okay.  The witness is excused.

3          THE WITNESS:  Thank you.

4          (Witness excused)

5          THE COURT:  Members of the Jury, we are going to

6     dismiss you for the day.  So don't discuss this case with

7     anyone else.  Don't let anyone discuss this case with you.

8     Don't do any independent research related to any of the issues

9     pertaining to this case.  We'll see you at 9:30 tomorrow

10    morning.  As I indicated, we will work no later than 4 o'clock

11    tomorrow.  Have a great day.

12          (Jury excused)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

GC89PIC5                           Weiss - redirect

1                    (In open court)

2                    THE COURT:  So, I'll see counsel tomorrow.  Let's ask

3       counsel again to get here at 9:15 just to avoid any unnecessary

4       bumping into jurors.  Is there anything that needs to be raised

5       with me before we adjourn for the day?

6                    MR. HUBBARD:  I don't think so, your Honor.  I still

7       want to deal with my job search books but we can do that

8       tomorrow.

9                    THE COURT:  Okay.  Anything from defense counsel?

10                   MR. JACKSON:  No, your Honor.

11                   THE COURT:  Okay.  See you tomorrow.

12                   MR. HUBBARD:  Thank you, sir.

13                   (Adjourned to December 9, 2016 at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                        Page

 3    MICHAEL PICARELLA

 4    Cross By Mr. Jackson . . . . . . . . . . . . 517

 5    Redirect By Mr. Hubbard  . . . . . . . . . . 606

 6    ELLEN WEISS

 7    Direct By Mr. Hubbard  . . . . . . . . . . . 638

 8    Cross By Mr. Jackson . . . . . . . . . . . . 666

 9    Redirect By Mr. Hubbard  . . . . . . . . . . 691

10                      PLAINTIFF EXHIBITS

11    Exhibit No.                         Received

12     305    . . . . . . . . . . . . . . . . . 614

13     68     . . . . . . . . . . . . . . . . . 640

14     74     . . . . . . . . . . . . . . . . . 645

15     83     . . . . . . . . . . . . . . . . . 646

16     87     . . . . . . . . . . . . . . . . . 647

17     97     . . . . . . . . . . . . . . . . . 650

18     127    . . . . . . . . . . . . . . . . . 654

19     113    . . . . . . . . . . . . . . . . . 691

20                      DEFENDANT EXHIBITS

21    Exhibit No.                         Received

22     21     . . . . . . . . . . . . . . . . . 517

23      138   . . . . . . . . . . . . . . . . . 529

24      144   . . . . . . . . . . . . . . . . . 529

25      186   . . . . . . . . . . . . . . . . . 534
```

699

1    195    . . . . . . . . . . . . . . . . . 536

2     153    . . . . . . . . . . . . . . . . 542

3     173    . . . . . . . . . . . . . . . . 543

4     176    . . . . . . . . . . . . . . . . 547

5     177    . . . . . . . . . . . . . . . . 548

6     179    . . . . . . . . . . . . . . . . 549

7     181    . . . . . . . . . . . . . . . . 551

8     182    . . . . . . . . . . . . . . . . 552

9     183    . . . . . . . . . . . . . . . . 555

10     196    . . . . . . . . . . . . . . . . 557

11    224 and 227    . . . . . . . . . . . . 563

12    236    . . . . . . . . . . . . . . . . 570

13    274    . . . . . . . . . . . . . . . . 594

14    250    . . . . . . . . . . . . . . . . 594

15     139    . . . . . . . . . . . . . . . . 671

16     155    . . . . . . . . . . . . . . . . 676

17     158    . . . . . . . . . . . . . . . . 678

18     167    . . . . . . . . . . . . . . . . 682

19

20

21

22

23

24

25