GC9TPIC1                    Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MICHAEL PICARELLA,

 4                Plaintiff,

 5           v.                          14 CV 4463 (ALC)

 6   HSBC (USA) SECURITIES, INC.,

 7                Defendant.

 8   ------------------------------x
                                        New York, N.Y.
 9                                       December 9, 2016
                                         9:30 a.m.
10
     Before:
11
                      HON. ANDREW L. CARTER,
12
                                         District Judge
13
                        APPEARANCES
14
     LIDDLE & ROBINSON LLP
15        Attorneys for Plaintiff
     BY:  JAMES R. HUBBARD
16        BLAINE H. BORTNICK
          ASA F. SMITH
17        CHRISTINE PALMIERI

18   BOIES, SCHILLER & FLEXNER LLP
          Attorneys for Defendant
19   BY:  RANDALL W. JACKSON
          DAVID L. SIMONS
20        NICHOLAS STANDISH

21   GIBSON, DUNN & CRUTCHER LLP
          Attorneys for Defendant
22   BY:  GABRIELLE F. LEVIN

23

24

25
```

GC9TPIC1                    Trial

1                (In open court, jury not present)

2                THE COURT:  So the jurors are all here.  We're going

3       to be ready to begin.  I got a submission from defense counsel

4       last night.  We can deal with that later.

5                Who is the first witness today?

6                MR. HUBBARD:  Your Honor, the first witness is

7       Ms. Jang.

8                THE COURT:  Okay.  And then who is after Ms. Jang?

9                MR. HUBBARD:  After Ms. Jang is -- I talked to

10      counsel, I think the next witness is going to be Mr. Silber.

11               THE COURT:  Okay.

12               MR. HUBBARD:  Then Mr. Descamps, followed by

13      Mr. Karam.  There's a person on the list I mentioned to you

14      earlier, Ms. Malanga, she will be called by the defendants on

15      Monday.

16               THE COURT:  Okay.  And at least one of those witnesses

17      I believe was traveling from out of the country.  Which one of

18      those is that?

19               MR. HUBBARD:  Mr. Descamps.

20               THE COURT:  So give me a sense of the time on the

21      examination of this first witness.

22               MR. HUBBARD:  All are, except Mr. Karam, including the

23      first witness, are brief, direct 15 minutes, your Honor.

24               THE COURT:  Okay.  And what about the cross of these

25      witnesses?

1            MR. JACKSON:  Your Honor, we don't expect any of them

2     to be very long, at the most 30 minutes, I think, at the most,

3     excepting Mr. Karam.  Mr. Karam is the longest of these.  He

4     may be longer than that, but the first three that were

5     mentioned we're talking about 30 minutes perhaps, at the most.

6            THE COURT:  Okay.  I wanted to make sure that we will

7     go ahead, I wanted to kind of watch the time because the

8     witness who is traveling from out of town we want to make sure

9     we get that witness done today.  Doesn't seem like it will be a

10    problem.

11           MR. JACKSON:  We very much appreciate that, and I

12    think based on the current schedule we have no concern that

13    we'll get Mr. Descamps done.

14           THE COURT:  All right.  I'll bring the jury in and

15    greet them and we'll start.

16           Anything else that we need to address this morning?

17           MR. HUBBARD:  No, sir.

18           THE COURT:  Let's bring the jury in.

19           (Continued on next page)

20

21

22

23

24

25

GC9TPIC1                        Jang Demian - direct

1              (Jury present)

2              THE COURT:  Good morning.  And welcome back.  We are

3     going to continue with the case on trial, counsel, you may call

4     your next witness.

5              MR. HUBBARD:  Thank you, your Honor.

6              Your Honor, we call Ms. Jang.

7      SUE JANG DEMIAN,

8          called as a witness by the Plaintiff,

9          having been duly sworn, testified as follows:

10    DIRECT EXAMINATION

11    BY MR. HUBBARD:

12    Q.  Good morning, Ms. Jang.

13    A.  Good morning.

14    Q.  Let me begin by asking you how you are currently employed.

15    A.  I work in human resources at HSBC supporting global banking

16    and markets business.

17             THE COURT:  Let me check and make sure the jury can

18    hear the witness okay.

19             Make sure you remember to lean into the microphone.

20    Q.  I didn't get the last part, I didn't get the exact place in

21    human resources that you are now working.

22    A.  I work for the global banking and markets business

23    supporting that division.

24    Q.  All right.  And today who is the senior executive in that

25    division, not human resources?

GC9TPIC1                         Jang Demian – direct

1   A.  But in the business?

2   Q.  Yes.

3   A.  Thierry Roland, who is the CEO of the Americas.

4   Q.  Is he officed here in New York?

5   A.  Yes.

6   Q.  And in your human resources area, do you have any reporting

7   relationship?

8   A.  That I report to?

9   Q.  Yes.

10  A.  My own personal report?

11  Q.  Yes.

12  A.  I report to Susan Roskell, who is the head of HR for global

13  banking and markets Americas.

14  Q.  Is Ms. Roskell officed here in New York?

15  A.  Yes.

16  Q.  Let's go back a bit to the year 2012.  Let me ask you where

17  you -- were you working in the human resources then?

18  A.  The same.

19  Q.  The same.

20          And at that time your direct report was not

21  Ms. Roskell, it was Ms. Weiss?

22  A.  Correct, yes, Ellen Weiss.

23  Q.  Ellen Weiss?

24  A.  Mm-hmm.

25  Q.  Did there come a time when Ms. Weiss asked you to

GC9TPIC1                         Jang Demian – direct

1    investigate some complaints regarding Eileen Hedges that

2    Mr. Picarella had made?

3    A.   Yes.

4    Q.   Do you recall the time that that began?

5         Just roughly, we're talking about the year 2012, I

6    think, and maybe the month in that year, if you recall.

7    A.   It was the beginning of that year.

8    Q.   And you say the beginning of that year, do you recall

9    having had that assignment at any time before the first of

10   April?

11   A.   I'm not sure of the exact dates but it was around April.

12   Q.   I realize it's been some time.

13        Okay.  How were you first contacted about working on

14   that complaint from Mr. Picarella?

15   A.   I believe it was Ellen asking me to look into it.

16   Q.   Okay.  And what, if anything, did you do when she asked you

17   to look into it?

18   A.   We discussed some of the feedback that she had received and

19   put together an outline of points to go over with Eileen.

20   Q.   So do I understand what you're saying that when you

21   commenced your investigation you started by talking to

22   Ms. Hedges?

23   A.   I spoke to Ellen.  So Ellen received the information for

24   which she asked me to look into these items.  She provided the

25   feedback that she received so I could look into it, then she

GC9TPIC1                     Jang Demian - direct

1   asked me to have a discussion with Eileen.

2   Q.  Do you remember when you had that discussion with

3   Ms. Hedges?

4   A.  I have notes that has a date.  I believe it was in April.

5   Q.  How many times in the April, May, June time frame did you

6   talk to Ms. Hedges?

7   A.  She was a business manager in the business that I

8   supported, so we did speak from time to time, work-related

9   items.  I don't have a number of times.

10  Q.  Did you make a written memorandum of that first discussion

11  with Ms. Hedges?

12  A.  I did, yes.

13  Q.  And it was in April?

14  A.  I have the date on the notes that I put together.  I'm

15  sorry, it's so long ago I didn't go back and memorize my dates

16  and notes.

17  Q.  You haven't looked at it before coming here today?

18  A.  I looked at it to refresh my memory but I didn't memorize

19  every date.

20  Q.  And you think that was in April possibly?

21  A.  Can you share the notes?  If you could share the notes it

22  would have the date that I spoke to Eileen.

23  Q.  The problem is I don't have them, but we'll get to that.

24          Did there come a time when Ms. Whang, W-H-A-N-G, did

25  some of that investigation for you or with you?

GC9TPIC1                        Jang Demian - direct

1  A.  There was a point in time where I had taken vacation.

2  We're required to take two weeks out of the office, and during

3  that time she stepped in for me.

4  Q.  Did she do -- did she file the first written report, do you

5  think?

6  A.  I am not sure.

7  Q.  Okay.  Let me have Exhibit PX-111.

8             THE COURT:  Is that already in?

9             MR. HUBBARD:  I believe it's in evidence.

10            THE COURT:  Okay.

11            MR. HUBBARD:  I'm checking now.

12            MR. JACKSON:  No.

13            MR. HUBBARD:  It's not.  May I move 111?

14            THE COURT:  Any objection to 111?

15             MS. LEVIN:  No objection.

16            THE COURT:  Okay.  It's in.

17            (Plaintiff's Exhibit 111 received in evidence)

18  Q.  You see at the top there, Ms. Jang, it says meeting notes

19  from June 28 meeting, Eileen Hedges and Jennifer Whang.

20            I asked her about the incident on the trading floor in

21  which she exposed her breast to Mike and Michelle Parker during

22  a conversation about her weight loss.

23            Do you believe that you talked to Eileen Hedges about

24  the complaints Mr. Picarella had made to Ms. Weiss back in

25  April before this?

GC9TPIC1                        Jang Demian - direct

1   A.  I believe this is notes from Jennifer's conversation when

2   she was filling in for me when I was out.

3   Q.  My only question to you is before that you think you spoke

4   to her?

5   A.  To Eileen?

6   Q.  Yes.

7   A.  I did, yes.  This is after I had spoken to Eileen

8   initially.

9   Q.  Let's see if we can find Plaintiff's Exhibit Number 1.  I

10  think I found it.

11          Let's take a look at this.

12          THE COURT:  Is plaintiff's 1 in evidence?

13          MR. HUBBARD:  I don't think 1 is in evidence.  May we

14  move Exhibit 1?

15           MS. LEVIN:  No objection.

16          THE COURT:  Okay, 1 is in evidence.

17          (Plaintiff's Exhibit 1 received in evidence)

18  Q.  Monday, April 26, let's assume that's '12 for purposes of

19  our discussion.

20  A.  Typo.

21  Q.  Is this the report of what you believe to be the first

22  conversation you had with Ms. Hedges?

23  A.  Yes.

24  Q.  So you said at the top:  Before I contacted Eileen she

25  asked me to meet to discuss the performance discussions she was

1    having with Mike.  These are notes of our discussion.

2              Right?

3    A.  That's correct.

4    Q.  She wanted -- she talks about aligning her expectations.

5    She was out for knee surgery.  She said she didn't think his

6    coverage was as smooth as it should be.

7              Let's go to the second paragraph.

8              After discussing Mike's performance, you see you have

9    some other topics that you discovered that you covered with

10   her.  Right?

11   A.  Yes.

12   Q.  And then do you recall when the next time is you spoke to

13   her?

14   A.  The next time that I spoke to Eileen?

15   Q.  Yeah.

16   A.  As I mentioned, because she was supporting the sales

17   business, which was the area that I covered, we did speak from

18   time to time on various matters.  So I don't know exactly when

19   I would have spoken to her next or what it was regarding.  We

20   spoke about this on the day that is noted on the top of my memo

21   in April.

22   Q.  What did you know in the April, May 2012 time frame about

23   Ms. Hedges' performance problems?

24   A.  Well, she had indicated to me previously that she was

25   concerned about Mike's performance.

1          Are you asking about --

2   Q.  We covered Mike's performance.  I'm asking you about her

3   performance.

4   A.  Her work performance was considered to be good.  It was

5   considered to be capable and knowledgeable of the business and

6   the various projects that they were working on.

7   Q.  Do you know that Mr. Pizzimbono had moved her from the --

8   moved her off the 9th floor?

9   A.  We moved floors all the time constantly.

10  Q.  That was not my question.

11         Did you know that Mr. Pizzimbono had moved Ms. Hedges

12  away from his floor and changed her reporting relationship away

13  from him?

14  A.  Away from Pablo?

15  Q.  Yes.

16  A.  Yes.

17  Q.  Did you know that he was not satisfied with her performance

18  and wanted her out of the business?

19  A.  In terms of her work performance --

20  Q.  Can you just answer that yes or no?

21  A.  Sorry, can repeat the question?

22  Q.  Did you know Mr. Pizzimbono, in the spring of 2013, was not

23  satisfied of her performance and wanted her out of the

24  business?

25  A.  2013?

1    Q.  '12.

2    A.  2012.  Again I'm not a hundred percent sure on dates, but I

3    would say behavior performance, yes.

4    Q.  Let's go to PX-118 in evidence?

5            MR. HUBBARD:  Any objection to 118?

6             MS. LEVIN:  No objection.

7            THE COURT:  118 is in.

8            (Plaintiff's Exhibit 118 received in evidence)

9            MR. HUBBARD:  Bring up 118.

10   Q.  Looks like you had another discussion here with Ms. Hedges

11   on or about July 23, 2012.

12   A.  Yes.

13   Q.  Looks like -- I'm going to go through this quickly with

14   you.  Can you see the screen okay?

15   A.  I can, yes.

16   Q.  There's a place at the top where you say something about

17   expenses, and then you go down to a meeting that took place a

18   year and a half ago, another reference to expenses.

19           Go down with me, there's a reference to a dinner with

20   Mr. Bottorff.  Do you see that?

21           Okay.  Then there's a place where you ask a question

22   about pulling Ms. Parker into somebody's office and asking her

23   to lie about the relationship with human resources.  She

24   replied no.

25           Let's go to the second page, please.

GC9TPIC1                        Jang Demian - direct

1          Looks like you write down the question at the top, and
2     it says:  In Key Largo, did you ever encourage Michelle to
3     flirt with Eduardo Legoretta or tell her that she should sleep
4     with him?
5          Where did you get that question from?  I realize it's
6     been some time.
7     A.  I believe I had discussions with legal and my manager Ellen
8     at the time prior to this meeting, so that's -- I don't
9     remember who would have provided the question.
10    Q.  Okay.  You don't know whether it came from Ms. Parvis --
11    sorry, Ms. Parker or Mr. Picarella?
12    A.  I don't remember.
13              MR. HUBBARD:  PX-120, please.
14              It's not in, your Honor.
15              Any objection?
16               MS. LEVIN:  No objection.
17              THE COURT:  Okay.  It's in.
18              (Plaintiff's Exhibit 120 received in evidence)
19    Q.  These appear to be discussion notes between you and
20    Ms. Hedges on or about July 24, 2012.
21          In sum and substance you met with her that day, you
22    told her that she was being put on a final warning with respect
23    to her managerial responsibilities and she would no longer have
24    direct reports, and that there would be some counseling about
25    focusing on behavior and poor judgment, and her work

GC9TPIC1                        Jang Demian - direct

1    responsibilities will be changed.

2              So at or about that time you recall that her

3    managerial responsibilities were removed from her --

4    A.  Yes.

5    Q.  -- plate?

6              Okay.  How long did you -- would it be fair to say

7    that about this time your investigation of the -- of

8    Mr. Picarella's complaints that he made to Ms. Weiss pretty

9    much ended your involvement in that phase?

10   A.  Yes.

11             MR. HUBBARD:  Exhibit 97, please.  I believe this is

12   this evidence.

13             Sorry, may I offer 97, your Honor?

14             THE COURT:  97 is already in.

15             MR. HUBBARD:  Okay.

16   Q.  This appears to be an email from you, Ms. Jang, to

17   Ms. Weiss on May 7, 2012.  You seem to be reporting the

18   conversations you had with Mr. Pizzimbono.

19   A.  Yes.

20   Q.  At or about this time he told you that he wanted Eileen out

21   of the managerial role and is on borderline of saying out all

22   together.

23   A.  Yes.

24   Q.  By May 7, 2012, fair enough?

25   A.  Yes.

GC9TPIC1                        Jang Demian - direct

1   Q.  Let's go to Exhibit 185, which I think is in evidence.

2            Let's go to the masthead.  Let's -- this is an email

3   from you on April 22nd, 2013 at or about the time -- this is in

4   2013, sorry, April 22, 2013, and you send this to Ms. Weiss and

5   others, right?

6   A.  It appears that way.  I haven't seen this e-mail.

7   Q.  And other employees on there are employees that work in the

8   human resources function?

9   A.  Yes.

10  Q.  And says action required PCC reporting Q1 2013, right?

11  A.  That's correct.

12  Q.  What is PCC reporting?

13  A.  It would be personal conduct cases.

14  Q.  Let's go down to the bottom, please.

15           Beginning with the email from Ms. Weiss, you see there

16  is an email from Ms. Weiss, looks like a list of these PCC

17  cases, right?  See that?

18  A.  Yes.  I'm sorry, I'm reading because I haven't seen this

19  yet.

20           Yes.

21  Q.  And there's some names down at the bottom, a couple of the

22  names are Hedges, Picarella, Goodwin, Legoretta, et cetera, on

23  the list, right?

24  A.  Mm-hmm.

25           MR. HUBBARD:  216, please.

GC9TPIC1                        Jang Demian – direct

1               THE COURT:  I don't think 216 is in.

2               MR. HUBBARD:  I don't believe it is.

3               Mr. Fitzgerald, wait to put it up.

4               Any objection to 216?

5                MS. LEVIN:  No objection, your Honor.

6               THE COURT:  It's in.

7               (Plaintiff's Exhibit 216 received in evidence)

8    Q.  This is from you to Ms. Weiss, March 14, 2014.  Now we're

9    up to looks like 2014.  There's some names at the top, Cary

10   Parker, MP, JR.

11              Let's go down to the next one, please.

12              MR. HUBBARD:  Is there anything else on the bottom of

13   that?

14              That's it, right?

15              Let me have, please, 219, please.

16              I think this is in evidence, your Honor.

17   Q.  There's an email at the bottom from Ms. Weiss to you and

18   others dated 13 May 2014.  The subject is restructuring.  Do

19   you know what that restructuring refers to?

20   A.  Yes.

21   Q.  Did you know at the time these emails were written?

22   A.  I'm sorry?

23   Q.  Did you know at the time these emails were written what it

24   refers to?

25   A.  Restructuring, yes.

GC9TPIC1                        Jang Demian – direct

1   Q.  What was going on in the restructuring area at this time?

2   A.  Restructuring is general, could be reductions in force, it

3   could be looking at loan performers, it could be restructuring

4   of reporting lines, reductions in business, kind of general

5   restructuring could be anything.

6   Q.  And you appear to be a recipient on the email list there?

7   A.  Yes.

8   Q.  And Ms. Weiss says:  I haven't heard much on markets

9   restructuring other than the names below.  Is there anyone else

10  that business wants to let go?

11  A.  Yes.

12  Q.  Let go to the top.  Can we add MP?

13          When she asked you was there anyone else that business

14  wanted to let go, you responded:  Can we add MP?

15          Right?

16  A.  Yes.

17  Q.  Did business want to let MP go?

18  A.  At this time I was supporting the sales business, and I

19  knew that there was continuous concern on performance with

20  Mike, so that's why I would have said that to that question.

21  Q.  Who in business had told you that they were concerned about

22  his performance to the point that they were considering firing

23  him?

24  A.  The main senior manager that I supported was Pablo

25  Pizzimbono.

1   Q.  And he told you that, based on Mr. Picarella's performance

2   at that time, that he was considering terminating his

3   employment?

4              MS. LEVIN:  Objection, your Honor.

5              THE COURT:  Please rephrase the question.

6   Q.  Mr. Pizzimbono told you at this time -- the reason you

7   wrote this is because Mr. Pizzimbono told you at this time that

8   he was considering terminating Mr. Picarella's employment,

9   correct, or not?

10  A.  I don't recall a specific conversation, but we did talk

11  about performance.

12  Q.  Did you make a regular practice of recommending the

13  termination of employees?

14  A.  Ultimately HR doesn't make the decisions, but if there are

15  conversations that are taking place with managers in the

16  business, we -- it's not unusual that we would discuss it.

17  Q.  And so at this point in time there were conversations in

18  the business about terminating Mr. Picarella's employment?

19  A.  It wouldn't necessarily mean termination, but it would be

20  prompted by performance.

21  Q.  Did you know what his last performance rating was before

22  you wrote this email?

23  A.  I don't off the top of my head, no.

24  Q.  If I told you it was three strong, would that refresh your

25  recollection?

GC9TPIC1                          Jang Demian - direct

1   A.  Highly likely.  The majority of people are three strong.

2   Q.  Let talk about that for a minute.  So it's the bank's

3   practice to grade the majority of the employees in the business

4   as a strong?

5   A.  Yes.

6   Q.  Is there something wrong with that or is that something

7   that reflects that you have a competent work force?

8   A.  I would say that we try to differentiate performance.

9   However, at the time I think in 2013 the rating scale that was

10  used at that time did have a very large population who was

11  rated as three strong, which made it difficult to differentiate

12  the group of people in that rating category.

13  Q.  But to your knowledge, when a rating was assigned to these

14  employees, the word "strong" was put down by their name, right?

15          Yes or no.

16  A.  Yes, strong is --

17  Q.  I didn't ask that, I'm asking if the word "strong" was put

18  down by the rating number three.

19  A.  Yes.

20          MR. HUBBARD:  Thank you, nothing further.

21          Wait, I'm sorry, may I have just a moment?

22          (Pause)

23          MR. HUBBARD:  May I ask one other question about

24  Exhibit 111?

25          THE COURT:  Okay.

GC9TPIC1                          Jang Demian - direct

1    BY MR. HUBBARD:

2    Q.  Back to first line, there's a reference there to the breast

3    incident on the trading floor, the third sentence there,

4    Ms. Whang says Eileen had no recollection of this incident and

5    completely denied it ever happened.

6            And so when Ms. Whang made this memorandum as you were

7    conducting this investigation, you picked the investigation

8    back up, right?

9    A.  Yes, I did.

10   Q.  And what did you -- did you continue to try to determine

11   whether or not that had actually happened?

12   A.  Yes.

13   Q.  What did you find out?

14   A.  She denied that it ever happened.  She gave a similar

15   response to what she provided earlier, according to Jennifer's

16   notes.

17   Q.  Did you ask Ms. Parker about it?

18   A.  I never had any conversations with her, so my conversations

19   were directed with Eileen Hedges.

20   Q.  At any time did the human resources function ever determine

21   that that allegation was true?

22   A.  Not that I'm aware.

23   Q.  Do you know whether or not that allegation or her conduct

24   was part of the reason that her -- that she was removed from

25   her management in the summer of 2013 -- in the fall of 2012 and

GC9TPIC1                          Jang Demian – cross

 1   then terminated in the spring of 2013?

 2              MS. LEVIN:  Objection.

 3              THE COURT:  Please rephrase the question.

 4   Q.  Do you know if the alleged incident on the trading floor,

 5   the breast incident, was the basis of management's

 6   determination to remove her management responsibilities in 2012

 7   and to terminate her in 2013?

 8              MS. LEVIN:  Objection.

 9              THE COURT:  Can you rephrase the question, counsel?

10   Break that up a little bit.

11              MR. HUBBARD:  Sorry?

12              THE COURT:  Break that up a little bit.

13              MR. HUBBARD:  Yes.

14   Q.  Do you know if the allegation here in number one about her

15   exposing her breast on the trading floor was a basis of

16   management's decision to remove her management responsibilities

17   from her?

18   A.  As far as I know, I don't think we were able to validate

19   the incident happening, so I am not sure the answer to your

20   question.

21   Q.  By the end of July or so of 2012 you didn't continue to

22   investigate Ms. Hedges, did you?

23   A.  Not really, no.  During that time I had had the last

24   conversation with Eileen and put her on warning, and that

25   pretty much concluded my involvement.

1              MR. HUBBARD:  Thank you.

2              THE COURT:  Any cross-examination?

3              MS. LEVIN:  Yes, your Honor.

4    CROSS-EXAMINATION

5    BY  MS. LEVIN:

6    Q.  Good morning, Ms. Jang.

7    A.  Good morning.

8    Q.  Ms. Jang, how many years of HR related experience do you

9    have?

10   A.  About 20 years.

11   Q.  And how many years have you worked at HSBC?

12   A.  Twelve and a half years.

13   Q.  Have you investigated allegations of misconduct during your

14   career?

15   A.  Yes.

16   Q.  Approximately how many investigations have you been a part

17   of throughout your HR career?

18   A.  I would say at least dozens, more, 50.  It's hard to say.

19   Q.  Does HSBC encourage employees to report misconduct?

20   A.  Yes.

21   Q.  How?

22   A.  There's lots of different ways.  We have gone through a

23   transformation at the bank to ensure that people -- to

24   emphasize the message that people should be reporting any

25   concerns, whether it's conduct related, behavior related,

1    financial crime, anything that doesn't seem right.  There's tip

2    lines, there's an integrity hot line, there's an HR central

3    phone number that can be used, you can always speak to your HR

4    manager, business partner like myself.  There are many

5    different avenues.

6    Q.  Does HSBC provide protection to employees who do report

7    misconduct?

8    A.  Yes.

9    Q.  How does HSBC go about doing that?

10   A.  When we do conduct investigations we remind individuals

11   that we speak with that first they're meant to keep

12   conversations absolutely confidential, they're not meant to

13   talk to other employees.  In addition to that, we remind them

14   of our non-retaliation policy at the bank.

15   Q.  When you conduct interviews as part of an investigation of

16   misconduct, do you also remind the interviewees of the

17   anti-retaliation policy?

18   A.  Yes, that's pretty normal, standard procedures.

19   Q.  What can an HSBC employee do if they feel they're being

20   retaliated against?

21   A.  Similar, they can report it to a tip line, hotline, to

22   their HR manager, to their manager directly.

23   Q.  In your view, does HSBC take its commitment to

24   anti-retaliation seriously?

25   A.  Absolutely.

GC9TPIC1                        Jang Demian - cross

1    Q.  Were you involved in the decision to hire Mr. Picarella?

2    A.  I was HR business partner that helped to hire him, yes.

3    Q.  To your knowledge, was Mr. Picarella promised a specific

4    bonus when he was hired by HSBC?

5    A.  No, he was hired with a discretionary bonus only, so no.

6    Q.  If Mr. Picarella had been promised a specific bonus at the

7    time of his hiring, what would have needed to happen?

8    A.  We would have needed special approval from our London

9    office and CEO, and it would have been captured as a written

10   guarantee in the offer letter.

11   Q.  Does HSBC typically promise promotions to applicants during

12   the hiring process?

13   A.  Definitely not.

14   Q.  Why not?

15   A.  Because promotions are discretionary.  They're subject to

16   performance and the individual's performance, and there's a

17   whole review process that takes place.  So even if you're

18   nominated for promotion by your manager doesn't necessarily

19   mean that you would be approved for promotion in that year.  So

20   you can't commit to that in advance if you don't know -- don't

21   have full control of the process.

22   Q.  If someone is designated as a potential successor to a

23   role, does that mean that they're automatically promised the

24   promotion to that role?

25   A.  No.  There's usually numerous successors for any one role,

1    ideally.  And again, it's subject to many factors, including

2    performance, capabilities, assessment in the role and for the

3    new role that you would be a successor for.

4    Q.  Ms. Jang, this is PX-1.  This is a document that we looked

5    at earlier this morning.  These are your notes of your

6    April 26, 2012 meeting with Ms. Hedges.

7    A.  That's correct.

8    Q.  When you met with Ms. Hedges on April 26, was anyone else

9    present for that meeting?

10   A.  No, it was just myself and Eileen.

11   Q.  Were you the one who set up this meeting?

12   A.  Eileen actually requested the meeting.

13   Q.  Why did Ms. Hedges request the meeting?

14   A.  She had some concerns about Mike's performance and asked me

15   to talk about them.

16   Q.  What were Ms. Hedges' concerns of Mr. Picarella's

17   performance that she related to you during this meeting?

18   A.  Well, we had previously talked about having regular

19   meetings with Mike, which she was doing, and she wanted to

20   update me on those meetings.  She also had expressed her

21   concerns from when she was out on disability for her knee

22   surgery, and Mike was covering for her during that time, and

23   there was poor feedback from various stakeholders in the

24   business and support functions regarding his ability in the

25   role.

GC9TPIC1                      Jang Demian - cross

1   Q.  During your meeting with Ms. Hedges, did you disclose to

2   Ms. Hedges that Mr. Picarella was the one who had raised the

3   concerns about her?

4   A.  No.

5   Q.  Was the alleged misconduct that you asked Ms. Hedges about

6   directed toward a specific person?

7   A.  Sorry, can you repeat that?

8   Q.  Sure.  During this meeting you discussed at least three

9   issues with -- regarding Ms. Hedges' performance that had been

10  raised, correct?

11  A.  Yes.

12  Q.  Were these three issues directed towards a specific

13  individual, another employee at HSBC?

14  A.  It was directed to Eileen to ask her about the issues that

15  had been brought to our attention.

16          Sorry, I'm not sure if I'm understanding your question

17  correctly.

18  Q.  That's okay.

19          Did you understand the complaints to be that

20  Ms. Hedges acted inappropriately towards another HSBC employee?

21  A.  During the discussion she asked if it was regarding Mike,

22  and I told her I couldn't disclose who it was coming from.

23  Q.  How did Ms. Hedges react when you raised these concerns

24  with her?

25  A.  She was clearly very upset.  I would say upset.  She was --

 1  she was surprised.  She wasn't expecting to hear the items we

 2  were talking about.

 3  Q.  Would you give us a brief summary of the concerns that had

 4  been raised that were discussed with Ms. Hedges during this

 5  meeting?

 6  A.  One of the items was regarding her practice of basically

 7  keeping her Blackberry in her bra, so she would take out her

 8  Blackberry from under her shirt.  And we talked about that

 9  being unprofessional and that she shouldn't do it, and she

10  agreed she would not do that.

11          The three second rule is regarding basically a sexual

12  act that she had me mention.  We sit on trading floors, so it's

13  kind of open seating, almost similar to how you're seated, a

14  little further apart.  So it's a very open environment, and she

15  made a comment about a three second rule, which she did not

16  deny.  She basically said that she had said it in a joking way,

17  but realized that she can't have conversations like that on an

18  open floor, or at work at all.

19          And the other comment was regarding having discussions

20  with employees in an open environment.  So if there was either

21  concern about somebody's performance or somebody didn't do

22  something correctly or any conversations regarding business

23  activities, to do her best to do that in an office setting, in

24  a closed office rather than on the open floor.

25  Q.  Ms. Jang, were you aware that Eileen Hedges and Ellen Weiss

1    were friends?

2    A.  Yes.

3    Q.  Did you have any concerns about Ms. Weiss being involved in

4    the investigation of Ms. Hedges?

5    A.  I worked for Ellen for ten years, over ten years, and

6    during that time I would say one of the things that we

7    constantly had to go through was people within our business who

8    we had relationships with sometimes were on the other end of

9    being let go or having to go through warnings or

10   investigations.  And it's never been an issue for Ellen, and we

11   always know that we need to put out professional work first.

12   Q.  Let's look at PX-120.

13            This is also a document that we looked at earlier,

14   Ms. Jang.  It's the notes of your July 24, 2012 meeting with

15   Eileen Hedges.

16            What was the discipline that was being imposed on

17   Ms. Hedges?

18   A.  She was notified that she was being put on final written

19   warning, that her management responsibilities were being taken

20   away, and the reporting lines were going to change for both

21   herself and Mike.  She knew it was very serious.

22   Q.  And in your view, in your years of experience in HR, did

23   you view this as a serious punishment?

24   A.  It was definitely very serious.  I mean in addition to

25   this, although we don't typically include it as part of our

1   memos or warnings, but she would have also had a bonus

2   reduction at the end of the year for having received something

3   like this, which I know she anticipated.

4   Q.  Did Ms. Hedges raise any concerns with you during this

5   meeting?

6   A.  She was concerned that she felt Mike was speaking

7   negatively about her within the organization and other business

8   areas that supported global markets and trading.

9   Q.  If that had been true would it have been an appropriate

10  comment?

11  A.  No.

12  Q.  Who assumed Ms. Hedges' responsibilities as Mr. Picarella's

13  manager?

14  A.  They were split up.  Her job kind of was restructured in a

15  way that was split among other people, between -- I believe it

16  was another manager, she would retain certain responsibilities.

17  Q.  So who was the business manager that Mr. Picarella was

18  reporting to after Ms. Hedges?

19  A.  Suzy White, who was our COO for global markets.

20  Q.  And then after Ms. White, was there another individual,

21  Ms. Jenner, that Mr. Picarella was reporting to?

22  A.  Yes, Carol Jenner.

23  Q.  Were you familiar with Carol Jenner?

24  A.  I didn't know her that well.

25  Q.  How was Ms. Jenner regarded in the organization?

GC9TPIC1                          Jang Demian – cross

1   A.  She had a very strong reputation.  She was highly rated.

2   What I did know of her was she was considered to be like an

3   up-and-coming female professional within the business

4   management function.

5   Q.  Did you have any involvement in the decision to promote

6   Carol Jenner to the head of business development position?

7   A.  I would not have been part of that decision, and generally

8   it's up to the business to make those final determinations.

9                  (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Do you know whether Mr. Picarella was considered for the

2  position?

3  A.  I believe he was considered, having worked in the --

4  sorry -- it's a little awkward -- having worked in the

5  department previously, yes, he would have been a natural person

6  to consider as part of the decision.

7         MR. HUBBARD:  Objection, your Honor.  Obviously she

8  doesn't know.

9         THE COURT:  Overruled.

10  Q.  Ms. Jang at HSBC could someone be rated a three strong and

11  still have performance issues?

12  A.  Yes.

13  Q.  If an employee receives an off-track rating at mid year are

14  they required to be placed on a performance improvement plan?

15  A.  They're not, no.

16  Q.  I believe you testified earlier in response to

17  Mr. Hubbard's questions that Pablo Pizzimbono had raised

18  concerns about Mr. Picarella's performance?

19  A.  Yes.

20  Q.  What was the nature of Mr. Pizzimbono's concerns regarding

21  Mr. Picarella's performance?

22         MR. HUBBARD:  Hearsay objection.

23         THE COURT:  Overruled.

24         Go ahead.  You may answer.

25         THE WITNESS:  Sorry.  Can you repeat that.

GC99PIC2                          Jang Demian - cross

1   Q.  Sure.  Did you have conversations with Mr. Pizzimbono about

2   Mr. Picarella's performance?

3   A.  Yes.

4           MR. HUBBARD:  Objection, your Honor.  Hearsay.

5           THE COURT:  Overruled.  Go ahead.

6   Q.  And during your -- as a result of your conversations with

7   Mr. Pizzimbono what did you learn regarding Mr. Pizzimbono's

8   view of Mr. Picarella's performance?

9   A.  He thought generally Mike was a weaker performer.

10  Q.  Is there anything else that Mr. Pizzimbono mentioned to you

11  regarding Mr. Picarella's performance?

12  A.  I mean the view from Pablo, who was one of the interviewees

13  at the time to hire Mike, was that the capabilities that he was

14  demonstrating in the office in the roles -- in the

15  responsibilities was not as strong as what they had hoped when

16  they hired him.

17  Q.  Did Mr. Pizzimbono raise these concerns with you on more

18  than one occasion?

19  A.  Yes.

20          MS. LEVIN:  Your Honor, may I have one moment?

21          THE COURT:  Yes.

22          MS. LEVIN:  I just have one more question, Ms. Jang.

23  Thank you for coming in today.  We appreciate it.

24  Q.  Do you think that anyone at HSBC retaliated against

25  Mr. Picarella?

GC99PIC2                          Jang Demian - redirect

```
 1   A.  Definitely not.

 2              MR. HUBBARD:  Your Honor.

 3              MS. LEVIN:  No further questions.

 4              MR. HUBBARD:  Objection.  Speculation.

 5              THE COURT:  I'll sustain.  Please rephrase the last

 6   question.

 7   Q.  Did you ever witness anything that could have been

 8   retaliation against Mr. Picarella?

 9   A.  No.

10              MS. LEVIN:  No further questions.

11              THE COURT:  Okay.  Any redirect?

12              MR. HUBBARD:  Just one, your Honor.

13   REDIRECT EXAMINATION

14   BY MR. HUBBARD:

15   Q.  You said, Ms. Jang, that you thought that Mr. Picarella

16   might have been considered as a replacement for Ms. Jenner?

17   A.  Yes.

18   Q.  And you don't have any direct knowledge of that, do you?

19   A.  I know that.

20   Q.  Yes or no?

21   A.  Yes.

22   Q.  I understood you to say when I was examining you that you

23   thought that that was a practice that she might have been

24   considered as a matter of normal practice?

25   A.  She, Carol?
```

GC99PIC2                          Silber - direct

1   Q.  Yes.

2   A.  Sorry.  Can you repeat that?

3   Q.  Yes, ma'am.

4   A.  I'm confused.

5   Q.  What I'm trying to get at is I understood from your answers

6   that you believed she might have been considered -- that

7   Mr. Picarella might have been considered for that job, right?

8   A.  Yes.

9   Q.  Because that was kind of the practice of the firm.  I did

10  not understand you to be saying that you had actual knowledge

11  as to whether or not he had been interviewed or considered.

12  A.  The reason why I said yes is because I know that his resume

13  was requested at the time we were making the -- the decision

14  was being made.

15  Q.  Do you know if he was interviewed for the position?

16  A.  I don't know.

17              MR. HUBBARD:  Thank you.

18              THE COURT:  Thank you.  The witness is excused.

19              (Witness excused)

20              THE COURT:  Plaintiff can call your next witness.

21              MR. HUBBARD:  Yes.  Mr. Karam, your Honor.

22              MS. LEVIN:  No, your Honor.  Mr. Silber is next.

23              MR. HUBBARD:  Okay, your Honor.  Mr. Silber is fine.

24              (Continued on next page)

25

1     DANIEL SILBER,

2          called as a witness by the Plaintiff,

3          having been duly sworn, testified as follows:

4     DIRECT EXAMINATION

5     BY MR. HUBBARD:

6     Q.  Good morning, Mr. Silber.  How are you?

7     A.  Good morning.

8     Q.  Tell us how you are employed, please.

9     A.  I'm currently employed by HSBC Bank USA.

10             THE COURT:  Let me just check in with the jury.  Is

11    the jury able to hear the witness okay?  Just make sure you

12    lean into the mic.

13             THE WITNESS:  Sure.

14    Q.  Tell us what kind of job you do, please, sir.

15    A.  I run our institutional sales business for the Americas so

16    I'm responsible for our client franchise and how it engages and

17    interfaces with our network and our proposition.

18    Q.  How long have you been in that position?

19    A.  Since around October, September of 2003.  So I think it's

20    about 13 years or so.

21    Q.  And in the year -- in the year 2015 did you have that

22    position?

23    A.  I did.

24    Q.  Did you have at that time regularly scheduled telephone

25    conferences with executives that worked with you in the sales

GC99PIC2                    Silber - direct

1   function at HSBC?

2   A.  So, I had biweekly management meetings, if that's what

3   you're referring to.

4   Q.  Your deposition was taken in this case, correct?

5   A.  Correct.

6   Q.  And in that deposition we discussed one such conference

7   call that took place around the middle of January 2015.  Do you

8   recall that?

9   A.  You keep referring to a conference call so if you're

10  referring to a management meeting that may have had

11  participation with teleconference then I do.

12  Q.  Yes.  I'm sorry.  There was a meeting at or about that time

13  and some of the people that attended, attended by phone?

14  A.  I believe so.

15  Q.  And so there were some of your colleagues actually in

16  attendance in the meeting?

17  A.  Yes, sir.

18  Q.  Where did the meeting take place?

19  A.  It was at our offices on Fifth Avenue.

20  Q.  How many executives attended the meeting in person?

21  A.  I don't recall.

22  Q.  Where did the meeting take place in the building?

23  A.  I don't recall.

24  Q.  And do you recall how many executives attended by phone?

25  A.  No.

GC99PIC2                        Silber - direct

1    Q.  Do you recall testifying at deposition that it was a

2    relatively large number, 20 or so people, maybe 20, 30?

3    A.  I don't recall my testimony but that sounds very plausible.

4    Q.  So it would be plausible that your biweekly meeting, this

5    meeting we're talking about, could have had as many as 20 or 30

6    executives either in person or by phone?

7    A.  Thirty is probably high but 20 sounds pretty plausible.

8    Q.  Let me direct your attention to January 12 of 2015.  Is

9    that the meeting that we talked about and we talked about at

10   your deposition?

11   A.  Okay.

12   Q.  Do you remember the subject -- did you lead the discussion

13   at that meeting?

14   A.  If the meeting you're talking about is what I think it is I

15   recall coming late to that meeting.

16   Q.  What meeting do you think it is we're referring to?

17   A.  You'd have to refresh my memory.  It's one of my management

18   meetings.

19   Q.  The one that was leaked -- the one that HSBC had alleged

20   was leaked to the press?

21   A.  Okay.

22   Q.  What meeting was that?

23   A.  It was a management meeting that occurred just like every

24   other management meeting that we had.

25   Q.  On that date, January 12, 2015?

GC99PIC2                              Silber - direct

1    A.  Yes.

2    Q.  And what was discussed at that meeting, please?

3    A.  Well, again, I came late, as I recall.  We conducted

4    general sales matters, how the business was doing, things of

5    that nature.  Nothing out of the ordinary.

6            I do know that prior to my arrival we had -- one of

7    our legal members, I believe it was Frank Weigand, in talking

8    about some matters related to FINRA, very general, that I

9    didn't participate in.  And then I came in and had my general

10   management discussion.

11   Q.  Were there some discussions at that meeting while you were

12   present about some earlier leaks of information from Bloomberg

13   chats?

14   A.  Not that I recall.

15   Q.  Do you recall if Mr. Picarella attended the meeting by

16   phone?

17   A.  I don't recall.

18   Q.  Did he regularly attend these biweekly business meetings

19   that you convened?

20   A.  I don't recall.

21   Q.  Did there come a time after that meeting that you reported

22   to HSBC a call to you the next day from a New York Post

23   reporter?

24   A.  Could you repeat the question, please.

25   Q.  Yes, sir.  Did you have occasion the next day to report to

1    the company that you had received a call the next day,

2    January 13, from a New York Post reporter?

3    A.  So getting a call from a New York Post reporter?

4    Q.  Yes, sir.

5    A.  And I recall having discussions about that call with a

6    couple of my colleagues.

7    Q.  Yes, sir.

8    A.  Yes.

9    Q.  Do you remember that reporter's name?

10   A.  I believe it was -- last name was Dugan.  Might have been

11   Kevin Dugan.

12   Q.  And I gather he called you on your office line?

13   A.  Yes.

14   Q.  Give us your best and fullest recollection of what he said

15   to you and what you said to him.

16   A.  Well, I recall Kevin introducing himself and referring to a

17   bunch of disparate things that quite frankly didn't make a lot

18   of sense to me.  So I remember him saying the word leaks.  I

19   remember him talking about chats.  And it took me a few minutes

20   to kind of acclimate myself to what he was referring until I

21   realized he was talking about the management meeting that we

22   had had the day before.

23   Q.  Is that because at that meeting there was discussion of

24   leaks and chats?

25   A.  I don't know why -- I don't know why I know that he was

GC99PIC2                          Silber - direct

1    referring to things -- a meeting -- he talked about a meeting

2    and I don't know what exactly he was referring to within that

3    meeting.  And some of those things may have been things that I

4    said and some of them may not have.

5    Q.  But the reason you thought he was referring to the meeting

6    the day before is because he referred to leaks and chats that

7    had been discussed at the meeting the day before?

8    A.  That's not necessarily why I concluded it; and, again, I

9    don't remember the entire conversation.  But after a few

10   minutes it was pretty clear what he was referring to.

11   Q.  But in any event you believed he was referring to that

12   call -- your business meeting the day before?

13   A.  Yes.

14   Q.  And he wasn't in the meeting?

15   A.  Correct.

16   Q.  Mr. Dugan?

17   A.  Correct.

18   Q.  So you naturally wondered where he got the information

19   from?

20   A.  Absolutely.

21   Q.  You were concerned about it?

22   A.  Very much so.

23   Q.  And you went to see some of your -- who did you go express

24   your concern to?

25   A.  I remember expressing the concern to our COO, Suzy White.

GC99PIC2                          Silber - direct

1   I also remember also discussing it with my boss Didier

2   Descamps.

3   Q.  All right.  In any of those discussions did Mr. Picarella's

4   name come up as a possible source of the leak to this newspaper

5   reporter?

6   A.  I don't recall.

7   Q.  If I give you a copy of your deposition.

8          MR. BORTNICK:  May I approach the witness?

9          THE COURT:  Yes.  Counsel, are you attempting to

10  refresh or impeach at this point?

11         MR. HUBBARD:  Impeach.

12         THE COURT:  Can you give counsel the page number and

13  line number.

14         MR. HUBBARD:  Yes.  Page 43, line 2.

15  Q.  If you look at page 43 there, Mr. Silber?

16  A.  I see it.

17  Q.  Page 43 you were asked -- may I ask you if you were asked

18  these questions -- this question and gave this answer:

19         "Did anyone in your presence suggest that

20  Mr. Picarella might be the source of the leak?

21  "A.  I recall his name coming up as a possible source of the

22  leak."

23         Were you asked that question and did you give that

24  answer?

25  A.  Yes.

GC99PIC2                              Silber - direct

```
 1   Q.  Did you have any reason to suspect that Mr. Picarella might
 2   have been the source of leaking that internal information?
 3   A.  Well I think it was general deduction.  I knew that
 4   Mr. Picarella had filed a lawsuit against the firm.  There had
 5   been some prior New York Post articles to that effect.  So it
 6   was really putting one plus one together.
 7   Q.  The truth is that you suspected him because you believed
 8   that he was a disgruntled employee who was suing the bank; is
 9   that correct?
10   A.  No.
11            MR. HUBBARD:  Turn to page 44, please.  Page 44, line
12   7.
13            THE WITNESS:  Mm-hmm.
14   "Q.  Do you have any reason to suspect that he might have been
15   the source of leaking this internal information?
16   "A.  Could you ask that question again?
17   "Q.  Yes.  What is the reason?
18   "A.  There were leaks prior to this.
19   "Q.  Okay.
20   "A.  He's a disgruntled employee who was suing the bank."
21   A.  Right.
22   Q.  Do you recall those questions and those answers?
23   A.  Sure.  I don't think that's any different than what I just
24   said.
25   Q.  That's not why I asked you.
```

GC99PIC2                    Silber - cross

```
 1              THE COURT:  Were you asked those questions and did you
 2    give those answers?
 3              THE WITNESS:  Yes.
 4    Q.  Other than the suggestion you made that he was a
 5    disgruntled employee, at the time that you made that suggestion
 6    did you have any evidence that Mr. Picarella had spoken to the
 7    reporter about that meeting or in any way provided that
 8    information to the New York Post?
 9    A.  No.
10              MS. LEVIN:  Objection.
11              THE COURT:  Overruled.
12    Q.  Did you have any evidence at that time that Mr. Picarella
13    had leaked any information in -- during the course of his
14    employment at any time prior to that meeting?
15    A.  No.
16              MR. HUBBARD:  Nothing further, your Honor.
17              THE COURT:  Okay.  Any cross-examination?
18              MS. LEVIN:  Yes, your Honor.  Very brief.
19    CROSS-EXAMINATION
20    BY MS. LEVIN:
21    Q.  Good morning, Mr. Silber.
22    A.  Good morning.
23    Q.  In the 2012 to 2015 time period did you have the occasion
24    to interact with Mr. Picarella in a professional capacity?
25    A.  I did.
```

GC99PIC2                           Silber - cross

```
 1   Q.  What were your general impressions of Mr. Picarella as a
 2   result of your interactions with him?
 3   A.  Just to give a little context.  It was not frequent.  It
 4   was not day-to-day.  It was occasional.
 5          And I'd say broadly not particularly impressive.
 6          And, again, there are not -- it's a while ago so not a
 7   lot of tremendous number of specific circumstances but I do
 8   recall one set of interactions that left a relatively
 9   unfavorable impression in terms of his work product, his
10   diligence, his execution on assigned tasks.
11   Q.  Was one of the projects that Mr. Picarella was responsible
12   for called the GM weekly report?
13   A.  Yes.
14   Q.  Would you describe to the jury what the GM weekly report
15   is?
16   A.  Sure.  So as a person overseeing the sales business we have
17   similarly situated professionals in other centers.  I report up
18   globally a couple of layers above to a gentleman named Tebow
19   Durou who runs our global markets business globally.  And as
20   part of our governance process every week we would gather and
21   discuss sales schematics, challenges, particularly interesting
22   thematics in our client base, etc.  And gathering that set of
23   information from my sales force, which is a pretty large number
24   of people, was an important task.  Synthesizing that
25   information, presenting it to me in a way that was clear and
```

1   coherent was important.

2           I would then take that information and participate in

3   probably a half-hour forum each week with Mr. Durou, as well as

4   my counterparts, the sales heads from other regions, and come

5   together and talk about the business.  And it was an important

6   part of our governance process.

7   Q.  Do you consider the GM weekly report to be an important

8   project, correct?

9   A.  Absolutely.

10  Q.  What were Mr. Picarella's responsibilities in connection

11  with the GM weekly report?

12  A.  As I recall Mr. Picarella was really responsible for

13  collecting all the information that went into that report,

14  insuring that it was accurate, insuring that it was clear, that

15  it was complete, and that, quite frankly, I wouldn't have to do

16  a tremendous amount of backwork in preparation for that

17  meeting.

18  Q.  And how did Mr. Picarella perform in connection with the GM

19  weekly report?

20  A.  Poorly.

21          And again it's a while back.  And, again, because we

22  didn't have a tremendous amount of interaction.  But in this

23  particular case what I do recall is that there were many gaps

24  in the reports.  There were things missing.  Things weren't

25  clear.  Had to do a lot of checking and rechecking.

1           I would just call it sloppy, incomplete, not the type

2      of work product that I would deliver to my boss and certainly

3      not to my boss's boss.  Unimpressive.

4      Q.  Mr. Hubbard asked you questions about the leak of

5      information to a reporter that was discussed on the weekly

6      manager's meeting.  Do you recall that?

7      A.  I do.

8      Q.  Did HSBC conduct a formal investigation to determine who

9      the source of the leak was?

10     A.  I believe they did.

11     Q.  Did you have any involvement in that investigation?

12     A.  No.

13     Q.  Do you know what the conclusion was as a result of the

14     investigation?

15     A.  No.

16     Q.  Mr. Hubbard also asked you about some of your deposition

17     testimony, specifically when you testified that you recall

18     Mr. Picarella's name coming up as a possible source of the

19     leak.  What did you mean by that?

20     A.  I just remembered his name coming up during the discussion

21     about a possible source.  I don't know who suggested it.  It

22     might have been all three of us.  I don't recall.

23          Can I just add something, if I may?  What I recall

24     most is the discussion about the leak.  A lot less so about

25     Mr. Picarella's name, if I could quantify the magnitude of what

GC99PIC2

1   was discussed.

2   Q.  Did you have any involvement in the termination of

3   Mr. Picarella's employment from HSBC?

4   A.  No.

5   Q.  Based on the interaction that you did have with

6   Mr. Picarella, were you surprised that HSBC decided to

7   terminate his employment?

8          MR. HUBBARD:  Objection, your Honor.

9          THE COURT:  Can you please rephrase that question.

10         MS. LEVIN:  I'll withdraw it, your Honor.

11  Q.  As far as you know between October 2014 and Mr. Picarella's

12  termination were any of Mr. Picarella's job responsibilities

13  taken away from him?

14  A.  Not to my knowledge.

15  Q.  Did you observe any conduct at HSBC in which it appeared

16  that Mr. Picarella was being retaliated against?

17  A.  No.

18         MS. LEVIN:  May I have one moment, your Honor?

19         No further questions, your Honor.  Thank you.

20         THE COURT:  Any redirect?

21         MR. HUBBARD:  Nothing further, your Honor.

22         THE COURT:  Thank you.  The witness is excused.

23         (Witness excused)

24         THE COURT:  Let's go ahead and take our morning break

25  now.  We'll take a fifteen-minute break.  Don't discuss the

GC99PIC2

1    case amongst yourselves or with anyone else.  I'll see you in

2    fifteen minutes.

3              (Jury excused)

4              THE COURT:  Okay.  See you in fifteen.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC99PIC2

1              (In open court)

2              THE COURT:  Okay we're going to bring the jury in.

3              MR. JACKSON:  Your Honor, should we have a witness

4    sitting in the witness stand?

5              THE COURT:  I guess we'll have the ceremony of them

6    coming to the stand.  That's fine.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC99PIC2                        Descamps - direct

 1              (Jury present)

 2              THE COURT:  Welcome back.  Let's continue.  Counsel,

 3      you may call your next witness.

 4              MR. HUBBARD:  Thank you, your Honor.  Mr. Didier

 5      Descamps, please.

 6        DIDIER DESCAMPS,

 7            called as a witness by the Plaintiff,

 8            having been duly sworn, testified as follows:

 9      DIRECT EXAMINATION

10      BY MR. HUBBARD:

11      Q.  Good morning, Mr. Descamps.  How are you?

12      A.  Good morning.

13      Q.  You had traveled a distance to visit with us today?

14      A.  Absolutely.

15              THE COURT:  Let me just ask the witness to completely

16      lean into the microphone.

17      Q.  Let's go back a moment and go back to the timeframe of

18      2011, '12.  Would you tell us how you were employed at HSBC?

19      A.  Starting from January 2010 I was employed in HSBC in the

20      US.  I was previously working for HSBC in France and I was

21      first global -- company head of global marks for Americas based

22      in New York.  And then from March 2012 until September last

23      year I was head of global markets for Americas for HSBC group.

24              THE COURT:  Now let me just check in.  Are the jurors

25      able to hear the witness?

GC99PIC2                        Descamps - direct

1              JUROR:  A little hard.

2              THE COURT:  Lean into the mic and try to speak a

3    little bit louder.

4              THE WITNESS:  Okay.  Do you want me to repeat?

5              THE COURT:  Yes.  Why don't you repeat that last

6    answer.  Go ahead.

7              THE WITNESS:  So starting January 2010 I moved from

8    Paris office of HSBC to the office in New York.  I was cohead

9    of global markets for Americas for the HSBC group in New York.

10   And from March 2012 until September of last year I was head of

11   global markets for Americas in New York.

12             THE COURT:  Are the jurors able to hear the witness

13   now?

14             Great.  Go ahead counsel.

15   Q.  Meaning an expansion from just.

16             THE COURT:  Hold on just a second.  Let's just wait

17   for that.

18             Go ahead counsel.

19   Q.  Meaning an expansion from just the Americas to global, your

20   duties?

21   A.  No.  My duties -- we were two sharing the job from

22   January 2010 to March '12 and I was the sole head of markets

23   for Americas starting March 2012 until September '15.

24   Q.  Did there come a time when -- you know Mr. Picarella?

25   A.  Absolutely.

1  Q.  Did there come a time when his manager, Michael Karam, met

2  with you and recommended that his employment be terminated?

3  A.  Yes.

4  Q.  And based upon your knowledge of the situation, your

5  investigation, I gather that you made the decision that his

6  employment would be terminated?

7  A.  I made the final decision based on the documentation

8  provided to me by Mike Karam and the HR department.

9          MR. HUBBARD:  Just need one document here.

10          THE COURT:  Again, the witness -- the acoustics here

11  aren't great so try to make sure you continue to keep your

12  voice up.  All right?

13          THE WITNESS:  Okay.

14          MR. HUBBARD:  May I have Exhibit 247, please.

15          MR. JACKSON:  Already in evidence, your Honor.  No

16  objection.

17  Q.  This letter is dated March 26, 2015.  You've seen this

18  letter before?

19  A.  Yes.

20  Q.  It's a letter that was sent to Mr. Picarella about that

21  time informing him that the decision had been made to terminate

22  his employment?

23  A.  Absolutely.

24  Q.  If we go to the bottom it's signed by Susan Roskell.  Was

25  Ms. Roskell in the discussions with you when the decision was

GC99PIC2                         Descamps - direct

1  made to terminate his employment?

2  A.  Yes.  Absolutely.

3          THE COURT:  Just one moment, counsel.  Again, counsel,

4  since the acoustics and the way things are set up the mic is a

5  little bit far away.  So we're going to hand him this cordless

6  mic and see if that helps the jurors be able to hear the

7  witness a little bit better.  So go ahead.  Let's test this

8  out.  Do a mic test.

9          THE WITNESS:  One, two, three.  Is that better?  I

10 will try to speak louder.

11         MR. JACKSON:  Your Honor.

12         THE COURT:  Was it better the first way?  Take the

13 cordless mic away.

14         MR. JACKSON:  There are some books right there.  I

15 think if we place the original mic on top of those books in the

16 front I think it would be helpful.

17         THE COURT:  We can try that.

18         Okay.  Testing.  One, two, three.

19         THE WITNESS:  One, two, three.

20         MR. HUBBARD:  Take that one down just a minute, Peter.

21 And see if -- I need the January '15 letter Mr. Marshall to me.

22 244.

23         Is this in evidence?

24         MR. BORTNICK:  Yes.

25 Q.  Let me show you this letter.

GC99PIC2                         Descamps - direct

1           On January 15, 2015 -- let me step back a second.

2     This appears to be a letter to me from Mr. Marshall.  You know

3     who Mr. Marshall is?

4     A.   Yes.

5     Q.   The bank counsel at the time?

6     A.   Absolutely.

7     Q.   At this time January 15, 2015, Mr. Picarella's employment

8     at the bank had not yet been terminated?

9     A.   No.

10    Q.   And you see he writes in the second sentence -- I'm sorry.

11    Let's do the first two sentences.

12          I write to inform you that HSBC has placed

13    Mr. Picarella on paid administrative leave effective

14    immediately.  HSBC has reason to believe that Mr. Picarella has

15    conveyed confidential -- and potentially privileged -- HSBC

16    information to one or more third parties not entitled to hold

17    such information, in violation of HSBC's policies and the terms

18    of his employment.  His access to HSBC's systems and premises

19    has been suspended.  This action is necessary to protect the

20    confidential information and assets of HSBC.

21          At the time that document was written had your

22    financial crimes division begun any investigation of those

23    leaks?

24    A.   Absolutely.

25    Q.   They had or had not?

1    A.  I think -- I don't remember the exact timing but clearly an

2    investigation was conducted about the leak.

3    Q.  I understand.  But, with respect, that was not my question.

4            Do you recall that there was a telephone

5    conversation -- there was a conference call, business

6    conference call on January 12 of 2015 with Mr. Silber's staff

7    and the next day a reporter called him who was obviously not in

8    the meeting?

9    A.  Absolutely.

10   Q.  And Mr. Silber reported to your management that he was

11   concerned that there had been some leak?

12   A.  Absolutely.

13   Q.  Of that January call.

14           And so that call would have been on the 13th of

15   January and this letter is now on the 15th.  So I want to go

16   back and say isn't it fair to say that the investigation that

17   was, in fact, conducted had not yet begun on the 15th?

18   A.  I don't remember the exact timing.  What I can tell you is

19   that as soon as the event happened we contacted the security

20   department to initiate an investigation.  Because it was quite

21   obvious from the call received by Dan Silber from a journalist

22   that that journalist was given access to information that was

23   private and confidential.

24   Q.  And you may recall that Mr. Kutas, the in-house

25   investigation team at the bank, finally wrote a report and

GC99PIC2                        Descamps - direct

1    presented it to you sometime around the end of March?

2    A.  Yes.  More or less.  Yeah.  I don't remember the exact date

3    but more or less.

4    Q.  Regardless, on this date of this letter, January 15, 2015,

5    if there had been any investigation begun, it was in its

6    infancy?

7    A.  Probably in its infancy, yeah.  But what I remember is that

8    very shortly, we weren't even certain that Mr. Picarella was on

9    the call, he was working from home at that time, and the first

10   thing was check was whether he had attended the call by phone

11   and we had confirmation immediately that he was.

12   Q.  Well there was no question, was there, Mr. Descamps, that

13   he was on the call?

14   A.  Sorry?

15   Q.  There was no question that he was on the call?

16   A.  Well we checked he was on the call.  And we had not checked

17   by the people that went to check the communication on that

18   call.

19   Q.  All you had to do was ask Mr. Silber if he was on the call.

20   A.  I don't know.  I did not conduct myself the investigation.

21   But that's the first step which we took.

22   Q.  But in any event you did attempt to confirm that he was on

23   the call by checking the records and you determined that he

24   was?

25   A.  Absolutely.

GC99PIC2                          Descamps - direct

1   Q.  Attending by phone?

2   A.  Yeah.

3             MR. HUBBARD:  Let's go back to the May 27 letter,

4   Peter, the termination letter.

5             The March 27 letter.  What's the number?

6             MR. BORTNICK:  247.

7             MR. HUBBARD:  247.

8   Q.  Again, that reflects the decision that was made ultimately

9   by you based upon the information you had that his employment

10  would be terminated on or about the date the letter is written,

11  correct?

12  A.  Yes.

13  Q.  Is it fair to say that you were told before the conclusion

14  of the investigation and before you made that decision that

15  there was no proof available about where the leak was from and

16  you did not take any such evidence into consideration in your

17  decision?

18            MR. JACKSON:  Objection.  Compound.

19            THE COURT:  Can you rephrase the question, counsel.

20            MR. HUBBARD:  Yes.

21  Q.  You were told before making that decision and concluding

22  the investigation that there was no proof available about where

23  the leak came from?

24  A.  We were told that there was high probability that

25  Mr. Picarella or somebody working with him could have been the

1    source of the leak but there was no factual proof so we should

2    not take that absolutely into consideration in any decision

3    concerning Mr. Picarella's employment.

4              MR. BORTNICK:  May I approach the witness, your Honor.

5    BY MR. HUBBARD:

6    Q.  Mr. Descamps, you don't make decisions to terminate senior

7    people based on suspicion, do you?

8    A.  I don't.

9              MR. BORTNICK:  May I approach the witness, your Honor?

10             THE COURT:  Okay.

11   BY MR. HUBBARD:

12   Q.  May I ask you to turn to page 47.

13             Do you recall -- this is a copy of your deposition

14   transcript.  Do you recall that on May 15, 2015 in this case

15   that your testimony was taken here in New York about these

16   events under oath?

17   A.  Absolutely.

18   Q.  And if you'll turn to page 47.  Beginning at line 11.

19   "Q.  Did you, in terminating him, did you take into

20   consideration this theory that he or his lawyer may have

21   disclosed this information from the sales meeting."

22             There's an objection to the question.  You may answer.

23   Your answer:  "We were told --

24             THE COURT:  Hold on.  Hold on.  Go back and please

25   rephrase the question.

GC99PIC2                          Descamps - direct

1              MR. HUBBARD:  I'm sorry.

2     Q.  Let me ask you to take -- to look at the transcript here

3     beginning at line 11, okay.  Let me ask you if you were asked

4     this question and you gave these answers.

5              "Did you, in terminating him, did you take into

6     consideration this theory that he or his lawyer may have

7     disclosed this information from the sales meeting?"

8              There's an objection to the question.

9              THE COURT:  Hold on.  Objection sustained.

10             MR. HUBBARD:  Question.  Were you asked this question

11    "You may answer," and did you give this answer.

12             THE COURT:  Hold on.  The objection is sustained.

13    Please -- let's do this.  Let me just see counsel in the robing

14    room for a second.  We don't need the court reporter.  Let me

15    see counsel in the robing room briefly.

16             (Robing room discussion off the record).

17             THE COURT:  Objection sustained.  Please rephrase the

18    question.

19    Q.  Would you refer to -- may I direct your attention,

20    Mr. Descamps, to page 47?

21    A.  47.

22    Q.  47 of the transcript.  Line 11, please.  And let me ask you

23    if you were asked this these questions and if you gave this

24    answer, please.

25    "Q.  Did you, in terminating him, did you take into

GC99PIC2                    Descamps - cross

1     consideration this theory that he or his lawyer may have

2     disclosed this information from the sales meeting?

3            Answer at line 17, "We were told before taking that

4     decision that the conclusion of the investigation that was that

5     no proof was available about where the leak was come so we

6     didn't take any consideration of that event in our decision."

7            Were you asked those questions and did you give those

8     answers on that date?

9     A.  Yes.

10           MR. HUBBARD:  Nothing further, your Honor.

11           THE COURT:  Any cross-examination?

12           MR. JACKSON:  Yes, please, your Honor.

13    CROSS-EXAMINATION

14    BY MR. JACKSON:

15    Q.  Good morning, Mr. Descamps.

16    A.  Good morning.

17    Q.  Now, Mr. Descamps where did you grow up?

18    A.  I grew up in southwest of France near Pyrenees which are

19    the mountains between France and Spain quite close to Atlantic

20    Ocean.

21    Q.  When was it that you first worked in the United States?

22    A.  The first time I worked in the United States was when I was

23    a student, was in the business core in France and we had to do

24    several type of trainings and some of them were operational

25    ones.  So I came working during almost six months in

1  California, and part of it in the Valley, Modesto, working

2  night shift in a factory was producing ketchup.

3  Q.  So when you worked in -- how long did you work in the

4  ketchup factory?

5  A.  Probably two months there.

6  Q.  Now, at some point you came to work at HSBC, right?

7  A.  Yes.  I was working in the bank in France which was named

8  CCF.  Then was -- it was bought by HSBC in the year 2000 and

9  then I became an HSBC employee by our bank being bought by

10  HSBC.

11  Q.  Where did you finish work after -- where physically were

12  you first working after HSBC acquired your bank?

13  A.  I was in Paris at that time.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

GC9TPIC4                        Descamps - cross

1   BY MR. JACKSON:

2   Q.  When was it that you came to the United States working for

3   HSBC?

4   A.  Can you repeat, please?

5   Q.  Yes.  When was it that your work at HSBC brought you to the

6   U.S.?

7   A.  I came in January 2010.

8   Q.  Now during the time that you were in the United States,

9   were you working in New York that whole time?

10  A.  Yes, I was based in New York the whole time.  I was

11  traveling, obviously, but I was based in New York.

12  Q.  Who were the people that reported directly to you during

13  that time period?

14  A.  Well, I had responsibility over the Americas region, so I

15  had several direct reports in New York, the head of the

16  different trading businesses, the head of sales, the COO and

17  the head of the business management teams, and then I had

18  responsibility over the global market teams in Canada, Latin

19  America, Mexico.

20  Q.  How many employees, approximately, in total were underneath

21  your supervision underneath all the lines of supervision

22  beneath you?

23  A.  Around 800.

24  Q.  And were two individuals named Suzy White and Pablo

25  Pizzimbono people that reported to you?

GC9TPIC4                        Descamps – cross

1   A.  Yes, absolutely.

2   Q.  Now at any point when you were working in New York did you

3   become to be familiar with Mr. Picarella?

4   A.  I met Mr. Picarella.  He was known to me.  Mr. Picarella

5   didn't work directly with me, but I met him several times in

6   meetings, yes.

7   Q.  You said you met him several times in meetings.  What was

8   your extent of your interaction with Mr. Picarella?

9   A.  The interaction was quite limited, but sometimes certainly

10  I was attending meetings where Mr. Picarella may have been

11  there among other people.

12  Q.  Do you know Mr. Picarella's title?

13  A.  Mr. Picarella was senior vice president.

14  Q.  And as a senior vice president -- well, which team did he

15  work on?

16  A.  He was working on the business management team for the

17  sales business.

18  Q.  And can you just describe what the role is generally of a

19  senior vice president working in that type of group?

20  A.  Well, that group is supporting the business.  It's not

21  involved on a day-to-day interaction with the clients, but he's

22  supporting the business management, which can be projects,

23  management information, surveys, new procedures, new controls

24  to be put in place, that kind of -- so it's a very diverse job,

25  I would say, generally speaking, in that business management

GC9TPIC4                          Descamps - cross

1    team.

2    Q.  Were you ever the person that personally filled out any of

3    Mr. Picarella's performance reviews?

4    A.  No, never.

5    Q.  Are you listed as countersigning manager on any of them?

6    A.  I was -- at the time he was directly managed by Suzy White,

7    and as Suzy White was reporting to me I was listed as the

8    countersigning manager, which is the normal process we have at

9    HSBC.

10   Q.  Did there come a time in early 2012 when Pablo Pizzimbono

11   spoke to you about Mr. Picarella's performance?

12   A.  Yes.

13   Q.  In summary, what did he communicate to you?

14            MR. HUBBARD:  Objection, your Honor, hearsay.

15            THE COURT:  Overruled.  You may answer.

16   A.  Mr. Picarella was at that time quite recently hired, so

17   clearly in the position of a senior role we would make sure

18   there was a particular focus and making sure that the

19   integration is working well and the performance is at the level

20   we are expecting.

21            I felt Mr. Picarella performed at mid level, more or

22   less, and at the end of the year when we have the normal

23   performance review process Pablo brought to me the fact that --

24   without showing -- I don't remember seeing the review itself,

25   but Pablo spoke to me about the fact that the first months of

1   performance were not at the level he was expecting.

2   Q.  And at this time when you were speaking with Mr. Pizzimbono

3   had you heard anything about any allegations related to sexual

4   harassment or any way connected to Mr. Picarella?

5   A.  No, absolutely not.

6   Q.  Now at some point in that year did you come to learn about

7   an investigation into an employee named Eileen Hedges?

8   A.  Yes.

9   Q.  And were you personally involved in that investigation?

10  A.  I was not involved in the details of the investigation,

11  which is the normal practice.  When we have an investigations

12  they are done independently from the management, and I was made

13  aware of the allegations.

14  Q.  Did you know at that time who had first approached HR and

15  initiated this?

16  A.  No, I don't think at that time I was aware of that.

17  Q.  At some point did you learn whether there were any

18  disciplinary actions taken against Ms. Hedges as a result of

19  the investigation?

20  A.  Yes, absolutely, and I validated those decisions.

21  Q.  In summary, what disciplinary actions did you end up

22  validating?

23  A.  The first one was withdraw from any management

24  responsibility, so making sure she was not any more responsible

25  to manage people.  Second, compensation already had been

1   impacted, and put in a role where she would not have any

2   responsibility to manage people.

3   Q.  Based on the conclusions of the investigation, did you

4   think those were appropriate disciplinary actions?

5   A.  I think they were --

6   Q.  Let me repeat my question.  My question is:  At that time

7   did you think that those were appropriate disciplinary actions

8   against Ms. Hedges?

9   A.  They were appropriate disciplinary actions at the time

10  knowing what we were knowing at the time.

11  Q.  Why do you say that?

12  A.  Because further down the road other things came to light

13  and Ms. Hedges left the bank completely.

14  Q.  During the time that you were managing HSBC at New York,

15  was sexual harassment an issue that you personally took

16  seriously?

17  A.  I think it's a very serious issue that we always took very

18  seriously, absolutely, within our company.

19  Q.  And was it important to you that the people underneath you

20  take any issues involving sexual harassment seriously?

21  A.  Yes, it was very important, and it was part of the training

22  of people that in any case we would like to make sure that the

23  investigation process would work quickly and permanently.

24  Q.  Now at some point -- I think you alluded to this -- but

25  Ms. Hedges was ultimately terminated?

1    A.  Yes.

2    Q.  Did you approve that termination?

3    A.  Yes.

4    Q.  Why?

5    A.  Once again, because I don't remember all the details, but

6    new allegations were brought to our attention.  And also in her

7    new job, which was in some way much less of a role, she was not

8    managing a team, she was not doing the proper performance

9    either.

10   Q.  Now at some point during this entire process did you learn

11   that Mr. Picarella made complaints about Ms. Hedges?

12   A.  I learned about that.  I don't remember exactly at what

13   time in that process.

14   Q.  And at any point when you learned that Mr. Picarella had

15   been one of the people who had made complaints about

16   Ms. Hedges, did you personally feel any degree of anger or

17   being upset at Mr. Picarella?

18   A.  No, absolutely not.  As I said, we were encouraging people

19   to bring issues.  The issues were real and happening, so

20   absolutely not.

21   Q.  Did you personally feel upset that any actions had to be

22   taken against Ms. Hedges?

23   A.  No, I didn't.  I think it was the right thing to do.  And I

24   think in particular the fact that she was managing people it

25   was very important to take an action.

GC9TPIC4                      Descamps - cross

1    Q.   Now when Ms. Hedges was removed from her supervisory

2    responsibility, do you know who ultimately replaced her?

3    A.   For a few months Suzy White assumed the position, then

4    Ms. Carol Jenner was promoted to that role.

5    Q.   Who is Carol Jenner?

6    A.   Carol was working with us already for several years.  She

7    was a business manager for a very specific team.  She was

8    delivering a very strong performance in that role.  She had

9    previously delivered also a very strong performance in a

10   previous role where was she was previously working in the

11   operational risk department where she had a lot of experience

12   and brought that experience to our team with that.

13   Q.   Why is operational risk important in this business area?

14   A.   Well, our business is made of -- a lot of the interaction

15   is day-to-day with the clients with the trading and the

16   markets, it's a business making probably thousands of

17   operations a day, so certainty we are doing that in a very

18   organized and processed way, and managing our risk is key to

19   our business.  Beyond the credit risk and the market risk we

20   are running, the operational aspect of this business is

21   absolutely key.

22   Q.   Now did you ultimately -- first of all, who recommended

23   Ms. Jenner to take that position?

24   A.   I think Suzy White recommended her.

25   Q.   Did you approve that recommendation?

GC9TPIC4                         Descamps - cross

1   A.  Yes, I did.

2   Q.  Why?

3   A.  I did it because I had interacted with Carol in several

4   meetings for projects.  She was not working directly for me,

5   but I had seen her directly interacting and delivering on some

6   projects.  She was doing very well.  At the end, the sales team

7   she was working with was absolutely complimentary of her

8   performance, and we knew she could be in that role and do very

9   well.

10  Q.  You were asked some questions on direct about an article in

11  the New York Post.  During the time that that was -- this

12  article in the New York Post -- let me back up.

13         Why is it important for the bank to figure out if

14  someone was leaking confidential information in connection with

15  a meeting like the meeting that was at issue there?

16  A.  Well, it's part of our processes to make sure when we have

17  interactions with the press we do that only in a very organized

18  way.  We have people with the ability to talk to the press, and

19  communication from the HSBC group to the press should come

20  through those people so the organization was properly

21  communicating.

22  Q.  When the ultimate decision was made to let Mr. Picarella

23  go, was the fact that there had been an investigation into a

24  leak a part of your decision?

25  A.  No.

GC9TPIC4                         Descamps - cross

```
 1   Q.  Now just going back for a moment to the promotion of
 2   Ms. Jenner, at that time that Ms. Jenner was promoted did you
 3   know anything about Mr. Picarella's reports of sexual
 4   harassment?
 5   A.  Yes, I think the time I did, yeah.
 6   Q.  When you first decided -- when you first began discussing
 7   whether or not Mr. Picarella would be terminated, who were the
 8   people you were discussing this with?
 9   A.  The final meeting where we made the decision was a meeting
10   with Mike Karam, and Suzanne Roskell was there for sure.
11   Q.  And what was, in summary, being communicated to you by
12   Mr. Karam and the other people that you were discussing this
13   with?
14   A.  Well, I think what we discussed is we reviewed the last
15   four years of performance review of Mr. Picarella to discuss
16   the consistency of his review in a direction where the
17   performance was not at the right level, and that was the
18   essential basis by which we decided it was time to terminate
19   his employment.
20   Q.  Did the fact that Mr. Picarella had made reports to HR
21   about sexual harassment play any role in your decision to
22   ultimately terminate him?
23   A.  No, the decision was purely on the review of the
24   performance report.
25   Q.  During the time that you were interacting with
```

1   Mr. Picarella's supervisors did you ever hear anyone say that

2   they had an intention to retaliate against Mr. Picarella?

3   A.  No, absolutely not.

4   Q.  Did you ever see anything suggestive of the idea that

5   someone wanted to try to retaliate against Mr. Picarella?

6   A.  No.

7           MR. JACKSON:  May I have one moment, your Honor.

8           (Pause)

9           MR. JACKSON:  Your Honor, I don't have any other

10  questions.

11          Thank you very much, Mr. Descamps.

12          THE WITNESS:  Thank you.

13          THE COURT:  Any redirect?

14          MR. HUBBARD:  Just a couple, your Honor.

15  REDIRECT EXAMINATION

16  BY MR. HUBBARD:

17  Q.  Mr. Descamps, before coming here today, in preparing for

18  your testimony did you have occasion to review any of

19  Mr. Picarella's actual performance reviews, mid-year or

20  year-end performance reviews?

21  A.  In the recent days?

22  Q.  Yes, sir.

23  A.  No.

24  Q.  At the time that you were having this meeting with

25  Mr. Karam and Ms. Roskell in considering Mr. Karam's

1   recommendation, I heard you say that you reviewed his

2   performance history.

3   A.   Yes.

4   Q.   Did you review his performance evaluations for '11, '12,

5   '13 and '14?

6   A.   I don't remember the exact list of documents we reviewed,

7   but we reviewed the history and the main comments in those

8   reviews.

9   Q.   And the history was good up until the last evaluation given

10  to him by Mr. Karam, was it not?

11  A.   No, his history was not good.

12  Q.   In 2011, what was his rating?

13  A.   I think three, probably.

14  Q.   Anything wrong with three?

15  A.   Three is not -- three represent the rating we were more or

16  less giving to 70 percent of our population.  So the rating

17  scale is going from one to five, and as a broad guidelines,

18  three represents 70 percent of the population.  So three is a

19  very large spectrum, and you have people who are three and they

20  are delivering quite a strong performance not yet at the level

21  of two, and people rated three who are delivering also poor

22  performance compared to what we are expecting.

23  Q.   Why did you write down -- beside their grading three, why

24  do you write the word "strong" down on the document that you

25  filed in your records if that is the case?

GC9TPIC4

1   A.  This was the general HSBC process at the time, which has

2   changed since then, where beside the number there was one word,

3   one word.  And this is not something at HSBC that is now part

4   of the process.

5   Q.  In the year 2011 do you dispute the fact that

6   Mr. Picarella's rating was strong?

7   A.  His rating was --

8   Q.  Sir, can you answer yes or no?  Do you dispute that his

9   rating --

10  A.  I do not dispute he was rated three, which means strong in

11  our process.

12  Q.  Thank you.  2012.

13          MR. JACKSON:  Your Honor, I ask not to interrupt the

14  witness.

15          THE COURT:  Overruled.  Go ahead.

16  Q.  Same question for 2012.

17  A.  He was rated three probably in 2012, too.

18  Q.  2013?

19  A.  Same thing.

20          MR. HUBBARD:  Nothing further.

21          THE COURT:  Okay, the witness is excused.

22          Plaintiff's counsel, you may call the next witness.

23          MR. HUBBARD:  Your Honor, we have one witness left,

24  Mr. Karam.  He is a longer witness, and so --

25          THE COURT:  Hold on.  Let's do this:  Members of the

GC9TPIC4

1    jury, let's give you a six-minute break while we discuss some

2    scheduling matters.  Don't discuss the case among yourselves or

3    with anyone else.  See you soon.

4                (Jury not present)

5                THE COURT:  Yes.

6                MR. HUBBARD:  I misspoke.  We have one witness left

7    today, that's Mr. Karam.

8                THE COURT:  Right.

9                MR. HUBBARD:  I can do his direct examination, it's

10   short, but I was thinking it would be better, since it's short

11   and if he's the last witness, took our lunch break and did

12   Mr. Karam and be through with this line-up for today.  There

13   are a couple more witnesses for Monday, but your Honor, I can

14   do the direct now if you like or do it after lunch.

15               THE COURT:  What is the concern?  The concern is not

16   an issue -- seems you're prepared to do the direct examination,

17   it's simply a matter of you don't want to break up the direct

18   and cross over lunch?

19               MR. HUBBARD:  Yes.

20               THE COURT:  Defense counsel?

21               MR. JACKSON:  Your Honor, I think it would be our

22   position we should go forward.  We think we can complete the

23   direct and cross before lunchtime, so -- well, let me just

24   consult for one moment.

25               My understanding is that it's a very brief direct, but

1    how long?  Can we get an estimate of how long the?

2              MR. HUBBARD:  Could be 20 minutes, 30 minutes.  I

3    don't know what the witness will say, so --

4              MR. JACKSON:  I may have underestimated, your Honor,

5    because I think we will need about 45 to 50 minutes.

6              THE COURT:  Why is that for Mr. Karam?  Can I hear an

7    offer of proof?

8              MR. JACKSON:  Mr. Karam is Mr. Picarella's last

9    supervisor, who is a person who is going to talk about his

10   performance reviews, what led to his termination.  He is

11   someone that we would be calling on the direct case even if not

12   called by the plaintiff.  We're going to do his direct now

13   because he's being called now.

14             So we would leave it to the discretion of the Court.

15   We think we can do it at all -- regardless, we would be done

16   either around 1:00 or a little after 1:00 and the jurors could

17   go home for the day, but we leave it to the discretion of the

18   Court.

19             THE COURT:  So I'm clear, counsels' estimate of the

20   time this will take on the direct and cross of Mr. Karam will

21   take no more than an hour and 15 minutes, is that fair to say?

22             MR. HUBBARD:  I could say I don't think the direct

23   will take longer than 15 or 20 minutes.  I could say that.

24             THE COURT:  Okay.  Perhaps what we can do is we'll

25   take an early lunch and ask the jury to get back here at 1:30

GC9TPIC4

```
1    and we should be able to finish.  And that's the last witness
2    for today?
3              MR. HUBBARD:  I think so.
4              THE COURT:  Is that correct, defense counsel?
5              MR. JACKSON:  Yes, your Honor.
6              THE COURT:  No defense witnesses are here today?
7              MR. JACKSON:  There is -- no, your Honor, there are --
8    no, there are none here today.
9         What originally was going to happen was Ms. Malanga
10   was going to testify, but plaintiff's counsel is not calling
11   her, so we're going to call her next week.
12             MR. HUBBARD:  Ms. Roskell was coming, but she had a
13   medical procedure.  She couldn't come today.
14             MR. JACKSON:  So Ms. Roskell will be the last of
15   plaintiff's witnesses, who is relatively short, on Monday.  And
16   we'll do our handful of witnesses, and I think we will be able
17   to complete them all on Monday.
18             THE COURT:  Then perhaps what we could do -- I
19   understand plaintiff's counsel's concerns, I'm sure this jury
20   would like to go -- instead of breaking up the direct and cross
21   we could do a late lunch and maybe not even lunch, work
22   through, do the direct and cross and break for the day.
23             Let's do that.  Does that work for everyone?
24             MR. JACKSON:  It works for us.
25             THE COURT:  If we need to take a 15-minute break we
```

GC9TPIC4                         Karam – direct

1   could around 1 o'clock, but we probably won't, so let's go

2   ahead and go.

3           Let's bring the jury in.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC9TPIC4                        Karam - direct

```
 1                (Jury present)
 2                THE COURT:  Welcome back.  Let's continue.
 3   Plaintiff's counsel may call your next witness.
 4                MR. HUBBARD:  Thank you, your Honor, Michael Karam.
 5    MICHAEL KARAM,
 6         called as a witness by the Plaintiff,
 7         having been duly sworn, testified as follows:
 8   DIRECT EXAMINATION
 9   BY MR. HUBBARD:
10   Q.  Good morning or good afternoon, Mr. Karam, how are you?
11   A.  Good afternoon.
12   Q.  Can you tell us how you are employed today?
13   A.  I'm the business manager for global markets sales for HSBC
14   Bank USA.
15   Q.  Is that --
16                THE COURT:  Let me ask the witness to, if you can,
17   move a little closer to the mike.
18                Go ahead, counsel.
19                MR. HUBBARD:  Very good.
20   BY MR. HUBBARD:
21   Q.  And we have seen some reference to that job as the old
22   Eileen Hedges job, the head of business development, is that
23   the position that you have today?
24   A.  No.
25   Q.  Was there a time when you had the job of head of business
```

1    development, the old Eileen Hedges job?

2    A.  I'm not aware of Eileen Hedges' job.  That is not part of

3    my portfolio or responsibilities.

4    Q.  Tell us your current position.

5    A.  The COO, chief operating officer, for the global markets

6    sales business for HSBC in the Americas.  It's a regional role.

7    My responsibilities are to support our institutional sales

8    team.  We're responsible for distributing HSBC financial

9    products to a wide range of customers, institutional banks,

10   brokers, pension funds, asset managers.

11   Q.  Who was your predecessor?

12   A.  Carol Jenner.

13   Q.  Do you know who her predecessor was?

14   A.  Not familiar with the roles and responsibilities and who --

15   if it was an exact match or not, no.

16   Q.  Ms. Jenner was your predecessor?

17   A.  Yes.

18           MR. HUBBARD:  Let me have that demonstrative exhibit,

19   please, 2011 org chart.

20   Q.  Were you working in global market sales in 2011?

21   A.  No.

22   Q.  Weren't you working in metals in 2012?

23   A.  Yes, I was the business manager for the precious metals

24   business.

25   Q.  This appears to be a September 2012 organizational chart

GC9TPIC4                        Karam - direct

1   for Mr. Pizzimbono's global sales, global markets Americas

2   organization, right?

3   A.   Yes.

4   Q.   Were you in that organization in September of 2012?

5   A.   No.

6   Q.   When did you join that organization?

7   A.   September of -- officially September of 2014, I believe.

8   Q.   I see.  Did there come a time in 2013 when you were -- just

9   a minute.

10            Let's look at this for a minute, 2012, Michael Karam,

11  SVP, business manager precious metals.

12  A.   Correct.

13  Q.   So September 2012, right?

14  A.   Yes.

15  Q.   How long did you keep that job SVP business manager

16  precious metals?

17  A.   I was in that role for about nine years.

18  Q.   When did it end?

19  A.   September of 2014.

20  Q.   In 2000 -- was Mr. Picarella ever in this group that we're

21  looking at now?

22  A.   No.

23  Q.   Did you ever manage him in this group?

24  A.   Can you repeat the question?

25  Q.   Did you ever manage him in any way in this group?

GC9TPIC4                        Karam - direct

```
 1   A.  Clarify time frame?

 2   Q.  I will rephrase it.

 3        He was never in this precious metals group that you

 4   were the business manager?

 5   A.  No.

 6   Q.  Did there come a time in 2013 that you were asked to

 7   become -- to succeed Ms. Jenner as Mr. Picarella's line

 8   manager?

 9   A.  Yes.

10   Q.  Who asked you to do that?

11   A.  Management.

12   Q.  How about any specific individual asking you to do that.

13   A.  I don't recall specifically, but it was management.

14   Q.  Suzy White?

15   A.  She was a part of the discussion, yes.

16   Q.  So did you take on that job in or about March -- let's say

17   May of 2013?

18   A.  Yes.

19   Q.  What's the first thing you did to start your relationship

20   with Mr. Picarella, please?

21   A.  I had a meeting with him where I introduced myself because

22   I wasn't familiar or didn't know him well before then.  And

23   over the succeeding weeks and so forth we began to work on some

24   agreed objectives and things that he would be responsible for

25   in carrying out in his role.
```

GC9TPIC4                         Karam - direct

1    Q.  And in 2014 when you changed jobs you continued to manage

2    him?

3    A.  Yes.

4    Q.  You managed him all the way up to the time he was

5    terminated?

6    A.  Yes.

7    Q.  Are you the person that recommended his termination to

8    Ms. White and Mr. Descamps?

9    A.  I did not.  I recommended the termination to Mr. Descamps.

10   Q.  To Mr. Descamps?

11   A.  Yes.

12   Q.  Sometime in the early part of 2015?

13   A.  Yes.

14   Q.  In June of 2013 you were managing Mr. Picarella?

15   A.  Yes.

16   Q.  And you learned that he had filed a charge of

17   discrimination or retaliation with the United States Equal

18   Employment Opportunity Commission?

19   A.  I knew of a filing, I wasn't specific -- I wasn't aware of

20   the specifics.  I was aware there was a filing with the EEOC,

21   yes.

22   Q.  Was that a problem?  Did you consider that a problem?

23   A.  No.

24   Q.  Did you consider the allegations he made in that complaint

25   to be a problem?

GC9TPIC4                          Karam - direct

```
 1    A.  Again, I'm not aware of the complaint itself, but I didn't
 2    find the notice to be a problem, no.
 3    Q.  During the time you managed him in 2013, 2014 and 2015, did
 4    you know that Mr. Picarella had made complaints to the human
 5    resources function at HSBC?
 6    A.  Can you please clarify?
 7    Q.  Yes, sir.  In the years 2013, 2014, and 2015, while you
 8    were his line manager, did you -- were you aware that he had
 9    made complaints of any kind to the human resources function
10    about other -- about the conduct of other employees or about
11    activities that affected him?
12    A.  Again --
13              MS. LEVIN:  Your Honor, objection.
14              MR. HUBBARD:  I'll rephrase.
15              THE COURT:  Okay.
16    Q.  In the time period that you managed Mr. Picarella, '13
17    through '15, did you know that he had complained to human
18    resources about the sexual harassment of a colleague, a female
19    colleague on the business development desk?
20    A.  Sorry, can you repeat the question again?
21    Q.  Yes, sir.  While you managed him, were you aware that he
22    had complained to HSBC human resources about the sexual
23    harassment of a female colleague?
24    A.  During the entire tenure I managed him?
25    Q.  Yes, sir.
```

GC9TPIC4                    Karam - direct

1   A.   Yes.

2   Q.   When did you learn?

3   A.   I don't remember specifically, but it was reported in the

4   press.

5   Q.   And can you give us a time frame?

6   A.   I don't remember specifically, no.

7   Q.   When you took over his line management, did you have any

8   animosity toward him?

9   A.   No.

10  Q.   Did you develop any?

11  A.   No.

12          MR. HUBBARD:  Plaintiff's Exhibit 193, please.

13  Q.   I'll ask you a few questions about this document.  We'll go

14  down to the Sametime text.

15  A.   I'm having a difficult time reading.

16  Q.   That's exactly what I was going to say.  There is a book

17  there in front of you but your microphone is on top of it.  Can

18  you find volume two?  Maybe we can help you.

19          Volume two, and let's look at tab 193.  I will give

20  you a minute to look at it.

21          MR. HUBBARD:  Peter go to 11:24 and highlight that

22  comment, 11:24:19.

23  A.   Okay.

24  Q.   Fair to say this is the Sametime Chat --

25  A.   Yes.

1  Q.  -- transcript.  These are instant messaging sort of

2  transcripts?

3  A.  It's internal to HSBC.

4  Q.  And date of this is June 7, 2013.  And is it fair to say

5  that this says it's involving Ms. Jenner and you?

6  A.  Yes.

7  Q.  Let's start there with where Ms. Jenner says hello, and

8  then she says:  I need to write this response email to MP.  I

9  want to write a response as to sufficiently address his point

10  so that I am not engaged in a back and forth on email nor have

11  to deal with this again at the Monday BCC.

12          Do you see that?

13  A.  Yes.

14  Q.  Can you tell us from your own experience who MP is?

15  A.  I believe it's Mr. Picarella.

16  Q.  If you read down with me I will try to use the screen and

17  you can use the exhibit there, please.

18          Go down to 11:24:31 Ms. Jenner says -- sorry, 11:24:24

19  Ms. Jenner says:  How is this?

20          MR. HUBBARD:  You got to come down some,

21  Mr. Fitzgerald.

22  Q.  11:24:24.  Carol, Ms. Jenner:  How is this?

23          Then she says:  Mike, I will update the attendee list

24  to reflect your participation.

25          Does she appear to be suggesting to you what the

1   language of her communication would be?

2   A.  I would say so, yes.

3   Q.  And she says:  Mike, I will update the attendee list to

4   reflect your participation that is well documented in the

5   detailed minutes.  I have to add Suzy as well.  Regarding your

6   second point, I will clarify the minutes as follows.  From

7   speaking with Mike Karam, it sounds like several of these

8   accounts were found to have RMs.

9          Then there's a quote beneath that, you see beginning

10  with MP and RH?  Right there.  You see where the quotation

11  marks begin MP and RH with COBAM?

12         Okay?  You see that?

13  A.  Yes.

14  Q.  If you go to 11:25:52 you say:  I would say the following.

15  No need to explain yourself.

16         Then you then apparently propose some language, fair

17  enough, for her letter or email.  Mike, I will update the

18  attendee list to reflect your participation that is well

19  documented in the detailed minutes.  There are other attendees

20  that I need to add as well.  Regarding your second point, I've

21  updated the minutes to reflect that the accounts are remaining

22  from the Topaz exercise.  Thanks for help on this.

23         Then you say:  Feel free to drop the thanks.

24         You wrote that part, right?

25  A.  Yes.

1   Q.  She says:  Okay, I like that.  Should I copy you in?  You

2   say:  No.  She says:  Cool, thanks.  She says:  I really need

3   to gets some chutzpah but this situation gives me the willies.

4   You say:  You have plenty of it, just use it.  She says:  True.

5   You say:  Feel free to bounce them off me.  CC me.  You say:

6   If he responds, we'll marginalize his behavior.

7           What type of conduct or activity did you envision you

8   would use to marginalize Mr. Picarella's behavior?

9   A.  Sorry, can you --

10  Q.  What did you envision you would do to marginalize his

11  behavior?

12  A.  Nothing specifically.

13  Q.  Is there anything good about an employee getting his

14  activities or his conduct marginalized by his manager?

15  A.  Well, Mr. Picarella -- Carol Jenner was having issues with

16  managing Mike, that's why -- part of the reason why I assumed

17  responsibilities for him.  This was a period where I was

18  managing him and there was a continuing dialogue at that time

19  that was contentious between him and Carol.

20  Q.  You would agree --

21          THE COURT:  Hold on.  You asked the question, let him

22  finish.

23  A.  It was a important for me to assert myself as his manager,

24  and it was important for me also that I'm aware of these

25  discussions and this back and forth that he had with Ms. Jenner

1    who had moved on to other responsibilities in a different role.

2    Q.  By marginalizing his behavior you were sorting setting him

3    aside?

4    A.  No.

5    Q.  Did you meet with Mr. Picarella after you became his

6    manager in May of 2013?

7            Did you meet with him at any time in the summer that

8    year, in June, July or August, to discuss his job?

9    A.  Again, my communications and meetings with him were

10   frequent.  Many of them were ad hoc, but yes.

11   Q.  So you met with him -- if I understand, you met with him

12   frequently in June, July and August of 2013?

13   A.  What do you mean by meeting?

14   Q.  Telephone meeting, in-person meeting, any kind of meeting.

15   A.  Yes.

16   Q.  You did?

17   A.  Yes.

18   Q.  And they were frequent?

19   A.  Yes.

20           MR. HUBBARD:  205, please, PX-205.

21           I believe this is in evidence, your Honor.

22   Q.  This is an email from Mr. Picarella dated September 23,

23   2013, to Ms. Bilbrey?

24           THE COURT:  Hold on a second, is 205 in evidence?

25           MS. LEVIN:  Yes.

GC9TPIC4                          Karam - direct

1          THE COURT:  Go ahead.

2    Q.  This is an email from you -- I mean from Mr. Picarella,

3    dated September 23, 2013, to Ms. Bilbrey, Mr. Alderoty, and to

4    you, is that correct?

5    A.  Yes.

6    Q.  He says:  Hi Mary, Mike and Carol have not met with me or

7    spoken with me in person in approximately three months, or

8    about the time of my filing with the EEOC.  At the same time

9    frame of my filing with the EEOC, Mike Karam has participated

10   in continued retaliation against me by assuming my role of

11   coordinating business case approvals and prioritization with

12   Pablo Pizzimbono and the relationship managers.

13          My question to you is:  When you received this email

14   from Mr. Picarella, did you write to Ms. Bilbrey or

15   Mr. Alderoty or anybody and say that the assertion that I have

16   not met with him in person in three months or about the time of

17   the filing of the EEOC was not accurate?

18   A.  I don't recall what form of action I would have taken on

19   the back of this email.

20          MR. HUBBARD:  209, please.

21          I believe this is in evidence, your Honor.  Let me

22   make sure.

23   Q.  It's also in volume two there, Mr. Karam, tab 209.  Maybe

24   the stuff starts on the second page.

25          Let's go to the bottom of the second page, please,

GC9TPIC4                         Karam - direct

 1    sir.  And I think at the bottom of the second page you will see

 2    that there's an email from Mr. Rose to you.

 3    A.  Yes.

 4    Q.  This says -- it's from Rose to you dated October 17, 2013,

 5    and the subject is Suzy Didier.  Who are Suzy and Didier?

 6    A.  Suzy was the chief operating officer for the global markets

 7    business, Didier was the head of global markets in the

 8    Americas.

 9    Q.  And it says:  Mike, please can you prepare a list of items

10    today which are on the aboves radar which I need to be prepared

11    for tomorrow.  Thanks.

12              This was written to you.  Who was Mr. Rose?

13    A.  Mr. Rose at the time was the co-head of the global precious

14    metals business for HSBC.

15    Q.  Located where?  Where was his office?

16    A.  London.

17    Q.  Did you understand why he was asking for these items to be

18    prepared for tomorrow?

19    A.  Yes.

20    Q.  What was the reason?

21    A.  He had -- in his visits to the U.S. he would meet with

22    senior management in the global markets businesses, and as the

23    COO for the global precious metals business I would prepare for

24    him things that we're working on, things on the radar, just so

25    he was familiar with them and was able to be prepared to speak

GC9TPIC4                        Karam - direct

```
 1   to them in the event that the issue would have arose or a
 2   discussion would have ensued.
 3            MR. HUBBARD:  Can we get to the next email,
 4   Mr. Fitzgerald, starts at the bottom of page 1, for Mr. Karam.
 5   Q.  So you see here at 22:30, October 17, this is you respond
 6   there, Mr. Karam, starting at the bottom of the first page,
 7   going to the second page, you say:  Dave, the big issue on
 8   their radar is this certificate issue.  Will provide you an
 9   update in the AM on that status.  The other is custody and
10   clearing transfer.
11            Do you see that?
12   A.  Yes.
13   Q.  Finally Suzy had asked that I help out on the sales issues.
14   It may be good for you to leverage that ask into some good
15   will.
16            What had Suzy asked you to do on the sales issues?
17   A.  Again, I think May of 2013 she asked me to oversee aspects
18   of the sales business management role, including managing Mike
19   Picarella.
20            (Continued on next page)
21
22
23
24
25
```

GC99PIC4                          Karam - direct

1    Q.  Was that all the sales issues that you're referring to

2    here?

3    A.  Yes.

4    Q.  So you believed at that time that the work you were doing

5    to manage Mr. Picarella was one of these items on Ms. White's

6    radar screen?

7    A.  Not specifically, no.  There were -- it was a broad --

8    broad responsibilities.

9    Q.  But was it on her radar screen?

10   A.  Can you please clarify what you mean.

11   Q.  Yes.  Was it something you were reporting to her on?

12   A.  When I was asked by management.  They had asked me to

13   oversee that -- those responsibilities.

14   Q.  Sir, at this time in October of 2013 were you reporting to

15   Ms. White on the development of your oversight of

16   Mr. Picarella?

17   A.  I have a functional reporting line in to Suzy and I have

18   always had one in to Suzy.

19   Q.  That was not my question.

20          My question is were you in that period of time

21   reporting to Ms. White specifically about your oversight of

22   Mr. Picarella?

23   A.  Nothing specifically, no.

24   Q.  In any way?

25   A.  Generally, yes.

1    Q.  Let's go to the next e-mail, please.

2            In the middle of the first page there, Mr. Karam,

3    please on the first page of this exhibit, Mr. Rose writes you

4    back, 4:45 p.m. re:  Suzy/Didier.  He says:  Okay.  Speak

5    t-o-m.  Sales issues?

6            Right?

7    A.  Yes.

8    Q.  And right above it you respond?

9    A.  Yes.

10   Q.  And your response is:  Picarella, the HR related problem.

11           Right?

12   A.  Yes.

13   Q.  After you wrote that did you explain to Mr. Rose what

14   the -- what Mr. Picarella's HR related problem was?

15   A.  I don't remember specifically, no.

16   Q.  What was the problem?

17   A.  Well by this time it was again reported that he had filed

18   issues against HSBC with the notice on the EEOC complaint.

19   There may have been some ensuing -- it's hard to place specific

20   timelines around this.

21   Q.  Was that viewed to be a problem at HSBC?

22   A.  I wouldn't say it's a problem at HSBC.  It was an issue

23   that we were dealing with.

24   Q.  So it was viewed to be a problem?

25   A.  Again, I don't view it as a problem.  It was an issue that

1   we were working through.

2   Q.  You wrote to the most senior management in your group that

3   he was an HR related problem, correct?

4   A.  Yes.

5   Q.  Did you tell anybody other than Mr. Rose, Didier,

6   Ms. White, that you viewed him as an HR problem?

7            MS. LEVIN:  Objection, your Honor.

8            THE COURT:  Please rephrase the question.

9   Q.  Did you tell anybody other than Mr. Rose that you viewed

10  him as an HR problem?

11  A.  I don't recall specifically, no.

12           MR. HUBBARD:  PX-214, please.

13           THE COURT:  Is 214 in?

14           MR. HUBBARD:  I'm not sure, your Honor.

15           May I move 214.

16           MR. BORTNICK:  It's not in.

17           MS. LEVIN:  No objection, your Honor.

18           THE COURT:  214 is in.

19           (Plaintiff's Exhibit 214 received in evidence)

20  Q.  Look at the first page.  Do you have it there in your book,

21  Mr. Karam?

22  A.  Yes.

23  Q.  Let's look at the top.  There this appears to be a Sametime

24  message involving you and Mr. Kartik, right?

25  A.  Yes.

1    Q.  I gather he was a business colleague?

2    A.  Yes.

3    Q.  And the date here is January 29, 2014.  You are still

4    managing Mr. Picarella, right?

5    A.  Yes.

6    Q.  Would you turn with me to the third page of this exhibit.

7    And the top line there is the -- the top line there it says --

8    do you see the top line where it says:  Michael Karam.  This

9    Iran deal.  Do you see that?

10   A.  Yes.

11   Q.  Let's go down a couple lines, please.  And there is one,

12   two, three, four, five blurbs down it says:  Michael Karam, a.

13   Role has come up in sales BM working for Pablo and I'm most

14   likely looking to take it.

15           Do you see that?

16   A.  Yes.

17   Q.  You say regional role.  Cross product.  It's the old Eileen

18   Hedges and now Carol Jenner role.  Was that accurate at the

19   time you wrote it?

20   A.  Yes.

21   Q.  So the role you took was the old Eileen Hedges, Carol

22   Jenner role?

23   A.  No.

24   Q.  Okay.  You say beneath that:  It's broken.  High profile.

25   And may be a relatively easy fix.

1          Go on down.

2          And if we go to the top of the next page, please, sir.

3     There it -- 12:58:57 p.m. Michael Karam.  I've been working

4     with them on this whole Mike Picarella situation and have

5     developed a limited engagement with him.

6          Do you see that?

7     A.  Yes.

8     Q.  You go down a couple of blurbs and you say:  Suzy and

9     Didier are extremely supportive of the move.

10         Right?

11         And Mr. -- your colleague says:  You have backing of

12    Suzy and Didier.

13         And you say:  Pablo.

14         And he says:  The profile is higher.

15         And it goes on.

16         Do you recall that discussion in January of 2014?

17    A.  I do now.

18    Q.  And that was essentially about the new role that you were

19    being asked to take?

20    A.  Yes.

21    Q.  When did you assume the new role?

22    A.  September 2014.

23    Q.  Mr. Karam, is that the same one that you now have?

24    A.  Yes.

25         MR. HUBBARD:  305, please.  This document is in

1   evidence, I believe, your Honor.

2   Q.  You have to go to another book, Mr. Karam, to get this one.

3   It might be volume three.

4          MR. HUBBARD:  Will this go all on one -- stop right

5   there.  Yes.

6   Q.  What is this document, please, sir?

7   A.  It appears to be guidance on the rating systems for

8   reviews, performance reviews.

9   Q.  There came a time in November of 2014 when you gave

10  Mr. Picarella a midyear review, I think.  And you rated him

11  off-track?

12  A.  I don't remember specifically the timeframe.

13  Q.  But there's a time in November 2014 when you provided a

14  performance review to Mr. Picarella and actually met with him

15  to review it.  Do you recall that?

16  A.  A review, yes.  I met with him.

17  Q.  And do you recall that that review was off-track?

18  A.  Again, I'd have to see the review.  I don't remember

19  specifically what the review was.

20  Q.  Assume with me for a moment that you gave him an off-track

21  review, okay.

22          MS. LEVIN:  Objection, your Honor.

23          THE WITNESS:  I'd like to see the review.

24          THE COURT:  Sustained.

25          MR. HUBBARD:  235, please.

1             THE WITNESS:  There isn't a 235 in this book.

2             MR. HUBBARD:  Yes.

3             Go down to the rating section.

4             THE COURT:  The witness indicates he doesn't have 235.

5             MR. HUBBARD:  I think that's right, your Honor.  The

6    best I can do is the screen.  I'll find a hard copy if you bear

7    with me just a moment.  What's the exhibit number, 235.  I

8    don't think I have a very good copy.

9             THE COURT:  Is 235 in?

10            MR. HUBBARD:  Yes, your Honor, I think it is.

11            THE COURT:  I don't believe 235 is in.

12            MR. HUBBARD:  Move the admission of 235.

13            MR. BORTNICK:  It's already in.

14            MR. HUBBARD:  We think it's in evidence, your Honor.

15            THE COURT:  Is this DX or PX-235.

16            MR. BORTNICK:  PX-235.

17            THE COURT:  Is there any objection to 235?

18            MR. JACKSON:  Your Honor there is a similar document

19   that's 236 that is in that I think is the appropriate

20   non-objected document.

21            MR. HUBBARD:  Do you have 236, Peter?  I think they're

22   identical, Judge.

23            Can we have the top?

24            THE WITNESS:  236?

25            THE COURT:  Yes.  236.

GC99PIC4                         Karam - direct

1   Q.  Take a look at that and if you go over a few pages and find

2   the mid year summary section.

3           MR. HUBBARD:  Go back up, Peter.  Just right above

4   what you had.  It says mid year summary right there.  Yes.

5   Q.  Just look at the checkpoint, please, for me, Mr. Karam.

6           (Pause)

7   Q.  Are you reading it, sir?

8   A.  Yes.

9   Q.  Had you finished?

10  A.  Not yet.

11          (Pause)

12  A.  Okay.

13  Q.  When was the last time you read it, sir?

14  A.  I don't recall.

15  Q.  How many times did you read it in the last week?

16  A.  I don't recall.

17  Q.  How many times did you read it preparing for your testimony

18  here today?

19  A.  I don't recall.

20  Q.  What does it say at the top at checkpoint?

21  A.  Off-track.

22  Q.  Is this the off-track review you gave Mr. Picarella on or

23  about November 21 of 2014?

24  A.  Yes.

25  Q.  This is the one you presented to him in the conference room

GC99PIC4                          Karam - direct

1    at the office?

2    A.  Yes.

3              MR. HUBBARD:  Peter, I want to go back to the

4    off-track.  Take this down.

5              THE WITNESS:  What number was that?

6              THE COURT:  He hasn't said.

7              MR. HUBBARD:  The exhibit number, sir, is 305.  It's

8    in that third book.

9              This is in evidence, your Honor.

10             THE COURT:  Yes.

11   Q.  Would you take a look at this for a moment, please, sir,

12   305.

13   A.  Okay.

14   Q.  Are you familiar with this rating description?

15   A.  Yes.

16   Q.  Let's look down the bottom of the top section you see where

17   it says:  Off-track employees should have a performance

18   improvement plan, PIP, with clearly documented actions.

19             Do you see it?

20   A.  Yes.

21   Q.  When did you give Mr. Picarella his performance improvement

22   plan?

23   A.  I wasn't able to.

24   Q.  You couldn't find him in the office to give it to him?

25   A.  No.  The performance improvement plan is a subsequent

GC99PIC4                        Karam - direct

1   action that happens -- that we put in place after the review.

2   Preliminarily we have the review -- we have the discussion, the

3   review, and then if off-track we would put a performance

4   improvement plan after that.

5   Q.   I see.   Okay.   Were you able to mail it to him?

6   A.   I don't know about that.   I don't know how practical it is.

7   The way our -- the way our relationships are with employees

8   specifically around something as important as a performance

9   improvement plan, I like to view that as a negotiated document.

10  It has to be very, very clear to the employee as well as to the

11  manager that we're both on the same page.   Something so

12  impersonal about writing something up and mailing it being one

13  way is not my style.

14  Q.   Did you draft a performance improvement plan for

15  Mr. Picarella?

16  A.   Well, Mr. Picarella --

17  Q.   You can explain.   Just tell me if you drafted a performance

18  improvement plan for him.

19  A.   (No response).

20  Q.   Just yes or no.

21  A.   He had very specific objectives.

22  Q.   That was not my question.

23  A.   And he had very specific --

24       THE COURT:   Hold on.   He's asking a yes-or-no

25  question.   If you can answer it yes or no, answer it yes or no.

GC99PIC4                          Karam - direct

1    If you can't just say you can't.

2               Restate the question again, counsel.

3    Q.  Just very simply did you draft at or about this time a

4    performance improvement plan for Mr. Picarella?

5    A.  No.

6    Q.  Did you evaluate his performance in any way after your

7    meeting with him on the 21st of November of 2014?

8    A.  Yes.

9    Q.  How?

10   A.  Would you please clarify.  What do you mean by how?

11   Q.  What performance was he doing after that meeting?

12   A.  Well he continued to carry out tasks and in certain

13   instances he demonstrated weaknesses and those were highlighted

14   to him.

15   Q.  How did you do that when he wasn't in the office?

16   A.  I don't recall specifically but communications via e-mail

17   or phone but I don't remember specifically how they were

18   carried out.

19   Q.  Sir, you never saw Mr. Picarella at HSBC after November 21

20   of 2014, did you?

21   A.  I don't believe so, no.

22   Q.  How did you evaluate his performance?

23   A.  Again, he was still responsible to carry out his role

24   working from home.  He continued to demonstrate weaknesses in

25   carrying out those objectives and he continued to fail all

 1  those objectives.  And when those instances were -- happened I

 2  would highlight them to him typically via e-mail or maybe in a

 3  phone conversation.  I don't recall specifically what the

 4  communications medium was with him.

 5  Q.  Did any of those failures take place in the month of

 6  December 2014?

 7  A.  Yes.

 8  Q.  Did you know in the month of December 2014 if he had access

 9  to the HSBC systems?

10  A.  Yes.

11  Q.  Don't you know that his access was suspended when he was

12  told to work from home?

13  A.  No.

14  Q.  You didn't know that?

15  A.  No.

16  Q.  You certainly didn't communicate with him in any way

17  between the time of that meeting and December 18 of 2014 when

18  his access was restored, did you?

19  A.  I don't recall my -- specifically had I or had I not.  I

20  can't answer that.  I don't remember.

21  Q.  What was the performance that you were evaluating and

22  finding to be deficient after January 15 of 2015?

23  A.  Well for starters he was responsible to collate sales

24  commentary on a weekly basis from the very various sales

25  managers.  It was important work that we would collect

GC99PIC4                          Karam – direct

1    information about business markets, any issues that had arisen.

2    And that information would be consolidated into a report that

3    would be shared with senior management in London.

4             So there are instances where that wasn't being carried

5    out.  There were some issues regarding his access and him not

6    having the right protocols even though, you know, we thought or

7    we understood that he had the privileges to log in from home to

8    do his work.  But clearly that wasn't happening.

9             MR. HUBBARD:  Give me the Marshall letter please,

10   Peter.  I don't know the number.  The January 15 letter to me

11   from Mr. Marshall.  244.  Would you blow it up.

12   Q.  Would you look at tab 244.  It would be in volume three,

13   Mr. Karam.

14            You knew that this gentleman who you were supervising,

15   Mr. Picarella, you knew as of January 15, 2015 that he had been

16   placed on paid administrative leave and that his access to

17   HSBC's systems and premises had been suspended, did you not?

18   A.  No.

19   Q.  You never laid eyes on him or worked with him or spoke to

20   him after this date, did you?

21            MS. LEVIN:  Objection, your Honor.

22            THE COURT:  Overruled.

23            THE WITNESS:  I don't recall specifically what would

24   have transpired -- the timeframe of me communicating with him.

25   Q.  But, sir, you've told us that his performance continued to

GC99PIC4                       Karam - direct

1   deteriorate after you were meeting with him -- the truth is

2   that you didn't have a single contact with him after

3   November 21 of 2014; is that correct?

4   A.   No.  I don't believe that to be true.

5           MR. HUBBARD:  Nothing further, your Honor.

6           THE COURT:  Any cross-examination?

7           MS. LEVIN:  Yes, your Honor.  We will have

8   cross-examination.

9           THE COURT:  Proceed.

10          MS. LEVIN:  Your Honor, I have a binder of documents

11  for the witness.  May I approach, please?

12          THE COURT:  Yes.

13          MS. LEVIN:  Your Honor, I also have a number of

14  documents that I'd like to move into evidence if the Court were

15  to find that more efficient.

16          THE COURT:  That's fine.  What are the numbers please.

17          MS. LEVIN:  DX-228.

18          MR. HUBBARD:  Go slow, your Honor.  228.

19          MS. LEVIN:  228.

20          MR. HUBBARD:  No objection.

21          MS. LEVIN:  DX-235.

22          MR. HUBBARD:  No objection.

23          MS. LEVIN:  DX-243.

24          MR. HUBBARD:  No objection, your Honor.

25          MS. LEVIN:  DX-245.

GC99PIC4                          Karam - cross

1           MR. HUBBARD:  No objection.

2           MS. LEVIN:  DX-251.

3           MR. HUBBARD:  No objection.

4           MS. LEVIN:  DX-258.

5           MR. HUBBARD:  No objection.

6           MS. LEVIN:  DX-263.

7           MR. HUBBARD:  No objection.

8           MS. LEVIN:  DX-265.

9           MR. HUBBARD:  No objection.

10           MS. LEVIN:  DX-268.

11           MR. HUBBARD:  No objection.

12           MS. LEVIN:  And DX-275.

13           MR. HUBBARD:  No objection.

14           THE COURT:  Okay.  So DX-228, 235, 243, 245, 251, 258,

15   263, 265, 268, and 275 are all in evidence without objection.

16   Go ahead, counsel.

17           (Defendants' Exhibits 228, 235, 243, 245, 251, 258,

18   263, 265, 268, and 275 received in evidence)

19           MS. LEVIN:  Thank you, your Honor.

20   CROSS-EXAMINATION

21   BY MS. LEVIN:

22   Q.  Good afternoon, Mr. Karam.

23   A.  Good afternoon.

24   Q.  Mr. Karam how many years have you worked in the financial

25   services industry?

GC99PIC4                         Karam - cross

1   A.   About 21.

2   Q.   And how many years have you worked at HSBC?

3   A.   Just over 15 years.

4   Q.   Could you briefly describe for us your current

5   responsibilities at HSBC as the business manager for global

6   sales?

7   A.   Sure.  My responsibilities are to support our institutional

8   sales force.  So within HSBC we have sales people that are

9   responsible for distributing financial products to, again,

10  pension funds, mutual funds, brokers, banks.  And within that

11  team I'm responsible for the day-to-day operations, working on

12  issues that they would have resolving customer -- customer

13  concerns, issues with HSBC's infrastructure getting

14  confirmations or settlements or -- a whole host of things.

15  Basically responsibilities for the operation of the business

16  without actually conducting business.

17  Q.   Do you currently supervise employees at HSBC?

18  A.   Yes.

19  Q.   How many?

20  A.   Four.

21  Q.   What was Mr. Picarella's title during the period that you

22  supervised him?

23  A.   Senior vice-president.

24  Q.   Were you also a senior vice-president?

25  A.   Yes.

GC99PIC4                          Karam - cross

1   Q.  Does that mean that you and Mr. Picarella were peers?

2   A.  No.  Mr. Picarella reported to me.

3   Q.  Is it common at HSBC that one senior vice-president would

4   report to another senior vice-president?

5   A.  Sure.

6   Q.  Would you describe just briefly and generally what

7   Mr. Picarella's responsibilities were as a senior

8   vice-president at HSBC?

9   A.  Sure.  All my business management team, we had broad

10  responsibilities for about 150 different sales people across

11  multiple financial products.  Mr. Picarella's responsibilities

12  were to assist in a portfolio of work within that space, very

13  specific items that he was fully responsible for.  But as a

14  team we would deal with issues as they arose on a daily basis.

15           THE COURT:  Just one moment.  Members of the Jury stay

16  patient.  Let me just see counsel in the robing room for a

17  second.  We don't need to have the court reporter.  I just want

18  to discuss some scheduling matters with you.

19           (Robing room discussion off the record)

20           THE COURT:  So, Members of the Jury, here's what we're

21  going to do.  We're going to break for lunch now.  I'd ask you

22  to come back at 2:10.  Don't discuss the case with anyone else.

23  Don't discuss the case amongst yourselves.  As I've told you

24  before we will go no later than 4 o'clock today.  So have a

25  great lunch.  We'll see you at 2:10.

1              (Jury excused)

2              THE COURT:  Okay.  So let's have counsel come back by

3     two to avoid any unnecessary bumping into jurors.  See you

4     then.

5              MR. JACKSON:  Your Honor.

6              THE COURT:  Everyone can sit down.  That's fine.

7              MR. JACKSON:  May we ask that Mr. Karam be excused

8     until -- for the moment, into the hallway.

9              THE COURT:  Well we can have him excused.  I'll ask

10    him to go into the robing room because the jurors will be

11    walking in the hallway.  That's fine.  Is there something you

12    want to discuss concerning his testimony?

13             (Witness excused)

14             THE COURT:  Go ahead, counsel.

15             MR. JACKSON:  Thank you, Judge.  I just wanted to

16    raise very briefly during Mr. Karam's direct there was a

17    point where Mr. Hubbard highlighted something in one of the

18    communications about the Iran deal.  I don't see how that adds

19    any relevance to the case and I just want to clarify that

20    that's not going to be something that plaintiff's counsel is

21    going to be further highlighting during the course of the case.

22    To me seemed just like an extraneous piece of information that

23    adds no relevance to anything.

24             MR. HUBBARD:  It was not offered for any purpose other

25    than find the place on the page.  I don't think anybody thought

GC99PIC4

1    that anybody was offering any evidence related to that at all.

2    It was just to find the place on the page to start reading.

3            THE COURT:  Okay.

4            MR. JACKSON:  That's fine.  It's just politically

5    sensitive stuff.  I don't think it's relevant.  If we have an

6    agreement that that's not going to be further highlighted, it's

7    not going to be highlighted in summations, then I don't have

8    any further issue.

9            MR. HUBBARD:  Absolutely.

10           THE COURT:  Okay.  I will note I didn't notice that

11   when that was highlighted.  I don't know the jurors are

12   necessarily making that kind of connection to any sort of

13   political Iran deal or just some Iranian deal somehow related

14   to some business activity at the bank.

15           MR. JACKSON:  Completely possible, your Honor, which

16   is we why we didn't offer any objection.  There is no need to

17   highlight it.  I just wanted to confirm I don't see any

18   relevance.  So that's the end of the issue, your Honor.

19           THE COURT:  I'll let Mr. Karam come out and I'll have

20   counsel come back at 2 and we'll start at 2:10.

21           (Luncheon recess)

22

23

24

25

GC99PIC4

                              AFTERNOON SESSION

                                 2:09 P.M.

  3            (Jury not present)

  4            MR. JACKSON:  Just to update the Court on the issue we

  5     were discussing before.  There were a couple of other comments

  6     in that chat we were discussing that were not relevant.  We had

  7     made a 403 objection in our pretrial order, but we think the

  8     document is admissible for its purposes.  We're prepared to

  9     redact a copy of PX-214, which we've shared with plaintiff's

 10     counsel and I think we have a basic agreement that that's going

 11     to be fine for the document to actually be admitted into

 12     evidence.

 13            THE COURT:  Plaintiff's counsel.

 14            MR. HUBBARD:  No objection.  I want a chance to look

 15     at it over the weekend.  But it looks fine with me.  We can

 16     substitute.

 17            THE COURT:  Good.  Just waiting for all the jurors to

 18     reassemble and we'll continue.

 19            MR. HUBBARD:  Are we off the record, Judge?

 20            THE COURT:  Yes.  We're on the record.  Yes.

 21            MR. HUBBARD:  On the record, yes.

 22            THE COURT:  Do you need to say something off the

 23     record?

 24            MR. HUBBARD:  No.  No.  No.  Chitchat.  Just

 25     chitchatting.

GC99PIC4

1              MR. BORTNICK:  Could we get that lowered a little bit

2       especially when the sun comes out of the clouds, right in our

3       faces, myself and Ms. Palmieri.

4              THE COURT:  You want to get what done?

5              MR. BORTNICK:  The curtain.

6              MR. HUBBARD:  We can do it.  She had a pull the other

7       day for it.

8              Thank you.

9              THE COURT:  We might as well ask the witness to come

10      on up to the witness stand.

11             MICHAEL KARAM, resumed.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Welcome back.  Hope you had a pleasant

3    lunch.  Let's continue with the case on trial.  Go ahead,

4    counsel.

5    CROSS-EXAMINATION CONTINUED

6    BY MS. LEVIN:

7    Q.  Welcome back, Mr. Karam.

8    A.  Thank you.

9    Q.  Hope you had a chance to get some lunch.

10           Mr. Karam before lunch we were discussing the fact

11   that in approximately mid 2013 you became Mr. Picarella's

12   supervisor, correct?

13   A.  Yes.

14   Q.  How would you describe your interactions with

15   Mr. Picarella?

16   A.  Would you mind please clarifying.

17   Q.  Sure.  Were your interactions with Mr. Picarella cordial?

18   A.  Yeah.  In the beginning.  When we commenced the

19   relationship, as a --

20   Q.  When you would have an in-person meeting with Mr. Picarella

21   how would those meetings generally begin?

22   A.  Very cordial.  Professional.  We shared some common

23   interests.  We both had families.  I know Michael had, I

24   believe it was four children.  And two of mine were similar in

25   age.  So we'd exchange stories about family interests.  They

1    were into sports.  Mine were beginning to play soccer.  They

2    weren't taking to it.  And I know he had -- I think he was

3    coaching Little League or he was active within sports.  I

4    wasn't very active at all.  So, it was very cordial, discussing

5    family.

6            In some instances we had -- I felt a common connection

7    through religious beliefs, you know.  Mike was very religious.

8    I'm also very religious.  And he was telling me, we would

9    discuss some of his trips in an instance one of them to Texas

10   to a mission.

11   Q.  Let's look at PX-193 which is one of the documents that

12   Mr. Hubbard reviewed with you earlier.

13           It's actually not in that binder, Mr. Karam.  It's one

14   of the ones that plaintiff's counsel looked at with you.  You

15   can also look at it up on the screen if you'd like.

16   A.  Sure.  Okay.

17   Q.  Earlier Mr. Hubbard asked you about this chat with

18   Ms. Jenner.  Were you friendly with Ms. Jenner?

19   A.  Yes.  We had a relationship.  She used to support us in a

20   previous role.  So she was a support partner of mine in my

21   previous role as the business manager of precious metals.

22   Q.  In this chat it looks like you're trying to be a

23   soundingboard for Ms. Jenner, give her advice perhaps on an

24   e-mail she was drafting to Mr. Picarella?

25           MR. HUBBARD:  Objection, your Honor.

GC99PIC4                          Karam - cross

<table>
<tr><td>1</td><td>THE COURT:  Please rephrase the question.</td></tr>
<tr><td>2</td><td>Q.  What were you trying to do in this chat with Ms. Jenner?</td></tr>
<tr><td>3</td><td>A.  Again, I knew Ms. Jenner.  We had worked together for a</td></tr>
<tr><td>4</td><td>long time and she was running this response by me.</td></tr>
<tr><td>5</td><td>Q.  Why did you make the comment about marginalizing his</td></tr>
<tr><td>6</td><td>behavior?</td></tr>
<tr><td>7</td><td>A.  Again, I knew there was -- there was a somewhat contentious</td></tr>
<tr><td>8</td><td>relationship with him with Ms. Jenner and I felt, without</td></tr>
<tr><td>9</td><td>having the source document as to what this was in reference to</td></tr>
<tr><td>10</td><td>specifically, is that she clearly was agitated by whatever he</td></tr>
<tr><td>11</td><td>had -- was asking her.  And I felt it was appropriate as being</td></tr>
<tr><td>12</td><td>his manager again for me to assert myself as his manager in</td></tr>
<tr><td>13</td><td>working through any of these issues.</td></tr>
<tr><td>14</td><td>Q.  What do you mean by a contentious relationship?</td></tr>
<tr><td>15</td><td>A.  I don't recall the specifics of it again.  But I knew that</td></tr>
<tr><td>16</td><td>there was -- there was a bit of friction between them.  And for</td></tr>
<tr><td>17</td><td>her it was -- it was an issue where she was having -- she was</td></tr>
<tr><td>18</td><td>having a difficult time dealing with him.</td></tr>
<tr><td>19</td><td>MS. LEVIN:  Let's look at PX-214.  Page four at the</td></tr>
<tr><td>20</td><td>top.</td></tr>
<tr><td>21</td><td>Q.  Mr. Karam this is another chat that you looked at earlier</td></tr>
<tr><td>22</td><td>today with Mr. Picarella's attorney.  We'll highlight the</td></tr>
<tr><td>23</td><td>portion for you.</td></tr>
<tr><td>24</td><td>Why were you making a comment about the whole Mike</td></tr>
<tr><td>25</td><td>Picarella situation?</td></tr>
</table>

1   A.  Again through various press reports and so forth.  There

2   was a bit of publicity around this.  And I was just making a

3   comment that I was at the time managing him.  And that was my

4   interaction with the sales management role.

5   Q.  You're referring to press coverage of Mr. Picarella's

6   lawsuit against HSBC?

7   A.  Yes.

8   Q.  Was Mr. Picarella usually in the office when you would

9   expect him to be?

10  A.  Not typically, no.

11  Q.  Did you receive complaints from others at HSBC that they

12  were having trouble locating Mr. Picarella?

13  A.  Yes.  From time to time I would have complaints where

14  people couldn't get ahold of him.

15  Q.  Are employees generally notified -- required to notify

16  their managers that they will be out of the office?

17  A.  Absolutely.

18  Q.  And they should notify their managers in advance if they're

19  going to be out of the office, correct?

20  A.  Yes.  It's important to make arrangements with your manager

21  if you're planning on being out of the office.

22  Q.  Were there times when Mr. Picarella was out of the office

23  and had failed to notify you in advance?

24  A.  Yes.

25  Q.  That happened on more than one occasion?

GC99PIC4                        Karam - cross

1    A.  Yes.

2    Q.  When Mr. Picarella was in the office did you have a

3    difficulty getting ahold of him?

4    A.  At times, yes.

5    Q.  Approximately how many times per day would you go by his

6    desk?

7    A.  Well he sat on an adjoining floor and we maintained our

8    office on that floor.  So I'd say 20, 25 times a day.

9    Q.  Would you sometimes find that Mr. Picarella was nowhere to

10   be found?

11   A.  Usually.

12   Q.  Was there any legitimate reason that Mr. Picarella needed

13   to be away from his desk?

14   A.  Not typically.

15   Q.  What about e-mail and phone communications?  Would

16   Mr. Picarella respond to those in a timely fashion?

17   A.  Not typically.

18   Q.  Did you receive complaints from others at HSBC about

19   Mr. Picarella's responsiveness?

20   A.  Yes.

21   Q.  Did you ever observe Mr. Picarella in a darkened office or

22   conference room speaking on his cellphone?

23   A.  Often.

24   Q.  What was your reaction to that?

25   A.  Again, it was a difficult situation.  I didn't feel -- I

1    didn't feel that it was appropriate for me to address it in

2    reprimanding.  I like to be as flexible as possible.  And I

3    like to give employees enough latitude to do what they need to

4    do.  What we do is -- could be trying.  We do a lot.  We're

5    responsible for a lot.  But it would be often that I'd find him

6    away, unresponsive, in closed or -- closed conference rooms

7    speaking on phones, on a personal phone.

8    Q.  How would you describe Mr. Picarella's general demeanor and

9    attitude?

10   A.  Not very good.  The tenor -- when you're speaking to him,

11   he's very cordial, very, very nice.  You can get along with

12   him.  You can connect with him.  But the communications that

13   came out via e-mail, when he wrote, the tone, the tenor in his

14   responses or his communications via e-mail often put people on

15   the defensive and turned off people.  And I had received

16   complaints about that.  And he as well.

17   Q.  Was Mr. Picarella elusive in your view?

18   A.  Very much so.

19   Q.  Was Mr. Picarella sloppy in your view?

20   A.  Yes.

21            MR. HUBBARD:  I mean I just have to say that there's

22   just an awful lot of leading.

23            THE COURT:  It's cross-examination.  Go ahead.

24   Q.  Was Mr. Picarella engaged in his job?

25   A.  I can't -- I can't say that, no.

GC99PIC4                          Karam - cross

1   Q.  Did you get the sense that Mr. Picarella was interested in

2   what was going on at work?

3   A.  Not really.  No.

4   Q.  What are some of the characteristics that you would expect

5   to see in a senior vice-president at HSBC?

6   A.  Senior vice-president is a business leader.  It's a very

7   important role.  It's the -- it's the level between managing a

8   business and managing lines of businesses and support.  So it's

9   an important level where you gain a lot of skills, where you

10  are working with people on various different wavelengths,

11  various levels of seniority, some junior to you, some more

12  senior.  And you have to be that bridge.

13          You learn to adapt to situations.  You're responsible

14  for identifying issues.  You're responsible for being proactive

15  about issues.

16          You also develop a network.  You develop a network.

17  It's a role where you develop a network with very senior

18  managers.  And it's a very, very important steppingstone in the

19  management structure typically at most banks, and a lot of

20  weight is put on it at HSBC.  There's a good layer of senior

21  vice-presidents.

22  Q.  Did Mr. Picarella embody those characteristics in your

23  view?

24  A.  Not at all.

25  Q.  Let's go to DX-228.  This is in the black binder,

GC99PIC4                         Karam - cross

1   Mr. Karam.

2              Just let us know when you've reviewed the document,

3   Mr. Karam.

4   A.   Okay.

5   Q.   Would you briefly explain the client account which you are

6   describing in this e-mail?

7   A.   Sure.  One of the primary objectives that I had asked Mike

8   to take responsibility for was a forum where we would -- where

9   we would entertain business cases to bring on new clients to

10  the bank with a significant sales force.  We had about 150 or

11  so sales people who were constantly receiving requests to open

12  accounts for new customers.  There was a preexisting forum that

13  was very limited on the subset of customers' hedge funds that

14  Michael was responsible for.  And after assuming

15  responsibilities I felt that it would be appropriate for Mike

16  to broaden that and take on additional responsibilities and

17  look at all clients, not just a specific segment of clients.

18  And it was a forum where we would -- we would support the sales

19  people to present business cases to open up new trading

20  relationships, new accounts with clients.

21             MS. LEVIN:  If we could zoom in on the bottom of the

22  first page of Mr. Picarella's e-mail.

23  Q.   Mr. Picarella says:  No problem.  I assume Pablo will

24  address and I'm there for adding color and answering any

25  questions?

1              Let's look at Mr. Karam's response.

2              Your response, Mr. Karam is:  Although Pablo is

3      supportive, it would be best for you to be prepared to address

4      at the meeting since we own this.  If he takes the lead, great.

5      I just think to move this forward we'll need to drive the

6      discussion.

7              Why did you write that to Mr. Picarella?

8      A.  Again, I shouldn't have needed to.  We had explained in the

9      initial meetings I had with him that part of my role as his

10     manager is to increase his profile within the bank.  So this

11     was a great forum where dealing with senior managers we're

12     dealing with people from all various aspects of the bank and it

13     was a great forum for Mike to build that network, to work

14     through these issues.  But at every juncture, even in this

15     relatively simple task I had to provide advice and guidance on

16     how to approach this from him.  Sort of spoonfeeding him

17     through the actual objective.

18     Q.  You also seem to be telling Mr. Picarella he needs to take

19     a leadership role at this meeting; is that correct?

20     A.  Yes.

21     Q.  Did you often have to tell Mr. Picarella that he should be

22     taking a leadership role on projects that he was responsible

23     for?

24     A.  Yes.  I had to remind him.

25             MS. LEVIN:  Let's go to DX-243.  Page eight.

1   Q.  So, Mr. Karam, we're on page eight of DX-243.  It's an

2   e-mail from you to Mr. Picarella dated August 8, 2013.  You

3   state:  Mike, I do not appreciate the tone of your note and am

4   disappointed that, if you were confused about your role, you

5   did not come to talk to me.  The process to propose new client

6   relationships has not changed.

7           What are you referring to in this e-mail?

8   A.  Again, three months into that objective of being the

9   coordinator of that forum Mike would continually throw

10  questions at the process and how he is involved and how things

11  work and who is responsible, all in an attempt to be elusive

12  away from this.  And this is in response to a note where if I

13  recall correctly it was out to a senior salesperson.  And the

14  tone of the e-mail, responding about a specific business case,

15  was really off-putting to a senior -- a senior sales manager,

16  someone that we're supposed to support.

17          So I had to remind him again of his tone and of his

18  lack of -- lack of initiative and needing him to -- to be

19  crystal clear that this is his responsibility and affirming

20  that that hasn't changed.

21  Q.  Did Mr. Picarella often write e-mails whose tone you felt

22  was inappropriate?

23  A.  Yes.

24  Q.  Just going to the next paragraph.  You state:  Business

25  cases continue to be, and will continue to be, submitted to you

822

GC99PIC4                        Karam - cross

1    for collection.

2              What was the issue about business cases that you're

3    referring to?

4    A.   It may have been a specific client -- sales manager wanting

5    to onboard a new client and the business case may have come in

6    through another channel, maybe through myself or through

7    someone else.  And three months after having very specifically

8    gave him responsibilities for his objective, here again I had

9    to go through and remind him of his responsibilities.

10             MR. HUBBARD:  Can we go to the next e-mail at the

11   bottom of page seven.

12   Q.   Mr. Karam, did you respond to Mr. Picarella and suggest

13   meeting in person to discuss?

14   A.   Yes.

15   Q.   What was Mr. Picarella's response?

16   A.   Again he was being elusive, not being able to meet with me

17   to discuss this.

18   Q.   So you had difficulty getting Mr. Picarella to respond and

19   actually schedule a meeting with you?

20   A.   Often, yes.

21   Q.   Would you have expected Mr. Picarella to be more responsive

22   to a meeting request from his direct manager?

23   A.   Absolutely.  Especially if he felt that there was confusion

24   or if there was something that he needed to address.  I was

25   widely available and a lot of times it was me initiating the

GC99PIC4                         Karam - cross

1    contact saying let's sit down and talk and not hide behind

2    e-mails and that sort.

3              MS. LEVIN:  Let's go to page one.  The first two

4    paragraphs.

5    Q.  Did you ultimately meet with Mr. Picarella on or about

6    September 27, 2013?

7    A.  Yes.

8    Q.  In your e-mail you state:  As discussed below are the

9    responsibilities expected of your role in the business

10   manager/COO community and position as an SVP.  Listed below is

11   the minimum expected, from time to time there will be

12   additional responsibilities, and it is incumbent upon yourself

13   to be proactive to embrace those opportunities as a senior

14   member of the team.

15             What were you setting forth in this e-mail?

16   A.  Baseline objectives of what I expected of him but then

17   again reconfirming to him that, again, much more -- as senior

18   vice-presidents we were mid level managers within the bank and

19   we had to take these as opportunities to chart our own course

20   and, again, expand the network, expand our responsibilities as

21   these situations arose.

22   Q.  Did you feel that Mr. Picarella should have had any

23   confusion about what was expected of him as a senior

24   vice-president?

25   A.  No.  As a midlevel manager making it that far absolutely

1   not.

2   Q.  After receiving this e-mail should Mr. Picarella have had

3   any confusion about his specific job responsibilities?

4   A.  I hope not.

5   Q.  What is the monthly GMB submission?

6   A.  It's a commentary that we would collect across the dealing

7   or across the many different product area and sales managers.

8   So we would collect commentary and it would be passed -- it

9   would be collated into a report.  And that report would be

10  shared by senior management at executive committee meetings.

11  So it was a view of what was happening in the Americas and in

12  the region.  And it would be shared with senior managers at the

13  executive committee meetings.  And it also had a broader

14  distribution where it was being shared with the regulators,

15  with the regulators in the United Kingdom.  We're an English

16  bank so we have regulators there.  And this was commentary as

17  to revenue trends, client activity, issues that we're

18  experiencing in the region.  And it was a forum where we were

19  raising those into the senior manager -- senior management team

20  in London.

21  Q.  What was Mr. Picarella's role with respect to the GMB

22  monthly submission?

23  A.  He would have to work with the sales managers in the region

24  to collect their feedback.  It was very prescriptive.  There

25  was four or five topics that they wanted addressed or they

1    wanted answered.  And he would work with the sales managers in

2    the region to collect that feedback.  He would collate that

3    into a report.  He would edit that report, proofread it as he

4    saw appropriate.  And it was his responsibility to submit it.

5    Q.  So it was really his project, correct?

6    A.  Yes.

7    Q.  How was Mr. Picarella's performance in connection with that

8    project?

9    A.  Up until February of 2014 he was providing the monthly

10   submissions without issue.

11           I noticed that the submissions had terminated.  I

12   didn't see submissions for -- I think it was like March or

13   April of that year.  And I queried Mike as to why haven't we

14   put this submission through.  And he had commented back to me

15   that the -- the requirement had changed and the person who he

16   was submitting this to in London no longer required it in this

17   form and they would collect it from other sources.  So he felt

18   at the time that the requirement had gone away.

19   Q.  Was his understanding accurate?

20   A.  No.

21   Q.  Why not?

22   A.  Well subsequently someone had come back to Mike asking for

23   that report and Mike in essence responded back and said he's no

24   longer responsible for collating that report.  And what that

25   person did was he escalated to me being his manager.  And then

GC99PIC4                        Karam - cross

1    I had to work with him, work with Mike to navigate a solution

2    to provide this feedback to this person.

3    Q.   Is there something at HSBC called the client governance

4    rationalization forum?

5    A.   Yes.

6    Q.   What is that?

7    A.   I referred to it earlier.  It's the forum where we review

8    collectively, as a business, we review new client onboards.  So

9    clients that wanted to do business with HSBC, new clients, we

10   would look at them, review them, and we would prioritize what

11   resources we were going to dedicate to open up their accounts

12   in order for them to trade with HSBC.

13   Q.   What was Mr. Picarella's role with respect to the client

14   governance rationalization forum.

15   A.   He was responsible for working with the sales managers to

16   produce business cases.  So we didn't have rationale as to why

17   we wanted to onboard specific customers.  A couple they would

18   look at potential profitability, areas of focus on the client

19   where they -- which financial products they transacted.  It was

20   important that the forum would review these cases and

21   collectively make a decision as to how we're going to

22   prioritize them as new business to the bank.

23   Q.   How was Mr. Picarella's performance in connection with that

24   project?

25   A.   Mediocre.  There were times where he would cancel the

1    meetings ad hoc.

2          One specific time, which was quite embarrassing, was

3    that the meeting was on.  We appeared into the conference room.

4    He didn't appear.  He wasn't there.  We attempted to have the

5    conference call facility.  But we couldn't activate the

6    conference call facility because he had the pass code.  So we

7    had people on the line waiting to be connected in the

8    conference call and we couldn't activate it.  So somewhat

9    embarrassing.  We had to go back and cancel the meeting after

10   the meeting had started, disrupting people's schedules.  So not

11   very good.

12   Q.  Did you receive complaints from others at HSBC regarding

13   Mr. Picarella's performance in connection with those meetings?

14   A.  Yes.

15   Q.  Did Mr. Picarella also have responsibility for something

16   called the give up project?

17   A.  Yes.

18   Q.  Would you describe what the give up project was for us?

19   A.  Sure.  It was an extension onto the client rationalization

20   forum.  I've expanded his responsibilities to focus on a

21   specific piece of business.  In give ups, the simplest way to

22   explain it is where another broker, another banker broker,

23   ourselves, enter into an agreement where the other broker

24   allows a customer, a third party customer, to transact on their

25   behalf.  This is very prevalent in the marketplace and HSBC

GC99PIC4                          Karam - cross

1    participates in this business.  It's a pretty important

2    business because it allows HSBC to transact with a lot of

3    customers but not necessarily having direct relationships with

4    those customers.  We would transact because they're acting as

5    an agent on behalf of a mutual broker, you know, someone like a

6    Goldman Sachs or a Citibank or a Morgan Stanley.  So it allowed

7    us to access a marketplace and a fair amount of clients without

8    necessarily having direct relationships with those clients.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC9TPIC5                         Karam – cross

BY MS. LEVIN:

Q.   Was there an issue with Mr. Picarella's performance in
connection with the give up project?

A.   Yes.

Q.   Would you describe that for us, please.

A.   Sure.  Over time HSBC accrued about 2,000 of these
relationships, and as time goes on some of the customers are no
longer relevant, some are no longer active, so we didn't do a
good job of maintaining that customer list.  It was important
to do that because the bank was allocating resources on an
annual basis to review these customers and do some basic level
checking, so it was important to make sure the customers
were -- the population of customers, the amount of these
customers was tidy.  And we wanted to get embarked on a project
to work with credit, work with other support areas within HSBC
to determine which of these customers were no longer active
with an attempt to close accounts out and make resources
available to new business.

Q.   Was there an instance where Mr. Picarella escalated
information to senior executives in London and it later proved
that information was inaccurate?

A.   Yes, during the assessment, when we were assessing these
relationships for foreclosure, he had encountered what he
perceived to be an issue, and on the back of that he took the
liberty to escalate the issue to senior management in London.

1              And it's not so much the issue of him escalating, we

2    all promote speaking up when we see something that is wrong.

3    That's not the issue.  The manner in which he did it was a

4    little disturbing.  He was very alarmist that things were out

5    of control and that there was unmanaged risk.  So he had jumped

6    to -- rather than fact finding, getting a handle on the issue,

7    he jumped through and already rendered a verdict or rendered

8    judgment on an entire process.

9              And what is more disturbing, on the back end of this,

10   we did review this, there weren't any issues.  People followed

11   proper protocols as related to those accounts.  There were no

12   issues.  And it was, again, a situation that was a little bit

13   embarrassing that we had to go back and explain ourselves to

14   senior management in London and deal with it.

15   Q.  DX-250, page 5.  Paragraph 3.

16             Mr. Karam, is this an email exchange regarding the

17   give up project we were just discussing?

18   A.  Yes.

19   Q.  On page 5 there's a paragraph that begins 3, is that a

20   paragraph that Mr. Picarella wrote to you?

21   A.  I believe so, yes.

22   Q.  Below it beginning "I viewed," is that your response that

23   you delineated in this email?

24   A.  Yes.

25   Q.  So Mr. Picarella writes:  You and are both SVPs in the

1   organization.  I found your approach to the meeting yesterday

2   to be both confrontational and at times condescending.

3          Does that match your recollection of the meeting,

4   Mr. Karam?

5   A.  No.

6   Q.  You respond:  I viewed 12/19 meeting as productive and

7   professional.  And you later say:  While you are correct we are

8   both SVPs, you report to me.

9          Were you surprised to have to remind Mr. Picarella

10  that he reported to you?

11  A.  Very much so.

12  Q.  Did you find Mr. Picarella's attitude to be insubordinate?

13  A.  Yes.

14  Q.  If you turn to page 2, middle two paragraphs, this is an

15  email that you sent to Mr. Picarella, correct?

16  A.  Yes.

17  Q.  And in the middle of the first paragraph, you write:  In

18  fact, I confirmed with credit that the potential credit breach

19  that you highlighted in your email -- redacted -- did not

20  result in any breach as you surmised.

21          Why is that significant?

22  A.  It's significant because when he escalated the issue to

23  senior management in London, bypassing a lot of people that

24  could have helped him better understand the issue, when it was

25  escalated he had made the assumption or he had made the comment

1    that we have unmanaged risk.  And it was very alarmist

2    language, but again, at the core of it, the issue -- there was

3    no issue.  People followed the proper protocol as it related to

4    this business and that specific transaction.

5    Q.  The next paragraph, there's a reference to GUP, is that an

6    acronym for give up project?

7    A.  Yes.

8    Q.  You state:  The initial guidance from the client

9    rationalization committee was quite clear to review and

10   validate the GUP customer base.  You still have yet to collate

11   a listing of the customer population that is validated for

12   those accounts that are active and have the support of a GM

13   business line.

14          Mr. Karam, how would you rate Mr. Picarella's

15   performance in connection with the give up project?

16   A.  Failure.

17   Q.  Did Mr. Picarella also work on something called the

18   Greenwich survey?

19   A.  Yes.

20   Q.  What is the Greenwich survey?

21   A.  Greenwich is a survey company that we pay a fee to and they

22   provide us intelligence around the marketplace.  They review

23   market share, how relevant HSBC is in specific market and

24   specific clients.  So it's very valuable information that we

25   get back from the survey company, and we can gauge the progress

GC9TPIC5                        Karam - cross

1    we're making as a business.

2    Q.   Does HSBC have to pay to participate in the Greenwich

3    survey?

4    A.   Yes, it's an expensive survey, it's about $400,000 per

5    annum.

6    Q.   $400,000 per year?

7    A.   Yes.

8    Q.   What was Mr. Picarella's responsibilities in connection

9    with the Greenwich survey?

10   A.   He was the coordinator of working between the sales

11   managers, the sales teams and Greenwich.  He was the liaison.

12   The Greenwich survey was very much dependent on us producing to

13   them a list of customers that we wanted them to interview.  And

14   once they interview those customers they would look at the

15   entire population of banks that participate in the survey and

16   then they rate us as to how we compare against our competitors.

17   So his role was to produce and give a listing of relevant

18   customers to Greenwich in order for them to focus their

19   interviewing on.

20   Q.   Was Mr. Picarella's performance satisfactory in your view?

21   A.   Not at all.

22   Q.   Why not?

23   A.   A couple of things.  Early on when the Greenwich survey was

24   assigned to him it took him three or four months before he

25   realized that he was responsible for it.  He would continually

1    defer the people from Greenwich or people asking questions

2    about this to other people within the bank.  So he never took

3    ownership for the survey.

4            And because of that, he missed a critical deadline in

5    the December of 2013.  We needed to produce a listing of

6    customers to them in December, and it would take them a few

7    months to do the survey, and then we would in turn get the

8    results in the spring or summer of the following year.  So we

9    missed the deadline, and by missing the deadline we had to take

10   another resource off of the desk who is a part of the team to

11   focus on, again, firefighting, working to correct that error.

12   Q.  236.

13           Mr. Karam, I'm going to ask you about page 1 of this

14   email, your email to Mr. Picarella dated August 6, 2013.  In

15   the top email:  I understand you have been communicating that

16   the process to propose new client relationships has changed and

17   that you are no longer responsible for collecting business

18   cases for review and managing this pipeline.  Not sure where

19   this confusion is emanating, since I haven't implemented any

20   changes to this process.  Just to be clear, a new client

21   business case process will continue to be managed by yourself.

22           Had Mr. Picarella's responsibilities with respect to

23   new client relationships been taken away from him?

24   A.  No, not at all.

25   Q.  Should Mr. Picarella have been confused about whether he

1    was responsible for new client relationships?

2    A.   Absolutely not.  Again, we have plenty -- there's a lot on

3    our plates to do, and to continuously come back and revisit

4    very simple responsibilities that Mr. Picarella was responsible

5    for was very frustrating.

6    Q.   At any point from the time you started supervising him

7    until his termination, were Mr. Picarella's responsibilities

8    regarding new client relationships ever taken away from him?

9    A.   No.

10   Q.   Let's go to DX-205.

11   A.   I don't have 205 in this book.

12   Q.   We'll come back to that?

13   A.   205?

14   Q.   205.  It starts at 228.  They may not be in order.

15           We can pull it up on the screen, page 4.

16           Who is Zach Howell?

17           I apologize, Mr. Karam.

18           PX-205.  Who is Zach Howell?

19   A.   Zach is a sales person on our credit sales desk.

20   Q.   Mr. Picarella sends Mr. Howell an email:  Hi Zach, I would

21   like to make clear the facts and timeline.

22           Was this email in reference to a new business or new

23   client on-boarding, do you recall?

24   A.   I believe so, yes.

25   Q.   Then if we go to the next response it's a response from

1  Mr. Tom Crystal.  Who was Tom Crystal?

2  A.   Tom was the senior manager that we hired to run the high

3  yield credit initiative.  It was a new business for HSBC, and

4  Tom was the senior person and well regarded in the marketplace,

5  and we hired him to run that business for us.

6  Q.   Was he a senior executive at HSBC?

7  A.   Yes, he was a managing director.

8  Q.   What was Mr. Crystal's reaction to Mr. Picarella's email?

9       He states he found it offensive, doesn't he?

10 A.   Yes.

11 Q.   Is that generally a positive statement when a senior

12 executive finds someone's email offensive?

13 A.   Could I hear the beginning?

14 Q.   Is it generally a good thing when a senior executive finds

15 an email offensive?

16 A.   Absolutely not.  Our role is to facilitate business, not to

17 obstruct.  We're here to help salespeople to facilitate and

18 conduct business, so having that judgment cast upon us and the

19 team is not good at all, no.

20 Q.   Could we go to page 2.

21      This is an email response that you sent to

22 Mr. Picarella on September 23, 2013, correct?

23 A.   Yes.

24 Q.   And you state:  Regardless of who was involved in an

25 original on-boarding request or meeting, part of your role as a

sales business manager is to assist sales with on-boarding

requests and issues, in this case Zach and Tom.  Please look

into the status of each of the outstanding names as a priority

and respond with an update.  The original request from Zach was

straightforward and should be easy to answer, but if you need

direction, please call me.

          Would you have met with Mr. Picarella if he needed

more direction from you regarding this?

A.  Sure.

Q.  Then if we go to page 1, Mr. Picarella forwards your email

to Mary Bilbrey and Stuart Alderoty, copying you.  Do you see

that?

A.  Yes.

Q.  Can we look at the first two paragraphs.

          Mr. Picarella states:  Mike Karam has not met with me

or spoken with me in person in approximately three months or

about the time of my filing with the EEOC.

          Is that correct, had you been avoiding Mr. Picarella

for three months?

A.  No.

Q.  Had you been in regular contact with Mr. Picarella?

A.  Yes.

Q.  In fact, you were actively trying to schedule a meeting

with Mr. Picarella when he sent this email, weren't you?

A.  Yes.

GC9TPIC5                      Karam - cross

1    Q.  The second paragraph reads:  In the same time frame of my

2    filing with EEOC Mike Karam participated in continued

3    retaliation against me by assuming my role of coordinating

4    business case approvals and prioritization with Pablo

5    Pizzimbono and the relationship managers.

6              Do you see that?

7    A.  Yes.

8    Q.  Had you assumed Mr. Picarella's role of assuming -- of

9    coordinating business case approvals?

10   A.  Never.

11   Q.  Did you provide Mr. Picarella with feedback on his

12   performance when you were his manager?

13   A.  Yes, frequently.

14   Q.  How frequently?

15   A.  We had a standing catch-up meeting where we would meet once

16   every three or so weeks if we had something to discuss.  And

17   also as issues came about, as in these emails, if there was

18   something that I noticed that needed to be addressed I would

19   address it, and it was a constant continual feedback.

20   Q.  You would have catch-up meetings with him, correct?

21   A.  Yes.

22   Q.  Who had requested those catch-up meetings?

23   A.  Mr. Picarella had.

24   Q.  DX-245.

25              Mr. Karam, is DX-245 Mr. Picarella's 2013 mid-year

1  performance review?

2  A.  Yes.

3  Q.  Did you prepare this review?

4  A.  Yes.

5  Q.  Go to page 4 with the rating.

6          What was Mr. Picarella's performance rating at

7  mid-year 2013?

8  A.  Three.

9  Q.  What did a rating of three mean at HSBC?

10 A.  It was on a scale, I believe it was a one -- at the time

11 the scale was one to five, with three being in the middle of

12 the pack.

13 Q.  If someone receives a three, does that mean there are no

14 issues with their performance?

15 A.  Not at all.  A three, again, is middle of the pack, and

16 there's going to be things that we all would work on to improve

17 ourselves, but not necessarily.

18 Q.  Let's take a look at your comments.  Specifically you

19 mention that Mr. Picarella's responsibilities fall short of

20 those that are typically expected of a SVP in the COO business

21 manager's role.  The business is committed in working with Mike

22 to take full advantage of opportunities as they arise, but this

23 is very much mutual and Mike should manage his career

24 accordingly.

25          Why did you include this comment in Mr. Picarella's

1   performance review?

2   A.   We discussed establishing his objectives.  They fall short

3   of someone who is a mid-level senior vice president, mid-level

4   manager, senior vice president.  And this was a way for me to

5   emphasize the point to him that the specific responsibilities

6   he's working on are fine, but that's the bare minimum, that we

7   needed him to expand the scope of what he would be responsible

8   for and to begin to behave in accordance with his title and his

9   rank.

10  Q.   DX-285.  Sorry, 258.

11       Mr. Karam, is DX-258 Mr. Picarella's year-end

12  performance review for 2013?

13  A.   Yes.

14  Q.   Did you prepare this review?

15  A.   Yes.

16  Q.   Let's look at your comments.  What did you mean by:  Mike

17  has demonstrated mixed results with the agreed objectives.

18  A.   We had some successes when we sat down and did this review.

19  The review of the objectives were that he functioned and he was

20  good at them, and others where he has fallen short again of his

21  responsibilities.

22  Q.   You also write:  Mike demonstrated a weakness in

23  proactively devising meaningful solutions to tasks which has

24  required intervention and guidance that should have been

25  unnecessary.

1          What are you referring to there?

2     A.  He would often raise questions about navigating or trying

3     to work through problems, and I felt that as a senior vice

4     president I was spending a lot of time working with him to

5     devise solutions, and this is stuff that is expected of a

6     person in that position.

7     Q.  If we go to the second page in the comments.  You note:  A

8     standing catch-up session has been established to assess

9     progress weaknesses and hurdles to overcome.

10         Did you hope that these regularly scheduled catch-up

11    meetings would help Mr. Picarella improve his performance?

12    A.  Absolutely.

13    Q.  Did they improve his performance?

14    A.  Generally no.

15    Q.  How does the objective setting process work at HSBC?

16    A.  Objectives are -- they don't -- they're expectations of how

17    we are to encounter our responsibilities.  They don't end at

18    the end of the year and new objectives get established at the

19    beginning of the year.  They are fluid.  They continue during

20    your tenure.

21         Typically what happens at the beginning of the year

22    we'll get objectives from our senior managers, they start with

23    the chairman of the board, to establish objectives that he or

24    she want to focus on for the coming year, and that gets

25    filtered down.  From our perspective we look at them and say:

1   How are going to meet those objectives?  So we establish

2   objectives for ourselves how we are going to meet them.

3            So it's an interesting dynamic where you have a view

4   of group responsibility, senior management responsibilities or

5   commitments, I should say, and then objectives are our

6   responses to them.

7   Q.  Did you have difficulty getting Mr. Picarella to set his

8   objectives in 2014?

9   A.  Very much so.

10  Q.  Was he resistant to setting his objectives?

11  A.  I'm not sure if it was resistance, but he wouldn't -- I

12  couldn't break that barrier for him to have a thought about

13  what he felt would be things he wanted to focus on and

14  objectives for the coming year.

15  Q.  Were you surprised to have such difficulty getting a senior

16  vice president to set his objectives?

17  A.  Totally.  And this is an opportunity -- personally, the way

18  I view this and what I counseled Mike on, these are

19  opportunities also for us to lay a marker in the sand to say

20  these are things we want to be held responsible for.  And we

21  charted our own course, and it helped us a lot in developing

22  our own careers in being able to have focus on things that were

23  important to us.  So I was looking at these as opportunities.

24  Mr. Picarella didn't have that view about this, and it was a

25  very, very difficult -- very, very difficult for him to

 1    establish objectives.

 2    Q.  Do you recall when Mr. Picarella's objectives for 2014 were

 3    actually finalized?

 4    A.  I don't remember him establishing them.  We may have had to

 5    give him some boilerplate objectives of those that would be

 6    required of people in that position, very general.

 7    Q.  And in 2014 approximately how much of the workday did

 8    Mr. Picarella spend on work?

 9    A.  It's hard to guesstimate, but a minimum.

10    Q.  More or less than ten percent of his day?

11    A.  I would say either side of ten percent.

12    Q.  Was that because work had been taken away from him?

13    A.  Not at all.

14    Q.  Would you have preferred that Mr. Picarella was a

15    productive, engaged member of your team?

16    A.  Absolutely.  Our responsibilities in our role are

17    significant.  We're supporting 150 salespeople, so our plates

18    in the role are full.  And there's plenty of work to do, plenty

19    of exposure to be had; just requires people to have initiative

20    and wanting to progress their careers and be able to develop

21    some skill sets to look further into the future for more

22    responsibilities.  And he never expressed any willingness to

23    expand that.

24    Q.  I want to ask you about operational risk.

25            Was operational risk a strength of Mr. Picarella's?

1    A.  No.

2    Q.  How did his operational risk skills compare to others at

3    HSBC, in your view?

4    A.  I think they were quite poor.  Mike -- Mr. Picarella didn't

5    have a good handle on the relevance of operational risk and how

6    it translated into practical issues in the business.  And being

7    blind somewhat to this takes away our ability to be proactive

8    and to look forward and to be able to project the issues on the

9    horizon.  So it's a very, very important discipline, and it's

10   one that Mr. Picarella had no clue about.

11   Q.  Please take a look at DX-268.

12           This is Mr. Picarella's 2014 mid-year performance

13   review, correct?

14   A.  Yes.

15   Q.  Did you prepare this review?

16   A.  Yes.

17   Q.  Look at the comments, please.

18           What was Mr. Picarella's rating at mid-year 2014?

19   A.  Off track.

20   Q.  What does an off track rating mean?

21   A.  HSBC adopted, in 2014, a pass/fail as a mid -- for the

22   mid-year reviews.  So we were on track or off track where we

23   failed.  And given his shortcomings in his responsibilities I

24   had no choice but to rate him as off track or a fail.

25   Q.  If someone is given an off track rating, are they required

1   to be given a formal performance improvement plan?

2   A.  I'm not sure.

3   Q.  Prior to receiving this review, had Mr. Picarella been

4   informed of the deficiencies in his performance?

5   A.  Yes.

6   Q.  Had Mr. Picarella been given the opportunity to improve his

7   performance?

8   A.  Absolutely.

9   Q.  Had Mr. Picarella improved his performance in any way?

10  A.  No, his performance actually degraded during the course of

11  the year.

12  Q.  Did you have a meeting with Mr. Picarella on or about

13  November 21st, 2014, where you reviewed this performance review

14  with him?

15  A.  Yes.

16  Q.  Did you threaten Mr. Picarella during that meeting?

17  A.  No.

18        MS. LEVIN:  Pull up the demonstrative.

19  Q.  Did you yell at Mr. Picarella during that meeting?

20  A.  No.

21  Q.  Did you act in a physically threatening manner towards him?

22  A.  Absolutely not.

23  Q.  Did you stick your finger in his face and point at him?

24  A.  No.

25  Q.  We have a demonstrative here.  Is this the type of room

1   where you held the mid-year review with Mr. Picarella?

2   A.  Yes, we would meet in the office.  That's the precious

3   metals office at HSBC.  So it was used by the precious metals

4   business, and that's the office that we would typically meet in

5   for catch-up sessions and reviews.

6   Q.  And it's an office that has a glass wall that anyone

7   walking by could see what was going on in the room?

8   A.  Oh, yes.  On the other side of the glass wall is a trading

9   floor with about 100 desks, open desks, not cubicles, like a

10  call center.

11  Q.  In 2014 did you file a complaint with human resources

12  regarding Mr. Picarella?

13  A.  Yes.

14  Q.  What was that complaint concerning?

15  A.  Late 2014 my name appeared in the New York Post in an

16  article relating Mr. Picarella's review, and it named me

17  personally there and there's some derogatory comments about me

18  personally.  And I felt it was appropriate that I -- I was

19  concerned about that, that my name was associated with this in

20  the public press, and I asked human resources to produce or to

21  have an investigation, and I wanted to know who the source of

22  that -- the purpose of that, the source around that.

23  Q.  The New York Post article related information concerning

24  that November 21st, 2014 review meeting that you had with

25  Mr. Picarella, correct?

1   A.  Yeah, there are details about the actual review that were

2   in the press, which was very troubling to me.  I do maintain

3   client -- the employee-manager confidentiality is very, very

4   important, and here in the New York Post there was commentary

5   about the review itself with an employee, and then some

6   derogatory stuff about myself and my behavior.  So it was very

7   troubling to me personally and professionally.

8   Q.  Was anyone else present for that review meeting aside from

9   Mr. Picarella and yourself?

10  A.  No.

11  Q.  Did you believe that Mr. Picarella had likely discussed the

12  review meeting with the New York Post?

13  A.  Well, there were only two of us in the room, and I know it

14  wasn't me, so I knew it had to have been him.

15  Q.  After Mr. Picarella filed a complaint with human resources

16  regarding the review meeting, he was working from home,

17  correct?

18  A.  Yes.

19  Q.  But in fact he didn't have access to log into the HSBC

20  computer system from home, did he?

21  A.  No, initially he was having technical issues.

22  Q.  Approximately how long was it before he brought to your

23  attention that he was unable to work from home because he

24  couldn't access the system?

25  A.  About three weeks.

1   Q.  So there was a three-week period where Mr. Picarella had no

2   access to the HSBC computer systems when he was supposed to be

3   working from home?

4   A.  Correct.

5   Q.  How could Mr. Picarella have been working from home if he

6   didn't have access to the HSBC system?

7   A.  He had limited use of a Blackberry, but again, it doesn't

8   lend itself well to too much.

9   Q.  Why did you recommend the termination of Mr. Picarella's

10  employment?

11  A.  Again, beginning in say in mid 2014 his performance had

12  begun to degrade.  We had to deal with some substantive issues

13  where he had raised the alarm bells about the give up process,

14  canceling meetings, and the behavior just became degraded going

15  into the event, and there was there was a point where I had no

16  choice but to recommend termination.  It was that point where I

17  didn't feel that we were connecting where I could help him come

18  along or to rehabilitate his career with us.

19          MS. LEVIN:  May I have one moment, your Honor?

20          (Pause)

21  Q.  Mr. Karam, you had a discussion with Susan Roskell and

22  Didier Descamps regarding Mr. Picarella's termination, correct?

23  A.  Yes.

24  Q.  During that meeting did you share information with them

25  regarding Mr. Picarella's performance and what you had observed

1   regarding Mr. Picarella's performance?

2   A.  Yes.

3   Q.  Did you retaliate against Mr. Picarella in any way?

4   A.  Absolutely not.

5           MS. LEVIN:  No further questions, your Honor.

6           THE COURT:  Any redirect?

7           MR. HUBBARD:  Yes, your Honor.

8           THE COURT:  Okay.

9   REDIRECT EXAMINATION

10  BY MR. HUBBARD:

11  Q.  Mr. Karam, you have the books there with the spiral

12  bindings on them?

13  A.  Yes.

14  Q.  When you began your examination by counsel, defense

15  counsel, you were asked about your knowledge of Mr. Picarella's

16  relationship with Ms. Jenner.

17          Do you recall being asked that question and giving an

18  answer to it?

19  A.  Yes.

20  Q.  My recollection is you said that -- let's take a look at

21  Exhibit 190, please.  Sorry, it was not 190, it was an email

22  about the being marginalized.  What's that number?

23          193.  Remember we looked at that earlier and you made

24  some comments here about -- your counsel asked you about this

25  comment you made about if he responds we'll marginalize his

GC9TPIC5                        Karam - redirect

1   behavior.  And my recollection is you said that you believe

2   Ms. Jenner here did not get along very well with Mr. Picarella

3   and she was agitated by him.

4   A.  I believe so, yes.

5   Q.  Pick up Exhibit 190 in front of you there, book number 2.

6   A.  190?

7   Q.  Yes, sir.

8        Where did you get the information from about

9   Mr. Picarella's relationship with Ms. Jenner in May of 2013?

10        I didn't give you a page yet.

11  A.  Repeat the question, please.

12  Q.  Where did you get the information about Mr. Picarella's

13  relationship with Ms. Jenner?

14  A.  Just through dialogue, anecdotal, with Ms. Jenner.

15  Q.  Turn to Exhibit 190 with me, please.

16        Turn to -- this exhibit you see on the first page is a

17  year end 2012 review by her of Mr. Picarella when she was

18  managing him, right?

19  A.  It appears so.  I don't know.

20  Q.  And the date on it, the discussion date she had with him

21  for this was May 13, 2013.  That was about the time you were

22  writing that chat email, right?

23        You can see the date.

24  A.  What was the --

25  Q.  The date, May 13, 2013?

1   A.  I'm --

2   Q.  The document says she discussed this with him on May 13,

3   2013, does it not?

4   A.  That's what it appears, but I wasn't part of this.

5   Q.  I understand.  She says in this review that in receiving

6   feedback from various stakeholders in the banks selected by

7   Mike and myself, Mike is an easy person to work with, he is

8   found to be professional and realistic, and good partner to CMV

9   and COBAM.

10          She writes that, doesn't she?

11  A.  I don't know.

12  Q.  Can you read it?

13  A.  I can read it.  This is not my review.

14  Q.  I didn't ask that, sir.  I said that's what she wrote,

15  Ms. Jenner.

16          THE COURT:  You have answer the question yes or no.

17  Did Ms. Jenner prepare that review?

18          THE WITNESS:  I don't know.

19          THE COURT:  Okay.  That document appears to be

20  prepared by Ms. Jenner?

21          THE WITNESS:  It appears to be, yes.

22          THE COURT:  And the language on there states what has

23  counsel said?

24  A.  What page?

25  Q.  It's on the last page, sir, next to last page, right under

1    three strong.

2    A.   Right.

3    Q.   So Ms. Jenner said nothing in that review about having any

4    difficulty meeting with Mr. Picarella at that time, did she?

5    A.   No.

6    Q.   Let me ask you a couple of questions about the mid-year

7    2013 review that you did.   Turn to tab 211.

8            Look at the first page of 211, it's the top page, you

9    see there's a mid-year review there prepared by you?

10           MS. LEVIN:   Your Honor, I object, this is not in

11   evidence.

12           MR. HUBBARD:   I move the admission of 211, please,

13   your Honor.

14           THE COURT:   I believe 211 is in.

15           MR. HUBBARD:   It is in.

16           THE COURT:   I believe it's in.

17           Go ahead.

18   Q.   Mr. Karam, this is a 2013 mid-year review prepared by you,

19   right?

20   A.   Yes.

21   Q.   And you have the discussion with Mr. Picarella about this

22   review on December 10 of 2013?

23   A.   Yes.

24   Q.   And in this review you rated him three strong?

25   A.   Yes.

1    Q.  And you did the same thing, sir, did you not, when you

2    rated him in May of 2014?

3    A.  I believe so, yes.

4    Q.  And not one single time when you did that did you make any

5    critical comments about him like you made here this afternoon?

6    A.  That's not true.

7    Q.  In those reviews -- in those reviews, did you make any of

8    the types of critical comments you made here this afternoon?

9    A.  Paragraph two on this review.

10   Q.  You're talking about his responsibilities falling short?

11   A.  Correct.

12   Q.  You have been on the stand for an hour and you have been

13   talking about the tone and the method and the fact that

14   everything he did was poor.  You didn't say any of that in this

15   review, did you?

16   A.  This review marks the period for the mid year, and a lot of

17   those issues -- again, the beginning of the relationship was

18   okay, things were progressing.  We expanded his

19   responsibilities.  It really didn't degrade until late 2013

20   into 2014.

21   Q.  That wasn't my question on either one of those.

22   A.  It wouldn't have been appropriate to raise the issues that

23   ensued in 2014 on a review that was dated in 2013.

24   Q.  Did you modify any of those reviews?

25   A.  I'm sorry?

```
 1    Q.  Did you modify the three strong on any of these reviews by

 2    modifying the word strong or modifying the number three that

 3    you gave?

 4              MS. LEVIN:  Objection.

 5              THE COURT:  Can you rephrase the question?

 6              MR. HUBBARD:  Yes, I'm wondering if he did anything --

 7

 8              THE COURT:  When you say "modify," what do you mean,

 9    counsel?

10    Q.  Did you give him -- when you wrote three strong, did you

11    write down anything beside it, like you said earlier, that

12    would detract from that rating?

13              You said earlier there was some three strongs that

14    were better than others.  Did you do anything to modify that

15    rating at the time you gave it?  Did you write plus, minus,

16    anything on it?

17              THE WITNESS:  May I answer?

18              THE COURT:  Is the question did he put a plus or minus

19    next to three strong?

20              MR. HUBBARD:  Yes.

21              THE COURT:  Did you put a plus or minus next to three

22    strong?

23              THE WITNESS:  That's not possible.

24              THE COURT:  You did not put a plus or minus next to

25    three strong?
```

GC9TPIC5

1                THE WITNESS:  You can't.  The system doesn't allow it.

2                MR. HUBBARD:  That's all.

3                THE COURT:  Thank you.  The witness is excused.

4                Okay.  Members of the jury, I want you to take a

5     five-minute recess.  We're going to be breaking soon.  I need

6     to discuss some scheduling things with counsel.  Don't discuss

7     the case with anyone else or amongst yourselves.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC9TPIC5

         (Jury not present)

1

2          THE COURT:  So counsel, I want to check in with you.

3    My plan is to dismiss the jury for the day and tell them to

4    come back Monday at 9:30.  But I wanted to find out from

5    counsel in terms of my instructions to them, typically my

6    instructions to them at the end of the day have simply been not

7    to discuss this case with anyone, don't let anyone discuss this

8    case with you.

9          There was one day, the day before yesterday, where I

10   gave them some additional instructions about reading things in

11   the paper.  Do counsel wish me to give that more complete

12   instruction regarding the newspapers before we discharge for

13   the weekend or not?  What's counsel's view on that?

14         MR. HUBBARD:  Your Honor, I think it might be helpful

15   to gave the same instruction but remind them that it's the

16   weekend, and more time between today and when we meet again on

17   Monday, and just remind them that they will be exposed to more

18   news, to be particularly careful not to read anything about

19   case -- read or see anything about the case.

20         THE COURT:  Defense counsel?

21         MR. JACKSON:  I think the Court's previous instruction

22   is appropriate.

23         THE COURT:  Which one, the one that I have given most

24   days or the one I gave the day before yesterday is my question.

25         MR. JACKSON:  I think the one that the Court has given

GC9TPIC5

most days is really fine.  The only thing I would add is

certain days you have included not to research anything about

the parties, the lawyers, et cetera.  I think that's

appropriate.

          The other thing I ask, your Honor, is the Court

intending -- as we come to the end of the week it may be

helpful if we give the jury some hope that we are on schedule,

and I don't know if the Court was intending to do that.  I

think it would be appropriate because I think we are actually

right on schedule.

          THE COURT:  Okay.  Before we do that let me find out

what plaintiff's counsel's position on what defense counsel

suggested in terms of my instructions at the end of the day.

          MR. HUBBARD:  That's fine.

          THE COURT:  I will tell them not to discuss the case

with anyone and not to do any other independent research.

          MR. HUBBARD:  That should be fine.

          And what's plaintiff's counsel's position on -- I

guess first from the defense counsel, what is it you want me to

say?  I don't want to make a promise that I can't keep.  What

is it you want me to -- you want me to simply reassure them

that we're on schedule?

          MR. JACKSON:  Yes, your Honor.  I don't want the Court

to get into specifics, I just think that psychologically it is

helpful to the jurors at the end of the week to know, as they

 1  go into the weekend, to let the jurors know things are on

 2  schedule, we expect the case to proceed efficiently next week,

 3  something like that.  Whatever the Court thinks is appropriate.

 4          THE COURT:  Plaintiff's counsel, any view on that?

 5          MR. HUBBARD:  I don't think it hurts anything, Judge.

 6          My only question is whether we are able at this point

 7  to predict to them when we might conclude, but I don't think

 8  there's anything that we can do other than to stick to the

 9  schedule you gave.  That seems to be a reasonable projection.

10  That means we predict we're on the same schedule.

11          THE COURT:  Okay.  If counsel both want me to say to

12  the jury that we're on schedule, I will simply say that.

13          I think the jury gets the feeling certainly a lot more

14  momentum has picked up in terms of the pace of the trial in the

15  last couple of days and certainly today.  But I will tell them

16  that as well, I will tell them that we are on schedule and I

17  will see them at 9:30 on Monday.

18          Anything else in terms of what I say to the jury?

19          MR. HUBBARD:  No, sir.

20          THE COURT:  I will tell them to have a great weekend

21  or something like that.

22          Let's bring in the jury.

23          (Jury present)

24          THE COURT:  So members of the jury, we are finished

25  for the day.  I want to let you know that we are on schedule.

GC9TPIC5

```
 1   I'm going to dismiss you for the day.  I ask you to come back

 2   on Monday at 9:30, and we'll work no later than 5 o'clock on

 3   Monday.

 4           In the meantime, as always, don't do any independent

 5   research about any issues pertaining to this case, don't do any

 6   research about any parties involved in this case, don't discuss

 7   this case amongst yourselves or with anyone else, don't allow

 8   anyone to discuss this case with you, and have a wonderful

 9   weekend.  We'll see you at 9:30 on Monday.

10           (Jury not present)

11           THE COURT:  Any objection to my instruction to the

12   jury?  Did I forget anything?

13           MR. JACKSON:  No, it's fine.

14           MR. HUBBARD:  Everything is fine.

15           THE COURT:  Great.  Everyone be seated.

16           My plan at this point is -- and I will hear from

17   counsel -- to let counsel go, ask counsel to perhaps -- let me

18   find out, who do we have on tap for Monday?  There's one more

19   plaintiff's witness, and then who do we have from the defense

20   on Monday?

21           MR. JACKSON:  So after Ms. Roskell, who would be the

22   last witness for the plaintiffs, we expect to call four

23   witnesses, that would be Ms. Malanga, Mr. Pizzimbono,

24   Ms. White, and Mr. DeLuca.  I believe that -- I'm hopeful we

25   will be able to finish all the witnesses on Monday, since I
```

GC9TPIC5

1    think Ms. Roskell is a very short witness, Mr. DeLuca and

2    Mr. Pizzimbono and Ms. White, while longer, is not much longer

3    than any of the witnesses.  They're both shorter than the last

4    witness and probably closer somewhere between what we heard

5    from Mr. Descamps and this last witness, so I think we're very

6    optimistic we could finish the whole case on Monday.

7            THE COURT:  Okay.  And I assume that Ms. Malanga's

8    testimony will be extremely short.  Am I off there?

9            MR. JACKSON:  I think we're going to -- we were

10   anticipating her as a plaintiff's witness, and we're going to

11   spend a little bit of the weekend evaluating just how much we

12   need from Ms. Malanga, but we are definitely going to make it

13   as tight as possible.

14           THE COURT:  It may make sense -- and I will hear from

15   counsel -- for us to perhaps for us to convene at perhaps 9:00

16   on Monday if we want to have further discussion on the

17   submission from defense counsel last evening regarding

18   Mr. DeLuca's testimony and these Sametime Chats as they relate

19   to that.

20           I will let counsel know my initial inclination is

21   still the same.  My leaning is still that the content of those

22   Sametime messages certainly may be admissible, but the actual

23   documents I still do not believe are business records, and

24   certainly that foundation has not been laid yet.  So I will

25   give counsel -- that's my inclination.  We can discuss it

1   further Monday at 9:00.

2                  Counsel, have any other thoughts on that they want to

3   share?  From plaintiff?

4                  MR. HUBBARD:  No, your Honor.

5                  THE COURT:  From defendant?

6                  MR. JACKSON:  No, I think discussing it now wouldn't

7   be appropriate, your Honor.

8                  THE COURT:  Okay.

9                  MR. JACKSON:  Your Honor, just in contemplation of the

10  schedule Monday, if we are able to conclude the case in terms

11  of the witnesses, the presentation of witnesses on Monday,

12  would it be the Court's inclination to have the charge

13  conference on Monday evening and summation on Tuesday?

14                 THE COURT:  My inclination is -- if we're able to

15  compete all the witnesses on Monday, my inclination would be

16  that I provide counsel our draft jury charge Monday evening and

17  we have a charge conference Tuesday morning and then go into

18  summations Tuesday morning.  That would be my anticipated plan,

19  but I'm open to other suggestions if counsel have another view

20  on things.

21                 MR. HUBBARD:  That sounds like a good plan.  One thing

22  is that we may have a small bit of rebuttal testimony related

23  to Mr. Karam this afternoon, but certainly --

24                 THE COURT:  I don't know what it would be, but

25  rebuttal testimony will probably not drastically change the

GC9TPIC5

1   charge.

2          MR. HUBBARD:  No, sir.

3          THE COURT:  That will be the plan, but that's my

4   anticipation, that assuming we finish -- or maybe even if we

5   don't finish, it might be helpful to give counsel our draft

6   jury charge Monday evening so you can look over it and be

7   prepared for a charge conference Tuesday morning.  If we do

8   that, I would start the charge conference sometime around 9:00

9   Tuesday morning, we give the jury a little bit of break and ask

10  the jury to come in perhaps 10:00, 10:30, and go into

11  summations.

12         MR. JACKSON:  Makes sense, your Honor, to us.

13         The only question we would ask on that, just in terms

14  of scheduling, is if the plaintiff's counsel would be willing

15  to provide to the Court their projection of how long they

16  anticipate the summation will be.

17         THE COURT:  Well, I don't know if we need that now,

18  but we'll cross that bridge when we get to it.

19         Have a good weekend.

20         MR. HUBBARD:  Same to you, Judge, thanks.

21         (Adjourned to December 12, 2016 at 9:00 a.m.)

22

23

24

25

```
1                    INDEX OF EXAMINATION

2   Examination of:                           Page

3   SUE JANG DEMIAN

4   Direct By Mr. Hubbard . . . . . . . . . . . 704

5   Cross By  Ms. Levin . . . . . . . . . . . . 722

6   Redirect By Mr. Hubbard . . . . . . . . . . 733

7    DANIEL SILBER

8   Direct By Mr. Hubbard . . . . . . . . . . . 735

9   Cross By Ms. Levin . . . . . . . . . . . . . 743

10    DIDIER DESCAMPS

11  Direct By Mr. Hubbard . . . . . . . . . . . 750

12  Cross By Mr. Jackson . . . . . . . . . . . . 760

13  Redirect By Mr. Hubbard . . . . . . . . . . 771

14  MICHAEL KARAM

15  Direct By Mr. Hubbard . . . . . . . . . . . 778

16  Cross By Ms. Levin . . . . . . . . . . . . . 806

17  Redirect By Mr. Hubbard . . . . . . . . . . 850

18

19

20

21

22

23

24

25
```

864

PLAINTIFF EXHIBITS

Exhibit No.                                        Received

111   . . . . . . . . . . . . . . . . . 708

1   . . . . . . . . . . . . . . . . . 709

118   . . . . . . . . . . . . . . . . 712

120   . . . . . . . . . . . . . . . . 713

216   . . . . . . . . . . . . . . . . 716

214    . . . . . . . . . . . . . . . . . . 794

                        DEFENDANT EXHIBITS

Exhibit No.                                    Received

 228, 235, 243, 245, 251, 258, 263, 265, . . . 806

           268, and 275