GCDTPIC1                          Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MICHAEL PICARELLA,

                    Plaintiff,

          v.                              14 CV 4463 (ALC)

HSBC (USA) SECURITIES, INC.,

                    Defendant.

------------------------------x
                                          New York, N.Y.
                                          December 13, 2016
                                          9:10 a.m.

Before:

                    HON. ANDREW L. CARTER,

                                          District Judge

                         APPEARANCES

LIDDLE & ROBINSON LLP
     Attorneys for Plaintiff
BY:  JAMES R. HUBBARD
     BLAINE H. BORTNICK
     CHRISTINE PALMIERI

BOIES, SCHILLER & FLEXNER LLP
     Attorneys for Defendant
BY:  RANDALL W. JACKSON
     DAVID L. SIMONS
     NICHOLAS STANDISH

GIBSON, DUNN & CRUTCHER LLP
     Attorneys for Defendant
BY:  GABRIELLE F. LEVIN

1     (Jury not present)

2          THE COURT:  So we're here for the charge conference.

3     I have reviewed the parties' written objections to the jury

4     charge and -- the draft jury charge and the draft verdict form.

5     First let me just make sure we're all on the same page.  My

6     understanding is the plaintiffs wish to withdraw the New York

7     State claim, is that correct?

8          MR. HUBBARD:  Yes, your Honor.

9          THE COURT:  All right.  And I assume the defendants

10    don't object to that.

11         MS. LEVIN:  Your Honor, we have no objection.  We do

12    ask that the Court issue an order memorializing the withdrawal

13    of that claim.

14         THE COURT:  It seems that moots a lot of the

15    defendant's objections to the jury charge and the verdict form;

16    not all of them, but it moots many of them.  But let's move on

17    to objections.  Let's go bit by bit here.

18         The plaintiff's objection to the verdict form question

19    13:  Has the defendant proved by preponderance of the evidence

20    that the defendant would have taken an adverse employment

21    action against plaintiff for non-retaliatory reasons alone?

22         I want to make sure that I fully understand the

23    plaintiff's objection.  The plaintiff's objection seems to be

24    as if -- let me make sure I fully understand what the

25    plaintiff's objection is, because in that statement, the way it

GCDTPIC1                        Trial

```
 1   is written, clearly the burden is on the defendant, that's the
 2   defendant's burden to prove that by a preponderance of the
 3   evidence.  I want to make sure I understand fully what the
 4   plaintiff's objection is.
 5            MR. HUBBARD:  Your Honor, may I ask your permission,
 6   Mr. Bortnick is going to handle -- and Ms. Palmieri will handle
 7   the charge conference, may I be excused for this portion?
 8            THE COURT:  Yes.
 9            MR. BORTNICK:  Your Honor, yes, it's the defendant's
10   burden of proof.  That's not the issue here for the plaintiff.
11   The issue is that if the -- under the law, as we understand it,
12   if there was an impermissible retaliatory animus, for lack of a
13   better word right now, that HSBC had when they decided to
14   terminate him, Mr. Picarella, even if they would have
15   terminated him or taken any other adverse employment action
16   against him solely on non-retaliatory grounds, under the New
17   York City statute that still is impermissible retaliatory
18   animus.
19            THE COURT:  Back up again.  Repeat that last part
20   again.  I want to make sure I'm fully understanding.
21            MR. BORTNICK:  Maybe I can try it a different way.
22            THE COURT:  If what you're saying is under the New
23   York City human rights law, if the retaliatory animus played a
24   part in the adverse employment action, then plaintiff wins, is
25   that your point?
```

GCDTPIC1                    Trial

```
1          MR. BORTNICK:  I'm saying that, and even if they had
2   still taken the same actions because they're saying 90 percent
3   with a permissible motive, under the New York City statute,
4   that's not permissible.
5          And question 13, the way I read it, at least, and the
6   way we read it, is that it's essentially suggesting or telling
7   the jury that if the defendant had taken an adverse employment
8   action against Mr. Picarella and 90 percent of their thought
9   process was for permissible reasons, then that would be okay,
10  and that is what we object to.
11         THE COURT:  But what is your take on the adverb
12  "alone" there at the end of that, "alone?"
13         MR. BORTNICK:  That's where I'm -- "alone," I can see
14  it read one of two ways, but the way I'm reading it is that
15  if -- you could read it either way.  When I first read this
16  instruction I read it as if they would have just for all the
17  90 percent reasons, that alone is enough.  In other words, our
18  non-retaliatory reasons alone are enough to fire him or take an
19  adverse employment action, then there's no retaliation under
20  the law.  That's how I read it.  Sort of like alone or enough,
21  rather I think we should not even have such an instruction, and
22  it should really be based on question 12.
23         And there are -- there's an additional modification I
24  would propose, because I know that the defendants objected in
25  part, and I do think that that should be addressed because I do
```

GCDTPIC1                    Trial

1   think they have a point on that issue.  But on 13, it seems to

2   me to indicate to the jury that if it's alone enough for

3   non-retaliatory reasons, then Mr. Picarella cannot prevail, and

4   that's not a correct statement of the law.

5          The seminal case here, the one that controls here is

6   the First Department case, the Williams case that we cited, and

7   the Williams case I think is very clear here.

8          THE COURT:  There doesn't seem to be in any

9   disagreement about the law, it seems that you have a

10  disagreement about the wording of that instruction.

11         MR. BORTNICK:  Yes.

12         THE COURT:  And you feel the instruction is

13  superfluous, I suppose, is your position.

14         MR. BORTNICK:  Yes on number 13, yes.

15         THE COURT:  What's defendant's position on this?

16         MS. LEVIN:  Your Honor, defendant's position is that

17  the instruction is wholly appropriate.  I think that

18  plaintiff's counsel appears to be misreading or

19  misunderstanding the import of the instruction.

20         The case law is clear that the Court is not permitted

21  to second guess legitimate personnel decisions so long as

22  they're based on non-retaliatory reasons, and I think the

23  instruction memorializes that.  If the defendant would have

24  taken the same adverse action in the absence of retaliatory

25  reasons, then defendant should prevail in this case.

GCDTPIC1                          Trial

1     THE COURT:  Okay.  I will think about that.  Let's

2  move on to 12.

3     MR. BORTNICK:  I want to point the Court to the

4  Williams case in the headnote 3 where it talks about -- where

5  the Williams court talks about that no challenged conduct may

6  be deemed non-retaliatory before determination that a jury

7  could not reasonably conclude from the evidence that such

8  conduct was, in the words of the statute, reasonably likely to

9  deter a person from engaging in a protected activity.

10     That's the heart of this, and that's what I don't

11  think that question 13 -- 13 just creates a lot of confusion

12  around it.  Counsel just said well, I must be confused or I'm

13  not reading it well.  If that's the case, then I think the jury

14  likely would have the same issue.

15     In other words, another way to say it, if the answer

16  to question 12 is yes, the answer to 13 has to be yes.  They

17  can't be inconsistent.  And that's why it's superfluous and

18  confusing.  If question 12 is yes, question 13 has to be yes,

19  too, otherwise you have a completely contradictory response on

20  the verdict form.

21     MS. LEVIN:  I disagree, your Honor, respectfully.  I

22  think the case law is clear that once a connection has been

23  established, the defendant then has the opportunity to

24  articulate a non-retaliatory legitimate business reason for the

25  decision.

GCDTPIC1                    Trial

```
 1          THE COURT:  Okay, let me ask you this, if we change

 2   the language of that -- what if we change the language to 13:

 3   Has defendant proved by a preponderance of the evidence that

 4   the defendant would have only taken the adverse employment

 5   action for non-retaliatory reasons?

 6          MR. BORTNICK:  How about "did take," as opposed to

 7   "have only," that the defendant took the adverse employment

 8   action solely for or only for non-retaliatory reasons, as

 9   opposed to would have taken or would take.  I'm just changing

10   it to the past tense.  The defendants took only for

11   non-retaliatory reasons, I think that gets --

12          THE COURT:  I think putting "took" in there may be a

13   bit of a problem; sort of hair splitting here.  Obviously the

14   jurors are supposed to go through the verdict sheet in order.

15   I don't want anything in the verdict sheet making this sort of

16   affirmative statement that the defendant took materially

17   adverse employment action.

18          But has defendant proved by the preponderance of the

19   evidence that the defendant would have only taken the adverse

20   employment action against plaintiff for non-retaliatory reasons

21   alone?  We can leave the "alone" in there as well so it's even

22   more clear.  Does that cure your issue?

23          MR. BORTNICK:  I'm not sure that it did, but I think

24   that would have taken -- maybe only -- maybe would have taken

25   the adverse employment action against plaintiff solely for
```

GCDTPIC1                    Trial

1    non-retaliatory reasons, period, maybe, and use the word

2    "solely."

3            THE COURT:  Okay.  Seems fine to me.

4            Defendants have any position on that?

5            MS. LEVIN:  Just to clarify, your Honor, the proposal

6    is --

7            THE COURT:  Has defendant proved by preponderance of

8    the evidence that defendant would have taken the adverse

9    employment action against plaintiff solely for non-retaliatory

10   reasons?

11           MS. LEVIN:  That's fine, your Honor, no objection.

12           THE COURT:  We'll make that correction.

13           Let's move to 12.

14           MR. BORTNICK:  12.  I'm looking at the letter here,

15   and I think there may be a typo because there was the

16   motivating factor language was struck, but I think probably we

17   should have played any role in brackets, and I'm looking at

18   that now.  Yes, so there's an error in that letter that I just

19   am noticing now.

20           But the issue is yes, the Second Department, which is

21   not controlling here, does use the words "motivating factor,"

22   the First Department does not.  And I think the reason is

23   motivating factor becomes confusing because motivating factor

24   is an issue when looking at Title VII or the state claim and

25   not the city claim.  The language of Williams talks about no

 1    role.  So any role is just sort of flipping that on its head,

 2    and I would have an objection to working with the word "no,"

 3    but no role is the issue under Williams, and motivating factor

 4    is not the standard under Williams, and it's too close to the

 5    Title VII.

 6              THE COURT:  What's defendant's position on this?

 7              MS. LEVIN:  Defendant's position, your Honor, is the

 8    same position that we set out in our two letters to the Court

 9    on this, that motivating factor is the correct standard.  It's

10    the standard that is consistently applied by district courts in

11    this district, including a case from earlier this year.  And so

12    we believe that motivating factor is the correct standard,

13    that, as plaintiff's counsel noted, there's New York State

14    Court case authority supporting motivating factor as well, and

15    that's the correct standard.

16              For the reasons stated in our letter, we do think that

17    the language regarding "desire to retaliate" should be struck,

18    because it implies that there was a desire to retaliate, and we

19    think that the proper standard is that the protected activity

20    was the motivating factor.

21              MR. BORTNICK:  Your Honor, if I may, in the brief that

22    defendant has submitted to the Court it does not even use

23    motivating factor as the standard.  They cite another Second

24    Department case which they quote as the standard being the

25    defendant was motivated, at least in part, by an impermissible

1    motive, not motivating factor, which is -- which I think is

2    different.

3         On this issue of desire, while I personally believe

4    that the evidence was overwhelming that HSBC had a desire, of

5    course I understand that could probably be better worded, and

6    that "desire" is probably not appropriate.  So I do agree and I

7    do have a suggested way of dealing with both of those issues

8    with suggested language.

9         THE COURT:  What's the suggestion?

10        MR. BORTNICK:  Has the plaintiff proved by a

11   preponderance of the evidence that retaliation played any

12   role -- sorry, yes, has plaintiff proved by a preponderance of

13   the evidence that retaliation played any role in defendant's

14   decision to take an adverse employment action against him in

15   violation of the New York City Human Rights Law.

16        I think it deals with their issue of desire, and it

17   deals with our issue -- plaintiff's issue of motivating factor.

18        MS. LEVIN:  Your Honor, we object, respectfully.  The

19   standard is whether protected activity was the motivating

20   factor in the adverse employment action, and we think the

21   question should be phrased based on that language.

22        THE COURT:  Okay.  I will think about that.

23        MR. BORTNICK:  And just one thing, your Honor.  I

24   don't know where motivating factor comes from.  It's not in the

25   Second Department case that they cite, and certainly not in

GCDTPIC1                     Trial

1   Williams, and not even in a more recently decided Second

2   Department case which talks about if the plaintiff was

3   motivated by racial or ethnic, in this case discriminatory

4   animus, retaliatory animus for us, even in part.  But the issue

5   is not motivating factor in any of the cases, and certainly not

6   in the controlling authority here.

7           THE COURT:  Many of the cases in our circuit, in the

8   Second Circuit, have used that language.  Again, while I

9   understand --

10          MR. BORTNICK:  I understand, but it's really a matter

11  of the state law here, your Honor.  In fact that's why the

12  Restoration Act was passed, because there were certainly

13  federal as well as state decisions that equated New York City

14  Human Rights Law with Title VII, and that's why the Restoration

15  Act was passed to say no, we have our own way of doing it in

16  the city.

17          THE COURT:  So to be clear, the debate is whether or

18  not to use motivating factor, motivated in part, or played any

19  role, is that what we're talking about?

20          MR. BORTNICK:  Yes, or to reverse it, no role, which

21  is the actual language of Williams, I think any role is exactly

22  the same thing.

23          THE COURT:  Okay.  I will think about that.

24          Let's move on to the next objection from plaintiff.

25  It seems to me the objection to Questions 1, 3, 9 and 11 on the

1   verdict form, you object to those because they're not in

2   question.  If both parties agree to stipulate to certain things

3   and take them out of the jury's consideration, fine, but it

4   seems to me I certainly shouldn't be taking matters out of the

5   jury's consideration.  The fact that there may not be any real

6   dispute about these issues, the jury does not have to accept

7   the fact that the parties may not seem to have a real

8   disagreement about that.  I don't want to invade the province

9   the jury.  The jury will make those determinations.

10            MR. BORTNICK:  All right, your Honor.

11            THE COURT:  Do you have anything else?

12            MR. BORTNICK:  I don't have anything to add, I guess,

13   to that.

14            THE COURT:  Do the defendants have a position on that?

15            MS. LEVIN:  We believe those issues are disputed and

16   should be presented to the jury, your Honor.

17            THE COURT:  Okay.  You have some objections to the

18   charge on page 35.

19            MR. BORTNICK:  If I may, your Honor, the first three

20   items are a mirror of exactly what we talked about on the

21   verdict form.

22            THE COURT:  Okay.  Objections to page 24 of our draft

23   instructions.

24            MR. BORTNICK:  The reason for that was it was only on

25   the third read through -- admittedly, I read it quickly when I

GCDTPIC1                         Trial

1   first saw it.  We were in a rush last night.  But it wasn't

2   until the third reading that I said okay, I see that

3   technically, yes, it looks correct, but I was confused, and I

4   think that the proposed change just makes it clear what the

5   Court was proposing, and that's why if I was confused.

6              I assume --

7              THE COURT:  It seems to me that's a fine edit.  I

8   don't know what the defendant's position is on that.

9              MS. LEVIN:  To be honest, your Honor, I'm not entirely

10  clear what plaintiff's objection is to this page.

11             THE COURT:  I think it's an edit, I suppose, that --

12  does the defendant object to making that change the plaintiff

13  has suggested?

14             Again, plaintiff's suggestion is that it would read on

15  page 24:  If, however, you find that HSBC was not aware that

16  Mr. Picarella had complained of the sexual harassment of his

17  co-worker, or HSBC was not aware that Mr. Picarella had made

18  either formal or informal complaints of alleged retaliation

19  against him, then you must find in favor of HSBC with regard to

20  Mr. Picarella's Title VII claim.

21             MS. LEVIN:  We object to that language, your Honor,

22  for the reason that is articulated in our letter and relates to

23  a few different places in the proposed instructions, which is

24  it appears to be an expansion of Mr. Picarella's claims.

25  Throughout this case he's never alleged that he was retaliated

1    against for complaining of retaliation, he has consistently

2    characterized his claims and the protected activity he claims

3    to have engaged in as complaining of the sexual harassment of a

4    co-worker.

5            THE COURT:  That's a different sort of objection.

6    We'll get to that shortly.  Maybe we should get to that now.

7            MR. BORTNICK:  Your Honor, I when I first read it,

8    because of the "or," if however, you find that HSBC was not

9    aware Mr. Picarella had complained, okay, or Mr. Picarella had

10   made formal or informal complaints.  And that was -- I just

11   wanted to make sure that "not aware" was referring to both,

12   which I think was the Court's intention, because that is

13   clearly the legal standard.  I wanted to make sure that it's

14   clear that "not aware" applies to both.

15           THE COURT:  What if we just strike all of that?  What

16   if we say:  If, however, you find that HSBC was not aware that

17   Mr. Picarella had complained of the harassment of his

18   co-worker, then you must find in favor of HSBC with regard to

19   Mr. Picarella's Title VII claim?  What if we strike all of

20   that?

21           MR. BORTNICK:  Well, I think he has made complaints.

22   After he filed the EEOC charge there were continued retaliatory

23   actions.  That's the allegation here.  And those didn't have to

24   do with the sexual harassment, it had to do -- some of those

25   later ones had to do with that he filed an EEOC charge and yet

GCDTPIC1                      Trial

1   retaliate continued.

2          And we have some evidence in the record of that from

3   Mr. Karam who identified Mr. Picarella -- he said called him, I

4   think it was the HR related problem, and the question was well,

5   what was the problem, well, the problem was the EEOC charge

6   being filed.  So that is not complaining of sexual harassment,

7   that's retaliation in that case for filing an EEOC charge,

8   evidence that would tend to support that.

9          THE COURT:  Let's talk about this other issue that the

10  defendants have objected to, and I am a little concerned about

11  that.  The plaintiffs did amend their proposed jury

12  instructions earlier this week, or maybe late last week, to add

13  information talking about the fact that Mr. Picarella filed the

14  lawsuit.  I don't believe that that is part of the plaintiff's

15  theory in this case, up until the trial had already begun, but

16  I want to make sure that I'm not -- what is plaintiff's counsel

17  position on that?

18         I don't think there's any dispute that there has been

19  some testimony about that, but I am concerned about sort of

20  this very late amendment to the sort of proof in this case and

21  the defendant's notice of what the claims were here in this

22  case, especially as it regards the -- any alleged retaliation

23  for filing the lawsuit here in this case.

24         What's plaintiff's position on that?

25         MR. BORTNICK:  Well, I don't have the complaint in

 1    front of me, and I will take everyone's word that it's not said

 2    in the complaint, but I would want to check that -- and I would

 3    want to check that.

 4            But even if it were not, can't come as a surprise.  It

 5    was part of the discovery in the case.  Mr. Picarella's

 6    deposition was taken.  But it also came in through Mr. Karam,

 7    wasn't objected to, and in that case the pleadings could easily

 8    be conformed, and I ask the pleadings be conformed to the

 9    evidence, which is a very typical motion that is made at the

10    end of a case.

11            So I don't see how -- there's no possible surprise or

12    prejudice to defendants on this because they have known every

13    step of the way what Mr. Picarella has alleged happened to him,

14    at what point in time, and why he felt that that was improper.

15            THE COURT:  Let me hear from defendants on this.  Let

16    me find out what the defendant's position is regarding this

17    issue.  It doesn't appear to me that there's any sort of

18    surprise regarding Mr. Picarella's filing of the EEOC claim and

19    the complaints of retaliation for doing that.  There may be

20    some surprise regarding the lawsuit, but let me hear from the

21    defendant.

22            MS. LEVIN:  I think the filing of the EEOC complaint,

23    your Honor, is identified in the second amended complaint as

24    protected activity.  What is not in identified in the second

25    amended complaint or any of plaintiff's pretrial filings in

1      this case is that his internal, quote, informal and formal

2      complaints of retaliation were protected activity and that the

3      filing of this lawsuit was protected activity.

4              And I think we may have cited some portions of the

5      pretrial filings to you in our letter, but in the joint

6      pretrial order, in plaintiff's proposed voir dire questions and

7      plaintiff's proposed jury instructions, all filed in the weeks

8      before trial, plaintiff characterized his protected activity as

9      making complaints about the sexual harassment of a co-worker.

10             So I think there has been prejudice.  There has been

11     surprise.  The fact that testimony was presented at trial on

12     these issues is not sufficient to give defendant advance notice

13     that the case has been expanded and additional protected

14     activity is being alleged.

15             THE COURT:  Okay.  Anything else from plaintiffs on

16     that?  I tend to agree with defendant.  If I recall, there were

17     some objections to certain portions -- not all of this

18     testimony, but there was certain evidence that I did allow in

19     to sort of go to the plaintiff's proposed theory regarding sort

20     of a pattern of retaliation different from the actual claims

21     here in this case.

22             Let me hear from plaintiff on that.

23             MR. BORTNICK:  I don't have anything to add to what I

24     said prior, your Honor.

25             You're referring to my December 11 letter, is that

GCDTPIC1                        Trial

1    what you're referring to?  You said my prior letter.

2             THE COURT:  Yes, I don't remember the date off the top

3    of my head.

4             MR. BORTNICK:  It was December 11, and then we did a

5    proposed amended jury instruction.  I thought this was sort of

6    superseded by your Honor's draft jury charge, that's why I

7    guess -- I was going off your Honor's draft jury charges having

8    been superseded by the exchange of letters on this topic.

9             And in the letter that -- and so I guess I just was --

10   when you referred to my prior letter, I was a little confused,

11   because we were going off of your draft jury charge.

12            THE COURT:  We included some of that, some of the

13   parties' requests, obviously, in the draft charge with the idea

14   that we would have this sort of discussion at some point, which

15   we're having now.  It does seem to me that it's appropriate,

16   perhaps, to limit the instruction on page 24 to the complaints

17   of sexual harassment of his co-worker and the filing of the

18   EEOC complaint, if that is what is alleged in the second

19   amended complaint.

20            MR. BORTNICK:  Page 24.

21            THE COURT:  Correct.  I'm looking at your objections,

22   but that seems to me to make the most sense.

23            MR. BORTNICK:  I'm sorry, you're talking about their

24   objection?

25            THE COURT:  Hold on a second.

```
 1              (Pause)

 2              THE COURT:  Go ahead, counsel.

 3              MR. BORTNICK:  Maybe I'm confused, which is quite

 4    possible.  The issue on page 24 that we had was, and it's at

 5    the bottom of the letter, other than the not aware issue, was

 6    underneath, wherever in the jury charge it says you must find

 7    for HSBC, and instead we gave as an example an instruction that

 8    should rather say:  In order to find for Mr. Picarella, you

 9    must find that he has proved.

10              That was our -- that was the objection.  That was the

11    other objection.  For example, on page 24 and 25 is where we

12    came up with another instance of that.

13              THE COURT:  Okay.  I understand that, but I was

14    talking about -- since we were on that, and this sort of

15    touches upon the defendant's other objection, this is sort of

16    the defendant's objection to sort of what they perceive as this

17    late amendment of the complaint in the middle of the trial.  I

18    guess I want to hear from plaintiff's counsel, because it does

19    seem that the complaint talks about, as a protected activity,

20    the complaints about the sexual harassment of his co-worker and

21    the filing of the EEOC complaint.

22              MR. BORTNICK:  Right.

23              THE COURT:  So it does seem that perhaps on page 24 we

24    limit it to that.

25              The other option is that we -- if we don't
```

GCDTPIC1                    Trial

1    specifically marshal that evidence in any way and just kind of

2    generally refer to protected activity we could wait and see

3    what the jury does and give them special interrogatories if

4    necessary.

5              MR. BORTNICK:  Either one would be fine with us, your

6    Honor.  Either one would be fine.

7              THE COURT:  Okay.  Then it seems to me it may make the

8    most sense to kind of limit that to the complaints about the

9    sexual harassment of the co-worker and the filing of the EEOC

10   complaint.

11             MS. LEVIN:  Your Honor, just to clarify, I think there

12   are a number of other places throughout the proposed jury

13   instruction where a similar change needs to be made.

14             THE COURT:  Okay, we'll do that.

15             I believe -- are there any other objections from

16   plaintiff's counsel to the jury instructions?

17             MR. BORTNICK:  Just the other one I mentioned a minute

18   ago about affirmative versus the negative one.

19             THE COURT:  Okay, let me hear from defendants.

20   Defendants have some objections -- again, many of the

21   defendant's objections appear to be mooted by the fact that the

22   state charges have been dropped.  So the first one that seems

23   moot now is the objection to the proposed verdict form.  We

24   will put captions above the two claims, Title VII and the New

25   York City Human Rights ones, I think that makes sense to do

GCDTPIC1                    Trial

 1    that.  I assume there's no objection to that by plaintiff.

 2              MR. BORTNICK:  No.

 3              THE COURT:  Again, the second objection again seems to

 4    be moot because the New York State human rights law claims have

 5    been dropped.

 6              MS. LEVIN:  Sorry, your Honor, I'm not following on

 7    the verdict form, I think we had a request that the yes and no

 8    be flipped since it was plaintiff's burden.

 9              THE COURT:  Okay, let me make sure I fully understand

10    what you're saying.  Hold on.

11              (Pause)

12              THE COURT:  And this is for which question

13    specifically on the verdict form?

14              MS. LEVIN:  Pretty much all of them, your Honor, the

15    ones the plaintiff bears the burden on.  It's our experience in

16    this district for the "no" to come first on an element where

17    the plaintiff bears the burden of proof.  We obviously defer to

18    the Court, but we do believe it's improperly suggestive to have

19    the "yes" come first when it's plaintiff's burden to prove each

20    of those elements.

21              (Continued on next page)

22

23

24

25

1          THE COURT:  Plaintiff, your position on that.

2          MR. BORTNICK:  I don't see it suggestive as one way or

3     the other.  What's important is I think to be consistent.

4          THE COURT:  We'll leave that alone.  I don't think

5     that suggests anything by having a yes before a no.

6          I think in terms of -- I'm looking at page two of your

7     objections under the Title VII and New York State Human Rights

8     Law.  I do think that we probably should refer to in the third

9     element protected activity instead of protected conduct.  I

10    think that that probably does make sense.  And I do believe

11    that it makes sense to the extent that it's not clear that the

12    fourth element should talk about perhaps but for causation,

13    although we do talk about but for later on in that section,

14    perhaps it does make sense instead of saying critical element

15    to use but for there as well.

16         Does that suggestion ameliorate the defendant's

17    concerns?

18         MS. LEVIN:  It does, your Honor.

19         THE COURT:  What's plaintiff's position on that?

20         MR. BORTNICK:  I thought critical element was proper

21    although I don't think it's -- that's fine, your Honor.

22         THE COURT:  Okay.  Looking at page three of the

23    defendant's objection can you tell me a little bit more about

24    your objection to the first element there of the Title VII

25    claim.

GCD9PIC2

1          MS. LEVIN:  Of course, your Honor.

2          THE COURT:  Again, some of that may be folded in now

3    that the New York State Human Rights Law claim is out.  But let

4    me hear.

5          MS. LEVIN:  It's less about the withdrawal of the

6    State Human Rights Law claim but I think a number of the -- our

7    objections on page 23 do relate to the issue that we discussed

8    earlier about what is the protected activity that's actually

9    alleged in this complaint.  So I think this is just one of the

10   pages where a number of those changes need to be made.

11         We do have an objection to the language about -- that

12   HSBC was actually engaged in retaliation at each of these

13   points in time.  We think this presupposes what plaintiff has

14   to prove which is that there actually was retaliation.  And

15   there was similar language in plaintiff's proposed instruction

16   that plaintiff later agreed was inappropriate.  So we think

17   that that language should be either modified or removed.

18         THE COURT:  So in addition to being clearer about what

19   the complaint is here let me just hear from defendants.  What

20   is your proposed language?

21         MS. LEVIN:  It's the sentence that begins furthermore,

22   "Furthermore, he does not have to prove that when he filed the

23   EEOC charge complaint to HSBC that he was retaliated against or

24   filed this lawsuit that HSBC was actually engaged in

25   retaliation at each of those points in time."

GCD9PIC2

1          One suggested revision would be, "Furthermore,

2     plaintiff satisfies this element as long as he had a good faith

3     reasonable belief that when he filed the EEOC charge that HSBC

4     was engaging in retaliation."

5          THE COURT:  Plaintiff, what's your position on that?

6          MR. BORTNICK:  I think it would be not "was engaging"

7     but "had engaged" in retaliation.  And while I think actually

8     the EEOC -- let me try to say this differently.

9          I have to say that I think the sentence as it's

10    originally written is probably the best way of dealing with it,

11    your Honor, because it's saying that Mr. Picarella, the

12    plaintiff, doesn't have to prove at each single one of these

13    points in time there's a retaliatory action being taken.

14    That's what -- and that's what -- that's true.  And I think

15    it's clear as to what it says there.  So I think the

16    instruction, that part, that "furthermore" sentence is correct.

17         MS. LEVIN:  Your Honor, the sentence suggests that

18    plaintiff does not have to prove that HSBC was engaged in

19    retaliation and I think that's confusing and incorrect as a

20    matter of law.  On this first element the issue is whether

21    plaintiff had a good faith reasonable belief that the

22    employer's actions violated Title VII.

23         MR. BORTNICK:  Maybe the way, your Honor, to do it is,

24    "Furthermore, he does not have to prove that when he filed the

25    EEOC charge," I think maybe this, "or complained to HSBC as

GCD9PIC2

```
 1    being retaliated against, or filed this lawsuit," and maybe
 2    that might make it a little clearer, just an extra "or" in
 3    there.
 4            THE COURT:  I thought we had talked about the fact
 5    that the filing of the lawsuit and those other things should be
 6    out.  We shouldn't put those in the jury instructions, right?
 7            MR. BORTNICK:  Yes.  Okay.  That's fine.  Yes.
 8            THE COURT:  What if we said something to the effect
 9    that:  Furthermore, Mr. Picarella does not have to prove that
10    when he complained about the sexual harassment of his coworker
11    or filed the EEOC charge that he was being retaliated
12    against -- or that HSBC was actually engaged in retaliation at
13    each of those points in time; rather, Mr. Picarella must prove
14    that at the time that he -- rather, Mr. Picarella must prove
15    that at some point in time HSBC had retaliated against him for
16    engaging in protected conduct.
17            Does that satisfy both parties?
18            MS. LEVIN:  Your Honor, we still have the same
19    objections, unfortunately.  I think there are a few issues.
20    There's the phrasing of the sentence in the negative,
21    "Plaintiff does not have to prove" this is an element on which
22    he bears the burden of proof and he does have to prove that he
23    had a good faith reasonable belief.
24            I think the other issue with the proposed language is
25    the reference to retaliation.  Retaliation is the ultimate
```

1    issue in this case that the jury has to decide.  I think the

2    language should rather be, as I stated earlier, whether he had

3    a good faith reasonable belief that the employer's actions

4    violated Title VII, either when he complained internally about

5    sexual harassment of a coworker or when he filed the EEOC

6    charge.

7            THE COURT:  Okay.  So give me your proposed language

8    again, counsel.

9            MS. LEVIN:  Absolutely, your Honor.

10           I think it's a modification to the first sentence of

11   that paragraph.  "An employee's complaint may qualify as

12   protected activity, satisfying the first element of this test,

13   as long as the employee has a good faith reasonable belief that

14   the employer's actions violated Title VII.  Therefore,

15   Mr. Picarella must prove that he had a good faith reasonable

16   belief that HSBC had violated Title VII when he complained

17   internally of the sexual harassment of a coworker or when he

18   filed the EEOC charge."

19           THE COURT:  Plaintiff.

20           MR. BORTNICK:  Obviously, I think it's critical that

21   it's improper to remove the sentence, "Therefore, Mr. Picarella

22   does not have to prove that his coworker was sexually

23   harassed."  That's sort of the point, an important point of

24   this instruction here.  You can't take that out; that he

25   doesn't have to prove that she was harassed; all he has to do

GCD9PIC2

```
 1   is show that he had a good faith reasonable belief.  And that

 2   is --

 3             THE COURT:  I don't know if the defendants were

 4   suggesting removing that.

 5             MS. LEVIN:  I don't have any objection to keeping that

 6   language in.

 7             MR. BORTNICK:  Because she eliminated that and that's

 8   why I -- okay.

 9             The way it was phrased it seems as if it's taking out

10   Mr. Picarella's internal complaints which are also, for which

11   he was retaliated against.  That's been part of this case.  And

12   by just limiting it, I guess -- maybe I misheard -- to filing

13   the EEOC charge and eliminating the internal complaints it's

14   unnecessarily improperly limiting his case.

15             THE COURT:  Okay.  I believe it is important to

16   include his complaints about the sexual harassment of a

17   coworker if that's what you're talking about.

18             MR. BORTNICK:  Yes, and not just the EEOC charge.

19             MS. PALMIERI:  But also his complaints internal

20   regarding how he was retaliated against.  So I understood your

21   Honor to be saying before that we would exclude reference to

22   the lawsuit but I think to limit it solely to the EEOC charge

23   and not to also include the more informal internal complaints

24   of retaliation, which also constitute protected activity,

25   unduly limits the claim.
```

GCD9PIC2

 1          THE COURT:  What's defendant's position on that?

 2          MS. LEVIN:  Defendant's position on that is this has

 3   already been addressed by your Honor and it's not within the

 4   scope of the case as it's been delineated prior to trial.  The

 5   case has always been focused solely on the internal complaints

 6   regarding the sexual harassment of a coworker and the EEOC

 7   charge.  Those were the two types of protected activity that

 8   have been alleged throughout this case.

 9          THE COURT:  Hold on a second.

10          Let me hear from plaintiffs as to why you feel these

11   other internal complaints not directly related to the sexual

12   harassment of his coworker are contained in the complaint.

13   Because it seems to me, looking at the complaint, there were

14   certainly references to -- looking at the second amended

15   complaint, it talks about other complaints that were listed by

16   Picarella, in paragraph 72 on page 18, and it's listed, the

17   complaints that were I believe e-mailed to Maria Malanga as

18   unacceptable behavior in the organization, sexual harassment,

19   ongoing bullying culture, fraud, and then it states, to date

20   the unacceptable behavior has been handled inappropriately, and

21   things of that nature.

22          But the real issue is in paragraph 106 and 107.  In

23   paragraph 107 it says from in or around January 2012 to the

24   present plaintiff opposed the defendant's sexual harassment of

25   his female coworker by engaging in the protected activity

GCD9PIC2

1    identified in the preceding paragraphs.

2              So I suppose the question is, it seems to me that that

3    is limited to the internal complaints surrounding the sexual

4    harassment of his female coworker and it's not talking about,

5    in your second claim for relief, any retaliation related to his

6    other potentially protected activity such as complaining about

7    bullying and other things directed at him.

8              MR. BORTNICK:  Well, the sort of sum of that bullying,

9    for lack of a better word, is part of the retaliation that he's

10   experiencing.  It's all part of one continuum.  And the

11   evidence certainly, that we've heard at trial and also from the

12   complaint, it really talks about a continuum.

13             THE COURT:  No.  That's fine.  I guess what I'm

14   trying --

15             MR. BORTNICK:  And that these other acts are just

16   other forms in a sense of retaliation and complaining about

17   I'm -- I'm continually being retaliated against, it's getting

18   worse and worse and worse is what we're talking about here.  So

19   I think it is appropriate.  And it's a fair reading of the

20   complaint as well as what's occurred here at trial.

21             THE COURT:  But that seems to me different.  It's a

22   difference to say that any alleged bullying of him by his

23   coworkers or supervisors, any bullying of him is an act of

24   retaliation for complaining about the sexual harassment of his

25   coworker as opposed to saying that the complaining about the

GCD9PIC2

1    bullying is protected activity and that he was retaliated

2    against for complaining about the bullying as an internal

3    complaint.

4         It seems to me that what we're talking about is based

5    on the complaint, the claims in this case appear to be limited

6    to the complaints he made, the protected activity regarding the

7    sexual harassment of his coworker and his filing of the EEOC

8    complaint.  That's what I'm trying to figure out because you

9    keep talking about the other internal complaints.  If you're

10   talking about internal complaints about the sexual harassment

11   of his female coworker, that's fine.

12        MR. BORTNICK:  And I think you know and the evidence

13   was there was actually some of both because some of it,

14   Mr. Picarella testified:  I was making these complaints because

15   Ms. Bilbrey had said anything that I see or feel is wrong I

16   should report.  Not all of those rose to retaliation.  But

17   other things, I think he said, did and, you know, rise to a

18   level of retaliation or arising out of the initial incident.

19        I guess, yes, in a certain sense I understand -- if

20   we're saying that all of these additional things happened to

21   him or some of these additional things that happened to

22   Mr. Picarella were a result of the EEOC charge and the original

23   complaint, sexual harassment, we can look at that, yes.

24        THE COURT:  Okay.  That's what that seems to be

25   because I thought your cocounsel was saying something different

GCD9PIC2

1    just now.  I don't know.

2            MR. BORTNICK:  She was but, you know, understanding

3    what your Honor is saying about the complaint.  And I think at

4    the end of the day I'm not sure how much of a difference it's

5    ultimately going to make with the jury.

6            THE COURT:  Okay.  Let's turn to the defendant's next

7    objection.  It seems the objection to the second element has

8    been addressed in terms of the limiting of the claims in this

9    case.

10           What's the defendant's objection to the third element

11   of the Title VII claim proposed jury instruction at 24?  I'm

12   not sure -- it seems that, again, you're not objecting that

13   that's an incorrect statement of the law but you're just saying

14   that that's not particularly relevant in this case.  Is that

15   basically what the objection is?

16           MS. LEVIN:  Well there are a few objections.  I think

17   the first one, your Honor, is that typically case law refers to

18   an adverse employment action, a materially adverse employment

19   action.  We think that language should be used here.

20   Mr. Picarella is not alleging that he experienced any adverse

21   action outside the scope of his employment at HSBC.

22           The other two objections we had, your Honor, to this

23   language is we think that there should be the additional

24   language we had suggested in our proposed jury instruction

25   regarding petty slight and minor annoyances not rising to the

1    level of a materially adverse employment action and that

2    whether an adverse employment action is material should be

3    judged from the perspective of a reasonable employee in

4    Mr. Picarella's position.

5         THE COURT:  Let's deal with that first one first.  It

6    seems to me that it's -- well what's plaintiff's position on

7    that, the adverse action itself?

8         We can add "materially adverse action itself, however,

9    need not be related to the plaintiff's employment."  It does

10   seem that we could take that out; we could leave it in.  What's

11   plaintiff's position on that?

12        MR. BORTNICK:  Maybe I'm misunderstanding but I

13   thought I heard two things.  One is that there's -- there's

14   sort of a request to talk continually about materially adverse

15   action.  I think, if I'm understanding that right, the first

16   sentence says, "With respect to the third element an adverse

17   action is material."  I'm just not sure I understand the

18   objection.

19        THE COURT:  So forgetting that adjective what is your

20   position on this sentence?

21        MR. BORTNICK:  On this sentence?

22        THE COURT:  Yes.

23        MR. BORTNICK:  I guess the -- it has to be an

24   employment action, I guess -- well, they could take actions

25   against Mr. Picarella outside the scope of his employment but

GCD9PIC2

```
1    it would be that would be retaliatory.  I think we've had --
2    you know, to the extent we've either had evidence or expect
3    there to be some evidence, for example, about a press article
4    that put Mr. Picarella in a bad light, that would be not
5    related to his employment per se, but it's a retaliation.  It's
6    a correct statement of the law.
7              THE COURT:  It seems to me it's a correct statement of
8    the law.  It can stay in.  Again, I don't think -- the jury
9    will determine whether or not that's particularly relevant in
10   this case or not.
11             In terms of the next issue, perhaps given the
12   testimony in this case in terms of advising the jurors that
13   petty slight or minor annoyances are not actionable under Title
14   VII, maybe that makes some sense.  There was some testimony
15   about Mr. Picarella complaining about humming next to him and
16   things like that and perhaps it would be helpful for the jury
17   to know -- I'm not ruling that the humming itself could not be
18   actionable.  But the jury needs to know that it must be some
19   real humming, I guess.
20             MR. BORTNICK:  I think that falls into what I said
21   earlier that he was reporting sort of anything as he understood
22   he was supposed to report, not that he thought that was some
23   retaliation against him.  I thought he was pretty clear.  He
24   didn't consider that retaliatory activity against him.  And
25   that wasn't the purpose of him doing it.
```

GCD9PIC2

```
 1            So that's fine, your Honor, as long as there's some

 2     sort of limiting factor that if it's only petty slight and

 3     things, you know, some sort of word like that, then

 4     Mr. Picarella couldn't prevail.  I don't want the jury to get

 5     the impression that everything -- that if they're petty and

 6     non-petty things that he can't prevail.  That would be the only

 7     suggestion.

 8            THE COURT:  What's defendant's position on that if we

 9     add something that says that only petty slight or minor

10     annoyances are not actionable under Title VII?

11            MS. LEVIN:  I don't think that's a correct statement

12     of the law.  I think the language we propose comes directly

13     from a case and is the language that you repeatedly see in

14     cases on what is a materially adverse employment action.  So I

15     would submit that that's the proper language to be used.

16            MR. BORTNICK:  I think the difference is when you have

17     someone that's complaining largely only about petty slights

18     it's an appropriate instruction, but that's not what we have

19     here.

20            THE COURT:  I guess what I'm concerned about is not so

21     much just how counsel views that testimony but if there's a

22     chance that the jury could be misled and the jury might think

23     that if someone is -- if someone is humming, if it's a Sam Cook

24     hum in a song perhaps that is more of a petty annoyance if you

25     don't like Sam Cook.  As opposed to some field workers humming
```

1    in a very loud manner, maybe that's not a slight annoyance.   It

2    seems to me that the jury is free to do what they wish but

3    perhaps they should be told that petty slights or annoyances

4    because your theory it seems is not focused on petty slights or

5    annoyances; it's about him getting fired.

6            MR. BORTNICK:   Correct.   And that's why I suggested

7    that that is fine as long as it's made clear to the jury

8    that -- and that's why I used not only type of language.   If

9    the -- so that the jury understands that maybe petty slights

10   are not actionable, for lack of a better word or, you know,

11   they can't return a verdict based on petty slights, but if

12   they're petty slights and other things, other more serious

13   things, then they should return a positive response on that

14   issue.

15           THE COURT:   But that's not right, is it?   I mean it's

16   kind of right but it's not right.   If you say petty slights and

17   other things.   It's not because it's petty slights combined

18   with other things.   It's the other things.

19           MR. BORTNICK:   Right.

20           THE COURT:   So it seems to me that that language may

21   make it actually worse for you.   If I start saying that mere

22   petty slights and annoyances are not enough, the jury might be

23   tempted to start conflating all of that stuff together.

24           MR. BORTNICK:   I think you can say if he suffered only

25   petty slights, then it would not be enough.   That's where I was

GCD9PIC2

1    going with that point.

2            THE COURT:  I think that sort of starts misleading the

3    jury in another way, to start focusing on slights and to

4    determine whether or not there were more than petty slights

5    without necessarily regarding the rest of the instructions

6    there.  So I'm inclined to include that language as suggested

7    by defendants.  It doesn't seem that there's any real harm to

8    plaintiffs because my assumption is that the plaintiffs are not

9    going to be focusing on the humming.  Maybe the defendants

10   will, but I don't think that that's part of the plaintiff's

11   real theory in this case.

12           As far as the next part, "judge from the perspective

13   of a reasonable employee in Picarella's position," what's the

14   plaintiff's -- let me find out really more about what the

15   defendants objection is to that.

16           MS. LEVIN:  We're asking that that language be

17   included, your Honor, and I think this and the petty slight

18   issue just go to the fact that a materially adverse employment

19   action is a term of law that some of the jurors may not fully

20   understand.  And so these instructions aren't -- are intended

21   to give more clarity on what it means to be material in the

22   context of an adverse employment action.

23           THE COURT:  Plaintiffs, what's your position on this?

24           MR. BORTNICK:  That's fine.

25           THE COURT:  All right.  We'll include that.

GCD9PIC2

```
 1              Fourth element.  Okay.  The defendant's objection to
 2      the fourth element seems to be centered on the sort of
 3      motivating language -- the motivating factor language.
 4              MS. LEVIN:  Your Honor, that relates to the state law
 5      claim so I think we can skip over that.
 6              The objection that we have is on page 25 of the
 7      proposed jury instructions.
 8              THE COURT:  Okay.
 9              MS. LEVIN:  And it's simply just the sentence
10      beginning "If you find that Mr. Picarella did not prove that he
11      would not have suffered."  We just feel that that statement is
12      a little confusing because of the double negative.  We don't
13      think it's a misstatement of the law but it's just a tad
14      difficult to follow.
15              THE COURT:  So what do you suggest?
16              MS. LEVIN:  We suggest just tracking the language in
17      the Supreme Court's decision in Nassar which is -- which
18      requires the plaintiff to establish by a preponderance of the
19      evidence that retaliation was the but for cause of the
20      materially adverse action, which is the unlawful retaliation
21      would not have occurred in the absence of the alleged wrongful
22      action or actions of the employer.
23              THE COURT:  What's plaintiff's position on that?
24              MR. BORTNICK:  I had trouble following it.  Maybe if I
25      read it.  But the other issues -- that's also what we had
```

GCD9PIC2

1   raised, your Honor, that we talked about earlier; so I don't

2   know if we need to go over it again.

3           But on page four of our letter, the second to last

4   paragraph there where we objected to paragraphs in the jury

5   charge says you must find for HSBC and we suggested alternative

6   language for that page 25.  "If you find that Mr. Picarella did

7   not prove that he would not have suffered any of the material

8   adverse actions had he not complained then you must find -- I'm

9   sorry -- I'm sorry.  That's what's written.  It should say

10  that, "This means in order to find for Mr. Picarella you must

11  find that he proved that he would not have suffered any of the

12  material adverse actions had he not complained."  We wrote that

13  in the instruction.  We identified that as sort of a different

14  objection.

15          THE COURT:  What's the defendant's position on that

16  language?  Does that cure your issue as well?

17          MS. LEVIN:  Your Honor, I'm just reviewing the

18  proposed language.

19          THE COURT:  Okay.

20          MS. LEVIN:  I'm looking at it on the screen.  Thank

21  you.

22          One way of dealing with this, your Honor, and this is

23  just a suggestion.

24          THE COURT:  What if we did this, before you make your

25  suggestion, maybe it's the same suggestion.

GCD9PIC2

1          What if we change that and used as the first sentence

2     what the defendants have proposed and as the second sentence

3     what plaintiffs have proposed since you're addressing slightly

4     different issues.  But I guess that wasn't your suggestion.

5               MS. LEVIN:  It was not, your Honor.

6               THE COURT:  So what's your suggestion?

7               MS. LEVIN:  We do object to the language that

8     plaintiff proposed.  We think that it's perfectly acceptable to

9     suggest to the jury you must find in favor of HSBC if plaintiff

10    fails to satisfy his burden.

11         What I was going to suggest was just -- as a way of

12    removing the double negative in the sentence was to change it

13    to, "If you find that Mr. Picarella failed to prove that he

14    would not have suffered any of the material adverse actions had

15    he not complained." I think that clarifies it a little more

16    instead of having three nots in a row.

17              THE COURT:  Okay.

18              MR. BORTNICK:  I think the "failed to prove" is okay

19    but we still strongly maintain the objection about the language

20    regarding, "then you must find in favor of HSBC" as opposed to

21    what we proposed on this one, which -- well I don't know if I

22    need to repeat it again.  But we wrote, "This means in order to

23    find for Mr. Picarella you must find that he has proved," just

24    put it in the positive and not the negative.  So I guess the

25    word "failed" wouldn't even be part of it now, thinking about

1123

GCD9PIC2

1    it.

2           Our instruction really is the issue here, is the heart

3    of our issue.

4           THE COURT:  Okay.  Let me hear defendant's proposed

5    language again.

6           MS. LEVIN:  Defendant's propose language was, "If you

7    find that Mr. Picarella failed to prove that he would not have

8    suffered any of the material adverse actions had he not

9    complained about the sexual harassment then you must find in

10    favor of HSBC with regard to Mr. Picarella's Title VII claim."

11           THE COURT:  And what's plaintiff's language again?

12           MR. BORTNICK:  "This means in order to find for

13    Mr. Picarella you must find that he has proved that he would

14    not have suffered any of the material adverse actions if or had

15    he not complained about the sexual harassment or retaliation."

16           THE COURT:  So why don't we switch it around, use

17    plaintiff's statement first followed by defendant's statement.

18    Then they get both.  They get it all and it's clear.

19           MR. BORTNICK:  That would be fine as long as we did it

20    for all of the other places that we've pointed it out in the

21    jury instructions, yes.

22           THE COURT:  Hold on.  Let me just check.

23           So we'll make that change.  We'll use plaintiff's

24    language, then defendant's language in that section.

25           Were there other sections you wanted to do that as

GCD9PIC2

```
 1   well in?
 2              MR. BORTNICK:  Yes, your Honor.  It's in our letter.
 3   I think similar language is on page 24, I think.  That would be
 4   under the third element.
 5              THE COURT:  Okay.
 6              MR. BORTNICK:  And, again, it would occur under the
 7   second element as well also on page 24.
 8              THE COURT:  Okay.
 9              MR. BORTNICK:  I don't believe it occurs anywhere
10   else.  Just on those --
11              THE COURT:  Yes.  Defense counsel.
12              MS. LEVIN:  Defendant objects, your Honor.  We're
13   perfectly fine with the language that you proposed on the but
14   for causation issue under Title VII but what plaintiff appears
15   to be proposing is to remove any reference in the jury
16   instructions to the fact that if plaintiff fails to satisfy his
17   burden then the jury must find for HSBC.  And we think that
18   that language is appropriate and shouldn't be stricken from any
19   of the proposed instructions.
20              THE COURT:  I don't believe that's -- I think
21   plaintiff's counsel was suggesting that we double up in every
22   section that we use plaintiff's language saying that in order
23   to find for plaintiff he has to do this and then next say if he
24   fails to do this you must find for HSBC in each of those
25   sections.  So he's not talking about striking that language
```

GCD9PIC2

1    from any of those sections, I don't believe.

2              Am I correct?

3              MR. BORTNICK:  Well it was your Honor's suggestion

4    that we were going along with as compromise.  If we can't have

5    a compromise, then obviously we maintain our original objection

6    in that case.

7              THE COURT:  So it seems to me that it makes sense to

8    just double it up in all of those sections.

9              MS. LEVIN:  That's fine, your Honor.  I think that's

10   already done in a lot of the proposed instructions where it

11   lays out what plaintiff bears the burden of proving, then

12   there's a sentence saying that if, however, you find that

13   plaintiff failed to satisfy his burden then you must find in

14   favor of HSBC.  So I think that's already how many of the

15   instructions are structured.

16             THE COURT:  That's sort of what happened with this

17   instruction when we first went down this path as well.  It was

18   sort of there in substance as well but counsel objected to the

19   language.

20             MS. LEVIN:  We objected to the language because we

21   felt it was confusing with three nots in one sentence.

22             THE COURT:  That's fine.  We'll make that change.

23             Is there anything else?  I don't believe there are any

24   other objections.

25             From plaintiff?

GCD9PIC2

 1          MR. BORTNICK:  No.

 2          THE COURT:  Any other objections from defendants?

 3          MS. LEVIN:  Not on the Title VII instructions, your

 4   Honor, no.

 5          THE COURT:  Okay.  Any other objections from

 6   defendants?

 7          MS. LEVIN:  Your Honor, many of our objections to the

 8   city law claim I think have already been mentioned but I would

 9   just submit that they should be made within the section of the

10   instructions addressing the city law claims, specifically the

11   issue I raised before where the city law claim requires a

12   causal connection between the protected activity and the

13   adverse employment action.

14          Then we did have some objections to the damages

15   instructions when your Honor is ready to address those.

16          THE COURT:  The damage instruction it seems to me that

17   your objection is that -- well I don't want to put words in

18   your mouth.  Is your objection to the damages instruction that

19   somehow the jury is going to think that increases in salary is

20   tantamount to a bonus?

21          MS. LEVIN:  No, your Honor.  Our objection is that

22   plaintiff has stipulated that he's not entitled to damages

23   based on increases in salary or bonuses and, in fact, there's

24   case law that we've cited to your Honor from the Second Circuit

25   holding that seeking damages based on future pay raises or

GCD9PIC2

1    bonuses are both speculative.

2             THE COURT:  Okay.  What's plaintiff's position on

3    that?

4             MR. BORTNICK:  Pay raises we do have the issue of

5    whether the jury find -- could find -- they may not find but

6    they could find that he should have had the promotion which had

7    a higher compensation level.

8             As far as bonuses there was a pattern of getting

9    essentially the same bonus each and every year that he was

10   there up until the time he was gone.  So I guess -- I'm just

11   trying to understand what the -- what they're trying to do.  If

12   they're trying to limit him to any backpay must be $225,000 a

13   year, if that's where they're going here, I think that that's

14   wrong and it's certainly not in accord with the testimony, the

15   unchallenged testimony of this case.

16            THE COURT:  Well their objection is not based on the

17   testimony.  Their objection is based on a claim that you

18   stipulated to something earlier on in this case that you

19   weren't seeking any damages for bonuses or increases in salary

20   and also the reference to some case law regarding increases in

21   salary.  That's their objection.

22            MR. HUBBARD:  Your Honor, I signed that stipulation.

23   That's not what it says.  We should get it out.

24            But what I think she's referring to is that -- is

25   referring to future changes in the bonus of the salary from the

GCD9PIC2

1     time -- you know, going forward.  I think that's what she's

2     referring to.  But we should look at the stipulation because it

3     has the language in it.

4            But we certainly didn't waive any claim to his loss of

5     his underlying earning capacity which had a bonus component to

6     it.  So just so there is no confusion about that.

7            In other words, I'm going to argue to the jury that

8     his earning capacity is either the $280,000 which is his base

9     pay plus his -- the bonus he got every year or his loss of

10    earning capacity is what he would have been paid had he not

11    been passed over for the other position.  Just to be clear.

12           THE COURT:  Okay.  Anything else from plaintiffs on

13    this?

14           MR. BORTNICK:  No, your Honor.

15           THE COURT:  Okay.

16           Defendants.

17           MS. LEVIN:  Well, your Honor, I think the stipulation

18    is clear.  If you'd like a copy, I have one.  It was also

19    attached as an exhibit to our 50(a) motion which was filed on

20    ECF last evening after court.

21           THE COURT:  Do you have it with you now?  A hard copy?

22           MS. LEVIN:  I do.

23           THE COURT:  Let me look at it now then.

24           MS. LEVIN:  It was in the binder of stipulations that

25    your Honor was given earlier in the trial.  I don't know if

GCD9PIC2

1    your Honor still has that.

2              THE COURT:  I think I have that back in chambers.  Do

3    you have a hard copy of that?

4              MS. LEVIN:  Can Mr. Jackson approach?

5              THE COURT:  Yes.

6              Let me hear from plaintiff's counsel on that.

7              MR. BORTNICK:  This was intended, at least from the

8    plaintiff's perspective, to talk about anything above -- if

9    he's, as my colleague said, in his job he was getting roughly

10   280 a year base and bonus, each and every year.  This wasn't

11   intended to say that he can't claim that as damages in backpay

12   or even front-pay.  And, likewise, if he's in a different job,

13   whatever that job would have -- the compensation level would

14   have been in that other job such as had he received the job of

15   Ms. Jenner.

16             THE COURT:  Let me hear from defendants.

17             MS. LEVIN:  Respectfully I disagree with that

18   characterization of the stipulation.  I think it's clear that

19   plaintiff would not argue or put into evidence anything

20   relating to pay raises or bonuses that plaintiff allegedly

21   would have received while employed by defendant but for his

22   alleged protected activity because there was no evidence on

23   this issue presented at trial per the stipulation.  I don't

24   understand what the jury could base such a damage calculation

25   on other than pure speculation.  And I think that your Honor

GCD9PIC2

1    can rule as a matter of law that this issue should not be

2    presented to the jury because it would call for improper

3    speculation.

4        MR. HUBBARD:  Your Honor, this is designed to address

5    raises.  It was designed to address increases in his pay or his

6    bonus, not to prevent him from arguing with respect to what his

7    underlying earning capacity was.

8        And the reason for that is that this stipulation is

9    based upon some cases that were submitted with it.  And those

10   cases reflect just that.  They don't say that you can't base

11   your claim of lost earnings on what you, in fact, were being

12   paid while you were there.

13       THE COURT:  Okay.  The language says, "Plaintiff and

14   his attorneys shall not in any way refer to, argue, interrogate

15   any witness concerning, submit evidence regarding, comment

16   upon, or otherwise mention in the trial, whether during voir

17   dire, opening statements, trial, or closing arguments, that any

18   award of damages should include damages based on a pay raise or

19   bonus, bonuses that plaintiff allegedly would have received

20   while employed by defendant but for his alleged protected

21   activity."

22       How does that stipulation allow you to argue about

23   bonuses?  If your point is that you feel that you can still

24   talk about his base salary, not including the bonuses, as part

25   of his damages calculation, that seems that that's fair with

GCD9PIC2

1    this stipulation.  But when you say that his base salary is

2    $280,000 and you're including the bonus in that base salary, if

3    that's what you're doing, it sounds like that's what you're

4    doing, that seems to me to be incorrect?

5            MR. HUBBARD:  No, your Honor.  That is designed to say

6    that you can't argue that you would have received higher

7    bonuses while employed had you not been -- I haven't argued

8    that had he not been retaliated against that his bonuses in

9    those years would have been higher than what it was.  But

10   clearly in terms of what he's lost, it includes what his -- in

11   terms of backpay, he would lose what his -- what his base

12   salary and bonus was and in the future his earning capacity,

13   even at HSBC, was his base pay plus his bonus.  The purpose of

14   this, based on the cases he submitted, was not to argue that in

15   the future his bonuses would have gone up or in the future he

16   would have gotten instead of a fifty thousand dollar bonus a

17   two hundred thousand dollar bonus.  But his earning capacity is

18   reflected by what he was paid.

19           THE COURT:  Why aren't the bonuses speculative?

20           MR. HUBBARD:  Sir?

21           THE COURT:  Why aren't the bonuses speculative?

22           The bonus isn't something that's set in stone.  You

23   have all sorts of testimony about what he expected his bonus to

24   be and he testified about how bonuses changed based on things

25   that are going on in the economy and things that are going on

GCD9PIC2

1     at HSBC and I'm not sure what other purpose there is for you

2     entering into this stipulation.

3              I mean, again, you're asking me to read basically

4     outside of the document, right?  This stipulation is a

5     contract.  Looking at the words of this stipulation --

6              MR. HUBBARD:  Your Honor, I signed it because based

7     upon the case law the case law does not say what counsel says

8     it says.  It does not say that he's prohibited from relying

9     upon his earning capacity at the firm.

10             THE COURT:  Then why not put that in the stipulation

11    or why sign the stipulation then?

12             MR. HUBBARD:  Because I believed when I worked on that

13    with Ms. Fiebig in the back we talked about it extensively and

14    I thought it was clear what we understood it to be.

15             THE COURT:  So then why would you include the word

16    "bonuses" then.  You keep talking about this desire to talk

17    about his bonuses and you're trying to lump bonuses in to

18    somehow that being his base salary when all the testimony has

19    been that the bonuses change from year to year.  Why include

20    that in the stipulation?

21             MR. HUBBARD:  Your Honor, there was never any

22    suggestion anywhere that his bonus was part of his base salary,

23    never.  It was not.  His bonus was not part.  He received

24    basically the same bonus, $55,000, every year.  It was not part

25    of his base salary.  His base salary was 225.  That was what

GCD9PIC2

1    the testimony was.  And that was clearly his earning capacity

2    while he was employed at the firm.  And the purpose of that was

3    to -- based on the case law that was submitted with it, was

4    to -- we agreed that we would not argue that had he been there

5    that he would have received increased salary or increased bonus

6    compensation because it would have been discretionary.  But

7    certainly the evidence suggests that that was a pattern of

8    paying him at least fifty or fifty-five thousand dollars that

9    was his bonus earning capacity at the firm.

10           The case law suggests that you can't jump into -- you

11   can't say that he should have been paid two hundred thousand or

12   three hundred thousand because clearly that's discretionary.

13   But the $55,000 is part of his earning capacity while he was at

14   the firm.  That was not the purpose of that stipulation.

15           THE COURT:  Hold on a second.

16           What about this?  Hold on a second.

17           So what about in this section, looking at say the

18   backpay damage section on page 40, if we get rid of part of

19   that, if we start off with "You may award as actual damages an

20   amount that reasonably compensate Mr. Picarella for any lost

21   wages and benefits," and we take out the "taking into

22   consideration any increases in salary and benefits" and simply

23   have, "You may award as actual damages an amount that

24   reasonably compensates Mr. Picarella for any lost wages and

25   benefits" or perhaps just saying "taking into consideration any

GCD9PIC2

1    wages and benefits that Mr. Picarella would have received had

2    he not been discriminated against."

3               MR. HUBBARD:  Yes, your Honor.

4               THE COURT:  And then if the jury awards damages we can

5    send them special interrogatories, if necessary, and have them

6    breakdown what these damages are and what these damages have

7    consisted of and find out what the jury is doing, if necessary.

8    And then we can make a determination whether or not the jury

9    has, in fact, given an award of damages for bonuses and the

10   like.  Maybe it will be obvious from the jury's verdict, but

11   how is that for a suggestion from counsel?

12              MR. HUBBARD:  Well, your Honor, I think if you take

13   out the qualifying language it certainly does eliminate the

14   possibility that the jury might add on but we haven't offered

15   any evidence of any add-on in the backpay period.  So I think

16   it would be appropriate to make that modification that you just

17   posed.

18              THE COURT:  Defendants.

19              MS. LEVIN:  The Court's proposal is acceptable to

20   defendants, your Honor.

21              THE COURT:  So we'll make that modification.  We'll

22   take that clause out and we'll see what happens when the jury

23   comes back with their verdict.

24              I believe that takes care of all of the defendant's

25   objections.

GCD9PIC2

1          Is that correct?  Are there other objections from the

2    defendants?

3          MS. LEVIN:  Your Honor, we had noted a few objections

4    on page six of our letter.  We'll defer to the Court's wisdom

5    on those.  I don't think we need to argue about them today.

6          THE COURT:  There's one that I punted on before.

7    Let's get back to that.  Let me hear counsel again on that

8    issue.

9          MR. BORTNICK:  Which one?

10         THE COURT:  I'm trying to remember.

11         MR. BORTNICK:  That may have been -- maybe I'm

12   mistaken, that was the issue of -- well --

13         THE COURT:  I think it was the issue under the New

14   York City law claims in terms of the language, in terms of, for

15   the fourth element, in terms of motivating factor or played any

16   role or things of that nature.

17         Counsel wish to be heard any further on that?  I'll go

18   think about this and make a decision on that.

19         MR. BORTNICK:  I thought we covered that and I gave

20   your Honor what I believed we proposed.

21         THE COURT:  Defendants want to be heard any further on

22   that?

23         MS. LEVIN:  We respectfully suggest that the Court

24   review the cases that we've cited.  Other than that we have

25   nothing further.

GCD9PIC2

| | |
|---|---|
| 1 | THE COURT:  So here's what I suggest we do at this |
| 2 | point.  The jury, I believe, is all here.  Is that right, Tara? |
| 3 | THE DEPUTY CLERK:  Yes. |
| 4 | THE COURT:  The jurors are all here.  What I suggest |
| 5 | we do at this point is continue on with the testimony of this |
| 6 | witness.  Does plaintiff's counsel have a sense of how long |
| 7 | your cross-examination of this witness is going to be. |
| 8 | MR. HUBBARD:  Very short, your Honor.  Ten minutes, |
| 9 | maybe. |
| 10 | THE COURT:  And then defense counsel, do you have a |
| 11 | sense of if there's going to be any redirect at this point?  I |
| 12 | guess you don't.  I guess you can't. |
| 13 | MR. JACKSON:  I'm not anticipating significant |
| 14 | redirect, your Honor. |
| 15 | THE COURT:  After that, after this witness, I don't |
| 16 | believe the defendants have any other witnesses; is that |
| 17 | correct or is that incorrect?  Does the defendant have any |
| 18 | other witnesses after this witness? |
| 19 | MR. JACKSON:  This is our final witness, your Honor. |
| 20 | THE COURT:  And then the defendants will rest. |
| 21 | MR. JACKSON:  Apart from one issue, your Honor, which |
| 22 | is the stipulation that the Court -- that we discussed |
| 23 | yesterday which we sent to defense counsel last night, which |
| 24 | basically just said the parties -- I'll read what we proposed |
| 25 | which we thought was consistent with what Mr. Hubbard said he |

would agree to at the conference.  It just says, "The parties

to the above-captioned action hereby stipulate and agree that

Mr. Picarella retained legal counsel in connection with this

matter in December of 2012."

THE COURT:  Okay.  That's stipulated to?

MR. JACKSON:  No.  Mr. Hubbard has informed us that on

reflection he doesn't -- he's not willing to sign the

stipulation.

MR. HUBBARD:  That's not what I said.  I said I

understood your Honor yesterday when we argued it to agree with

us that that was an inappropriate stipulation, that was not an

issue -- when counsel was retained was not an issue in the case

and it would unduly highlight it and potentially put it in

evidence in a way that it could be commented on.  That was my

recollection of the conversation yesterday.  If your Honor got

the impression that I agreed to the stipulation I will abide by

that.

THE COURT:  My impression was that you were seriously

considering the stipulation.  That was the conversation prior

to you opening the door by asking Mr. Picarella those -- asking

those questions.  And then once that came in, that's when I

felt that the stipulation was necessary to avoid any

misimpression with the jury that Mr. Picarella hired counsel

immediately when he filed the EEOC complaint.  I had previously

indicated that it wasn't relevant.  But that door has been

GCD9PIC2

 1     opened so I think that that stipulation is necessary just to

 2     avoid that confusion.

 3            MR. HUBBARD:  May I look at the language then again of

 4     the stipulation?

 5            THE COURT:  Yes.

 6            MR. HUBBARD:  Thank you.

 7            Your Honor, just so I'm getting back in my mind but

 8     your Honor indicated that you would not permit that to be

 9     argued to the jury in terms of how it impacted his complaints

10     and the appearance of counsel.

11            THE COURT:  That is correct.  That is a stipulation

12     that will be received in evidence to sort of clear up any

13     misunderstanding.  Defense counsel will not be allowed to argue

14     about the fact that counsel was retained had an impact on

15     Mr. Picarella's complaints, internal complaints regarding the

16     sexual harassment.

17            MR. HUBBARD:  Thank you, your Honor.  Thank you.

18            MR. JACKSON:  Thank you, Judge.

19            THE COURT:  So what I suggest we do at this point is

20     we're going to need to -- my staff will work on making these

21     corrections to the jury instructions and the verdict form.

22     What I suggest we do is -- here are the possibilities.  We

23     bring the jury in.  We need to bring them in any way, let them

24     know what's happening.  Bring the jury in.  We can finish with

25     this witness.  Defense counsel can rest on the record.  And I

GCD9PIC2

1    assume defense counsel or maybe plaintiff's counsel will be

2    making a motion at that point.

3             MR. JACKSON:  Yes, your Honor.  I mean we -- I would

4    just say -- I was going to say before the conclusion of this,

5    it's our understanding that under the 2006 amendment to the

6    rules there is no longer a necessity for us to renew our 50

7    motion at the close of all evidence.  But if plaintiff's

8    counsel would agree that that's deemed renewed to whatever

9    extent there would be an argument of waiver, we won't need to

10   break with the jury if we have agreement on that.

11            MR. HUBBARD:  Yes.

12            THE COURT:  So.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

GCDTPIC4

1          THE COURT:  So defense counsel will rest, and is there

2     rebuttal case from the plaintiff?

3          MR. HUBBARD:  Yes.

4          THE COURT:  What will that consist of?

5          MR. HUBBARD:  Mr. Picarella's testimony.

6          THE COURT:  And give me an offer of proof about that.

7          MR. BORTNICK:  Again, your Honor, there was the -- one

8     of the things in this case is that even though we may have

9     called -- plaintiff may have called certain witnesses, they

10    were also witnesses on defendant's direct case.  And so, for

11    example, Mr. Karam testified to a number of items that were

12    actually directly contradicted by documentary evidence, such as

13    GMB submissions, for example, where Mr. Picarella's apparently

14    not doing his job and there's actually documentary evidence

15    showing that Mr. Karam was incorrect.  That occurs on a certain

16    number of things.  For example, he said Mr. Picarella had

17    responsibility for surveys when in fact there is documentary

18    evidence that Mr. Picarella did not get that job until after

19    the deadline which Mr. Picarella was supposed to have missed

20    and there is clear evidence on.

21          There are items like that, I think anywhere between 20

22    and 40 minutes or 20 and 30 minutes; not a lot, but I think

23    it's important.

24          THE COURT:  So let's do this, let's bring the jury

25    in --

GCDTPIC4

1          MR. HUBBARD:  Judge, I'm sorry, I want to clear up one

2     last thing so we don't interrupt you any more.  I had these

3     mitigation books, the books with his job search.  What I would

4     like to do is to simply move the admission of those

5     compilations.  I don't know if we would be able to use them or

6     not, but I would like to have them in evidence.

7          THE COURT:  My recollection is before you were

8     speaking to defense counsel about perhaps culling that down

9     some.  Is that happening?  I think there were like well over a

10    thousand documents.

11         MR. BORTNICK:  Big notebooks that show -- two big

12    notebooks.  The other thing I could do would be on direct to

13    show them to him and have him say what's in those books and

14    have that as part of the testimony and not necessarily put the

15    books themselves in evidence, but I really do think -- there is

16    the mitigation instruction, there's a mitigation defense, so I

17    think that we should be allowed to use it.

18         MR. JACKSON:  Your Honor, I don't know if this is the

19    appropriate time to make this objection, but we don't think any

20    rebuttal case is appropriate.

21         The subject matter that Mr. Bortnick is talking about

22    could have been the subject of the cross-examination of

23    Mr. Karam, and it was not.  Moreover, the plaintiffs chose to

24    call these witnesses in their case.  There are no subject

25    matters that were the subject of testimony that were not either

GCDTPIC4

1    explored in depositions or other aspects of the case.  So the

2    claim of any unfair surprise just doesn't exist in this case.

3           And for them to recall Mr. Picarella, who is a witness

4    who testified extensively in this case, and they were given an

5    extensive opportunity to redirect him, I submit, your Honor,

6    would be highly irregular and would require us to again have an

7    opportunity to cross him regarding any of those issues and

8    regarding any potential bias associated with it.  It's

9    unnecessary in the case and it's not appropriate in this

10   situation where we have a very short, truncated defense case.

11          THE COURT:  I will allow the brief rebuttal.

12          What's the defendant's position on the binders for

13   mitigation?

14          MR. JACKSON:  The defendant's position on this is this

15   is something that was raised on I believe the first day, if not

16   the first day, the second day of trial, and we haven't heard

17   word one about it.  There hasn't been any attempt to bring it

18   down, and it wasn't offered in the plaintiff's case.  They

19   could have raised it with us at any point.  They rested, it

20   wasn't introduced, we didn't introduce evidence during the

21   course of our case on mitigation, so it's not a part of any

22   appropriate rebuttal case.

23          THE COURT:  Okay.  I will allow them to introduce the

24   documents.  It was something that plaintiff's counsel wanted to

25   introduce early on in the case.  The reason it wasn't

GCDTPIC4

introduced is because defense counsel objected there were too

many documents and you needed a lot of time to go through all

the documents.  So whether or not plaintiff's counsel contacted

the defense or not, you certainly had an opportunity to go

through all of those documents.  So I will allow them to put

them in.  I don't think it's something that would be fair for

me to have deemed waiving them putting this in because

plaintiff's counsel did attempt to introduce this and it wasn't

introduced on the direct case because the defense objected to

the volume of the documents.

             MR. JACKSON:  Your Honor, we respectfully disagree,

because it wasn't the volume, per se, of the documents that was

our issue, is was the fact that this wasn't a document.  It

wasn't a voluminous document.  If they had sought to introduce

a 2,000-page voluminous document, that would be fine.

             What this is is a collection of numerous different

types of documents, and it's impossible for us to even -- we

have numerous different types of objections ranging throughout

the federal rules of evidence.  It is impossible for us -- they

couldn't take their entire case and make that PX-1 and offer it

in evidence and then we're forced to parse out each part.

             And I thought that, after our discussion, the

responsibility was on the plaintiffs to come back and at least

break this up into some reasonable portions that we could offer

appropriate objections on and discuss the evidentiary basis for

the admission of this of the different parts of it.

          THE COURT:  I would just observe -- I don't know if you actually expect the jury to go through all of these binders and all of that other stuff, but if you want to admit that into evidence, I will let you admit that in evidence.  It seems that's fine if that's what you wish to do with Mr. Picarella on your rebuttal case.

          So let's do that.  We'll bring the jury in and let's get going on the testimony.  It seems we won't finish this testimony before lunch, probably; maybe we will, but let's go ahead and get to it with the witness who is still on the stand.

          The defendants will rest, the plaintiffs will have a brief rebuttal case.  I believe it's appropriate for me to let the jury know -- first apologize to the jury for the delay because they have been here for a while, and then I will also let the jury know that juror number one is no longer with us, and they shouldn't speculate as to why that is the case, and move forward.

          Is there anything that counsel want to raise about anything regarding that issue about juror number one?

          MR. HUBBARD:  Not for the plaintiff.

          MR. JACKSON:  No, thank you, your Honor.

          THE COURT:  Okay.  Let's bring the jury in.

          (Continued on next page)

GCDTPIC4                        White Carr – cross

```
 1            (Jury present)

 2            THE COURT:  Welcome back.  I hope you had a pleasant

 3   evening.  I'm sorry about the delay, I was discussing some

 4   scheduling matters with counsel.

 5            As you see, juror number one is no longer with us.

 6   You should not speculate on the reasons for that.

 7            We will continue with the case on trial with

 8   plaintiff's counsel's cross-examination of the witness.

 9            Go ahead, counsel.

10            MR. HUBBARD:  Thank you, your Honor.

11    SUZANNE WHITE CARR,

12       having been previously sworn, testified as follows:

13   CROSS-EXAMINATION

14   BY MR. HUBBARD:

15   Q.  Ms. White, good morning.

16   A.  Hi.

17   Q.  Did you tell us yesterday what your present position is at

18   HSBC?

19   A.  Yes, I did.

20   Q.  What is it?

21   A.  Chief operating officer for global markets business.

22   Q.  Have you been reassigned to a different job?

23   A.  Not as of today.  I did get promotion recently effective

24   2nd of January, yes.

25   Q.  What position is that?
```

GCDTPIC4                         White Carr - cross

1   A.  Chief risk officer for the markets business, banking

2   business, and the CMB business, our commercial banking

3   business.

4   Q.  That's outside of the investment bank?

5   A.  No, it covers that, too, so keeps the coverage I have and

6   extends it into our businesses.

7   Q.  Do you recall on the day before the decision was made to

8   select Ms. Jenner to succeed Ms. Hedges that you and some of

9   your colleagues met to discuss who would be chosen to follow

10  Ms. Hedges?

11  A.  There were a number of discussions.  I don't recall one

12  specifically, but there were discussions about who would be

13  chosen, yes.

14  Q.  And there was one meeting that you attended with

15  Mr. Pizzimbono, right?

16  A.  Yes.

17  Q.  And you had Ms. Weiss in that meeting, did you not?

18  A.  I don't remember if Ms. Weiss was there or not.  She was

19  our HR rep, so she may well have been, but I don't recall.

20  Q.  But there were some meetings about what decision should be

21  made?

22  A.  Yes.

23  Q.  And the decision was made to select Ms. Jenner to succeed?

24  A.  Yes, that's correct.

25          MR. HUBBARD:  May we see 132, please.

GCDTPIC4                        White Carr - cross

1   Q.  I want to ask you about a couple of documents, please.

2   A.  Sure.

3   Q.  Looks like a note that you wrote on the 11th of September,

4   and it looks like it's to Ms. Weiss, and you are reporting a

5   conversation with Mr. Picarella looks like a couple months

6   earlier, fair enough?

7   A.  Yes.

8   Q.  And you say:  Mike reached out to me to catch up.  As you

9   know, I was aware of the situation between him and Eileen and

10  was happy to meet with him.

11          Then in the middle of the document:  My advice to him

12  was that he should not feel pressured, and I told him that it

13  was really not a big deal in any case, it happened a long time

14  ago, talking about some email.  I tried to make him feel

15  comfortable.  And you go on to say that I asked Mike if he

16  wanted to talk about the issues, and I asked Mike what he

17  wanted to talk to me about, and I told him I was aware of the

18  issues that he raised in the investigation.

19          So twice here you indicate in your note that you were

20  aware of the complaints that Mr. Picarella had made.

21  A.  I was aware that he made some complaints about Ms. Hedges,

22  yes.

23  Q.  You were aware?

24  A.  That Mr. Picarella had made complaints about Ms. Hedges'

25  treating him poorly.

GCDTPIC4                    White Carr - redirect

1  Q.  So were you aware at the time that Mr. Picarella had made

2  complaints about the way Ms. Hedges had treated Ms. Parker?

3  A.  No.

4  Q.  You were not?

5  A.  I was not, no.

6  Q.  When did you learn what the allegations were with respect

7  to Key Largo?

8  A.  Excuse me?

9  Q.  When did you learn what the allegations were with respect

10  to Key Largo?

11           MR. JACKSON:  Objection, vague.

12           THE COURT:  Overruled, you may answer.

13  A.  There was some -- let me think.  I'm not sure who made what

14  allegation about exactly what in Key Largo, to be honest.  I

15  never saw anything specific.  So I heard that there was some

16  incidents down there but I'm not sure if they were part of the

17  complaints or not or exactly what form they took.

18  Q.  Ms. Bilbrey told you, did she not, about the complaints

19  that Mr. Picarella had made about sexual harassment of

20  Ms. Parker at that meeting, correct?

21  A.  No, she didn't tell me anything about that.

22           MR. HUBBARD:  Nothing further from this witness.

23           THE COURT:  Okay.  Any redirect?

24           MR. JACKSON:  Just very quickly, Judge.

25           (Continued on next page)

GCDTPIC4

 1   REDIRECT EXAMINATION

 2   BY MR. JACKSON:

 3   Q.   Ms. White, we were looking at PX-132?

 4   A.   Yes.

 5   Q.   And you wrote that in September of 2012?

 6   A.   Yes.

 7   Q.   What were you doing in between July and September of 2012?

 8   A.   I got married, and so I was out of the office for a few

 9   weeks, just over three weeks.

10   Q.   And you were out during some of that time period between

11   the end of July when you had the meeting and when you wrote

12   that note?

13   A.   Yeah, I had a visa issue that I had to deal with before I

14   got married, and then I got married on the 4th of August and

15   went on honeymoon after that.

16          MR. JACKSON:   Ms. White, thank you very much for your

17   testimony.

18          No further questions, your Honor.

19          THE COURT:   Okay, the witness is excused.

20          Defense counsel, do you have another witness?

21          MR. JACKSON:   Your Honor, at this time we would like

22   to offer a stipulation in evidence.

23          THE COURT:   Okay.  What number is that going to be?

24          MR. JACKSON:   Your Honor, this is DX-301.  It simply

25   reads:  The parties to the above-captioned action hereby

1   stipulate and agree that Mr. Picarella obtained legal counsel

2   in connection with this matter in December 2012.

3           It is dated December 12, 2016, and signed by the

4   parties.

5           THE COURT:  Okay.  Are there any other witnesses?

6           MR. JACKSON:  Your Honor, at this time HSBC rests.

7           THE COURT:  Okay.  Is there any rebuttal case by the

8   plaintiff?

9           MR. BORTNICK:  There is, your Honor.

10          THE COURT:  Plaintiffs, you may call your witness.

11          MR. BORTNICK:  Call Mr. Picarella.

12          Your Honor, at this time we move introduction of

13  Plaintiff's Exhibits 301 and 302, which are these binders.

14          THE COURT:  Okay.  Those are in.

15          (Plaintiffs' Exhibits 301 and 302 received in

16  evidence)

17          MR. BORTNICK:  If I could hand this to the witness,

18  your Honor.

19          THE COURT:  Okay.

20   MICHAEL PICARELLA,

21      having been previously sworn, testified as follows:

22  DIRECT EXAMINATION

23  BY MR. BORTNICK:

24  Q.  Mr. Picarella, I'm showing you what has been admitted into

25  evidence as Plaintiff's Exhibits 300 and 301, those two

1    binders.  What are they?

2    A.  That's a compilation of documents that support my search

3    for employment since being terminated by HSBC.

4    Q.  During some of the testimony from the defendant's witnesses

5    do you recall there was some discussion by them of what were

6    called GMB submissions?

7    A.  Yes.

8    Q.  And do you recall the testimony that you had stopped

9    preparing those GMB submissions sometimes in March or

10   April 2014, 2014 time frame, because you wrongly thought they

11   were no longer needed to be done by London.  Do you recall that

12   testimony?

13   A.  Yes.

14   Q.  Could we have Plaintiff's Exhibit 240, please.

15          MR. BORTNICK:  And if you would highlight the top.

16   Q.  What is this again, Mr. Picarella?

17   A.  This is a response that I had put together in regards to

18   the mid-year review that was provided to me by Mr. Karam on

19   November 21.

20   Q.  This was that off-track review, as it has been referred to

21   here?

22   A.  Yes.

23   Q.  And the date -- Wednesday, November 26, how did that relate

24   to Thanksgiving of that year?

25   A.  That was the day before Thanksgiving and my last day of

1   employment in the building at HSBC.

2            MR. BORTNICK:  Could we skip in that to page 5, the

3   text at the top.

4   Q.  Now in this -- by the way, you did send this to somebody at

5   HSBC?

6   A.  I sent it to Mary Bilbrey and copied Mike Karam.

7   Q.  Now you write here, with respect to the GMB at the top,

8   one, Mike Karam -- who was Mr. Karam at the time?

9   A.  My boss.

10  Q.  Your direct boss?

11  A.  Yes.

12  Q.  Mike Karam did not provide real examples regarding the

13  monthly GMB submission, but when I questioned him in the review

14  Mike stated that you dropped the ball by not sending the

15  commentary for a few months during the first six months of the

16  year.  This was a false statement.

17           The facts are that I submitted the monthly GMB for

18  January and February 2014, and London had requested that we

19  stop providing the monthly GMB submission starting in March

20  because the format and frequency of the commentaries were being

21  restructured.  I had communicated this to Karam promptly.

22  Karam was not even aware of the monthly GMB commentary, even

23  though he assigned the task to me at the end of 2013 and I

24  copied him on the monthly submission to London (Andrew

25  Mottram).  Did you write that?

1    A.  I did.

2    Q.  Was it accurate when you wrote it?

3    A.  It was accurate.

4    Q.  Did you support your writing there with anything?

5    A.  Yes, I had took screen shots and copied and pasted them

6    into this document, and they were screen shots of emails

7    between myself and London and myself and Mr. Karam.

8    Q.  Let's look at the first screen shot right underneath the

9    text.

10            Now what is the date on this?

11   A.  It's off to the right there.  Assuming it's in March.

12            April 23rd.

13   Q.  Okay.  And now if we could go back to the text where it

14   says hi Mike -- dealing with two Mikes, you and Mr. Karam.

15   A.  Correct.

16   Q.  So this is you, Mike Picarella, writing your boss,

17   Mr. Karam, right?

18   A.  That's right.

19   Q.  And you write:  Hi, Mike, yes, London recently changed the

20   monthly process and it is no longer required for me to collect

21   the U.S. comments.

22            And you notified him in April, right?

23   A.  Correct.

24   Q.  And then if we can look at the next screen shot, let's look

25   at the date, what is the date?

GCDTPIC4                         Picarella - direct

1    A.   April 23rd, I believe the same date.

2    Q.   Okay.  And that one, who writes this document?

3    A.   Well, there's two, the lower --

4    Q.   The bottom.

5    A.   The bottom half.

6    Q.   The lower half of that second document, the from and to.

7    A.   Right, Mr. Mottram worked out of our London office.  He was

8    the central repositor for these regional commentaries.

9    Q.   And he writes:  Hi, Mike, the process has changed for the

10   coalition of commentary with the GMB commentary being replaced

11   by the business performance commentary, BPC, request.

12        Was that the change that you were referring to?

13   A.   Yes, and he went on to describe it in more detail.

14   Q.   Did you have anything to do with the BPC requests?

15   A.   No, it was being redirected to the chief financial officer

16   for each product, and they were going to go a different route

17   of collecting the commentary each month going forward.

18   Q.   Was that task ever assigned to you?

19   A.   No.

20   Q.   The BPC?

21   A.   No.

22   Q.   And now if we go to the next screen shot on page 6, if you

23   can look, there's two emails there.  Let's look at the bottom

24   one first from Michael Karam, it's the top box, the second.

25        Can you read the date there on the right?

1    A.  Yeah, February 6.

2    Q.  And this email is from your boss, Mr. Karam, to you, right?

3    A.  Correct.

4    Q.  And he writes to you:  Mike -- as in Mr. Picarella -- I'm

5    not familiar with this submission.  Any idea to who this is

6    for?  Please CC me on the submission.  Thanks.

7            Do you see that?

8    A.  Yes, and the subject matter was the GMB submission.

9    Q.  That was my question.

10           So he's referring to the GMB submission, and then you

11   responded in the top half of that to him:  Hi, Mike -- as in

12   Mr. Karam -- the GMB submission is a monthly commentary

13   provided by each region.  It is one the tasks you assigned me

14   at the end of last September 2013.  I will copy you on the

15   email response today.  I believe you are copied on the email

16   requests that I sent each month.

17           Do you see that?

18   A.  Yes.

19   Q.  Now let's go to the bottom on the page, and let's look at

20   the date first on the right, if we can pull that up.

21           What's the date of that?

22   A.  March 7.

23   Q.  Now let's go to the -- that's fine.  Thank you.

24           And what is this email?

25   A.  This is the complete February 2014 GMB submission.

GCDTPIC4                          Picarella - direct

1    Q.  Is that the last one you did?

2    A.  I believe so.  February or March was the very last one.

3    Q.  And who did you CC on that?

4    A.  Mr. Karam, my boss.

5    Q.  Let's go to the next page, please.

6             The top email there, what's the date of that one?

7    A.  February 7, 2014.

8             MR. BORTNICK:  If we highlight the top part, the

9    subject of the email and the people it's addressed to.

10   Q.  And what is the subject of this email?

11   A.  This is the January GMB monthly submission.

12   Q.  Did you prepare that?

13   A.  I did.

14   Q.  And did you send it to London?

15   A.  I did.

16   Q.  In accordance with your prior practice?

17   A.  Yes.

18   Q.  And who did you CC?

19   A.  Mr. Karam, my boss.

20   Q.  There was also some testimony during defendant's case that

21   said you were late in making certain Greenwich survey

22   submissions.  Do you recall that?

23   A.  Yes, I do.

24   Q.  And just so we're all back on the same page, what was

25   Greenwich survey project?

1    A.   Each year -- Greenwich Associates is an industry survey,

2    and we work with them.  They're an external third party.  And

3    we work with them throughout the course of the year to collect

4    information which clients they should go out to interview them

5    based on our performance, our HSBC performance, so firm

6    performance, and we get anonymous feedback from Greenwich

7    periodically on what our clients think we're doing well and

8    what they think we need to improve on.

9    Q.   And what did HSBC need to do in order to be part of the

10   survey?

11   A.   Well, we needed to submit our client survey list to them by

12   product so they would have a database of clients and contacts

13   that they would reach out to with questionnaires and collect

14   the information collate it and give us back themes and basic

15   feedback.

16   Q.   Now the testimony that we heard earlier had to do with your

17   being late in submitting this information to the Greenwich

18   survey in late or fall of -- fall or early winter of 2014, is

19   that correct?

20   A.   Right, it was a missed deadline I was accused of.

21   Q.   Did you actually, at the time of the deadline, even have

22   this task assigned to you?

23   A.   No, I did not.

24   Q.   Had you had it before that time ever?

25   A.   Yes, in 2011 and '12 it was my responsibility, but in 2013

1    it was not.

2    Q.  Was it taken away from you in 2013?

3    A.  Yes.

4    Q.  If we could go the same Exhibit, 240, page 8 of 20 at the

5    top, and if you could highlight the top text.

6            And this is, again, part of your response to the

7    off-track review?

8    A.  Yes, there were three items that Mr. Karam had documented.

9    Q.  GMB was one we talked about that?

10   A.  GMB, this one, and the give up accounts.

11   Q.  And you wrote here at the top:  Mr. Karam did not provide

12   real examples regarding the Greenwich survey, but when I

13   questioned him he stated that he received complaints about me

14   from Greenwich that the corporate account lists were late.

15   This is a false statement.  I had then explained the facts to

16   Mike Karam that the corporate account lists are due in November

17   each year, and that the Greenwich work was not assigned to me

18   in November 2013 but instead was assigned to David Garcia at

19   that time.  I also explained the facts to Mike Karam that the

20   Greenwich work was first assigned to me in December 2013 during

21   my sudden and without notice 2013 mid-year review held in

22   December 2013.  I also pointed out the facts to Mike Karam that

23   the first meeting held to discuss my involvement with the

24   Greenwich survey was following the 2013 mid-year review in

25   December 2013 with Pablo Pizzimbono, Mike Karam, and myself.

GCDTPIC4                    Picarella - direct

```
 1                Was that accurate?
 2   A.  Yes.
 3   Q.  Let's look at the first -- did you again, as you did with
 4   the GMB, attach some emails or screen shots supporting what you
 5   said?
 6   A.  Yes, I did.
 7   Q.  Are those following that text?
 8   A.  Yes.
 9   Q.  Let's look at the first one underneath, and the date is --
10   what is the date?
11   A.  December 10, 2013.
12   Q.  And look at the text of the email.
13                It is from whom?
14   A.  Mr. Karam to myself.
15   Q.  And he writes, if you look in the second line of this, I
16   would also like to review progress over the business
17   management's support objectives and Greenwich.
18                Do you see that?
19   A.  Yes.
20   Q.  What does the Greenwich refer to there?
21   A.  The Greenwich Associates survey.
22   Q.  So as of this date, did you have -- as of the date
23   December 10, did you have responsibility for that?
24   A.  No, not at that time.
25   Q.  If we could go to the next page, page 9.  And if you look
```

GCDTPIC4                       Picarella - direct

1    at the top email --

2              MR. BORTNICK:  All we need to do is highlight the top

3    part there, the subject.

4    Q.  What was the subject of this email, or what is the -- what

5    is this document?

6    A.  That's a calendar invite between Mr. Karam, myself, and

7    Mr. Pizzimbono regarding the Greenwich survey and engagement

8    strategy moving forward.

9    Q.  Did you send this or did someone send it to you?

10   A.  I believe that was sent by Mr. Karam.

11   Q.  And when did he send it, what date?

12   A.  December 11, 2013.

13   Q.  So was it on or after that date where you assumed the role

14   again of doing the Greenwich survey?

15   A.  Yeah, we had that meeting and there were a few agenda

16   items, from that point going forward I assumed the

17   responsibility.

18   Q.  If we could go to the next page 10, and I want you to look

19   at the bottom email there, the bottom.  Could we get a date on

20   that?

21   A.  Yeah, looks to be December 2nd, 2013.

22   Q.  And who was this from?

23   A.  It is from Zach Lungo, senior manager at Greenwich

24   Associates.

25   Q.  Who is it addressed to?

1   A.  Carol Jenner and Michael Karam.

2   Q.  If you look at the second paragraph, can you read that out

3   loud?

4   A.  It's not so clear, but I will try.  As a reminder, we have

5   normally moved -- think that's normally -- moved past the

6   corporate --

7   Q.  Shall I read it?  As a reminder, we have formally moved

8   past the deadline for input November 25.

9           Do you see that?

10  A.  Yes, I do.

11  Q.  So what was the deadline for the submission that you were

12  supposed to have made?

13  A.  November 25th.

14  Q.  On November 25th whose responsibility was this?

15  A.  Carol Jenner.

16  Q.  If we can turn to the next page, page 11.

17          MR. BORTNICK:  Now highlight the top text portion,

18  please.

19  Q.  You recall there was some testimony about the give up

20  accounts?

21  A.  Yes.

22  Q.  And did you also respond in this document --

23  A.  I did.

24  Q.  -- to what really occurred there?

25  A.  Yes.

1   Q.  And does the text there accurately describe what occurred?

2   A.  Yes.

3   Q.  Is the testimony that you heard in the courtroom accurate

4   about the give up accounts?

5   A.  By Mr. Karam, no.

6        MR. BORTNICK:  You can take that down.

7   Q.  There was some testimony from Mr. Karam, and there was an

8   exhibit in which Mr. Karam wanted you to take the lead at a

9   particular meeting.  Do you recall that?

10  A.  Yes, I do.

11  Q.  And you had written in the email in that exhibit that you

12  had assumed that you were at the meeting to provide something

13  along the lines of commentary and color or words to that

14  effect, was that correct?

15  A.  Yes, I was looking for clarity to what my role would be in

16  that meeting, whether I would take the lead or add color and

17  answer questions.

18  Q.  And Mr. Karam suggested -- did Mr. Karam suggest that you

19  were supposed to take the lead at that meeting?

20        MR. JACKSON:  Your Honor, at this point objection,

21  leading.

22  Q.  Why don't you --

23        THE COURT:  Please rephrase the question.

24        MR. BORTNICK:  Could we have Defendant's Exhibit 228.

25  Can we go to -- just the top, the from, the to.  Keep going

1    down.

2    Q.  That's what you wrote to Mr. Karam, that you assumed

3    Pablo --

4              That's Mr. Pizzimbono?

5    A.  Yes.

6    Q.  -- will address certain issues, and you're there for color

7    and answer any questions, right?

8    A.  Yeah, I was just making sure of what the expectations of my

9    role were going to be in that meeting.

10   Q.  Would you normally be expected to lead this meeting?

11   A.  No, that was Mr. Pizzimbono's weekly sales manager meeting

12   and he led every one of those meetings.

13   Q.  Was there anything different about this meeting than any of

14   the other weekly meetings?

15   A.  No.

16   Q.  There was testimony that in or around August 13 that you

17   had wrongly thought you had been stripped of your new client

18   relationship duties, and Mr. Karam said that was incorrect.  Do

19   you recall the testimony?

20   A.  I recall.

21   Q.  Was it correct or was it incorrect?

22   A.  His testimony was incorrect.

23   Q.  Why?

24   A.  The responsibility for client on-boarding and exiting had

25   been assumed by Ms. Jenner in the April 2013 time frame.  And

1   then in May, when Mr. Karam assumed responsibility for managing

2   me, he had sent out a mail to a large audience that stated that

3   Mr. Pizzimbono would be handling the prioritization and

4   on-boarding of new clients, Mr. Karam would handle the exiting

5   of clients, and that a gentleman by the name of James Long, who

6   works for -- worked for Suzy White, would be collecting the

7   business cases for new clients and logging them in a

8   spreadsheet.

9   Q.  Did you ever have that responsibility at one time?

10  A.  Yes, I did.

11  Q.  When did you last have that?

12  A.  The last time I had it was in April, but that was one of my

13  significant job responsibilities from the first day I joined

14  the firm.

15  Q.  Mr. Karam testified that he filed a human resources

16  complaint against you.  Do you recall that testimony?

17  A.  I recall.

18  Q.  And he said the subject of that complaint was that he

19  believed or at least suspected that you had told the New York

20  Post about your off-track review, and that information in that

21  regard was published in the New York Post article.  Do you

22  recall that?

23  A.  I recall.

24  Q.  Did you ever in any way, directly or indirectly, tell the

25  New York Post about that off-track review meeting?

GCDTPIC4                        Picarella - direct

1    A.  Absolutely not.

2    Q.  What was your reaction -- did you see the article at some

3    point?

4    A.  I did, yes.

5    Q.  What was your reaction to the article?

6    A.  I was embarrassed, humiliated that my personal affairs at

7    work were now in the newspaper.

8    Q.  Could we have Plaintiff's Exhibit 104, please.

9             MR. BORTNICK:  104 is not in evidence.

10            THE COURT:  Any objection to 104?

11            MR. JACKSON:  Outside of the scope of an appropriate

12   rebuttal case.

13            MR. BORTNICK:  Your Honor, may I do it this way, and I

14   think the objection may be ameliorated.

15            THE COURT:  Go ahead.

16   BY MR. BORTNICK:

17   Q.  Ms. Malanga testified, and do you recall her saying that

18   you were not excluded from Mr. Pizzimbono's -- certain of

19   Mr. Pizzimbono's meetings because they had been discontinued?

20            MR. JACKSON:  Objection, your Honor.

21            THE COURT:  Please rephrase the question.

22   Q.  Was there any testimony from Ms. Malanga concerning

23   Mr. Pizzimbono's internal circle meetings?

24   A.  Yes.

25   Q.  And do you recall what that testimony was?

1           MR. JACKSON:  Objection, your Honor.

2           THE COURT:  Okay.  Let me see counsel in the robing

3     room, and we'll bring the court reporter.

4           (In robing room)

5           THE COURT:  Okay.  What's the objection?

6           MR. JACKSON:  Two bases, your Honor.  First, I didn't

7     object because I wanted us to proceed efficiently with regard

8     to the first set of questions, but there are numerous cases

9     saying it's improper to ask a witness to comment on the

10    testimony of other witnesses.

11          The second basis is we're now getting into a second

12    witness, and if the intention of this redirect testimony is to

13    to go through every witness in the case and to ask them to --

14    to ask Mr. Picarella to go subject by subject and explain why

15    they were false, I just think that that's an improper use of

16    rebuttal case.  It's not appropriate.

17          THE COURT:  Okay.  Where are we going with this?

18          MR. BORTNICK:  We didn't call Malanga, but what she

19    testified to is that Mr. Picarella had made a complaint that he

20    was excluded from certain meetings, and the reason was he

21    wasn't excluded but they had been discontinued when in fact --

22    and that's what PX-104 was going to, is that in fact the

23    meetings had been reinstated back around the end of May of

24    2012, and that all the prior attendees would be part of that

25    meeting except for Mr. Picarella and Ms. Parker.  So the jury

```
 1    is left with this impression in the testimony that these

 2    meetings stopped, that's why he wasn't there, when in fact they

 3    restarted and he was excluded.

 4              THE COURT:  Okay.

 5              MR. JACKSON:  This is the whole point of

 6    cross-examination, your Honor, you are allowed to cross-examine

 7    on any of these subjects.  You're not allowed to recall the

 8    plaintiff in order to present additional evidence in an attempt

 9    to impeach each one of these witnesses.  At this point it's --

10              THE COURT:  What is 104?

11              MR. BORTNICK:  Malanga is not on it, your Honor.

12              (Pause)

13              THE COURT:  Back up for me again, I thought this --

14    what was this about?  I thought it was about what Pizzimbono is

15    talking about.

16              MR. BORTNICK:  It is.  This is a chat between

17    Ms. Murray and Ms. Hedges in which Ms. Murray is reporting that

18    the weekly month meeting is now both reinstated, same time as

19    before, but now it's just the certain people listed, and it's

20    Mr. Pizzimbono's meeting, which is the reference to him.  In

21    other words, the meeting has been reinstated, it's Pizzimbono,

22    it's Murray, it is Ms. Hedges and one other, but Mr. Picarella

23    and Ms. Parker, who used to be in the meetings, are no longer

24    in them.

25              THE COURT:  And what is it that you plan on doing with
```

1    him regarding that?

2                MR. BORTNICK:  I wanted to ask him about this because

3    it shows the meeting has been reinstated.

4                THE COURT:  How does he know that, because he looked

5    at it in discovery?

6                MR. BORTNICK:  Yes, because he saw it and he knows who

7    the people are and he is competent to interpret what this chat

8    means.

9                THE COURT:  But does he know from firsthand knowledge

10   whether or not these meetings were reinstated?

11               MR. BORTNICK:  That's what he testified to earlier,

12   that yes, they -- he said that there were the meetings, he

13   didn't talk about them -- my recollection of his testimony was

14   not they existed and they stopped and restarted, his testimony

15   was:  I made a complaint that at a time they were being held I

16   was excluded.

17               THE COURT:  What is Malanga's testimony on this point?

18               MR. BORTNICK:  Malanga's testimony is no, you're not

19   being exclude, Mr. Picarella, because the meetings have been

20   discontinued and were discontinued some time ago.

21               THE COURT:  And --

22               MR. BORTNICK:  This shows that they were --

23               THE COURT:  They weren't discontinued.  But what was

24   her testimony in of terms of time?

25               MR. BORTNICK:  I believe this was the September 2012

1   time frame is her time frame.  Yes, September 2012, that was

2   her time frame.

3              THE COURT:  She said in September 2012 the meetings

4   were discontinued?

5              MR. BORTNICK:  Yes.

6              THE COURT:  And that's why he was excluded?

7              MR. BORTNICK:  Right.

8              THE COURT:  And this shows what?

9              MR. BORTNICK:  In May they were reinstated.  She said

10  they had been discontinued.  I don't recall if she ever said

11  when in her testimony.

12             THE COURT:  So why is that proper rebuttal?  I don't

13  understand what is it you're doing.

14             MR. BORTNICK:  She's saying the meetings didn't exist

15  in September.  They did.  They were reinstated in May of that

16  year.

17             THE COURT:  And these were whose meetings?

18             MR. BORTNICK:  Mr. Pizzimbono's meetings, weekly

19  meetings.

20             THE COURT:  How do we know that from this document?

21             MR. BORTNICK:  First I expect him to testify the

22  weekly admin meeting is the same as Mr. Pizzimbono's inner

23  circle meeting, and the "him," therefore, has to be

24  Mr. Pizzimbono.

25             THE COURT:  So break this down for me.  His testimony

GCDTPIC4                      Picarella - direct

1   is going to be what?  You want to show him this document and

2   have him say what, have him say, looking at this document, this

3   must be what this is referring to?

4            MR. BORTNICK:  Do you know what it refers to?  And I

5   expect he will say yes.  And I will say:  How do you know?  And

6   I expect him to say:  Because it refers to the weekly

7   administrative meeting.  And did that meeting have another

8   name?  I expect him to give the answer of:  The inner circle

9   meeting.  And then I will ask him:  What does this document

10  show about that meeting?

11           THE COURT:  What's defendant's position on that?

12           MR. JACKSON:  He has zero personal knowledge of this

13  communication, what it's about.  It's pure speculation about a

14  conversation he didn't participate in.  It this should have

15  been the subject of cross-examination of Mr. Pizzimbono if they

16  thought it was appropriate.  It's just not.

17           THE COURT:  Why didn't you ask Pizzimbono about this,

18  or Malanga's testimony, why didn't you confront her on this?

19           MR. BORTNICK:  Malanga is not on this.

20           THE COURT:  Neither is Picarella.

21           MR. BORTNICK:  No, but this is the kind of thing that

22  he would be familiar with what he was referring to.  I could

23  have asked Malanga, but I don't think I would have gone any

24  where, and Mr. Pizzimbono.  The witnesses here, seems to me, is

25  the one that would know most about what this means.

1          THE COURT:  And did -- let me see this again.

2          Did Hedges testify about any of this?

3          MR. BORTNICK:  She didn't testify.

4          THE COURT:  She didn't testify at all.

5          MR. BORTNICK:  None of the other witnesses are here in

6    this trial.

7          MR. JACKSON:  By the way, your Honor, Ms. Hedges was

8    on their witness list.  They could have called Ms. Hedges if

9    they thought this was something that was important.  They chose

10   not to call Ms. Hedges.

11         THE COURT:  How does this talk about -- who is MJ on

12   this?

13         MR. BORTNICK:  That is Mary Jo -- blanking on her last

14   name.  Mary Jo Rogers.

15         MR. HUBBARD:  I think that was Mr. Pizzimbono's

16   secretary.

17         THE COURT:  And you're saying this refers to a meeting

18   that -- who is usually at this weekly meeting?

19         MR. BORTNICK:  Those same people that are identified

20   here in the chat, plus Mr. Picarella and Ms. Parker.  And now

21   with the reinstatement of the meeting, at least as far as we're

22   concerned, Mr. Picarella is no longer part of the meeting.

23   That's what he is complaining about being excluded from.

24         THE COURT:  According to that, neither is Mr. Parker

25   or Mr. Pizzimbono.

GCDTPIC4                      Picarella - direct

1          MR. BORTNICK:  It's Mr. Pizzimbono's meeting.  That's

2     what the weekly admin meeting is.

3          THE COURT:  Who is this Margaret Murray person?

4          MR. BORTNICK:  She's one of the people that is

5     normally at this meeting.

6          Your Honor, we'll withdraw it.

7          THE COURT:  But it says here Murray says just you, me

8     and MJ.

9          MR. BORTNICK:  But then it goes a little further down,

10    but we'll withdraw it and make it easy.

11         THE COURT:  How much more do you have?

12         MR. BORTNICK:  Two more questions, actually.  Two

13    questions.

14         THE COURT:  Okay.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              THE COURT:  That objection is sustained.

 3    BY MR. BORTNICK:

 4    Q.  Mr. Picarella, earlier during defense's case there was a

 5    picture, demonstrative exhibit of a dark conference room.  Was

 6    that an accurate depiction -- well, were there times when you

 7    went to a conference room to make personal calls?

 8    A.  Yes.

 9    Q.  How often?

10    A.  Couple times a day.  Generally you were not allowed to use

11    your personal cell phone on the trading floor, so people would

12    go into conference rooms regularly.  I did it as often as

13    anybody else would.

14    Q.  Was the practice limited to you?

15    A.  No, it was to everybody.

16    Q.  The picture that we saw up there of that dark room, is that

17    an accurate depiction of the room you would typically make

18    these phone calls from?

19    A.  That was not a typical conference room on the trading

20    floor.

21    Q.  What did they look like typically?

22    A.  They were on the perimeter of the trading floor.  And the

23    outer wall of these rooms, these conference rooms and offices,

24    were glass from floor to ceiling.  So your conference room was

25    basically all glass, and during business hours, daylight hours,
```

GCDTPIC4                          Picarella - cross

1  it was so bright in those rooms most of the time you didn't

2  need to turn a light on.

3  Q.  I have one question for you.  Is it conceivable to you that

4  Mr. Karam, your direct boss, did not know that you were

5  suspended from work from January 15 through almost the end of

6  March when you were terminated?

7           MR. JACKSON:  Objection.

8           THE COURT:  Sustained.

9           MR. BORTNICK:  No further questions.

10          THE COURT:  Okay, any cross-examination?

11          MR. JACKSON:  Your Honor may I retrieve the books that

12 were offered into evidence?

13          THE COURT:  Yes.

14 CROSS-EXAMINATION

15 BY MR. JACKSON:

16 Q.  Mr. Picarella, the document that we were looking at earlier

17 was your response to your review?

18 A.  Yes, where I had three responses to three subjects that

19 were discussed in my review.

20 Q.  So you wrote that up.  You wrote that, right?

21 A.  I wrote that in the office.  The review was I believe on

22 Friday, November 21st, and the remaining days I had in the

23 office until the 26th I put that together.

24 Q.  I want to be clear, that's a document that we were looking

25 at that you wrote, correct?

1    A.  I wrote every part of that.

2    Q.  And you said you wrote that in the office, correct?

3    A.  Correct.

4    Q.  So you spent several hours during the workday crafting your

5    response to the review that you had gotten from your

6    supervisor, correct?

7    A.  Yeah, I don't know how long it took me to put that

8    together, but I put it together while I was in the office at my

9    desk.

10   Q.  And it took you several hours, correct?

11   A.  I don't know.  I don't know how long it took me to put it

12   together.  Not that long, because I had the information readily

13   available.  I knew the facts and how things took place and they

14   were different from how Mr. Karam was portraying them.

15   Q.  Now, sir, the vast majority of the documents in these two

16   binders related to your job search, these are just online

17   applications, right, that you clicked on something?

18   A.  No, it's a combination of things.  Some of it is online

19   applications, some of it is receipts from online applications,

20   some of it is emailed correspondence with colleagues -- former

21   colleagues, I should say.  Some of it might be some LinkedIn

22   chat messages.  I tried to preserve everything I could in my

23   job search and provide that to yourself -- my counsel and

24   yourself.

25             (Continued on next page)

1176

1   Q.  I see.  So some of this is LinkedIn messages, LinkedIn

2   applications?

3   A.  There may be some LinkedIn -- I know I was subscribed to

4   LinkedIn jobs.  There might be some LinkedIn job applications

5   in there.  But some of it was correspondence with headhunters

6   and other colleagues that I had been connected through on

7   LinkedIn.

8   Q.  So it's e-mails, LinkedIn applications, online

9   applications, right?

10  A.  Yeah.  And maybe some other forms of communication.

11  Q.  I see.  Okay.

12          Now, when you were describing a moment ago that you

13  drafted this response, this is in 2014 that you drafted this

14  response, right?

15  A.  Yeah.  It was within the three days after my review.

16  Q.  And this is during the time period that you were spending

17  90 percent of your workday not working, correct?

18  A.  Well I had only been assigned work that allowed me to work

19  ten percent of my workday.

20  Q.  I just want to know:  I'm correct that this was during the

21  time period when you were spending 90 percent of your workday

22  not working, correct?

23  A.  Only because ten percent --

24          THE COURT:  This is, again, this is a yes-or-no

25  question.  If you can answer yes or no, answer yes or no.

1        THE WITNESS:  Yeah.  That's an estimate.  Yes.

2   Q.  And during that 90 percent, much of the time you were

3   surfing personal websites, right?

4   A.  I wouldn't say personal websites.  I mean I was reading

5   industry news.  I would be researching a lot of research on

6   various topics.  I can't recall how I spent most of the time on

7   the internet.

8   Q.  Okay.  You can't recall how you spent most of the time on

9   the internet.  That's what you just said, right?

10  A.  Yeah, I mean --

11  Q.  I'm just asking, yes or no, that's what you just said,

12  correct?

13  A.  Yeah, going back a couple years I can't remember all the

14  topics that I would research.

15  Q.  Okay.  All right.  Now, you talked a little bit about

16  Mr. Karam during your brief testimony just a second ago,

17  correct?

18  A.  Yes.

19  Q.  And he was one of your -- he was your last direct

20  supervisor, correct?

21  A.  Correct.

22  Q.  And you had problems with Mr. Karam, right?

23  A.  I had complaints that I had made.

24  Q.  You had problems with Mr. Karam, correct?

25  A.  I didn't have problems with him personally.  There were

GCD9PIC4                          Picarella - cross

1    some times in the way he treated me I had problems with his

2    behavior.

3              THE COURT:  Okay.  Hold on.  Hold on.  Again, these

4    are designed to be yes-or-no questions.

5    A.  I don't know how to define problem.  Can you define problem

6    for me?

7    Q.  If you can't define problem, that's fine.

8              You had problems in your relationship with Ms. Jenner

9    too, right?

10   A.  No.  I don't believe so.

11   Q.  You don't think there were any problems at all in your

12   relationship with Ms. Jenner?

13   A.  I don't believe so.

14   Q.  You had problems with your relationship -- in your

15   relationship with Suzy White professionally, right?

16   A.  No.  I mean I generally liked Suzy White but I believe

17   that -- no.  I don't believe I had problems with Suzy White.

18   Q.  No problems at all?

19   A.  No.  Some of the behaviors, yes.  But I didn't have

20   problems with her personally.

21   Q.  Okay.  Well you had problems with Ms. Hedges before any

22   retaliation, correct?

23   A.  Well define problems, please.

24   Q.  I'm just asking if you had any problems with Ms. Hedges

25   before there was any retaliation before you made your

1   complaints?

2   A.  No.  I generally liked Ms. Hedges.  I didn't like her

3   behavior.

4   Q.  Okay.  All right.  But all of these people -- all of your

5   supervisors had criticisms of the way that you were performing

6   your job throughout the time that you were at HSBC, correct?

7   A.  (No response).

8   Q.  That's a yes-or-no answer.

9   A.  No.  I had received constructive criticism in the reviews

10  but generally I was not receiving criticism from them prior

11  to -- can you repeat the question, please.

12  Q.  Let me repeat it.  And if you can't answer this yes or no

13  just tell me.  All of your supervisors at HSBC had criticisms

14  of the work that you were doing at HSBC, correct?

15  A.  Not while I was working there.  I heard the criticisms

16  here.  But not while I was at work.

17  Q.  Okay.

18          MR. JACKSON:  May I have one moment, your Honor?

19          THE COURT:  Yes.

20          MR. JACKSON:  Can we look at DX-251 briefly.

21          Could we zoom in on the top part.  That's good.

22  Q.  Now this is an e-mail from Mr. Karam to you on February 24,

23  2014, correct?

24  A.  Correct.

25  Q.  And what he says in the first line of this e-mail is:

1   Mike, I'm glad you have finally made contact with Greenwich but

2   two months have lapsed since this was handed over to you.  I've

3   highlighted a timeline of events.

4           That's what he wrote to you, correct?

5   A.  Well he wrote that, yes.

6   Q.  And this is an e-mail that you received, correct?

7   A.  Yes.

8           MR. JACKSON:  Can you take that down.

9           Can we just look at PX-240 briefly at page three.

10          Could you make that a little bigger?

11  Q.  This is another portion that you wrote of this document,

12  right?

13  A.  Yes.

14  Q.  And what you wrote at the top in part one here on page

15  three is:  Mike Karam did provide clear examples of where I

16  failed on the three objectives he mentioned in the document.

17  But Mike -- that's what he wrote, right?

18  A.  No.  I wrote that.

19  Q.  That's what you wrote but you were talking about -- this is

20  something that you wrote about your conversation with

21  Mr. Karam, right?

22  A.  That was a typo though, because I meant to say did not,

23  because in each of the three sections I said he did not provide

24  clear examples.  That -- looking back at it, that was a typo.

25  Q.  I see.  So it's your testimony you spent several hours

1    putting this together, right?

2    A.  No.  I wouldn't say it took me several hours.  Again, I

3    don't know how long it took me.  But I worked on these items.

4    The information -- he provided very little information in the

5    meeting.  In my mind, I knew exactly how these things took

6    place.  For me to put this document together did not take long.

7    Maybe a couple hours over a course of, you know, two or three

8    days after the review.

9    Q.  So it's your testimony that it was a typo and it should

10   have said Mike Karam did not provide clear?

11   A.  Right.  Because I validate that in each of the three

12   sections you'll see I say Mike Karam did not provide.

13   Q.  Okay.

14   A.  Details.  Examples.

15   Q.  All right.

16   A.  You can reconcile it.

17            THE COURT:  Hold on.  There's not a question before

18   you.

19            THE WITNESS:  I'm sorry.

20   Q.  Mr. Picarella, just to be clear, you accept that you were

21   free to call any witnesses you wanted to this case, right?

22            MR. HUBBARD:  Objection, your Honor.

23            MR. BORTNICK:  Objection.

24            THE COURT:  Sustained.

25   Q.  Mr. Picarella, you will agree, right, that after you made

GCD9PIC4                    Picarella - cross

1   your complaints HSBC continued to provide you with a job for

2   years, correct?

3   A.  Which complaints?

4   Q.  The complaints that relate to this case.

5   A.  Well there's many.  As an example of the complaints --

6   Q.  No.  No.  I'm just asking you:  Yes or no, do you agree

7   with me that after you made the complaints that relate to this

8   case HSBC continued to provide you employment for years?

9          MR. BORTNICK:  Objection, your Honor.

10         THE COURT:  Overruled.

11         THE WITNESS:  Which complaints?  I mean the initial

12  complaints?  My complaint to Mr. Mullen in November 2011?  My

13  complaints to HR?  My complaints that Mr. Karam --

14         THE COURT:  Hold on, hold on, okay.

15         MR. JACKSON:  Your Honor.

16         THE COURT:  It was requesting a yes-or-no answer.

17         Go ahead.  Do you want to rephrase the question,

18  counsel.

19         MR. JACKSON:  Yes, your Honor.

20  BY MR. JACKSON:

21  Q.  Let's focus on your initial complaint.  After you made your

22  initial complaint that relates to this case about the alleged

23  mistreatment of Ms. Parker you continued to work at HSBC for

24  years?

25  A.  After my initial complaint to HR --

1           THE COURT:  Hold on.  That's a yes-or-no question if

2      you can answer it yes or no.

3           THE WITNESS:  Okay.  Let me just think of the

4      timeframe.

5           Yes.

6           MR. JACKSON:  I have no further questions for this

7      witness, your Honor.

8           THE COURT:  Okay.

9           MR. BORTNICK:  Nothing, your Honor.

10           THE COURT:  Okay.  The witness is excused.

11           (Witness excused)

12           THE COURT:  Does plaintiff's counsel have any other

13      witnesses?

14           MR. BORTNICK:  We do not, your Honor.

15           THE COURT:  Okay.  Plaintiff rests?

16           MR. BORTNICK:  Yes, your Honor.

17           THE COURT:  Okay.  Members of the Jury, let's do this.

18      We're going to take a break while I discuss some scheduling

19      matters with counsel.  Don't discuss the case amongst

20      yourselves or with anyone else.  I'll see you in 20 minutes.

21           (Jury excused)

22           (Continued on next page)

23

24

25

1          (In open court)

2          THE COURT:  Let's talk about scheduling here.  Let me

3     get an updated estimate from each counsel as to what they think

4     the approximate length of their summation will be starting with

5     plaintiff's counsel.

6          MR. HUBBARD:  Well your Honor my argument is a

7     responsive argument.  I just said yesterday I thought 75

8     minutes.  If my brother argues for two hours I may have to

9     change.

10         THE COURT:  Defense counsel.

11         MR. JACKSON:  At this point, your Honor, I'm

12    anticipating 90 minutes but I would just ask for a little bit

13    of flexibility because I am -- I'm anticipating argument since

14    I have to go first, but I anticipate I'll be able to get my

15    estimate from yesterday down to 90 minutes.

16         THE COURT:  So here are the possibilities.  Going to

17    need to break for lunch.  I don't generally prefer to have the

18    summations and the jury instructions on different days.  I

19    certainly don't want to unnecessarily break up the summations

20    into different days.  So even though I had certainly hoped to

21    get to the summations and the charge today, what I am currently

22    considering is perhaps letting this jury go home early today

23    and then bright and early, 9:30 tomorrow, have summations which

24    will probably take the morning and then I will give them the

25    instructions after lunch.  But, let me hear from counsel.

1            MR. HUBBARD:  That is by far my preference, your

2      Honor.  I think it would get -- allow the arguments and the

3      instructions to come together and give us time to get them done

4      in an efficient way.  There are some things that have happened

5      this morning.  We've been working on the instructions.  So it

6      gives us a chance as counsel to understand what the final

7      instruction is.  And so I would prefer that -- I would prefer

8      that plan, your Honor.

9            THE COURT:  Defense counsel.

10           MR. JACKSON:  Your Honor, that's not our preference.

11     We think it would be much more fair to the jury, they've come

12     everyday, to give them a full day.  And we've truncated our

13     summation.  If we have 90 minutes and 75 minutes, if we take a

14     brief break in between, there should still be sufficient time

15     if we do lunch just a little bit earlier, there should be

16     plenty of time for us to be finished including the charge by

17     5 o'clock.

18           THE COURT:  No.  It's going to take some time to read

19     the charge.  We also would probably need to -- and while I'm

20     sure that both counsel will be absolutely captivating in their

21     closing arguments the jury is probably going to need a break

22     between hour-and-a-half-long summations from either side.

23           So, I don't think it's going to be feasible to get

24     the -- both summations and the charge done today.  I think it's

25     certainly possible to perhaps get both summations done.  But it

1    may make sense, unfortunately, I don't think the jury will

2    object to going home early.  That way we don't break for lunch,

3    we just send them home and have them start 9:30.  There

4    shouldn't be any reason for any delay tomorrow.  And we go

5    right into summations and they get the charge, then the case is

6    theirs.  So I think that's what I'm inclined to do because I

7    just don't think realistically we're going to be able to get

8    all of that done.  But I'll hear further from counsel if you

9    have any other things you want to add to try to persuade me

10   differently.

11              MR. JACKSON:  Judge, I think the -- if we start at say

12   1 o'clock, if we let the jury -- if we let the jury go for

13   lunch.  We tell them communicate to them now they can go for

14   lunch.  We come back at 1 o'clock.  I'll be done by 2:30.  We

15   can take a brief break.  Mr. Hubbard will be done by, if we

16   take a five, ten-minute break after mine, Mr. Hubbard will be

17   done by four o'clock.  And that still preserves an hour for --

18   that still preserves an hour for the Court to do the charge.

19   And I think that the jurors will really appreciate it if we

20   make use of their time and try to complete the day.  Even if,

21   you know -- I think it would be appropriate to ask the jury --

22   to tell the jury look, we think that we can complete the case

23   if you're willing to stay and ask if they'd be willing to, if

24   the charge goes a bit beyond five, if they'd be willing to stay

25   a few minutes past so that it can be completed, give them the

1    option of that.  But I also don't think, your Honor, that this

2    is a case where if we reach the late part of the day and we

3    needed to give the charge tomorrow, I don't think that there

4    would be any prejudice.  And I really think that we should ask

5    the jurors.  But, for them to get -- for us to complete the

6    summations today and for us to have the charge tomorrow and

7    then to have a full day of deliberations I think will be much

8    more fairer to the jurors than sending them home after only

9    hearing essentially what amounts to about 30 minutes of

10   testimony.

11              THE COURT:  I understand.  I am concerned, again,

12   though about -- and defense counsel's suggestion that we give

13   the jurors a lunch break until one.  They're on their other

14   break until about 12:22.  That only gives them 38 minutes for

15   lunch.  That makes it seem as if defense counsel is in the

16   category of people who lose fifteen pounds on trial.  Maybe you

17   don't eat.  These jurors are probably going to need more time

18   to get food if they haven't brought some lunch with them.

19              Let me hear from plaintiff's counsel.

20              MR. HUBBARD:  Your Honor, I think the schedule the

21   Court proposes is far better.  It's going to take longer than

22   we think it is to get these summations done, to get a break for

23   the jury in between, and it just doesn't -- these are important

24   things for the jury and they're going to be worn out by the end

25   of the day and so I think it would be better if we could argue

1     to the jury straight out in the morning and get instructed and

2     then the case is concluded.   That would seem to me to be a much

3     better procedure, particularly for the court, for us, and for

4     the jury.

5          THE COURT:  I tend to agree with plaintiff's counsel.

6     Again, I think it certainly would be appropriate to say to the

7     jury that the evidence is in and that tomorrow morning we will

8     be proceeding with summations so that they know they're coming

9     back and that the case is coming to an end.  They know that

10    they're going to come back and get summations and then get my

11    instructions on the law.

12         My hope would be that tomorrow what we can do is start

13    promptly at 9:30.  Hopefully defense counsel's argument won't

14    last much longer than 90 minutes, take a break at around 11

15    o'clock to 11:15, have plaintiff's counsel's summation and then

16    we see where we are.  Maybe, I could try to instruct the jury

17    prior to lunch and we order lunch for them ahead of time and

18    have their lunch waiting for them so they can take kind of a

19    late lunch.  But we'll see where we are.

20         So I believe that's what I'm inclined to do.  I will

21    give defense counsel another shot at it.  It seems to me that

22    that's what makes the most sense because I think that --

23         MR. JACKSON:  Judge, I appreciate that.  And I don't

24    mean to belabor the point.  I have tremendous respect for the

25    judgment of the Court, as the Court knows.  The only thing I

GCD9PIC4                          Picarella - cross

would ask is can we at least ask the jurors what their

preference is on this?  If they want to go home today or if

they want to use the remainder of the day.  I just think that,

you know, these are working jurors.  They clearly I think have

been very attentive and patient with the case and I just feel

like it is a -- I personally feel like it's not a respectful

use of their time to only have them come in during the day to

only have them hear, you know, 30, 40 minutes of testimony.  If

they're fine going home, I think that that would be -- that

would be fine.  But I'd hate to have them, to develop a sense

of lack of respect for the process because of them thinking

that we're not efficiently using their time.

          THE COURT:  Again, I don't want to -- we have some

jurors who have other obligations, childcare obligations and

the like, and which they've certainly appreciated the days that

we've broken early.  This will be a day that we break extremely

early.  I don't want to keep the court reporters and the other

court personnel here after five o'clock either.  I don't really

want to do that.  So I am going to tell the jury that they're

going home today.  They'll get the case tomorrow.  We'll have

summations.  I will give them the instructions on the law

tomorrow.  And my hope is that with some more time to think

about the summations that it's sort of reminiscent of the Mark

Twain quote that, "I would have written you a shorter letter

but I didn't have enough time," but now that counsel has more

1   time, perhaps the summations won't be quite as lengthy and

2   maybe counsel won't be quite as verbose as counsel anticipates

3   they might be and maybe we can move things along a little bit

4   better.

5          So I will bring the jury back in and I'll let them

6   know that we're done for the day.  And I'll tell them not to

7   talk about the case.

8          Did counsel want me to give them any extra special

9   instructions in terms of press coverage or anything today or

10  no?

11         MR. HUBBARD:  No, your Honor, for the plaintiff.

12         THE COURT:  And defense counsel?

13         MR. JACKSON:  No.  Thank you, your Honor.

14         THE COURT:  And I will -- I had planned on letting the

15  jury know that tomorrow morning they should be here at 9:30 and

16  we will proceed with closing arguments by counsel and then I

17  will give them the instructions on the law and then they can

18  start their deliberations.  Any objection to that by counsel

19  from either side?

20         MR. HUBBARD:  Not from the plaintiff, your Honor.

21         MR. JACKSON:  No.  Thank you, Judge.

22         THE COURT:  Okay.  Let's bring the jury back in.

23         THE DEPUTY CLERK:  Just waiting for one juror that

24  went downstairs.

25         THE COURT:  I guess while we're waiting, counsel, my

GCD9PIC4                         Picarella - cross

```
 1   plan is to -- I'll have my staff -- let me find out.

 2   Plaintiff's counsel's e-mail situation working, your internet

 3   service up again?

 4            MR. HUBBARD:  Yes, your Honor.

 5            THE COURT:  I'll have my staff e-mail counsel the

 6   final draft of our jury instructions and if there are any sort

 7   of typographical errors or if there's anything that we've

 8   discussed here that's not reflected in there counsel should

 9   respond in writing.  We'll give counsel until I guess we can do

10   that by let's say about six o'clock tonight.

11            MR. HUBBARD:  Yes, your Honor.

12            MR. BORTNICK:  To understand, so it's not to make new

13   objections, it's just -- because your Honor didn't rule on

14   certain things presumably by what we see in the document will

15   be your ruling.

16            THE COURT:  Correct.  Yes.  Correct.  Not for new --

17   not for renewing old objections.  If there's something again

18   dramatically incorrect or there's some typographical error or

19   if there's something that I've ruled on that I neglected to

20   reflect in the instructions then let me know about that.

21            Everybody here, Tara?

22            THE DEPUTY CLERK:  All the jurors are here.

23            THE COURT:  Okay.  Let's bring them in.

24            (Continued on next page)

25
```

1           (Jury present)

2           THE COURT:  Please be seated.

3           So both sides have rested.  Here's what we're going to

4    do.  We are going to let you go for the day today.  We're going

5    to ask that you come here tomorrow at 9:30 sharp in the

6    morning.  In the morning at 9:30 a.m. we're going to have

7    closing arguments by both counsel and then I will give you the

8    instructions on the law and then you can begin your

9    deliberations.  All right.

10          So in the meantime don't discuss the case with anyone

11   else.  Don't let anyone discuss the case with you.  Don't do

12   any independent research related to any of the issues germane

13   to this case.  And have a wonderful evening and I will see you

14   tomorrow morning at 9:30.

15          (Jury excused)

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

GCD9PIC4                        Picarella - cross

1              (In open court)

2              THE COURT:  Any objection to my instructions to the

3    jury?  Did I leave anything out?

4              MR. HUBBARD:  No, your Honor.

5              MR. JACKSON:  No, Judge.

6              THE COURT:  All right.  You may be seated.  So I will

7    see you tomorrow.  Let's get counsel here at 9 a.m. to avoid

8    bumping into the jurors and so we can clear up any other sort

9    of issues on the instructions with the law.  Is there anything

10   else we need to take up today?

11             MR. HUBBARD:  Not a thing, Judge.  Thank you.

12             MR. JACKSON:  No.  Thank you very much, your Honor.

13             THE COURT:  Okay.  Have a good day.

14             (Adjourned to December 14, 2016 at 9 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1

INDEX OF EXAMINATION

2   Examination of:                              Page

3   SUZANNE WHITE CARR

4   Cross By Mr. Hubbard . . . . . . . . . . .1145

5   Redirect By Mr. Jackson  . . . . . . . . . .1149

6   MICHAEL PICARELLA

7   Direct By Mr. Bortnick . . . . . . . . . . .1150

8   Cross By Mr. Jackson . . . . . . . . . . . .1174

9                     PLAINTIFF EXHIBITS

10  Exhibit No.                              Received

11   301 and 302   . . . . . . . . . . . . . . .1150

12

13

14

15

16

17

18

19

20

21

22

23

24

25