GCE9PIC1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MICHAEL PICARELLA,

4                 Plaintiff,

5           v.                              14 CV 4463 (ALC)

6   HSBC (USA) SECURITIES, INC.,

7                 Defendant.

8   ------------------------------x
                                         New York, N.Y.
9                                        December 14, 2016
                                         9:03 a.m.
10
    Before:
11
                      HON. ANDREW L. CARTER,
12
                                          District Judge
13
                          APPEARANCES
14
    LIDDLE & ROBINSON LLP
15       Attorneys for Plaintiff
    BY:  JAMES R. HUBBARD
16       BLAINE H. BORTNICK

17  BOIES, SCHILLER & FLEXNER LLP
         Attorneys for Defendant
18  BY:  RANDALL W. JACKSON
         DAVID L. SIMONS
19       NICHOLAS STANDISH

20  GIBSON, DUNN & CRUTCHER LLP
         Attorneys for Defendant
21  BY:  GABRIELLE F. LEVIN

22

23

24

25

GCE9PIC1

1           (Trial resumed; jury not not present)

2           THE COURT:  Your Honor, Ms. Palmieri is not here.  She

3    has an arbitration matter this morning and I would ask if you

4    could excuse her.

5           THE COURT:  That's fine.

6           Are we ready?  So we received the objections that

7    counsel had to the jury instructions last night.  First, let me

8    deal with plaintiff's objections.  I understand the primary

9    objection is just sort of renewing their objection to the use

10   of the phrase "motivating factor" instead of "plays no role."

11          Just give a little further elucidation as to my

12   thinking on that.  I am relying in large part on a decision by

13   my distinguished colleague Paul Engelmayer in the case of

14   Heather Ann Bivens v. Institute for Community Living, et al.

15   It's 14 CV 7173 reported at 2016 U.S. District LEXIS 13538.  In

16   that decision Judge Engelmayer very thoroughly discusses the

17   fact that those terms are used as synonyms, essentially

18   "motivating factor" and "plays no role," and points to the fact

19   that in some of the cases that plaintiff is relying on, in

20   particular Williams, the word "motivating factor" was used; in

21   footnote 27, there is the use of the word "motivating factor."

22   So I will use the word "motivating factor."  Plaintiff's

23   objection is noted.

24          I don't believe there are any other real objections by

25   plaintiffs.

GCE9PIC1

1          MR. HUBBARD:  Yes, your Honor.  There is a very

2     serious objection.

3          THE COURT:  What's that?

4          MR. HUBBARD:  Your Honor, as we said in our letter

5     last night, first I want to go to the verdict form.  And as we

6     say in our letter, your question number five is we say not

7     permissible because if the answer to number four is yes, then

8     there can't be a five.  There can't be a non-retaliatory

9     reason -- if the jury has determined that retaliation or animus

10    was a motivating factor or the protected activity was a

11    motivating factor, then there can't be any exoneration;

12    otherwise it's but for causation.  The same thing happens in

13    the instruction.  If you go to instruction (f), non-retaliatory

14    reasons, at page 31.  That essentially is, you give that

15    instruction after the jury has been told what the causation

16    charge is under the city law, the motivating factor test.  So

17    it's a redo -- it's a do-over.  And we say that it can't be

18    done.  It turns -- the non-retaliatory reason section turns

19    this instruction into we say a but for causation charge.  I

20    know the Court certainly didn't intend that and may disagree.

21         But if on the verdict form the jury finds yes for

22    number four, then it's not possible for the jury to conclude to

23    the contrary that they did it for non-retaliatory reasons

24    because the jury has already concluded that they did it for

25    retaliatory reasons.

GCE9PIC1

1          And so we appreciate the Court's diligence with this.

2     This is not an unconfusing area, as you have pointed out, and

3     there has been a lot of writing on this subject, including

4     Judge Engelmayer's case that you point out to us.

5          But I do think that it would be a serious mistake to

6     proceed to the -- the thing that the defendants are proposing,

7     the non-retaliatory reason excuse.  That does not fit within

8     the motivating factor analysis.  It does not fit within the

9     playing a part analysis.  Once it plays a part and once it's a

10    motivating factor, you can't get out the door by arguing that

11    you had non-retaliatory reasons because -- I could just go

12    through the instruction.

13         THE COURT:  I think plaintiff has a point.  What's

14    defense counsel's position on that, that perhaps number five is

15    superfluous.

16         MS. LEVIN:  Your Honor, good morning.  First, let me

17    thank the court for the significant amount of time it's put

18    into the verdict form and instructions and the careful

19    consideration that it's given them.

20         With respect to question five on page four we don't

21    believe that it's superfluous because plaintiff seems to be

22    arguing that he's only entitled to meet the first four elements

23    of his prima facie case and if he satisfies that he wins and

24    that's not what the law is.  Courts are not here to second

25    guess legitimate non-retaliatory business decisions.  And if

GCE9PIC1

1    the defendant shows that it would have made the same decision

2    in the absence of protected activity then I think that the jury

3    is entitled to find for the defendant.

4              MR. HUBBARD:  That, of course, is a Title VII but for

5    standard, your Honor.  And it's not applicable under the city

6    statute.

7              MS. LEVIN:  It's not the but for standard, your Honor,

8    because the but for standard is that the protected activity had

9    to be the reason for the adverse employment action and the but

10   for clause.

11             Here what I'm saying is that even if there had been

12   protected activity -- even if there had not been protected

13   activity, I'm sorry, that if the employer would have made the

14   same decision regardless of protected activity, because it was

15   a legitimate business decision, then the plaintiff cannot

16   prevail.

17             THE COURT:  I'll take that under advisement.  Were

18   there other objections by plaintiff's counsel?

19             MR. HUBBARD:  Your Honor, I don't think anything -- we

20   noted the absence of the EEOC charge as protected activity in

21   our letter and we're comfortable leaving that to the Court's

22   judgment as to whether that should be added back in.

23             THE COURT:  Okay.

24             Let's turn to the defendant's objections.

25             In terms of the first objection, pages 22 and 23,

GCE9PIC1

1    there are references, as well as footnote three, there are

2    references to the New York State Human Rights Law.  It does

3    seem we need to take those out.

4          As to number two, the defendant suggests that we

5    substitute "solely" for "in fact" and "solely" later on.  It

6    seems to me that that is taken care of in the later portion of

7    the instructions when it starts telling the jury to look at if

8    there were -- if this was totally but for causation is taken

9    care of later on in there.  So it does seem to me that we don't

10   need to make that change.  Let me hear from defendants further

11   on that.

12         MS. LEVIN:  Absolutely, your Honor.  The issue here is

13   just the references to "motivated by" in the section dealing

14   with causation under Title VII.  We had attempted to suggest

15   some language for the Court's convenience.  We're not wedded to

16   that language.  But we were -- we just wanted to better

17   understand the reason for the references to "motivated by" in

18   the section dealing with but for causation.

19         THE COURT:  It may be that -- I believe that we did

20   discuss the word "solely" yesterday, which I remember.  I think

21   that that was the word that was discussed.  So perhaps we

22   should make that change.

23         What's plaintiff's counsel's position on that?  I

24   believe that the "solely" came from plaintiff's counsel.  That

25   may have been in a different section.

GCE9PIC1

1      MR. HUBBARD:  Your Honor, I don't remember.  May I ask

2  Mr. Bortnick.  I remember the discussion.

3      MR. BORTNICK:  That came up in the context of well

4  your Honor saying I'm not going to get rid of jury verdict

5  number I think it's 5 in this one, it was 13 in that one.  You

6  said:  Well, what about solely?  I said in a sense it makes it

7  better but I still have the problem with the "would have taken"

8  and the but for issue which Mr. Hubbard has raised, but that's

9  the context it came up in, that it was better than what was

10  there before but still objectionable.  That was the issue and

11  how it came up.

12      THE COURT:  But this was for this section, correct?

13      MR. BORTNICK:  It was for the city statute on the

14  verdict form old question 13 which is now --

15      MR. HUBBARD:  We're not talking about that.

16      MR. BORTNICK:  Yeah, but he's asking what it was

17  yesterday, what we were talking about.

18      THE COURT:  What's plaintiff's position on that and

19  whether we should make this "solely" or leave it as "in fact"?

20      MR. HUBBARD:  I preferred the earlier language, your

21  Honor.  The "solely" moves more into sort of diluting the

22  motivating factor portion of the instruction or the but for

23  portion of the instruction.

24      MR. BORTNICK:  Your Honor, on page 22 we're talking

25  about the Title VII claim so it's a different context.  So

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

GCE9PIC1

1    yesterday's "solely" had nothing to do with this.

2              THE COURT:  Correct.  So I think we just leave it as

3    "in fact."  I think that's easier.  Just leave it as "in fact."

4    I don't think there's a real difference there.

5              Next objection by defendants.  Number three on page

6    26.  It does seem that in terms of the at least in part --

7              MS. LEVIN:  I'm sorry to interrupt, your Honor.  There

8    was one additional change at the top of page two of our letter

9    which references page 24 of the proposed instructions.  This is

10   a slightly -- it's another reference to motivating factors but

11   it's a slightly different issue because, again, it seems to

12   incorporate the motivating factor causation standard in the

13   Title VII claim.  I believe the language should read that

14   "HSBC's explanations are pretextual and were not, in fact, the

15   real reason or the but for cause for the alleged adverse

16   actions."

17             THE COURT:  What's plaintiff's position on that?

18             MR. HUBBARD:  I'm just trying to find it, your Honor.

19             THE COURT:  Page 24.

20             MR. HUBBARD:  It's on page 26, I think.

21             THE COURT:  We're talking about the bottom of page 24.

22             MR. HUBBARD:  I'm sorry.

23             The last sentence, your Honor, on page 24,

24   "Mr. Picarella claims that HSBC's explanations are pretextual,

25   that is that they are unworthy of belief and were not, in fact,

GCE9PIC1

1   motivating factors."  That's kind of inconsistent.  That seems

2   to be just the opposite.  If the claim -- and our claim is not

3   pretext.  As your Honor knows, we don't argue pretext in the

4   legal sense.  But -- claims that the explanations are

5   pretextual; that is, they are unworthy of belief.  If they are

6   unworthy of belief, then -- I'm just getting confused about --

7   it seems that they're inconsistent.  Pretext is confused with

8   motivating factors.  I don't understand the relationship

9   between the two.

10          THE COURT:  What their objection is as to the use of

11   the word "were not in fact motivating factors," that phrase

12   instead of "were not the real reason for the alleged adverse

13   actions."  And what the defendants are objecting to is the use

14   of the word "motivating factors" in this Title VII section

15   because under Title VII's but for causation, not motivating

16   factors.

17          MR. HUBBARD:  I'm okay with that, Judge.

18          THE COURT:  So we'll make that change to "were not the

19   real reason for the alleged adverse actions."

20          The next one on page 26.  The "at least in part."  Let

21   me give plaintiffs a chance to look at that, see what your

22   position is on that.

23          MR. HUBBARD:  That instruction is absolutely correct

24   and that's what we've argued the law is and we certainly object

25   to that being changed.  That's an important part of the

GCE9PIC1

1    instruction.

2             THE COURT:  They're just objecting to the "at least in

3    part."  They're saying that should come out.

4             MR. HUBBARD:  That's exactly what Judge Engelmayer is

5    saying, they're the same thing, Judge, and we shouldn't be

6    deprived of the "in part" language.  That's the state law and I

7    obviously don't have that other decision in front of me, your

8    Honor has seen it, but it seems to me it's consistent with I

9    think you said Bivens.  Perhaps I got the case wrong.

10            THE COURT:  Yes, you did.

11            MR. HUBBARD:  But obviously we've read the case.  And

12   I don't have it in front of me.  And I think it's consistent --

13   it's certainly consistent with the "a motivating factor"

14   concept.  So we would think that that's an important part of

15   the instruction.

16            THE COURT:  What's defendant's position on that?  I

17   tend to agree with plaintiff's counsel.

18            MS. LEVIN:  I think the issue, your Honor, is that

19   this discussion is in the Title VII portion of the instructions

20   and that was why we objected to the "in part" because for the

21   Title VII claim it's not motivating factor it's but for.  And

22   that was why we objected to the inclusion of the phrase "in

23   part" or "at least in part."

24            THE COURT:  Hold on a second.

25            MR. HUBBARD:  I might try to make a deal with defense

GCE9PIC1

```
 1    counsel, your Honor.  I think that it may well be that the "in
 2    part" is more appropriate in the city instruction.  We argued
 3    that yesterday and I know your Honor has that and it may be
 4    that in the Title VII instruction we should just leave it as
 5    because he engaged in protected activity.
 6             THE COURT:  Okay.  We'll do that.  We'll take out the
 7    "at least in part."
 8             MR. HUBBARD:  And, of course, we've been through the
 9    argument about the motivating factor instruction under the city
10    statute.  We've already argued that.
11             THE COURT:  The next objection, page 29, seems to me
12    we need to make that change.  Left out some words there.  "That
13    that protected activity" should be "in that protected
14    activity."
15             The next objection.  Typographical error.  We'll
16    change that as well.
17             Back to what plaintiffs were talking about before with
18    the verdict form.  Let me just make sure I have a clear picture
19    of what the plaintiff's objection is here.  What is your -- are
20    you conflating the plaintiff's burden of proof in terms of
21    establishing a prima facie case with the defendant's burden of
22    proof in terms of they would have done it solely for
23    non-retaliatory reasons?  Is that what's happening here?  Tell
24    me what your position is.
25             MR. HUBBARD:  Well, your Honor, just as a matter of
```

GCE9PIC1

1    preference I don't think we -- I don't think that the prima

2    facie case discussion has any place in the trial of the case.

3    But putting that aside for a minute.  I don't think that

4    affects this discussion.

5            If you look at number four.

6            THE COURT:  Right.

7            MR. HUBBARD:  Number four is the motivating factor

8    question.  I would have much preferred it to say was a

9    motivating factor meaning did it play any part in the decision

10   to take the adverse employment action.  But the Court has

11   decided to use motivating factor and we understand that.

12           But what I'm saying is that if the jury says yes or no

13   here, there's nothing left for them to decide.

14           THE COURT:  Why?  If they say no, I can see that.  But

15   if they say yes, why are the defendants precluded from proving

16   by a preponderance of the evidence that they would have taken

17   the adverse employment action solely for non-retaliatory

18   reasons?

19           MR. HUBBARD:  Because they've already decided that

20   they did not.

21           THE COURT:  No.  Well why do you say that?

22           MR. HUBBARD:  Because they decided that his protected

23   activity was a motivating factor.  You can't erase it with

24   five, in our view.  What they might have done is really not

25   relevant either.

GCE9PIC1

 1           If they have infected this process with retaliatory

 2      animus based upon the protected activity and they answered

 3      number four yes, your Honor, I can't imagine they can be

 4      exonerated under number five.  And that's why we objected to

 5      including that section on non-retaliatory reasons in the

 6      charge, because it's inconsistent with the entire theme of the

 7      city statute.

 8           THE COURT:  Let me hear from defendants on this.

 9           MS. LEVIN:  Your Honor, I think the case law on

10      retaliation is clear that even if plaintiff establishes a prima

11      facie case, if the defendant can show that it would have taken

12      the same action even in the absence of protected activity, that

13      the plaintiff doesn't get to benefit from whatever may have

14      happened while he was employed at the company.

15           MR. HUBBARD:  There is no law that I have seen at the

16      trial level.  They proposed this instruction in their

17      underlying proposal, and we objected to it, your Honor.  And I

18      haven't seen any case, certainly from this district, that says

19      what counsel is representing to you.  If there is, we can take

20      a look at it.  But it would be wrong to -- it would be wrong

21      unless there's some consideration of how the motivating factor

22      comes in.

23           In the Rule 50 motion, citing Brighton, the defendant

24      said the plaintiff must establish that the defendant was

25      motivated at least in part by an impermissible motive.  That's

GCE9PIC1

1    in their Rule 50 motion.

2            MS. LEVIN:  That's on a completely different issue,

3    your Honor.  We already addressed the fact that motivating

4    factor is the causation standard under prong four of

5    plaintiff's case.

6            The issue is once plaintiff has established a prima

7    facie case there's a clear burden shifting framework.

8    Defendants are entitled to show that they would have taken the

9    same action in the absence of protected activity.

10            MR. HUBBARD:  Your Honor, there is no prima facie case

11    at this trial level and that is an improper, improper statement

12    of the law under the city statute.

13            MS. LEVIN:  Well I disagree with Mr. Hubbard who is

14    accusing me of misstating the law.  I know the law very well.

15    I know what it is.  I haven't misstated it.

16            THE COURT:  I'll be back.  I'm going to go do some

17    research on this.  I'll be back.

18            MR. HUBBARD:  Thank you, Judge.

19            (Recess)

20            THE COURT:  All of our jurors are here now.  I've

21    looked at that issue.  I do think that it makes sense to delete

22    that from the New York City Human Rights Law claim question

23    five.  I do think that is sort of subsumed within question

24    four.

25            To the extent that defendants still feel this is an

GCE9PIC1

1    issue, I suppose what we could do is after the jury's verdict,

2    assuming there is a verdict at some point, we can give them a

3    special interrogatory and they can answer that question, if you

4    feel that that's some misstatement of the law.  But I think

5    it's appropriate to take that out of the New York City Human

6    Rights Law section.

7            And what is plaintiff's position with that similar

8    question under Title VII?

9            MR. HUBBARD:  Your Honor, I probably need to think

10   about it but I'm not as concerned about it under Title VII.

11           THE COURT:  Okay.  Yes.

12           MR. BORTNICK:  That would come out.

13           THE COURT:  The time is now.

14           MR. BORTNICK:  It would come out of the jury charge as

15   well.

16           THE COURT:  Under the New York City Human Rights Law,

17   we will take that out of the jury charge as well.

18           MR. BORTNICK:  Okay.

19           THE COURT:  All right.  So if you're going to think

20   about it, you better tell me now, because once we start --

21           MR. HUBBARD:  The problem, your Honor, I've tried

22   several of these cases where we didn't differentiate, because

23   you could get an inconsistent answer.

24           So, for example, under the Title VII the jury could

25   return -- answer an interrogatory verdict on adverse actions or

GCE9PIC1

1   materiality or these other things and then they got to get back

2   to them when they get to the city statute or the state statute

3   so you run some risk.  Sometimes we just try to lump them

4   altogether and the but for causation has caused a problem with

5   that.  It used to be that you could just do it all in one

6   place.  I want to look real quick --

7           THE COURT:  Actually as I'm looking at this, it seems

8   that that question -- I don't know if that question is actually

9   in our Title VII verdict form.  I don't think it is.

10          MR. BORTNICK:  It's not.

11          THE COURT:  So that's not an issue.  So I think we're

12  good to go.  Ready for summations now?

13          MS. LEVIN:  Your Honor, I understand the Court's

14  decision.  I simply wish to note for the record our continuing

15  objection to the deletion of that question from the verdict

16  form.  Thank you.

17          THE COURT:  Thank you.  It is noted.

18          Is there anything else before we start closing

19  argument?

20          MR. HUBBARD:  I just want to put these papers away.

21  May I just have 30 seconds?

22          MR. JACKSON:  Your Honor, can we just have one minute?

23  Because of the Court's change, I just want to make a slight

24  change to the PowerPoint that we're using.  And I'm just going

25  to run to the bathroom real quick.

GCE9PIC1

1          THE COURT:  I will give counsel a six-minute break.

2     We will make those corrections to the jury instructions and the

3     verdict form.  As soon as those changes are made we'll give

4     those to counsel's associate counsel so they can look at that

5     before we do anything like that.

6          MR. JACKSON:  Thank you, Judge.

7          THE COURT:  Just going to break.  Then we'll head into

8     summations.  Have counsel been able to edit their summations

9     somewhat in terms of time?

10         MR. HUBBARD:  I have been doing -- practiced it twice

11    and have done the best we can, yes.

12         THE COURT:  Okay.  See you soon.

13         (Recess)

14

15

16

17

18

19

20

21

22

23

24

25

GCETPIC2

| | |
|---|---|
| 1 | THE COURT:  Here is the updated jury charge.  Counsel |
| 2 | can look at that, see if there's anything else that needs to be |
| 3 | dealt with.  Then let's go straight into defense counsel's |
| 4 | summation and take a 20-minute break and maybe we can discuss |
| 5 | other issues with the charge jury charge then. |
| 6 | MR. HUBBARD:  Take a break between the two arguments? |
| 7 | THE COURT:  Yes, that's what I just said. |
| 8 | MR. HUBBARD:  Let me ask, is it possible to get this |
| 9 | verdict form emailed to us by your staff? |
| 10 | THE COURT:  Yes. |
| 11 | MR. HUBBARD:  Thank you. |
| 12 | THE COURT:  I plan on telling the jury that -- give |
| 13 | them a general instruction that counsels' closing arguments are |
| 14 | not evidence, just what counsel believes the evidence has shown |
| 15 | in the case, but jurors should still pay close attention to it. |
| 16 | Anything else from plaintiff? |
| 17 | MR. HUBBARD:  No, your Honor. |
| 18 | THE COURT:  Defense? |
| 19 | MR. JACKSON:  No, your Honor. |
| 20 | THE COURT:  Is there any demonstrative evidence that |
| 21 | either side wants to use?  If so, has it been shown to opposing |
| 22 | counsel already? |
| 23 | MR. JACKSON:  I think all of the demonstratives in |
| 24 | our -- |
| 25 | THE COURT:  Are things that have already been -- |

1    I'm sorry, go ahead.

2    MR. JACKSON:  I think all the demonstratives in ours

3  are things that have been shown.  There shouldn't be anything

4  surprising.

5    THE COURT:  Okay.

6    MR. HUBBARD:  Your Honor, I don't think I intend to

7  use anything other than exhibits that are in evidence.

8    THE COURT:  Okay.  Let's bring the jury in.

9    (Jury present)

10    THE COURT:  Welcome back.  I hope you had a pleasant

11  evening.  Sorry for the delay.  We'll get starting with closing

12  arguments by counsel, and I instruct you that closing arguments

13  do not constitute evidence, it's simply what the lawyers

14  believe the evidence has shown in this case.  You should pay

15  attention.  If anything that counsel says is conflict with your

16  recollection of the evidence in this case, it is your

17  recollection that controls.

18    We will start with the closing argument by defense

19  counsel.

20    MR. JACKSON:  Thank you, your Honor.

21    Good morning, ladies and gentlemen.

22    Now in his opening statement when Mr. Hubbard started

23  out he made clear what he was going to attempt demonstrate

24  during the course of this case.  What Mr. Hubbard said in his

25  opening statement was that the evidence will show that

1    Mr. Picarella stood up for young female colleague who was

2    sexually harassed.  And he also stated that the evidence will

3    show that the senior management did not like it and they

4    retaliated against him for reporting that conduct.

5        Now at this you point, ladies and gentlemen, you know

6    that that's what Mr. Hubbard said at the start of the case, but

7    you have seen all the evidence and it's clear that that is not

8    what the evidence demonstrated.  The evidence hasn't

9    demonstrated anything like that.

10       During several days of trial Mr. Picarella was able to

11   call all of the witnesses that you saw to stand, witnesses from

12   HSBC, former employees of HSBC, anyone could testify.  And when

13   these current and former employees came from all over the world

14   and came from all over the country to testify in this case, you

15   didn't hear a single HSBC employee say that they had any intent

16   to retaliate against Mr. Picarella.  You didn't hear a single

17   witness say that they had seen anyone exhibit an intent to

18   retaliate against Mr. Picarella, and you didn't see any

19   documents to demonstrating an attempt to retaliate against

20   Mr. Picarella.  In short, you saw no evidence whatsoever that

21   supported the theory of the case that Mr. Picarella has

22   attempted to advance during the course of this case.

23       Mr. Picarella didn't get the promotion that he wanted

24   because there was a more qualified woman who had been an

25   excellent worker at her job, and she was selected for it.

1   Mr. Picarella was ultimately terminated from his job years

2   after he alleges that he first complained about protected

3   activity because he was doing a bad job.  He was being a really

4   poor colleague in terms of the way he was dealing with other

5   people, which was a critical part of his job.  That's what the

6   evidence demonstrated, and that's why Mr. Picarella is not

7   entitled to anything under the law and just as a matter of

8   common sense.

9           Now I want to thank you all for your attention during

10  the course of this case.  As we said in the opening statement,

11  we know, we know that jury service is a serious imposition on

12  your life.  It's difficult.  We all know you have other

13  responsibilities; your jobs, your families, your lives.  And

14  for all the parties, we deeply, deeply appreciate how attentive

15  you have been throughout the course of the case.  It's been

16  evident in how you have been patient in dealing with this case,

17  and we attempted to make it as efficient as possible, and I'm

18  going to attempt to make it as efficient as possible today as I

19  talk through what I believe the evidence has shown in the

20  course of this case.

21          Now one of the things I want to say before I talk

22  about that is that I hope that it is not lost in the back and

23  forth in court how important this is, less so because of

24  anything having to do with the damages, money that you

25  ultimately will hear about, but because of the principles that

GCETPIC2                    Summation - Mr. Jackson

1    are involved in this case.  These are very serious laws.  They

2    have to be taken seriously.  And it is a big deal in a case

3    like this when, as we said at the beginning, and as I think the

4    evidence has shown, someone like Mr. Picarella attempts to make

5    a mockery of these laws, attempts to manipulate them for his

6    own purposes.  It's a big deal.  These are important laws, and

7    we ask that you don't lose sight of how important these laws

8    are and how important it is that they're treated seriously.

9            Now I think it is useful right at the outset here to

10   talk about, since we heard now several days of trial, what I

11   would submit to you, based on what you have seen during the

12   course of the case, what is no longer in dispute, no longer in

13   serious dispute, I will submit.  And there are several things,

14   a handful of things, that I think we can easily dispose of,

15   because if you look at the evidence, if you consider the

16   testimony that you heard and what you didn't hear, there are

17   several things that there can be no serious dispute about.

18           What are those things?  First, there's no serious

19   dispute at this point that numerous HSBC employees complained

20   about Mr. Picarella's work throughout the time that he was

21   working there.  You heard from Mr. Picarella's supervisors.

22   You heard from his co-workers, you heard from human resources

23   professionals that were dealing with complaints, and you saw a

24   number of the documents that are related to that.  People were

25   complaining about Mr. Picarella's work product, his follow

 1    through on work, his level -- the way that he dealt with his

 2    colleagues, his communication.  There were a number of problems

 3    that were the subject of discussion from the beginning of the

 4    time he was there all the way up to the end.  There's no

 5    serious dispute about that.

 6         There's also no serious dispute that many of the

 7    people that you heard from had no motive that could even be

 8    articulated by Mr. Picarella to retaliate against him.  And

 9    these are people who observed serious problems with him.  You

10    heard no articulation of why these later supervisors, younger

11    co-workers, would somehow retaliate against Mr. Picarella with

12    no motive whatsoever.

13         You even heard complaints were being made -- and we'll

14    talk about that later, but complaints were being made by the

15    woman that Mr. Picarella claims he was trying to be the white

16    knight for.  She was complaining about Mr. Picarella's work.

17    And there can really be no question that that young woman had

18    no motive to retaliate against Mr. Picarella.  These were

19    genuine complaints about the fact that he was never at his desk

20    doing what he was supposed to do.

21         Let's take a quick look at very quickly some of the

22    trial testimony.  This is what Mr. Picarella said when he was

23    asked the question:  You are aware that Ms. Parker complained

24    that you were doing very little work after you found out that

25    you weren't going to get your bonus?

1        He says that he is aware of that.

2        You heard from Chris DeLuca, and we asked him about

3    several specific incidents back in 2012, the beginning of 2012,

4    before Mr. Picarella had even made the complaints that he's

5    made the focus of this case to HR.  Ms. Parker was telling him:

6    Every day Mike is in the conference room on long phone calls.

7        Then on December 8, 2011, Ms. Parker was saying to

8    Chris DeLuca:  He just doesn't like being told to do things, I

9    guess.  You can have conversations until the day you die, but

10   you also need to sit at your desk, grit your teeth, and do some

11   work.  And Chris DeLuca told you that.  Again, Chris DeLuca had

12   no motive to retaliate.  This is before there was ever any

13   complaint made to HR, even by Mr. Picarella's own timeline,

14   which we will talk about more also.

15       There's also no serious dispute that one of the

16   important aspects of the job performance -- and this is true

17   with any job, but witnesses told you it was particularly

18   important in Mr. Picarella's job -- was appropriate

19   communications with your co-workers.  You heard that even from

20   Ian Mullen, who is really the one person that --

21   Mr. Picarella's mentor, who testified that he had some positive

22   things to say about him.

23       And he we asked him:  One of the things you were

24   describing in your direct testimony was the role for

25   Mr. Picarella was hired.  And you would agree with me it would

 1    be very difficult to perform that role if one wasn't operating

 2    at the appropriate level of collegiality, correct?  And the

 3    answer from Mr. Mullen was:  Yes.  Obviously yes.

 4         This was an important part of his job, because a lot

 5    of his job had to do with coordinating people, being the link

 6    between different businesses and different roles people were

 7    playing, and every one that you heard from said Mr. Picarella

 8    was terrible at that.

 9         There's also no serious dispute, as I said a moment

10    ago, that a number of complaints were made about Mr. Picarella,

11    numerous complaints were made before any complaints that could

12    have led to retaliation.  There's no dispute that the human

13    resources professionals that were involved in this case handled

14    everything dealing with Mr. Picarella professionally and

15    courteously.

16         And you saw these people, you saw them come in and

17    testify under oath, and they all talked to you about how much

18    they attempted to respond to Mr. Picarella's concerns in a way

19    that was professional and courteous.  Ms. Bilbrey, Ms. Weiss,

20    Ms. Malanga, Sue Jang, all the women who worked in human

21    resources came in and talked to you about how important it was

22    to make sure that they were giving him appropriate

23    consideration to deal with him professionally and courteously.

24         And Mr. Picarella even admitted, when he was asked

25    about this:  By the way, let's go to the top and close this

 1   out.  And we asked him:  This was a professional response in

 2   your mind?  Absolutely, he said.  It was a courteous response?

 3   He said yes.  He acknowledged that about a number of HR

 4   professionals, they had been courteous in their dealings with

 5   him, and this is no real dispute about that.

 6        There's also no dispute that by 2014 Mr. Picarella was

 7   only spending ten percent of his time in the office working.

 8   That's something that Mr. Picarella had to admit to on the

 9   witness stand.  He's only spending ten percent of his time, by

10   2014, working.

11        And this is, I would submit, ladies and gentlemen, one

12   of the more amazing answers, because we asked him:  When you

13   went to work, if you only had enough work to take ten percent

14   of your time, how did you occupy your time?  His answer was:

15   It wasn't easy.  I would read at my desk, read news articles

16   related to business, talk to colleagues in the building trying

17   to talk about business, and work on personal stuff.

18        Now you have all worked at jobs.  You have worked at

19   places, and I submit to you it doesn't match your common sense

20   that in an organization where there is as much that needs to

21   get done as needed to get done at HSBC that Mr. Picarella can

22   only find ten percent of his time with something to do.  Does

23   that comport with your experience at any job that you've ever

24   worked, that there was a guy that nobody needed him to do

25   anything?  Does that match up with what saw in the documents?

1  No.  But we'll talk about that.  There's no real dispute about

2  that.

3          There's also no dispute that Pablo Pizzimbono and Suzy

4  White, two of the core people that Mr. Picarella claimed were

5  involved in retaliating against him, there's no dispute,

6  pursuant to Mr. Picarella's own testimony, that these people

7  were both supportive of Mr. Picarella at various points.  They

8  were attempting to be supportive of him and reaching out and

9  trying to give him a fresh chance, a fresh shot over and over.

10 Ms. White talked about trying to find new supervisors for him

11 at different points.  There's no dispute about that.

12         And finally, there's no serious dispute that HSBC

13 continued to employ Mr. Picarella for years, years after he

14 first made his complaint.  And that, ladies and gentlemen, is

15 just inconsistent with any common sense notion of what

16 retaliation looks like.  You don't keep a guy for years and pay

17 him hundreds of thousands of dollars if you're trying to

18 retaliate against him for a complaint.  It doesn't make any

19 sense.  They were trying to give Mr. Picarella a fresh shot.

20 No dispute that Mr. Picarella worked there for years after what

21 he claims was his initial complaint.  And this really puts the

22 nail in the coffin, I think, of his retaliation claim.

23         But given all of that, given all of those things are

24 not in dispute, ask yourself:  What is the dispute?  And I

25 think it's a legitimate question because it's a little bit

GCETPIC2                         Summation - Mr. Jackson

1    difficult, but I submit to you, based on the evidence that you

2    heard, based on Mr. Picarella's failure to call any witnesses

3    who were able to provide anything that sounded like a

4    description of any real retaliation, based on all the

5    documentation that you saw in this case, the only question that

6    is in dispute arguably in this case is:  Is there any way,

7    applying the law fairly, that you can disregard all of that

8    evidence, all the testimony that you have seen in this case,

9    and arrive at any verdict other than a verdict of no liability

10   in favor of HSBC?  I would submit to you, ladies and gentlemen,

11   very humbly, the answer to that question, the simple answer to

12   that question is no, there is no way.

13          All I will talk about with the remainder of my time is

14   why that's the case.

15          Let me talk about briefly discussing the law that

16   would apply in this case.  I will not spend a tremendous amount

17   of time on this because the judge will give you very detailed

18   legal instructions that control.  This is just my attempt to

19   give you some framework so you can anticipate the law you're

20   going to hear from Judge Carter, and I want you to understand

21   some of the arguments that we're going to make today and the

22   law you are going to be instructed on.

23          Mr. Picarella has the burden in this case.  And that's

24   very important.  We weren't required to do anything in this

25   case.  We made a number of witnesses available to

GCETPIC2                    Summation - Mr. Jackson

1     Mr. Picarella.  We called our own witnesses.  We asked

2     questions of witnesses that Mr. Picarella called.  Some of

3     those people we probably would have called ourselves, but we

4     presented a lot of information to you.  But we weren't required

5     to do anything.  The burden in this case at all times was on

6     Mr. Picarella to prove that there had actually been

7     retaliation.  He's utterly failed to meet that burden.

8          There are four elements, essentially, that

9     Mr. Picarella has to prove.  Now the judge is going to instruct

10    you a little bit later on the fact of federal law and talk

11    about state law, there is no state law claim at this point, the

12    city law claim, so it's a federal and a city claim.  And the

13    first one is that Mr. Picarella engaged in protected activity.

14         Now I'm not going to spend a lot of time on that

15    because you can assume that he engaged in some protected

16    activity at some point and it would still be very easy,

17    focusing on the rest of the case, to conclude that he can't

18    meet his burden.  But I submit to you, ladies and gentlemen

19    even on that element, even on the engaged in protected

20    activity, you yourself could have serious questions.  Because,

21    as the judge is going to instruct you later on, Mr. Picarella

22    has to establish that he had a good faith belief, basically, a

23    good faith belief that he was engaging in protected activity

24    complaining about sexual harassment.  I think if you look at

25    the course of this case, if you look at the timing of it, if

GCETPIC2                    Summation - Mr. Jackson

1    you look at what he did and why he did it, you could have

2    serious questions about the good faith.

3          Second element is HSBC had knowledge that

4    Mr. Picarella had engaged in protected activity.

5          The third is that Mr. Picarella was subjected to a

6    materially adverse action at the time or after the protected

7    activity took place.  That's the federal standard.  It's

8    slightly different from the city statute, but it's getting at

9    the same things in terms of facts.  Conduct that was reasonably

10   likely to deter a person from engaging in protected activity.

11         Mr. Hubbard may describe it differently because

12   Mr. Picarella had a lot of complaints, but I think the two

13   things that are adverse actions that are really the focus in

14   this case are Mr. Picarella's failure to get the promotion that

15   he wanted and ultimately went to Ms. Jenner, and Mr. Picarella

16   being fired.  There's no question that he got fired.  There's

17   no question that he didn't get that job.

18         We don't consider the first one to even plausibly be a

19   possible materially adverse action against Mr. Picarella

20   because he wasn't entitled to it.  He didn't get a demotion, he

21   kept his salary.  But the second one, it certainly can be

22   considered conduct that could deter a person.  So you can take

23   that into consideration.  You can think about his termination,

24   and ask yourself, and this is the key question, the fourth

25   element:  He has to prove, he has to demonstrate, it's his

1    burden to demonstrate any materially adverse employment action

2    that Mr. Picarella was subjected to was the but-for cause of

3    Mr. Picarella's protected activity for the Title VII claim.  Or

4    he has to demonstrate that, for the city claim, that the

5    but-for cause of the adverse employment action -- for the city

6    claim he has to demonstrate that the adverse employment action

7    was motivated by Mr. Picarella's protected activity.

8            So for one he has to demonstrate that he was fired

9    because of the protected activity, that has to be the cause,

10   and for the other one he has to demonstrate it was motivated.

11   He can't come close on the evidence to either one of those

12   standards.  It is not a close question because there's no

13   evidence in the record of anyone being motivated, and we'll

14   talk a little bit more about that.

15           Now I want to talk to you -- just in term of going

16   through the evidence before I talk about some of the arguments

17   that Mr. Picarella is focused on, I think it's useful to talk

18   about what the road was to Mr. Picarella's termination, because

19   the termination is really the key focus of this trial.  And I

20   submit to you that it's not really that complex of a question.

21           There are basically ten steps on the road to

22   Mr. Picarella's termination, and you can think of it almost

23   like the yellow brick road, except the three companions that

24   Mr. Picarella brought were greed, opportunism, and, of course,

25   laziness, instead of the cowardly lion, the scarecrow, and the

GCETPIC2                    Summation - Mr. Jackson

1    tinman.

2            Let's start at the first step.  Mr. Picarella

3    discovered within months of coming to HSBC the people were not

4    happy with his performance, and that he was not likely to get

5    the bonus that he wanted.  That's the first step in what

6    happened.

7            And if you look at this, this is back in 2011, again

8    this is before he's made any complaints about sexual

9    harassment, and he is already having conflicts with various

10   co-workers.  This is some beef that he had with an individual

11   named Kieran that was completely unclear.

12           Then more evidence of conflicts in 2011.  This is in

13   June of 2011, he is having this fight with this individual

14   named Brady who is calling him a political animal and engaging

15   in all these conversations with Ms. Hedges about the back

16   biting and everything that is going on here.  He's complaining

17   that someone is saying that his group is lazy.  He's talking

18   about ring fencing people, whatever that means, a need to keep

19   people in check.

20           This is a level of animosity with one's colleagues

21   that I submit to you you rarely see for someone who has only

22   been at their job for a month or two.  He's only a month or two

23   into his job and he's involved in numerous conflicts with

24   people.  And Mr. Picarella admitted this whole thing with

25   Patrick Brady:  That has nothing to with any retaliation

1    issues, right?  He agreed:  No, it didn't.

2             What else?  This is the situation where Mr. Picarella,

3    in November of 2011, approached somebody who he said turned

4    beet red -- which one of Mr. Picarella's catch phrases when he

5    starts describing these conflicts with people.  He said the

6    person turned beet red when he confronted this much more junior

7    guy, who only said -- who only went to Mr. Picarella's boss

8    because Mr. Picarella wouldn't respond to his emails.

9             This guy is trying to get his job done, some younger

10   guy at the company trying to get his job done, and

11   Mr. Picarella wouldn't respond to his emails.  You don't see

12   anything in here saying that Mr. Picarella told the guy, "I

13   have responded to your emails," because he hadn't.

14            Of course, we know from the course of the case the guy

15   went to his supervisor and said this guy doesn't respond to

16   emails.  Instead of engaging in a professional, reasonable

17   response, Mr. Picarella goes up and threatens this guy at work.

18   I mean that is stunningly unprofessional and uncollegial

19   behavior.  He is saying to them he told the guy:  Be careful.

20   Be careful.  Who does that at work to a younger colleague who

21   is simply asked:  Could you remind the guy we need somebody to

22   respond to these emails?  That is improper behavior.

23            And Mr. Picarella admitted this.  The reason you were

24   telling him he needed to be careful is because he made a

25   complaint to your supervisor that you don't answer his e-mails.

1    It looks that way.  Again, I don't really clearly remember the

2    situation.

3           I submit to you, and this is something we'll talk

4    about later, Mr. Picarella doesn't remember the details of

5    things that are problematic to him, but that is neither here

6    nor there.

7           Now we also know that Ms. Parker was complaining

8    during this early time period about the fact that he wasn't

9    around.  They referred to him as:  Where's Waldo?  And

10   Mr. Picarella conceded that, that people were saying in real

11   time at that time:  Where's Waldo?  That was their reference to

12   Mr. Picarella.

13          Ladies and gentlemen I submit to you that is -- it

14   takes a lot for your co-workers to think that you are so

15   invisible and hard to find in the office that they're referring

16   to you as:  Where's Waldo?  That's not being absent once,

17   that's not being absent twice, that is we cannot find this guy.

18   And again, these are people who were talking.  This is before

19   there's any motive to retaliate, and they're certainly people

20   who have no motive to retaliate because this is the woman who

21   Mr. Picarella was allegedly trying to protect.

22          Now we also know, by the way, that Mr. Picarella spent

23   a lot of time in dark conference rooms.  This is something that

24   Mr. DeLuca told you about, that he found very strange.  You

25   don't see people in -- you see people in conference rooms all

1    the time, but you don't generally see him in a conference room

2    sitting in the dark on a cell phone.  Mr. DeLuca has no skin in

3    this game, and he described behavior that was very strange, and

4    a number of other people also described that.

5            Now this is Mr. Descamps' testimony about these

6    earlier problems that we saw.  And this is in early 2012, again

7    before Mr. Picarella has made any of the complaints that he

8    claims he made to HR, Didier Descamps was having a conversation

9    with Mr. Pizzimbono, and a number of people told you about

10   this, told you that they remembered this contemporaneous

11   conversation where Pablo Pizzimbono and Didier were speaking

12   about the fact that Pablo spoke to me about the fact that the

13   first months of performance were not at the level he was

14   expecting.

15           I submit to you ladies and gentlemen, it wasn't

16   because he didn't have the abilities, it was because he was

17   lazy.  It was because he didn't want to do his job and wanted

18   to treat his colleagues poorly.  He spent his time threatening

19   some junior guy telling him to be careful when he should have

20   been focused on doing his job.  Again, these are some of the

21   other things we can talk about, Weiss talked about it.

22           And by the way, it's worth mentioning very briefly,

23   you heard Mr. Ian Mullen.  Mr. Hubbard may talk about him

24   later.  He said some nice things about him.  He said he was

25   Mr. Picarella's mentor.  We submit his testimony is really

1    meaningless in this case because Ian Mullen didn't really have

2    the opportunity to observe Mr. Picarella during the first few

3    months that he was there.

4          And even during that time what he is saying is that:

5    What portion of the day would you spend with Mr. Picarella

6    during the time period?  Maybe one percent, two percent.

7    That's the only witness that Mr. Picarella called in this case

8    who is able to say anything positive about Mr. Picarella's work

9    experience, and this guy had no real exposure to Mr. Picarella.

10   99 percent of the time he was dealing with other people.  He

11   was trying to be nice, but his testimony is really not

12   meaningful.

13         What's the second step on the road to Mr. Picarella's

14   termination?  It was after he learned he wasn't getting the

15   bonus he wanted his already poor work started deteriorating

16   even further.  And we saw during the course of this case that

17   Mr. Picarella knew that.  So he started looking for another

18   job, again before any of the alleged retaliation issues started

19   to develop.

20         This is during -- we asked him about this, yes or no,

21   your conversations with Mr. Freer -- that's the recruiter that

22   he was speaking to relatively early during his time there --

23   had nothing to do with retaliation?  He agreed with that.

24   Mr. Picarella said:  Yeah, I wasn't retaliated against at that

25   time.

1            I asked:  Were you looking for a new job at that time?

2            He said:  No, but I was beginning to have some doubts

3    as to whether HSBC was the right place for me.

4            He's looking for a new job.  Why?  Just based on what

5    I saw, a toxic relationship, the bonus was not what was

6    promised.

7            Again, multiple witnesses told you he was never

8    promised any huge bonus.  He got a nice bonus anyway.  Most

9    people would consider a $50,000 bonus on top of making a couple

10   hundred thousands dollars or $250,000, whatever he made, is a

11   nice bonus, but he was upset that it wasn't bigger.

12           And at that point, because of that, he considered it

13   to be a toxic environment.  He was looking for a new job,

14   ladies and gentlemen, because he had already heard from

15   supervisors that they were really dissatisfied with his work,

16   and that's where things started to get even worse in terms of

17   Mr. Picarella's job performance.

18           Now the third step, I submit to you, in the road to

19   Mr. Picarella's termination was Mr. Picarella started to put

20   together his secret plan to take over the unit.  And this I

21   think ties into the opportunism that you saw repeated with

22   Mr. Picarella throughout the case.  This is a guy who is always

23   focused on trying to take advantage of whatever opportunity can

24   arise and turn it to his own benefit.

25           He's communicating -- for whatever reason he doesn't

GCETPIC2                      Summation - Mr. Jackson

1    like the situation that's unfolding with his co-workers.  He's

2    communicating with someone, Marie-Jo Rogers, the woman who was

3    his friend to begin with, who he later ended up concluding was

4    someone he suspected, on no evidence, was attempting to

5    retaliate against him, but this was his friend at this point.

6    And he's communicating to her:  I do have an objective for next

7    year that I'm keeping to myself.

8            Then after that he has a conversation with Mr. O'Leary

9    where Mr. O'Leary says, "So the group is all yours now," when

10   Ms. Hedges is out because of a medical procedure that she had

11   to have, and his response is one word:  Soon.

12           That's what he said.  We heard no explanation of what

13   he was talking about during his testimony about this, but it's

14   pretty obvious what he's talking about.  The secret plan is

15   that he's going to do whatever he needs to do to try to push

16   Ms. Hedges out of the picture and assume control of that group.

17           What's the fourth step of this?  Mr. Picarella began

18   speaking with human resources about all these problems with

19   Ms. Hedges in April of 2016.  Now this is a really important

20   part of sort of the timeline of this case, and what I would

21   submit to you is Mr. Picarella's attempt to smudge and make

22   fuzzy and unclear in this case what he was complaining about

23   when.

24           In April of 2016 he starts talking to human resources,

25   and everyone freely admitted yes, he talked to us then.  The

1    complaints that he's making in April of 2016 had nothing to do

2    with any alleged sexual harassment of Ms. Parker.  They were

3    taken extremely seriously by HSBC, because HSBC, you heard, has

4    a policy against any type of harassment or bullying, and if

5    it's directed at Mr. Picarella, it's important to HSBC if a

6    supervisor is not acting properly.  So it was taken seriously.

7    But it had nothing to do at that point with any alleged

8    harassment of Ms. Parker, which is what this case is about, and

9    Ellen Weiss told you that.

10            When he described this to you, did he describe this in

11   the context of something that he thought was directed to

12   Ms. Parker or more generally?  And she said:  Definitely not at

13   Ms. Parker.  It wasn't explained that way.  It was Ms. Parker

14   was there, but it was -- when we were talking about it, it was

15   about Mike.  Ellen Weiss was talking about the fact that

16   Mr. Picarella was complaining about his treatment of him.

17            And Mary Bilbrey told you the same thing.  At that

18   point -- it was not at that point that it was really raised

19   that there was an issue of harassment, more that there was

20   inappropriate behavior.  He was complaining about what he was

21   observing in terms of Eileen Hedges and her treatment of him.

22   And also he just didn't like the friendship, whatever it was

23   that he saw between Ms. Hedges and Ms. Parker, because he felt

24   that he was being subjected to it.  That was not a complaint

25   about sexual harassment.

1        This is Ellen Weiss.  You remember she took

2   contemporaneous notes of this that matched up perfectly with

3   what her testimony was, and she is saying -- we asked her:

4   What was your understanding of what he was saying about the

5   giggling and winking?  That's a reference to one of the notes

6   that she took to memorialize what Mr. Picarella was telling

7   her.  Mike said at the beginning that he actually said that he

8   felt at some point they should be separated because they were

9   giggling and would go out together and joke amongst one

10  another, and he felt uncomfortable being part of that.  This is

11  a guy that had two women he was working with and he didn't like

12  that they were giggling too much.

13        Mr. Picarella worked on a sales floor where there are

14  like hundreds of people, and he individually on the desk -- you

15  saw a picture of that -- he individually throughout his time

16  there had all these grievances about he felt that everyone on

17  the sales floor should be bowing down to his notion of what

18  would make Mike Picarella happy.  And you heard later on, and

19  we'll talk about this, he was complaining that someone was

20  humming; actually went to human resources with a complaint that

21  someone was humming in the room.  This is a guy who -- this is

22  not what he represented it to be.

23        One of the ways that you know this is not what he

24  represented it to be is because during this time period he's

25  actually complaining about Ms. Parker and he is disparaging

GCETPIC2                    Summation - Mr. Jackson

1   Ms. Parker.  He acknowledged that on the witness stand.  We

2   asked him:  Sir, I want to ask you very simply -- he wanted to

3   wrestle with this, you saw on the witness stand.  He didn't

4   want to answer the question because Mr. Picarella knows it's

5   inconsistent with his story.

6          But when we were asking him -- can you go back to the

7   previous slide?  When he said very simply, yes or no, during

8   this time period you were having a number of conversations with

9   Ms. Hedges where you were disparaging Ms. Parker, correct?  And

10  his answer was yes.

11         I mean he's actually disparaging the woman that he

12  claims durning this very same time period he was so concerned

13  about what was happening to her.  If you were so concerned

14  about what was happening to your colleague, about what a boss

15  was doing to your colleague, would you be talking to that very

16  same boss and trashing them repeatedly in communications?  No.

17  That doesn't make sense.  That doesn't comport with any common

18  sense notion of the way people behave who are concerned about

19  other people.

20         And we talked about it here:  At this point, you

21  didn't view her as a victim, right?  And he said:  Right, I

22  wasn't sure.  Right, exactly.

23         We'll talk about that more, but it's inconsistent with

24  what he later puts into his EEOC complaint.

25         And this is more of him disparaging her.  This is in

GCETPIC2                        Summation - Mr. Jackson

1   August, he's talking about she's very sneaky.  And this is

2   months after his EEOC complaint that he claims he started to

3   become so disturbed about what he observing with Eileen Hedges

4   he's accusing this woman of being sneaky and painting herself

5   as a victim.  This is one of a number of ways in which he is

6   disparaging Ms. Parker.

7          Now the fifth step on the road to Mr. Picarella's

8   termination is that at some point much later, in 2012 --

9   actually, let me back up just a second.  At some point later in

10  2012 Mr. Picarella finally makes a complaint to human resources

11  that relates to Michelle Parker.

12         Now again, this comes back to opportunism, and we'll

13  talk a little more about this.  But one of the important points

14  that you can't miss from the testimony is that Mr. Picarella

15  makes this complaint after Michelle Parker no longer works at

16  the bank.  She's no longer working at the bank.  And that's

17  when he decides to go and make the complaint about her being

18  sexually harassed.

19         I just ask you, ladies and gentlemen, to ask yourself

20  if that comports with your notion of the way someone in good

21  faith was trying to look out for someone else behaves.

22         (Continued on next page)

23

24

25

1            MR. JACKSON:  (Continuing)  This is also after human

2     resources already knows about what happened to Ms. Parker

3     because she told them.  It's pure opportunism.

4            The sixth step on the road is that HSBC appropriately

5     removes Ms. Hedges from her supervisory role and later

6     terminates her, as you heard, and promotes Carol Jenner to

7     Ms. Hedges' former job based on merit, purely based on

8     Ms. Jenner's merit.  Very hard working woman.

9            Now, why is this important?  Because Hedges being

10    terminated, first of all being demoted, removed from her

11    supervisory role after complaints are made by Mr. Picarella and

12    a number of other people, being removed from her supervisory

13    role and later being terminated, it's completely inconsistent

14    with the idea that the bank wanted to retaliate against him.

15           They got rid of the woman that he's complaining about

16    and they kept him.  She lost her job.  He continued to make

17    hundreds of thousands of dollars for years.  That's not

18    retaliation.  That's not something that you see when someone is

19    trying to retaliate against someone.  It doesn't match up.

20           And just for a moment I want to talk about the Carol

21    Jenner situation.  Because I submit to you, ladies and

22    gentlemen, one of the more offensive ideas to any logic in this

23    case is the idea that Mr. Picarella was retaliated against

24    because he didn't get Carol Jenner's job.  I mean that is

25    offensive to logic.  Because you all heard from everyone who

GCE9PIC3                    Summation - Mr. Jackson

1   testified this was an extraordinarily hard-working woman who

2   got the job based on merit.

3          Look at what is going on here.  Mr. Picarella claimed,

4   his only basis for saying that this is retaliation is that he

5   thinks he had more operational risk experience than Ms. Jenner.

6   However, you saw, first of all, during the course of this case

7   that's down at the bottom, that in the peer reviews, people

8   were criticizing Mr. Picarella's operational work experience.

9          You also know that Mr. Picarella had no real

10  understanding of what Ms. Jenner's background was.  He admitted

11  to you on the witness stand that that was just based on pure

12  speculation.  He hadn't seen her resume, he didn't know her

13  background in the industry.  So he's just speculating based on

14  nothing that she only had two or three years of operational

15  risk experience.

16         But what the actual witnesses told you, this is from

17  Mr. Descamps, was that she had previously delivered also with

18  very strong performance -- a very strong performance in a

19  previous role where she was previously working in the

20  operational risk department, where she had a lot of experience

21  and brought that experience to our team.  And then he explained

22  why that's important.  Managing our risk is key to our

23  business.  You know that, just as people who have money in a

24  bank, banks are dealing with the money of customers and it's

25  important to manage risk in terms of that.  And this is

1    something that they believe was absolutely key and that she was

2    better at.

3              So look in here.  The performance reviews.  If you

4    look at the 2011 mid year performance review.  And this is

5    Mr. Picarella is already performing badly, but before he really

6    started to perform super badly after he didn't get the bonus

7    that he wanted, his rating is a three, which we've heard a

8    number of times had an automatic strong behind it.  But they're

9    already talking about criticisms associated with Mr. Picarella.

10             Ms. Jenner has a higher rating.  She's a two.  And I

11   submit to you, ladies and gentlemen, based on -- look at what

12   was said about Ms. Jenner in these performance reviews.  These

13   aren't after-created documents.  These are documents that were

14   created years before this case when no one knew that

15   Mr. Picarella was going to make complaints about retaliation.

16   "Carol continues to do a great job and grow in this position.

17   Carol continues to be hard-working, reliable and willing to do

18   what's necessary to ensure projects are completed on time and

19   accurately."

20             That's like the opposite of what everyone testified

21   was their experience with Mr. Picarella.  That's not to --

22   look, we're not trying to dump on Mr. Picarella.  But what he

23   is presenting in this case is not a fair recitation of the

24   truth.  It's not what actually happened.  Okay

25             This is a woman who was more qualified for the job

GCE9PIC3                    Summation - Mr. Jackson

1    than him.  And the fact that he's upset about that is not

2    retaliation.

3            Let's look at the next one.  This is another one.

4    People are already talking again in his early reviews.  He

5    needs to be better at communicating.  Again, outstanding

6    reviews.

7            By the way, again, we talked about this a little

8    bit -- actually we'll just move on.  Let's go to the next slide

9            Now I want to talk about this a little bit because

10   this brings us to the seventh step really of the road to

11   Mr. Picarella's termination.  His terrible work continues

12   through 2012 and 2013.  And you saw a number of different

13   aspects of the evidence that demonstrate this.

14           This is the list of names that Mr. Picarella

15   submitted.  He wrote:  Here are a few names that I have worked

16   closely with across different business units in 2012.

17           And again Mr. Picarella in his testimony tried to back

18   off of even this e-mail where he clearly is the one that

19   selected these people and he tried to say:  Well, you know,

20   some of those people were suggested to me.

21           No.  He picked these people out to be his reviewers.

22           And Ms. White, who also is a person you heard, had no

23   motivation whatsoever to be retaliating against Mr. Picarella,

24   she's just a person who worked at HSBC, was trying to do her

25   job.  She contacted the people for the standard 360 reviews

 1    where your peers get an opportunity to comment on your work.

 2    And what did we see?

 3              I'm not going to go through them all because, frankly,

 4    you heard about them from a number of witnesses.  But this is

 5    one of his peers, Mr. Pietroforte, saying on more than one

 6    occasion the root cause of the issue was not corrected and the

 7    same issue came up more than once.  As business manager, I

 8    would expect him to understand, manage, and improve the

 9    process.

10              Let's go to the next one.  This is Mr. Blizzard.  I

11    believe these meetings could be more productive and efficient

12    if he was more familiar with the rules, materials, and/or

13    relevant procedures in advance of these meetings.

14              Let's go to the next one.  Mike's participation in

15    this effort has had fits and starts.  There's a lack of

16    understanding the details needed to effectively challenge

17    logistics function.  I find the help is limited in scope to

18    e-mail chasers and organizing meetings.  That's Cary Goodwin.

19              In my dealings with Mike Picarella I found him to be

20    unreliable.  He's lacked follow through on the projects we've

21    worked together on.  I don't find him to be the go-to

22    professional we need in that role.

23              Now, again, this is -- these are his -- these are

24    other people in the job who really have nothing to do with any

25    of Mr. Picarella's allegations in any real way other than he

1    claims that basically everyone who ever said anything bad about

2    him is somehow engaging in an attempt to retaliate against him.

3    And they are just giving honest critiques.

4           Now, ladies and gentlemen, I submit to you that if

5    you're working in your job you know how difficult it is to

6    write a critical review of one of your colleagues.  Nobody

7    wants to do it.  Nobody wants to write a review saying that the

8    person that they work with is not up to the job.  Okay.  It

9    takes a lot for somebody to do that.  And the people are doing

10   it because Mr. Picarella is so bad at his job that they can't

11   in good faith respond to Suzy White's e-mail without giving

12   these very serious criticisms of the way that he's performing

13   at work.

14          This was the mid year review summary.  And

15   Mr. Picarella during his rebuttal testimony, which we'll talk

16   about briefly later, he made the amazing statement that no one

17   said to him during the time, you know, offered him criticisms.

18   Well this is back in 2012.  You know, there's a general feeling

19   that while you're keen to help you are not always reliable to

20   follow through an issue to resolution.  You need to work on

21   developing the skills required to resolve the problems.  Also

22   felt that you lacked a detailed knowledge of the global markets

23   business

24          Now that's the whole job.  I mean having knowledge of

25   the business, follow through, resolving the problems.  And it's

 1   one of the nice things that people try to say about
 2   Mr. Picarella in some of these reviews throughout the time he's
 3   there, they say he's good at raising issues but he never solves
 4   them.  You know from your own common sense that's probably the
 5   least helpful person in the world, the guy who like when you're
 6   riding a car is like I think we got a flat.  You can hear it.
 7   Everyone hears it like this.  Then it comes time to change the
 8   flat and he's like good luck with that.  We all know we got a
 9   flat.  Somebody's got to get the jack out.  Let's help.  Let's
10   help with the problem.
11            Now, just another thing that I think is important to
12   keep in mind as you look at the time period that Mr. Picarella
13   is doing this bad work is that Mr. Picarella was repeatedly
14   refusing to do work.  I submit to you that that's exceptional.
15   I submit to you that in your experience you would probably
16   rarely, if ever, encounter a situation where supervisors are
17   repeatedly asking someone to do a job and he's refusing to do
18   it.  And we saw that repeatedly from Mr. Picarella.
19            This is where we were asking him about the fact that
20   on certain occasions some of his colleagues complained to him
21   about his failure to attend certain meetings.  And I think we
22   all remember the calendar he showed us where he supposedly went
23   to all these meetings.  Those are just Outlook entries,
24   completely meaningless
25            What he says is he recalls this e-mail where this guy

GCE9PIC3                    Summation - Mr. Jackson

1   named Mike Susoev, another person who has nothing to do with

2   anything with alleged retaliation, said you physically haven't

3   attended the meeting in three-plus months.  When you did, you

4   showed up late and sat there clicking away on your BlackBerry.

5   Not exactly the definition of a fully engaged participant.

6          And that's in July of 2012.  This is way back.  This

7   is literally years before he ultimately gets fired.  People are

8   complaining that he hasn't shown up to meetings in months and

9   that when he comes he's not even paying attention.  He's doing

10  something crazy.

11          Now, ladies and gentlemen, I would just submit to you

12  that, again, it takes a lot for in a typical corporate setting

13  someone to one take note of the fact that a guy is not

14  attending meetings.  You've got to miss a lot of meetings

15  before people are, like:  That dude is never at the meeting.

16  And the one time that he was there, he's just clicking away on

17  his BlackBerry.  This is a colleague who has nothing to do with

18  what Mr. Picarella is alleging was in retaliation in this case,

19  who is coming to him and saying:  Please, you've got to come to

20  the meetings.

21          It's just laziness and there's really no other word

22  for it.

23          Can we go to the next slide.  This is a 2012 e-mail

24  from Ms. Jenner who is the new supervisor; again, who was given

25  to Mr. Picarella, had no involvement with his earlier issues

1  with Ms. Hedges.  And she's asking him to do stuff.  She's

2  pointing out how busy she is on stuff.  And his response to one

3  of the things is:  I'm bogged down with a number of other tasks

4  can we pass this off to somebody else

5          And then on another occasion he's communicating to

6  Suzy White and Carol Jenner, his boss and his boss's boss:  I'm

7  covering sales functions that other people would cover in

8  addition to my normal job functions and DF suitability.  I have

9  zero capacity.  Actually in deficit

10          Now, ladies and gentlemen, when have you -- one of the

11  sort of amazing things in terms of the timeline that

12  Mr. Picarella has set out in this case is that he apparently

13  went from a situation where even though no one else who

14  testified in this case could understand how he could possibly

15  be too busy, because he's not showing up to meetings, everybody

16  is saying he doesn't get anything done.  But somehow during

17  that whole time period in 2013; 2012, 2013, he's too busy to do

18  anything that people are asking him to do.  And then at a

19  point that he can't identify he goes all the way to the other

20  extreme where he has nothing to do but surf the web.  That

21  doesn't make any sense, ladies and gentlemen.  We actually

22  asked him:  Can you tell us at what point this transition

23  happened?  He's like, hard to say.

24          Ladies and gentlemen, that doesn't comport with your

25  common sense.  People were asked -- and it definitely doesn't

1     comport with the evidence.  People were asking Mr. Picarella

2     the entire time he was there to do jobs.  He was refusing to do

3     them.

4               And that brings us to the eighth step on the road to

5     Mr. Picarella's termination which is that by 2014 he is

6     literally doing nothing at work.

7               By the way, actually go back.  This is just important

8     because one of the other things that people were complaining

9     about is that he was -- his communications were improper, they

10    talked about the fact that he was abrasive and sometimes

11    offensive and how that gets in the way of getting results

12    delivered.  And that's not something that people say everyday

13    about their coworkers in a normal environment, certainly not

14    executives who are supposed to be mature people at work, who

15    are supposed to be senior vice-presidents; that they're

16    operating the way that people are finding abrasive and

17    offensive.  Those are extraordinary criticisms.

18              Now, again, by 2014, by Mr. Picarella, he's forced to

19    admit this, because the reason he's forced to admit this is

20    because there is no work that he can show for his entire time

21    during this time period, there's almost nothing he can show for

22    this time period.  He points to a couple of random things but

23    he's got this whole claim that his responsibilities were taken

24    from him

25              But he makes the statement.  It wasn't easy, it wasn't

1    easy.  And, ladies and gentlemen, that is a ridiculous

2    statement.  He's talking about working on personal stuff

3    sitting at his desk while he's collecting a huge salary from

4    HSBC and claiming that it wasn't easy.  Okay.  It wasn't easy

5    is digging a ditch all day.  Not sitting in a dark conference

6    room surfing the internet while your colleagues are begging you

7    to do your job and you're spending 90 percent of the your time

8    surfing the web.  It wasn't easy.

9            By the way, his own estimation matched up perfectly

10   with Mr. Karam's testimony.  You saw Mr. Karam said that:  In

11   2014 how much of his workday did he spend at work?

12           It was hard to guesstimate but a minimum

13           More or less ten percent?

14           Could have been either side of ten percent.  Could

15   have been nine, could have been eleven.

16           Would you have preferred that he was a productive

17   engaged member of your team?

18           Absolutely.  And he explained:  Our responsibilities

19   and our role are significant.  We're supporting 150 sales

20   people.  So our plates in the role are full, and there's plenty

21   of work to do, plenty of exposure to be had.  It just requires

22   people to have innative and wanting to progress their careers,

23   to be able to develop some skill sets, to look further into the

24   future for more responsibility.  And he never expressed any

25   willingness to expand that.

1          And, ladies and gentlemen, this is the person that

2    Ms. White explained to you she assigned to Mr. Picarella

3    because he had so much difficulty with all of the other

4    supervisors.  And he was a person that she understood to be a

5    very patient, gentle person who she thought might have a chance

6    to be able to work with him and actually get something out of

7    him.  And even Mr. Picarella, you know, he told you during

8    his -- Mr. Karam told you during his testimony that he started

9    out having collegial communications with him where he was like

10   we had some things in common, same kind of church stuff, and

11   then he would just turn around and just slam me after

12   conversations.

13         And by the way, there is a point where Mr. Picarella

14   is claiming that Mr. Karam threatened him.  And I just think

15   that this is really important that you understand that this is

16   false, okay.  Mr. Karam testified that this didn't happen.

17   Mr. Picarella admitted that he never saw Mr. Karam behave in

18   that way towards anyone, anyone throughout the years that he

19   was working there.  And he admitted that this happened in a

20   glass room on a trading floor that literally hundreds of other

21   people sat on.

22         We asked him:  And no one that you're aware of saw

23   anything like what you're describing, right?

24         Right.

25         Just you?

GCE9PIC3                   Summation – Mr. Jackson

1          Just me.

2          Ladies and gentlemen, do you have any idea how boring

3     it is in the middle of the workday for a lot of people who are

4     sitting on a big trading floor, do you really think that

5     hundreds of people would miss if there was a showdown happening

6     in the glass conference room right there?  Nobody would see it?

7     Nobody saw it but Mr. Picarella?  It doesn't make any sense.

8          The reason it doesn't make any sense is because it

9     never happened.  Mr. Karam didn't threaten him.  He didn't turn

10    beet red like the guy that Mr. Picarella threatened who we know

11    that he actually threatened someone because he admitted it in

12    his communications.  It didn't happen.  It's another attempt to

13    smear a person who had nothing to do with any alleged

14    retaliation

15         And you know Mr. Karam, you saw him when he came in

16    and testified.  This is difficult to come into a courtroom

17    where the guy has accused you of some very serious stuff.  And

18    you saw when he was testifying how uncomfortable it was for him

19    to talk about the fact that like he was being accused of

20    threatening a coworker.  And this ended up all over the place,

21    in the paper.  And it is so contrary to what all of the other

22    witnesses testified about what Mr. Karam was and what even

23    Mr. Picarella testified he knew about Mr. Karam's persona and

24    the way that he generally dealt with his colleagues.

25         So what's the ninth step?  Mr. Picarella –– this is a

1   step that we don't need to spend much time on because it's not

2   really significant.  But the ninth step is that Mr. Picarella

3   is investigated completely legitimately for a leak after he's

4   already given information to the very same reporter.  His

5   attorney has been in contact with that reporter.

6              Look, this is important because for whatever reason

7   Mr. Picarella has made this red herring of like the leak

8   investigation that happened near the end of the time that he

9   was there.  That has nothing to do with anything.  The

10  information that was leaked during the course of that meeting

11  had nothing to do with retaliation, had nothing to do with

12  sexual harassment.  It was basically related to HSBC's

13  customers and it was taken very seriously because banks have a

14  responsibility to protect the information and to protect the

15  sensitive information of the people that they work with.  We

16  all hope for that from our banks that if they find out that an

17  employee might be disclosing information about customers that

18  they'll take it very seriously.  So it was taken very

19  seriously.

20             And one of the people who was at that, who was

21  investigated, for reasons I would submit to you makes sense,

22  was Mr. Picarella.  But everyone said they couldn't determine

23  conclusively, even though they thought based on the factors,

24  like the fact that he was in communication previously with the

25  very same reporter, they suspected him of being the person that

1   was the source of the leak.  But they said that's not -- we

2   can't determine conclusively.  And so that's not going to be

3   factored into why ultimately he was terminated.

4          And that brings us really to the last step on the road

5   to Mr. Picarella's termination which is he was terminated in

6   2015 after years of, frankly, just underperforming, after years

7   of not doing his job.

8          Everyone who testified in this case, everyone who

9   testified in this case said that the reason that he was

10  terminated was because of his lack of performance.  Okay.  He

11  hasn't brought in a single witness.  He wasn't able to bring in

12  a single document to evidence that there was another reason for

13  that.  And there is no other reason.

14         Just very quickly.  You remember Mr. Descamps's

15  testimony, you know, what we discussed, we reviewed the last

16  four years of performance review of Mr. Picarella, that was the

17  essential basis by which we decided it was time to terminate

18  his employment.

19         Then you saw the testimony of Ms. Bilbrey.  Again,

20  this is a person who doesn't even work at HSBC anymore.  She

21  works at a different job in Chicago for a real estate company.

22  She's got no skin in this game.  It was like do you know why he

23  was terminated.  Because of his performance.

24         You heard from Mr. Karam.  You know, his performance

25  had degraded.  I had no choice but to recommend termination.

1    It was at the point where I feel like we weren't connecting

2    where I could help him come along, rehabilitate his career.

3            Sue Jang.  Talked about the fact that even early on

4    Ms. Hedges was making -- raising concerns about Mr. Picarella's

5    performance.  This is going back years, going back before he

6    ever raised any issues.

7            Sue Jang also told you about how Mr. Pizzimbono raised

8    these concerns very early on during the time that Mr. Picarella

9    was there.  And he was given years of second and third and

10   fourth and fifth chances.

11           Mr. Silber described his work.  Again, another person

12   who had had no involvement in anything having to do with any

13   alleged sexual harassment retaliation.  He was describing his

14   work.  He was saying:  I would just call it sloppy, incomplete,

15   not the type of work product I would deliver to my boss and

16   certainly not to my boss's boss.  Unimpressive

17           These are the people that Mr. Picarella chose to call.

18           Mr. Picarella wasn't there.  We asked Mr. Karam:  Was

19   he usually in his office when you would expect him to be?  Not

20   typically, no.

21           Were there times when Mr. Picarella was out of the

22   office and had failed to notify you in advance?  Yes.

23           He said that that happened repeatedly.

24           Did you receive complaints from others at HSBC about

25   Mr. Picarella's responsiveness?  Yes.

1           And he said that Mr. Picarella did not respond to

2     e-mails in a timely fashion.

3           This is really -- there can't be any dispute about the

4     fact the guy just did not respond to e-mails.  You saw going

5     back to the threat that he had against the junior guy.  That

6     was the complaint that led to him threatening that guy to be

7     careful way back at the beginning because the guy was like this

8     guy never responds to e-mails.

9           Did you ever observe Mr. Picarella in a darkened

10    conference room speaking on his cellphone?

11          Often.

12          And he said that it was a difficult situation, but

13    he'd often find him away, nonresponsive in a closed conference

14    room speaking on his personal phone.

15          Talked about his attitude.

16          Can go on.

17          And Suzy White.  This is another important one.  Back

18    in March 14, 2012 she was communicating with Ms. Hedges that

19    based upon the communications it was clear that he had -- that

20    he could not do risk type things.  She explained to you this is

21    really an essential part of the job.  But she is communicating

22    in real time before he's made any of his complaints to HR.  We

23    just can't ask him to do risk type things.  We're going to have

24    to try to find something else for him to do, even though that's

25    the core of his job.

1          Mr. Karam continued to talk about how he failed to

2     take a leadership role.  How he had to be spoonfed in terms of

3     getting him through the actual objective.

4          Now, there are -- just to point out.  I think that

5     there is -- it is important to focus for one second on this

6     three-strong thing because it's been the subject of a lot of

7     testimony.  I think it's obvious to all of you at this point

8     the three rating is meaningless.  Okay.  HSBC discontinued it,

9     you heard, because they even realized we've got a rating system

10    that's broken.  Okay.  It's meaningless.  It amounted to

11    70 percent of the people at the bank got a three rating.

12         So you had people like Ms. Jenner who were in the top

13    20 percent of the employees who got a two or a one.  And then

14    everyone down from like the person who was in the, like the

15    80th percentile, all the way down to the bottom ten percent of

16    employees -- I'm sorry -- were getting like this three rating.

17    And you had to be basically -- you could be almost at the

18    border of the bottom ten percent and still get the three

19    rating.

20         It doesn't mean anything.  You have to look at the

21    words in the review.  You have to look at what absolutely was

22    there.  And that is what explains, when you look at the actual

23    documentary evidence, what was actually going on with

24    Mr. Picarella and what the witnesses testified; how poor his

25    performance was and why he had to be terminated

1           And this is something that Sue Jang explained.  She

2    told you the majority of the people are three strong.

3           Mr. Descamps explained that.  More or less given to

4    70 percent of the population.

5           Now, just to be clear.  This is important because

6    Mr. Picarella hasn't even alleged when he was putting together

7    on the stand his list of people he thought had retaliated

8    against him, he didn't even include Mr. Descamps.  And

9    Mr. Descamps, who came here from France, the French gentleman

10   that you met, he was the ultimate decision maker.  And he said

11   he did it purely on review of the performance report.  And he

12   said that he had not heard anyone talk about retaliating

13   against Mr. Picarella.

14          So the ultimate decision maker had no exposure to

15   retaliatory intent and he himself was doing it purely on bad

16   performance.  That's really the end of the question in terms of

17   whether or not this was anything that played a role.

18          Could we just go to slide 116.  Actually go to 114.

19          Just to be clear.  Every witness that testified said

20   that they had never seen any indication of retaliation.  These

21   people all came in and testified under oath.  Unless every

22   single one of them, including people who no longer work at

23   HSBC, people who had no involvement in this, unless every

24   single one of them is lying and came up with part of some

25   massive conspiracy that was created years ago to go back and

GCE9PIC3                    Summation - Mr. Jackson

1    create contemporaneous documents that matched up perfectly with

2    their testimony, unless they are all doing that, he can't meet

3    his burden.  There is no evidence of retaliation.

4              The last thing I'll say is on that, is that he's paid

5    over a million dollars during this time.  And almost all of it

6    is after he makes the complaints that are at issue in this

7    case.  So, ladies and gentlemen, that's not what retaliation

8    looks like.  It just isn't.  He was terminated because he was a

9    poor performer.  And that's his compensation.  It's simple.

10             Take that down, please.

11             Now, there are a couple of special notes that I want

12   to point out about Mr. Picarella's testimony that I think are

13   important for you to take into consideration.

14             One of them is that a lot of the testimony is just

15   illogical.  Years after -- we are now years after he first

16   started claiming retaliation and Mr. Picarella still couldn't

17   describe coherently who he thought was engaged in this

18   retaliation effort against him.  You saw that during the course

19   of this.  We were just asking him a question:  Please, can you

20   tell us who was doing the retaliation.  And he started adding

21   names.  You know he had Ms. Weiss, Ms. Hedges, Ms. White,

22   Mr. Pizzimbono, Mr. Karam, Maria Malanga, Cary Goodwin,

23   Mr. Pietroforte, Mary-Jo, Margaret, Carol Jenner and Bo

24   Prempeh.  All these people were supposedly engaged in

25   retaliation against him just because they said something that

1    was critical about him during the course of time that he was

2    there.  No actual evidence.  He's just slamming everybody who

3    said anything that was critical about him, and even some people

4    who didn't really even have much involvement than that.

5           What else?  Mr. Picarella simply did not tell the

6    truth with regard to his timeline about when certain things

7    happened.  Okay.  And this is something that is made explicitly

8    clear by the testimony.  When you compare his testimony to his

9    EEOC complaint, when you compare it with the documents in this

10   case, it's clear that Mr. Picarella offered false testimony

11   about this on the stand.

12          Now if you look at this, this is from the note of his

13   complaint to HR in October of 2012.  And in this version of

14   what Mr. Picarella told HR that he learned about the Key Largo

15   situation in August of 2012 after Ms. Parker contacted him

16   related to a job referral.  That's what he told HR in

17   October 2012.

18          Let's go on.

19          Then in his EEOC complaint he says that in June of

20   2013 -- and this is important because he acknowledges that

21   Ms. Parker left on June 1, which is a fact.  She left HSBC for

22   new employment on June 1.  He says shortly thereafter he was

23   questioned about this.  And he says on or about June 28 he

24   reported to Weiss and Pizzimbono that Parker had been sexually

25   harassed at an investment conference in Key Largo after hearing

1   conversation about that activity on the desk.  So this is the

2   end of June he claims now, and this is different, right.

3   Because in the EEOC complaint he's claiming at the end of June

4   this is what he heard about -- hearing about this activity on

5   the desk.  Then we get yet another version.  Because he's

6   saying in his trial testimony that in the middle or end of June

7   he overheard Ms. Parker at her desk talking about this.

8           So first he overheard it -- first he learned about it

9   from her telling her when he saw the job -- when she saw the

10  job referral.  Then he heard about it from other people,

11  according to his EEOC complaint, after she left the job, you

12  know, people talking about it on the sales desk.  Then in his

13  testimony he comes up with yet a third version where he's

14  saying in the middle of June or the end of June -- and, by the

15  way, this was after she no longer works there so it would have

16  been impossible -- he's saying that he overheard her telling

17  stories about what happened in Key Largo; at least three

18  different versions of the story of how he heard this that he's

19  giving in the course of different sworn statements.  I mean the

20  EEOC charge is a sworn statement.  The reason there are

21  different versions is because Mr. Picarella is making it up as

22  he goes along.

23          The timeline of when he actually made complaints that

24  related to Ms. Parker is completely muddled because he's trying

25  to obscure his earlier complaints which were about him with

GCE9PIC3                        Summation - Mr. Jackson

1    later on when he talked to HR about stuff that happened to

2    Ms. Parker after he realized that it could potentially benefit

3    him and there was an opportunity for him to benefit.

4                   Can we go to the next slide.

5                   THE COURT:  Just one moment counsel.  Let me just see

6    counsel in the robing room just briefly.

7                   (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GCE9PIC3                        Summation - Mr. Jackson

1              (In the robing room)

2              THE COURT:  Sorry to interrupt your flow.  I thought

3      that was a good stopping point.  I noticed something in the

4      instructions.  Plaintiff's counsel had alluded earlier to my

5      taking out of the instructions the charge about the EEOC

6      complaint.  That was simply an oversight.  And we had talked

7      about yesterday that's part of that.  So I'm going to insert

8      that on page 20 when it talks about his making these claims for

9      retaliation for complaining about the sexual harassment of a

10     female coworker and filing the EEOC complaint.  I just didn't

11     want you to be mistaken that that wasn't in the case as you're

12     summing up.

13             MR. JACKSON:  That's fine, your Honor.  Thank you.

14     Thank you very much, Judge.

15             MR. HUBBARD:  Thank you, Judge.

16             THE COURT:  Okay.

17             (Continued on next page)

18

19

20

21

22

23

24

25

 1              (In open court)

 2              THE COURT:  Go ahead, counsel.

 3              MR. JACKSON:  Thank you very much, your Honor.

 4              What else?  Mr. Picarella also lied during his

 5    testimony about whether Ms. Hedges told him to look for another

 6    job.  This is in his EEOC charge, as plain as day.  His sworn

 7    EEOC charge.  He says by year end 2011 when I met with

 8    Ms. Hedges for my performance review she told me that

 9    Pizzimbono and Suzy White, or the COO of global markets, did

10    not think highly of me and it might be a good idea if I looked

11    for another job.

12              Then we asked him about it on the witness stand:

13    Before you even find out about the bonus situation, Ms. Hedges

14    communicated to you that it was the view of some at the bank

15    that you were doing a very bad job and you might need to start

16    looking for another job, right?

17              No.  That's not correct.

18              She didn't say anything like that to you?

19              No.

20              She did say you might need to start looking for

21    another job, right?

22              Answer:  No.

23              The reason he's saying that is because he's trying to

24    keep organized the web of this timeline in his head because he

25    wants to push back as far as possible the timeline of protected

1    activity.  But it doesn't make sense.

2            What else?  Mr. Picarella also did not tell the truth

3    initially in his testimony about talking on his phone in dark

4    conference rooms.  We asked him:  There did come a point where

5    you would spend a substantial part of your day sitting in

6    conference rooms with the lights off, right?

7            No.

8            That never occurred?

9            No.

10           At no point?

11           No.

12           Then what happened?  Numerous witnesses came in and

13   testified:  Yes, of course, this is what he did.  Everyone saw

14   it and was like this is strange, strange behavior.

15           Mr. Pizzimbono.  He was often seen by myself and

16   others in conference rooms by himself with the lights off

17   talking on his phone.

18           Ms. Malanga said that she was getting reports

19   contemporaneously at the time he was often in dark conference

20   rooms speaking on his phone.

21           Mr. DeLuca was saying way back, going back:  Often

22   observe him in darkened conference rooms speaking on his

23   cellphone.

24           Mr. Karam said it.

25           And at that point Mr. Picarella realized, right, of

1    course, they got me.  Numerous people have observed this.  I've

2    got to figure out some way to explain this.  And so after all

3    these people had testified, they asked him:  Were there times

4    when you went to a conference room to make personal calls?

5            And he's like:  Yes.

6            How often?

7            A couple of times a day.

8            And the way he explains the darkness is he's like it

9    was so bright in these rooms most of the time you didn't need

10   to turn a light on.

11           Ladies and gentlemen, this doesn't match up with

12   logic.  If it was so bright in the rooms that most of the time

13   you wouldn't need to turn a light on do you think that all of

14   these witnesses would have said that they observed him in

15   darkened conference rooms?

16           Part of the reason that they thought it was weird and

17   that they noticed it is because he's sitting there in the dark

18   with the lights off.

19           But that doesn't even really matter.  The point is

20   first he's saying that it never occurred and then later on

21   after all the witnesses have testified to it his testimony

22   changes that this happened a couple times a day.  That means

23   that it happened thousands of times because he worked there for

24   years.  And he's saying that when he first testified about it

25   he couldn't remember that ever occurring?  If you do that twice

 1    a day, even for a month, don't you think your answer to the

 2    question that never occurred would be:  Yeah, that probably did

 3    occur a couple times.

 4             What else?  Mr. Picarella didn't tell the truth in his

 5    testimony about the fact that he had told people that

 6    Ms. Hedges worked for him.  Because this is one of the things

 7    he did, this weird sort of grandiose thing early on where he's

 8    telling people that Ms. Hedges worked for him.  And when we

 9    asked him about it, we said:  At no point did Ms. Hedges work

10    for you, right?

11             Correct.

12             But that's something you communicated to people

13    sometimes, right?

14             His answer:  No.  I don't believe so.

15             Then we confronted him with a communication where he

16    clearly said that, what you wrote:  Eileen works for me?

17             Answer:  Yes.

18             That's what he wrote in the communication.  Okay.  And

19    he attempted to say it was a joke.  But when we asked him about

20    it, there's like no smiley faces, there's nothing in there to

21    indicate it's a joke.  It's not a joke.  And you know it wasn't

22    a joke because Mr. Picarella acknowledged that this is

23    something that Ms. Hedges complained about.

24             Now if it was just a jokey joke -- we saw that they

25    had a very fun relationship early on where, you know, they

GCE9PIC3                    Summation - Mr. Jackson

1    would make jokes with each other, and he would say love you and

2    stuff like that -- if it were just a jokey joke, I don't think

3    that Ms. Hedges would be complaining about it.  She was

4    complaining about it because it was strange and it was not a

5    joke.  He was telling people seriously.  And in his testimony

6    on the stand he denied it until he was confronted with it.

7            What else?  During his testimony Mr. Picarella didn't

8    tell the truth about spying on Ms. Parker's private

9    conversations.  And this was a bizarre description because we

10   asked him at some point -- first, he was talking about this

11   sort of code of honoring people's privacy to be had.  And then

12   he shifted into, we asked him a question:  Do you think it's

13   possible there were times you did try to look at other people's

14   screens?  And he's like maybe.  And he says if it was something

15   I did, I'm not purposely looking at somebody's screen.  Okay.

16   Well sometimes you were purposely trying to spy on Ms. Parker's

17   screen?  Didn't recall that.

18           Then we showed him clear communication where he is

19   talking to Mary-Jo, the woman who was his friend at the time,

20   who he later on determined was one of the people that was

21   trying to retaliate against him; you know:  MP has the IM for

22   EH up on the desktop.  I can't read but will try.  That's him

23   trying to spy on her screen to see what she's communicating

24   with Ms. Hedges about.  And his testimony that this was like:

25   Oh, I was -- it was me looking at it under, consensually

GCE9PIC3                    Summation - Mr. Jackson

looking at her screen makes no sense.  You don't write this

kind of communication that you're going to try to look at

somebody's screen if it's just a normal situation where

somebody is like, yeah, come take a look at this.  He was just

offering false testimony about that.

    We've already discussed this so I won't belabor the

testimony.  But the testimony about Mr. Karam is just false.

No evidence supporting it and there would have been evidence

supporting it.  One of the ways that you know that there would

have been evidence supporting that is because Mr. Picarella

admitted that he recorded -- he secretly recorded his

coworkers.  I mean he talked about that during the course of

his testimony:  Yes or no?  Did you record any conversations

with HSBC employees without their knowledge?  And he said:

One.

    Now, ladies and gentlemen, I submit to you I just ask

you to determine from your own common sense if you believe that

the person he was secretly recording communications only

recorded one communication.  And then I ask you I think the

answer to that is obvious.  But taking that into consideration,

the fact that he was having this practice of secretly recording

conversations, the fact that even though he's doing that he

comes up with no evidence of retaliation, no recordings of

Mr. Karam actually engaging in this kind of conduct is just yet

another thing that shows the stuff he's talking about didn't

GCE9PIC3                    Summation - Mr. Jackson

1    happen because if it had he would have it.

2         What else?  It's important to note that in his

3    testimony he essentially admitted everything that you need to

4    know to know that he was a terrible coworker who was constantly

5    harassing his colleagues, filing improper complaints about

6    them.

7         This is the one with Mary Bilbrey where he is saying:

8    My boss, Carol Jenner, moved her seat in the past few weeks as

9    directed by Suzy White.  Continually throughout the day she

10   hums, sings, and laughs, and talks to herself out loud.  It's

11   very distracting.

12        This is in 2013 when he's claiming that his

13   responsibilities are starting to get stripped away.  What was

14   he distracted from?  Nobody can find him to do any work.  He's

15   not doing any work.  So what was he distracted from?

16        Putting that aside, I would submit to you that's a

17   very -- it's a very disturbing communication in terms of what

18   it signals about the level of collegiality.

19        Ms. Jenner is a person who was trying to do her job.

20   Maybe she hummed a couple times in the office.  And he went to

21   human resources to harass her about that and to suggest that

22   this was part of a pattern of retaliation against him?  That is

23   stunning.

24        We asked Ms. Bilbrey about this.  And we asked her had

25   you ever seen complaints of this nature being made by a person

GCE9PIC3                    Summation - Mr. Jackson

1     at the executive level of HSBC?  Things like the desk drawer

2     incident that he complained about.  Somebody left a desk drawer

3     opened.  Somebody bumped -- his chair bumped into somebody so

4     that had to be retaliation.

5               We said:  Have you ever seen that?

6               And she said:  No.  We investigated it.

7               Was any evidence supporting the idea that any of these

8     people were trying to retaliate against him ever discovered?

9               No.

10              Did you ever have any executive complaint to you that

11    a colleague was humming too much?

12              No.

13              And no one else ever complained about Ms. Jenner in

14    this way?

15              Just Mr. Picarella.

16              You saw she was rated outstanding by her colleagues.

17              Now, I just have a few more areas I want to talk to

18    you about.  One of them is I want to talk very briefly about

19    the damages in this case because it's part of the instruction

20    that you're going to hear and because it's part of the verdict

21    sheet that you're going to see.

22              I want to submit to you if you are taking your oath

23    seriously and you are examining the evidence in this case

24    there's really no logical way that you even get to the

25    discussion of damages.  But if you did, even if Mr. Picarella

1   could establish liability, he can't establish that he's

2   entitled to any damages.  Because, frankly, there's a couple of

3   kinds of damages at play and one of them comes down to this

4   idea that Mr. Picarella is going to try to establish that he

5   was entitled to Eileen Hedges' salary or something like that.

6   That was never developed in the testimony.  There is no proof

7   of that.  If you look in the record, we admitted Ms. Jenner's

8   paystubs, she was making basically the same amount, not much --

9   essentially the same amount as Mr. Picarella even after she got

10  the promotion.  So it's not like he would have gotten a pay

11  raise if he had gotten that job.  And the -- looking to the

12  future, looking to the future, what we sometimes call

13  front-pay, it's not really available because, as you can see

14  from Mr. Picarella's performance, even if he could establish

15  that he -- somebody retaliated against him, he was going -- he

16  cannot establish that he was going to be working at HSBC for a

17  long time after that.  Not with the way he was working, not

18  with the way that he was treating his coworkers.  So he

19  wouldn't be able to establish any damages.  And certainly not

20  any punitive damages which you will see in the judge's

21  instructions.  He has to demonstrate that there was malice or

22  ill will.  And he has to demonstrate that HSBC didn't have a

23  good faith effort in place to comply with the law.  And the

24  good faith effort you saw in terms of the policies and the way

25  that the HR dealt with everything.  So he can't establish

GCE9PIC3                        Summation - Mr. Jackson

1    damages even if he could establish liability.

2           I just want to talk briefly about the handful of

3    documents that I think Mr. Picarella has focused on during the

4    course of this case.  And there are -- there really aren't many

5    because almost all of the documents in this case signal that

6    there was never any retaliation and that the complaints about

7    him go way back before anyone had any knowledge even of some of

8    his complaints.

9           There is one communication that he focused on which

10   was the whole marginalized, his behavior communication between

11   Mr. Karam and Ms. Jenner.  And I submit to you that if you look

12   at that communication, if you consider Mr. Karam's testimony,

13   it's clear that what that communication was is Mr. Karam was

14   talking to Ms. Jenner who was having a very difficult time

15   managing Mr. Picarella.  You saw he was -- she was the subject

16   of some really unfair petty complaints to HR, even though she

17   had nothing to do with anything involving Mr. Picarella.  He

18   was refusing to do projects that she was assigning to him.  And

19   so Mr. Karam was trying to help out his colleague and talk

20   about the fact that, look, we're going to not deal with this

21   and we're going to make -- not allow Mr. Picarella's bad

22   collegiality takeover the workplace.  That's really all we were

23   talking about there.

24          There's also a communication where Mr. Karam in a

25   conversation was talking to a colleague who is leaving and she

1   basically asked him if maybe he could take on some project that

2   she's working on.  And he's like, yeah, that would be great,

3   that might give me a chance to dump the whole Picarella saga.

4   If you look at that, that's something that -- I don't know,

5   Mr. Hubbard may make a big deal about it, but the fact of the

6   matter is, if you actually look at the communication, it's

7   clear that what he's saying is that he welcomed an opportunity

8   to be working on something other than his dealings with

9   Mr. Picarella which, as you saw, were continuously

10   dissatisfying because he wasn't doing his job.

11          There's also the Mr. Karam communication where he

12   referred to Mr. Picarella as the HR related problem.  And at

13   that point Mr. Picarella, you know, as you saw, he had a number

14   of issues with HR.  And Mr. Karam is basically in the

15   communication just talking about his awareness of that.  That

16   does not evidence any retaliation.  That doesn't evidence any

17   retaliatory animus.  All it shows is that he was aware of what

18   Mr. Picarella went to pains to make everyone aware of.

19          Now, there's also Mr. Picarella's calendar.  The

20   calendar, you may even be wondering what the significance of

21   the calendar is.  It only really relates to the question of

22   damages because Mr. Picarella has this obligation to mitigate

23   any of his damages -- I'm sorry.  Let me backup.  Because I'm

24   getting ahead of myself.  I'm talking about another document.

25          The calendar first has a relationship to the question

1   of whether or not he was in the office or at meetings.  This is

2   the evidence that they've used to establish that he was at

3   meetings.  No witnesses were called who said that he was coming

4   and doing his job.  No real evidence of that.  Just this

5   Outlook calendar.  Well, you saw testimony and you saw

6   communications that he didn't actually show up to a lot of

7   meetings.  An Outlook calendar you could fill up just by

8   clicking accept on a bunch of meetings.  The calendar does not

9   evidence anything.  It's Mr. Picarella's own thing that he's

10  created and it doesn't evidence that he actually was doing

11  work.

12          The thing that I was getting at a second ago is you

13  also got those big books that he put in during the course of

14  his rebuttal testimony that showed his attempt to mitigate his

15  damages by basically his seeking new jobs.  Well we didn't go

16  through those.  There is no reason to go through them.  But if

17  you do, you see it's just a bunch of LinkedIn messages.  It's

18  like he's clicking on a bunch of different jobs.  Half of them

19  don't even logically appear to be jobs that Mr. Picarella would

20  ever take.  There's a job in there that relates to him wanting

21  to be the manager of a waxing center.  This is just him trying

22  to fill up a book with as many things as he can to suggest that

23  he was actually trying to mitigate his damages.  But, as you

24  heard the during the testimony, what he was really doing was

25  focusing on this lawsuit, doing all the work that he could on

 1    this lawsuit, attending every deposition, going through all of

 2    the documents and focused on that.

 3            There is also the one communication from Ms. Jang

 4    where she asked if they should add MP, if they should add MP

 5    when they were talking about the restructuring.  Well he was a

 6    poorly performing person and she told you that they always

 7    determine whether or not any people who haven't been performing

 8    should be added to a restructuring plan.

 9            So the last thing that I'll talk about is the 2013

10    360s, reviews, where some of them were positive.  You heard

11    Mr. Picarella admit on the stand that in 2013 after the really

12    negative reviews in 2012 he changed his strategy and basically

13    identified a bunch of people who were subordinate to him mostly

14    or who had very limited contact with him and some of them had

15    more positive things to say.  But his managers and the other

16    problems he was having with his colleagues continuously went

17    throughout the time he was there.  So I submit to you if you

18    look at the totality of it, it paints an uncomplicated picture

19    of Mr. Picarella's poor performance throughout the time that he

20    was there.

21            Now, there are a couple of arguments that Mr. Hubbard

22    may make during the course of his summation.  And I have to go

23    first.  So I'm taking a little bit more time to try to preview

24    some of these arguments because I don't get a chance to get up

25    after he speaks so I have to anticipate them.  The reason I

GCE9PIC3                    Summation - Mr. Jackson

 1   don't is because he has the burden.  It's his burden of proof

 2   to prove by a preponderance of the evidence that this actually

 3   occurred, that someone -- the bank was actually trying to

 4   retaliate against Mr. Picarella.  So he gets to go last.  But I

 5   have to anticipate some of these.  And I ask that you don't

 6   just blanketly accept what the lawyers say.  Think about what

 7   the actual responses are to some of the things -- to some of

 8   the arguments that are being made.

 9          But one of them is that Mr. Hubbard, I anticipate, may

10   make is that the jury instructions which tell you that under

11   the city law essentially you have to determine that this was

12   a -- the retaliation was a motivating factor in his

13   termination; meaning that you could find for Mr. Picarella if

14   there's anything that suggests that somebody might have at some

15   point thought about this in terms of termination.  This is

16   false.  Okay.  That is not the law.  And it's important that

17   you focus on Judge Carter's instructions and follow the law.

18          The keyword is motivating.  And when you actually look

19   at the law and you look at this, there is no question what

20   motivated Mr. Picarella's termination was his poor performance.

21   And that is the only thing that the evidence has actually

22   indicated.

23          They may also argue, Mr. Hubbard may also argue that

24   while there is no direct proof there's sort of circumstantial

25   proof.  And circumstantial evidence is something that the judge

1    will instruct you on.  Circumstantial evidence does not mean

2    that you can just take Mr. Picarella's own testimony where he's

3    saying people must have been trying to retaliate against me

4    because I was so good and I ultimately got terminated.  You

5    can't just take speculation and turn that into a conclusion.

6    There has to be actual evidence that demonstrates that

7    Mr. Picarella was the victim of retaliatory intent.

8           There is no evidence of that fact.  There is no

9    circumstantial evidence.  There is no direct evidence.  So

10   please don't let the idea of circumstantial evidence be used to

11   sort of confuse you about what they have to establish.  They

12   have to meet their burden.

13          He may also suggest that some witnesses should be

14   disbelieved because he would ask them about some random bit of

15   their deposition and they're like I don't know.  Some of these

16   depositions happened a long time ago.  Unlike Mr. Picarella,

17   these witnesses have not been working full time on this.  They

18   have other jobs and responsibilities.  And so if you look at

19   what happened during the course of the testimony, I think it's

20   very clear that the testimony was very consistent and I submit

21   to you very credible throughout.  So please don't let any

22   random bits of testimony distract you from looking at the

23   entirety of the witnesses and how credible and how sincere all

24   of the witnesses were that testified in this case.

25          There also may be an argument that the standard under

1    the city law is so wildly different from the federal standard.

2    Again, focus on the judge's instructions.  Because in both the

3    city law and in the federal law one thing is clear:  He has to

4    demonstrate that retaliatory intent was the reason -- that that

5    existed and that was part of why he got terminated.  And there

6    is no evidence of that kind of retaliatory intent.

7         The federal standard is a higher standard than the

8    city standard.  But he does not come close to meeting the city

9    standard.  And so I just ask you not to be distracted by that.

10        Now, I'm coming close to the end.  I have just a

11   couple of final things to talk to you about.  One of them is

12   just some of the red herrings that I think exist in this case.

13   I just want to point out the leak investigation.  It's a

14   complete distraction.  If you think that Mr. Picarella got

15   fired because people thought that he leaked information, okay,

16   that means that you have to find in favor of HSBC under the law

17   because getting fired because of a leak does not mean

18   retaliatory animus.

19        Now, the fact of the matter is he didn't get fired for

20   a leak because all the witnesses told you they investigated him

21   for the leak as they were required to do to fulfill their

22   responsibility to their customers.  But the reason he got fired

23   was performance.  But even if he could establish he got fired

24   because of the leak, that does not mean that he's established

25   retaliation.  It's a red herring.  It's meant to distract you

1    from what the actual evidence demonstrated in this case.

2              Also, if you think that Mr. Picarella, that people

3    didn't like his random complaints about regulatory issues, that

4    also does not equal retaliatory animus.  He could have gotten

5    fired for that reason and that would just mean that that's why

6    he got fired.  It does not mean that he meets his burden.

7              But there is no evidence to support that.  It's

8    something that was sort of suggested.  But it's not actually

9    anything that there's any evidence to support.

10             There's also a lot of innuendo that came up during the

11   course of this case.  I hope that during the course of the

12   testimony none of you were offended by some of the things that

13   you had to hear about I think what are -- to any of us some

14   relatively uncomfortable facts.  Nobody likes hearing about the

15   details of anyone engaging in sexual harassment of another

16   person or people's difficult situations at work.  You heard

17   that they brought out that Ms. Parker was terminated at one

18   point.  And, again, we submit to you that that's a distraction.

19   She was terminated for a situation that we had to bring out if

20   it was raised that she was terminated.  That has nothing to do

21   with retaliation or Mr. Picarella's claim.  She had to be

22   terminated because, you know, of an unfortunate situation where

23   somebody's wife came onto the trading floor and caused a scene.

24             MR. HUBBARD:  Objection.  There is no evidence of

25   that, your Honor.

1              MR. JACKSON:  It's in the record.

2              THE COURT:  This is argument.  Go ahead.  Overruled.

3              MR. JACKSON:  And someone came onto the trading floor.

4    Someone's wife came on the trading floor and basically

5    Ms. Weiss explained to you that they asked some questions to

6    Ms. Parker about that.  She gave false statements about it.

7    Under HSBC's rules she had to be terminated.  They continued to

8    investigate the sexual harassment and HSBC has dealt

9    appropriately with everything having to deal with Ms. Parker

10   completely separately from this case.  That's a red herring and

11   a distraction that has nothing to do with Mr. Picarella's

12   attempt to capitalize on this situation, opportunistically.  It

13   has nothing to do with it.  It's a distraction.

14             And similarly this whole PCC report things that there

15   was a lot of noise about during the case.  Nothing -- it's a

16   red herring.  Okay.  The witness explained to you that the

17   reason that he was on the PCC list is because it also includes

18   people who made complaints.  It's a system where you have to

19   put in names of different people.  There is no indication that

20   they were trying to put him on a list to get him fired.  If

21   they wanted to fire him why wouldn't they have just fired him

22   instead of paying him a million dollars?

23             No one was trying to retaliate against Mr. Picarella.

24   Everyone was trying to give him every opportunity to do his job

25   and he refused.

1    Now I just want to go quickly through the verdict

2    sheet, which the judge is going to explain to you in more

3    detail, but this is the verdict sheet that you will ultimately

4    get in this case.  And you will see it has boxes to check

5    related to different aspects of this.  I think that what is

6    going to be important is the answer to each one of these is no.

7    For some of these -- the first one, no, you stop.

8         THE COURT:  Counsel, take that down.

9         Go ahead.

10        MR. JACKSON:  You will see the instructions on the

11   verdict sheet, but the point is you can look at it, you can

12   follow it, the answer to those questions is no.

13        Now one of the other things -- I'm wrapping up.  One

14   of the other things the judge is going to instruct you is that

15   sympathy cannot play a part in your role in your determination

16   of this case.  To whatever extent you feel sympathy for

17   Mr. Picarella, first of all, I submit he's fine.  He made

18   millions of dollars on Wall Street, he's fine.  But to whatever

19   extent you feel sympathy, you got to put it out of your mind,

20   and you have to make your determination on the evidence, on

21   what the actual law is, and what the evidence actually

22   demonstrates.

23        And I submit to you the evidence has only demonstrated

24   one thing, and these laws, as we said before, they're

25   important.  It's a big deal for somebody to make these kinds of

 1   accusations against their co-workers, for them to accuse of

 2   their co-workers to engage in this grand scheme to retaliate

 3   against them for complaining about sexual harassment.  It is a

 4   very big deal for each and every one of the people who are

 5   subject to what are ultimately false allegations, and I ask you

 6   to take that into consideration in evaluating the witnesses and

 7   evaluating the entire case.

 8            One of the most important things and the judge is

 9   going to instruct you, is that Mr. Picarella's personal

10   subjective belief that he was retaliated against is not

11   sufficient to meet his burden of proof.  It is not enough for

12   him to show his subjective belief, feelings, suspicions or

13   speculation that the reasons stated by HSBC for the alleged

14   adverse actions are now genuine.  His subjective beliefs are

15   not evidence.  The actual testimony you heard from objective

16   witnesses about things that actually happened or didn't happen,

17   that's the evidence.  The documents you saw, that's the

18   evidence.

19            We told you at the beginning of this case that what

20   this case was really going to be about was greed, opportunism

21   and laziness.  I submit to you, ladies and gentlemen, that

22   throughout the course of this case that is what you saw.  You

23   saw a remarkable number of indications that Mr. Picarella just

24   refused to do his job throughout the time he was there, that

25   from the beginning all the way to the end there was greed in

GCETPIC4

 1    terms of the whole thing being triggered by being upset about

 2    his bonus not being big enough; and ultimately opportunism, the

 3    timing, everything shows that he was trying to take advantage

 4    of someone else's misfortune.  That's not okay.  That's not

 5    right.  You should reject it.  You should make your verdict

 6    based on the evidence.  And when you do that, there's really

 7    only one verdict that could possibly be consistent with that,

 8    and that is a verdict that we humbly ask you to return:  No

 9    liability in favor of HSBC.

10            I deeply appreciate your time and your attention

11    today.  Thank you.  Thank you very much.

12            THE COURT:  Okay.  So members of the jury, we're going

13    to take a 20-minute break and then you will have closing

14    argument by plaintiff's counsel.

15            Don't discuss the case amongst yourselves or with

16    anyone else.  We'll see you soon.

17            (Jury not present)

18            THE COURT:  So here's what I suggest at this point:

19    The jurors are going to get a 20-minute break.  We ordered

20    lunch for the jurors, it should get her around 1:00 or so.  So

21    in terms of timing, plaintiff's counsel will deliver his

22    closing argument.  After that we'll give the jury a short lunch

23    break, since their lunch will already be here.  At that point

24    we can discuss any corrections to the charge, and after a short

25    lunch break I will charge the jury.

GCETPIC4

 1            MR. HUBBARD:  Judge, respectfully, I don't think

 2    that's fair.  It's 12 o'clock now, it's going to be almost

 3    12:30 when they get back and I'm able to start, and I will have

 4    to argue from 12:30 to almost 2 o'clock.  I don't think that's

 5    fair.

 6            THE COURT:  Why not?  That's an hour and half.  Not

 7    fair to whom?

 8            MR. HUBBARD:  Not fair to me, number one.  Obviously I

 9    will abide by the Court's schedule, but I have to argue while

10    the jury is sitting here during their lunch hour.  It's from 12

11    to 2 o'clock when I do my argument.  Why can't we lunch now and

12    come back and then let me argue and you instruct the jury?

13            THE COURT:  Lunch isn't here now, for one.  If you

14    want to break it up -- if you want to stop in the middle of

15    your closing argument, I feel that's more unfair if you want to

16    do that.  We can do that and go until 1 o'clock, stop and take

17    a very truncated lunch break and discuss the charge and then

18    finish your closing argument.

19            MR. HUBBARD:  I would much prefer to do that only

20    because the jury -- they are going to be -- their stomachs are

21    going to be growling, they're going to be hungry, and it will

22    be difficult for me to keep their attention over the lunch

23    hour.  I much prefer to do it after a short lunch.

24            THE COURT:  I'm no gastroenterologist, but typically

25    speaking, talking about keeping people's attention, it's much

GCETPIC4

1    harder to keep someone's attention after lunch than before

2    lunch.

3              What is defense counsel's position?

4              MR. JACKSON:  The Court's first plan is the best one,

5    but we defer to the wisdom of the Court.

6              THE COURT:  We'll do that.  We'll break that up.  And

7    then we'll discuss any issues with the charge over the

8    truncated lunch break, although perhaps we could do this now.

9              Counsel, have you had a chance to look at the charge?

10             MR. HUBBARD:  We can do it now, sure.

11             THE COURT:  Go ahead.

12             MR. HUBBARD:  As I understand what your Honor did --

13             THE COURT:  I am going to -- here's what I also need

14   to add, on page 20, it was on page 20 in one of the drafts

15   where I talk about Mr. Picarella's claims, to add -- the claim

16   about the sexual harassment of a female co-worker -- the filing

17   of this EEOC charge, the filing of the charge with the EEOC.

18             MR. BORTNICK:  I'm trying to find it now in the most

19   recent --

20             THE COURT:  It's the section before you start getting

21   to the elements, the overall sort of the description.

22             MR. BORTNICK:  It was on page 20.  Right now says

23   Mr. Picarella alleges the defendant retaliated against him for

24   reporting sexual harassment of a female co-worker by an HSBC

25   executive, and you were going to add that, which not in the

```
1    current one.
2              THE COURT:  That's what I will add, yes, and the
3    filing of the charge with the EEOC.
4              MR. BORTNICK:  Right.
5              THE COURT:  The other thing I would like to add is a
6    change in the jury instructions -- nothing that substantive,
7    but on page 40 when I talk about if you want any testimony read
8    back to you, we'll change that to if you want any testimony
9    provided to you, and same thing the other way, that way we have
10   the option of having it read back, or if it's extremely
11   voluminous we could send the transcript in to them.
12             MR. BORTNICK:  Sure.
13             MR. JACKSON:  Your Honor, one thing, your Honor had
14   asked if the parties wanted to send the exhibits back.  It's
15   our request that we wait for jurors to request specific things
16   before we send them in.
17             THE COURT:  That's fine.  If both sides don't agree, I
18   won't send it in.
19             MR. HUBBARD:  Sorry, your Honor, I was distracted.
20   What did your Honor say about the exhibits to the jury?
21             THE COURT:  Defense counsel doesn't want to send them
22   in.  If both parties consent, I will send them in.  If both
23   parties don't consent, I will not send them and the jury can
24   request whatever they want.
25             MR. HUBBARD:  Thank you.
```

GCETPIC4

1          THE COURT:  Anything else on the jury charge?

2          MS. LEVIN:  Yes, may I seek one point of clarification

3    about the jury charge?

4          THE COURT:  Yes.

5          MS. LEVIN:  It's on page 24, which we discussed

6    earlier this morning.  I apologize that I have not had a chance

7    to go back and look at the transcript of the discussion from

8    this morning, but I thought that we had agreed that the phrase

9    "were not, in fact, motivating factors" was going to be

10   changed.  So I just respectfully request the Court clarify its

11   ruling on that.

12         THE COURT:  Yes, that has been changed.

13         MR. HUBBARD:  May I ask you one question, your Honor,

14   please?

15         THE COURT:  Yes.

16         MR. HUBBARD:  You indicated that, of course, it's the

17   standard practice if the both parties don't agree the exhibits

18   don't go back unless the jury requests them.

19         THE COURT:  Right.

20         MR. HUBBARD:  In this system that we are using now,

21   when exhibits are shown to the jury and portions of them are

22   shown to jury, does that make a defense in whether or not they

23   should have access to the full exhibit as opposed to just the

24   sample of them?

25         THE COURT:  No.  The jury will let us know what they

GCETPIC4

```
1    want.  If they ask for the exhibit, it seems to me the entire

2    exhibit goes in.  The fact that counsel may want to highlight

3    one portion, that's counsel's right and counsel's decision.

4              Anything else in terms of the charge?

5              MR. BORTNICK:  I think your Honor took out the -- I

6    must be looking at the wrong one.  Your Honor took out the

7    non-retaliatory -- sorry, your Honor took out the two sections

8    that really related to section five of the jury verdict, you

9    lifted that wholesale out of the jury charge?

10             THE COURT:  Right.

11             MR. BORTNICK:  That's what was requested.

12             THE COURT:  Anything else?

13             MR. JACKSON:  No, thank you, your Honor.

14             THE COURT:  Counsel can get their eight-minute break

15   in and we'll come back.

16             (Recess taken)

17             THE COURT:  Let me confirm with counsel that there are

18   no additional issues with the most recent copy of the verdict

19   form.

20             MR. HUBBARD:  None from the plaintiff, your Honor.

21             MS. LEVIN:  No, your Honor, not from the defendant.

22             THE COURT:  All right.  Let's bring the jury in.

23             Plaintiff's counsel, what's the estimated time for

24   your closing argument?

25             MR. HUBBARD:  Well, I'm still on the 75 minutes.  That
```

GCETPIC4

1   was a little longer summation than I had expected.  There was a

2   lot covered.  I will look at my notes, Judge, and I will do my

3   best to be as judicious as I can.

4           THE COURT:  I think this defense counsel went about 94

5   minutes.  Some of that was taken up with the sidebar, but when

6   the jury gets assembled we'll bring them in and have closing

7   argument by plaintiff's counsel.

8           And I guess we'll go until about 1:15, does that work?

9           MR. HUBBARD:  Absolutely.

10          THE COURT:  20 minutes after lunch.

11          MR. HUBBARD:  Sorry?

12          THE COURT:  We can go until 1:15, which would be about

13   55 minutes, and you can have your remaining 20 minutes after

14   lunch.  I will give you more time.  I won't shut you down after

15   75 minutes.

16          MR. HUBBARD:  I thought you were going to break for

17   lunch before my summation.

18          THE COURT:  No, no, no, I said you start your

19   summation and then in the middle we break for lunch.

20          MR. HUBBARD:  I think that's terrible, your Honor,

21   terrible for me to have to break my argument.  I thought you

22   said that we were going to take a lunch and then I --

23          THE COURT:  That's not what I said.  I originally said

24   that we were going to go straight through and have lunch.  You

25   objected.  I said we'll break it up and do it in the middle of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

GCETPIC4

```
 1    your summation then.  That's why I had the comment about it's

 2    usually --

 3              MR. HUBBARD:  Judge, I don't want to break it up, and

 4    I don't think it's fair for me to have to argue from 12:30 to

 5    2:00 or 2:15 to this jury, but I abide by your --

 6              THE COURT:  12:30 to 2:15 is 105 minutes, that's quite

 7    a bit longer than 75 minutes.  If you want go straight through,

 8    we can do that, but I was breaking it up because you objected.

 9              MR. HUBBARD:  No, I will do it at one time.

10              THE COURT:  You want to go straight through?

11              MR. HUBBARD:  Yes, sir.  If we can't take a break,

12    we'll go straight through.

13              THE COURT:  That's what we'll do.

14              Defense counsel have no objection to that?

15              MR. JACKSON:  No objection, your Honor.

16              THE COURT:  Plaintiff's counsel, if you prefer I could

17    let the jury know when they come out that we ordered their

18    lunch and their lunch will be waiting for them at the end of

19    your summation and there's a microwave and refrigerator.  Do

20    you want me to tell them that?

21              MR. HUBBARD:  That would be good.

22              THE COURT:  Any objection to that by defendant?

23              MR. JACKSON:  No objection, your Honor.

24              THE COURT:  Okay.

25              (Continued on next page)
```

1            (Jury present)

2            THE COURT:  We are now going to have plaintiff's

3    counsel's closing argument.  In terms of schedule, we ordered

4    lunch for you.  Your lunch will be ready for you at the end of

5    plaintiff's counsel's closing argument.  And we do have a

6    microwave and refrigerator in the jury room for you to use.

7            Go ahead, counsel.

8            MR. HUBBARD:  Thank you, your Honor.

9            Ladies and gentlemen, it's now our turn to give a

10   summation to you.  But before we begin I want to do the same

11   thing as my brother did and thank you for your diligence in

12   sitting through this trial with us.  We have great respect for

13   your jury service.  We realize it's a time of year when you're

14   all busier than you ordinarily are with holiday chores and

15   family things, and so we realize it has been challenging a bit

16   in this holiday season to be here so long, and we appreciate

17   your service.  We're not unmindful, and we are grateful for

18   that service.

19           I want to go back and begin with the way we introduced

20   this case, and that was that in the spring of 2012

21   Mr. Picarella reported to HSBC the sexual harassment that he

22   observed by Ms. Hedges involving Ms. Parker, and continued that

23   reporting process through the spring of 2012.

24           And then following that into the next couple of years

25   the evidence will show -- we'll go through it this afternoon,

1    the evidence shows that there were various times when he

2    suffered adverse employment actions as a result of those

3    complaints.

4            You know that those complaints began in February or

5    March when he spoke to Ms. Hedges.  You may recall that he

6    spoke to her first, that Mr. Pizzimbono -- he talked to

7    Mr. Pizzimbono and he said I want to talk to her first, I don't

8    want to report her, I want to talk to her and see if I can ask

9    her to stop this conduct.  When that happened -- did not

10   happen, he went back to Mr. Pizzimbono and asked to continue to

11   do that, and only in April of 2012 did he go in to see

12   Ms. Weiss and report to human resources of what had happened.

13           There's a debate in counsel's argument this morning,

14   that was a debate about when Mr. Picarella added the

15   information about what happened at that Key Largo conference in

16   March, and there was some suggestion that Mr. Picarella's dates

17   and times were off.  The testimony was that Mr. Picarella did

18   not go to human resources or to management with any information

19   about that Key Largo conference, that after it happened there

20   were rumors all around the sales desk about what happened, and

21   that Mr. Pizzimbono and Ms. Weiss called Mr. Picarella in and

22   said have you heard about this Key Largo conference, which he

23   did no not attend.  And at that time, in April, he said no, I

24   haven't heard about it at all.  He didn't take some opportunity

25   to launch some further reports, he said I haven't heard

GCETPIC4                      Summation - Mr. Hubbard

1    anything about it.  They called him back in in June and asked

2    him if he heard anything, and he told them.  He didn't initiate

3    any contact with human resources, the record would suggest.

4           We saw that Mr. Pizzimbono -- a little different than

5    we heard this morning, but when Mr. Pizzimbono was talking to

6    Mr. Picarella about the complaints he was making,

7    Mr. Pizzimbono was first to tell him that not to worry about --

8    Mr. Picarella was worried about making these complaints, would

9    he be a tattle tale, would he offend people, would he be

10   retaliated against.  Mr. Pizzimbono said no, you will not.  I

11   encourage you to do that.  We appreciate that.  That's what the

12   company wants you to do.  And he said in that memo that we

13   think you're showing courageous integrity.

14          Let me see, Peter, number 125, please, on the screen.

15          Mr. Pizzimbono wrote about this and said Mike told me

16   he was afraid of being labeled as a problem.  I told him that

17   he should realize that myself and others had encouraged him to

18   provide details and examples of what he experienced so that we

19   could address, and that he would never -- and we would never

20   hold that against him, as it was our responsibility to provide

21   him with a comfortable and safe work environment.

22   Additionally, we're all subject to the same rules and

23   standards, and we understand that it is critically important

24   that they be upheld.  It takes courageous integrity to do that.

25   Try that on with what you are hearing this morning from HSBC,

GCETPIC4                    Summation - Mr. Hubbard

1    that him going in and reporting this stuff was opportunism,

2    that he was trying to take advantage of some else's misfortune.

3    That's his manager.

4         What you will see is -- what this reflects, talking

5    about these performance reviews -- what you see and what you

6    heard this morning is an effort to rewrite history.  I'm going

7    to go through it with you.  It's an effort to change what

8    happened.  The performance reviews are an example, and I will

9    go over it with you, but now three strong is now three poor,

10   three no good.  They look you right in the eye, look you right

11   in the eye and ask you to ignore what they wrote and to set it

12   aside as being some type of irrelevant part of the history.

13        You may recall that Mr. Picarella, when he complained

14   to Ms. Bilbrey, he complained about three of Mr. Pizzimbono's

15   deputies at the same time he made those complaints.

16        Let's talk a minute about Mike sitting in the dark

17   room just off the floor.  You heard from his testimony that he

18   did sit in some conference room to make personal calls.  You

19   saw that he had his appointment calendar that had meetings all

20   over the place.  Mr. DeLuca, none of those folks had any idea

21   where he was when he was attending his meetings.

22        There's not a single report -- all this not at his

23   desk stuff, Waldo stuff, there's not a single report in a

24   single company document, not a single manager, not one, all

25   these managers for four years documenting his performance, not

GCETPIC4                    Summation - Mr. Hubbard

1    a single one ever wrote Mr. Picarella is in dark conference

2    room on his phone not doing his work.  Where does all this come

3    from?  It comes because we're in a courtroom, that's where it

4    comes from.

5            The worst, Mr. Karam, after he gave him the off-track

6    review in November 2014 -- he testified here in front of you

7    before I cross-examined him that his performance continued to

8    deteriorate from November 21, 2014 until he was fired in late

9    March 2015.

10           Here's what he said:  What was the performance that

11   you were evaluating and finding to be deficient after

12   January 15 of 2015?  Well, for starters he was responsible to

13   collate sales commentary on a weekly basis.  It was important

14   that he would collect information from business markets and any

15   issues that had arisen, and that information would be

16   consolidated into a report that would be shared with senior

17   management in London.  So there are instances where that wasn't

18   being carried out.  There were some issues regarding his

19   access, et cetera.

20           He was locked out and shut off all through that period

21   of time.  And so the observation that he was continuing to get

22   worse just has no support in the evidence at all.  And

23   certainly it's obvious that he either forgot what happened or

24   got it confused, but that testimony was absolutely not

25   accurate.  He was locked out and shut off.

1      HSBC wanted to talk about witness credibility, so I

2  want to talk to you about some of the other examples of where

3  his protected activity leads to retaliation.

4      Let talk a little bit about Mr. Picarella being passed

5  over for the Hedges job and Ms. Jenner being selected.  No one

6  has alleged here, in fact it's the opposite, that Ms. Jenner

7  wasn't qualified for the job, that she was not a qualified

8  person at all.

9      What our view is, and what Mr. Mullen said on his

10  testimony, was that Mr. Picarella was hired to succeed

11  Ms. Hedges.  He was hired as her deputy and he was hired to be

12  her successor, that he had far more experience than she did in

13  all areas, and that having -- and that in selecting her for the

14  job and having him report to her was extremely damaging to his

15  career at the firm.  His testimony was quite clear.  Let me

16  recall a little bit for you.

17      Did there come a time that a candidate was identified

18  for the job?

19      Yes.

20      Who was that the candidate?

21      He says:  Hiring Mike.

22      When you hired him, what were his qualifications?

23      He had a significant amount of sales experience.

24      Were you searching for a deputy?  Did you explore the

25  credentials of a candidate who was working in the bank at that

GCETPIC4                    Summation - Mr. Hubbard

1    time?  Ms. Jenner was working at the bank at that time.

2            There were no internal candidates that were viable at

3    that time.

4            Did you know Carol Jenner?

5            Yes.

6            Was she in the organization at the time?

7            Yes.

8            Was she ever considered?

9            No, never even spoken to as an option.

10           She wasn't a viable candidate?

11           She wasn't a viable candidate, just in my view, but

12   there were a group of people that were making this decision,

13   and there was no viable internal candidate.

14           Did you consider Mr. Picarella's operational risk

15   experience?

16           He said yes.

17           We asked him at that time if he would put

18   Mr. Picarella in the performance evaluation queue, what rating

19   he would have received?

20           He said two.

21           When you were in New York, did you hear any criticism

22   of his work performance at any level?

23           No.  There was not one conversation I ever had with

24   anybody that Mike was not the logical successor to Eileen

25   Hedges.  If

1          I were to say to you that someone characterized him as

2     lazy, what would you say?

3          That would be incorrect.  I was generally one of the

4     earlier people in to work.  Mike would have been, on that sales

5     team, generally the earliest person to work within that sales

6     team.  When I was working late, he was generally -- I would

7     generally see Mike there.  And there's two ways of looking at

8     that.  You can say someone is putting long hours, et cetera.

9          And at any point while you were in New York did you

10    hear any criticism of his work performance from any source?

11         Not one conversation, he said.

12         And I asked him the practical effect of having him

13    passed over for that position.

14         And he said that the practical effect for Mike, bear

15    in mind she's a VP and Mike is an SVP, is basically to say that

16    he has no future in the organization.  In my career I have

17    never seen -- in my career I have never seen a situation such

18    as this one we're now talking about where you have a more

19    junior person that's the boss of a more senior person.  So it

20    was tantamount -- this is Mr. Mullen -- that was tantamount to

21    saying:  No future.

22         Nobody is criticizing Ms. Jenner at all.  While we're

23    talking about Ms. Jenner, Ms. Jenner was not one of the people

24    who had any difficulty with Mr. Picarella.

25         That's false.  Let's look at Ms. Jenner's performance

1   review.  Do you have that one, Peter?  It's in -- I think it's

2   in May of 2013, I think it's 190.

3          Ladies and gentlemen, this is Ms. Jenner's 2012

4   performance review on Mr. Picarella.  You see in the feedback:

5   Myself, Mike is an easy person to work with.  He's found to be

6   professional and realistic and is a good partner to CMB and

7   COBAM.  So she certainly wasn't reporting any animosity toward

8   him, any difficult to work with him in any way.

9          Let's talk about a little bit about what happened to

10  Mr. Picarella after he was passed over for the job.

11         As he testified, by mid 2013 HSBC had stripped him of

12  his major job responsibilities as a senior vice president and

13  assigned Mr. Karam as his supervisor.  Mr. Karam did not work

14  in his group.  Mr. Karam was assigned by Ms. White specially to

15  supervise Ms. Picarella.  Ms. Jenner no longer supervised him,

16  he now has a special supervisor.

17         As you saw in the evidence, his name was taken off the

18  organizational chart.  He found out, he complained, and they

19  put him back on.

20         Ms. Weiss put him on a list of employees accused of

21  misconduct.  HSBC attempted to make light of the facts that he

22  was listed as a personal conduct case.  You will see in a

23  moment when Ms. Weiss put him on that list, she wasn't listing

24  cases that had been reported.  She didn't even put Ms. Hedges'

25  name on it.  She put Mr. Picarella's name on the list of

1     employees who have engaged in misconduct or violated the firm's

2     values.  What does that hostility come from?  This is in the

3     middle of 2013.

4            Again you saw in the middle of '13, we'll look at it

5     in some detail, Mr. Karam disparaged him by referring him to

6     senior management all the way to London as a human resources

7     problem after he filed an EEOC charge.

8            He testified here that he called him a human resource

9     problem because he filed an EEOC charge.  The Court will tell

10    you in its instruction that that was protected activity, just

11    as this case here is a protected activity.  Asserting these

12    rights under state and federal law, city law, is protected

13    activity.  So he engages in protected activity and he gets

14    characterized all the way to the top as a human resource

15    problem.

16           By 2014 the evidence shows Mr. Karam stripped him of

17    all of his job responsibilities down to where he candidly

18    admitted -- he didn't make any bones about it, he candidly

19    admitted that he had only about ten percent of his time that he

20    had work to do.  He didn't sit tight either.

21           October 20, 2014, just before the review, he writes to

22    Ms. Bilbrey, the head of human resources, I have continued to

23    complain in desperation to human resources, and still I sit

24    with no more than one hour of work a week on average.

25           This is to the head of human resources.  Does anybody

1    come down and say:  Wait a minute, Mr. Picarella, you can do

2    this, you should be doing this, Jim needs help.  Nothing.  He

3    doesn't hide.  Several of these are in the record, you will see

4    them.

5           Even that minimal effort is that of an administration

6    or cutting and pasting commentary.  At times months have gone

7    by with no work at all.  My reviews are given to me many months

8    after the firm's mandated deadline, if they are given at all,

9    and they last only a few minutes.  A year and a half has passed

10   with hardly any purpose or work.

11          Now this man is writing, this putting this in writing

12   to the head of human resources.  Is he manipulating the

13   marketplace?  He is trying to create some sort of false

14   accusation?  He puts it right on the record to the head person.

15   What's he hiding?  What's he manipulating?  He puts it right on

16   the record.  A year and a half has passed with hardly any

17   purpose or work.

18          By 2014 we're down to the ten percent situation, and

19   that ten percent situation, the effect of that is to disable

20   him.  Not only does he get shut out and shut off, but now he

21   has no work to do.  And he didn't cause that.  That was done by

22   HSBC.

23          I want to discuss with you for a minute again the

24   issue now that you're asked to decide and what the instructions

25   may say to you about that as counsel review with you for a

1    minuted.   The issue for your determination here, the primary

2    issue, is first under the city human rights law -- applies here

3    because Mr. Picarella worked in New York City -- under the city

4    human rights raw is whether protected activity, these reports

5    of sexual harassment, his complaints about retaliation, was a

6    motivating factor in HSBC's decision to engage in conduct that

7    was reasonably likely to deter an employee from engaging in

8    protected activity.   In other words, was it a motivating factor

9    in HSBC's decision to engage in an adverse employment action, a

10   motivating factor?

11        What you will learn is it does not have to be the only

12   reason that he was retaliated against, it does not have to be

13   main reason he was retaliated against under the city law.   It's

14   a little different test than the federal law.   Under the city

15   statute if it's a motivating factor, there is causation, and if

16   the other standards are met Mr. Picarella would be entitled to

17   your verdict.

18        Well go over the verdict form in a minute.   There are

19   a couple of other questions that counsel mentioned, such as did

20   he engage in protected activity, did the firm know that he

21   engaged in protected activity, and those things.

22        Whether the adverse actions we see -- the adverse

23   employments actions we see were motivated by his complaining

24   about sexual harassment at HSBC, under Title VII under the

25   federal law, there's a different test.   As counsel said, there

 1    is a but-for causation standard.  And that test will be, under

 2    the federal statute, that his protected activity, his

 3    complaints, under that standard would have to be the main

 4    reason that if he was retaliated against it would have to be

 5    because of those -- of his protected activity.

 6              Let me talk to you a moment about the plaintiff's

 7    burden of proof.  As you obviously can tell, this is not a

 8    criminal case, this is a civil case.  So the standard here is

 9    preponderance of the evidence.  That means the greater weight

10    of the evidence.  If you were in a criminal case, some of you

11    may have been on criminal juries, because the life and liberty

12    is at stake the standard is much higher, the standard is beyond

13    a reasonable doubt, and we all know that.

14              In a civil case the standard is the greater weight of

15    the evidence.  The judge going to explain all this to you, but

16    it's the preponderance of the evidence, and that means the

17    greater weight of the evidence.  So you will see lawyers

18    walking around the courtroom pretending like they have a scale

19    in their hand, and they balance it, that's what you do.  If it

20    tips in favor -- if it tips, if it's more likely than not -- if

21    the greater weight of the evidence tips the scale in favor of

22    Mr. Picarella's retaliation claim, he's entitled to your

23    verdict.  If it tips the other way, the defendant is entitled

24    to it.  That's what the greater weight of the evidence means.

25              Evidence of retaliation beyond the fact that he was

1    hired to replace Ms. Hedges, without question, and was then

2    passed over for that job for no reason.  That appears in this

3    record.  That's the first instance that we say in which he

4    was -- there was a motivation to harm him by an adverse action.

5    Clearly the fact he was not given the job that he was hired to

6    do in these circumstances is an adverse bad employment action.

7    As Mr. Mullen said -- basically you heard Mr. Mullen, he said

8    it was fatal to his future at the firm.

9              But let's go past that.  Let's go past that.  We've

10   talked about the organizational chart, we've talked about the

11   personal conduct list, I want to show you that in a moment.

12   Maybe I will just get -- let me get the personal conduct list,

13   Peter, which is, I believe, 131.

14             Ms. Weiss, five days after he's been passed over for

15   this job, Michelle Parker, James Rist, Mike Picc.

16             Is there a second page of this?  I think there's a

17   list somewhere there.  I might have the wrong exhibit.

18             Sorry, go back to the top.  Go back to the list of

19   employees.  Go back to the list.

20             Ms. Weiss, September 9, 2012, Eileen Hedges, the woman

21   who Mike reported this information the sexual harassment

22   information about and who was then relieved of her managerial

23   responsibilities is not on the list.  This is not a list of

24   cases, this is a list of people who are believed to have

25   personal conduct issues.

1          Peter, let me have -- the last one of those is 214.

2     It's 185.  Let me see 185, please, and show you one other

3     personal conduct case list.

4          There are several in the evidence, if you get a chance

5     to look at them, there are several, but this one is 2013, this

6     is Ms. Jang.  Remember she works for Ms. Weiss, PCC reporting.

7     Ms. Weiss, can you guys provide any additional names to me, and

8     I will try to complete.  Jenny, now we have Hedges, Picarella,

9     Goodwin and Legoretta.  Hedges, Goodwin and Legoretta you will

10    see in the record are the three deputies of Mr. Pizzimbono that

11    were accused of attempting to push Ms. Hedges onto

12    Mr. Legoretta at his presence at the off-site conference, and

13    Mr. Picarella's name comes to the list.

14         Go to the second page.  Purpose, this quarterly report

15    is a group-wide report of conduct cases that are alleged or

16    determined to contravene HSBC values and behaviors.

17         There was testimony that this bad list did not -- was

18    not circulated to management.  It certainly was circulated

19    throughout the human resources function at the firm.

20         And what happens later?  We see later in early 2014 he

21    appears on this list, and Ms. Jang says:  Is there anybody else

22    in the business we want to let go?  And they write back --

23    somebody asked that question, she writes back:  How about MP?

24    I will show that to you.  How about Mike Picarella?  Why is

25    human resources suggesting Mr. Picarella should be terminated

1    because he ends up on the bad conduct list?  Maybe you will

2    find there are other reasons, but that's one of them.

3               193, please, Peter.

4               This is a nice response.  First -- he's helping

5    Ms. Jenner draft a note to Mr. Picarella.  First he says:  Feel

6    free to drop the "Thanks."  She was writing him a nice note.

7    She got along with him just fine.  Mr. Karam was hostile to

8    this man.  It's obvious from watching his testimony.  He was

9    hostile to him.  Why don't you drop the "thanks" from your

10   letter.  No need for it.  Down at the bottom he says:  If he

11   responds, we'll marginalize his behavior.  That's a friendly

12   comment from your boss.

13               After this Mr. Picarella files his EEOC charge.  That

14   charge is not public.  That charge is filed with a government

15   agency.  It's not in the newspaper.  It's not public.  It's a

16   government charge to generate some kind of investigation.

17               After that charge is filed, Mr. Karam does not speak

18   to him.  Mr. Karam has just been made his manager.  Mr. Karam

19   does not speak to him for the next three months.

20               Do you have 205?  First line.

21               Mike Karam has not met with me or spoken with me in

22   person in approximately three months or about the time of my

23   filing of the EEOC charge.  That's his manager.  I guess that

24   telegraphed to everybody in the group what Mr. Karam thought

25   about Mr. Picarella.

1      209, please, Peter.

2           Mr. Rose was in London.  Mr. Karam was responding.  He

3    was coming to New York to meet with Ms. White and Mr. Descamps.

4    There was an email about what is going on.  Okay, speak

5    tomorrow.  He says:  Sales issues?  And Karam writes back:

6    Sales issues, Picarella, human resource problem.  That did him

7    a lot of good in this organization to be viewed as a human

8    resource problem.

9           There are laws that apply here.  There are laws that

10   prohibit retaliation.  I'm going to show you in a minute the

11   company's own policy that says that you must report unlawful

12   conduct, but yet this man reports it and he's a problem.  The

13   law is not a problem, it's the conduct that's the problem.

14          Do you have the anti-retaliation policy, Peter?

15          This is the anti-retaliation whistleblower policy.

16   HSBC relies on the cooperation and support of individuals who

17   have witnessed or experienced possible incidents of alleged

18   wrongdoing or violation of company policy to report these

19   instances, just like Mr. Picarella, just like Mr. Pizzimbono

20   said.  HSBC makes fun of this man today because he had the

21   courage to follow this policy.  It's their policy.  It's also

22   the law that Judge Carter is going to give to you shortly.

23          Down to no retaliation, please.

24          HSBC recognizes the importance of providing a safe

25   environment for individuals to report incidents of possible

1   unlawful activity or violations of company policy.  The company

2   strictly prohibits all forms of retaliation against an

3   individual who in good faith reports any such incident to the

4   company.

5          Did he report it in good faith?  Counsel says no.

6   Take a look at it.  Maybe he was manipulating something or he

7   was trying to be opportunistic.  What did Mr. Pizzimbono, their

8   own employee, their own manager, the boss say when he wrote it,

9   when he came into this courtroom?

10          He obviously, when he complimented him about his

11  courageous integrity, didn't think he was making that report in

12  bad faith.  You got to use your common sense.  You don't hear

13  contradictions like that except in a courtroom where a

14  defendant is trying to avoid liability for something that is

15  wrong, and that's why they say it to you.  Don't be fooled by

16  it.

17          Let's go to PX-219, please.

18          I want pause for a minute and tell the jury I know

19  this argument is coming to you in lunchtime.  It always happens

20  if you're the plaintiff, you argue last.  So as you saw this

21  morning Mr. Jackson argues first, so by the time you get to the

22  plaintiff's argument it's less time.  So I get up here and I

23  argue while we're all sitting here wanting to get some food,

24  but we will do that shortly.

25          Let's look at this one.  Did we show this one before?

GCETPIC4                    Summation - Mr. Hubbard

1    I'm is not sure we did.  I know I mentioned it.  I don't think

2    I showed it, but if I did I'm sorry, but I know I mentioned it.

3    But other than the names below -- maybe you pulled it up,

4    Peter, I didn't see it, but can we add MP.  I know I mentioned

5    it before.

6             I will take you, ladies and gentlemen, to the time in

7    late November of 2014, we heard about the review that he got,

8    the off-track review that he got, we know he was shut out of

9    the office there on December the 1st, he's standing there while

10   everyone in the building is streaming past him and the access

11   had been cut off.  An email had been sent to him telling him,

12   because of his complaint about Mr. Karam, that his access was

13   being shut off.  That email was like 4:50 on Friday afternoon

14   before Thanksgiving.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            MR. HUBBARD:  (Continuing)  The time on that e-mail is

2     that it's somewhere in the 4:50 to 5 o'clock timeframe.  Okay.

3     He doesn't see it.  It's Thanksgiving weekend.  He comes in on

4     Monday morning and he can't get in the building.  So we know

5     what happens from that point up until about December 18.  He

6     has no access to their systems.  He gets access to the system

7     but he's told to stay home because of this dispute with

8     Mr. Karam.  He's told to work remotely going forward.

9            We come to January of 2014 -- 2015.  There is a

10    meeting.  Mr. Silber's group meets.  There's a conference call.

11    Mr. Picarella attends the conference call.  I believe the date

12    is the 13th.  You'll get that from the records.  But there is

13    a conference call that Mr. Picarella and 20 -- 20 or so other

14    executives attend that call either in person or on the

15    telephone.  And the next day there is a call to Mr. Silber from

16    a reporter who obviously was not in the meeting.  Mr. Silber

17    says what's going on.  There must be a leak about this meeting.

18    He goes down and he reports it.  The next day Mr. Picarella, no

19    evidence of any kind that he had spoken to a single person then

20    or any time.  He gets a letter from the bank's lawyer.  We'll

21    see in a minute.  That was Ms. Roskell's deposition, Exhibit

22    No. 1.  It's 244, Peter.

23            Remember, he's working remotely.  Now, I write to

24    inform you that HSBC has placed Mr. Picarella on paid

25    administrative leave immediately.  We have reason to believe

that he has conveyed confidential and potentially privileged

HSBC information to one or more third parties not entitled to

hold such information, in violation of HSBC's policies and the

terms of his employment.  His access to the systems and

premises has been suspended.

So there we are on January 15.  He never regains

access.  He never regains any access to the building.  He never

regains any access to the systems whatsoever.

Let me have the termination letter, Peter.  Number

247.

So in this period of time from January 15 to 2015 when

he is supposed to continue to be failing at his job, he has no

BlackBerry access, no computer access, no access at all, he

can't do his job, but he's failing at it.  Right.  He gets

terminated.  Your employment is being terminated due to your

significant performance issues which have been previously

discussed with you in addition you should know that the

investigation into the disclosure of internal confidential

discussions of the January 13, 2015 sales group meeting

resulted in a finding that you were highly likely the source of

that information either directly or indirectly.

Well you now know what I know.  Because Mr. Descamps

told you there was no evidence of that at all.  So that's not a

big deal.  Maybe they just made a mistake.  But it is a big

deal because the testimony you heard about it is false.

1    Ms. Roskell told you that that was in the letter just to let

2    him know that the investigation had been concluded.  It was

3    not.  Because Ms. Roskell admitted that that was part of the

4    decision to fire him.

5         Now, I heard Mr. -- I heard counsel say no big deal.

6    No big deal that whether it was false or not.  It's a huge deal

7    if he's fired for a false reason.  They weren't prepared to

8    terminate this man simply on the basis of performance.

9    Ms. Roskell the head of human resources said that charge that

10   he had leaked information, treason in the financial services

11   industry, treason, that that was part of the decision.

12        Ms. Roskell, when she was testifying here, she said

13   no, even though she testified before, as I showed you that it

14   was part of the decision, when she came here she's brought in

15   here by the bank to tell you a story about it that's not true.

16   She came in here and said that was in there only because we

17   wanted to show the investigation had concluded.  Yet they know,

18   as I know and you now know, that she had testified that it was

19   part of the reason he was fired.  If he was fired for a false

20   reason -- any motivation -- there could be another reason.  He

21   can be terminated for performance reasons.  But if that false

22   reason, that lie infects that decision, it's retaliation.  It

23   motivates it.  If it is a motivating factor, that's

24   retaliation.  There is no question about it.  And you were not

25   told this morning, you were not accurately told what those

1   facts show.

2              Let's talk about the -- let's talk about the lottery

3   that Mr. Picarella is here to play.  When we began counsel for

4   HSBC, I could read it to you, you probably remember it.  He's

5   looking for a big payday.  It's a lottery for him.  It's a

6   lottery ticket.  Is it?  A man who has a wife and four children

7   and a 25-year career on Wall Street is going to do what's right

8   and report the misconducts you heard about because he's simply

9   looking to find some way of scamming HSBC.

10             To call his claims here under federal and state law a

11  lottery is demeaning to this courtroom, to him, and everybody

12  involved in it.  There is no lottery here.  We think this man

13  decided he was going to vet his career and the support of his

14  family on a lottery ticket.  There are no lottery tickets in

15  this courtroom and I don't want you to return any lottery

16  verdict.  What I want you to do when you sit and talk about

17  this, if you find that this bank retaliated against him when

18  they passed over him, when they gave him these bad reviews,

19  when all these disparaging comments were made about him, if you

20  find he was retaliated against, what I want you to do is not

21  send him any profit.  I don't want to have any lottery.  I

22  don't want to show any greed.  I want you to make him whole.

23  That's all I want you to do.  Just fix the damage that was

24  done.

25             Mockery.  I heard it again this morning, that his

claim is a mockery.  His claims were in writing.  He didn't
make up something.  He didn't circulate these allegations by
innuendo.  He didn't go to the newspaper to make these
allegations.

What's a mockery, what's a mockery is to argue that
these claims are not made in good faith when they were exposed
and it put his job and his career at risk.  Look what happened.
He got a root canal from the time he started these complaints
until today.  He sat there on cross-examination, answered the
questions.  Not easily.  But he answered the questions.  He sat
here and listened to these arguments about how greedy he is.

Greed is something you're not entitled to.  There is
no evidence in this case of any greed from this man.

Is there any evidence from this man that he was lazy?
Can you imagine coming into this courtroom after hearing
Mr. Mullen say that he was not lazy, that he was one of the
hardest working people in the office, and called him this man
lazy.  You know how we live here in this metropolitan area.  We
take trains to work and we leave before dawn and we go home,
it's still dark.  This man did it for 23 years.  He did it
successfully.

When HSBC went out to fill this role they didn't hire
some chump change to take this job to succeed Hedges.  They
went out and searched in this city, the biggest financial
market in the world, for somebody to succeed Eileen Hedges.

1    They didn't hire somebody they thought was lazy.

2              So he gets on the train in the morning.  He comes to

3    work.  And until his job was destroyed he stayed late, he

4    worked hard.  He -- as Mr. Mullen said, pushed forward many,

5    many ideas and good things.

6              So let's go to one of the other issues we talked about

7    and that is these performance reviews.

8              May I see them, please, Peter.

9              Ladies and gentlemen, I'm going to just run through

10   these with you real quickly.  You'll see them in evidence.

11   This is the first review in the summer of '11.  He's only been

12   there a few months.  This is Ms. Weiss, three strong.

13             Let's go to the next one.  That's August of '11.

14   Let's go to December of '11, the year end '11.  Ms. Hedges.

15   Three strong.

16             The first one, I'm sorry, was by Ms. Hedges.  The

17   second one here is by Ms. Hedges also.  Three strong.  That's

18   two.

19             Go to the next one, please, Peter.  For the first half

20   of 2012.  Three strong.  Three poor.  Three no good.  Three

21   failure.

22             Next one, please.  This is number four.  This is in

23   May of 2013 by Ms. White.  Three strong.

24             The next one, please.  Mr. Karam.  Three strong.

25             The next one, please.  Three strong.

1            Six in a row.  And this main is a failure.

2            Now, you can let them rewrite history but you

3    shouldn't.

4            You've seen some e-mails here, some chats.  People are

5    disagreeing.  People are writing sometime a caustic e-mail or a

6    chat here.  You saw about ten e-mails and chats that they

7    pulled up that they thought that Mr. Picarella should be

8    criticized for.

9            How many e-mails and chats did he write or receive in

10   the four years that he was at HSBC?  Think about it.  Ten

11   thousand.  You can all do the math.  You all use e-mail.  You

12   all know how rampant it is, when you get home tonight how many

13   e-mails you'll have from your office, how many e-mails you'll

14   have.  Ten thousand.  And he -- they walk in this courtroom and

15   they show you five.  In an investment bank do you think that

16   anybody ever has an argument or a disagreement?  But if you

17   look at Mr. Picarella's e-mails you'll see that almost every

18   time he writes back and he says thank you very much, he

19   communicates in a positive way and polite way.  Just pulls out

20   the ones that now that we're in the courtroom that they think

21   show some kind of lack of collegiality, as counsel said.

22           I want to go back and remind you.  I missed it for a

23   minute.  I want to go back and remind you, consistent with what

24   you heard today, what was said to you at the beginning of this

25   case.  He viewed his complaints taking advantage of another

1   person's misfortune as a way to get a lottery ticket and

2   perhaps a jackpot from this jury.  I'm not going to ask you for

3   any jackpot or any lottery ticket.  All I'm asking you to do

4   under these instructions you see is to award Mr. Picarella

5   fair, reasonable, make-whole compensation.  That's all.

6          Let's talk a minute, if we can, about what you're

7   going to -- well let me do one thing first before we do that.

8          Let me have the verdict form, please.  I'm getting

9   close to the end.  And we're all getting hungry.

10          Can we have the verdict form please, Peter

11          THE COURT:  Let's not put the verdict form up on the

12   screen.

13          MR. HUBBARD:  I thought we --

14          THE COURT:  Hold on.  We're not going to put that up

15   on the screen.  Go ahead, counsel.

16          MR. HUBBARD:  But I can talk about it?

17          THE COURT:  Yes.  You can talk about it.

18          MR. HUBBARD:  You will receive something like this.

19   It's a piece of paper.  It's called verdict form and it has

20   questions and places for you to answer it.  And the first

21   section is under Title VII of the Civil Rights Act, that's the

22   federal claim, and the second section is the section under the

23   New York City Human Rights Law.  Many of the questions are the

24   same.  Some are not.  That causation question, that but for

25   versus motivating factor section is different.  But under each

1    one there's a question to you whether he engaged -- do you find

2    by a preponderance of the evidence -- remember that's the

3    burden we have, to prove preponderance of the evidence -- do

4    you find that he engaged in protected activity under the Title

5    VII or under the New York City Human Rights Law?

6            Well, we know he engaged in protected activity when he

7    filed his EEOC claim.  The judge will tell you that.  We know

8    he engaged in protected activity when he filed this case in the

9    summer of 2014 before he was fired in 2015.  That's two

10   examples right off the bat of protected activity.

11           As we go through, we've seen all these negative

12   reviews, we saw the fact that he was passed over, we saw all of

13   the other samples we say.  And so we know that preceding that

14   adverse -- those adverse actions that they followed.  We know

15   that this protected activity, including his internal

16   complaints, including his internal complaints began in the

17   spring of 2012 and as you saw continued through the termination

18   of his employment.

19           Did the defendant know that he was making these sexual

20   harassment complaints?  I did not hear this morning I did not

21   hear -- I could have missed it but I don't believe I heard

22   counsel say that HSBC was not aware of these claims.  I don't

23   think they did.  But I want to make sure that I remind you that

24   HSBC was aware of his sexual harassment complaints at the

25   highest level.

1          This is Ms. Bilbrey.  Were there a member of senior

2    management who you along with employment counsel reported to

3    about the investigations related to Mr. Picarella?  This is the

4    head of human resources.  She goes on.  She says:  His direct

5    supervisor at that time forward to the end of the period, Mike

6    Karam, and there was a more senior individual by the name of

7    Didier Descamps that we eventually had conversations with.  How

8    about Suzanne White?  She was a person.  She says, answer:

9    Suzy White, yes.  I go on and I say:  From time to time had she

10   had been a person who you would discuss his complaints with?

11   Answer:  Yes.  And Mr. Pizzimbono?  And Pablo Pizzimbono, yes.

12         There is no debate.  We say under this evidence that

13   the defendant -- and you'll see from the instruction that all

14   you have to find is that HSBC as an institution was aware that

15   he had engaged in this protected activity.

16         Has plaintiff proved by a preponderance of the

17   evidence that the defendant took an adverse employment action

18   against him?  Well, we've just talked about -- we've just

19   talked about him being passed over.  We've talked about the

20   negative review that he received that resulted in part in his

21   termination.  And, obviously, the termination of his employment

22   is an adverse employment action.

23         Under Title VII, the federal statute, the causation

24   question is whether or not -- if I can find it -- is whether or

25   not the defendant took the adverse employment action because of

1     his protected activity.  Cause and effect relationship.  You'll

2     be asked to make that determination.

3            Under the city statute, it's quite different under the

4     city statute.  Has the plaintiff proved by a preponderance of

5     the evidence that defendant's desire to retaliate against the

6     plaintiff for engaging in protected activity was a motivating

7     factor in the defendant's decision to take the adverse

8     employment action in violation of the New York City Human

9     Rights Law?  It does not need to be the sole reason.  It does

10    not have to be the sole reason.  It can be part.  There can be

11    other reasons that precipitate those decisions.

12           And then -- so that's a different test under the city

13    statute.  And then when you finish with that you will come to a

14    section in the verdict form that relates to damages.  And there

15    are different sections.  One is back pay.  Back pay is what

16    he's lost in terms of his earnings from the date he was fired

17    until the date of your verdict.  And that's about 21 months.

18    We'll talk about that in a minute.  Front pay is the, the Court

19    will give you the instruction, but it's what he could

20    reasonably have been expected to earn until you find from

21    today, from the date of your verdict, until you find that he's

22    likely to be re-employed in a comparable job.  That's going to

23    require you to look forward a little bit into the future.

24           You saw me give Mr. Picarella those notebooks that

25    were this thick.  That's not something he got at the supply

1  store downstairs and filled out.  There are documents that were

2  provided though this court in discovery in this case, asked for

3  by the defendant.  Send us every document you used to look for

4  a job.  They made fun of it.

5        Imagine getting notes.  Those notebooks are nothing

6  but pain.  There's a man at the kitchen table at home telling

7  his wife and family he's been terminated.

8        MR. JACKSON:  Objection.

9        THE COURT:  Sustained.  Move on.

10        MR. HUBBARD:  Those documents reflect the -- those

11  documents reflect the difficulty in this city of finding a job

12  when you've been terminated and you go and tell the people you

13  interview with, if they interview you, that you were fired.

14  You can't make fun of the fact that he's sitting there looking

15  for a job through all of this time as he told you he was.

16        Let's talk about how you go about awarding damages.

17  If you decide -- if you decide that the defendant has

18  retaliated against him and you answer these questions yes, you

19  will be asked if he has proven that he's entitled to back pay

20  and, if so, how much do you award.

21        How do you figure out back pay?  You can use one of

22  two things.  You could use 21 months of his annual compensation

23  while he was at HSBC which I think we know is about $280,000.

24  It was $225,000 in base salary and I think if I get it right

25  maybe $55,000 bonus.  I think the total of his compensation at

1    HSBC -- maybe it was more in the first year but the remaining

2    years was $280,000.  So if you take that 21 months you can

3    figure out what that lost pay without any increase, the same

4    rate, would be.  And it comes out to about $500,000 in back pay

5    if you decide to award back pay.

6              Front pay, in the front pay category again you have to

7    decide how long you think he is likely to be -- lose his

8    earning capacity and be unemployed as a result of this

9    termination.  You may decide it's two years.  You may look at

10   the difficulty he's had in finding a job.  You may decide it's

11   going to be three years.  You may decide it's one year.  You

12   may decide it's five years.  You may decide that he's been --

13   his career has been significantly damaged for the long-term.

14   What you would do there is you would then decide how many years

15   you think it's going to take until he can restore that earning

16   capacity and what amount of money you believe should be awarded

17   for each year in terms of his loss of earning capacity.  Is it

18   the two hundred thousand -- $280,000 that he was paid at HSBC

19   or is it the $400,000 that was being paid to the head of

20   business development, the job that he was hired to take.

21   You'll have to decide which number to apply.  If you decide to

22   award him front pay you'll have to decide what the loss of

23   earning capacity is.  And you have some options there to

24   discuss.

25              The next element is if you prove that he's entitled to

1    damages is whether or not he's entitled to damages for pain,

2    suffering, humiliation, mental anguish or reputational harm.  I

3    won't spend much time on this.  But when you get to this think

4    to yourself what harm has been done to his earning capacity in

5    future years because of what happened to him at HSBC based upon

6    conduct that was wrong, the retaliation that I've mentioned to

7    you.

8            The last question on this form is a question that asks

9    you to consider an award of punitive damages.  The Court will

10   instruct you on what punitive damages means.  Punitive damages

11   are exemplary damages.  They are damages designed to set an

12   example, so that deter future conduct, to deter future

13   instances in which someone would decide to retaliate against

14   someone because they have followed the law and they have

15   reported violations of the law to their employer.

16           The instruction will tell you that it must be

17   accompanied by ill will or spite.  And that will be up to you

18   to determine if you believe that the retaliation he suffered,

19   giving a false reason for firing him, these e-mails you see,

20   marginalize him, he's a problem, can we get -- can we put him

21   on the list.  Do those things reflect ill will and spite?  You

22   decide.

23           If you decide to award him punitive damages, there is

24   no magic number.  The instruction will lead you to the obvious

25   way to do it.  The law requires that punitive damages award

GCE9PIC5

 1   to -- punitive damages awards bear a reasonable relationship to

 2   the compensatory award you return; not some number picked out

 3   of the sky; not some number that bears no relationship to the

 4   harm, but a very reasonable relationship in a multiple of what

 5   the compensatory damages are.  You'll be able to figure out

 6   that from the -- may I just have a moment please, your Honor.

 7           Ladies and gentlemen, thank you for your attention and

 8   your patience and we look forward to your deliberations.  Thank

 9   you very much.

10           THE COURT:  Okay.  Let me just see counsel in the

11   robing room just for a moment with the court reporter.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

GCE9PIC5

1                    (In the robing room)

2              THE COURT:  Do counsel need to raise anything before

3    we send this jury to lunch?

4              MR. JACKSON:  There are a couple of issues, your

5    Honor, that we want to put on the record and at least one I

6    think I'm going to ask for some relief from.

7              The first one is Mr. Hubbard told the Court that he

8    was not going to raise any claim of recent fabrication that

9    related to the testimony about Mr. -- about the observations of

10   Mr. Picarella not being in these conference rooms, not being

11   where he was supposed to be.  And here he made what amounted to

12   a pure argument of recent fabrication saying it comes now

13   because we're in a courtroom, not a single report saying dark

14   conference rooms.  The Sametime exhibits that the Court

15   sustained Mr. Hubbard's objection for go directly to that

16   recent fabrication and I was very surprised that there would be

17   such a clear argument of recent fabrication in spite of what

18   was --

19             MR. HUBBARD:  May I address that?

20             THE COURT:  No.  Go ahead.

21             MR. JACKSON:  Second, your Honor.  There is -- we have

22   an objection to Mr. Hubbard's statement that the filing of --

23   filing the lawsuit is protected activity.

24             THE COURT:  I guess my first question is do you want

25   me to do anything -- are you asking me to do anything about

GCE9PIC5

1    this now or should I send the jury to lunch?  Are you asking me

2    to do something before the jury has lunch?

3            MR. JACKSON:  Your Honor, the only thing -- the only

4    thing that we would ask with regard to -- with any of our

5    objections, the only one is just the first one; that we could

6    do it after lunch, but we would ask to just display at least

7    one of those messages to show that this is not a recent

8    fabrication.

9            THE COURT:  But we can deal with that -- I can let

10   this jury go grab lunch real quick?

11           MR. JACKSON:  Absolutely, Judge.

12           THE COURT:  Let's do that.  Let's do that and then

13   we'll deal with the next one.  I plan on giving the jurors

14   about 35 minutes for lunch.  Is that enough time?  Forty

15   minutes?

16           MR. JACKSON:  That's fine.

17           MR. HUBBARD:  That's fine.

18           (Continued on next page)

19

20

21

22

23

24

25

GCE9PIC5

1          (In open court)

2          THE COURT:  So, Members of the Jury, we're going to

3     give you your lunch break now.  Don't discuss the case amongst

4     yourselves or with anyone else.  After lunch I will give you

5     the instructions on the law and then you can begin to

6     deliberate.  So I will give you a 40-minute lunch break.  In

7     the meantime don't discuss the case with anyone else or amongst

8     yourselves.  See you in 40 minutes.  Thank you.

9          (Jury excused)

10          (Continued on next page)

GCE9PIC5

1      (In open court)

2          THE COURT:  Defense counsel, you may continue.

3          MR. JACKSON:  Thank you, your Honor.  So I think we

4   made our objection regarding the recent fabrication.

5          We had an objection regarding the argument that filing

6   the lawsuit constituted a protected activity.  The Court has

7   clearly already defined what the protected activity is.  That

8   was the subject of our discussion at the charge conference and

9   subsequently.  So we think a curative instruction of some kind

10  is appropriate with regard to that.

11         There is also -- there was also an exhibit that was

12  displayed that I believe is not in evidence which is PX-302.

13  If I could be -- if we could confirm that.  We'd just like to

14  just have the Court -- I don't think that that's -- that's not

15  one of our major issues but we think it should be clarified to

16  the jury that PX-302 is not in evidence.

17         I believe that's all of our issues, your Honor.

18         I'm sorry, your Honor.  There's one other thing which

19  is the damages arguments that were made by plaintiff's counsel

20  were a violation of the stipulation that we discussed with the

21  court.  There were a number of arguments made that related --

22  that were just in violation.  I mean there was an argument

23  about he should be entitled to his bonus.  He should be

24  entitled to $400,000 which was a salary that he would have

25  gotten if he had gotten a particular raise.  That's flatly in

GCE9PIC5

 1    conflict with what we stipulated to.  And it's also not

 2    supported by the evidence, your Honor.  There is no evidence

 3    that that was a salary that Mr. Picarella was ever entitled to.

 4            THE COURT:  So what are you asking me to do, if

 5    anything?

 6            MR. JACKSON:  With regard to --

 7            MR. HUBBARD:  May I respond?

 8            THE COURT:  You probably shouldn't to this first one.

 9    Go ahead.

10            MR. JACKSON:  With regard to the recent fabrication

11    argument, as we said we'd ask the Court to admit one of the

12    documents just to respond to the recent fabrication.

13            With regard to the protected activity, just a curative

14    instruction just to clarify that, your Honor.

15            With regard to the damages issue, this one is a little

16    bit difficult because the Court has suggested -- has indicated

17    that it would use special interrogatories but I think it would

18    be appropriate to say that there is no evidence in the record

19    that is connected to any potential raise that Mr. Picarella

20    claims he is entitled to and that shouldn't be a part of their

21    considerations.

22            THE COURT:  As to that one that objection is

23    overruled.  Plaintiff's counsel's argument regarding the lack

24    of documentation I believe was confined to the lack of any

25    documentation from any manager of Mr. Picarella.  Those

GCE9PIC5

1   Sametime Chats are not Mr. Picarella's managers so that

2   objection is overruled.

3        The third one, again, I'm going to -- we'll wait and

4   see what the jury does and we'll deal with that if we need to.

5        As to the second one, it does seem that perhaps a

6   curative instruction is appropriate.  But let me hear

7   plaintiff's counsel on that, number two.

8        You certainly did indicate as you were going down the

9   verdict sheet that the filing of this lawsuit is a protected

10  activity and that's not in this case as a protected activity.

11       MR. HUBBARD:  Well, Mr. Bortnick reminds me that your

12  Honor's instruction only says that the EEOC charge was

13  protected activity.  But I believe the law is.

14       THE COURT:  And the reporting of the sexual harassment

15  of the female coworker.

16       MR. HUBBARD:  Yes.  Yes.  Yes.  But I guess my point

17  is, and I'm sorry if I misspoke, but I don't think I said that

18  your Honor is going to say that it's protected activity.  I

19  think I said that it was protected activity.  And I don't think

20  that's an incorrect statement of the law.  We can get the

21  transcript.  But I don't think that's an incorrect statement of

22  the law at all.

23       THE COURT:  It's not a question of whether or not

24  that's a correct statement of the law.  It's a question of

25  whether or not that's in this case.  It's not in this case.

1329

GCE9PIC5

1   You didn't put it in the amended complaint.  It's not one of

2   the allegations in this case.

3         It seems that a curative instruction is appropriate

4   since you made this statement that this constitutes protected

5   activity, the filing of this lawsuit.  Even though my

6   instructions to the jury will not mention that, it certainly

7   might be appropriate to at some point let the jury know that

8   that's not protected activity that's covered in this case.

9   That's not a statement that that can never be protected

10  activity, that's not the case, but that's certainly not in this

11  case.

12        Anything further from plaintiff on that?

13        MR. HUBBARD:  Your Honor, obviously I believed that

14  there was testimony in the case about the filing of the lawsuit

15  and when that took place.  If I'm wrong, I'm wrong.

16        THE COURT:  That's all fine.  I mean that has come

17  into this case.  What I'm saying is we talked about at length

18  yesterday is that that's not one of the claims in this case.

19  That wasn't contained in the second amended complaint and

20  that's not one of the claims here.  So the fact that that

21  evidence has come in I think it's misleading to then say to the

22  jury that that is protected activity in this case.

23        So it's not a question of whether or not the

24  evidence -- there's evidence about that.  The issue is that

25  this wasn't one of the claims in this case.  It could have been

GCE9PIC5

 1   but it wasn't.

 2            MR. HUBBARD:  Well I defer to your Honor.  I don't

 3   have the complaint in front of me.  I accept what your Honor

 4   says.

 5            THE COURT:  Well we did have a lengthy discussion

 6   about this yesterday.  Your objection to my jury instructions

 7   last night was to the fact that I did not include the filing of

 8   the EEOC charge.  It were those two protected activities.

 9   That's what we talked about yesterday.  And complaints about

10   the sexual harassment of a female coworker, and the filing of

11   the EEOC charge.

12            MR. HUBBARD:  I understand.

13            THE COURT:  Okay.

14            Does defense counsel have any suggested language for a

15   curative instruction?  What do you want me to say?

16            MR. JACKSON:  Just your Honor that you heard argument

17   related -- you heard argument that there was -- that the filing

18   of this lawsuit was protected activity.  The filing of this

19   lawsuit is not included in any of the protected activity that

20   you should consider in this case so you should disregard that.

21            THE COURT:  That seems a little vague.  That seems a

22   little too broad.

23            MR. HUBBARD:  I would be okay if your Honor said that

24   it was not a protected activity asserted by the plaintiff in

25   this case.  That would seem to be consistent with what your

1331

GCE9PIC5

1   Honor was saying.

2           MR. JACKSON:  I'm fine with "asserted by" your Honor.

3           THE COURT:  So the language that counsel agreed to is,

4   "The filing of this lawsuit is not a protected activity

5   asserted by the plaintiff in this case."

6           MR. HUBBARD:  Mr. Bortnick wants me to ask you to add

7   to that that the -- as you have in your instruction, that

8   the -- that the plaintiff does assert that the filing of the

9   EEOC charge was a protected activity but I know that that's

10  already --

11          THE COURT:  That's already in the instructions.

12          Is there anything else -- do we have the updated jury

13  instructions?

14          So counsel should have the last version of the jury

15  instructions and the verdict form.  I'll let counsel grab some

16  lunch if you want to and we'll come back at -- let's come back

17  at 2 o'clock just in case there's some other issues and then

18  when the jury gets back here at 2:15 I plan to give them the

19  instructions on the law and let them start deliberating.

20  Anything else from either side?

21          MR. JACKSON:  No.  Thank you, Judge.

22          MR. HUBBARD:  Thank you, your Honor.

23          (Luncheon recess)

24

25

GCETPIC6

```
                          AFTERNOON SESSION

                            (2:10 p.m.)

 1          THE COURT:  Counsel, one thing I noticed that I need
 2   to edit in the instructions -- are there any kind of
 3   typographical errors?
 4          What I noticed is on page 39 it says -- both counsel
 5   didn't agree, I should strike the sentence that says:  In aid
 6   of your recollection, all of the exhibits admitted into
 7   evidence will given be given to you at the start of your
 8   deliberations.  I will strike that sentence if that's not
 9   happening.
10          MR. BORTNICK:  Right, because your Honor said you
11   wouldn't do that.
12          THE COURT:  Is there anything else?
13          MR. JACKSON:  No, your Honor.
14          MR. BORTNICK:  Perhaps, your Honor -- it may be in
15   here somewhere -- if the jury wants to see any of the exhibits
16   that they should be told that of course they will be provided
17   to them during the deliberations.  I just don't want them to
18   think that they get only what's seen in the courtroom and then
19   relying on their notes.
20          Maybe it would be done right there.
21          THE COURT:  Maybe what I should do is add that next
22   sentence:  Additionally, if any of you wishes to have witness
23   testimony or exhibits provided, you may request that.
```

1  AFTERNOON SESSION
2  (2:10 p.m.)
3  THE COURT: Counsel, one thing I noticed that I need
4  to edit in the instructions -- are there any kind of
5  typographical errors?
6  What I noticed is on page 39 it says -- both counsel
7  didn't agree, I should strike the sentence that says:  In aid
8  of your recollection, all of the exhibits admitted into
9  evidence will given be given to you at the start of your
10 deliberations.  I will strike that sentence if that's not
11 happening.
12 MR. BORTNICK:  Right, because your Honor said you
13 wouldn't do that.
14 THE COURT:  Is there anything else?
15 MR. JACKSON:  No, your Honor.
16 MR. BORTNICK:  Perhaps, your Honor -- it may be in
17 here somewhere -- if the jury wants to see any of the exhibits
18 that they should be told that of course they will be provided
19 to them during the deliberations.  I just don't want them to
20 think that they get only what's seen in the courtroom and then
21 relying on their notes.
22 Maybe it would be done right there.
23 THE COURT:  Maybe what I should do is add that next
24 sentence:  Additionally, if any of you wishes to have witness
25 testimony or exhibits provided, you may request that.

GCETPIC6

1            MR. BORTNICK:  Thank you.

2            MR. JACKSON:  Your Honor, is it the Court's practice

3    to have the jury come back for readbacks or to send transcripts

4    back to the jury if they request?

5            THE COURT:  Depends on how long it is.  My preferred

6    practice is to send the transcript in so we don't have to tax

7    the court reporter's vocal cords.  But if it's quick, I will

8    defer to the parties.  But with the length of testimony in this

9    case, it's probably most efficient to send in the portion of

10   the transcript.

11           MR. JACKSON:  So we prepared redacted transcripts of

12   all of the witnesses that we redacted the colloquy and all

13   objections sustained, so if that occurs we'll --

14           THE COURT:  Obviously, counsel, what will happen is if

15   we get a note and jurors request anything, we'll share that

16   note with counsel and counsel can decide what they want to to.

17   Counsel can confer, should confer, and we'll take it up then.

18           MR. JACKSON:  Thank you, Judge.

19           THE COURT:  Anything else?  I will make those

20   additions, those changes on page 39.

21           There may be other things as we --

22           MR. BORTNICK:  39, your Honor?

23           THE COURT:  Yes, page 39.

24           It seems to me that also on page 39, first sentence of

25   the next paragraph, if any juror wishes to have testimony or

GCETPIC6

1    exhibits provided, we should add --

2              MR. BORTNICK:  Right.

3              THE COURT:  -- simply send me a written note through

4    your foreperson.

5              Any objection to that by either side?

6              MR. BORTNICK:  No.

7              MR. JACKSON:  No, your Honor.

8              THE COURT:  Both sides have seen the verdict form.  I

9    think everything there is clear.  If so, let's go ahead and

10   we'll hand -- after I instruct the jury, we will give

11   counsel -- Hold on a second.

12             (Pause)

13             THE COURT:  We will hand counsel this verdict form.

14   Let's have both counsel look at this and make sure this is the

15   proper version, then we will mark that as Court Exhibit 2 and

16   the instructions as Court Exhibit 1 and we'll hand it to

17   counsel.  It should be the same version as what you have.

18             MR. BORTNICK:  This appears to be in accord with what

19   your Honor gave us earlier.

20             THE COURT:  Share it with defense counsel.

21             When the jury comes out I will give the curative

22   instruction that we discussed and I will read the jury

23   instructions to the jury.  Afterwards I will meet with counsel

24   in the robing room briefly to make sure there were no mistakes

25   in my reading the jury instructions, and I will send the jury

1    in to start their deliberations.  Once we made any adjustments

2    to the typographical errors in the jury instruction we will

3    send a copy in to the jury, giving counsel obviously an

4    opportunity to review it before it goes to the jury.

5             Everyone good with that?

6             MR. HUBBARD:  Yes, your Honor.

7             MR. JACKSON:  Yes, your Honor.

8             THE COURT:  When the jury is ready, we'll get going.

9             MR. BORTNICK:  I notice on the verdict form, I think

10   we're short one signature line.  Don't we have nine jurors?

11   There are eight lines.

12            THE COURT:  Okay.

13            MR. BORTNICK:  Just noticed.

14            THE COURT:  All right.

15            MR. BORTNICK:  It's the kind of thing you never really

16   look at.

17            THE COURT:  You're correct, we need another signature

18   line.  We'll make that change and share it with counsel.

19            So counsel are aware, I will give the jury a written

20   copy of the instructions.  For efficiency's sake, I do not plan

21   on reading all of the captions or any of the captions in the

22   jury instructions until we get to the section regarding the

23   elements and the damages, because that helps things flow better

24   if I read the captions.  But other than that, I plan on

25   skipping the captions.

GCETPIC6                          Charge

```
 1              Does anyone have an objection to that?

 2              MR. HUBBARD:  No, your Honor.

 3              MR. JACKSON:  No, your Honor.

 4              THE COURT:  Okay.

 5              MR. BORTNICK:  Your Honor, I noticed something in the

 6    jury charge, page 30, the third element of Mr. Picarella's city

 7    law claims, second to last sentence of the first paragraph

 8    there, the fourth element.

 9              THE COURT:  Okay.

10              MR. BORTNICK:  Mr. Picarella contends that HSBC took

11    action against him because he protested sexual harassment.

12              THE COURT:  Hold on.  Okay, second to last.  Go ahead.

13              MR. BORTNICK:  Where it says Mr. Picarella contends

14    that HSBC took action against him because he protested sexual

15    harassment, and but we also had the issue of the EEOC charge

16    that is also part of this case.

17              THE COURT:  Okay.  It seems to me to make sense to

18    add -- what language do you suggest?

19              MR. BORTNICK:  Because of -- because either he

20    protested sexual harassment or filed an EEOC charge.

21              MR. HUBBARD:  Say including his EEOC charge.

22              THE COURT:  No, that's different.

23              MR. JACKSON:  I actually think including is more

24    appropriate.

25              THE COURT:  Okay.
```

1        MR. HUBBARD:  Including his EEOC charge.

2        THE COURT:  That's what you want?

3        MR. HUBBARD:  That's what I would do, but I defer.

4        MR. BORTNICK:  It's or, because they're separate.  We

5   talked about that earlier.  It's one or the other.

6        THE COURT:  Or is the more correct statement of the

7   claims in this case.

8        Anything else from defense counsel on that?

9        MR. BORTNICK:  No, I noticed that.

10        MR. JACKSON:  We defer to the Court, your Honor.

11        THE COURT:  Counsel, we have added another line.  Go

12   ahead and look at it and see if we're good.  This is the

13   verdict sheet.

14        Let's bring the jury in.

15        (Jury present)

16        THE COURT:  Welcome back.

17        I'm going to give you the instructions on the law, but

18   before I do that I need to give you another brief instruction,

19   that the filing of this lawsuit is not a protected activity

20   asserted by the plaintiff in this case.

21        I am now going to instruct you on the law.  It is

22   important that you listen to my instructions, but you do not

23   need to write them down because I am going to give you a

24   written copy of the instructions when you go to deliberate.

25        You have now heard all of the evidence in this case.

1    At this point, it is my duty to instruct you on the law that

2    will govern your deliberations.

3              As I told you at the start of this case, it is your

4    duty to accept my instructions of law and apply them to facts

5    as you determine them.  You must follow the law as I give it to

6    you, regardless of any opinion you may have about what the law

7    may be or ought to be.  If any attorney states a legal

8    principle different from any that I state to you in my

9    instructions, it is my instructions that you must follow.  You

10   should not single out any instruction, or any word or phrase in

11   an instruction, as alone stating the law, you should consider

12   the instructions as a whole.

13             As I have said, your role is to decide the fact issues

14   in this case.  You, the members of the jury, are the sole and

15   exclusive judges of the facts.  You determine the weight of the

16   evidence.  You appraise the credibility of the witnesses.  You

17   resolve such conflicts as there may be in the testimony.  You

18   draw whatever reasonable inferences you decide to draw from the

19   evidence or lack of evidence.

20             Let me also check in with the jury.  Testing one, two,

21   three.  Can everyone hear me?

22             I'll continue.

23             In determining facts, you should rely on your

24   recollection of the evidence.  What the lawyers have said the

25   evidence shows in their opening statements, objections or

1    questions, or may say in their closing arguments, is not

2    evidence.  Nor is anything I may have said during the trial or

3    may say during these instructions to be taken as evidence.  If

4    there is any difference or contradiction between what any

5    lawyer has said and what you decide the evidence has shown, or

6    between anything I may have said and what you decide the

7    evidence has shown, please be mindful that it is your view of

8    the evidence only that controls.

9         You are to perform your duty of finding the facts in

10   this case in an atmosphere of complete fairness and

11   impartiality without bias, prejudice, or sympathy toward any

12   party.  All parties stand as equals before the bar of justice.

13   You are to deliberate coolly and calmly, considering and

14   weighing the evidence without emotion or regard to the reaction

15   of the parties or the public may have to your verdict.

16        It is the duty of the attorney for each side of a case

17   to object when the other side offers testimony or other

18   evidence that the attorney believes is not properly admissible.

19   An attorney has the right and duty to ask the Court to make

20   rulings of law and to request conferences at the sidebar out of

21   the hearing the jury.  All such questions of law must be

22   decided by me.  You should not show any prejudice against any

23   attorney or party because an attorney objected to the

24   admissibility of evidence, asked for a conference out of the

25   hearing of the jury, or asked me for a ruling on the law.

1    Whether offered evidence is admissible is purely a

2    question of law and the province of the Court and outside the

3    province of the jury.  In admitting evidence to which the

4    objection has been made, the Court does not determine what

5    weight should be given to such evidence, nor does it pass on

6    the credibility of the evidence.  Of course, you will dismiss

7    from your mind completely any evidence which has been ruled out

8    of the case by the Court, and you will refrain from speculation

9    or conjecture or any guesswork about the nature or effect of

10   any colloquy between the Court and counsel held out of your

11   hearing or sight.

12   I also ask you to draw no inference from my rulings or

13   from the fact that, on occasion, I may have asked questions of

14   certain witnesses.  My rulings were no more than applications

15   of the law and my questions, if any, were only intended for

16   clarification or to expedite matters.

17   I have no opinion concerning the verdict you should

18   render in this case.

19   In this case, defendant HSBC is a corporation.  The

20   mere fact that one of the parties is a cooperation does not

21   mean that it is entitled to any lesser consideration by you.

22   All litigants are equal before the law, and corporations, big

23   or small, are entitled to the same fair consideration as you

24   would give any other individual party.

25   The evidence from when you are to decide the facts in

 1    this case consists only of:

 2            1.  The sworn testimony of witnesses on both and

 3    direct and cross-examination, regardless of who called the

 4    witness;

 5            2.  The exhibits that were received in evidence; and

 6            3.  Any facts to which all the lawyers have agreed or

 7    stipulated.

 8            Nothing else is evidence.  Not what the lawyers say,

 9    not what I say, and not anything that you may have heard

10    outside the courtroom.

11            There are two types of evidence which you may use in

12    reaching your verdict, direct evidence and circumstantial

13    evidence.

14            Direct evidence is when a witness testifies about

15    something that the witness knows by virtue of his own senses,

16    something the witness has seen, touched, heard or tasted.

17    Direct evidence may also be in the form of an exhibit admitted

18    into evidence where the fact to be proven is its present

19    existence or condition.

20            Circumstantial evidence is evidence which tends to

21    prove a disputed fact by proof of other facts.  For example,

22    assume that when you came into the courthouse this morning the

23    sun was shining.  Assume that the courtroom blinds were drawn

24    and you could not look outside.  As you were sitting here,

25    someone walked in with an umbrella which was dripping wet.

GCETPIC6                    Charge

1    Then a few minutes later another person entered with a wet

2    umbrella.  Now on these facts you cannot look outside of the

3    courtroom to see whether it is raining, so you have no direct

4    evidence of that fact.  But on the combination of facts that I

5    have asked you to assume, it would be reasonable and logical

6    for you to conclude that it has been raining.  That is all

7    there is to circumstantial evidence.  Using your reason,

8    experience and common sense, you infer, from established facts,

9    the existence or non-existence of some other fact.

10           The law makes no distinction between district and

11    circumstantial evidence.  Circumstantial evidence is of no less

12    value than direct evidence.  You can consider either or both

13    and give them as much or little weight as you deem warranted.

14           In their closing arguments the attorneys may ask you

15    to infer from one or more facts the existence of some other

16    fact.

17           An inference is not a suspicion or a guess.  It is a

18    logical conclusion that you, the jury, are permitted to draw --

19    but not required to draw -- from the facts that have been

20    established by either direct or circumstantial evidence using

21    your reason, experience and common sense.

22           There are times when different inferences may be drawn

23    from facts, whether proved by direct or circumstantial

24    evidence.  The plaintiffs may ask you to draw one set of

25    inferences, while the defendants may ask you to draw another.

GCETPIC6                        Charge

 1    It is for you, and you alone, to decide what inferences, if

 2    any, you will draw.

 3            A question put to a witness is not evidence.  Only a

 4    witness's answers are evidence.  However, you may not consider

 5    any answer that I directed you to disregard or struck from the

 6    record or to which I sustained an objection.

 7            At times a statement may have been incorporated into a

 8    question which assumed certain facts to be true, and a witness

 9    may have been asked if the statement was true.  If the witness

10    denied the truth of a statement, and if there is no evidence in

11    the record proving that assumed fact to be true, then you may

12    not consider it to be true simply because it was contained in

13    the question posed to the witness.

14            Similarly, if a hypothetical question was asked based

15    upon certain assumed facts, it is for you to determine, based

16    on the evidence in the case, whether those assumed facts are

17    true.  You may not consider them to be true simply because they

18    were contained in a question posed to a witness.

19            You have had the opportunity to observe or hear from

20    the witnesses.  It is now your job to decide how to believable

21    each witness was in his testimony.  You are the sole judges of

22    the credibility of each witness and the importance of each

23    witness's testimony.

24            How do you determine where the truth rests?  You

25    should use all the tests for truthfulness that you would use in

1    determining matters of importance to you in your everyday life.

2    You should consider any bias or hostility the witness may have

3    shown for or against any party, as well as any interest the

4    witness has in the outcome of the case.  It is your duty to

5    consider whether the witness has permitted any such bias or

6    hostility to color his testimony.

7           You should consider:  1, the opportunity the witness

8    had to see, hear and know the things about which he testified,

9    2, the accuracy of the witness's memory, 3, the witness's

10   candor or lack of candor, 4, the witness's intelligence, 5, the

11   reasonableness and probability of the witness's testimony, and

12   6, the consistency and corroboration of the witness's testimony

13   with other believable testimony.

14          You watched each witness testify.  Everything a

15   witness said or did on the witness stand counts in your

16   determination.  Often it is not what a witness says but how the

17   witness says it that counts.  How did witness impress you?  Did

18   the witness appear to be frank, forthright and candid, or

19   evasive and edgy, as if hiding something?  What was the

20   witness's demeanor?  What was the witness's behavior, bearing,

21   manner and appearance while testifying?  These are examples of

22   the kinds of common sense questions you should ask yourselves

23   in deciding whether a witness is truthful.

24          In other words, what you must try to do in deciding

25   credibility is to size a witness up in light of the witness's

demeanor, the explanations given, and all the other evidence in

the case.  Always remember that you should use your common

sense, your good judgment, and your own life experience in

determining witness credibility.

          In deciding whether to believe a witness, keep in mind

that people sometimes forget things.  You need to consider,

therefore, whether the witness's testimony reflects an innocent

lapse of memory or an intentional falsehood, and that may

depend on whether it has to do with an important fact or with

only a small detail.

          If you find that any witness has testified falsely as

to any material fact, that is, as to any important matter, the

law permits you to disregard completely the entire testimony of

that witness upon the principle that one who testifies falsely

about one material fact is likely to testify falsely about

everything.  You are not required, however, to consider such a

witness as totally unbelievable.  You may accept so much of his

testimony as you deem true and disregard what you feel is

false.  As the sole judges of the facts, you must decide which

witnesses you will believe, what portion of their testimony you

accept, and what weight you will give to it.

          In evaluating the credibility of a witness, you should

take into account any evidence that the witness may benefit in

some way from the outcome of the case.  Such interest in the

outcome creates a motive to testify falsely and may sway a

GCETPIC6                    Charge

witness to testify in a way that advances the witness's own

interest.  Therefore, if you find that any witness whose

testimony you are considering may have an interest in the

outcome of this trial, then you should bear that factor in mind

when evaluating the credibility of his testimony.

        Keep in mind, however, that it does not automatically

follow that testimony given by an interested witness is to be

disbelieved.  There are many people who, no matter their

interest in the outcome of a case, would not testify falsely.

It is for you to decide, based upon your own perceptions and

common sense, to what extent, if at all, a witness's interest

affected his or her testimony.

        In this case, as in any lawsuit, both the plaintiffs

and the defendants have an interest in the outcome of the case.

        The weight of the evidence presented by each side does

not necessarily depend on the number of witnesses testifying on

one side or the other.  You must consider all the evidence in

the case, and you may decide that the testimony of a smaller

number of witnesses on one side has a greater weight than that

of a larger number on the other.

        The testimony of a single witness which produces, in

your minds, belief in the likelihood of truth is sufficient for

the proof of any fact, and would justify a verdict in

accordance with such testimony, even though a number of

witnesses may have testified to the contrary, if, after

consideration of all the evidence in the case, you hold greater

belief in the accuracy and reliability of the one witness.

The test is not which side brings the greater number

of witnesses or presents the greater quantity of evidence, but

which witness and which evidence appeals to your minds as being

the most accurate and otherwise trustworthy.

Inconsistencies or discrepancies in the testimony of a

witness or between the testimony of different witnesses may or

may not cause you to discredit such testimony.  Two or more

persons witnessing an incident or a transaction may see or hear

it differently.  An innocent misrecollection, like failure of

recollection, is not an uncommon experience.  In weighing the

effect of a discrepancy, always consider whether it pertains to

a matter of importance or an unimportant detail, and whether

the discrepancy results from innocent error or intentional

falsehood.

To constitute evidence, exhibits must be received in

evidence.  Exhibits marked for identification but not admitted

are not evidence.  Materials brought forth only to refresh a

witness's recollection are also not evidence.

Members of the jury, now that I have given you general

instructions, I am going to instruct you on the law to be

applied to the specific issues in this case.  But first I am

going to explain the concept of burden of proof.  The burden of

proof in this case is by a preponderance of the evidence.

1      The party with the burden of proof on any given issue

2  has the burden of proving to you every disputed element of that

3  party's claim by a preponderance of evidence.  If you conclude

4  that the party bearing the burden of proof has failed to

5  establish that party's claim by a preponderance of the

6  evidence, you must decide against that party on the issue you

7  are considering.

8      What does preponderance of the evidence mean?  To

9  establish a fact by a preponderance of the evidence means to

10  prove that the fact is more likely true than not true.  A

11  preponderance of the evidence means the greater weight of the

12  evidence.  It refers to the quality and persuasiveness of the

13  evidence, not the number of witnesses or documents.  In

14  determining whether a claim has been proved by a preponderance

15  of the evidence you may consider the relevant testimony of all

16  witnesses, regardless of who may have called them, and all the

17  relevant exhibits received in evidence, regardless of who may

18  have produced them.

19      This concept, preponderance of the evidence, is often

20  illustrated with the idea of scales.  In considering whether

21  Mr. Picarella has met his burden of proof on his claims, you

22  put on one side all the credible evidence favoring

23  Mr. Picarella, and on the other side all the credible evidence

24  favoring HSBC.  If the scale tips towards Mr. Picarella because

25  his evidence is weightier, then you must find in his favor.  If

GCETPIC6                     Charge

1    the scale tips toward HSBC because its evidence is weighter,

2    then you must find in favor of HSBC.

3           If you find that the credible evidence on a given

4    issue is evenly divided between the parties, that is, equally

5    probable that one side is right as it is that the other side is

6    right, then you must decide that issue against the party having

7    this burden of proof.  That is because the party bearing this

8    burden of proof must prove more than a simple equality of the

9    evidence.  That party must prove the element at issue by a

10   preponderance of the evidence.  On the other hand, the party

11   with this burden of proof need prove no more than a

12   preponderance.  So long as you find that the scale tips,

13   however slightly, in favor of the party with this burden of

14   proof that what the party claims is more likely true than not

15   true, then that element will have been proved by a

16   preponderance of the evidence.

17          Proof beyond a reasonable doubt is the proper standard

18   for proof in a criminal trial.  That requirement does not apply

19   to a civil case such as this, and you should put it completely

20   out of your mind.

21          In this case the burden is on Mr. Picarella, the

22   plaintiff, to prove every essential element of his claims by a

23   preponderance of the evidence.  If the proof should fail to

24   establish any essential element of Mr. Picarella's claims by a

25   preponderance of the evidence in this case, you should find for

1    the defendant as to that claim.

2            Now let's talk about the specific claims in this case.

3    Mr. Picarella, the plaintiff in this case, has brought this

4    lawsuit under two types of law, a federal statute and a city

5    statute.  The federal statute is Title VII of the United States

6    Code.  The city statute is the New York City Human Rights Law.

7            In essence, these statutes prohibit employers from

8    retaliating against an employee who complains that his employer

9    is engaging in unlawful discrimination or who files a charge

10   with the Equal Employment Opportunity Commission.  Opposing

11   discrimination in employment is a protected activity, whether

12   the protest is justified or not.  Mr. Picarella alleges that

13   the defendant retaliated against him for reporting the sexual

14   harassment of a female co-worker by an HSBC executive and for

15   filing a charge with the EEOC.

16           I will now explain each of the statutes to you in

17   greater detail.

18           Plaintiff Picarella's Title VII claim.

19           Plaintiff Picarella first brings a claim under Title

20   VII against HSBC.  Title VII provides, in relevant part, that

21   it shall be an unlawful employment practice for an employer to

22   discrimination against any of its employees because he has

23   opposed any unlawful employment practice, or because he has

24   made a charge to the Equal Employment Opportunity Commission.

25   This prohibits an employer subject to this statute from

1   retaliating against an employee that complains that the

2   employer was engaged in an unlawful employment practice.

3            To establish his claims under Title VII, Mr. Picarella

4   must prove by a preponderance of the evidence:

5            First, that Mr. Picarella engaged in protected

6   activity, such as complaining of discrimination at HSBC,

7   specifically the sexual harassment of a female co-worker or

8   filing a charge with the EEOC;

9            Second, that HSBC was aware that Mr. Picarella was

10   engaging in such activity;

11            Third, that Mr. Picarella was subjected to a material

12   adverse action by HSBC at the time or after the protected

13   activity took place by materially changing the terms or

14   conditions of Mr. Picarella's employment; and

15            Fourth, that HSBC would not have taken the materially

16   adverse action in the absence of Mr. Picarella's protected

17   activity.

18            First element of plaintiff Picarella's Title VII

19   claim.

20            The first element of a retaliation claim under Title

21   VII is that the activity plaintiff engaged in that resulted in

22   retaliation was an activity protected by law.  An employee has

23   a right to report and protest workplace sexual harassment where

24   such harassment has actually occurred or where the employee

25   reasonably believes in good faith that sexual harassment

1   occurred.

2          To prove that he engaged in protected activity,

3   Mr. Picarella need not establish that he was correct in his

4   complaints or that there was indeed sexual harassment.  He need

5   only show that he had a good faith reasonable belief that the

6   challenged actions by HSBC violated Title VII.

7          It is for you to decide whether any of these actions

8   constitute protected activity as I have defined that term.  If

9   you find that these actions do constitute protected activity,

10  you must move on to the next element of Mr. Picarella's Title

11  VII claim.  If you find that these actions do not constitute

12  protected activity, you must find in favor of HSBC with regard

13  to Mr. Picarella's Title VII claim.

14         Second element of plaintiff's Picarella's Title VII

15  claim.

16         The second element of a retaliation claim under Title

17  VII is that HSBC must have been aware of the protected

18  activity.  General corporate knowledge that Mr. Picarella

19  engaged in a protected activity is sufficient to establish this

20  element of a retaliation claim under Title VII.

21         If you find that HSBC was aware that Mr. Picarella had

22  complained of the sexual harassment of a co-worker, then you

23  must move on to the third element of the Title VII claim.  If,

24  however, you find that HSBC was not aware that Mr. Picarella

25  had complained of the sexual harassment of his co-worker, then

GCETPIC6                         Charge

1    you must find in favor of HSBC with regard to Mr. Picarella's

2    Title VII claim.

3           Third element of plaintiff Picarella's Title VII

4    claim.

5           The third element of retaliation claim under Title VII

6    is that the plaintiff suffered a material adverse action.  An

7    adverse action is material if it would dissuade a reasonable

8    worker in Mr. Picarella's position from making or supporting a

9    complaint of sexual harassment.  Personality conflicts, petty

10   slights, snubbing, minor annoyances, simple lack of good

11   manners and other ordinary tribulations of the workplace are

12   not materially adverse employment actions.

13          If you find that HSBC took action against

14   Mr. Picarella that might have discouraged a reasonable worker

15   in Mr. Picarella's position from complaining about sexual

16   harassment then you must move on to the fourth and final

17   element of the Title 7 claim.

18          If, however, you find that HSBC's alleged action

19   against Mr. Picarella would not have discouraged a reasonable

20   worker in Mr. Picarella's position from complaining about

21   sexual harassment, then you must find in favor of HSBC with

22   regard to Mr. Picarella's Title VII claim.

23          Fourth element of plaintiff Picarella's Title VII

24   claim.

25          Finally, Title VII uses a but-for test for causation.

GCETPIC6                    Charge

1    This means that in order to find that Mr. Picarella established

2    a Title VII claim, you must find that Mr. Picarella proved that

3    a material adverse action was taken against him because of his

4    protected activity, as I have defined that term.  Mr. Picarella

5    must prove that retaliation was the but-for cause of the

6    materially adverse action, that is, the unlawful retaliation

7    would not have occurred in the absence of Mr. Picarella's

8    protected activity.

9          In considering whether Mr. Picarella has met his

10   burden, you must first decide whether HSBC was in fact

11   motivated by a desire to retaliate against Mr. Picarella

12   because of his complaints of sexual harassment.  If not, you

13   must find in favor of HSBC.

14         If you conclude that HSBC was motivated by a desire to

15   retaliate against Mr. Picarella for having engaged in a

16   protected activity, you must next consider whether HSBC also

17   had a non-retaliatory reason for the material adverse action.

18   If you decide that HSBC did not have a non-retaliatory motive

19   for the material adverse action, and that the material adverse

20   action was solely motivated by retaliatory animus, then you

21   must find in favor of Mr. Picarella with regard to his Title

22   VII claim.

23         If, however, HSBC had both retaliatory and

24   non-retaliatory motives for taking the material adverse action

25   against Mr. Picarella, then you must consider whether the

retaliatory motive was the but-for cause of the material

adverse action taken against Mr. Picarella.  In other words,

you must consider whether HSBC would have taken the material

adverse action against Mr. Picarella absent the retaliatory

motive.  This means that in order to find for Mr. Picarella

under Title VII, you must find that he has proven that he would

not have suffered any of the material adverse actions had he

not complained about the sexual harassment.

          If, on the other hand, you decide that HSBC would have

taken the material adverse action against Mr. Picarella

regardless of its retaliatory intent, or if you find that HSBC

had no retaliatory motive at all, then you must find for HSBC

on Mr. Picarella's Title VII claim.

          Circumstantial evidence of retaliatory motive.

          You can see from these instructions that it is very

important in this case to determine the reasons why certain

actions were taken and the intent that motivated those actions.

HSBC contends that there were legitimate reasons for the

alleged adverse actions taken against Mr. Picarella.

Mr. Picarella claims that HSBC's explanations are pretextual,

that is, they are unworthy of belief and were not the real

reason for the alleged adverse actions.

          How do juries go about deciding what was in someone's

mind?  Direct proof concerning state of mind is often not

available.  A person's state of mind can be inferred, however,

from that person's words, action and conduct.  A person's state

of mind can be established by surrounding facts and

circumstances at the time an action was taken and the

reasonable inferences to be drawn from those facts and

circumstances.  Circumstantial evidence of a retaliatory motive

might include proof that the protected activity was followed by

closely in time by the adverse action, or evidence that the

plaintiff was treated differently than fellow employees who

were similarly situated.

However, an employee who has engaged in protected

activity, such as complaining about sexual harassment or

retaliation, is not entitled to special treatment.  This means

that he should not be in a better position than other employees

solely because he made the complaint of sexual harassment or

retaliation.

Non-retaliatory reasons.

If Mr. Picarella proves each of the four elements of

his Title VII --

Let me see counsel in the robing room with the court

reporter.

(In robing room)

THE COURT:  I wanted to confirm this stays in, because

this is in the Title VII section.  I wanted to make sure there

was no objection to that.  I wanted to take this moment, if

anyone wants me to do anything about the other portions where

GCETPIC6                         Charge

1    we talked about the complaining about sexual harassment, I

2    didn't mention the filing of the EEOC complaint each of those

3    times, but it does seem --

4            MR. BORTNICK:  It seemed to be included because your

5    Honor did, on page 21, make that insertion.  So long as when

6    the jury gets the written copy the verbal correction you made

7    on page 21 is in there.

8            THE COURT:  Okay.  Anything else?

9            MR. JACKSON:  No.

10           THE COURT:  Very good.  I will continue.

11           (In open court)

12           THE COURT:  Non-retaliatory reasons.

13           If Mr. Picarella proves each of the four elements of

14   his Title VII claim, HSBC may demonstrate that it based its

15   employment action on legitimate, non-retaliatory reasons.

16           When you consider the question of retaliatory motive,

17   you are not to judge the wisdom of HSBC's action but are

18   instead to decide whether the non-retaliatory reasons advanced

19   by HSBC were the actual reasons for HSBC's actions.  An

20   employer or supervisor is entitled to make decisions for good

21   reasons, bad reasons, or for no reason at all, so long as the

22   decision is not motivated by unlawful retaliation.  The issue

23   in this case is not whether you would have taken any of the

24   alleged adverse actions against Mr. Picarella if you were in

25   charge.  Rather, you are to determine whether HSBC took the

alleged adverse actions against Mr. Picarella because of

non-retaliatory reasons or because of his protected activity.

        If you believe that the reasons offered by HSBC for

adverse actions taken against Mr. Picarella are false, you may,

but are not required to, infer that HSBC acted out of a desire

to retaliate against Mr. Picarella.  However, if you find that

the reasons given by HSBC for the alleged adverse actions are

false, that does not necessarily mean that the true motive was

the unlawful retaliatory motive argued by Mr. Picarella.

Mr. Picarella's personal, subjective belief that he was

retaliated against is not sufficient to meet his burden of

proof.  It is not enough for him to show his subjective belief,

feelings, suspicions, or speculation that the reasons stated by

HSBC for the alleged adverse actions are not genuine.

        In determining whether Mr. Picarella has carried his

burden of proving retaliatory intent, you will consider all the

facts and circumstances that your common sense and good

judgment tell you are relevant to deciding why someone acts as

they did.  The central question is whether HSBC took the

alleged adverse actions against Mr. Picarella because he

engaged in a protected activity, and the burden is on

Mr. Picarella to prove that.

        If you find that Mr. Picarella has proven all of the

elements of his retaliation claim, but that HSBC has proven by

a preponderance of the evidence that it would have taken the

GCETPIC6                          Charge

```
 1   same action against Mr. Picarella regardless of any protected

 2   activity and regardless of any retaliatory motive, then you

 3   must return a verdict in favor of HSBC on Mr. Picarella's Title

 4   VII claim.

 5              Liability for retaliation on a corporate employer

 6   under Title VII.

 7              Title VII imposes liability for retaliation on a

 8   corporate employer where the offending employee is an officer,

 9   manager, or other supervisory employee, and where that employee

10   was acting within the scope of his or her employment when he or

11   she unlawfully retaliated against the plaintiff.

12              In determining whether a managerial employee acted

13   within the scope of his or her employment, you must consider

14   the following factors:

15              First, whether the managerial employee's material

16   adverse action fell within the discretion and control of HSBC;

17              Second, whether the managerial employee acted under

18   the express or implied authority of HSBC;

19              Third, whether the managerial employee's material

20   adverse action was in furtherance of HSBC's interests;

21              Fourth, whether the managerial employee was

22   discharging his duty to HSBC by taking material adverse action

23   against Mr. Picarella;

24              Fifth, whether the material adverse action was part of

25   the work assigned by HSBC; and
```

GCETPIC6                         Charge

Sixth, whether the material adverse action was so closely connected with what the managerial employee was hired to do that it may be regarded as a method, even though an improper one, of carrying out the objectives of the employment.

By contrast, where a managerial employee engages in conduct for wholly personal reasons which are outside the scope of his employment, the employer is not responsible for that conduct.  However, even where a managerial employee engaged in conduct for a wrongful purpose or with partially personal motives, the employer is liable if the manager engaged in the conduct to further the interests of the employer or as part of the work assigned by the employer.

In assessing Mr. Picarella's claim against HSBC, you must consider whether a high level managerial employee of HSBC, acting within the scope of his or her employment with HSBC, unlawfully retaliated against Mr. Picarella.  If you find that a high level managerial employee of HSBC, while acting within the scope of his or her employment with HSBC, unlawfully retaliated against Mr. Picarella, you will find HSBC liable for retaliation under Title VII.

Plaintiff Picarella's city law claims.

Mr. Picarella also asserts a retaliation claim under the New York City Human Rights Law.  The elements of a retaliation claim under the city human rights law are similar to those under Title VII, but there are some important

GCETPIC6                    Charge

1   differences, which I will explain.

2           To prevail on his retaliation claim under the city

3   human rights law, Mr. Picarella must prove each of the

4   following four elements by a preponderance of the evidence:

5           First, that Mr. Picarella engaged in a protected

6   activity, such as complaining of discrimination at HSBC,

7   specifically, the sexual harassment of a female co-worker;

8           Second, that HSBC knew that Mr. Picarella was engaging

9   in such activity;

10          Third, that HSBC engaged in conduct that was

11  reasonably likely to deter a person from engaging in that

12  protected activity; and

13          Fourth, that HSBC's conduct was motivated, at least in

14  part, by Mr. Picarella's protected activity.

15          First element of Mr. Picarella's city law claims.

16          In deciding whether Mr. Picarella engaged in protected

17  activity under the city human rights law, the instructions

18  regarding protected activity set forth in connection with

19  Mr. Picarella's Title VII retaliation claim applies with equal

20  force.

21          Second element of Mr. Picarella's city law claims.

22          In deciding whether Mr. Picarella has proved that HSBC

23  knew that he had engaged in protected activity, the

24  instructions on this issue given in connection with

25  Mr. Picarella's Title VII retaliation claim applies with equal

GCETPIC6                              Charge

1    force.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  (Continuing) Third element of

2     Mr. Picarella's city law claims.

3          The third element of the retaliation claim under the

4     City Human Rights Law is that HSBC engaged in conduct that was

5     reasonably likely to deter a person from engaging in that

6     protected activity.  To find that this element has been proven,

7     you need not find that the alleged retaliation of which

8     Mr. Picarella complains resulted in an ultimate action with

9     respect to his employment, or even in a materially adverse

10     change in the terms and conditions of his employment.

11          In contrast to Title VII, to constitute retaliatory

12     conduct under the City Human Rights Law, HSBC's conduct need

13     not be materially adverse to Mr. Picarella.  Instead, you need

14     only find that the conduct at issue was reasonably likely to

15     deter a person from engaging in protected activity.

16          The fourth element of Mr. Picarella's city law claims.

17     The fourth element of retaliation under the City Human Rights

18     Law that Mr. Picarella must prove by a preponderance of the

19     evidence is that Mr. Picarella's protected activity was a

20     motivating factor in HSBC's decision to engage in conduct that

21     was reasonably likely to deter a person from engaging in

22     protected activity.  Mr. Picarella contends that HSBC took

23     action against him because either he protested sexual

24     harassment or he filed a charge with the EEOC.  HSBC claims

25     that the actions at issue were taken because of HSBC's

1    legitimate concerns about Mr. Picarella's job performance.

2          In order to carry his burden as to this element,

3    Mr. Picarella need not establish that his protected activity

4    was the sole or principal reason for any action that HSBC took

5    against him that constitutes conduct that would be reasonably

6    likely to deter a person from engaging in protected activity.

7    The City Human Rights Law is violated when retaliatory intent

8    is a motivating factor for HSBC's action, whether or not that

9    retaliatory motive was the sole basis for the action.  If

10   Mr. Picarella proves that there was a retaliatory motive for

11   any action HSBC took against him that would be reasonably

12   likely to deter a person from engaging in protected activity,

13   this element is satisfied.  Mr. Picarella may show either that

14   the individual who made the decision to take such action was

15   motivated in part by a desire to retaliate against him, or that

16   an individual who was substantially motivated by a retaliatory

17   intent played a meaningful role in the decision.

18         The instructions I gave you in connection with

19   Mr. Picarella's retaliation claim under Title VII regarding

20   circumstantial evidence of retaliatory motive applies with

21   equal force to Mr. Picarella's claim under the City Human

22   Rights Law.

23         Liability for retaliation on a corporate employer

24   under City Human Rights Law.

25         The City Human Rights Law imposes liability on an

1   employer where the offending employee exercised managerial or

2   supervisory responsibility, and where that employee was acting

3   within the scope of his or her employment when he or she

4   unlawfully retaliated against the plaintiff.

5          In determining whether any HSBC officer, manager, or

6   supervisor acted within the scope of employment under the City

7   Human Rights Law, you should use the same test that I explained

8   above in connection with Mr. Picarella's retaliation claim

9   under Title VII.

10          Damages.  Damages generally.

11          If you find that Mr. Picarella has proven any of his

12   retaliation claims by a preponderance of the evidence, you must

13   then determine the damages to which he is entitled.  Please

14   note that just because I am instructing you on how to award

15   damages does not mean that I have any opinion on whether the

16   defendant should be held liable.  That is for you to decide on

17   the evidence presented and the law I have given you.

18          You should not reach the issue of damages unless you

19   find that the plaintiff has established the liability of the

20   defendant.  If you decide that Mr. Picarella has not proven

21   that he is entitled to recover from HSBC, you need go no

22   further.  I am instructing you on damages only so that you will

23   have guidance should you decide that the plaintiff is entitled

24   to recover damages.

25          Nature of the plaintiff's damages claims.  In this

GCE9PIC7                    Charge

1  case, Mr. Picarella seeks to recover back pay, front pay,

2  compensatory damages, and punitive damages.  Mr. Picarella has

3  the burden of proving each of these damages by a preponderance

4  of the evidence.  I will now describe each of these elements of

5  damages to you.

6          Back pay damages.

7          If you determine that HSBC discriminated against

8  Mr. Picarella by failing to promote or terminating him, then

9  you must determine the amount of damages that HSBC have caused

10 Mr. Picarella.  You may award as actual damages an amount that

11 reasonably compensates Mr. Picarella for any lost wages and

12 benefits that Mr. Picarella would have received had he not been

13 discriminated against.  Should you determine that HSBC

14 illegally terminated Mr. Picarella's employment, you may

15 include in your back pay award all forms of compensation that

16 he would have earned.

17         You must reduce any award by the amount of any back

18 pay that you award Mr. Picarella to the extent that he did or

19 should -- that he did or should have mitigated his damages --

20 you must reduce any award by the amount of any back pay that

21 you award Mr. Picarella to the extent that he should have

22 mitigated his damages, as I will instruct you in a moment.

23         Front pay damages.

24         You must calculate separately, as future damages, a

25 monetary amount equal to the present value of the wages and

benefits Mr. Picarella would have earned had he not been

discriminated against or terminated for the period from the

date of your verdict until the date when Mr. Picarella would

have voluntarily resigned or obtained other employment.

You must also reduce any award to its present value by

considering the interest Mr. Picarella could earn on the amount

of the award if he had made a relatively risk-free investment.

The reason you must make this reduction is because an award of

an amount representing future loss of earnings is more valuable

to Mr. Picarella if he receives it today than if he received it

in the future, when he would otherwise have earned it.  It is

more valuable because he can earn interest on it for the period

of time between the date of the award and the date he would

have earned the money.  Thus, you should adjust the amount of

any award for future loss of earnings by the amount of interest

Mr. Picarella can earn on that amount in the future.

Finally, if you find that Mr. Picarella is entitled to

recovery of future earnings from HSBC, then you must reduce the

amount of any front pay that you award him to the extent that

he should have mitigated his damages, as I will instruct you in

a moment.

Compensatory damages.

If you return a verdict for Mr. Picarella, finding

that HSBC retaliated against Mr. Picarella, then you must

determine an amount that is fair compensation for

1   Mr. Picarella's damages.  You may award compensatory damages

2   only for injuries Mr. Picarella proves were caused by HSBC's

3   allegedly wrongful conduct.

4            The damages that you award must be fair

5   compensation -- no more and no less.  You may award damages for

6   any pain, suffering, humiliation, mental anguish or

7   reputational harm that Mr. Picarella experienced as a

8   consequence of HSBC's alleged retaliation.  The nature and

9   degree of pain, suffering, humiliation, mental anguish or

10  reputational harm may differ widely from person to person.

11  Consequently, the law does not try to fix, nor does the law

12  permit a precise formula by which pain, suffering, humiliation,

13  mental anguish, or reputational harm, as an element of

14  compensatory damages, may be measured and reduced to dollars

15  and cents.  Instead of providing a formula for measuring these

16  damages, the law leaves the determination of the amount of

17  damages to your common sense and good judgment, drawing

18  reasonable inferences from the facts in evidence.  Any award

19  you make should be fair in light of the evidence presented at

20  the trial.

21           You may not award damages based on sympathy,

22  speculation, or guesswork.  On the other hand, the law does not

23  require that Mr. Picarella prove the amount of his losses with

24  mathematical precision, but only with as much definiteness and

25  accuracy as circumstances permit.  Finally, evidence of

1    treatment for psychological harm is not required for an award

2    of compensatory damages.

3            Mitigation of damages.  Any person who claims damages

4    as a result of an alleged wrongful act on the part of another

5    has a duty under the law to mitigate those damages.  For

6    purposes of this case, the duty to mitigate damages requires

7    Mr. Picarella to be reasonably diligent in seeking

8    substantially equivalent employment to the position he had with

9    HSBC.  The burden is on HSBC to prove that Mr. Picarella did

10   not mitigate damages for loss of compensation.  To prove that

11   Mr. Picarella failed to mitigate damages, HSBC must prove by a

12   preponderance of the evidence that:

13           First, work comparable to the position Mr. Picarella

14   held with HSBC was available; and

15           Second, Mr. Picarella did not make reasonably diligent

16   efforts to obtain it.

17           Mr. Picarella must accept employment that is of a like

18   nature.  In determining whether employment is of a like nature,

19   you may consider:

20           One, the type of work; two, the hours worked; three,

21   the compensation; four, the job security; five, the working

22   conditions; and six, the other conditions of employment.

23           You must decide whether Mr. Picarella acted reasonably

24   in not seeking or accepting a particular job.  If you determine

25   that he did not make reasonable efforts to obtain another

GCE9PIC7                        Charge

1    similar job, you must decide whether any damages resulted from

2    plaintiff's failure to do so.

3              You must not compensate Mr. Picarella for any portion

4    of plaintiff's loss of compensation resulting from plaintiff's

5    failure to make reasonable efforts to reduce Mr. Picarella's

6    loss of compensation.

7              Mr. Picarella claims the acts of HSBC were done with

8    malice or reckless indifference to his protected right to be

9    free from retaliation so as to entitle him to an award of

10   punitive damages in addition to compensatory damages.  Just

11   because I am instructing you on how to award punitive damages

12   does not mean that I have any opinion on whether a defendant

13   should be held liable or that the defendants are entitled to

14   punitive damages.

15             In some cases punitive damages may be awarded for the

16   purposes of punishing a defendant for its wrongful conduct and

17   to deter others from engaging in similar wrongful conduct.

18   However, an employer may not be held liable for punitive

19   damages because of discriminatory acts on the part of its

20   managerial employees where those acts by such employees are

21   contrary to the employer's own good faith efforts to comply

22   with the law by implementing policies and programs designed to

23   prevent such unlawful discrimination in the workplace.

24             An award of punitive damages would be appropriate in

25   this case only if you find for Mr. Picarella and then further

 1    find from a preponderance of the evidence:  First, that an HSBC

 2    officer, manager, or supervisor personally acted with malice or

 3    reckless indifference to Mr. Picarella's right to be free from

 4    retaliation; and second, that HSBC itself had not acted in a

 5    good faith attempt to comply with the law by adopting policies

 6    and procedures designed to prohibit such discrimination in the

 7    workplace.

 8          If you find that punitive damages should be assessed

 9    against HSBC, you may consider the financial resources of HSBC

10    in fixing the amount of such damages.

11          Punitive damages must bear a reasonable relationship

12    to Mr. Picarella's actual injury.  However, there is no simple

13    way to link punitive to compensatory damages.  In determining a

14    reasonable relationship to the actual injury, you must consider

15    all relevant factors.  These include whether HSBC:  Engaged in

16    a pattern of discrimination toward Mr. Picarella; acted

17    spitefully or malevolently towards Mr. Picarella; showed a

18    blatant disregard for civil legal obligations; failed to

19    investigate reports of retaliation against Mr. Picarella; and

20    failed to take corrective action concerning discriminatory acts

21    or comments by its employees.

22          If you find by a preponderance of the evidence that

23    HSBC acted with malicious intent to violate Mr. Picarella's

24    rights or injured him unlawfully, or if you find that HSBC

25    acted with a callous or reckless disregard of Mr. Picarella's

1    rights, then you may decide that punitive damages are

2    appropriate.  Remember, however, that an award of punitive

3    damages is discretionary.  In fixing the amount of punitive

4    damages, you should consider the degree to which a certain sum

5    would punish or deter HSBC, or employers like HSBC, from

6    committing wrongful acts in the future.

7              Nominal damages.

8              If Mr. Picarella established the elements of his claim

9    but has not proven by a preponderance of the evidence any

10   injury or actual damages meriting compensatory damages, then

11   you may return an award of nominal damages not to exceed the

12   sum of one dollar.

13             As I said earlier, in determining the facts of this

14   case you must rely on your recollection of the evidence.

15   Additionally, if any of you wishes to have witness testimony or

16   exhibits provided, you may request that.  I am not suggesting

17   that you must or should do this.  I am simply saying that we

18   can make this available to you.

19             If any juror wishes to have testimony or exhibits

20   provided, simply send me a written note, through your

21   foreperson.  If you request testimony, please try to be as

22   specific as possible about which portions of the testimony you

23   would like read or provided.  If you are not specific, the

24   lawyers must agree on what portions of the testimony you are

25   requesting; and if they disagree, I must resolve that

GCE9PIC7                          Charge

1    disagreement.  In any event, it takes time for the court

2    reporter to find testimony in the record, so please be patient

3    if you send a note and there seems to be a delay in responding

4    to you.  If you want any further explanation of the law as I

5    have explained it to you, you may also request that.

6         Any notes that you send to me should be one signed by

7    your foreperson indicating the date and time of the note; two,

8    sealed in an envelope; and three, given to the marshal who will

9    be seated outside the jury room throughout your deliberations.

10   If you do send me any notes, please make sure that you do not

11   give any indication of your present state of thinking on any

12   disputed issue.  Particularly, you must not inform me of your

13   vote count on any issue.

14        Any notes you may have taken during the trial are

15   simply an aid to your memory.  Because the notes may be

16   inaccurate or incomplete, they may not be given any greater

17   weight or influence than the recollection of other jurors about

18   the facts or the conclusions to be drawn from the facts in

19   determining the outcome of the case.  Any difference between a

20   juror's recollection and a juror's notes should always be

21   settled by asking to have the court reporter's transcript on

22   that point provided to you.  You must base your determination

23   of the facts and ultimately your verdict on the court record

24   rather than on any juror's notes.

25        The juror who sits in the number one chair will be the

GCE9PIC7                    Charge

1    foreperson of the jury unless for any reason that person

2    prefers not to act in that capacity in which event your first

3    order of business will be to send me a note identifying the new

4    foreperson.

5           The foreperson presides over the deliberations and

6    speaks for the jury in open court.  Moreover, the foreperson

7    signs and sends all notes to me and notifies the marshal when

8    the jury has reached a verdict.

9           The foreperson has no greater voice or authority than

10   any other juror.

11          It is your duty as jurors to consult with one another

12   with a view to reaching a unanimous verdict.  Each of you must

13   decide the case for yourself, after consideration of the

14   evidence with your fellow jurors.  You should not hesitate to

15   change an opinion if the discussion persuades you that you

16   should.  However, you are not to give up a point of view that

17   you conscientiously believe -- however, you are not to give up

18   a point of view that you conscientiously believe in simply

19   because you are outnumbered or outweighed.  You should vote

20   with the others only if you are convinced on the evidence,

21   facts, and law that it is the correct way to decide the case.

22          I remind you that no juror should surrender his or her

23   conscientious beliefs about the effect or weight of the

24   evidence solely for the purpose of returning a unanimous

25   verdict.

1           In an effort to assist you, your verdict in this case

2     will be a verdict in the form of a series of questions to be

3     answered by you in the jury room after you have begun your

4     deliberations.

5           No inference is to be drawn from the way the questions

6     are worded about what the answer should be.  The questions are

7     not to be taken as any indication that I have any opinion about

8     how they should be answered.

9           Before the jury attempts to answer any question, you

10    should read all of the questions, and make sure that everyone

11    understands each question.  Before you answer the questions,

12    you should deliberate in the jury room and discuss the evidence

13    that relates to the questions you must answer.  When you have

14    thoroughly considered the questions and the evidence that

15    relates to those questions, record the answers to the questions

16    on the verdict form.  Remember, all answers must be unanimous.

17          After you have reached a verdict and your foreperson

18    has filled in the verdict form that has been given to you, each

19    of you should sign and date it.  The foreperson should then

20    send me a note indicating that you have reached a verdict.  Do

21    not specify what the verdict is in the note.  Instead, the

22    foreperson should retain the verdict sheet, and hand it to the

23    deputy clerk in open court when you are called in.

24          I remind you that your verdict must be unanimous.

25    Once your verdict is announced by your foreperson in open court

GCE9PIC7                          Charge

1    and officially recorded it cannot ordinarily be revoked.

2              I'll be right with you in a second.  I want to see

3    counsel in the robing room.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (In the robing room)

 2          THE COURT:  I made a few edits on the fly.  Most of

 3    them were sort of grammatical things.  I did edit the stuff

 4    regarding the mitigation of damages.  I didn't say "did"

 5    because it didn't seem that it flowed and it didn't seem

 6    exactly correct either.  But, I don't know.  Any objection to

 7    that?  I took the "did" out.  Sort of did mitigate damages and

 8    just said "should."

 9          MR. JACKSON:  No objection.

10          MR. BORTNICK:  That was fine.  I noticed that as well.

11    Then you did something on Exhibit No. 39 that we had talked

12    about that was correct, but -- I'm sorry.  39 we had talked

13    about previously.  But on page 40 I saw that you did make one

14    change.  It's minor but I just, for the sake --

15          THE COURT:  Yes.  I edited as well on 40 "to provide

16    to you" instead of saying "read to you" so we have the option

17    of giving them the written transcript.

18          MR. BORTNICK:  There was one other issue about the

19    foreperson.  We don't have a juror number one so I think maybe

20    it should be juror number two.

21          MR. HUBBARD:  She becomes juror number one.

22          THE COURT:  I think they can figure it out.  If you

23    want me to say something.  I don't want to keep drawing their

24    attention to the fact that we lost somebody.  Any objection to

25    my reading of the instructions?

GCE9PIC7                          Charge

1              MR. JACKSON:  No, your Honor.

2              THE COURT:  We'll make those edits that I made on the

3     fly in the written copy and we'll bring that in to the jury.

4     So I intend to send the jury into the jury room to deliberate.

5     Anything else I need to tell them right now?

6              MR. JACKSON:  No, your Honor.

7              THE COURT:  Then once -- we'll mark the verdict form

8     as a court exhibit, send that in to them, and then we'll make

9     these other edits and once they're done we'll send in the jury

10    instruction.

11             MR. JACKSON:  Thank you, Judge.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Now you may begin your deliberations soon.

3     When you go in to deliberate you may discuss the case amongst

4     yourselves.  You can only discuss the case amongst yourselves

5     when all of you are assembled in the jury room.  If someone

6     needs to step out and take a break you should cease your

7     deliberations until all of you are assembled in the jury room.

8     Hold on just a second.

9          THE DEPUTY CLERK:  Marshal, come forward, please.

10         (Marshal sworn)

11         THE COURT:  So again, Members of the Jury, you may

12    start your deliberations.  We will send the verdict form in to

13    you soon.  And, shortly, we will send you in a written copy of

14    the instructions.  There are some minor edits we have to make.

15    So once we've done that we'll send that in to you as well.

16         (At 3:24 p.m., the jury retired to deliberate)

17         THE COURT:  Okay.  Counsel may be seated.  Let me ask

18    counsel to look at this.  We have this marked as Court Exhibit

19    2.  One final look.  That's the verdict form.  Once you've done

20    that, we'll have that sent in to the jury.  Then I'll need

21    counsel to step back for a second.  I have a couple other

22    matters on.  I would normally let counsel leave.  It's 3:30.

23    Counsel may hang out here since we're not going to go past five

24    o'clock tonight.

25         MR. JACKSON:  That's excellent, your Honor.  I'm going

GCE9PIC

1    to -- could we be permitted, if we step into the hallway, or

2    anything like that?

3              THE COURT:  Yes.  That's fine.

4              MR. JACKSON:  I'm going to leave my -- I'm just

5    going -- just in case anything, I'm going to leave my cellphone

6    number.

7              THE COURT:  Leave you cellphone number with my deputy.

8              MR. BORTNICK:  I was, the same with mine, because I

9    did not, in the ten minutes or fifteen minutes, get a chance to

10   get anything to eat.

11             THE COURT:  Just check that verdict form first.

12             All good on the verdict form?

13             MS. LEVIN:  Yes.  May I approach?

14             THE COURT:  Thank you.  We'll provide that to the

15   jurors now.

16             Thank you very much.

17             MR. JACKSON:  Thank you, your Honor.

18             (Recess pending verdict)

19             THE COURT:  So first order of business is we have the

20   jury instructions that counsel have both reviewed and we're

21   ready to send that in to the jury.

22             Is that correct, counsel?

23             MR. HUBBARD:  Yes, your Honor.

24             MR. BORTNICK:  Yes.

25             MR. JACKSON:  Yes, your Honor.

GCE9PIC

```
 1              MR. BORTNICK:  The corrections that you read, you
 2      know, the verbal corrections you made were incorporated into
 3      Court Exhibit 1.
 4              THE COURT:  Correct.
 5              So we also have a note from the jury, Court Exhibit 3,
 6      which counsel have received a copy of.  I'll read it into the
 7      record.  Dated today, December 14, 2016, 4:25 p.m.
 8              Dear Judge Carter,
 9              We would like to receive the following documents.
10              Number one.  Juror instructions.
11              Number two.  HSBC whistleblower anti retaliation
12      policy.
13              Three.  All of Mike Picarella's mid year and full year
14      performance reviews.
15              Four.  All performance reviews for Carol Jenner.
16              Thank you.
17              Juror No. 1.
18              So, how do -- here's what I propose and then I'll hear
19      from counsel.  I will bring the jury out, read the note to
20      them, tell them we've received the note.
21              The jury instructions they have now.  In terms of the
22      HSBC whistleblower anti retaliation policy.  Are counsel in
23      agreement as to what that is, which document that is?
24              MR. HUBBARD:  It's Defendant's Exhibits 248.
25              MR. BORTNICK:  We've been conferring when we were
```

GCE9PIC

1    called in.

2         MR. JACKSON:  Yes, your Honor.

3         MR. BORTNICK:  Except for that last one we had

4    actually conferred on what all the other requests.

5         THE COURT:  So let's do this then.  Let's have counsel

6    confer.

7         MR. JACKSON:  Well, Judge not to -- I'm sorry.

8         THE COURT:  Go ahead.

9         MR. JACKSON:  We've conferred.  I think we're in

10   agreement on what needs to go back.

11        THE COURT:  Right.

12        MR. JACKSON:  So I don't think that the Court actually

13   needs to bring the jury out.  I think we can simply put on the

14   record what we think needs to go back and then we can just give

15   that to your deputy to send back, if there is no objection.

16        THE COURT:  We can do that, if both counsel agree to

17   that we can just send those documents in without bringing the

18   jury out.  It may be -- that's fine.  If both counsel want to

19   do that we'll just send those documents in if both counsel are

20   in agreement with what those are.

21        MR. HUBBARD:  For the plaintiff I think we are, your

22   Honor.

23        THE COURT:  And defendant.

24        MR. JACKSON:  Yes, your Honor.

25        THE COURT:  So we will just -- I think we probably

GCE9PIC

1    need to at least give them some sort of acknowledgment that

2    we've received the note and have it in the record of some sort

3    so we can either write something or I can just bring them out

4    here quickly and I can say to them we've received the note,

5    we're going to send it all in to them, and then send it all

6    back.  But we need to have something in the record just

7    indicating that --

8        MR. JACKSON:  Your Honor, our preference would be,

9    just because we find it to disturb the flow of juror

10   conversation to just bring them out whenever they send a note,

11   for this we would prefer if the Court would write a brief note

12   that says we've received your note.  Here are the things you've

13   requested.  Signed, Judge Carter.

14       THE COURT:  We can do that.  I will either counsel --

15   I guess I'll ask my staff to do that.  My penmanship isn't

16   great.  So I will have someone write a note that says the note

17   will say we have received your note and we are sending these

18   documents in.  Sound good to everyone?

19       MR. HUBBARD:  Yes, your Honor.

20       THE COURT:  We'll mark that as Court Exhibit 4, our

21   responsive note.

22       I'll be right back.

23       All right, counsel we have a note here.  We have our

24   note.

25       We have received your note and are sending the

GCE9PIC

1    requested documents in.

2         Look at it and stick a sticker on it as Court Exhibit

3    4.  We'll send it in.

4         MR. JACKSON:  Your Honor, it appears we have a slight

5    dispute.

6         THE COURT:  Okay.

7         MR. JACKSON:  I don't think it's very complicated.

8         The thing is there are some exhibits that are DXs and

9    PXs just because what happened is at the last minute plaintiffs

10   took a bunch of our exhibits and marked them as PXs so that

11   they could introduce them.  So there are some that are

12   duplicates.  Mr. Hubbard has informed me that he wants only PXs

13   to go back to the jury.  I think it would be fair and

14   appropriate to the extent that there's a duplicate for all of

15   these that we just sort of split it in half and do PXs and DXs.

16        MR. HUBBARD:  I don't believe any of these, your

17   Honor, were originally marked as Defendant's Exhibits.  I think

18   they were marked as Plaintiff's Exhibits.  And they were

19   introduced first.  It's no big deal.  But we introduced these

20   exhibits and it seems to me that it makes some sense to send

21   them in as PX.  It's not going to disturb the drink, so.

22        THE COURT:  Is there an issue -- are the DXs and the

23   PXs all in evidence?

24        MR. HUBBARD:  Yes.  I don't know if the DXs are.

25        MR. JACKSON:  They're all in evidence, your Honor.

GCE9PIC

1          THE COURT:  So then why don't we I guess just -- we'll

2     just -- why don't we just send in the PXs and the DXs.

3          MR. JACKSON:  That's great, Judge.

4          THE COURT:  Just send in the DX and the PX.

5          So here's the note we're sending that in.  Let me find

6     out from counsel.  It's about 4:54.  How do you want to

7     proceed?  We usually break at 5.  I know some of the jurors

8     have childcare issues and the like.  It doesn't seem from this

9     note that -- who knows what the jury is going to do but it

10    doesn't seem that the verdict is imminent but who knows what

11    they're going to do.  It seems like it may make sense to send

12    in this note and then soon bring the jury out and then tell

13    them we're going to dismiss them for the day and have them come

14    back at 9:30.

15         MR. JACKSON:  We could do that, your Honor.  I think

16    it might be prudent to send this stuff back.  And perhaps, if

17    the Court is inclined, send them a note to just ask them how

18    long they would like to deliberate today and if they'd like to

19    come back tomorrow.

20         MR. HUBBARD:  I don't think we should do that, Judge.

21         THE COURT:  I don't want to do that since we've been

22    on sort of a same schedule.  So I think -- my sense is if we

23    say to them we're going to dismiss you for the day and you'll

24    come back at 9:30, if they all start jumping up and down saying

25    no, no, no, no, then we'll deal with that.  But I would be

1    inclined to do that, although we have another note now, it

2    looks like.

3              My guess is this addresses counsel concern.  I'll just

4    read it in before we start making copies of it and the like.

5              So it says there are two jurors who will leave the

6    jury room for five to ten minutes to inform their families that

7    they are staying late.  Thank you, juror number one.  So that's

8    what the note says.

9              What do you want to do, counsel?

10             MR. JACKSON:  Your Honor, I think it seems like the

11   jury feels like they're making progress.  I think we should

12   send them a note saying you're free to continue deliberating.

13   We're sending you back these documents.  Please let us know

14   when you would like to -- how long you'd like to deliberate or

15   when you would like to end for today.

16             THE COURT:  Plaintiff's counsel, what's your take on

17   that?

18             MR. HUBBARD:  Your Honor, I think we should stick to

19   the same schedule we've had.  I don't know how long they expect

20   that they can deliberate so -- and they may make phonecalls by

21   the time we find out what happens with the phonecalls I have no

22   idea what they're going to say.  So I'm not sure we're making a

23   lot of progress by changing the schedule and having them make

24   these phonecalls and that kind of thing.  I think we should

25   abide by the schedule we had before, have them come back fresh

1    in the morning.

2             THE COURT:  Well if -- I guess I need to do some

3    inquiries and figure out how long -- I don't want to impose on

4    the court personnel and the court reporter and my staff.  I

5    want to kind of get a sense of how long folks can hang out

6    because I think we need to let the jury know -- if we're going

7    to let them stay past five o'clock, if we're going to do that,

8    it would be appropriate to let them know how long we'd be

9    available because we can't stay here until ten o'clock tonight

10   and I'm a little concerned about doing that.  But what are

11   counsel's thoughts on that?

12            MR. HUBBARD:  I'm very concerned about doing that,

13   Judge, because it appears to impose a time limit on their

14   deliberations that really shouldn't be imposed.  So I'm very

15   concerned about that.

16            MR. JACKSON:  No, your Honor.  I don't think that's

17   right.  I know that -- we've had multiple cases where courts

18   have allowed the jurors to continue deliberating for a little

19   bit longer.  I think what the Court is suggesting is entirely

20   inappropriate.

21            Just to tell the jurors:  It sounds like you would

22   like to stay a little bit longer.  We can only stay until X

23   time or please let us know how long you intend to stay and then

24   if they say a time that goes beyond what the time is then --

25   that works for the court, we can send a note back that says

GCE9PIC

 1    we're going to stop today at X time and that could be that.

 2    But it does seem that where they are making a special effort --

 3    at the point that deliberations begin, it's really the jury's

 4    deliberations and they are making a special effort to continue

 5    their deliberations right now.

 6         THE COURT:  Let me just find out some things real

 7    quick from the -- let me just -- let's just go off the record

 8    for a second.

 9         (Discussion off the record).

10         THE COURT:  Okay.  I think, again, I think the best

11    course of action is to let the jury know we appreciate their

12    efforts but the Court is not available later on today so we'll

13    ask them to come back tomorrow at 9:30.  So that's what we'll

14    do in terms of that request.  And in terms of the other

15    request, I can still send that note in to them now but it may

16    make sense at this point just to answer that when they come

17    out.  Counsel have any position on that?

18         MR. HUBBARD:  Yes, your Honor.  And then we can send

19    the exhibits in in the morning because it will take some time

20    to collect them.

21         MR. JACKSON:  I think we -- I think, your Honor,

22    frankly, we should send the exhibits in and at least respond to

23    their request before we -- and let them have the exhibits for

24    two minutes before we --

25         THE COURT:  Let's do that.  Let's send in the note,

GCE9PIC

1    send in the exhibits and then 45 seconds later we'll bring the

2    jury out and tell them that unfortunately we're not available

3    later on today and we'd ask them to come back at 9:30 in the

4    morning.

5          Has it gone in now?

6          THE DEPUTY CLERK:  Yes.  The note has gone in, Judge.

7          THE COURT:  Where is the most recent note?

8          MR. JACKSON:  Your Honor, we have our exhibits

9    together.  We're just waiting on the plaintiffs to pull their

10   exhibits.

11         THE COURT:  So, wait.  Have the exhibits not gone in

12   yet?

13         MR. JACKSON:  No.  We're waiting on plaintiffs to

14   assemble their exhibits.

15         MR. HUBBARD:  I've got to get my exhibit box.  It

16   takes a minute, please.

17         MR. JACKSON:  We've been sitting here for a while.

18         MR. HUBBARD:  I know counsel is in a hurry to get them

19   back but it takes a second to pull them.

20         THE COURT:  I want to get them out here now so they're

21   not running around trying to make these -- so they don't leave

22   and make these calls to stay late since we're not going to stay

23   late today.  It may make sense to just give them this answer to

24   the other one.  I guess we'll just answer the other one in

25   writing tomorrow if need be.

GCE9PIC

1      So let's bring the jury out and I will read this most

2  recent note and I will let them know that unfortunately we

3  cannot stay late today and we'll ask them to come back at 9:30.

4  And what's counsel's position regarding the earlier note?  I

5  guess we'll just send in our note response tomorrow morning.

6      MR. HUBBARD:  Yes.

7      THE COURT:  Okay.  So let's bring the jury out.

8      MR. JACKSON:  Judge, can I ask one thing?

9      THE COURT:  Yes.

10      MR. JACKSON:  Tomorrow at 9:30 the jurors can go

11  straight to deliberation.

12      THE COURT:  Absolutely.  They're not checking in here.

13  Tomorrow I will tell them to get here at 9:30.  They go

14  straight to the jury room.  I will again tell them they cannot

15  start deliberations until all the jurors are there.

16      MR. JACKSON:  Great.  Thank you very much, Judge.

17      (Jury present; time noted:  5:03 p.m.)

18      THE COURT:  Thank you.  Please be seated.

19      We received your most recent note.  Court Exhibit 5.

20  Dear Judge, there are two jurors who will leave the jury room

21  for five to ten minutes to inform their families that they are

22  staying late.  Thank you.  Signed Juror No. 1.

23      In response to your note, unfortunately, the Court is

24  not available to stay late today.  So we're going to ask that

25  you come back tomorrow at 9:30.  You do not need to come into

GCE9PIC

```
 1    the courtroom.  You report directly to the jury room.  And you
 2    may begin your deliberations only when all of you are together
 3    in the jury room.
 4              In the meantime do not discuss the case with anyone
 5    else.  Do not discuss the case even amongst yourselves unless
 6    all of you are together in the jury room.  Don't do any
 7    independent research related to any of the issues pertaining to
 8    this case or to any of the parties.
 9              Have a wonderful evening and, again, at 9:30 you don't
10    need to check in here, just go straight to the jury room.  And
11    when everyone is assembled your may resume your deliberations.
12    Have a pleasant evening.
13              (Jury not present)
14              THE COURT:  Please be seated.  Tomorrow we will send
15    in that note.  I would hope that between now and tomorrow
16    morning counsel have gotten the exhibits together so that we
17    can send those in to the jury first thing in the morning.
18              MR. HUBBARD:  Yes, sir.
19              THE COURT:  In terms of counsel tomorrow I suppose it
20    makes sense to have counsel get here at 9:30 just to check in
21    so that we can go ahead and get these exhibits in.  Other than
22    that counsel don't need to stay here in the courtroom.  Just
23    make sure my deputy still has your cellphone so that we can
24    contact you if we get anymore notes.  Anything else from
25    plaintiff today?
```

GCE9PIC

```
1         MR. HUBBARD:  Nothing from the plaintiff, your Honor.

2   Thank you.

3         THE COURT:  Anything else from the defendant today?

4         MR. JACKSON:  Just one thing, your Honor.  Our

5   technology order has run out and we would ask if the Court

6   could extend our technology order by a couple of days.

7         THE COURT:  Yes.  That's fine.

8         MR. JACKSON:  Thank you.  I'm just going to pass this

9   up.

10        MR. BORTNICK:  Obviously we would -- the same too.  We

11  have a computer as well.

12        THE COURT:  Same thing for you.  Hand it to us.  We'll

13  sign it.

14        MR. BORTNICK:  Do you need to get a copy?

15        THE COURT:  Yes.  We have it, I believe.  Anything

16  else from the parties today?

17        MR. JACKSON:  No.  Thank you very much.

18        THE COURT:  See you at 9:30 tomorrow.

19        Again, counsel I believe have seen this.  I've read

20  this note into the record.  You can look at it.  We'll give you

21  the copies of it tomorrow.

22        You've seen it.  We'll give you copies tomorrow.

23        (Adjourned to December 15, 2016 at 9:30 a.m.)

24

25
```